1  DAVID M. POITRAS – Bar No. 141309
   SUSAN K. SEFLIN - Bar No. 213865
2  JESSICA S. WELLINGTON - Bar No. 324477
   BG LAW LLP
3  21650 Oxnard Street, Suite 500
   Woodland Hills, CA 91367
4  Telephone:  (818) 827-9000
   Facsimile:  (818) 827-9099
5  Email:      dpoitras@bg.law
               sseflin@bg.law
6              jwellington@bg.law

7  Proposed Attorneys for Chapter 11 Debtors and
   Debtors in Possession

8
                    **UNITED STATES BANKRUPTCY COURT**
9
                    **CENTRAL DISTRICT OF CALIFORNIA**
10
                    **SAN FERNANDO VALLEY DIVISION**
11

| | |
|---|---|
| 12  In re | Case No. 1:24-bk-11323-VK |
| 13  Irwin Naturals *et al.*, | Chapter 11 |
| 14                    Debtors and Debtors in Possession. | Jointly Administered With: |
| 15 | Case No. 1:24-bk-11324-VK |
| 16 | Case No. 1:24-bk-11325-VK<br>Case No. 1:24-bk-11326-VK |
| 17  ☐  Affects Irwin Naturals | **DEBTORS' NOTICE OF EMERGENCY MOTION AND EMERGENCY MOTION FOR AUTHORITY TO: (A) USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING; (B) GRANT REPLACEMENT LIENS; AND (C) SET FINAL HEARING; MEMORANDUM OF POINTS AND AUTHORITIES [11 U.S.C. § 363 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001]** |
| 18  ☐  Affects Irwin Naturals Inc. | |
| 19  ☐  Affects 5310 Holdings, LLC | |
| 20  ☐  Affects DAI US HoldCo Inc. | |
| 21  ☒  Affects All Debtors | |
| 22 | |
| 23 | *Declaration of Klee Irwin Filed Concurrently Herewith* |
| 24 | **Hearing:** |
| 25 | Date:     August 16, 2024 |
| 26 | Time:     1:30 p.m.<br>Place:    Courtroom 301 |
| 27 |           21041 Burbank Blvd<br>           Woodland Hills, CA 91367 |
| 28 | |

# **TABLE OF CONTENTS**

Page

I.    FACTUAL BACKGROUND .......................................................................5

    A.    General Case Background........................................................5

    B.    Description of the Debtors' Business ........................................5

    C.    The Debtors' Ownership and Management Structure ................6

    D.    The Debtors' Prepetition Lenders ...........................................6

    E.    Circumstances Impacting the Debtor's Operations and Reason for the
Bankruptcy Filing ................................................................7

    F.    The Debtor's Other Indebtedness ...........................................8

II.    THE BUDGET.......................................................................................8

III.    ARGUMENT ........................................................................................10

    A.    The Debtors Should Be Authorized To Use Cash Collateral To Operate,
Maintain And Preserve Their Business.....................................11

    B.    The Secured Creditors Are Adequately Protected. ..................12

        1.    The Secured Creditors Are Adequately Protected By Equity Cushions....13

        2.    The Secured Creditors Are Adequately Protected By The Continued
Operations Of The Debtors' Business. ........................................13

        3.    The Secured Creditors Are Adequately Protected By Replacement
Liens Against The Debtors' Assets............................................14

IV.    CONCLUSION......................................................................................15

# TABLE OF AUTHORITIES

*Page*

## CASES

In re Delco Oil, Inc.,
    599 F.3d 1255 (11th Cir. 2010) ...................................................................11

In re Dynaco Corporation,
    162 B.R. 389 (Bankr. D.N.H. 1993) ...........................................................11

In re Ernst Home Center, Inc.,
    209 B.R. 955 (Bankr. W.D. Wash. 1997) ....................................................12

In re Las Vegas Monorail Co.,
    429 B.R. 317 (Bankr. D. Nev. 2010) ............................................................13

In re McCombs Properties VI, Ltd.,
    88 B.R. 261 (Bankr. C.D. Cal. l988) ......................................................12, 13

In re Mellor,
    734 F.2d 1396 (9th Cir. 1984) ...............................................................12, 13

In re Oak Glen R-Vee,
    8 B.R. 213 (Bankr. C.D. Cal. 1981) ............................................................11

In re O'Connor,
    808 F.2d 1393 (10th Cir. 1987) ...................................................................12

In re Prime, Inc.,
    15 B.R. 216 (Bankr. W.D. Mo. 1981) .........................................................11

In re Stein,
    19 B.R. 458 (Bankr. E.D. PA  1982) ......................................................11, 13

In re Sunnymead Shopping Center Co.,
    178 B.R. 809 (9th Cir. BAP 1995) ..........................................................11, 12

In re Triplett,
    87 B.R. 25 (Bankr. W.D. Tex. 1988) ...........................................................13

Matter of Pursuit Athletic Footwear, Inc.,
    193 B.R. 713 (Bankr. D. Del. 1996) ............................................................13

United Savings Association v. Timbers of Inwood Forest Associates,
    108 S. Ct. 626 (1988) ...................................................................................12

## STATUTES

11 U.S.C. § 1107(a) ...........................................................................................5, 10

11 U.S.C. § 1108 ....................................................................................................5

11 U.S.C. § 363 ....................................................................................................10

11 U.S.C. § 363(a) ................................................................................................11, 12

11 U.S.C. § 363(c)(l)........................................................................................10, 11, 12

11 U.S.C. § 363(c)(2) ..........................................................................................11, 12

11 U.S.C. § 363(c)(2)(A) .........................................................................................11

11 U.S.C. § 363(c)(2)(B) .........................................................................................11

11 U.S.C. § 363(e) ...................................................................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO THE HONORABLE VICTORIA S. KAUFMAN, UNITED STATES BANKRUPTCY JUDGE, SECURED LENDERS, CREDITORS HOLDING THE TWENTY LARGEST UNSECURED CLAIMS, AND THE OFFICE OF THE UNITED STATES TRUSTEE:**

**PLEASE TAKE NOTICE** that a hearing will be held on **Friday, August 16, 2024 at 1:30 p.m.** before the Honorable Victoria S. Kaufman, United States Bankruptcy Judge for the Central District of California, for the Court to consider the motion (the "Motion") filed by Irwin Naturals, a Nevada corporation ("Irwin Nevada"), and its related chapter 11 debtors (each a "Debtor" and collectively, the "Debtors"),[1] for entry of interim and final orders authorizing the Debtor to use cash collateral to pay the Debtors' ordinary and necessary expenses set forth on the budget (the "Budget") attached as **Exhibit 1** hereto and as **Exhibit 1**[2] to the Declaration of Klee Irwin, Irwin Nevada's Chief Executive Officer (the "Irwin Declaration"). The proposed order on the Motion is attached hereto as **Exhibit 2**.

The Debtors have two secured creditors that assert a lien upon the Debtors' "cash collateral" as that term is defined in 11 U.S.C. § 363(a). East West Bank ("EWB"), as agent for a syndicate, is owed approximately $19 million pursuant to a term loan and revolving line of credit and has a security interest in all of the Debtors' assets. CFG Bank ("CFG") is the Debtor's other secured creditor and is part of the aforementioned syndicate.

Pre-petition, EWB declared a default against the Debtors which caused EWB to cease advancing under the line of credit in the normal course of business (while EWB has continued to sweep Irwin Nevada's funds paid by customers). Furthermore, EWB attempted a hostile takeover of the Debtors by, among other things, placing an allegedly independent director on Irwin Nevada's

---

[1] Irwin Nevada is the operating entity through which the Debtors' business nutraceutical business is conducted. Irwin Naturals Inc., a Canadian company ("Irwin Canada"), is the "parent company" of the Debtors. Irwin Canada does not have any employees and only transacts limited business with its subsidiaries. DAI US HoldCo Inc. ("DAI") is a wholly owned subsidiary of Irwin Canada. DAI is solely a holding company that owns 100% of the Class A Voting Shares of Irwin Nevada amounting to 2% of equity if Irwin Nevada (with Klee Irwin owning the other 98% personally or through his family trust in the form of 100% of the Class B non-voting shares of Irwin Nevada). 5310 Holdings, LLC ("Holdings") is a wholly owned subsidiary of Irwin Nevada.

[2] For the Court's convenience, a copy of the Budget is also attached to the annexed Memorandum of Points and Authorities.

1

board of directors, installing various insolvency professionals to oversee the Debtors' businesses, and only advancing funds that EWB deemed necessary to the Debtors' business operations. Among other things, the Debtors were not authorized to use any revenue to pay for the Debtors' own insolvency professionals – which is the primary reason behind the Debtors filing their respective bankruptcy petitions without counsel. Immediately pre-petition, after EWB's "independent director" resigned without any prior notice to the Debtors, the Debtors determined that the only solution for them to continue operating was to commence these bankruptcy cases in time to fund their next payroll (which must be funded by no later than August 20, 2024).

EWB is secured by all of the Debtors' assets. Furthermore, the Debtors' founder Klee Irwin and his family trust pledged their shares in Irwin Nevada to EWB. As additional adequate protection of their interest in the cash collateral, EWB will be granted replacement liens upon all postpetition assets of the Debtors' estates (except any "Avoidance Actions" arising under sections 544, 545, 546, 547, 548, 549, 550 or any similar provisions of the Bankruptcy Code) to the same extent, validity and priority as its respective liens upon the Debtors' prepetition assets. While the Debtors are hopeful that EWB will consent to use of cash collateral, in the event that it does not consent, the Debtors believe that EWB's liens will be adequately protected by equity cushions, the replacement liens and the Debtors' continued business operations.

The Debtors' assets include, but are not limited to, accounts receivable, inventory, cash, deposits, furnishings, fixtures, intellectual property and equipment, with an estimated fair market value of at least $40 million. This leaves EWB with an equity cushion of at least 210%.

It is imperative that the Debtors obtain immediate Court authority to use cash collateral in order to avoid immediate and irreparable harm to the Debtors' business. Irwin Nevada <u>must</u> be able to fund its next payroll in order to avoid a mass exodus of its employees and the corresponding harm to the Debtors' business.[3] Moreover, the inability to use cash collateral to pay the Debtors' post-petition debts, as well as allowable pre-petition debts, threatens the ability of Debtors to operate their

---

[3] Irwin Nevada must fund its payroll by 3:00 p.m. Tuesday, August 20, 2024 for its employees to be paid by Friday, August 23, 2024.

supply chain.  Any delays in shipping and filling Debtors' obligations to its big box customers will cause irreparable harm.

**PLEASE TAKE FURTHER NOTICE** that if you wish to object to the relief sought by the Motion, you must appear at the hearing and file any responsive pleading in accordance with the deadline set forth in the accompanying Notice of Emergency Motions.  Your failure to timely object may be deemed by the Court to constitute consent to the relief requested herein.

**PLEASE TAKE FURTHER NOTICE** that the Motion is based on this Motion and attached Memorandum of Points and Authorities, the concurrently filed Irwin Declaration and evidence appended thereto, the arguments of counsel and other admissible evidence properly brought before the Court at or before the hearing on this Motion.

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order granting the Motion in its entirety and:

1.    Authorizing the Debtors to use cash collateral to pay all of the expenses set forth in the Budget;

2.    Granting EWB and CFG as adequate protection of their prepetition collateral and cash collateral, replacement liens upon all postpetition assets of the Debtors' estates (except any "Avoidance Actions" arising under sections 544, 545, 546, 547, 548, 549, 550 or any similar provisions of the Bankruptcy Code) to the same extent, validity and priority as their respective liens upon the Debtors' prepetition assets;

3.    Authorizing the Debtors to continue to make their monthly interest payment of approximately $155,000 to EWB as further adequate protection;

4.    Authorizing and directing the applicable banks and other financial institutions to receive, process, honor and pay all checks presented for payment and to honor all electronic payment request made by the Debtors relating to their August 23, 2024 payroll (and to any other post-petition transaction);

/ / /

/ / /

/ / /

5.      Scheduling a final hearing on this Motion; and

6.      Granting such other and further relief as the Court deems just and proper under the circumstances.

DATED:  August 15, 2024                    BG Law LLP


By: /s/ Susan K. Seflin
       Susan K. Seflin
Proposed Attorneys for Chapter 11 Debtors
and Debtors in Possession

4

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    FACTUAL BACKGROUND

### A.    General Case Background

1.    On August 9, 2024, the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their business and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or committee has been appointed in the Debtors' chapter 11 cases.

### B.    Description of the Debtor's Business

2.    Irwin Naturals ("Irwin Nevada") is a popular dietary supplement company that was founded in 1994, the same year that Congress first enacted legislation to define and regulate dietary supplements. Irwin Nevada formulates, markets, and distributes vitamins and supplements. In addition to its Irwin Naturals® supplement brand, Irwin Nevada also has two other supplement brands, Nature's Secret® and Applied Nutrition®. Irwin Nevada's product line currently includes over 130 formulas, which are distributed in more than 100,000 retail locations, including stores like Costco, Walmart, and CVS. The Debtors' 2023 gross sales were $91 million.

3.    Irwin Nevada has a number of subsidiaries and affiliates including related debtors Irwin Naturals, Inc., a British Columbia corporation ("Irwin Canada"), DAI US HoldCo, Inc., a Nevada corporation ("DAI"), and 5310 Holdings, LLC ("Holdings"), which serves as its intellectual property holding company. Irwin Nevada, Irwin Canada, DAI, and Holdings are collectively referred to herein as the "Debtors".

4.    For almost three decades, Irwin Nevada enjoyed financial stability and profitability from its long-trusted dietary supplement brands.[4] In or around 2020, Irwin Nevada sought to expand its footprint and saw two unique opportunities for growth.

5.    First, Irwin Nevada sought to go public. It began this process in August 2021 through a reverse-takeover transaction by Irwin Canada, which was an existing Canadian public company that formerly went by a different name. After being listed on the Canadian Securities Exchange

---

[4] On an adjusted EBITDA basis, when accounting for extraordinary expenses.

("CSE") through Irwin Canada, the ultimate goal was uplist to the Nasdaq Exchange and have an initial public offering in the United States (the "Uplisting"). The compliance costs ended up being unjustified relative to the little benefit brought to the Debtors by the initiative.

6.    Second, amid the mental health crisis exacerbated by the COVID-19 pandemic, Irwin Nevada embarked on a plan to become the world's first and largest household brand of psychedelic mental health clinics. To do so, it formed a new subsidiary: Irwin Naturals Emergence, Inc. ("Emergence"; together with the Debtors, the "Irwin Companies"). Emergence would act as the much-needed gateway between big pharmaceutical companies and the many patients in need of mental health care. This new business venture involved Emergence completing an M&A roll-up of existing psychedelic mental health clinics, with the intent of capitalizing on the long-established Irwin Naturals® brand and utilizing economies of scale to drive down clinic operating costs (the "Roll-Up").

### C.    The Debtor's Ownership and Management Structure

7.    Klee Irwin is the founder of the Debtors. While Irwin Canada is a public company, Mr. Irwin is in control of 99% of the voting rights. Irwin Canada owns 100% of DAI and Mr. Irwin is the CEO of DAI. Mr. Irwin, both individually and through his family trust, owns 98% of Irwin Nevada and DAI owns 2% of Irwin Nevada. Mr. Irwin is the CEO of Irwin Nevada, Mark Green is the CFO of Irwin Nevada, and Dan Wing is the COO of Irwin Nevada. Irwin Nevada owns 100% of Holdings and is the managing member of Holdings.

### D.    The Debtor's Prepetition Lenders

8.    In the fall of 2022, East West Bank ("EWB") and CFG Bank ("CFG") agreed to form a syndicate, wherein EWB would be the main lender in a new lending facility focused on providing cash for the roll-up that the Debtors and Emergence could use to fund acquisitions. At the beginning of 2023, the Irwin Companies secured a credit facility ("Credit Facility") from EWB, as agent for the syndicate, for up to $40.0 million in two equal parts: (1) up to a $20 million revolving line of credit that was meant to support Irwin Nevada's day-to-day operations (the "Line of Credit"), a version of which was already in place as of December 2021 between EWB and the Debtors and was to be replaced by this new Credit Facility; and (2) a $20 million delayed-draw term loan facility (the

"Term Loan") that was meant to support Emergence's clinic roll-up. The Credit Facility was and is governed by a credit agreement ("Credit Agreement").  As of the petition date, EWB asserts that it is owed approximately $19 million, which the Debtors dispute.

9.      Counsel for the Debtors has not yet been able to confirm that EWB perfected its security interests but has ordered UCC / lien searches on an urgent basis and hopes to have them prior to the hearing on the Motion.

**E.      Circumstances Impacting the Debtors' Operations and Reason for the Bankruptcy Filings**

10.      The Uplisting and the Roll-Up were bold and costly departures from Irwin Nevada's tried and true dietary supplement business model. Unfortunately, neither endeavor panned out as planned; both efforts caused the usually profitable business to suffer idiosyncratic financial constraints, losses, and debts. These endeavors, and efforts to salvage them, resulted in tens of millions of dollars of losses and/or liabilities. In addition, Irwin Nevada's typically strong sales numbers began to take a hit in or around March of 2023. The unexpected downturn was attributable to many factors outside of the Debtors' control, including extraordinarily high returns from retailers that were not on par with historical figures and projections, a downturn in the retail market generally, and the unexpectedly slow growth of digital sales. To add to the Debtors' financial burden, their once-trusted bank, EWB, exerted excessive and unreasonable control over their business affairs and imposed unconscionable constraints on the Debtors, turning their existing financial distress into a full-blown crisis, which the Debtors are not able to overcome without this Court's oversight.

11.      After having the Credit Facility for a little over a year, the Irwin Companies received three (3) notices of default from EWB for failure to meet certain *technical* covenants of the Credit Agreement. The notices were based on technical defaults, not defaults on the critical servicing of the debt; the Irwin Companies have never been late on any debt service payments to EWB. The Irwin Companies also were very transparent and cooperative with EWB, including communicating with EWB regularly regarding their current states of affairs, their day-to-day actions and expenditures, and their plans to turn their financial state around. Indeed, the Irwin Companies have already undertaken tremendous efforts to continue to support their operations and meet their obligations

despite their financial hardship. These efforts include renegotiating payment terms with customers and suppliers, exploring options to amend or refinance their debt, reducing operating costs and expenditures, conducting multiple rounds of personnel layoffs, terminating as many third-party contracts and services as possible, closing the debt-accruing Emergence clinics, and more.

12.    As the Irwin Companies attempted to pull themselves out of their financial difficulties, EWB engaged in numerous instances of misconduct. EWB's alleged misconduct includes, but is not limited to, exerting undue, unreasonable, and excessive control over the Irwin Companies' operations, finances, and decision-making.

13.    Having exhausted all other options and with no further hope of reconciliation, the Debtors sent EWB a letter memorializing the many instances of misconduct that EWB had committed, identifying the irreparable injuries EWB caused, and stated the Debtors' urgent need to declare bankruptcy. EWB claimed it would respond to the letter.

14.    Instead, EWB swiftly exercised its proxy rights, of which the validity is disputed by the Debtors, and voted in a new sole Director to Irwin Nevada's Board of Directors, removing Mr. Irwin.  This act prevented Irwin Nevada from declaring bankruptcy, and temporarily spared EWB from facing lender liability claims. Mr. Irwin repeatedly informed the new Director of EWB's misconduct and the ongoing risks to the company. Eventually, the new Director resigned for unspecified reasons.  That resignation, along with EWB's sweeping of the Debtors' bank accounts (which left the Debtors with no liquidity other than what EWB determined was necessary to pay), the Debtors decided that their only option was to attempt to reorganize under chapter 11 to save their thirty-year old business.

**F.    The Debtor's Other Indebtedness**

15.    Aside from the Debtors' obligations to EWB and CFG, the Debtors estimate they have an additional approximately $5 million in unsecured debt to approximately 100 entities.

**II.    THE BUDGET**

As set forth in the budget (the "Budget"), a true and correct copy of which is attached as **Exhibit 1** to the Irwin Declaration (and which is attached hereto as **Exhibit 1** for the Court's convenience), the Debtors estimate that their assets currently have a value of at least $40 million

(and likely considerably more).  The Debtors' cash, accounts receivable and inventory total $25,262,176.70, and the Debtors' other assets (including intellectual property, deposits, furnishings, fixtures and equipment) have a value of at least $20 million.  The Debtors believe that their business (inclusive of intellectual property and goodwill) has a value of at least $100 million; however, the Debtors have conservatively valued their assets for the purpose of this Motion.

As set forth above, the Debtors commenced these cases based on their inability to use their cash without EWB's strict oversight.  As illustrated by the Budget, the Debtors will be able to operate cash flow positive post-petition.  The Budget sets forth the minimum requirements of the Debtors to operate their business to accomplish a successful reorganization for all creditors.  The Budget does not contemplate any "extraordinary" or "luxury" expense.  The Budget therefore contains the Debtors' basic requirements for operations and is reasonable.

The Budget does provide for payment of a $100,000 post-petition retainer to the Debtors' proposed bankruptcy counsel BG Law LLP ("BG") and a $50,000 post-petition retainer to the Debtors' proposed special litigation counsel Greenberg Glusker ("GG").  BG will file an application to employ BG and requesting a total post-petition retainer of $250,000, which the Debtors submit is reasonable given the size of the Debtors' operations and the fact that EWB prevented it from paying and retaining insolvency counsel pre-petition. GG will file an application to employ GG and requesting a total post-petition retainer of $50,000, which the Debtors submit is reasonable given the size of the Debtors' operations and the need for special litigation counsel.

The Budget also provides for the Debtors to continue to make their post-petition interest payment to EWB.  The Budget provides for the Debtors to pay three critical vendors.  Two of them provide almost all warehousing and logistics services to the Debtors and are entitled to assert warehouseman and other liens against the Debtors' goods.  These vendors have ceased providing services to the Debtors, which services the Debtors rely upon, and without these services the Debtors will not be able to operate.  The third critical vendor is Robinson Pharma ("RP"), which is by far the Debtors' largest supplier.  RP manufacturers approximately 90% of the goods that Irwin Nevada sells, and similarly Irwin Nevada will go out of business without maintaining RP as a supplier.  The

Debtors have previously looked into alternate suppliers and there are no alternate suppliers that can manufacture the Debtors' products at the quality and amount the Debtors require.

The Budget includes a $14,325 payment to Fidelity, which consists of 401(k) withholdings from employees. This payment is typically paid by ACH withdrawal which did not go through on August 12, 2024.

The Debtors will not pay any insider salaries (which are highlighted on the Budget) until the time period has passed with respect to the Insider Comp Notices served in accordance with the local rules.

Although the Budget represents the Debtors' best estimate of the necessary expenses associated with the business, as the ebbs and flows of the Debtors' business are unpredictable, the needs of the business may fluctuate. Therefore, the Debtors request Court authority to deviate from the total expenses contained in the Budget by no more than 15%, on a cumulative basis, and to deviate by category (provided the Debtors do not pay any expenses outside of any approved categories) without the need for further Court order.

In order for the Debtors to operate their business in accordance with the Budget and to fund the upcoming August 23, 2024 payroll[5], the Debtors must be able to use the revenues that are paid to the Debtors' bank account and via credit cards.

## III.    ARGUMENT

The Debtors' use of property of the estate is governed by Section 363 of the Bankruptcy Code. Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section … 1108 … of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

---

[5] The Debtor must fund its payroll by 3:00 p.m. Tuesday, August 20, 2024 in order to ensure its employees are timely paid by Friday, August 23, 2024.

11 U.S.C. § 363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  *See* 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ." 11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

>    (A)    each entity that has an interest in such cash collateral consents; or

>    (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

*See* 11 U.S.C. § 363(c)(2)(A) and (B).

Further, upon the request of an entity that has an interest in property proposed to be used by the debtor, the Court shall prohibit or condition such use "as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

**A.    The Debtors Should Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve Their Business.**

It is well settled that it is appropriate for a chapter 11 debtor to use cash collateral for a reasonable period of time for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B)*; In re Sunnymead Shopping Center Co.*, 178 B.R. 809, 814 (9th Cir. BAP 1995) ("*Sunnymead*"); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981) .  In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459 (Bankr. E.D. PA  1982).  *See also, In re Delco Oil, Inc.,* 599 F.3d 1255, 1258 (11th Cir. 2010) ("a debtor reorganizing his business has a compelling need to use cash collateral in order to meet its daily operating expenses and rehabilitate its business"); *In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D.

Mo. 1981)("it is apparent that the Congress intended business under reorganization to proceed in as normal a fashion as possible").

The Debtors only commenced their bankruptcy cases because of EWB's actions including sweeping the Debtors' accounts and limiting what it would authorize the Debtors to pay.  The Debtors believe that it is in the overwhelming best interests of their estates, their business, Irwin Nevada's employees, their vendors and their creditors to continue to operate and maintain their business as a going concern.  The Court should authorize the Debtors to use cash collateral to continue to operate and maintain their business because the interests of the secured creditors are adequately protected.

**B.**      **The Secured Creditors Are Adequately Protected.**

To the extent that an entity has a valid security interest in the revenues generated by property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy Code.  Pursuant to Section 363(c)(2), the Court may authorize the debtor to use a secured creditor's cash collateral if the secured creditor is adequately protected.  *Sunnymead,* 178 B.R. at 814; *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984).  *See also In re O'Connor,* 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.,* 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("*McCombs*").

Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood Forest Associates,* 108 S. Ct. 626, 629 (1988) ("*Timbers*") and subsequent case law, the property interest that a debtor must adequately protect pursuant to Section 363(c)(1) and (2) of the Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S. Ct. at 630. *See also McCombs, Id.,* at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral."  *McCombs, Id.,* at 266.  *See also, IN re Ernst Home Center, Inc.*, 209 B.R. 955 (Bankr. W.D. Wash. 1997) (adequate protection is not meant to be a guarantee that a creditor will be paid in full … the court must determine whether the creditor's interests are protected as nearly as possible against the possible risks to that interest).

### 1. The Secured Creditors Are Adequately Protected By Equity Cushions.

As set forth above, EWB, as agent for the syndicate, is oversecured. The Debtors are indebted to EWB for approximately $19 million. The Debtors' assets are valued conservatively at $40 million, which makes EWB oversecured by approximately $21 million (or an equity cushion of approximately 210%). The Debtors' principal Klee Irwin has also pledged his equity in Irwin Nevada to EWB.

It is well established that the existence of an equity cushion alone can constitute adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Mellor*, 734 F.2d 1396 (9th Cir. 1984) (equity cushion is the classic form of protection for a secured debt justifying the restraint of lien enforcement by a bankruptcy court … "it has been held that the existence of an equity cushion, standing alone, can provide adequate protection"). In *Mellor*, the Ninth Circuit held that a 20% equity cushion constituted adequate protection as a matter of law. *In re Mellor*, 734 F.2d at 1404.

### 2. The Secured Creditors Are Adequately Protected By The Continued Operations Of The Debtor's Business.

In these cases, EWB and CFG are also adequately protected by replacement liens and by the continued operation of the Debtors' business. The preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Triplett*, 87 B.R. 25 (Bankr. W.D. Tex. 1988). *See also In re Las Vegas Monorail Co.*, 429 B.R. 317, 341 (Bankr. D. Nev. 2010) (recognizing that other courts "have found that a debtor's use of cash collateral to maintain properties from which rents are being generated is a sufficient form of adequate protection); *In re Stein,* 19 B.R. 458 (Bankr. E.D. Pa. 1982). In *Stein*, the Court found that, as a general rule, a debtor may use cash collateral where such use would enhance or preserve the value of the collateral, and allowed the debtor therein to use cash collateral even though the secured party had no equity cushion for protection. The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also In re McCombs, supra*, where the court determined that the debtor's use of cash

collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

The Debtors believe that with their continued business operations, there will not be a diminution in the value of its business. In the case of *Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713, 716 (Bankr. D. Del. 1996), the Court, accepting the debtor's argument that no additional adequate protection payments need be made, held as follows:

> if there is no actual diminution in the value of [the] collateral through the date of the hearing, and [Debtor] can operate profitably post-petition, [creditor] is adequately protected for the use of its cash collateral. 11 U.S.C. Section 361; *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

The only way for the Debtors to maximize their going concern value and prevent diminution in the value of their business is for the Debtors to continue to operate their business seamlessly.

**3.    The Secured Creditors Are Adequately Protected By Replacement Liens Against The Debtors' Assets and by Monthly Interest Payments.**

Finally, and in order to provide EWB and CFG with further adequate protection for the Debtors' use of cash collateral, the Debtors propose to provide EWB and CFG with replacement liens against the Debtors' post-petition assets with the same validity, priority, and scope as each respective creditor had with its lien(s) against the Debtors' prepetition assets. The Debtors also propose to continue to pay monthly interest payments to EWB, which the Debtors estimate to be $155,000 for the next interest payment due on September 1, 2024.

**IV.    CONCLUSION**

**WHEREFORE**, the Debtors respectfully request that this Court enter an order granting the Motion in its entirety and:

1.    Authorizing the Debtors to use cash collateral to pay all of the expenses set forth in the Budget;

2.    Granting EWB and CFG as adequate protection of their prepetition collateral and cash collateral, replacement liens upon all postpetition assets of the Debtors' estates (except any

"Avoidance Actions" arising under sections 544, 545, 546, 547, 548, 549, 550 or any similar provisions of the Bankruptcy Code) to the same extent, validity and priority as their respective liens upon the Debtors' prepetition assets;

      3.    Authorizing the Debtors to continue to make their monthly interest payment of approximately $155,000 to EWB as further adequate protection;

      4.    Authorizing and directing the applicable banks and other financial institutions to receive, process, honor and pay all checks presented for payment and to honor all electronic payment request made by the Debtors relating to their August 23, 2024 payroll (and to any other post-petition transaction);

      5.    Scheduling a final hearing on this Motion; and

      6.    Granting such other and further relief as the Court deems just and proper under the circumstances.

DATED:  August 15, 2024              BG Law LLP


                              By: _/s/ Susan K. Seflin_____
                                  Susan K. Seflin
                              Proposed Attorneys for Debtors
                              and Debtors in Possession

| | 2024<br>1<br>08/12/24 | 2024<br>2<br>08/19/24 | 2024<br>3<br>08/26/24 | 2024<br>4<br>09/02/24 |
|---|---|---|---|---|
| *Week Starting* | | | | |
| **Cash Balance, Beginning** | $1,862,379.25 | $573,940.53 | $402,880.00 | $808,861.97 |
| | | | | |
| **Cash Inflows** | 468,187.35 | 869,424.82 | 1,877,611.61 | 1,224,837.83 |
| | | | | |
| **COGS Expenses:** | | | | |
| COGS - Robinson Pharma* | $1,459,948 | $563,333 | $727,294 | $614,764 |
| COGS - Others | $86,913 | $10,937 | $112,647 | $20,000 |
| Distribution - Coast* | $50,519 | $19,269 | $19,269 | $19,269 |
| Distribution - TLS* | $6,000 | $6,000 | $6,000 | $6,000 |
| Other Distribution Expenses | $16,000 | $10,250 | $10,000 | $6,250 |
| Freight - Coast* | $5,310 | $12,057 | $81,265 | $22,164 |
| Freight - TLS* | $45,000 | $45,000 | $45,000 | $45,000 |
| Other Freight | $18,735 | $20,000 | $49,000 | $53,500 |
| **Salaries / Guaranteed Payment (biweekly)** | | | | |
| Payroll Regular | $0 | $217,494 | $0 | $217,494 |
| Payroll-Insider | $0 | $0 | $0 | $52,577 |
| EE Commission | $0 | $45,000 | $0 | $0 |
| Auto Allowance | $0 | $1,500 | $0 | $0 |
| Payroll Taxes | $0 | $20,196 | $0 | $20,660 |
| Payroll Fees | $0 | $3,500 | $0 | $3,500 |
| Health Insurance Withholding | $0 | ($20,036) | $0 | ($20,036) |
| 401k Withholding | $0 | ($17,675) | $0 | ($13,869) |
| 401k Withholding paid to Fidelity | $0 | $17,675 | $0 | $13,869 |
| 401k Withholding that  bounced to Fidelity 8/12/24 | $14,325 | $0 | $0 | $0 |
| **Freelance / Contract Labor** | | | | |
| Consulting | $11,035 | $27,160 | $24,285 | $11,035 |
| Consulting-Insider | $0 | $0 | $0 | $22,352 |
| Onboarding Services | $0 | $0 | $0 | $0 |
| Temporary Labor | $3,089 | $2,326 | $13,833 | $1,320 |
| **Insurance** | | | | |
| Worker's Comp (Alaska) | $0 | $0 | $10,000 | $0 |
| Auto | $0 | $0 | $0 | $6,131 |
| General Liability | $31,561 | $0 | $0 | $0 |
| EPLC | $0 | $0 | $0 | $0 |
| Anthem | $0 | $0 | $59,791 | $0 |
| Unum | $0 | $0 | $5,500 | $0 |
| Colonial | $0 | $0 | $6,000 | $0 |
| EDIS | $1,500 | $1,500 | $1,500 | $1,500 |
| **Sales/Use Tax/GST/B&O** | | | | |
| CA CDFTA | $5,000 | $0 | $0 | $0 |
| Canada Revenue Agency | $0 | $0 | $25,000 | $0 |
| State of Washington | $149 | $0 | $0 | $0 |
| CA FTB | $0 | $0 | $0 | $0 |
| US Treasury | $0 | $0 | $0 | $0 |
| **Rent** | | | | |
| Rent | $0 | $0 | $48,500 | $0 |
| Parking | $0 | $0 | $4,700 | $0 |
| Utilities (Excess Utilities) | $0 | $0 | $0 | $0 |
| **Bank Fees** | | | | |
| Merchant Fees | $0 | $0 | $30,000 | $0 |
| Bank Fees - EastWest | $0 | $0 | $5,000 | $0 |
| **Equipment Contracts** | | | | |
| Peac Solutions - Marlin Leasing Corporation | $0 | $0 | $702 | $0 |
| Promac Image Systems | $0 | $0 | $150 | $0 |
| MRC Smart Technology Solutions | $0 | $0 | $1,114 | $0 |
| **Telephone/Internet/Cloud** | | | | |
| Airespring | $0 | $0 | $0 | $1,919 |

| | Week Starting | 2024 1 08/12/24 | 2024 2 08/19/24 | 2024 3 08/26/24 | 2024 4 09/02/24 |
|---|---|---|---|---|---|
| Charter Communication | | $0 | $0 | $0 | $0 |
| Data Storage Group Inc | | $0 | $0 | $0 | $1,875 |
| Phone/Efax | | $500 | $0 | $122 | $0 |
| **Courier/ Delivery/Postage** | | | | | |
| Courier Service | | $100 | $0 | $100 | $100 |
| Postage Meter | | $0 | $0 | $0 | $0 |
| Others | | $0 | $0 | $0 | $0 |
| **Information Technology** | | | | | |
| Concur Technologies Inc. | | $471 | $0 | $0 | $0 |
| Core BTS, Inc | | $0 | $0 | $0 | $1,550 |
| SPS Commerce Inc. | | $0 | $0 | $0 | $7,739 |
| Vision33 | | $471 | $0 | $0 | $7,710 |
| SAP Consultant | | $0 | $0 | $500 | $1,000 |
| **Marketing Expenses** | | | | | |
| Trade Shows | | $0 | $0 | $0 | $0 |
| Brokers' Commission | | $0 | $0 | $0 | $125,000 |
| CO-OP Advertising | | $0 | $0 | $0 | $0 |
| POS Data | | $0 | $0 | $0 | $6,669 |
| Coupons | | $0 | $0 | $0 | $0 |
| E-Comm | | $0 | $0 | $16,188 | $3,000 |
| Sales & Marketing Expenses | | $0 | $0 | $0 | $0 |
| **Other Operating Expenses:** | | | | | |
| Accountants/Auditors (Emp App to Be Filed) | | $0 | $0 | $0 | $28,650 |
| BG Law LLP- Retainer (Subject to Approval of Emp App) | | $0 | $0 | $100,000 | $0 |
| Greenberg Glusker- Retainer (Subject to Emp App) | | $0 | $0 | $50,000 | $0 |
| Information Technology | | $0 | $0 | $0 | $0 |
| Travel & Trade Shows | | $0 | $0 | $0 | $0 |
| Lab Testing - Tech Affairs | | $0 | $55,000 | $11,000 | $5,000 |
| Website Fees | | $0 | $0 | $0 | $0 |
| General & Administrative Expenses | | $0 | $0 | $7,171 | $4,338 |
| EWB Interest / Adequate Protection Payment | | $0 | $0 | $0 | $155,000 |
| **Total Disbursement** | | $1,756,626 | $1,040,485 | $1,471,630 | $1,453,029 |
| **Cash Balance, ending** | | $573,940.53 | $402,880.00 | $808,861.97 | $580,670.38 |

*Debtors have filed a critical vendor motion for these obligations.

| | |
|---|---|
| AR - 8/14/2024 | $11,837,586.97 |
| Inventory - 8/14/2024 | $11,562,210.48 |

DAVID M. POITRAS – Bar No. 141309
SUSAN K. SEFLIN - Bar No. 213865
JESSICA S. WELLINGTON - Bar No. 324477
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone: (818) 827-9000
Facsimile:  (818) 827-9099
Email:    dpoitras@bg.law
          sseflin@bg.law
          jwellington@bg.law

Proposed Attorneys for Chapter 11 Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re | Case No. 1:24-bk-11323-VK |
| Irwin Naturals *et al.*, | Chapter 11 |
|         Debtors and Debtors in Possession. | Jointly Administered With: |
| | Case No. 1:24-bk-11324-VK<br>Case No. 1:24-bk-11325-VK<br>Case No. 1:24-bk-11326-VK |

☐  Affects Irwin Naturals

☐  Affects Irwin Naturals Inc.

☐  Affects 5310 Holdings, LLC

☐  Affects DAI US HoldCo Inc.

☒  Affects All Debtors

**[PROPOSED] INTERIM ORDER AUTHORING DEBTORS TO USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING, GRANTING REPLACEMENT LIENS AND SETTING A FINAL HEARING**

**Hearing:**
Date:     August 16, 2024
Time:     1:30 p.m.
Place:    Courtroom 301
          21041 Burbank Blvd
          Woodland Hills, CA 91367

1

**Exhibit 2_001**

On August 16, 2024 at 1:30 p.m., an interim hearing (the "Interim Hearing") was held before the Honorable Victoria S. Kaufman, United States Bankruptcy Judge for the Central District of California, for the Court to consider the *Emergency Motion For Authority to: (A) Use Cash Collateral on an Interim Basis Pending a Final Hearing; (B) Grant Replacement Liens; and (C) Set Final Hearing* [Doc. #---] (the "Motion") filed by Irwin Naturals, a Nevada corporation ("Irwin Nevada"), and its related debtor entities (collectively, the "Debtors"). Appearances were made as noted on the record.

By the Motion, the Debtors sought the following: (1) authorization to use cash collateral on an interim basis, (2) the granting to East West Bank ("EWB") and CFG Bank ("CFG"), as adequate protection of their prepetition collateral and cash collateral, replacement liens upon all postpetition assets of the Debtors' estates  (except any "Avoidance Actions" arising under sections 544, 545, 546, 547, 548, 549, 550 or any similar provisions of the Bankruptcy Code) to the same extent, validity and priority as their respective liens upon the Debtors' prepetition assets, and (3) the setting of a final hearing on the relief requested in the Motion.

The Court, having read and considered the Motion; the Court having heard and considered the arguments of counsel; the Court finding that notice and service of the Motion was proper and good cause appearing therefor,

**IT IS HEREBY ORDERED AS FOLLOWS:**

1.    The Motion is granted on an interim basis to the extent set forth in this Order.

2.    <u>Cash Collateral:</u>  The Debtors are authorized to use cash collateral on an interim basis through _____, 2024 to pay all of the expenses set forth in the Budget attached as **Exhibit 1** to the Motion. To the extent the Budget contains line items for insider compensation, such payments will not be paid until the Notices of Insider Compensation have been served and no objections have been filed.  To the extent the Budget contains professional fees and/or pre-petition claims, such payments will not be made unless and until the Debtors' obtain the appropriate Court orders authorizing such payments.

3.    The Debtors are authorized to deviate from the total expenses contained in the projections by no more than 15% on a cumulative basis and to deviate by categories, provided the Debtors do not pay any expenses outside of any approved categories.

3000838

**Exhibit 2_002**

4.      EWB and CFG are hereby granted replacement liens upon all postpetition assets of the Debtor's estate (except any "Avoidance Actions" arising under sections 544, 545, 546, 547, 548, 549, 550 or any similar provisions of the Bankruptcy Code) to the same extent, validity and priority as their respective liens upon the Debtors' prepetition assets, as adequate protection of their prepetition collateral and cash collateral.

5.      As additional adequate protection, the Debtors shall pay EWB its monthly interest payment of $155,000 on September 1, 2024.

6.      All applicable banks and other financial institutions are authorized and directed to receive, process, honor and pay all checks presented for payment and to honor all electronic payment request made by the Debtors relating to its August 23, 2024 payroll (and to any other post-petition transaction).

7.      A continued hearing on the Motion will be held on _____ at ___ in Courtroom 301 of the above entitled Court and, in connection with such further interim hearing, the Debtors shall file and serve any new or additional briefs and supporting declarations no later than _____, 2024.  Any response to the Debtors' additional briefs and/or supporting declarations shall be filed no later than _____.

8.      The Debtors shall provide notice of the continued hearing on the Motion upon the top thirty (30) general unsecured creditors, all secured creditors, the Office of the United States Trustee and those parties who have requested special notice.

IT IS SO ORDERED.

# # #

**Exhibit 2_003**

3000838