1  DAVID M. POITRAS – Bar No. 141309
   SUSAN K. SEFLIN - Bar No. 213865
2  JESSICA S. WELLINGTON - Bar No. 324477
   BG LAW LLP
3  21650 Oxnard Street, Suite 500
   Woodland Hills, CA 91367
4  Telephone:  (818) 827-9000
   Facsimile:  (818) 827-9099
5  Email:      dpoitras@bg.law
               sseflin@bg.law
6              jwellington@bg.law

7  Proposed Attorneys for Chapter 11 Debtors and
   Debtors in Possession

8
                 UNITED STATES BANKRUPTCY COURT

9                CENTRAL DISTRICT OF CALIFORNIA

10               SAN FERNANDO VALLEY DIVISION

11 | In re                          | Case No. 1:24-bk-11323-VK |

12 | Irwin Naturals *et al.*,       | Chapter 11 |

13 |           Debtors and Debtors  | Jointly Administered With: |
   |              in Possession.    |

14 |                                | Case No. 1:24-bk-11324-VK |
                                      Case No. 1:24-bk-11325-VK
15 | ☐  Affects Irwin Naturals      | Case No. 1:24-bk-11326-VK |

16 | ☐  Affects Irwin Naturals Inc. | **DECLARATION OF KLEE IRWIN IN** |
                                      **SUPPORT OF THE DEBTORS' FIRST**
17 | ☐  Affects 5310 Holdings, LLC  | **DAY EMERGENCY MOTIONS** |

18 | ☐  Affects DAI US HoldCo Inc.  | **Hearing:** |
                                      Date:     August 16, 2024
19 | ☒  Affects All Debtors         | Time:     1:30 p.m. |
                                      Place:    Courtroom 301
20                                              United States Bankruptcy Court
                                                21041 Burbank Blvd
21                                              Woodland Hills, CA 91367

22

23 I, Klee Irwin, declare:

24         1.      I am the founder and Chief Executive Officer of Irwin Naturals Inc., a British

25 Columbia corporation ("Irwin Canada"), and founder and principal of Irwin Naturals, a Nevada

26 corporation ("Irwin Nevada"), DAI US HoldCo Inc. ("DAI"), and 5310 Holding, LLC ("Holdings,"

27 and collectively with Irwin Nevada, Irwin Canada, and DAI, the "Debtors").  I know each of the

28

1

following facts to be true of my own personal knowledge, except as otherwise stated, and if called as a witness, I could and would competently testify with respect thereto.

2.    I make this declaration in support of the Debtors' emergency first-day motions as follows:

a.    Emergency Motion for Order (1) Authorizing, But Not Requiring, the Debtor to Pay Prepetition (A) Wages, Salaries, and Other Compensation, (B) Employee Medical, Workers' Compensation and Similar Benefits, and (C) Reimbursable Employee Expenses; (2) Authorizing and Directing Applicable Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Presented for Payment and to Honor Fund Transfer Requests; and (3) Related Relief (the "Wage Motion");

b.    Emergency Motion for Authority to (A) Use Cash Collateral on an Interim Basis Pending a Final Hearing; (B) Grant Replacement Liens; and (C) Set Final Hearing (the "Cash Collateral Motion");

c.    Emergency Motion for Order (I) Authorizing the Continued Use of the Debtor's Cash Management System, (II) Authorizing the Maintenance of the Debtor's Pre-Petition Bank Accounts, and (III) Requiring Banks to Release Administrative Holds and/or Freezes on the Debtor's Pre-Petition Bank Accounts (the "Cash Management Motion"); and

d.    Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief (the "Critical Vendor Motion" and collectively with the Wage Motion, the Cash Collateral Motion, and Cash Management Motion, the "Emergency First Day Motions").

3.    All initial capitalized terms used but not defined herein have the same meanings ascribed to them in the Emergency First Day Motions.

4.    Irwin Nevada is a popular dietary supplement company that was founded in 1994, the same year that Congress first enacted legislation to define and regulate dietary supplements. Irwin Nevada formulates, markets, and distributes vitamins and supplements. In addition to its Irwin Naturals® supplement brand, Irwin Nevada also has two other supplement brands, Nature's Secret®

3000840

and Applied Nutrition®.  Irwin Nevada's product line currently includes over 130 formulas, which are distributed in more than 100,000 retail locations, including stores like Costco, Walmart, and CVS.  The Debtors' 2023 gross sales were $91 million.

5.    Irwin Nevada has a number of subsidiaries and affiliates including related debtors Irwin Naturals, Inc., a British Columbia corporation ("Irwin Canada"), DAI US HoldCo, Inc., a Nevada corporation ("DAI"), and 5310 Holdings, LLC ("Holdings"), which serves as its intellectual property holding company.  Irwin Nevada, Irwin Canada, DAI, and Holdings are collectively referred to herein as the "Debtors".

6.    I am the founder of the Debtors.  While Irwin Canada is a public company, I am in control of 99% of the voting rights.  Irwin Canada owns 100% of DAI and I am the CEO of DAI.  I, both individually and through my family trust, own 98% of Irwin Nevada and DAI owns 2% of Irwin Nevada.  I am the CEO of Irwin Nevada, Mark Green is the CFO of Irwin Nevada, and Dan Wing is the COO of Irwin Nevada.  Irwin Nevada owns 100% of Holdings and is the managing member of Holdings.

7.    Irwin Nevada is the operating entity through with the Debtors' nutraceutical business is conducted.  Irwin Canada is the "parent company" of the Debtors. Irwin Canada does not have any employees and only transacts limited business with its subsidiaries. DAI is a wholly owned subsidiary of Irwin Canada.  DAI is solely a holding company.

8.    For almost three decades, Irwin Nevada enjoyed financial stability and profitability from its long-trusted dietary supplement brands.[1]  In or around 2020, Irwin Nevada sought to expand its footprint and saw two unique opportunities for growth.

9.    First, Irwin Nevada sought to go public.  It began this process in August 2021 through a reverse-takeover transaction by Irwin Canada, which was an existing Canadian public company that formerly went by a different name.  After being listed on the Canadian Securities Exchange ("CSE") through Irwin Canada, the ultimate goal was uplist to the Nasdaq Exchange and have an

---

[1] On an adjusted EBITDA basis, when accounting for extraordinary expenses.

initial public offering in the United States (the "Uplisting"). The compliance costs ended up being unjustified relative to the little benefit brought to the Debtors by the initiative.

10.    Second, amid the mental health crisis exacerbated by the COVID-19 pandemic, Irwin Nevada embarked on a plan to become the world's first and largest household brand of psychedelic mental health clinics. To do so, it formed a new subsidiary: Irwin Naturals Emergence, Inc. ("Emergence"; together with the Debtors, the "Irwin Companies"). Emergence would act as the much-needed gateway between big pharmaceutical companies and the many patients in need of mental health care. This new business venture involved Emergence completing an M&A roll-up of existing psychedelic mental health clinics, with the intent of capitalizing on the long-established Irwin Naturals® brand and utilizing economies of scale to drive down clinic operating costs (the "Roll-Up").

11.    In the fall of 2022, East West Bank ("EWB") and CFG Bank ("CFG") agreed to form a syndicate, wherein EWB would be the main lender in a new lending facility focused on providing cash for the roll-up that the Debtors and Emergence could use to fund acquisitions. At the beginning of 2023, the Irwin Companies secured a credit facility ("Credit Facility") from EWB, as agent for the syndicate, for $40.0 million in up to two equal parts: (1) up to a $20 million revolving line of credit that was meant to support Irwin Nevada's day-to-day operations (the "Line of Credit"), a version of which was already in place as of December 2021 between EWB and the Debtors and was to be replaced by this new Credit Facility; and (2) a $20 million delayed-draw term loan facility (the "Term Loan") that was meant to support Emergence's clinic roll-up. The Credit Facility was and is governed by a credit agreement ("Credit Agreement"). As of the petition date, EWB asserts that it is owed approximately $19 million, which the Debtors dispute.

12.    The Uplisting and the Roll-Up were bold and costly departures from Irwin Nevada's tried and true dietary supplement business model. Unfortunately, neither endeavor panned out as planned; both efforts caused the usually profitable business to suffer financial constraints, losses, and debts. These endeavors, and efforts to salvage them, resulted in tens of millions of dollars of losses and/or liabilities. In addition, Irwin Nevada's typically strong sales numbers began to take a hit in or around March of 2023. The unexpected downturn was attributable to many factors outside of the

3000840

Debtors' control, including extraordinarily high returns from retailers that were not on par with historical figures and projections, a downturn in the retail market generally, and the unexpectedly slow growth of digital sales. To add to the Debtors' financial burden, EWB, exerted excessive and unreasonable control over their business affairs and imposed unconscionable constraints on the Debtors, turning their existing financial distress into a full-blown crisis, which the Debtors are not able to overcome without this Court's oversight.

13. After having the Credit Facility for a little over a year, the Irwin Companies received three (3) notices of default from EWB for failure to meet certain technical covenants of the Credit Agreement. It is my understanding that he notices were based on technical defaults, not defaults on the servicing of the debt; the Irwin Companies have never been late on any debt service payments to EWB. I believe the Irwin Companies also were very transparent and cooperative with EWB, including communicating with EWB regularly regarding their current states of affairs, their day-to-day actions and expenditures, and their plans to turn their financial state around. Indeed, the Irwin Companies have already undertaken tremendous efforts to continue to support their operations and meet their obligations despite their financial hardship. These efforts include renegotiating payment terms with customers and suppliers, exploring options to amend or refinance their debt, reducing operating costs and expenditures, conducting multiple rounds of personnel layoffs, terminating as many third-party contracts and services as possible, closing the debt-accruing Emergence clinics, and more.

14. As the Irwin Companies attempted to pull themselves out of their financial difficulties, EWB engaged in numerous instances of misconduct. EWB's alleged misconduct includes, but is not limited to, exerting undue, unreasonable, and excessive control over the Irwin Companies' operations, finances, and decision-making.

15. Having exhausted all other options and with no further hope of reconciliation, I caused the Debtors to send EWB a letter memorializing the many instances of misconduct that EWB had committed, identifying the irreparable injuries EWB caused, and stated the Debtors' urgent need to declare bankruptcy. EWB claimed it would respond to the letter.

3000840

16.    Instead, EWB swiftly exercised its proxy rights, which the validity of is disputed by the Debtors, and voted in a new sole Director to Irwin Nevada's Board of Directors, removing me. This act prevented Irwin Nevada from declaring bankruptcy.  Management repeatedly informed the new Director of EWB's misconduct and the ongoing risks to the company.  Eventually, the new Director resigned for unspecified reasons.  That resignation, along with EWB's sweeping of the Debtors' bank accounts (which left the Debtors with no liquidity other than what EWB determined was necessary to pay), the Debtors' management determined that the Debtors only option was to attempt to reorganize under chapter 11 to save their thirty-year old business.

17.    Aside from the Debtors' obligations to EWB and CFG, I estimate the Debtors have an additional approximately $5 million in unsecured debt to approximately 100 entities.

18.    The Debtors currently have no use of cash collateral to, among other things, pay their employees and fund ongoing business operations.  Without the filing of this bankruptcy and obtaining use of cash collateral, the Debtors would have no choice but to immediately fire all of their 55 employees and 5 independent contractors and close its business.  The Debtors will not be able to fund their next payroll on August 20, 2024, without the use of cash collateral.

19.    The Debtors' CFO and accounting staff prepared a budget, which I have reviewed. As set forth in the budget (the "Budget"), a true and correct copy of which is attached hereto as **Exhibit 1**,[2] I have estimated that the Debtors' assets currently have a value of at least $40 million (and likely considerably more).  The Debtors' cash, accounts receivable and inventory total $24,961,737.09 (excluding approximately $350,000 that EWB swept on the petition date, which the Debtors have demanded be returned to them), and the Debtors' other assets (including intellectual property, deposits, furnishings, fixtures and equipment) have a value of at least $20 million.  I believe that the Debtors business (inclusive of intellectual property and goodwill) has a value of at least $100 million (which is supported by the Debtors' prior engagements of investment bankers and their opinions); however, we have conservatively valued the Debtors assets for the purpose of the Cash Collateral Motion.

---

[2] An identical copy of the Budget is attached to the Emergency Cash Collateral Motion as **Exhibit 1.**

3000840

20.     As set forth above, the Debtors commenced these cases based on their inability to use their cash without EWB's strict oversight.  As illustrated by the Budget, the Debtors will be able to operate cash flow positive post-petition.  The Budget sets forth the minimum requirements of the Debtors to operate their business to accomplish a successful reorganization for all creditors.  The Budget does not contemplate any "extraordinary" or "luxury" expense.  The Budget therefore contains the Debtors' basic requirements for operations and is reasonable.

21.     The Budget does provide for payment of a $100,000 post-petition retainer to the Debtors' proposed bankruptcy counsel BG Law LLP ("BG").  BG will file an application to employ BG and requesting a total post-petition retainer of $250,000, which the Debtors submit is reasonable given the size of the Debtors' operations and the fact that EWB prevented it from paying and retaining insolvency counsel pre-petition.

22.     The Budget also provides for the Debtors to continue to make their post-petition interest payment to EWB, at least on an interim basis.  The Debtors reserve the right to clarify in a supplement that they will not be making interest payments.  The Budget provides for the Debtors to pay three critical vendors.  Two of them provide warehousing and logistics services to the Debtors and are entitled to assert warehouseman and other liens against the Debtors' goods.  These vendors have ceased providing services to the Debtors, which services the Debtors rely upon.  The third critical vendor is Robinson Pharma ("RP"), which is by far the Debtors' largest supplier.  RP manufacturers approximately 90% of the goods that Irwin Nevada sells, and Irwin Nevada will go out of business without maintaining RP as a supplier.  The Debtors have previously looked into alternate suppliers and there are no alternate suppliers that can manufacture the Debtors' products at the quality and amount the Debtors require.

23.     The Budget includes a $14,325 payment to Fidelity, which consists of 401(k) withholdings from employees.  This payment is typically paid by ACH withdrawal which did not go through on August 12, 2024.

24.     The Debtors will not pay any insider salaries (which are highlighted on the Budget) until the time period has passed with respect to the Insider Comp Notices served in accordance with the local rules.

25.     Although the Budget represents the Debtors' best estimate of the necessary expenses associated with the business, as the ebbs and flows of the Debtors' business are unpredictable, the needs of the business may fluctuate.  Therefore, the Debtors request Court authority to deviate from the total expenses contained in the Budget by no more than 15%, on a cumulative basis, and to deviate by category (provided the Debtors do not pay any expenses outside of any approved categories) without the need for further Court order.

26.     In order for the Debtors to operate their business in accordance with the Budget and to fund the upcoming August 23, 2024 payroll[3], the Debtors must be able to use the revenues that are paid to the Debtors' bank account and via credit cards.

27.     I believe that the continued operation of the Debtor's business will preserve the value of the Debtors and their assets.

28.     As set forth above, EWB is owed approximately $19 million.  Accordingly, I believe that EWB is significantly oversecured, and that it has an equity cushion of at least 210%.

29.     I believe that the immediate cessation of the Debtors' business and accompanying liquidation of their inventory would result in significantly less of a return to the Debtors' creditors.  I believe that by continuing to operate the Debtors' business, the Debtors will preserve the value of the Debtors' business.

30.     Presently, Irwin Nevada employs approximately 55 employees, plus 5 consultants that are independent contractors, plus 2 temporary employees who are directly compensated through a staffing agency (the "Staffed Employees," and collectively with the other employees and independent contractors, the "Employees").  All of Irwin Nevada's Employees are located in the United States.  The Employees, other than the Staffed Employees, are all paid on a bi-weekly basis, in arrears, a week after the payroll period has ended.  With regard to the Staffed Employees, the Irwin Nevada receives weekly or monthly invoices directly from the staffing agency, who then in turn pays the Staffed Employees.  The spreadsheet attached hereto as **Exhibit 2** reflects the pre-

---

[3] The Debtor must fund its payroll by 3:00 p.m. Tuesday, August 20, 2024 in order to ensure its employees are timely paid by Friday, August 23, 2024.

3000840

petition wages (including payroll taxes) owed to the Employees for the period August 5, 2024

through August 9, 2024.

31.    The following Employees are insiders of the Debtors:  Klee Irwin, Margareth Irwin,

Leta Paz, Dan Wing, Mark Green and Marcelo Goncalves (collectively, the "Insider Employees").

Through the Wage Motion, Irwin Nevada seeks authority to pay all obligations pertaining to

Employees other than the Insider Employees.  With respect to the Insider Employees, no payments

will be made until the expiration of the notice period with regard to the Notices of Insider

Compensation filed for each of them.

32.    Also, in the ordinary course of its business, Irwin Nevada deducts from its

employees' paychecks (as applicable): (a) payroll taxes and the employees' portion of FICA and

unemployment taxes, (b) employee contributions for health and disability related benefits, (c)

employee contributions to 401(k) plans, and (e) other miscellaneous items (collectively, "Employee

Deductions").  Irwin Nevada forwards amounts equal to the Employee Deductions from its operating

accounts to appropriate third-party recipients.

33.    Under ordinary conditions, Irwin Nevada's next payroll for employees is scheduled

for Friday, August 23, 2024, and relates to the payroll period of August 5, 2024 through August 16,

2024 (*i.e.*, two weeks' pay, one week in arrears).  This payroll includes amounts for the prepetition

period of August 5, 2024 through August 9, 2024.  Irwin Nevada must fund this payroll by 3:00 p.m.

August 20, 2024, in order to ensure Employees are timely paid by August 23, 2024.

34.    The payroll amount associated with this prepetition period of August 5, 2024 through

August 9, 2024 is expected to be in the aggregate amount of approximately $121,383 for employees,

the aggregate amount of approximately $31,967 for independent contractors, and the amount of

approximately $15,994 for the Staffed Employees (collectively referred to as the "Prepetition

Wages").  Attached hereto a **Exhibit 2** is a true and correct spreadsheet reflecting payroll August 5,

2024 through August 9, 2024.

35.    In sum, Irwin Nevada expects to owe Prepetition Wages in the combined amount of

approximately $160,344.  As of the Petition Date, no Employee has a claim of more than $15,150 in

Prepetition Wages on an individual basis.

36.     Irwin Nevada seeks authority to continue with its payroll schedule in the ordinary course of its business and consequently to pay all Prepetition Wages as planned on the dates indicated above.  In all instances, no single Employee has a claim of more than $15,150 in Prepetition Wages, which amount I understand to be entitled to priority distribution under the Bankruptcy Code.  The costs associated with paying priority Employee wage claims are relatively minimal compared with the damage to Irwin Nevada's estate that would ensue if Employee morale were disrupted by Irwin Nevada's failure to meet its payroll obligations.

37.     In addition to the payment of Prepetition Wages, Irwin Nevada is also seeking to be authorized, but not required, to pay all payroll taxes related to the Prepetition Wages, which Irwin Nevada estimates to be approximately $9,327.

38.     Irwin Nevada has established a variety of benefit plans and programs ("Employee Benefits") designed to assist its Employees and the Employees' eligible dependents in meeting certain financial burdens, including those that arise from illness, disability, and death.  The Employees receive Employee Benefits pursuant to the terms and policies established by Irwin Nevada.  Irwin Nevada seeks authorization, but not direction, to pay or otherwise honor these Employee Benefits, which are described below.

39.     Irwin Nevada offers all full-time Employees basic medical, dental, and vision insurance, as well as group life and disability insurance.  Irwin Nevada's medical insurance is provided by Anthem Blue Cross.  Unum provides Irwin Nevada's vision, life, AD&D, and disability insurance.  The Colonial Life, TASC (FSA and COBRA) and EDIS also provide insurance for Irwin Nevada.  A portion of the cost for each Employee's insurance is deducted from his or her regular paycheck, and Irwin Nevada contributes a portion as well.  To maintain employee morale and not unfairly impose hardships on its workforce, Irwin Nevada seeks authority to pay any outstanding unpaid premiums, deductibles, and/or claims with respect to medical, dental, and vision insurance accrued prepetition, and to continue to honor its prepetition policies relating to such insurance. Irwin Nevada believes it is current under these obligations and that there are no arrears with respect to Employees' insurance.  Irwin Nevada pays approximately $74,500 a month in premiums to Colonial Life, TASC, EDIS, Unum, and Anthem Blue Cross.

3000840

40. Irwin Nevada is obligated to pay worker's compensation insurance premiums for its Employees. Irwin Nevada owes approximately $4,697 in monthly worker's compensation premiums. Irwin Nevada seeks authority to pay this obligation in the ordinary course of its business as part of its Employee Obligations.

41. Irwin Nevada offers eligible Employees the opportunity to participate in a 401(k) Savings and Retirement Plan ("401(k) Plan"). Irwin Nevada forwards amounts equal to the Employee's chosen contributions from its operating accounts to appropriate third-party recipients on behalf of its Employees, and thus seeks authority to continue the 401(k) Plan and forward any prepetition amounts as necessary. Irwin Nevada's most recent payroll was paid on the Petition Date and included $14,325.23 in 401(k) withholdings from employees. However, the ACH payment to Fidelity did not go through on August 12, 2024. Accordingly, Irwin Nevada seeks authority to make this payment to Fidelity on the next payroll.

42. Additionally, approximately $7,970 in 401(k) withholdings will be owed for Irwin Nevada's employees for August 5, 2024 through August 9, 2024.

43. Employees may submit certain business-related expenses to Irwin Nevada for reimbursement. These expenses include, among other things, car rental, meals, business supplies, and other business-related costs, including those charged by Employees onto corporate credit cards. These expenses are not submitted to Irwin Nevada until the 16th of each month. Accordingly, Irwin Nevada does not know the exact amount of prepetition expenses owed to its Employees. At the beginning of August this year, Irwin Nevada and numerous employees attended an annual major trade show in the industry, which increases the expenses for August significantly. Based on last year's expenses, Irwin Nevada anticipates that it will need to reimburse approximately $95,000 in Employee expenses for all of August 2024. Irwin Nevada seeks authority, but not direction, to pay these Employee Expenses and to continue to pay them postpetition in the ordinary course of business.

44. By the Wage Motion, Irwin Nevada is also seeking authority, but not direction, to permit Employees to use earned, accrued prepetition vacation time, personal time, sick, bereavement and other leave in the ordinary course (the "Paid Time Off"). I believe that it is very important to

the morale of the Employees that they be able to use their Paid Time Off in the ordinary course of business.

45.     Irwin Nevada's goal in its chapter 11 case is to reorganize its affairs and continue operating as a successful nutraceuticals company.  I believe it is imperative to the accomplishment of Irwin Nevada's goals in its case that Irwin Nevada's employees make a smooth transition into the chapter 11 process.  I believe that any disruption to payment of Employee Obligations will prove destructive to Irwin Nevada's goals because it will hurt employee morale at a particularly sensitive time for all employees, especially considering the small number of Employees employed by Irwin Nevada.  Indeed, each Employee is crucial to the continuation of Irwin Nevada's business operations.  Due to the timing of the filing of this case, certain Employee Obligations may have accrued expenses, but were unpaid prior to the Petition Date.  If Irwin Nevada is not permitted to meet all payroll-related obligations in the ordinary course of business, I believe that Irwin Nevada could suffer unmanageable employee outrage or turnover to the detriment of all parties to Irwin Nevada's bankruptcy estate.  Any significant disruption will adversely impact Irwin Nevada's business and result in immediate and irreparable harm to the estate.  Simply put, the Employees are essential to Irwin Nevada being able to continue its business operations and thus successfully reorganize, and thus approval for payment of ongoing Employee Obligations is critical to Irwin Nevada's success in its case.

46.     I believe that the amounts to be paid pursuant to the Employee Obligations are relatively small in light of the importance and necessity of preserving the Employees' services and morale, and the difficulties and losses Irwin Nevada will suffer if Employees leave.  Even the slightest delay in providing this relief to its Employees will hamper operations and damage Irwin Nevada's estate.

47.     In May 2024, Irwin Nevada entered into an agreement with ADP, Inc. ("ADP") for ADP to provide Irwin Nevada with payroll services.  Attached hereto as **Exhibit 3** is a true and correct copy of the ADP Agreement.  ADP administers and manages Irwin Nevada's payroll and all Employee Benefits.  If ADP were to discontinue services the harm to the Employees would be tremendous, which could potentially result in a delay of payroll or a disruption of Employee

12

3000840

benefits.  Accordingly, Irwin Nevada seeks to assume the ADP Agreement.  Irwin Nevada is current on all pre-petition obligations to ADP under the ADP Agreement and therefore no cure amount pursuant to section 365(b) of the Bankruptcy Code will need to be paid to assume the agreement.  I believe that assumption of the ADP Agreement represents a sound exercise of Irwin Nevada's business judgment and is in the best interest of Irwin Nevada, its bankruptcy estate and all creditors.

48.    As of the Petition Date, in connection with the operation of their business, the Debtors maintained and utilized the following Pre-BK Bank Accounts with East West Bank ('EWB"), which Pre-BK Bank Accounts are used for the following purposes (collectively, the "Cash Management System"):

| Debtor | Bank | Account Name | Acct. # | Type | Description | Proposed Action |
|--------|------|--------------|---------|------|-------------|-----------------|
| Irwin Nevada | EWB | Operational Account (B2B) | X3108 | Deposit | DDA - Analyzed Checking. Critical funds from retailers deposited here. | To remain open as the recipient of the Debtors' merchant credit card account funds |
| Irwin Nevada | EWB | E-Commerce (B2C) | X3116 | Deposit | DDA - Analyzed Checking. Critical funds from consumers deposited here. | To remain open as the recipient of the Debtors' merchant credit card account funds |
| Irwin Nevada | EWB | Operational Account (B2B) | X6606 | Disbursement | Checking Account - Critical funds to retailers disbursed from here. | To remain open as this account is the disbursement account to retailers |
| Irwin Nevada | EWB | E-Commerce Account (B2C) | X6614 | Disbursement | Checking Account - Critical funds to consumers or webservices disbursed from here. | To remain open as this account is the disbursement account to consumers or webservices |
| Irwin Canada | EWB | Irwin Naturals | X4072 | Deposit/ Disbursement | Checking Account - Only account to pay for Irwin Canada expenses. | To remain open as this account is the only account that Irwin Canada can pay expenses through |

13

3000840

| Irwin Nevada | EWB | Irwin Naturals | X0465 | Money Market Account | Contains Cash Collateral. | Transition to DIP account; to be closed |
|---|---|---|---|---|---|---|

49.     I believe that it is imperative that the Debtors' proposed Cash Management System be approved to provide a smooth transition into chapter 11 without disrupting the Debtors' ongoing business operations and, most importantly, not disrupting the upcoming August 23, 2024 payroll. Among other things, the Debtors need to ensure that its employee paychecks can be issued and cashed, that customers may use credit cards to purchase the Debtors' goods and pay outstanding invoices, and that business continues as usual.

50.     Prepetition, EWB swept the Pre-BK Accounts, and on the Petition Date, EWB swept approximately $300,000 from the Pre-BK Accounts.  While EWB has agreed to return these funds to the Debtor, as of the time this declaration was signed, the funds have not yet been returned.  Through the Cash Management Motion, the Debtors respectfully request that the Court require EWB to turn over, on an ongoing and daily basis, all receipts and funds in the account, to the Debtors, and to cease all sweeping of the Pre-BK Accounts.  The Debtors additionally request that the Court order EWB to return the approximately $300,000 it swept on August 9, 2024.

51.     The Debtors request authorization to keep the money market account open temporarily while the Debtors transition the funds into their Debtors in Possession accounts in accordance with the guidelines established by the Office of the United States Trustee, with the accounts being swept weekly by the Debtors into the Debtor in Possession Accounts for taxes, general business, and payroll, as appropriate.

52.     I believe that it is very important that the Debtors' merchant accounts with EWB remain open.  These are the accounts where the Debtors' credit card receipts are deposited, and these accounts have received at least $500,000 in receipts this week alone.  The Debtors will transfer those funds to the new DIP account that they will open on a regular basis.

53.     I believe that Irwin Nevada has several critical vendors.  Attached hereto as **Exhibit 4** is a list of those vendors.

3000840

54.     Irwin Nevada's primary supplier, Robinson Pharma ("RP" or "Robinson Pharma"), manufactures approximately 90% of its products.  While Irwin Nevada formulates all of its products in-house, it relies on Robinson Pharma to provide upwards of 90% of the product components and ingredients needed and used to create Irwin Nevada's products – and RP creates the final product. Irwin Nevada pays RP approximately $35 million a year and is on thirty (30) day terms with RP.  In the ordinary course of business, Irwin Nevada receives inventory from RP on an almost daily basis with invoices generated weekly.  Irwin Nevada also pays RP weekly on 30 day terms. If Irwin Nevada does not continue to pay RP in the same manner with which it did pre-petition, RP will stop supplying to Irwin Nevada.

55.     In fact, I am informed that RP has already ceased supplying post-petition to Irwin Nevada pending payment of the invoice that is due this week.  Without product from Robinson Pharma, Irwin Nevada will not be able to create product post-petition, which will result in its inability to stock the shelves at its major customers including, but not limited to, Walmart, Costco, CVS, Whole Foods and others, which retailers will then "blacklist" Irwin Nevada and no longer sell Irwin Nevada's products. This result would be devastating to Irwin Nevada's business and would likely result in the cessation of business operations.

56.     In addition to critical vendor status, it is my understanding that a large portion of the Robinson Pharma claim is subject to: (i) reclamation under section 546(c) of the Bankruptcy Code (as of the Petition Irwin Nevada had **$2,419,343.87** of product on hand from Robinson Pharma which it received within 45 days of the Petition Date), and (ii) payment as an administrative claim under section 503(b)(9) of the Bankruptcy Code (within 20 days of the Petition Date the Debtor received **$1,652,343.87** of product from Robinson Pharma in the ordinary course of business).

57.     Attached hereto as **Exhibit 5** is a true and correct copy of the detail on the Robinson Pharma product delivered to Irwin Nevada during the 20 days pre-petition, and still in Irwin Nevada's possession on the petition date.

58.     Irwin Nevada has, in the past, attempted to find an alternate supplier but has not been successful.  While RP is Irwin Nevada's largest supplier, Irwin Nevada is not RP's largest customer and RP is willing to lose Irwin Nevada's business.

3000840

59.     Irwin Nevada cannot even go one more week without paying RP on its pre-petition claim as Irwin Nevada has delivery deadlines that it must meet for its customers – including a particularly large Costco order in the next two weeks.

60.     While Irwin Nevada understands and acknowledges that RP's pre-petition claim of $3,110,585.30 seems high, it is only one month of invoices, it is well within the average of what Irwin Nevada pays RP monthly, and Irwin Nevada proposes to pay it in the ordinary course of business (i.e., over the next four weeks).  There is no possibility of Irwin Nevada's business surviving without RP.

61.     Two logistics providers who warehouse Irwin Nevada's inventory and transport it have asserted possessory warehouseman's liens against Irwin Nevada's inventory stored in their warehouse facilities and in their trucks. The first is Coast Warehouse / Coast 3PL (collectively, "Coast") and the second is TLS Transportation ("TLS").  Both Coast and TLS warehouse and transport inventory of Irwin Nevada, and it is my understanding that each of them assert possessory warehouseman's liens against such inventory.  Both Coast and TLS have ceased providing warehousing and transportation services to Irwin Nevada pending approval of the Critical Vendor Motion and assurances that their post-petition invoices will be paid in the ordinary course of business.

62.     I believe it is critical to Irwin Nevada's business to have access to and be able to ship this inventory to its customers.  Both Coast and TLS will not release Irwin Nevada's inventory, and their possessory liens, unless the Critical Vendor Motion is approved, and payment of their prepetition claims are provided for.

63.     TLS is owed approximately $24,000 for logistics and approximately $180,000 for warehousing.  Coast Warehouse is owed $186,950.02 and Coast 3PL is owed $10,746.66.  Both TLS and Coast have ceased providing services to the Debtor pending the result of the Critical Vendor Motion.

64.     Currently, with Robinson Pharma refusing to deliver new products, and Coast and TLS refusing to provide logistics services, Irwin Nevada's supply chain has completely shut down.  Every day this continues causes significant harm to Irwin Nevada's business and its customers.  If

this is not rectified immediately, Irwin Nevada will lose its large retail customers that Irwin

Nevada's business depends upon.  I cannot emphasize enough how critical it is to pay Robinson

Pharma, Coast and TLS on their existing invoices.

   I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

   Executed this 16th day of August, 2024, Topanga, California.

_____
   Klee Irwin

3000840

Doc ID: 978ac47ed29ddaf00a09b4c7fcdef96199f9001c

| | 2024 | 2024 | 2024 | 2024 |
|---|---|---|---|---|
| | 1 | 2 | 3 | 4 |
| Week Starting | 08/12/24 | 08/19/24 | 08/26/24 | 09/02/24 |
| **Cash Balance, Beginning** | **$1,862,379.25** | **$573,940.53** | **$402,880.00** | **$808,861.97** |
| **Cash Inflows** | **468,187.35** | **869,424.82** | **1,877,611.61** | **1,224,837.83** |
| **COGS Expenses:** | | | | |
| COGS - Robinson Pharma* | $1,459,948 | $563,333 | $727,294 | $614,764 |
| COGS - Others | $86,913 | $10,937 | $112,647 | $20,000 |
| Distribution - Coast* | $50,519 | $19,269 | $19,269 | $19,269 |
| Distribution - TLS* | $6,000 | $6,000 | $6,000 | $6,000 |
| Other Distribution Expenses | $16,000 | $10,250 | $10,000 | $6,250 |
| Freight - Coast* | $5,310 | $12,057 | $81,265 | $22,164 |
| Freight - TLS* | $45,000 | $45,000 | $45,000 | $45,000 |
| Other Freight | $18,735 | $20,000 | $49,000 | $53,500 |
| **Salaries / Guaranteed Payment (biweekly)** | | | | |
| Payroll Regular | $0 | $217,494 | $0 | $217,494 |
| Payroll-Insider | $0 | $0 | $0 | $52,577 |
| EE Commission | $0 | $45,000 | $0 | $0 |
| Auto Allowance | $0 | $1,500 | $0 | $0 |
| Payroll Taxes | $0 | $20,196 | $0 | $20,660 |
| Payroll Fees | $0 | $3,500 | $0 | $3,500 |
| Health Insurance Withholding | $0 | ($20,036) | $0 | ($20,036) |
| 401k Withholding | $0 | ($17,675) | $0 | ($13,869) |
| 401k Withholding paid to Fidelity | $0 | $17,675 | $0 | $13,869 |
| 401k Withholding that  bounced to Fidelity 8/12/24 | $14,325 | $0 | $0 | $0 |
| **Freelance / Contract Labor** | | | | |
| Consulting | $11,035 | $27,160 | $24,285 | $11,035 |
| Consulting-Insider | $0 | $0 | $0 | $22,352 |
| Onboarding Services | $0 | $0 | $0 | $0 |
| Temporary Labor | $3,089 | $2,326 | $13,833 | $1,320 |
| **Insurance** | | | | |
| Worker's Comp (Alaska) | $0 | $0 | $10,000 | $0 |
| Auto | $0 | $0 | $0 | $6,131 |
| General Liability | $31,561 | $0 | $0 | $0 |
| EPLC | $0 | $0 | $0 | $0 |
| Anthem | $0 | $0 | $59,791 | $0 |
| Unum | $0 | $0 | $5,500 | $0 |
| Colonial | $0 | $0 | $6,000 | $0 |
| EDIS | $1,500 | $1,500 | $1,500 | $1,500 |
| **Sales/Use Tax/GST/B&O** | | | | |
| CA CDFTA | $5,000 | $0 | $0 | $0 |
| Canada Revenue Agency | $0 | $0 | $25,000 | $0 |
| State of Washington | $149 | $0 | $0 | $0 |
| CA FTB | $0 | $0 | $0 | $0 |
| US Treasury | $0 | $0 | $0 | $0 |
| **Rent** | | | | |
| Rent | $0 | $0 | $48,500 | $0 |
| Parking | $0 | $0 | $4,700 | $0 |
| Utilities (Excess Utilities) | $0 | $0 | $0 | $0 |
| **Bank Fees** | | | | |
| Merchant Fees | $0 | $0 | $30,000 | $0 |
| Bank Fees - EastWest | $0 | $0 | $5,000 | $0 |
| **Equipment Contracts** | | | | |
| Peac Solutions - Marlin Leasing Corporation | $0 | $0 | $702 | $0 |
| Promac Image Systems | $0 | $0 | $150 | $0 |
| MRC Smart Technology Solutions | $0 | $0 | $1,114 | $0 |
| **Telephone/Internet/Cloud** | | | | |
| Airespring | $0 | $0 | $0 | $1,919 |

**Exhibit 1_001**

| | Week Starting | 2024<br>1<br>08/12/24 | 2024<br>2<br>08/19/24 | 2024<br>3<br>08/26/24 | 2024<br>4<br>09/02/24 |
|---|---|---|---|---|---|
| Charter Communication | | $0 | $0 | $0 | $0 |
| Data Storage Group Inc | | $0 | $0 | $0 | $1,875 |
| Phone/Efax | | $500 | $0 | $122 | $0 |
| **Courier/ Delivery/Postage** | | | | | |
| Courier Service | | $100 | $0 | $100 | $100 |
| Postage Meter | | $0 | $0 | $0 | $0 |
| Others | | $0 | $0 | $0 | $0 |
| **Information Technology** | | | | | |
| Concur Technologies Inc. | | $471 | $0 | $0 | $0 |
| Core BTS, Inc | | $0 | $0 | $0 | $1,550 |
| SPS Commerce Inc. | | $0 | $0 | $0 | $7,739 |
| Vision33 | | $471 | $0 | $0 | $7,710 |
| SAP Consultant | | $0 | $0 | $500 | $1,000 |
| **Marketing Expenses** | | | | | |
| Trade Shows | | $0 | $0 | $0 | $0 |
| Brokers' Commission | | $0 | $0 | $0 | $125,000 |
| CO-OP Advertising | | $0 | $0 | $0 | $0 |
| POS Data | | $0 | $0 | $0 | $6,669 |
| Coupons | | $0 | $0 | $0 | $0 |
| E-Comm | | $0 | $0 | $16,188 | $3,000 |
| Sales & Marketing Expenses | | $0 | $0 | $0 | $0 |
| **Other Operating Expenses:** | | | | | |
| Accountants/Auditors (Emp App to Be Filed) | | $0 | $0 | $0 | $28,650 |
| BG Law LLP- Retainer (Subject to Approval of Emp App) | | $0 | $0 | $100,000 | $0 |
| Greenberg Glusker- Retainer (Subject to Emp App) | | $0 | $0 | $50,000 | $0 |
| Information Technology | | $0 | $0 | $0 | $0 |
| Travel & Trade Shows | | $0 | $0 | $0 | $0 |
| Lab Testing - Tech Affairs | | $0 | $55,000 | $11,000 | $5,000 |
| Website Fees | | $0 | $0 | $0 | $0 |
| General & Administrative Expenses | | $0 | $0 | $7,171 | $4,338 |
| EWB Interest / Adequate Protection Payment | | $0 | $0 | $0 | $155,000 |
| **Total Disbursement** | | $1,756,626 | $1,040,485 | $1,471,630 | $1,453,029 |
| **Cash Balance, ending** | | $573,940.53 | $402,880.00 | $808,861.97 | $580,670.38 |

*Debtors have filed a critical vendor motion for these obligations.

| | |
|---|---|
| AR - 8/14/2024 | $11,837,586.97 |
| Inventory - 8/14/2024 | $11,562,210.48 |

**Exhibit 1_002**

August 05, 2024 to August 09, 2024
**EMPLOYEES**

| Payroll Name | File Number | Rate Type | STATE WORK IN | TOTAL Wages | SS ER Expense (6.20%) | Medicare ER Expense (1.45%) | ER SUI Expense | Total Insider |
|---|---|---|---|---|---|---|---|---|
| Redacted | 000124 | Salary | AZ | $ 2,031.47 | $ 125.95 | $ 29.46 | | |
| Redacted | 001678 | Hourly | CA | $770.55 | $ 47.77 | $ 11.17 | | |
| Redacted | 001537 | Hourly | CA | $813.55 | $ 50.44 | $ 11.80 | | |
| Redacted | 001649 | Hourly | CA | $793.35 | $ 49.19 | $ 11.50 | | |
| Redacted | 000177 | Hourly | CA | $1,281.00 | $ 79.42 | $ 18.57 | | |
| Redacted | 001661 | Hourly | CA | $1,152.00 | $ 71.42 | $ 16.70 | | |
| Redacted | 000188 | Hourly | CA | $910.36 | $ 56.44 | $ 13.20 | | |
| Redacted | 000113 | Hourly | CA | $1,226.81 | $ 76.06 | $ 17.79 | | |
| Redacted | 000221 | Hourly | CA | $1,101.61 | $ 68.30 | $ 15.97 | | |
| Redacted | 000119 | Hourly | CA | $919.60 | $ 57.02 | $ 13.33 | | |
| Redacted | 001624 | Hourly | CA | $1,354.36 | $ 83.97 | $ 19.64 | | |
| Redacted | 000145 | Hourly | CA | $994.18 | $ 61.64 | $ 14.42 | | |
| Redacted | 001564 | Hourly | CA | $821.54 | $ 50.94 | $ 11.91 | | |
| Redacted | 001523 | Hourly | CA | $821.54 | $ 50.94 | $ 11.91 | | |
| Redacted | 001528 | Hourly | CA | $166.93 | $ 10.35 | $ 2.42 | | |
| Redacted | 001687 | Hourly | CA | $923.20 | $ 57.24 | $ 13.39 | | |
| Redacted | 001639 | Salary | CA | $220.38 | $ 13.66 | $ 3.20 | | |
| Redacted | 000102 | Salary | CA | $ 1,358.32 | $ 84.22 | $ 19.70 | | |
| Redacted | 001497 | Salary | CA | $ 3,846.16 | $ 238.46 | $ 55.77 | | |
| Redacted | 001555 | Salary | CA | $ 1,201.93 | $ 74.52 | $ 17.43 | | |
| Redacted | 001633 | Salary | CA | $ 2,661.55 | $ 165.02 | $ 38.59 | | |
| Redacted | 000106 | Salary | CA | $ 1,384.62 | $ 85.85 | $ 20.08 | | |
| Redacted | 000185 | Salary | CA | $ 2,729.08 | $ 169.20 | $ 39.57 | | |
| Redacted | 001542 | Salary | CA | $ 2,403.85 | $ 149.04 | $ 34.86 | | |
| Redacted | 000108 | Salary | CA | $ 1,423.36 | $ 88.25 | $ 20.64 | | |
| Redacted | 001657 | Salary | CA | $ 2,627.82 | $ 162.92 | $ 38.10 | | |
| Redacted | 000114 | Salary | CA | $ 1,565.72 | $ 97.07 | $ 22.70 | | |
| Redacted | 001691 | Salary | CA | $ 2,884.62 | $ 178.85 | $ 41.83 | | |
| Redacted | 000116 | Salary | CA | $ 974.19 | $ 60.40 | $ 14.13 | | |
| Redacted | 001645 | Salary | CA | $ 1,391.36 | $ 86.26 | $ 20.17 | | |
| M. Goncalves - Insider Relative | 000120 | Salary | CA | $ 1,742.08 | $ 108.01 | $ 25.26 | | $ 1,742.08 |
| Redacted | 000125 | Salary | CA | $ 1,627.74 | $ 100.92 | $ 23.60 | | |
| Redacted | 000128 | Salary | CA | $ 1,083.53 | $ 67.18 | $ 15.71 | | |
| K. Irwin - CEO | 000130 | Salary | CA | $ 7,692.31 | $ 476.92 | $ 111.54 | | $ 7,692.31 |
| M. Irwin - Insider Relative | 001688 | Salary | CA | $ 1,923.08 | $ 119.23 | $ 27.88 | | $ 1,923.08 |
| Redacted | 000131 | Salary | CA | $ 3,748.54 | $ 232.41 | $ 54.35 | | |
| Redacted | 000132 | Salary | CA | $ 1,509.24 | $ 93.57 | $ 21.88 | | |
| Redacted | 001605 | Salary | CA | $ 1,718.32 | $ 106.54 | $ 24.92 | | |
| Redacted | 001690 | Salary | CA | $ 1,778.85 | $ 110.29 | $ 25.79 | | |
| Redacted | 000138 | Salary | CA | $ 2,734.42 | $ 169.53 | $ 39.65 | | |
| Redacted | 001521 | Salary | CA | $ 3,169.40 | $ 196.50 | $ 45.96 | | |
| Redacted | 000175 | Salary | CA | $ 1,289.62 | $ 79.96 | $ 18.70 | | |
| Redacted | 001681 | Salary | CA | $ 4,326.93 | $ 268.27 | $ 62.74 | | |
| Redacted | 000220 | Salary | CA | $ 1,295.01 | $ 80.29 | $ 18.78 | | |
| L. Paz - Insider Relative | 001692 | Salary | CA | $ 1,750.00 | $ 108.50 | $ 25.38 | | $ 1,750.00 |
| Redacted | 000150 | Salary | CA | $ 1,382.41 | $ 85.71 | $ 20.04 | | |
| Redacted | 001593 | Salary | CA | $ 1,901.73 | $ 117.91 | $ 27.58 | | |
| Redacted | 001631 | Salary | CA | $ 3,234.47 | $ 200.54 | $ 46.90 | | |
| Redacted | 000162 | Salary | CA | $ 3,935.39 | $ 243.99 | $ 57.06 | | |
| Redacted | 000163 | Salary | CA | $ 3,079.42 | $ 190.92 | $ 44.65 | | |
| Redacted | 001551 | Salary | CA | $ 3,365.39 | $ 208.65 | $ 48.80 | | |
| Redacted | 000164 | Salary | CA | $ 1,394.24 | $ 86.44 | $ 20.22 | | |
| D. Wing - COO | 000169 | Salary | CA | $ 5,056.28 | $ 313.49 | $ 73.32 | | $ 1,750.00 |
| Redacted | 001675 | Salary | CA | $ 2,019.24 | $ 125.19 | $ 29.28 | | |
| Redacted | 000172 | Salary | CA | $ 1,655.69 | $ 102.65 | $ 24.01 | | |
| Redacted | 001614 | Hourly | CO | $494.88 | $ 30.68 | $ 7.18 | 12.62 | |
| Redacted | 000206 | Salary | FL | $ 1,319.89 | $ 81.83 | $ 19.14 | | |
| Redacted | 000193 | Salary | IL | $ 2,937.77 | $ 182.14 | $ 42.60 | | |
| Redacted | 000104 | Salary | TX | $ 5,769.24 | $ 357.69 | $ 83.65 | 14.42 | |
| Redacted | 001651 | Salary | VA | $ 1,866.77 | $ 115.74 | $ 27.07 | | |
| Redacted | 001609 | Salary | WA | $ 1,826.93 | $ 113.27 | $ 26.49 | 14.62 | |
| | | | | **$ 121,383.69** | **$ 7,525.79** | **$ 1,760.06** | **41.66** | |

**Exhibit 2_001**

|  | Amount |
|---|---|
| **Estimated Employer 401k Contribution (8/5/24 - 8/9/24)** | $14,325.23 |
| **Estimated Employer 401k Contribution (8/5/24 - 8/9/24)** | $7,970.52 |

| **Reimbursed Expenses (estimate)** | $95,000 |
|---|---|

**INDEPENDENT CONTRACTORS**

| Independent Contractor | File Number | Rate Type | STATE WO | TOTAL Wages | Total Insider |
|---|---|---|---|---|---|
| CYM Business Solutions | N/A | IC | CA | $2,208 | |
| Mark Green - CFO | N/A | IC | CA | $6,096 | $6,096 |
| James Q. | N/A | IC | CA | $8,000 | |
| Pam K. | N/A | IC | MI | $12,000.00 | |
| Richard C. | N/A | IC | CA | $3,663.36 | |

**AGENCY WAGES**

| Agency | Last Name | First Name | Period | TOTAL Wages | Total Insider |
|---|---|---|---|---|---|
| Select Staffing | N/A | | July 1, 2024 - July 31, | $15,288.00 | |
| Aston Carter | N/A | | July 2024 - | $706.80 | |

**Exhibit 2_002**

# Investment Summary

Quote Number 02-2024-241122 4

**ADP**

| Company Information | Executive Contact |
|---|---|
| Irwin Naturals | Mark  Green |
| 5310 Beethoven St | CFO |
| Los Angeles, CA 90066-7015 | Mark@irwinnaturals.com |
| United States | (310) 306-3636 |
| | x{3500} |







| 79 | $0.00 | $57,608.45 |
|---|---|---|
| Total Employees | Implementation Costs | Total Annual Investment |

## Expiration

5/21/2024

**ADP Sales Associate**

Emily Bahr
HRO DM
emily.bahr@adp.com

** The Implementation Costs and Total Annual Investment listed out on this Investment Summary are estimates based on the services, frequencies, recurring rates and pay counts outlined on the sales order and are shown for illustrative purposes only.  These numbers are not binding amounts and shall not become incorporated into or made a part of any sales order or services agreement governing the services contemplated therein.

Page 1

**Exhibit 3_001**



# GLOBAL MASTER SERVICES AGREEMENT

Effective Date: 5/20/2024

As between:

**ADP, INC.**                                        -and-                                        **Irwin Naturals**
(Referred to in this agreement as "**ADP**")                              (Referred to in this agreement as "**Client**")
One ADP Boulevard                                                                              5310 Beethoven St
Roseland, NJ  07068                                                          Los Angeles,  CA  90066-7015

ADP and Client agree that ADP shall provide Client with the following services in accordance with the terms set forth in this Global Master Services Agreement and the applicable Sales Order (as defined herein):

- ADP Payroll Services – delivered via ADP Workforce Now

- ADP Comprehensive Services:

    - Human Resource Administration Services – delivered via ADP Workforce Now

- ADP Compliance on Demand

- ADP DataCloud

- ADP Document Cloud

- ADP Marketplace

- ADP Time & Attendance Services

- Benefit Services – delivered via ADP Workforce Now

- Comprehensive Learning Library (myLearning@ADP)

- Employment Verification Services

- ESS & MSS Technology

- Essential ACA Services

- Participant Solution Center Support

- Talent Acquisition Solutions – delivered via ADP Workforce Now

- Talent Management Solutions – delivered via ADP Workforce Now

**ADP, INC.**                                                          **Irwin Naturals**

*Emily Bahr*                                                          *Mark Green*

ADP eSignature    1009925935
Info                       38.76.113.130
5/20/2024
5:00:29 PM

Signature of Authorized Representative                    Signature of Authorized Representative

Emily Bahr                                                          Mark Green

Name **-** Please Print                                              Name **-** Please Print

HRO DM                                                              CFO

Title                                                                    Title

Notwithstanding any Investment Summary that may precede this Global Master Services Agreement and the page numbering below, this signature page is the first page of the Global Master Services Agreement and the Investment Summary that precedes it is for illustration purposes only and shall not become part of the Global Master Services Agreement.

# Appendices

- Appendix: ADP Comprehensive Services - Service Definition

- Appendix: Data Privacy

PROPRIETARY AND CONFIDENTIAL TO ADP, INC.

**Exhibit 3_003**    Page 3

# Global Master Terms and Conditions

## 1   Definitions

**1.1**   **ADP HCM Services**. Only those Services, as defined below, that have been purchased by Client (as listed on the cover page, a Sales Order or otherwise) will be applicable.

**1.1.1**   **ADP Compliance on Demand.** A workforce management solution that provides clients with access to information and best practice guidance.   ADP Compliance on Demand may include access to (1) a self-service library of human resources compliance information, (2) an online community to collaborate with other clients, (3) Tier 1 human resources professionals available to support and assist clients with their workforce management administration requirements, and (4) Tier 2 compliance experts who are available for up to a total of four (4) contacts per year.

**1.1.2**   **ADP Comprehensive Services.** ADP's business process outsourcing services delivered via ADP Workforce Now technology that covers the spectrum of human capital management services, including payroll, human resources, time and attendance, recruitment, talent, learning, benefits, among other services, as further described in the Service Definitions.

**1.1.3**   **ADP Data Cloud.** Provide tools to analyze and understand data.

**1.1.3.1**   **Analytics.** Enables an employer to gain insight from data for key Human Capital Management (HCM) metrics.

**1.1.3.2**   **Market and People Insights.**   Enables comparison of an employer's performance with other companies in the same industry and/or region to facilitate insight into business performance against industry averages for key Human Capital Management (HCM) metrics.

**1.1.4**   **ADP Document Cloud.** Integrated solution to support maintenance and retrieval of employee-specific documents via cloud-based technology.

**1.1.5**   **ADP Marketplace.** Enable Client to build applications and/or purchase available applications via online store. Provide access to certain Client data stored in ADP systems via industry-standard Application Programming Interfaces (APIs).

**1.1.6**   **ADP Payroll Services.** Administration and processing of payroll including performing gross-to-net calculations and generating and/or transmitting of payment instructions, and also including:

**1.1.6.1**   **ADP Employment Tax Services.** Coordination of payroll-related tax and/or regulatory agency deposits, filings and reconciliations on behalf of employers.

**1.1.6.2**   **ADP Wage Garnishment Payment Services.** Garnishment payment processing and disbursement of payments to appropriate Payees as directed by Client.

**1.1.6.3**   **ADP Wage Payment Services.** Payment of wages, commissions, consulting fees, or similar compensation or work-related expenses in the employment context to employees and independent contractors via direct deposit, check or payroll debit cards, in each case only to the extent applicable.

**1.1.6.4**   **Print and Online Statement Services.** Print and distribution of payroll checks, pay statements, and/or year-end statements, as well as online posting of pay statements and/or year-end statements.

**1.1.6.5**   **State Unemployment Insurance (SUI) Management Services.** ADP becomes the unemployment insurance address of record. ADP requests the state to send unemployment insurance claims, charges, tax rates and related information to ADP and Client receives a quarterly summary of all claims.

**1.1.7**   **ADP Time & Attendance Services.** Support of time-related services, including time data collection, employee scheduling, timecard reviews and approvals, and consistent application of time-related policies.

**1.1.8**   **ADP Workforce Now.** ADP's web-based portal which provides a single point of access to ADP online solutions and employee-facing websites and resources related to payroll, HR, benefits, talent, and time and attendance.

**1.1.9**   **Benefit Services.** Technology to facilitate the administration of employee benefits, including applying eligibility rules, facilitating online enrollment and changes and calculating payroll deductions within a unified system, as well as providing data to carriers through ADP carrier connection services.

**1.1.10**   **COBRA Services.** Access to a solution for administration of federal COBRA continuation coverage, including required notification and billing.

**1.1.11**   **Employment Verification Services.** Management of employment and income verification requests.

**1.1.12**   **ESS & MSS Technology.** Employee self-service (ESS) and Manager self-service (MSS) functionality provides all Client Users (practitioners, managers and employees) 24x7 online access to ADP Application Programs.

**1.1.13**   **Essential ACA Services.** A technology and software solution to assist Client in managing compliance needs related to the Affordable Care Act (ACA), including eligibility calculations and affordability determinations, preparation and electronic filing of Forms 1094-C and 1095-C, access to evidence of benefit offering information and benefit offering audit reports.

**1.1.14    Human Resources Administration Services**. Administration of human resource functions using a unified system to process and audit employee lifecycle events, provide compliance tracking and reporting, including new hire reporting, and automate notification and approval processes via self-service/direct access, as further described in the Service Definitions, and also including:

**1.1.14.1    WFN EI-9 Services.** Electronic I-9 administration and onboarding services to help facilitate and manage I-9 and related employment eligibility verification processes.

**1.1.14.2    HR Consultant.** Access to HR consultant to provide guidance, HR best practices, and support for maximizing the use of HR and Talent Management Services technology

**1.1.14.3    Knowledge and Document Library.** Online library of HR best practices, template letters, procedures, checklists and legislative considerations, including job descriptions, employee and administrator onboarding welcome kits, employee handbooks, interview and hiring best practices, among other templates and forms.

**1.1.14.4    Comprehensive Learning Library (myLearning@ADP)**. Online access to ADP self-paced, web-based training library content and some live instructor-led webinars. Library will consist of courses covering topics such as compliance, broad workplace safety, workplace culture, and leadership/performance and will be available to employees, managers, practitioners and administrators.

**1.1.14.5    EAP.** Access to employee assistance programs.

**1.1.14.6    Employee Perks.** Access to employee discount programs.

**1.1.15    Participant Service Center.** Management of inquiries related to services through ADP service center locations as part of a comprehensive offering.

**1.1.16    Talent Acquisition Solutions**. Talent acquisition solutions made up of the following:

**1.1.16.1    ADP Recruiting Management Services.** Talent recruiting management technology, including talent acquisition for exempt and non-exempt workforce.

**1.1.17    Talent Management Solutions**. Technology to facilitate the administration of talent management services, including:

**1.1.17.1    ADP Compensation Management**. Solutions and tools to administer the compensation planning process.

**1.1.17.2    ADP Performance Management.** Solutions and tools to facilitate the performance management process, including goal alignment and employee engagement.

**1.1.17.3    Learning Management**. Solutions and tools to facilitate the career and individual development of the workforce through formal and informal learning.

**1.1.17.4    Succession Planning.** Solutions and tools to facilitate talent assessments and establish action plans for critical roles.

**1.2    General**

**1.2.1    "ADP"** has the meaning set forth on the cover page.

**1.2.2    "ADP Application Programs"** means the computer software programs and related Documentation, including any updates, modifications or enhancements thereto, that are either delivered or made accessible to Client through a hosted environment by ADP in connection with the Services.

**1.2.3    "ADPCheck"** means checks printed and distributed by ADP to Payees pursuant to Client's direction.

**1.2.4    "ADPCheck Services"** refers to ADP's payment of Client's Payees for Permitted Payments through ADPCheck.

**1.2.5    "ADP Direct Deposit Services"** means ADP's full service direct deposit services which includes ADP's payment of Client's Payees who have elected to receive Permitted Payments by direct deposit into an account at a financial institution of such Payee's selection.

**1.2.6    "Affiliate"** means, with respect to any entity, any other entity that controls, is controlled by or under control with such first entity.  For purposes of this Agreement, "control" (or variants of it) means the ability, whether directly or indirectly, to direct the management and corporate policies and actions of an entity by means of ownership, contract or otherwise. Client's Affiliates do not include third parties for whom Client is a service provider or provides outsourcing services.

**1.2.7    "Agreement"** means this Global Master Services Agreement, consisting of the signature pages, the Global Master Terms and Conditions, all exhibits, annexes, appendices, addenda and schedules, and each Amendment, if any.

**1.2.8    "Amendment"** means a written amendment to this Agreement modifying, supplementing or amending the terms and conditions of this Agreement.

**1.2.9    "API"** means application programming interface.

**1.2.10**  **"Biometric Data"** includes the information collected by timeclocks and software that use finger and/or hand scan technology, which potentially may include Biometric Identifiers and Biometric Information.

**1.2.11**  **"Biometric Identifier"** means a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry.

**1.2.12**  **"Biometric Information"** means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual.

**1.2.13**  **"Biometric Services"** means services provided by ADP to Client via the use of timeclocks and software in connection with ADP's provision of Time & Attendance Services, to the extent such timeclocks or software collect, store or use Biometric Data.

**1.2.14**  **"Biometric User"** means Client's employees or independent contractors who use Biometric Services to record their attendance, hours worked or other work-related data.

**1.2.15**  **"Business Day"** means any day, except a Saturday, Sunday or a day on which ADP's bank is not open for business in the applicable jurisdiction where services are provided by ADP.

**1.2.16**  **"Cardholder"** means the Payees of Client who receive a Pay Card.

**1.2.17**  **"Client"** has the meaning set forth on the cover page.

**1.2.18**  **"Client ACA Liaison"** means the Client's designated person who shall serve as ADP's principal contact for Essential ACA Services.

**1.2.19**  **"Client Content"** means all information and materials provided by Client, its agents or employees, regardless of form.

**1.2.20**  **"Client Group"** means Client and Client's Affiliates listed in the Sales Order who are authorized to receive the Services.

**1.2.21**  **"Client Infringement Event"** means (i) any change or enhancement in, or use of, the Services by Client or a third party on Client's behalf other than at the direction of, or as approved by, ADP or (ii) Client's failure to use the most current release or version of any computer software programs included in the ADP Application Programs or any corrections or enhancements provided by ADP thereto (to the extent ADP requires Client to use the most current release or version of any computer software programs, the implementation of such shall be at no charge to Client).

**1.2.22**  "**Client-Uploaded Material**" any content uploaded, used, copied, installed or enabled on myLearning@ADP.

**1.2.23**  **"Confidential Information"** means all trade secrets, processes, proprietary data and documentation and any pricing and product information, Personal Data, the terms of this Agreement, and any other information that is confidential or proprietary provided by the disclosing party to the receiving party for use in connection with the Services or this Agreement, but does not include information that (i) the receiving party already knows prior to its disclosure by the disclosing party,  (ii) becomes generally available to the public, except as a result of disclosure by the receiving party in violation of this Agreement or (iii) becomes known to the receiving party on a non-confidential basis from a source other than the disclosing party.

**1.2.24**  "**Data Security Breach**" means a security breach as defined by applicable law or any incident that compromises the confidentiality, integrity, or availability of Personal Data.

**1.2.25**  **"DHS"** means the U.S. Department of Homeland Security.

**1.2.26**  **"Documentation"** means all manuals, tutorials and related materials that may be provided or made available to Client by ADP in connection with the Services.

**1.2.27**  "**Early Termination Fee**" has the meaning set forth in Section 12.4.

**1.2.28**  **"Effective Date"** has the meaning set forth on the cover page.

**1.2.29**  **"ERISA"** means Employee Retirement Income Security Act of 1974, as amended.

**1.2.30**  **"E-Verify"** means the DHS's employment eligibility verification program which allows participating employers to electronically verify the employment eligibility of each newly hired employee and/or employee assigned to a covered federal contract.

**1.2.31**  **"Form I-9"** means the employment eligibility verification form issued by the DHS.

**1.2.32**  "**FCRA**" means the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.

**1.2.33**  **"Global Master Terms and Conditions"** means the terms and conditions contained in the main body of this document following the signature pages.

**1.2.34**  "**Go-Live Date**" means the date of commencement of the first live processing of any given Service.

**1.2.35**  **"I-9 Handbook"** means the current USCIS Handbook for Employers: Instructions for Completing Form I-9 (M-274).

**1.2.36**  **"Implementation Services"** means the Services to be performed in order to commence ongoing Services.

**1.2.37**  **"Improvements"** has the meaning set forth in Section 5.4.

**1.2.38**  **"Indemnitee"** has the meaning set forth in Section 6.3.

**1.2.39**  **"Indemnitor"** has the meaning set forth in Section 6.3.

**1.2.40**  **"Initial Term"** means the period beginning as of the Effective Date and ending one (1) year after the date of Client's first monthly invoice for Services.

**1.2.41**  **"Intellectual Property Rights"** means all rights, title and interest to or in patent, copyright, trademark, service mark, trade secret, business or trade name, know-how and rights of a similar or corresponding character.

**1.2.42**  **"Internal Business Purposes"** means the usage of the Services, including the ADP Application Programs, exclusively by the Client Group for its own internal business purposes, without the right to provide service bureau or other data processing services, or otherwise share or distribute the Services.

**1.2.43**  **"NACHA"** means the National Automated Clearing House Association.

**1.2.44**  "**Notice to Furnishers**" means with respect to Employment Verification Services, the notice provided to a furnisher of information pursuant to the Obligations of Furnishers of Information provided at the following URL: https://www.consumer.ftc.gov/articles/pdf-0092-notice-to-furnishers.pdf.

**1.2.45**  **"Payee"** means any intended recipient of payments under the Payment Services and may include Client's employees, taxing authorities, governmental agencies, suppliers, benefit carriers and/or other third parties; provided that in the case of ADP Wage Payment Services, Payee shall be limited to Client's employees and independent contractors.

**1.2.46**  **"Payment Services**" means Services that involve electronic or check payments being made by ADP to third parties on Client's behalf and at its direction.

**1.2.47**  **"Permitted Payment"** means the legal payment of wages, commissions, consulting fees or similar compensation or work-related expenses in the employment context.

**1.2.48**  **"Personal Data"** means any information relating to an identified or identifiable natural person.  An identifiable person is one who can be identified, directly or indirectly, in particular by reference to an identification number or to one or more factors specific to such person's physical, physiological, mental, economic, cultural or social identity.

**1.2.49**  **"Plan"** means Client's plan, including a group health plan, as identified by Client for the applicable Services.

**1.2.50**  **"Plan Administrator"** means the appropriate plan administrator as defined in Section 3(16)(A) of ERISA and Section 414(g) of the Internal Revenue Code of 1986, as amended.

**1.2.51**  **"Renewal Term"** means each additional one (1) year period after the Initial Term.

**1.2.52**  "**Sales Order(s)**" means the document(s) between the parties that lists the specific Services purchased by Client Group from ADP.

**1.2.53**  **"Services"** means the services listed on the cover page of this Agreement (including Implementation Services related thereto and ADP Application Programs), as may be further described in the Services Definitions, and such other services as the parties may agree to be performed from time to time.

**1.2.54**  **"SOC 1 Reports"** has the meaning set forth in Section 9.1.

**1.2.55**  **"Term"** means the Initial Term together with each Renewal Term, if any.

**1.2.56**  "**Termination Event**" means with respect to any party, the occurrence of any of the following: (i) under the applicable bankruptcy laws or similar law regarding insolvency or relief for debtors, (A) a trustee, receiver, custodian or similar officer is appointed for a party's business or property, (B) a party seeks to liquidate, wind-up, dissolve, reorganize or otherwise obtain relief from its creditors, or (C) an involuntary proceeding is commenced against a party and the proceeding is not stayed, discharged or dismissed within thirty (30) days of its commencement, or (ii) a party's Standard and Poor's issuer credit rating falls to or below BB.

**1.2.57**  **"Time & Attendance Hardware"** means timeclocks and other time collection devices provided to Client by ADP in connection with the ADP Time & Attendance Services.  Hardware may be purchased or provided on a subscription basis.

**1.2.58**  **"Unauthorized Third Party"** means any commercial third party or business that seeks to access or accesses ADP Application Programs using the account credentials (e.g., username and password) of a User even if such User has provided consent.

**1.2.59**  **"USCIS"** means U.S. Citizenship and Immigration Services.

**1.2.60** **"User"** means any single natural person who, subject to the terms of this Agreement, is an employee or independent contractor of Client authorized by Client to use, access or receive the Services.

**1.2.61** **"Verification Agent"** means ADP and its subcontractors, as authorized by the Client, to perform Employment Verification Services.

**1.2.62** **"Verification Data"** means employment and income information disclosed on the Client's behalf in connection with Employment Verification Services.

**1.2.63** **"Verifiers"** means commercial, private, non-profit and government entities and their agents that wish to obtain or verify any Client's employees or former employees Verification Data in connection with Employment Verification Services.

## 2   Provision and Use of Services

**2.1**   **Provision of Services.**  ADP, or one of its Affiliates, will provide the Services to Client Group in accordance with the terms of this Agreement.  ADP will provide the Services in a good, diligent and professional manner in accordance with industry standards, utilizing personnel with a level of skill commensurate with the Services to be performed. ADP's performance of the Services (including any applicable implementation activities) is dependent upon the timely completion of Client's responsibilities and obligations under this Agreement. Without limitation of the foregoing, Client will timely provide the Client Content necessary for ADP to provide the Services.

**2.2**   **Cooperation.**  ADP and Client will work together to implement the Services.  Client will cooperate with ADP and execute and deliver all documents, forms, or instruments necessary for ADP to implement and render the Services.  Client will provide ADP with all reasonable and necessary Client Content in the format requested by ADP, and will otherwise provide all reasonable assistance required of Client in order for ADP to successfully implement the Services.

**2.3**   **Use of Services.**  Client will use the Services in accordance with the terms of this Agreement and solely for its own Internal Business Purposes. Client will be responsible for the use of the Services by the Client Group and the Users in accordance with the terms of this Agreement. Client understands and agrees that only Users are permitted to access and use ADP Application Programs (and that access by Unauthorized Third Parties is not permitted) and will reasonably cooperate with ADP to limit access to such persons. Client is responsible for the accuracy and completeness of the Client Content provided to ADP. ADP Workforce Now is designed for the United States and Canada and enables the processing of HR data for global human capital management needs. Client may, at its discretion, enable ADP Workforce Now functionality in other jurisdictions, except when prohibited by applicable law. ADP makes no representation or warranty that such global use comports with any local laws, regulations or directives outside the United States and Canada. Furthermore, if Client during the implementation process or as part of the ongoing Services configures the ADP Application Programs to process additional data elements beyond those data elements that are required by ADP to perform the Services, Client will remain solely responsible for such configurations, including the processing of Personal Data pursuant to applicable law.

**2.4**   **Errors.**  Client will promptly review all documents and reports produced by ADP and provided or made available to Client in connection with the Services and promptly notify ADP of any error, omission, or discrepancy with Client's records.   ADP will promptly correct such error, omission or discrepancy and, if such error, omission or discrepancy was caused by ADP, then such correction will be done at no additional charge to Client.

**2.5**   **Records.**  Unless expressly included as a part of the Services, and without prejudice to ADP's obligation to retain the data necessary for the provision of the Services, ADP does not serve as Client's record keeper and Client will be responsible for retaining copies of all documentation received from or provided to ADP in connection with the Services to the extent required by law or Client's internal policies.

**2.6**   **Third Party Services Available through or Integrated with the Services.**  At times, ADP may make available to Client through the Services, or integrate the Services with, the services of a third party, either through a link, integration, or otherwise. ADP reserves the right to terminate such links, services or integrations at any time for any reason. If Client uses any third party services that are integrated with or linked to the Services which require the transmission, use, sharing, access or exchange of Client Content or any other payroll or other data or information provided to ADP or the third party by Client, Client is expressly agreeing to the transmission, use, sharing, access and exchange of such data between ADP and the third party. Client's use of any third party services will be governed by any terms Client agrees to with the third party and in the event of any conflict between the terms of this Agreement and any third party terms, the terms of this Agreement will apply to the provision of the Services by ADP to Client.

## 3   Compliance

**3.1**   **Applicable Laws.**  Each party will comply with laws and regulations that affect its business generally, including any applicable anti-bribery, export control, computer fraud and data protection laws.

**3.2**   **Design of the Services.**  ADP will design the Services, including the functions and processes applicable to ADP's performance of the Services, to assist the Client in complying with its legal and regulatory requirements applicable to the Services, and ADP will be responsible for the accuracy of such design.  Client and not ADP will be responsible for (i) how it uses the Services to comply with its legal and regulatory requirements and (ii) the consequences of any instructions that it gives to ADP, including as part of the implementation of the Services, provided ADP follows such instructions.  Services do not include any legal, financial, regulatory, benefits, accounting or tax advice.

**3.3**   **Online Statements.** If Client instructs ADP to provide online pay statements, Forms W2, Forms 1099, or Forms 1095-C without physical copies thereof, Client will be exclusively responsible for determining if and to what extent Client's use of online pay statements, Forms W2, Forms 1099, or Forms 1095-C satisfies Client's obligations under applicable laws and the consequences resulting from such determinations.

3.4    **Data Privacy Appendix.**  The Data Privacy Appendix is attached as an appendix to this Agreement.

# 4  Confidentiality

4.1    **General**.  All Confidential Information disclosed under this Agreement will remain the exclusive and confidential property of the disclosing party.  The receiving party will not disclose to any third party the Confidential Information of the disclosing party and will use at least the same degree of care, discretion and diligence in protecting the Confidential Information of the disclosing party as it uses with respect to its own confidential information.  The receiving party will limit access to Confidential Information to its employees and independent contractors with a need to know the Confidential Information and will instruct those employees and independent contractors to keep such information confidential.  ADP may disclose Client's Confidential Information on a need to know basis to (i) ADP's subcontractors who are performing the Services, provided that ADP shall remain liable for any unauthorized disclosure of Client's Confidential Information by those subcontractors, (ii) employees of ADP's Affiliates, provided such employees are instructed to keep the information confidential as set forth in this Agreement and (iii) social security agencies, tax authorities and similar third parties, to the extent strictly necessary to perform the Services.  ADP may use Client's and its employees' and other Services recipients' information in an aggregated, anonymized form, such that neither Client nor such person may be identified, and Client will have no ownership interest in such aggregated, anonymized data.  Client authorizes ADP to release employee-related data, and such other data as required to perform the Services, to third party vendors of Client as designated by Client from time to time. Notwithstanding the foregoing, the receiving party may disclose Confidential Information (x) to the extent necessary to comply with any law, rule, regulation or ruling applicable to it, (y) as appropriate to respond to any summons or subpoena or in connection with any litigation and (z) to the extent necessary to enforce its rights under this Agreement.

4.2    **Return or Destruction**.  Upon the request of the disclosing party or upon the expiration or earlier termination of this Agreement, and to the extent feasible, the receiving party will return or destroy all Confidential Information of the disclosing party in the possession of the receiving party, provided that each party may maintain a copy if required to meet its legal or regulatory obligations and may maintain archival copies stored in accordance with regular computer back-up operations.  To the extent that any portion of Confidential Information of a disclosing party remains in the possession of the receiving party following expiration or earlier termination of this Agreement, such Confidential Information shall remain subject to the generally applicable statutory requirements and the confidentiality protections contained in Section 4.1.

# 5  Intellectual Property

5.1    **Client IP Rights.**  Except for the rights expressly granted to ADP in this Agreement, all rights, title and interests in and to Client Content, including all Intellectual Property Rights inherent therein and pertaining thereto, are owned exclusively by Client or its licensors.  Client hereby grants to ADP for the Term a non-exclusive, worldwide, non-transferable, royalty-free license to use, edit, modify, adapt, translate, exhibit, publish, reproduce, copy and display the Client Content for the sole purpose of performing the Services; provided Client has the right to pre-approve the use by ADP of any Client trademarks or service marks.

5.2    **ADP IP Rights**.  Except for the rights expressly granted to Client in this Agreement, all rights, title and interest in and to the Services, including all Intellectual Property Rights inherent therein and pertaining thereto, are owned exclusively by ADP or its licensors.  ADP grants to Client for the Term a personal, non-exclusive, non-transferable, royalty-free license to use and access the ADP Application Programs solely for the Internal Business Purposes in the United States and Canada and solely up to the maximum number of Users (if any) indicated in the Sales Order.  The ADP Application Programs do not include any Client-specific customizations unless otherwise agreed in writing by the parties.  Client will not obscure, alter or remove any copyright, trademark, service mark or proprietary rights notices on any materials provided by ADP in connection with the Services, and will not copy, recompile, disassemble, reverse engineer, or make or distribute any other form of, or any derivative work from, such ADP materials.

5.3    **Ownership of Reports.**  Client will retain ownership of the content of reports and other materials that include Client Content produced and delivered by ADP as a part of the Services, provided that ADP will be the owner of the format of such reports.  To the extent any such reports or other materials incorporate any ADP proprietary information, ADP (i) retains sole ownership of such proprietary information and (ii) provides the Client a fully paid up, irrevocable, perpetual, royalty-free license to access and use same for its Internal Business Purposes without the right to create derivative works (other than derivative works to be used solely for its Internal Business Purposes) or to further distribute any of the foregoing rights outside the Client Group.

5.4    **Improvements.**  ADP will make available to Client, at no additional cost, software improvements, enhancements, or updates to any ADP Application Programs that are included in the Services (collectively "**Improvements**") if and as they are made generally available by ADP at no additional cost to ADP's other clients using the same ADP Application Programs as Client and receiving the same Services as Client.  All Improvements provided under this Section 5.4 shall be considered part of the ADP Application Programs.  If Client fails to implement Improvements provided or made available to Client by ADP, ADP shall be relieved of any responsibility for errors or degradation in the Services and shall have no obligation to provide support for the ADP Application Programs.

# 6  Indemnities

6.1    **ADP Indemnity.**  Subject to the remainder of this Section 6.1, and Sections 6.3 and 7, ADP will defend Client against any third party claims and will indemnify and hold Client harmless from any resulting damage awards or settlement amounts in any cause of action to the extent such cause of action is based on a claim alleging that the Services or ADP Application Programs, as provided by ADP and used in accordance with the terms of this Agreement, infringe upon any Intellectual Property Rights of a third party in the United States.  The foregoing infringement indemnity will not apply and ADP will not be liable for any damages assessed in any cause of action to the extent resulting from a Client Infringement Event or ADP's use of Client Content as contemplated by this Agreement.  If any Service is held or believed to infringe on any third-party's Intellectual Property Rights, ADP may, in its sole discretion, (i) modify the Service to be non-infringing, (ii) obtain a license to continue using such Service, or (iii) if neither (i) nor (ii) are practical, terminate this Agreement as to the infringing Service and return to Client any unearned fees prepaid by Client to ADP.

**6.2**    **Client Indemnity**.  Subject to Sections 6.3 and 7, Client will defend ADP against any third party claims and will indemnify and hold ADP harmless from any resulting damage awards or settlement amounts in any cause of action to the extent such cause of action is based on the occurrence of a Client Infringement Event or ADP's use of Client Content as contemplated by this Agreement.

**6.3**    **Indemnity Conditions.**  The indemnities set forth in this Agreement are conditioned on the following: (i) the party claiming indemnification (the **"Indemnitee"**) shall promptly notify the indemnifying party (the **"Indemnitor"**) of any matters in respect of which it seeks to be indemnified, and shall give the Indemnitor full cooperation and opportunity to control the response thereto and the defense thereof, including without limitation any settlement thereof, (ii) the Indemnitor shall have no obligation for any claim under this Agreement if the Indemnitee makes any admission, settlement or other communication regarding such claim without the prior written consent of the Indemnitor, which consent shall not be unreasonably withheld, and (iii) the Indemnitee's failure to promptly give notice to the Indemnitor shall affect the Indemnitor's obligation to indemnify the Indemnitee only to the extent the Indemnitor's rights are materially prejudiced by such failure. The Indemnitee may participate, at its own expense, in such defense and in any settlement discussions directly or through counsel of its choice.

## 7    Limit on Liability

**7.1**    **Ordinary Cap.**  Notwithstanding anything to the contrary in this Agreement and subject to the remainder of this Section 7, neither party's aggregate liability in any calendar year shall exceed an amount equal to six (6) times the average ongoing monthly Services fees paid or payable to ADP by Client during such calendar year for all Services (the "**Ordinary Cap**").

**7.2**    **Extraordinary Cap.**  As an exception to Section 7.1, if damages arise from a breach of Section 4 (Confidentiality), Section 9.3 (Data Security) or Section 9.4 (Unauthorized Third Party Access), the Ordinary Cap will be increased by an additional six (6) times the average ongoing monthly Services fees paid or payable to ADP by Client during such calendar year for all Services (the "**Extraordinary Cap**").  For the avoidance of doubt, in no case shall either party's aggregate liability in any calendar year under this Agreement exceed an amount equal to twelve (12) times the average monthly ongoing Services fees paid or payable to ADP by Client during such calendar year for all Services.

**7.3**    **Matters not Subject to the Cap.** The foregoing limits on liability shall not apply to the following:

**7.3.1**    Client's funding obligations in connection with the Payment Services;

**7.3.2**    Loss or misdirection of Client funds in possession or control of ADP due to ADP's error or omission;

**7.3.3**    In connection with the ADP Employment Tax Services, (i) interest charges imposed by an applicable tax authority on Client for the failure by ADP to pay funds to the extent and for the period that such funds were held by ADP and (ii) all tax penalties resulting from ADP's error or omission in the performance of such Service. The provisions of this Section 7.3.3 shall only apply if (x) Client permits ADP to act on Client's behalf in any communications and negotiations with the applicable taxing authority that is seeking to impose any such penalties or interest and (y) Client assists ADP as reasonably required by ADP;

**7.3.4**    Either party's gross negligence, or willful, criminal or fraudulent misconduct;

**7.3.5**    The infringement indemnity set forth in Section 6.1 and 6.2;

**7.3.6**    Client's biometrics indemnity set forth in Section 14;

**7.3.7**    Client's obligations to pay the fees for Services; and

**7.3.8**    ADP's obligations to provide credit monitoring as set forth in Section 10.2.

**7.4**    **Mitigation of Damages.**  ADP and Client will each use reasonable efforts to mitigate any potential damages or other adverse consequences arising from or related to the Services.

**7.5**    **No Consequential Damages.**  NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT AND ONLY TO THE EXTENT PERMITTED BY APPLICABLE LAW, NONE OF ADP, CLIENT OR ANY BANK WILL BE RESPONSIBLE FOR SPECIAL, INDIRECT, INCIDENTAL, CONSEQUENTIAL OR OTHER SIMILAR DAMAGES (INCLUDING DAMAGES FOR LOSS OF BUSINESS OR PROFITS, BUSINESS INTERRUPTIONS OR HARM TO REPUTATION) THAT ANY OTHER PARTY OR ITS RESPECTIVE AFFILIATES MAY INCUR OR EXPERIENCE IN CONNECTION WITH THIS AGREEMENT OR THE SERVICES, HOWEVER CAUSED AND UNDER WHATEVER THEORY OF LIABILITY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. The foregoing exclusion shall not apply to claims for consequential damages arising from (i) ADP's or Client's gross negligence or willful, criminal or fraudulent misconduct, (ii) Client or Client's Users sharing or allowing access to a User's password, User ID, or other form of user authentication, or (iii) ADP's or Client's breach or breaches of Section 4.1 or Section 9.3 under this Agreement; provided however, that any consequential damages recovered by Client or ADP in a calendar year for claims pursuant to Sections 7.5(ii) and 7.5(iii) will be subject to the Extraordinary Cap set forth in Section 7.2 above.

## 8    Warranties and Disclaimer

**8.1**    **Warranties.**  Each party warrants that (i) it has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby and (ii) this Agreement has been duly and validly executed and delivered and constitutes the valid and binding agreement of the parties, enforceable in accordance with its terms.

**8.2**    **DISCLAIMER.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, ALL SERVICES, ADP APPLICATION PROGRAMS AND EQUIPMENT PROVIDED BY ADP OR ITS SUPPLIERS ARE PROVIDED "AS IS" AND ADP AND ITS LICENSORS AND

SUPPLIERS EXPRESSLY DISCLAIM ANY WARRANTY, EITHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, NON-INTERRUPTION OF USE, AND FREEDOM FROM PROGRAM ERRORS, VIRUSES OR ANY OTHER MALICIOUS CODE, WITH RESPECT TO THE SERVICES, THE ADP APPLICATION PROGRAMS, ANY CUSTOM PROGRAMS CREATED BY ADP OR ANY THIRD-PARTY SOFTWARE DELIVERED BY ADP AND RESULTS OBTAINED THROUGH THE USE THEREOF.

**8.3**   **ADP COMPREHENSIVE SERVICES DISCLAIMERS**. THE PARTIES ACKNOWLEDGE AND AGREE THAT:

**8.3.1**   THE ADP COMPREHENSIVE SERVICES PROVIDED HEREUNDER, INCLUDING, BUT NOT LIMITED TO, ANY AND ALL INFORMATION, MATERIALS, FORMS, AND PARTICIPANT SERVICE CENTER ACCESS, ARE PRESENTED IN GOOD FAITH, ARE GENERAL AND EDUCATIONAL IN NATURE AND ARE NOT INTENDED TO BE AND WILL NOT BE RELIED UPON BY CLIENT AS EITHER LEGAL, FINANCIAL, INSURANCE OR TAX ADVICE. FURTHERMORE, THE INFORMATION CONTAINED IN THE COMPREHENSIVE SERVICES MAY NOT BE APPLICABLE TO OR SUITABLE FOR EVERY SPECIFIC FACT SCENARIO OR CIRCUMSTANCE OR NEED AND MAY REQUIRE CONSIDERATION OF OTHER MATTERS AND LEGAL SUPPORT. CLIENT ACKNOWLEDGES THAT IT IS RESPONSIBLE FOR SEEKING ADVICE, AS IT DEEMS NECESSARY, FROM QUALIFIED LEGAL, FINANCIAL, INSURANCE, ACCOUNTING OR OTHER PROFESSIONALS IN ALL JURISDICTIONS WHERE CLIENT OPERATES AND HAS EMPLOYEES.

**8.3.2**   THERE MAY BE CONFLICTING CURRENT PRACTICES, POLICIES OR CONTRACTS (WRITTEN OR UNWRITTEN) THAT MUST BE ADDRESSED BY CLIENT PRIOR TO THE ADOPTION AND IMPLEMENTATION OF ANY MATERIAL(S) AND/OR CONTENT(S) UNDER THE COMPREHENSIVE SERVICES. WHERE CERTAIN MATERIAL(S) AND/OR CONTENT(S) ARE BEING ADOPTED AND IMPLEMENTED BY THE CLIENT FOR ITS EXISTING WORKFORCE, IT MAY CONSTITUTE A CHANGE IN THE EMPLOYMENT TERMS OR CONTRACTUAL RELATIONSHIP, AND MAY REQUIRE THE PROVISION OF NOTICE OR CONSIDERATION.

**8.3.3**   IN NO EVENT SHALL ADP BE LIABLE TO CLIENT FOR ANY CLAIM(S) RELATING IN ANY WAY TO CLIENT'S INABILITY OR FAILURE TO PERFORM LEGAL, TAX OR OTHER RESEARCH OR RELATED WORK PROPERLY OR COMPLETELY EVEN IF ASSISTED BY ADP, OR ANY DECISION MADE OR ACTION TAKEN BY CLIENT IN RELIANCE UPON THE CONTENT(S) AND/OR MATERIAL(S) PROVIDED AS PART OF THE COMPREHENSIVE SERVICES. THE CONTENT(S) AND/OR MATERIAL(S) WERE NOT NECESSARILY PREPARED BY A PERSON LICENSED TO PRACTICE LAW IN A PARTICULAR JURISDICTION.

## 9   Security and Controls

**9.1**   **Service Organization Control Reports.**  Following completion of implementation of any applicable Services, ADP will, at Client's request and at no charge, provide Client with copies of any routine Service Organization Control 1 reports ("**SOC 1 Reports**") (or any successor reports thereto) that are both directly related to those Services provided hereunder for Client and already released to ADP by the public accounting firm producing the report.  SOC 1 Reports are ADP Confidential Information and Client will not distribute or allow any third party (other than its independent auditors) to use any such report without the prior written consent of ADP.  Client will instruct its independent auditors or other approved third parties to keep such report confidential and Client will remain liable for any unauthorized disclosure of such report by its independent auditors or other approved third parties.

**9.2**   **Business Continuity; Disaster Recovery**.  ADP maintains a commercially reasonable business continuity and disaster recovery plan and will follow such plan.

**9.3**   **Data Security.**  ADP has an established information security program containing appropriate administrative, technical and physical measures to protect Client data (including Personal Data) against accidental unlawful or unauthorized destruction, alteration, unauthorized disclosure or access consistent with applicable laws.  In the event ADP suspects any unauthorized access to, or use of, the Services and ADP Application Programs, ADP may suspend access to the Services to the extent ADP deems necessary to preserve the security of ADP, Client or User data.

**9.4**   **Unauthorized Third Party Access.**  Client and its Users are responsible for maintaining the security and confidentiality of any password, User ID, or other form of user authentication involved in obtaining access to ADP Application Programs, and Client and its Users shall not disclose any confidential account access credentials or related information to Unauthorized Third Parties.

## 10   Data Security Breach

**10.1**   **Notification**.  If ADP becomes aware of a Data Security Breach of Client's Personal Data, ADP will take appropriate actions to contain, investigate and mitigate the Data Security Breach.  ADP shall notify Client without undue delay after becoming aware that a Data Security Breach has occurred, unless otherwise required or instructed by law enforcement or regulatory authority. ADP will share information in its possession with Client for Client to determine any regulatory reporting obligations required by applicable law.

**10.2**   **Other ADP Obligations**.  In the event that a Data Security Breach is the result of the failure of ADP to comply with the terms of this Agreement, ADP shall, to the extent legally required or otherwise necessary to notify the individuals of potential harm, bear the actual, reasonable costs of notifying affected individuals.  ADP and Client shall mutually agree on the content and timing of any such notifications, in good faith and as needed to meet applicable legal requirements.  In addition, where notifications are required, and where such monitoring is practicable and customary, ADP shall also bear the cost of one year of credit monitoring to affected individuals in the applicable jurisdictions.

## 11   Payment Terms

**11.1**   **Fees and Fee Adjustments.** Client will pay to ADP the fees and other charges for the Services at the rates set forth in the Sales Order for the Initial Term. Total fees charged, including within the Initial Term, may change commensurate with the number of Client's

employees being serviced. ADP may increase prices for Services at any time after the Initial Term upon at least thirty (30) days prior written notice to Client. The fees presented in any Sales Order were calculated based upon particular assumptions relative to Client requirements (including funding requirements), specifications, volumes and quantities as reflected in the applicable Sales Order and related documentation, and if Client's actual requirements vary from what is stated, ADP may adjust the fees based on such changes. The fees do not include any customizations to any Service.

**11.2    Additional Services and Charges.** Any Services provided to Client but not included in a Sales Order will be provided subject to the terms of this Agreement and charged at the applicable rates as they occur; and those services will be considered to be "Services" for purposes of this Agreement. Additional charges may be assessed Client in relation to the performance of the Services in certain circumstances, including without limitation, late funding, an insufficient funds notification and emergency payment requests from Client.

**11.3    Fees for Implementation Services.** Implementation fees are due and payable by Client when billing begins for the Services in accordance with Section 11.4.

**11.4    Invoicing.** Client will be invoiced for fees on a monthly billing cycle. If Client is purchasing Comprehensive HR alone or with any other of the ADP Comprehensive Services, billing shall begin starting the monthly billing cycle following the initial kickoff call with Client's applicable ADP Relationship Manager (the "Kick-off Call"). If Client is purchasing Comprehensive Payroll (without Comprehensive HR),Comprehensive Benefits and/or Comprehensive Talent billing shall begin upon the earlier of (a) the date Client is first able to use the services in a live production environment or (b) ninety (90) days from the Kick-off Call. Notwithstanding the foregoing, if Client is an existing ADP Workforce Now client migrating from Major Accounts Services to Comprehensive Services and has purchased Comprehensive Payroll, Comprehensive Benefit and/or Comprehensive Talent, then Client shall be invoiced for such Comprehensive Services commencing one month from the date Client is implemented on the Comprehensive Services platform. With the exception of the addition of any of the Comprehensive Services, in the event after the Effective Date Client adds additional Services pursuant to an Amendment, unless otherwise specified in such Amendment or Sales Order, billing shall commence when Client is first able to use such added Services in a live production environment. ADP will notify Client of all applicable Services fees payable by Client by way of invoice or other method (i.e. ADP's on-line reporting tool). Client will pay the amount on each invoice or such other similar document in full pursuant to the agreed upon method of payment set forth in the Sales Order. All amounts not paid when due are subject to a late payment charge of one and one-half percent (1.5%) per month (not to exceed the maximum allowed by applicable law) of the past due amount from the due date until the date paid.

**11.5    Currency.** Client shall pay the fees in US dollars.

**11.6    Taxes.** Unless Client provides ADP a valid tax exemption or direct pay certificate, Client will pay directly, or will pay to ADP, an amount equal to all applicable taxes or similar fees levied or based on the Agreement or the Services, exclusive of taxes based on ADP's net income.

**11.7    Postage, Shipping, Travel and Out-of-Pocket Expenses.**  ADP will invoice Client for postage charges, delivery charges, other third party charges, reasonable preapproved travel expenses, and travel-related out-of-pocket expenses, as necessary to provide the Services.

**11.8    Funding Requirements and Disbursement Disclosures.** With respect to Payment Services to be deducted by ACH or Pre-Authorized Debit, Client must have sufficient good funds for payment of the payroll obligations, tax filing obligations, wage garnishment deduction obligations, service fees (as applicable), expenses, and any other applicable charges, to be direct debited from Client's designated account no later than one (1) Business Day  prior to the pay date for the applicable payroll (in the case of payroll processing services), or as otherwise agreed by the parties.  For reverse wire clients, funds must be available (a) by 6:00 a.m. Pacific time on the Business Day immediately before the associated payroll check date (in the case of the ADP Employment Tax Services) and (b) by 6:00 a.m. Pacific time two (2) Business Days prior to the associated payroll check date for all other Payment Services. In consideration for the additional costs incurred by ADP in providing wire transfer service, Client agrees to pay a reasonable fee for each wire transfer.  Notwithstanding the foregoing, ADP reserves the right to modify the aforementioned deadlines at any time and will communicate any such modifications to Client.

**11.9    Change Control.** In the event either party requests a change in the scope of Services (including implementation services) or any rework is required by ADP as a result of a delay by Client in implementation of any Services (each a "**Change Control Item**"), the parties shall address such change request, if possible via ADP's change control process. Change Control Items and the cost associated with such changes (if any) to the Services shall be mutually agreed to by the parties and shall be defined in a statement of work agreed to by the parties, with the exceptions of Change Control Items that are required to be made by law or regulation applicable to the Services or to the duration of implementation services, which ADP will notify Client of prior to making the change.

## 12  Term; Termination; Suspension

**12.1    Term.** This Agreement is effective for the Initial Term and will automatically renew at the end of any Term for additional Renewal Terms unless terminated by either party upon written notice given at least ninety (90) days prior to the end of such Term.

**12.2    Termination for Cause.** Either party may terminate this Agreement for the other's material breach of this Agreement if such breach is not cured within sixty (60) days following notice thereof or in the event either party is the subject of a Termination Event. In addition, ADP may terminate this Agreement in the event Client fails to timely pay fees for Services performed within ten (10) days following notice that such fees are past due. ADP may also terminate this Agreement or the Services immediately on written notice to Client if the provision of Service to Client causes or will cause ADP or its Affiliates to be in violation of any laws, rules or regulations applicable to it including any sanction laws applicable to ADP or any Affiliate.

**12.3    Suspension.**  Without limiting the foregoing, the parties agree that Payment Services involve credit risk to ADP.  Payment Services may be suspended by ADP (A) immediately following notice to Client (i) that Client has failed to remit sufficient, good and available funds within the deadline and via the method of delivery agreed upon as it relates to the applicable Payment Services, or (ii) if Client

breaches any rules promulgated by the NACHA (or other similar local regulator) as it relates to ADP conducting ACH (or similar electronic payment) transactions on behalf of Client, and (B) with 24 hour notice if: (i) a bank notifies ADP that it is no longer willing to originate debits from Client's account(s) or credits for Client's behalf for any reason or (ii) the authorization to debit Client's account is terminated or ADP reasonably believes that there is or has been fraudulent activity on the account. If the Payment Services are terminated or suspended pursuant to Sections 12.2 or 12.3, Client acknowledges that ADP shall be entitled to allocate any funds in ADP's possession that have been previously remitted or otherwise made available by Client to ADP relative to the Payment Services in such priorities as ADP may determine appropriate, including reimbursing ADP for payments made by ADP on Client's behalf to a third party. If the Payment Services are terminated by ADP, Client understands that it will (x) immediately become solely responsible for all of Client's third party payment obligations covered by the Payment Services then or thereafter due (including, without limitation, for ADP Employment Tax Services, any and all penalties and interest accruing after the date of such termination, other than penalties and interest for which ADP is responsible under Section 7.3.3), and (y) reimburse ADP for all payments properly made by ADP on behalf of Client to any Payee, which has not been paid or reimbursed by Client. If the Payment Services remains suspended for 30 days, the affected Payment Service shall be deemed terminated on the 31st day following suspension.

**12.4**    **Early Termination Fee.** In order for ADP to recoup certain costs associated with the Services provided under the Agreement in the event of an early termination, if Client terminates Services or the Agreement in whole or in part for convenience or ADP terminates the Agreement pursuant to Section 12.2 or 12.3 above, Client will reimburse ADP for its costs (including unamortized investments and any costs incurred that have not been recovered from fees charged) associated with the termination of the Services as a percentage of the estimated aggregate ongoing fees for Services (the "**Early Termination Fee**"). During the Initial Term, the Early Termination Fee shall be equal to A multiplied by B where A equals the number of months remaining in the Initial Term, as of the effective date of termination, and B equals the average monthly fee for the terminated Services. During any Renewal Term, the Early Termination Fee shall be equal to fifty percent (50%) of A multiplied by B. If monthly fees for Services have not been payable at the time of termination, B above shall be equal to the estimated monthly fees that would have been payable under the Agreement. In the case of a partial termination, ADP may adjust the fees for the remaining Services accordingly. Client shall also pay the Early Termination Fee in the event of any reduction in Client's volume or usage of Services by more than fifty percent (50%).

**12.5**    **Additional Termination Provisions.**

**12.5.1**    **Additional Termination Provisions for ADP Employment Tax Services**. If the ADP Employment Tax Services in the United States are terminated, Client's access to ADP websites containing Client's data will expire 90 days from the effective date of the termination, and Client will be responsible for downloading all relevant data, including Statements of Deposit (SODs) prior to the expiration of such access.

**12.5.2**    **Additional Termination Provisions for Employment Verification Services**. ADP may, in its sole discretion, terminate the Employment Verification Services at any time upon 90 days prior written notice to Client should a Verification Agent notify ADP that it is no longer willing to provide the Employment Verification Services and ADP, after taking commercially reasonable steps, cannot engage a successor Verification Agent.

**12.5.3**    **Additional Termination Provisions for ADP Time & Attendance Services.** If ADP determines that Client has failed to comply with any potentially applicable laws and regulations applicable to the Biometric Services, ADP may, in its sole discretion and upon notice to Client, immediately suspend or terminate the Biometric Services.

**12.5.4**    **Additional Termination Provisions for ADP Comprehensive Services.** ADP may terminate, by further written notice to Client, if Client fails to render reasonable cooperation needed in connection with the implementation services such that ADP is unable to complete the Implementation Services and commence Services. ADP may also suspend and/or terminate performance immediately without prior notice in the event Client, its employee(s) or any other third party uses or accesses the Services in a manner that exposes ADP to civil or criminal liability.

**12.5.5**    **Additional Termination Provisions for Essential ACA Services**. If ADP reasonably determines that it can no longer provide all or any portion of Essential ACA Services due to changes in applicable law or application of existing law, ADP may, in its sole discretion and upon notice to Client, immediately terminate the applicable portion of Essential ACA Services.

**12.5.6**    **Additional Suspension for ADP Compliance on Demand.** ADP may, in its sole discretion, immediately suspend access to ADP Compliance on Demand without prior notice to Client in the event Client posts or otherwise distributes any content online that is (i) inappropriate or otherwise objectionable, (ii) potentially violates the privacy or publicity right of a third party, or (iii) advertises any other site or business. In the event Client continues to post or distribute such content after access to ADP Compliance on Demand is restored, ADP shall have the right to terminate ADP Compliance on Demand.

## 13  Post Termination

**13.1**    **Scope.** At any time prior to the actual termination date, Client may download Client's information or reports available to it in conjunction with all of the Services provided to Client by ADP. Upon expiration or termination of the Services, subject to Section 13.2, Client may order from ADP any data extraction offered by ADP, at the then prevailing hourly time and materials rate. In connection with any data extraction, ADP will not be required to provide any third party with access to ADP's systems, intellectual property or any Confidential Information of ADP.

**13.2**    **Past Due Amounts**. If ADP has terminated this Agreement due to Client's failure to pay fees, ADP's obligations in Section 13.1 will be subject to Client's payment of all past due amounts and ADP may require Client to prepay for any services.

## 14  Additional Terms

**14.1**    **ADP Employment Tax Services.**  The following additional terms and conditions apply to the ADP Employment Tax Services:

**14.1.1**  **Important Tax Information (IRS Disclosure) for U.S. Only.** Notwithstanding Client's engagement of ADP to provide the ADP Employment Tax Services in the United States, please be aware that Client remains responsible for the timely filing of payroll tax returns and the timely payment of payroll taxes for its employees. The Internal Revenue Service recommends that employers enroll in the U.S. Treasury Department's Electronic Federal Tax Payment System (EFTPS) to monitor their accounts and ensure that timely tax payments are being made for them, and that online enrollment in EFTPS is available at www.eftps.gov; an enrollment form may also be obtained by calling (800) 555-4477; that state tax authorities generally offer similar means to verify tax payments; and that Client may contact appropriate state offices directly for details.

**14.2**  **ADP Recruiting Management Services.**  The following additional terms and conditions apply to the ADP Recruiting Management Services:

**14.2.1**  **Hiring Practices.**  Client shall be exclusively responsible for all hiring practices, including, but not limited to, complying with all employment laws, including, if applicable, the monitoring, analysis and reporting of any adverse impact that may result from any specification or criteria that Client uses to rank candidates in the ADP Recruiting Management Services Application Programs.

**14.2.2**  **Vendors.**  Client shall be exclusively responsible for all access and use of the ADP Recruiting Management Services by its vendors and such vendors' compliance with the terms of this Agreement.

**14.2.3**  **Additional Third-Party Terms.**  During the Term of this Agreement, the Client's use and access to the Recruitment Management Services may be subject to additional terms of services which shall be included within the ADP Recruitment Management Services. Prior to enabling the Recruitment Management Services, Client shall and Client shall ensure that its Users of Recruitment Management Services click through and accept such additional terms of service.

**14.3**  **Benefit Services.**  The following additional terms and conditions apply to the Benefit Services:

**14.3.1**  **Benefits Liaison.**  Client shall designate in writing to ADP one or more contacts for the Benefit Services to serve as the Client Benefits Liaison, and such Client Benefits Liaison shall have the authority to (i) provide information, instructions and direction on behalf of the Client, each Plan Administrator and, if applicable, each "fiduciary" (as defined in Section 3(21) of ERISA) of each separate Plan, and (ii) grant or provide approvals (other than Amendments) required or permitted under the Agreement in connection with the Benefit Services.

**14.3.2**  **Compliance of Benefit Plans.**  Client shall furnish to ADP all necessary information and data for each Plan.  Client shall be responsible for the final preparation, approval and submission of Plans and related amendments to applicable governmental authorities.  Client is responsible for, and shall take measures required under state and federal law to assure the qualification and compliance of the Plans with such laws.

**14.3.3**  **Disclaimer.**  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN THE SCOPE OF SERVICES, CLIENT EXPRESSLY ACKNOWLEDGES THAT ADP IS NOT THE "ADMINISTRATOR" OR "PLAN ADMINISTRATOR" AS DEFINED IN SECTION 3(16)(A) OF ERISA AND SECTION 414(g) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, RESPECTIVELY, NOR IS ADP A "FIDUCIARY" WITHIN THE MEANING OF ERISA SECTION 3(21), NOR IS ADP A "HEALTH CARE CLEARINGHOUSE" WITHIN THE MEANING OF SECTION 1171 OF THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996, AS AMENDED ("HIPAA") AND CLIENT SHALL NOT REQUEST OR OTHERWISE REQUIRE ADP TO ACT AS SUCH. FURTHER, ADP DOES NOT PROVIDE CLAIMS PROCESSING OR ANY OTHER COVERED FUNCTION WHICH WOULD CAUSE ADP TO BE CONSIDERED A BUSINESS ASSOCIATE AS DEFINED AT 45 CFR §160.103. ALL ENROLLMENT INFORMATION AND RELATED DATA COLLECTED BY ADP IS ON BEHALF OF CLIENT AND NOT ANY EMPLOYER-SPONSORED BENEFIT PLAN. ALL OTHER INFORMATION COLLECTED BY ADP FOR PROVIDING BENEFITS SERVICES IS CONSIDERED EMPLOYMENT RECORDS AND EXPLICITLY EXCLUDED FROM THE DEFINITION OF PROTECTED HEALTH INFORMATION AS STATED AT 45 CFR §164.501, AND IS NOT PROTECTED BY HIPAA'S PRIVACY RULE. SEE ALSO 65 FED. REG. 82461, 53181. ADP SHALL NOT EXERCISE ANY DISCRETIONARY AUTHORITY OR DISCRETIONARY CONTROL REGARDING MANAGEMENT OF ANY PLAN OR MANAGEMENT OR DISPOSITION OF ANY PLAN ASSETS. ADP SHALL NOT RENDER INVESTMENT ADVICE FOR A FEE OR OTHER COMPENSATION, DIRECT OR INDIRECT, WITH RESPECT TO ANY MONIES OR OTHER PROPERTY OF ANY PLAN, NOR DOES ADP HAVE ANY AUTHORITY OR RESPONSIBILITY TO DO SO. ADP HAS NO DISCRETIONARY AUTHORITY OR DISCRETIONARY RESPONSIBILITY IN THE ADMINISTRATION OF THE PLAN(S).

**14.3.4**  **Carrier Connections.**  ADP will, at Client's request, and for an additional charge as set forth on the Sales Order, provide Client with the following Carrier Connections services:

**14.3.4.1**  ADP will electronically transmit employee data, including employee benefits enrollment data, to Client's carriers or other third parties authorized by Client, and Client authorizes ADP to provide such transmission on Client's behalf.  Commencement of carrier connection service is subject to Client completing the configuration setup of Client Content and the format for such transmission to the designated carriers.

**14.3.4.2**  ADP's ability to transmit Client Content data is subject to the provision by Client's designated carriers of a current functional interface between ADP's systems and the designated carriers' systems.  ADP will not be obligated to transmit Client's data to designated carriers if at any time Client's designated carriers fail to provide the proper interface as described above.  Client is responsible for promptly reviewing all records of carrier transmissions and other reports prepared by ADP for validity and accuracy according to Client's records, and Client will notify ADP of any discrepancies promptly after receipt thereof.  In the event of an error or omission in carrier connection services caused by ADP, ADP will correct such error or omission, provided that Client promptly advises ADP of such error or omission.

**Exhibit 3_014**

**14.3.5    Additional Third-Party Terms.**  During the Term of this Agreement, the Client's use of, and access to, the Benefit Services may be subject to additional terms of service which shall be included within the Benefit Services. Prior to enabling such Services, Client shall ensure that its Users of Benefit Services click through and accept such additional terms of service.

**14.4    COBRA Services.** The following terms relating to COBRA Services will apply.

**14.4.1    Use of Name**.  In no event may Client identify or refer to ADP as "administrator", "plan administrator", "plan sponsor", "fiduciary", "plan fiduciary", or a similar title.

**14.4.2    Administrative Fee.**  Client acknowledges that Client may be responsible for any administrative fee for premiums not paid directly by the Qualified Beneficiary, as such term is defined under COBRA.

**14.4.3    HIPAA.**  Pursuant to the federal Health Insurance Portability and Accountability Act, Public Law 104-191 ("HIPAA"), the Health Information Technology for Economic and Clinical Health Care Act passed as part of the American Recovery and Reinvestment Act of 2009 ("ARRA"), the U.S. Department of Health and Human Services regulations entitled "Standards for Privacy of Individually Identifiable Health Information" ("Privacy Rule"), Security Standards for the Protection of Electronic Protected Health Information ("Security Rule") and the Breach Notification for Unsecured Protected Health Information ("Breach Notification Rule"), all enrollment information collected is on behalf of Client and not the health plan. All other information collected for providing COBRA Services is considered employment records and is explicitly excluded from the definition of Protected Health Information as stated at 45 CFR §160.103, and is not subject to the privacy rule found in HIPAA. See also IDENTIFIABLE HEALTH INFORMATION: FINAL RULE,67 FED. REG. 53,182, 53,192 (Aug. 14, 2002). To the extent any information is deemed to be Protected Health Information by any regulator, COBRA Services otherwise comply with the Privacy and Security Rules disclosure exception found at 45 CFR §164.504(f).

**14.4.4    Disclaimer.**  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN THE SCOPE OF SERVICES, CLIENT EXPRESSLY ACKNOWLEDGES THAT ADP IS NOT THE "ADMINISTRATOR" OR "PLAN ADMINISTRATOR" AS DEFINED IN SECTION 3(16)(A) OF ERISA AND SECTION 414(g) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, RESPECTIVELY, NOR IS ADP A "FIDUCIARY" WITHIN THE MEANING OF ERISA SECTION 3(21), NOR IS ADP A "HEALTH CARE CLEARINGHOUSE" WITHIN THE MEANING OF SECTION 1171 OF HIPAA AND CLIENT SHALL NOT REQUEST OR OTHERWISE REQUIRE ADP TO ACT AS SUCH.  FURTHER, ADP DOES NOT PROVIDE CLAIMS PROCESSING OR ANY OTHER COVERED FUNCTION WHICH WOULD CAUSE ADP TO BE CONSIDERED A BUSINESS ASSOCIATE AS DEFINED AT 45 CFR §160.103. ALL ENROLLMENT INFORMATION AND RELATED DATA COLLECTED BY ADP IS ON BEHALF OF CLIENT AND NOT ANY EMPLOYER-SPONSORED BENEFIT PLAN. ALL OTHER INFORMATION COLLECTED BY ADP FOR PROVIDING COBRA SERVICES IS CONSIDERED EMPLOYMENT RECORDS AND EXPLICITLY EXCLUDED FROM THE DEFINITION OF PROTECTED HEALTH INFORMATION AS STATED AT 45 CFR §160.103, AND IS NOT PROTECTED BY HIPAA'S PRIVACY RULE. SEE ALSO IDENTIFIABLE HEALTH INFORMATION: FINAL RULE,67 FED. REG. 53,182, 53,192 (Aug. 14, 2002). ADP SHALL NOT EXERCISE ANY DISCRETIONARY AUTHORITY OR DISCRETIONARY CONTROL REGARDING MANAGEMENT OF ANY PLAN OR MANAGEMENT OR DISPOSITION OF ANY PLAN ASSETS.  ADP SHALL NOT RENDER INVESTMENT ADVICE FOR A FEE OR OTHER COMPENSATION, DIRECT OR INDIRECT, WITH RESPECT TO ANY MONIES OR OTHER PROPERTY OF ANY PLAN, NOR DOES ADP HAVE ANY AUTHORITY OR RESPONSIBILITY TO DO SO.  ADP HAS NO DISCRETIONARY AUTHORITY OR DISCRETIONARY RESPONSIBILITY IN THE ADMINISTRATION OF THE PLAN(S).

**14.5    WFN EI-9 Services.** The following additional terms and conditions apply to the WFN EI-9 Services.

**14.5.1    Use of Services.**  Client shall, and cause the members of the Client Group, receiving the WFN EI-9 Services to do the following:

**14.5.1.1**    Review the USCIS Form I-9, which is the employment eligibility verification form issued by the DHS, including instructions in the form and the guidelines in the current I-9 Handbook, each of which is available on the USCIS website, currently located at http://www.uscis.gov/i-9central.  Client certifies that it has reviewed the current USCIS Form I-9 and the I-9 Handbook and that it agrees to comply with the applicable policy and procedures set forth therein, and any future new or amended policies or procedures, as required by law.  Client will ensure availability of the most recent version of the USCIS Form I-9 and the I-9 Handbook to all employees authorized to complete the USCIS Form I-9 on behalf of Client and/or its Affiliates.

**14.5.1.2**    Client is responsible for reviewing reports available to Client on the WFN EI-9 Services and for resolving (or causing the applicable employee to take action to resolve) missing or incomplete Forms I-9. This includes communicating with the employee in question and the submission or resubmission of the missing or incomplete Form I-9.

**14.5.1.3**    ADP executed a Memorandum of Understanding with the DHS as the E-Verify employer agent. E-Verify is the DHS's employment eligibility verification program which allows participating employers to electronically verify the employment eligibility of each newly hired employee and/or employee assigned to a covered federal contract. The following is required as it relates to the use of E-Verify through ADP and will apply only to the extent Client is using E-Verify through ADP

**14.5.1.3.1**    Notify ADP of (i) the location(s) where Client elects to enroll; and (ii) whether the employer is a federal contractor or a federal, state or local government organization.

**14.5.1.3.2**   Execute a Memorandum of Understanding with the DHS and ADP (as its E-Verify employer agent), and comply with the terms and conditions set forth therein.

**14.5.1.3.3**   Review and comply with the policy and procedures contained in the E-Verify User Manual for Employers, and any superseding policy and procedures, available to Client on the WFN EI-9 Service.

**14.5.1.3.4**   To the extent the Client elects to have more than one company location participate in E-Verify, ensure all authorized users in each location have complied with all requirements of this Section.

**14.5.1.3.5**   Ensure all of Client's authorized users (i) complete the mandated E-Verify training course and any applicable update courses administered by ADP and (ii) pass a knowledge test with the required score.

**14.5.1.3.6**   Immediately notify ADP of any updates/changes to its E-Verify employer status (e.g., Client becomes a federal contractor or Client ceases being a federal contractor).

**14.5.2    Form I-9 Retention.** During the term of the Agreement, ADP will store electronic copies of Forms I-9 in the WFN EI-9 Services for a minimum of three years from the employee's hire date or until one year after the employee ceases to be employed by Client (or the applicable Affiliate), whichever is later (or as otherwise required by changes to federal regulations that come into effect hereafter). Upon termination or expiration of the Agreement, ADP shall use commercially reasonable methods to transfer all electronically stored Forms I-9 to Client in accordance with ADP's current security policies. Upon termination of the WFN EI-9 Services, Client shall be solely responsible for storage of copies of Forms I-9.

**14.6    Payment Services.**  The following additional terms and conditions apply to the Payment Services:

**14.6.1    Client Credentialing.**  Client understands and acknowledges that the implementation and ongoing provision of Payment Services are conditioned upon Client passing (and continuing to pass) a credentialing process that ADP may deem necessary in connection with the provision of Payment Services.

**14.6.2    Additional Requirements.**  Payment Services may be subject to the rules and standards of any applicable clearing house, payment and/or card networks or associations. Client and ADP each agree to comply with all such rules and standards applicable to it with respect to the Payment Services.

**14.6.3    Funding Obligations.**  Client acknowledges that ADP is not a lender.  As such, as a condition to receiving services, Client will remit or otherwise make available to ADP sufficient, good and available funds within the agreed-to deadline and via the agreed-to method of delivery to satisfy all of Client's third-party payment obligations covered by the Agreement. ADP will apply such funds to satisfy such third-party payment obligations.  ADP will not be required to provide Payment Services if ADP has not received all funds required to satisfy Client's third-party payment obligations.  Client will immediately notify ADP if it knows or should know that it will not have sufficient funds to satisfy the amounts required in connection with the Payment Services.  If Client has a material adverse change in its condition, ADP may modify the funding method or deadline by which funds must be made available to ADP for payment to Payees.  Client agrees to pay to ADP upon demand any amounts that have been paid by ADP to satisfy Client's third party payment obligations prior to receiving such amounts from Client.

**14.6.4    Investment Proceeds; Commingling of Client Funds.** IF ADP RECEIVES CLIENT'S FUNDS IN ADVANCE OF THE TIME ADP IS REQUIRED TO PAY SUCH FUNDS TO THIRD PARTIES, ALL AMOUNTS EARNED ON SUCH FUNDS, IF ANY, WHILE HELD BY ADP WILL BE FOR THE SOLE ACCOUNT OF ADP.  ADP may commingle Client's funds with similar funds from other clients and with similar ADP and ADP-administered funds.  ADP utilizes a funds control system that maintains general ledger entries by client and/or by jurisdiction.

**14.6.5    Recovery of Funds; Stop Payment Requests.** Client agrees to cooperate with ADP and any other third parties to recover funds erroneously issued or transferred to any Payee or credited to any Payee's account. If Client desires to stop payment on any check or to recall or reverse any electronic payment, Client will provide ADP with a stop payment request in the form required by ADP.  Client acknowledges that ADP's placement of a stop order request is not a guarantee that such stop payment will occur.

**14.7    ADP Wage Payment Services.**  The following additional terms and conditions apply to ADP Wage Payment Services:

**14.7.1    ADPCheck; Direct Deposit.**  Client agrees not to distribute any ADPChecks to Payees in a manner that would allow Payees to access the associated funds before pay date.  Prior to the first credit to the account of any employee or other individual under ADP Direct Deposit Services, Client shall obtain and retain a signed authorization from such employee or individual authorizing the initiation of credits to such party's account and debits of such account to recover funds credited to such account in error.

**14.8    ADP Time & Attendance Services.**  The following additional terms and conditions apply to the ADP Time & Attendance Services:

**14.8.1    Time & Attendance Hardware.**

**14.8.1.1**   If Client procures Time & Attendance Hardware, Client shall provide and maintain an installation environment (including all power, wiring and cabling required for installation) as specified in the manufacturer's product documentation and other written instructions provided to Client by ADP.

**14.8.1.2** Regarding Time & Attendance Hardware provided on a subscription basis only, Client shall not make any alterations or attach any devices thereto that are not provided by ADP, nor shall Client remove same from the place of original installation without ADP's prior consent.  All right and title in the Time & Attendance Hardware procured on a subscription basis is, and at all times shall remain, that of ADP and a separate item of personal property of ADP, notwithstanding its attachment to other items or real property, and promptly upon termination of the ADP Time & Attendance Services, for any reason whatsoever, Client shall, at its expense, return such Time & Attendance Hardware in good condition, in accordance with ADP's instructions, normal wear and tear excepted.  If such Time & Attendance Hardware is not returned within 30 days of termination, Client agrees to purchase same at fair market value.

**14.8.2** **Biometric Services.**  Biometric Services are optional.  In certain jurisdictions, there are laws and regulations that govern the collection, use, and retention of biometric information, which potentially may apply to Client's use of Biometric Services.  To the extent Client elects to use Biometric Services, Client agrees to comply with all such potentially applicable laws and regulations in accordance with this section.  In the event Client is unwilling to comply with laws and regulations potentially applicable to Biometric Services, Client will be able to continue to use ADP Time & Attendance Services without Biometric Services.  The following terms and conditions apply to Biometric Services to the extent Biometric Services are part of the scope of Services:

**14.8.2.1** **Requirements for Receipt of Biometric Services.**  Before any Client or Biometric User is permitted to use any Biometric Services in a jurisdiction where laws and regulations potentially govern such use, Client will comply with the following requirements, in addition to any other requirements imposed by potentially applicable law (to the extent there is a conflict between the requirements below and the requirements of potentially applicable law, Client will comply with potentially applicable law):

**14.8.2.1.1** **Client Biometric Information Policy.**  Client will implement, distribute and make available to the public, a written policy establishing Client's policy with respect to the use of Biometric Data.  Such policy will include:

**14.8.2.1.1.1** a retention schedule and guidelines for permanently destroying Biometric Data;

**14.8.2.1.1.2** a commitment to destroy Biometric Data when the initial purpose for collecting or obtaining such Biometric Data has been satisfied or within 3 years of the individual's last interaction with Client, whichever occurs first; and

**14.8.2.1.1.3** any additional requirements as required by potentially applicable law.

**14.8.2.1.2** **Biometric User Notice and Consent.**  Client will provide notice to and procure and retain appropriate consents or releases from Biometric Users in the manner and to extent the same are required by potentially applicable law, including:

**14.8.2.1.2.1** notifying Biometric Users in writing that Client, its vendors, and/or the licensor of Client's time and attendance software are collecting, capturing, or otherwise obtaining Biometric Users' Biometric Data, and that Client is providing such Biometric Data to its vendors and the licensor of Client's time and attendance software; such notice will specify the purpose and length of time for which Biometric User's Biometric Data is being collected, stored, and used;

**14.8.2.1.2.2** obtaining a written release or consent from Biometric Users (or their legally authorized representative) authorizing Client, its vendors, and licensor of Client's time and attendance software to collect, store, and use the individual's Biometric Data for the specific purpose disclosed by Client, and authorizing Client to provide such Biometric Data to its vendors and the licensor of Client's time and attendance software; and

**14.8.2.1.2.3** if requested by ADP, providing to ADP copies of the required consents or releases collected and retained by Client, and/or certifying to ADP that such consents or releases have been obtained.

**14.8.2.1.3** **Retention and Purging of Biometric Data.**  Client will work with ADP to ensure that Biometric Data is retained and purged in accordance with potentially applicable law.  To the extent necessary for the purging or deletion of such Biometric Data, Client agrees to provide timely notification to ADP of the termination of the employment, or the satisfaction of the purpose for which Biometric Data was collected with respect to any given Biometric User.  ADP is not responsible for Client's failure to provide timely notification of the termination of the employment, or the satisfaction of the purpose for which Biometric Data was collected with respect to any given Biometric User.

**14.8.2.1.4** **Storage of Biometric Data in Timeclocks.**  Client agrees that it shall use a reasonable standard of care consistent with potentially applicable law to store, transmit and protect from disclosure any Biometric Data. Such storage, transmission, and protection from disclosure shall be performed in a manner that is the same as or more protective than the

**Exhibit 3_017**

manner in which Client stores, transmits and protects from disclosure other confidential and sensitive information, including personal information that can be used to uniquely identify an individual or an individual's account or property, such as genetic markers, genetic testing information, account numbers, PINs, driver's license numbers and social security numbers.

**14.8.2.2** **Biometrics Indemnity.** Subject to Sections 6.3 and 7, Client will defend ADP against any third party claims (including claims made by or on behalf of Biometric Users) and will indemnify and hold ADP harmless from resulting damage awards or settlement amounts in any cause of action to the extent such cause of action is based on any performance or breach of Client's obligations in connection with the Biometric Services, including any failure by Client to obtain consent from Biometric Users in connection with the use of the Biometric Services.

**14.8.2.3** **Third Party Beneficiary.** Notwithstanding anything to the contrary in the Agreement, Client agrees that ADP and licensor of any applicable Biometric Services (and their respective successors and assigns) are third party beneficiaries of this Agreement solely as it relates to Biometric Services.

**14.9** **Tax Registration Services.** ADP shall provide tax registration services as further described in this Section and the Services Definitions (the "**Tax Registration Services**") in accordance with and subject to the terms of this Agreement. The Tax Registration Services provided hereunder relate solely to ADP obtaining jurisdiction account numbers for employment tax as requested by Client. There shall be no additional fees for Tax Registration Services.  In receiving the Tax Registration Services hereunder, Client acknowledges the following:

**14.9.1** Client understands that ADP will not perform Tax Registration Services in connection with the following events:  (i) mergers and acquisitions; (ii) name, address or entity (corporate form) changes; (iii) applications to a state's Secretary of State; and (iv) closing of accounts with a state taxing agency.

**14.9.2** As a third-party service provider, ADP's Services hereunder are consultative in nature. ADP is not representing Client in any dealings before any tax agencies. ADP's provision of the Tax Registration Services should not be construed as legal, tax, or accounting advice. Client should consult its legal, tax, or accounting advisors for such advice.

**14.9.3** All submissions to the taxing jurisdiction will be (i) reviewed by Client prior to submission, when provided and (ii) signed by Client where necessary or Client will instruct ADP to affix electronically the Client signature provided by Client. By signing the documents or requesting that ADP affix Client's electronic signature, Client is confirming that (i) Client has reviewed the documents and/or data being submitted to the taxing jurisdiction and (ii) the information contained therein is complete and accurate.

**14.9.4** By utilizing the Tax Registration Services, Client authorizes ADP to act on its behalf in obtaining jurisdiction employment tax account numbers including, but not limited to, affixing the electronic signature provided by Client to registration forms and other documentation, submitting forms to tax agencies and directly communicating with such agencies as necessary.

**14.9.5** Client understands that ADP's Services are based solely on the information provided by Client and/or otherwise available for ADP in connection with the Services about Client's business established within a particular jurisdiction and other written correspondence that is in reply to ADP's questions regarding the registration process or otherwise provided by Client. Client authorizes ADP to rely upon such in providing the Tax Registration Services. ADP is not responsible for Tax Registration Services provided hereunder based on any inaccurate information supplied by Client or the failure by Client to provide ADP with information relating to the registration process.

**14.9.6** Client understands that, for reasons beyond ADP's reasonable control, ADP may not be successful in securing an employment tax account number for Client in any particular jurisdiction.

**14.9.7** ADP is not responsible for any penalties or interest incurred by Client as a result of ADP's failure to timely receive Client's identification numbers.

**14.10** **State Unemployment Insurance (SUI) Management Services**.  The following additional terms and conditions apply to the SUI Management Services:

**14.10.1** **Provision and Transfer of Information**. Client will provide ADP with accurate, complete and timely information necessary for ADP to perform the SUI Management Services, including without limitations, the claimants' names, relevant dates, wage and separation information, state-specific required information, and other documentation to support responses to unemployment compensation agencies.  Client will transfer this information via (i) on-line connection between ADP and Client's computer system or (ii) inbound data transmissions from Client to ADP, using mutually acceptable communications protocols and delivery methods.  Client will promptly notify ADP in writing if Client wishes to modify the communication protocol or delivery method.

**14.10.2** **Definition of Claim; Claim Cap.** For purposes of the SUI Management Services provided under this Agreement and billed to Client, a "claim" shall be defined as a claim notice generated by a state agency as a result of an individual filing for unemployment insurance benefits. In addition, Client acknowledges and agrees that (i) claim notices are typically generated for each state unemployment tax ID number under which an employee had worked and earned wages; (ii) state unemployment agencies generally issue multiple claim notices per individual as identified by a Social Security Number during the benefit eligibility period upon receiving a request for unemployment benefits; and (iii) all such claim notices require review ADP (e.g., including but not limited to, last employer claims, base period employer claims, periodic qualification claims, additional benefit claims, renewed claims and extended benefit claims).  Client further acknowledges and agrees that an applicable claim cap applies to the fees for SUI Management Services and that the claim cap shall be stated on the Sales Order, and will be based on all claim notices processed by ADP as a result of an individual filing for

unemployment benefits. The number of claims counted for billing purposes will be reported to Client by ADP as "Claims Processed" via on-line reports.

**14.11** **ADP Wage Garnishment Payment Services.** The following additional terms and conditions apply to the ADP Wage Garnishment Payment Services:

**14.11.1** **Description of Services.** ADP will act solely in the capacity of a third party service provider of payment processing.

**14.11.2** **Client's Use of Services.** Client agrees not to distribute any ADPChecks to Payees in a manner that would allow Payees to access the associated funds before pay date.

**14.12** **Employment Verification Services; Employee Authorized Disclosure.** The following additional terms and conditions apply to the Employment Verification Services and Employee Authorized Disclosure:

**14.12.1** **Employment Verification Services.** Client authorizes ADP and Verification Agents through which Employment Verification Services are performed to disclose, on Client's behalf, Verification Data to Verifiers who wish to obtain or verify any of Client's employees' (or former employees') Verification Data. Verification Data will be disclosed to Verifiers who certify they are entitled to receive such data (as described below) pursuant to FCRA, and, in the case of income information requests, who additionally certify they have a record of the employee's consent to such disclosure or who utilize a salary key. In accordance with FCRA, Verification Data may be provided to Verifiers where (i) the employee has applied for a benefit (such as credit, other employment or social services assistance); (ii) the employee has obtained a benefit and the Verifier is seeking to (a) determine whether the employee is qualified to continue to receive the benefit; and/or (b) collect a debt or enforce other obligations undertaken by the employee in connection with the benefit; or (iii) the Verifier is otherwise entitled under FCRA to obtain the Verification Data. In certifying they have a record of the employee's consent, Verifiers generally rely on the employee's signature on the original application as authorization for the Verifier to access the employee's income data at the time of the application and throughout the life of the obligation. Client understands that Verifiers are charged for commercial verifications processed through ADP or its Verification Agents.

**14.12.1.1** **Data Quality.** If requested by ADP, Client agrees to work with ADP during implementation to produce a test file and validate the Verification Data using validation reports made available by ADP or its Verification Agents. If Client uses ADP's hosted payroll processing services, ADP will utilize the latest Verification Data available on ADP's payroll processing system.

**14.12.1.2** **Notice to Furnishers of Information: Obligations of Furnishers of Information**". Client certifies that it has read the Notice to Furnishers provided to Client at the following URL:  https://www.consumer.ftc.gov/articles/pdf-0092-notice-to-furnishers.pdf. Client understands its obligations as a data furnisher set forth in such notice and under FCRA which include duties regarding data accuracy and investigation of disputes, and certifies it will comply with all such obligations. Client further understands that if it does not comply with such obligations, ADP may correct incorrect Verification Data on behalf of Client or terminate the Employment Verification Services upon 90 days prior written notice to Client.

**14.12.1.3** **Archival Copies.** Notwithstanding anything to the contrary in the Global Master Terms and Conditions, Client agrees that, after the termination of this Agreement, ADP and its Verification Agents may maintain archival copies of the Verification Data as needed to show the discharge and fulfillment of obligations to Client's employees and former employees and the provisions of Section 4 of the Global Master Terms and Conditions will continue to apply during the time that ADP and its Verification Agents maintain any such archival copies.

**14.12.1.4** **Employee Authorized Disclosure.** ADP may disclose or use Personal Data of Client's employees to the extent the employee requested or consented to the disclosure or use such as but not limited to when an employee needs their identity verified when they submit an application for a bank account, cellular service, credit or a benefit.

**14.13** **Essential ACA Services.** The following terms shall apply to Essential ACA Services.

**14.13.1** Client must use ADP Workforce Now payroll, HR and benefits services in order to purchase and implement Essential ACA. For the avoidance of doubt, all Forms filed by ADP with the IRS on behalf of Client will be filed electronically; any Forms sent to Client for its employees by ADP shall be sent in paper form and, if Client has ADP's iPay functionality, ADP will also make Forms accessible to Client employees electronically. It will then be Client's responsibility to distribute the Forms directly to its employees.

**14.13.2** **Client ACA Liaison.** Client shall designate in writing to ADP the name of one person who shall serve as the Client ACA Liaison for Essential ACA ), and such Client ACA Liaison shall have the authority to (i) provide information, instructions and direction on behalf of Client, and (ii) grant or provide approvals (other than Amendments) required or permitted under the Agreement in connection with Essential ACA. Client shall designate an alternate Client ACA Liaison in the event the principal Client ACA Liaison is not available.

**14.13.3** **Disclaimer.** NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN THE SCOPE OF SERVICES, CLIENT EXPRESSLY ACKNOWLEDGES THAT ADP IS NOT THE "ADMINISTRATOR" OR "PLAN ADMINISTRATOR" AS DEFINED IN SECTION 3(16)(A) OF ERISA AND SECTION 414(g) OF THE CODE, RESPECTIVELY, NOR IS ADP A "FIDUCIARY" WITHIN THE MEANING OF ERISA SECTION 3(21). ADP SHALL NOT EXERCISE ANY DISCRETIONARY AUTHORITY OR DISCRETIONARY CONTROL RESPECTING MANAGEMENT OF ANY BENEFIT PLANS SPONSORED OR OFFERED BY CLIENT. ADP HAS NO DISCRETIONARY AUTHORITY OR DISCRETIONARY RESPONSIBILITY IN THE ADMINISTRATION OF THE CLIENT'S BENEFIT PLAN(S). ADP EXPRESSLY DISCLAIMS ANY WARRANTY, EITHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES

OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, NON-INTERRUPTION OF USE, AND FREEDOM FROM PROGRAM ERRORS WITH RESPECT TO ESSENTIAL ACA, THE ADP APPLICATION PROGRAMS OR ANY THIRD-PARTY SOFTWARE DELIVERED BY ADP.

14.13.4    **Important Tax Information (IRS Disclosure)**: Notwithstanding Client's engagement of ADP to provide Essential ACA , please be aware that Client remains responsible for the timely filing of all required reports and filings, and the timely payment of Client penalty obligations. The Internal Revenue Service recommends that employers enroll in the U.S. Treasury Department's Electronic Federal Tax Payment System (EFTPS) to monitor their accounts and ensure that timely tax payments are being made for them, and that online enrollment in EFTPS is available at www.eftps.gov; an enrollment form may also be obtained by calling (800) 555-4477.

14.13.5    **Additional Requirements**. Client further understands that Essential ACA may be modified as ADP may deem appropriate to assist ADP in complying with its obligations.

14.14    **ADP Marketplace and Use of ADP APIs.**

14.14.1    **Disclaimer.**  ADP may provide Client with access to the ADP Marketplace.  Client acknowledges that any third party application or service purchased by Client through the ADP Marketplace is provided by a third party and not ADP and ADP makes no endorsements, representations or warranties (including any representations or warranties regarding compliance with laws) regarding such application or service.  Client will enter into a relationship directly with the third party provider of such application or service. Any application or service purchased through the ADP Marketplace will be governed exclusively by the terms and conditions agreed to by Client and the third party provider and not by this Agreement.  ADP will not provide any advice, service or support with respect to any third party application or service purchased on the ADP Marketplace.

14.14.2    **Transmitting Information to Third Parties.**  In the event that Client elects to use an API  to provide any Client Content or employee or plan participant information to any third party, Client represents that it has acquired any consents or provided any notices required to transfer such content or information and that such transfer does not violate any applicable international, federal, state, or local laws and/or regulations.    ADP shall not be responsible for any services or data provided by any such third party.

14.14.3    **Use of the ADP APIs.**   Client will use the ADP APIs to access Client's information only.   Client may not use any robot, spider, or other automated process to scrape, crawl, or index the ADP Marketplace and will integrate Client's application with the ADP Marketplace only through documented APIs expressly made available by ADP.  Client also agrees that Client will not (a) use the ADP Marketplace or any ADP API to transmit spam or other unsolicited email; (b) take any action that may impose an unreasonable or disproportionately large load on the ADP infrastructure, as determined by ADP; or (c) use the ADP APIs or the ADP Marketplace in any way that threatens the integrity, performance or reliability of the ADP Marketplace, Services or ADP infrastructure. ADP may limit the number of requests that Client can make to the ADP API gateway to protect ADP's system or to enforce reasonable limits on Client's use of the ADP APIs.   Specific throttling limits may be imposed and modified from time to time by ADP.

14.15    **ESS & MSS Technology.**  The following additional terms and conditions apply to the ESS & MSS Technology.

14.15.1    Client acknowledges that Client's employees or participants may input information into the self-service portions of the ADP Application Programs. ADP shall have no responsibility to verify, nor does ADP review the accuracy or completeness of the information provided by Client's employees or participants to ADP using any self-service features.  ADP shall be entitled to rely upon such information in the performance of the Services under this Agreement as if such information was provided to ADP by Client directly.

14.16    **ADP Compliance on Demand.** The following additional terms and conditions apply to ADP Compliance on Demand:

14.16.1    **Compliance Assistance.**  Client may have access to certain human resources or compliance professionals who may, in ADP's sole discretion, provide reasonable guidance or best practice recommendations to Client which Client may choose to follow.  Client assumes all responsibility and risk arising from its use and reliance upon such recommendations.  ADP may require Client to include its legal counsel in communications with such professionals.  The ADP Compliance on Demand Services are not a substitute for advice of an attorney.  Client agrees that ADP is not a law firm, does not provide legal advice or representation, and that no attorney-client relationship between ADP and Client exists or will be formed as part of the Services.  ADP may discontinue access to human resources and compliance professionals in its discretion.

14.17    **Comprehensive Learning Library (myLearning@ADP).**  The following additional terms and condition shall apply to the Comprehensive Learning Library:

14.17.1    **Party Content Uploaded to myLearning@ADP.**  Except for content created or licensed by ADP for Client's use, the Client is solely responsible for any content uploaded, used, copied, installed or enabled (collectively, "**Client-Uploaded Material**") on myLearning@ADP.  The Client shall not submit any Client-Uploaded Material that is: (a) libelous, defamatory, obscene, threatening, abusive, illegal or otherwise objectionable, or (b) protected by copyright, trademark, trade secret, or other proprietary right without a valid license from the owner of such copyright, trademark, trade secret, or other proprietary right. The Client is singularly responsible for obtaining and maintaining all licenses and any other necessary rights (contractual or otherwise) for any Client-Uploaded Material.

## 15   Miscellaneous

15.1    **Amendment.** This Agreement may not be modified, supplemented or amended, except by a writing signed by the authorized representatives of ADP and Client.

**15.2**   **Assignment.**   Neither this Agreement, nor any of the rights or obligations under this Agreement, may be assigned by any party without the prior written consent of the other party, such consent not to be unreasonably withheld.  However, Client may assign any or all of its rights and obligations to any other Client Group member and ADP may assign any or all of its rights and obligations to any Affiliate of ADP, provided that any such assignment shall not release the assigning party from its obligations under this Agreement.  This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and permitted assigns.

**15.3**   **Additional Documentation.**   In order for ADP to perform the Services, it may be necessary for Client to execute and deliver additional documents (including reporting agent authorization, client account agreement, limited powers of attorney, etc.) and Client agrees to execute and deliver such additional documents.

**15.4**   **Subcontracting.**   Notwithstanding Section 15.2, ADP reserves the right to subcontract any or all of the Services, provided that ADP remains fully responsible under this Agreement for the performance of any such subcontractor.  For the avoidance of doubt, third parties used by ADP to provide delivery or courier services, including the postal service in any country or any third party courier service, and banking institutions, are not considered subcontractors of ADP.

**15.5**   **Entire Agreement.**   This Agreement constitutes the entire agreement and understanding between ADP and Client with respect to its subject matter and merges and supersedes all prior discussions, agreements and understandings of every kind and nature between the parties.  No party will be bound by any representation, warranty, covenant, term or condition other than as expressly stated in this Agreement.  Except where the parties expressly state otherwise in a relevant exhibit, annex, appendix or schedule, in case of conflict or inconsistency between these Global Master Terms and Conditions and any such exhibit, annex, appendix or schedule, the Global Master Terms and Conditions will prevail and control.  Purchase orders or statements of work submitted to ADP by Client will be for Client's internal administrative purposes only and the terms and conditions contained in any purchase order or statements of work will have no force and effect and will not amend or modify this Agreement.

**15.6**   **No Third Party Beneficiaries.**   Except as expressly provided herein or in an applicable exhibit, annex, appendix or schedule, nothing in this Agreement creates, or will be deemed to create, third party beneficiaries of or under this Agreement.  Client agrees that ADP's obligations in this Agreement are to Client only, and ADP has no obligation to any third party (including, without limitation, Client's personnel, directors, officers, employees, Users and any administrative authorities).

**15.7**   **Force Majeure**.   Any party to this Agreement will be excused from performance of its obligations under this Agreement, except for Client's obligation to pay the fees to ADP pursuant to Section 11, for any period of time that the party is prevented from performing its obligations under this Agreement due to an act of God, war, earthquake, civil disobedience, court order, labor disputes or disturbances, governmental regulations, communication or utility failures or other cause beyond the party's reasonable control.  Such non-performance will not constitute grounds for breach.

**15.8**   **Waiver**.   The failure by any party to this Agreement to insist upon strict performance of any provision of this Agreement will not constitute a waiver of that provision.  The waiver of any provision of this Agreement shall only be effective if made in writing signed by the authorized representatives of ADP and Client and shall not operate or be construed to waive any future omission or breach of, or compliance with, any other provision of this Agreement.

**15.9**   **Headings.**   The headings used in this Agreement are for reference only and do not define, limit, or otherwise affect the meaning of any provisions hereof.

**15.10**   **Severability.**   If any provision of this Agreement is finally determined to be invalid, illegal or unenforceable by a court of competent jurisdiction, the validity, legality or enforceability of the remainder of this Agreement will not in any way be affected or impaired and such court shall have the authority to modify such invalid, illegal or unenforceable provision to the extent necessary to render such provision valid, legal or enforceable, preserving the intent of the parties to the furthest extent permissible.

**15.11**   **Relationship of the Parties.**   The performance by ADP of its duties and obligations under this Agreement will be that of an independent contractor and nothing contained in this Agreement will create, construe or imply an agency, joint venture, partnership or fiduciary relationship of any kind between ADP and Client.  None of ADP's employees, agents or subcontractors will be considered employees, agents or subcontractors of Client.  Unless expressly stated in this Agreement, none of ADP, its employees, agents or its subcontractors may enter into contracts on behalf of, bind, or otherwise obligate Client in any manner whatsoever.

**15.12**   **Governing Law.**   This Agreement is governed by the laws of the State of New York without giving effect to its conflict of law provisions.

**15.13**   **Communications to U.S. Based Employees.**   Client agrees that ADP may use Client's U.S.-based employee and/or participant name, email and mailing address to provide information about products and/or services offered by ADP directly such employees and/or participants. Client may elect for ADP to cease such communications upon 30 days' prior written notice.  In addition, each communication sent by ADP will comply with applicable laws and will enable the recipient to opt-out of receiving additional similar communications from ADP.

**15.14**   **Jurisdiction.**   Any disputes that may arise between ADP and Client regarding the performance or interpretation of this Agreement shall be subject to the exclusive jurisdiction of the state and federal courts of New York, New York.  The parties hereby irrevocably consent to the exclusive jurisdiction of the state and federal courts of New York, New York and waive any claim that any proceedings brought in such courts have been brought in an inconvenient forum.  THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RIGHT TO TRIAL BY JURY.

**15.15**   **Counterparts.**   This Agreement may be signed in two or more counterparts by original, .pdf (or similar format for scanned copies of documents) or facsimile signature, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**15.16    Notices.**  All notices required to be sent or given under this Agreement will be sent in writing and will be deemed duly given and effective (i) immediately if delivered in person, or (ii) upon confirmation of signature recording delivery, if sent via an internationally recognized overnight courier service with signature notification requested to Client at the address indicated on the signature page hereof or to ADP at 5800 Windward Parkway, Alpharetta, GA 30005, Attention: ADP Comprehensive Services SVP or to any other address a party may identify in writing from time to time.  A copy (which shall not constitute notice) of all such notices shall be sent to ADP at One ADP Boulevard, MS 425, Roseland, New Jersey 07068, Attention: General Counsel and to Client at the address indicated on the signature page hereof.

**15.17    Survival.**  Those provisions which by their content are intended to, or by their nature would, survive the performance, termination, or expiration of this Agreement, shall survive termination or expiration of this Agreement.

PROPRIETARY AND CONFIDENTIAL TO ADP, INC.

**Exhibit 3_022**

Appendix : ADP Comprehensive Services - Service Definition

| Services | Service Specifics | Roles and Responsibilities |
|---|---|---|
| **Solutions Platform** | | |
| ADP Workforce Now ("WFN") | WFN is ADP's trademarked, branded, webbased payroll, HR, Benefits and Time and Attendance technology. WFN serves as the access point for all Client administrators, employees and managers. General information about ADP WFN can be found at www.productdescription.majoraccounts.adp.com (which may be modified from time to time). | |
| WFN Technology Support | Access to specialists to support Client in use of WFN technology solutions. | |
| **Implementation** | | |
| Implementation – Project Manager | The ADP Project Manager is responsible for the overall Comprehensive Services technology implementation and as such creates and maintains a project plan during implementation. The Project Manager conducts an implementation planning meeting to review the multi-faceted implementation, holds regular status meetings with the entire project team (Client, ADP, and external assigned resources) and manages deliverables accordingly. | The Project Manager provides cross product guidance for the duration of implementation and introduces the training curriculum to Client. The Project Manager directs the team of ADP implementation specialists and consultants who work on the multifaceted implementation required for Client to go live on ADP Comprehensive Services, including WFN. |
| Implementation -- Assignment of a dedicated ADP Relationship Manager/HR Business Partner | The ADP Relationship Manager/HR Business Partner participates in implementation and partners with the Project Manager to complete the Implementation. The ADP Relationship Manager/HR Business Partner: <br>• Schedules onsite visit for Client's strategic analysis during or immediately after implementation kickoff meeting. <br>• Schedules planning meeting to introduce Client's managers and employees to WFN portal and self-service functionality. <br>• Coordinates and schedules Employee/Manager Self Service Launch Meeting and distribution of Welcome Kits. <br>Develops Client Strategic Action Plan for additional services to help assure alignment of Services with Client strategic direction and business drivers in all related functional areas. | The ADP Relationship Manager/HR Business Partner acts as a business consultant during the implementation process and performs business analysis. Client is responsible for validating the accuracy of all converted data. Client will attend all necessary implementation meetings and provide timely feedback as requested. |

Proprietary And Confidential To ADP, INC.

**Exhibit 3_023**

| Services | Service Specifics | Roles and Responsibilities |
|---|---|---|
| **Implementation** | | |
| Set-up of Payroll, HR & Benefits, and Time and Attendance modules (as applicable) | Implementation includes all activities needed to complete set-up of the Payroll, HR & Benefits, and Time and Attendance modules (the "Module(s)") including the following:<br>• Implementation of all outsourcing services listed in this Statement of Service.<br>• Scheduling and planning all implementation meetings.<br>• Coordinating the collection of implementation service questionnaires.<br>• Setting-up the Module(s) based on Client's requirements.<br>• Collecting all relevant human resources ("HR"), payroll and enrollment data and loading them into the Module(s). Client must provide all data (e.g., corporate information, payroll data, benefit plan information, relevant HR data, including current personal and work data and employee/dependent enrollment information) in a format required by ADP.<br>ADP will determine Client and ADP's readiness to go live based on completion of key deliverables and success of data gathering, conversion and other implementation milestones.<br>ADP will set-up the HR & Benefits module to incorporate Client's (i) corporate structure (e.g., divisions, locations, employee classes, and departments) and user rights; (ii) benefit plans and providers; (iii) HR data, including reports to information, performance management, leave data, job titles, salary structures, and HR reason codes; and (iv) census data, including current personal and work data and employee/dependent enrollment information for all applicable parties. | Client is responsible for (i) accurately completing and providing questionnaires to ADP's implementation team in a timely manner; (ii) providing all HR corporate group information to ADP; (iii) providing all plan requirements information, company policies and procedures to either configure WFN and/or incorporate into administrative practices; (iv) providing all payroll data; (v) providing any documents and materials needed to complete employee access set-up; (vi) providing all plan participant and enrollment data in a predefined format required by ADP; (vii) reviewing all information in the Module(s) for accuracy; and (viii) all fees related to travel. Failure to meet these requirements may impact the date upon which Client may access the Services.<br>Client is responsible for maintaining system configuration of and data related to all HR-related information (e.g., salary structures, job codes, leave policies, manager access, etc.) post implementation. Client's implementation team will determine Client's readiness to start implementation and assign Client its implementation team members. The make-up of Client's implementation team may vary according to the number of complementary products or services purchased. Client's implementation team will coordinate with the service team and Client's designated team members to ensure all requirements are understood and will assist in the transition to service. |
| Interfaces - ADP Carrier Connection ® | If Client purchases Comprehensive HR, Comprehensive Payroll or Comprehensive Talent either separately or together, but without Comprehensive Benefits, Client shall be entitled to up to three (3) standard carrier connections at set up of the Services. If Client purchases Comprehensive Benefits alone or with any other Comprehensive Service(s), Client shall be entitled to unlimited standard carrier connections at set up (initial implementation) of the Services.<br>Client may elect additional standard carrier connections for an additional fee. Subsequent reconfiguration of existing carrier connections and additional elections requested after set up (initial implementation) of the Services are available for an additional fee. Carrier connections shall be subject to an annual maintenance fee. | Client shall promptly deliver to ADP any Client Content required by ADP to set-up standard carrier connections. Client will work with its carriers to ensure ADP is permitted to transmit data and access Client's data in the carrier's system. No third party agreements with Client's carriers should be required.<br>With respect to Carrier Connections, any changes in Client's benefit providers that require the establishment of a new carrier connection or the modification of an existing carrier connection shall be considered a new carrier connection and shall be completed by ADP at ADP's then current rates. |

**Exhibit 3_024**

| Services | Service Specifics | Roles and Responsibilities |
|---|---|---|
| **Implementation** | | |
| **Interfaces -** Payroll Interfaces, Custom Interfaces | Client may require payroll or other custom interfaces in order to electronically transmit data, including but not limited to employee payroll data, certain HR and other demographic employee data, etc., to designated third parties authorized by Client. The development of such Interfaces shall be at ADP's then current fees for such services and fees shall be depend on the amount of customization required by ADP to create such interfaces. ADP shall provide Client with an estimate of the cost of the interface prior to its development. An annual maintenance fee shall apply to all interfaces, including Payroll Interfaces and Custom Interfaces. | ADP's construction of interfaces are subject to configuration by Client of the applicable Client Content and the formatting of such transmission to designated third parties. ADP's ability to transmit Client Content is dependent on the agreement by the designated third parties and ADP will not be obligated to transmit data unless the designated third parties have agreed to accept data via the interface. |
| **ADP Personnel – Roles and Responsibilities** | | |
| ADP Relationship Manager/HR Business Partner | Each Client is assigned one (1) ADP Relationship Manager/HR Business Partner, no matter which Services Client has purchased. The ADP Relationship Manager/HR Business Partner actively communicates with Client and acts as the primary contact between ADP and Client to ensure the delivery of services and resolution of issues. | The Relationship Manager/HR Business Partner strengthens the connection with clients through proactive service and consultation. The Relationship Manager/HR Business Partner aligns with executives and key stakeholders in the Client's organization to understand business goals and objectives. They consult with the client to align the right services and help create efficiencies through ADP technology solutions. The Relationship Manager/HR Business Partner conducts executive meetings to share updates on key initiatives and maintain alignment to changes in the Client's business.<br>Additionally, the Relationship Manager/HR Business Partner proactively identifies HR needs and coordinates the delivery of HR services. This includes consultation and best practices to help Client maintain compliance with applicable federal, state and local employment laws. The Relationship Manager/HR Business Partner coordinates HR services, such as Employee Training, HR Policies and Procedures, Job Descriptions and guidance for resolving employee relations issues. |

Exhibit 3_025

| Services | Service Specifics | Roles and Responsibilities |
|---|---|---|
| **ADP Service Centers** | | |
| ADP Service Center (for Client administrators) | Access to a toll free number with Client identification and issue routing via telephony. Provides access to primary support resources through WFN technology. | ADP provides access to an assigned specialist team that will be Client's primary support resource. ADP will provide standard service center hours 8:00 am to 5:30 pm, Client local time (Clients in Hawaii will have service center access 8:00 am to 5:30 pm PST), Monday through Friday, except for scheduled downtime for training, meetings and ADPrecognized company holidays. Such scheduled downtime shall not exceed two percent (2%) of available hours each calendar quarter. |
| My Life Advisor | Access to a toll free number for use by employees and managers for:<br>• General self-service and payroll inquiries<br>• General HR inquiries where Client policy is explicit when WFN Comprehensive HR is elected<br>• Benefit call support when WFN Comprehensive Benefits is elected<br>As authorized by Client, respond to Client's employees inquiries, when ADP has all pertinent information related to:<br>• Employee personal information<br>• Employee pay information and issues<br>• Vacation, holiday, and leave of absence information<br>• Hours of work and overtime information<br>• Benefit Participant Information when WFN Comprehensive Benefits is elected Further, the My Life Advisors can provide bi-lingual support for both English and Spanish speaking employees. Other languages are available via a partnership with AT&T's language line for an additional fee charged back to Client on a pay per usage basis. | As a prerequisite to use of My Life Advisors, Client is responsible to support and promote employee self-service and manager self-service. ADP will conduct one (1) onsite employee selfservice/manager self-service launch meeting. On request, ADP will support multiple virtual self-service launch meetings. ADP will answer employee and manager questions that have an apparent relationship to data entry visible through the WFN applications.<br>ADP will provide standard service center hours 8:00 am to 11:30 pm EST, Monday through Friday, except for scheduled downtime for training, meetings and ADPrecognized company holidays. Such scheduled downtime shall not exceed two percent (2%) of available time each calendar quarter. |

| Services | Service Specifics | Roles and Responsibilities |
|---|---|---|
| **Payroll and Tax Administration** | | |
| Payroll and Tax | ADP payroll processing with tax service to authorized jurisdictions (also included: CheckView, Payroll Preview, Total Tax PlusSM, Full Service Direct Deposit or TotalPay®️ banking options, Labor Distribution, iPayStatements, iReports). Additional fees will apply for ADP delivery via courier. **Year-end Forms W-2 will be provided and Clients will be billed separately. Additional fees will apply for direct mailing of year-end Forms W-2.** | ADP processes payroll and files and deposits appropriate federal, state and local taxes. **Client must review and approve final payments.** |
| Time and Attendance Feed to Payroll | Import employee Time and Attendance records provided that such records are in an ADP-acceptable format (if not utilizing ADP's Time and Attendance Module). | ADP provides Client with required file formats to utilize this feed. Client is responsible for adaptation of its file feed to a format that is compatible with ADP's feed. |
| Checks and Direct Deposit | ADP offers Clients two (2) banking features: Full Service Direct Deposit (payroll wages electronically deposited into employees' bank account(s)) or TotalPay (ADPCheck plus Full Service Direct Deposit). | Client must choose one of the banking features (unless Client is purchasing Comprehensive Payroll which requires TotalPay). |
| Wage Garnishment Processing Services (WGPS) | ADP provides tools to calculate garnishments based on court orders and client interpretation and also generates reports documenting garnishment activity. | Client provides employee liens and withholding information to ADP. ADP processes employee deductions for liens, wage garnishments and court ordered support and disburses payments to third parties as appropriate. The following shall only apply if Client is not purchasing Comprehensive Payroll Services: Client is responsible for lien interpretation. Client is responsible for all compliance with agency notification requirements; replies to garnishment notices received; notices of employee terminations and all other required written responses. Client must provide minimum of two (2) weeks' notice prior to processing of any special pays to accommodate any garnishment requirements. |
| HR, Payroll and Benefits Reporting | Comprehensive standard and analytical reports cover HR, payroll, and benefits data. | ADP provides access to certain standard payroll reports. Client has access to ADP reporting tools to generate a limited number of custom reports. |
| GL Interface | ADP will generate a file every payroll that contains labor expense information that can be entered into popular general accounting programs. Custom programming not included. | |
| Paid Time Off (PTO) | Access to systems to track employees' paid time off. | Client is responsible for leave administration unless Total Absence Management is purchased as an optional service. |
| Non-Paid Persons | Access to HR & Benefits module to track Client headcount not included in the payroll system. Such persons may include international employees (located outside the U.S.), independent contractors paid outside the payroll system, persons on leave, and retirees. | |

| Services | Service Specifics | Roles and Responsibilities |
|---|---|---|
| **Tax Registration Services** | | |
| Relevant and Required Information | | Client must provide to ADP all information requested by ADP with respect to the Tax Registration Services. ADP shall obtain relevant and required information to complete online or paper registration applications. |
| Submission of Applications | Upon Client's request, ADP shall initiate the registration process for each jurisdiction identified by Client and arrange for the submission of the application(s) to the appropriate tax agency on the Client's behalf. | Client may need to provide a signed Power of Attorney (POA) or Reporting Agency Authorization (RAA) when needed by ADP for it to obtain account number and status information from an employment tax jurisdiction. ADP will not perform Tax Registration Services in connection with the following events: (i) mergers and acquisitions; (ii) name, address or entity (corporate form) changes; (iii) applications to a state's Secretary of State; and (iv) closing of accounts with a state taxing agency. |
| Communications | ADP shall communicate with the tax agency representatives on the status of the application and notify Client in writing of the new account numbers (to the extent this information is communicated to ADP by the tax agency), other account status information, or problems encountered during the process. | Client must promptly provide ADP with any communications received from the tax agency which are directly or indirectly applicable to the registration process or that may otherwise impact Client's request for an account number. ADP is not responsible for P&I based on timeliness of receipt of the client's ID number. |

| Services | Service Specifics | Roles and Responsibilities |
|---|---|---|
| **State Unemployment Insurance (SUI) Administration** | | |
| Administer SUI Claims (where authorized by state law) | Provide pre-separation unemployment insurance (UI) counseling to Client. UI claims administration. Audit SUI tax rate components.<br>Audit UI benefits charges. Voluntary contribution review. Provide a quarterly summary report of claims activity.<br>**Client hearing and appeals not included in base services.** | ADP assists Client with unemployment claims administration and unemployment tax filings to help Client manage claims and State unemployment costs. |
| **Training and Development** | | |
| Employee/Manager Self-Service Launch Training | Training for both Client employees and managers on the self-service tools and application (includes one on-site Employee Self-Service Kickoff and, upon request, virtual Employee Self-Service Kickoff meetings). | Client shall require its employees and managers to attend self-service tools and application training. |
| Core Product Training | Product training on all the core products for administrator users (not employees or managers). | Client shall require administrator users to attend core product training. |
| **Benefit Support** | | |
| Open Enrollment Support (In the event the Client does not receive ADP plan and Comprehensive Benefit Services) | Access to Modules to maintain benefit plan and enrollment information. | HR Consultants assist Client in using the Modules for maintaining benefit plan information and reporting. My Life Advisors assists Client employees in using self-service to make benefit enrollment selections. |
| **Employee Relations** | | |
| Employee Perks | Employee access to a wide range of discounts on premium-brand products and services | |
| New Hire Welcome Kit | New Hire Welcome Kits are made available to Client employees detailing the employee services and perks provided by Client through ADP. The welcome kits are available electronically via WFN. | ADP provide Electronic Welcome Kits via WFN |
| **Compliance Support** | | |
| Compliance Newsletters<br>*Note: The offering does not include legal advice or guidance.* | Access to periodic subject matter Compliance Newsletters. | |
| Alerts<br>*Note: The offering does not include legal advice or guidance.* | Access to periodic subject matter Alerts and e-mails. | |
| Online Compliance Resources<br>*Note: The offering does not include legal advice or guidance.* | Access to law summaries, periodic tips related to best practices and compliance changes. | |

Exhibit 3_029

**Comprehensive HR Services Definitions**

**The following supplements the Comprehensive Services Definitions and applies to the extent that Client purchases Comprehensive HR Services.**

| Services | Service Specifics | Roles and Responsibilities |
|---|---|---|
| **Recruitment and Selection** | | |
| Job Descriptions | Access to sample job descriptions, resources, and guides Access to an ADP specialist who provides support and guidance on:<br>• Developing new job descriptions<br>• Reviewing job descriptions | Client is responsible for determining Fair Labor Standards Act (FLSA) exempt or non-exempt status. |
| Benchmark Pay Scales | Service that allows Client to have access to a compensation evaluation tool. | ADP will provide Client with the tools to conduct compensation analysis for open positions. |
| **Employee Relations** | | |
| Employee Handbook and Policies<br>*Note: ADP Comprehensive HR services do not include legal advice or guidance.* | ADP will provide specialists and tools to assist the client with the creation of a customized employee handbook. Client has access to sample forms and policies. | |
| Employee Assistance Program (EAP) | Access to the EAP service that provides confidential assistance for employees and their dependents for issues such as family problems, substance abuse, legal problems, etc. | |
| **Workplace Safety and Labor Law Compliance** | | |
| Labor Law Compliance Posters | Provides Client with suitable Federal and State Labor Law Compliance posters for Client's worksites. | Client will receive updated posters as laws and posting requirements change. |
| **Training** | | |
| Self-Paced Online Web-Based Training | Online access to ADP self-paced, web-based training library content. | Library will consist of courses covering topics such as compliance, broad workplace safety, workplace culture, and leadership/performance and will be available to employees, managers, practitioners and administrators |
| **Comprehensive HR Support Team** | | |
| HR Consultants | Access to HR Consultants to provide industry best practices from recruitment to retirement. | |
| Payroll Consultants | Access to Payroll Consultants to provide industry best practices. | |

Proprietary And Confidential To ADP, INC.

| Services | Service Specifics | Roles and Responsibilities |
|---|---|---|
| Risk and Safety Specialists | Access to Risk and Safety Specialists to provide support on OSHA industry standards and record keeping requirements, and guidance on the development of health and safety programs. | |
| **Benefits Support** | | |
| Open Enrollment Support (In the event Client does not receive ADP Comprehensive Benefits services) | Access to HR module to maintain benefit plan and enrollment information. | HR Consultants assist Client in using the HR module for maintaining benefit plan information and reporting. My Life Advisors assists Client employees in using self-service to make benefit enrollment elections. |

## Data Privacy Appendix

This Data Privacy Appendix is a data processing agreement under Applicable Law and supplements the Agreement, between ADP and Client. Capitalized terms throughout this Data Privacy Appendix not defined in the Agreement are defined in the ADP Privacy Glossary at www.adp.com/-/media/adp/privacy/pdf/glossary_en.pdf, provided, however, that the relevant definitions (or equivalent terms) under Applicable Law will supersede both the Agreement and ADP Privacy Glossary terms in the event of a conflict.

**PART I - GENERAL**

1.    Client Obligations. Client shall only provide ADP with Client Personal Data that: (a) is required to perform the Services; (b) has been collected in accordance with Applicable Law, including obtaining any needed consent from Client Employees, where applicable; and (c) Client has and will maintain authority to provide such data under Applicable Law.

2.    ADP Obligations. Client is disclosing Client Personal Data to ADP only for the limited and specified business purposes as set forth in the Agreement, associated statements of work and/or any subsequent amendments. ADP, as a Data Processor (or equivalent term under Applicable Law), will comply with Applicable Law for Processing Client Personal Data pursuant to the Agreement. ADP will not: (a) "sell" or "share" Client Personal Data; (b) retain, use, disclose or otherwise Process Client Personal Data outside of ADP's direct business relationship with Client or for any commercial or other purpose other than the business purposes specified in the agreement(s) between Client and ADP, except as permitted by Applicable Law; or (c) combine Client Personal Data with personal data that ADP receives from, or on behalf of, other persons, or collects from ADP's own interaction with a consumer, except as permitted under Applicable Law. ADP will provide the same level of privacy protection for Client Personal Data as required of Client under Applicable Law. ADP has the right to Process Client Personal Data in order to comply with ADP's legal obligations (e.g., compliance with sanction laws) or in order to prevent, detect or investigate fraud.
ADP employees, contingent workers and Subprocessors are authorized to Process Client Personal Data to the extent necessary to provide the Services and as permitted under the Agreement and by Applicable Law.

3.    Anonymization and Aggregation. In addition to any rights granted to ADP in Section 4 of in the Agreement to use aggregated or anonymized data, ADP will not attempt to, and will not, re-identify any Client Personal Data that has been "anonymized." For the purposes of this Data Privacy Appendix and Agreement, anonymized data (which includes de-identified data under applicable US Privacy Law(s)) means data that cannot be used to identify an individual, directly or indirectly, by any means reasonably likely to be used in accordance with Applicable Law. The process of "de-identification" under applicable US Privacy Law(s) has the same effect on Client Personal Data as anonymization. ADP will implement reasonable measures to ensure that anonymized or aggregated data has no reasonably foreseeable risk of being re-identified and associated with Client or any individual.

4.    Transfers to Subprocessors. ADP may transfer Client Personal Data to ADP Subprocessors and Third Party Subprocessors located outside of the country or region where Client Personal Data was initially collected (collectively "Subprocessors"). ADP will establish appropriate safeguards with Subprocessors to ensure the adequate protection of Client Personal Data. Third Party Subprocessors are bound by written contracts with ADP that impose data protection terms that are not less protective than those imposed by this Data Privacy Appendix.
An up-to-date list of ADP Subprocessors and Third Party Subprocessors, including locations, is accessible at https://workforcenowservice.adp.com/DigitalService/s/article/Comprehensive-Services-Sub-processor-Listing. Such list may be updated from time to time.

5.    Compliance Obligations. ADP will notify Client if ADP makes a determination that it can no longer meet its Processing obligations under Applicable Law.
Client may, upon providing written notice to ADP, take reasonable steps to stop and remediate unauthorized Processing of Client Personal Data.

6.    Client Instructions. When receiving a Client instruction regarding the Processing of Personal Data, ADP will notify Client if ADP considers such instruction to violate Applicable Law; however, ADP is not obliged to and will not perform a legal examination with respect to a Client instruction.

7.    Assistance. ADP will assist Client with Client's data privacy obligations where required under Applicable Law, including assisting Client in responding to and addressing Client Employee individual rights requests, and complaints concerning Client Personal Data Processed by ADP in connection with the Services. ADP will also provide Client with relevant information for conducting data protection impact or risk assessments, (including transfer impact assessments) and any other assessments or reassessments required by Applicable Law or competent regulatory authorities. ADP reserves the right to charge for such assistance rendered. If ADP receives an individual rights request or complaint directly from a Client Employee, ADP shall promptly forward the Client Employee request to Client.

8.    Client Audit. ADP will answer questions asked by Client regarding the Processing of Client Personal Data by ADP. In the event Client reasonably considers that the answers provided by ADP justify further analysis or are necessary to demonstrate compliance with this DPA, ADP will:
(a) provide security materials known as ADP's trust package (which includes security policy and standards overview, password summary, resiliency program summary, disaster recovery program overview, data center and hosting service summary and a third-party risk management executive summary), that details ADP's business processes and procedures for the Processing of Client Personal Data; and
(b) where legally required under applicable Privacy Laws, if Client reasonably considers that the documents provided by ADP justify further analysis, make the facilities ADP uses to Process Client Personal Data available for an audit by a qualified independent third-party assessor reasonably acceptable to ADP, bound by confidentiality obligations satisfactory to ADP and engaged by Client. Client will provide a copy of the audit report to ADP's Global Chief Privacy Officer which will be ADP Confidential Information. Audits shall be conducted no more than once per year during the term of the Agreement during regular business hours and will be subject to (i) a written request submitted to ADP at least 45 days in advance of the proposed audit date; (ii) a detailed written audit plan reviewed and approved in advance by ADP's security organization; and (iii) ADP's on-site security policies. Such audits will take place only in the presence of a representative of ADP's global security office, ADP's global data privacy & governance team, or such person designated by the appropriate ADP representative. The audits shall not be permitted to disrupt

ADP's Processing activities or compromise the security and confidentiality of Personal Data pertaining to other ADP Clients. ADP will charge Client a reasonable fee for such audit.

9.    <u>Personal Data Return and Deletion</u>. Upon termination of the Agreement, ADP shall comply with its contractual obligations regarding the return of Client Personal Data (if Client Personal Data has not been previously returned to Client, or is not otherwise accessible to Client through the relevant product functionality or features for the Services, such as the ability to download the Client Personal Data) and shall delete Client Personal Data in accordance with ADP's then current applicable records retention schedule. ADP shall address Client's request to delete Client Personal Data before the records retention period has ended to the extent feasible and at a reasonable cost to Client. ADP may maintain Archive copies of Client Personal Data, to the extent required under Applicable Law, as authorized by Client in writing, or as needed for dispute resolution purposes.

**PART II – GDPR/UK GDPR**

10.    <u>Scope</u>. This Part II applies solely with respect to Client Personal Data subject to Regulation (EU) 2016/679 on the protection of natural persons with regard to the processing of Personal Data and on the free movement of such data ("General Data Protection Regulations" or "GDPR") and as transposed into United Kingdom national law by operation of section 3 of the European Union (Withdrawal) Act 2018 and as amended by the Data Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019 ("UK GDPR"). With respect to ADP's processing of Client Personal Data subject to GDPR and/or UK GDPR, the EU and UK Binding Corporate Rules ("BCR") for Client Data Processing Services (the "ADP Privacy Code(s)"), located at ADP Privacy ([https://www.adp.com/-/media/adp/privacy/pdf/bcrpc_en.pdf](https://www.adp.com/-/media/adp/privacy/pdf/bcrpc_en.pdf) and ukbcrpc_en.pdf (adp.com)), govern(s) as applicable. ADP has obtained EU and UK authorization of its ADP Privacy Code(s).

11.    <u>International Transfers</u>. For transfers outside of the EEA, Switzerland and United Kingdom, the ADP Privacy Code(s) serve(s) as the legal basis for the data transfer to an ADP Group Company or between ADP and an ADP Subprocessor, which Client acknowledges and accepts. ADP shall enter into appropriate contractual agreements, such as standard contractual clauses, or rely upon any other lawful transfer mechanism prior to transferring Client Personal Data to a Third Party Subprocessor or to an ADP company when the ADP Privacy Code(s) do(es) not apply.

12.    <u>Additional Subprocessor Obligations</u>. Within 30 days of a written update (including electronic notice) by ADP to Client adding a new Subprocessor, Client may object to such new Subprocessor by providing written notice to ADP alleging objective justifiable grounds that such Subprocessor is unable to protect Client Personal Data. If the parties cannot reach a mutually acceptable solution, ADP shall, at its option, either: (a) not allow the Subprocessor to access Client Personal Data; or (b) allow Client to terminate the relevant Services in accordance with the terms of the Agreement.

13.    <u>ADP Privacy Code(s) EU and UK Authorization</u>. ADP will make commercially reasonable efforts to maintain the EU and the UK authorization of its ADP Privacy Code(s) for the duration of the Agreement and will promptly notify Client of any subsequent material changes in the EU or UK authorization of its ADP Privacy Code(s).

**PART III - MISCELLANEOUS**

14.    <u>Order of Precedence</u>. In the event of a conflict between the Agreement, this Data Privacy Appendix, the ADP Privacy Code(s) and Applicable Law, then the conflict will be resolved by giving effect to such in the following order of precedence: (a) Applicable Law; (b) the ADP Privacy Code(s); (c) this Data Privacy Appendix; and (d) the Agreement.

15.    <u>Scope</u>. This Data Privacy Appendix provides no additional rights to a Client Employee that are not already provided under the Applicable Law to which the Client Employee is subject.

0424 Global DPA v. 2.3

**ADP**

## Company Information

Irwin Naturals
5310 Beethoven St
Los Angeles, CA 90066-7015
United States

## Executive Contact

Mark  Green
CFO
Mark@irwinnaturals.com
(310) 306-3636
x{3500}

## Recurring Fees and Considerations

Number of Employees: 79 on Irwin Naturals

### 📅 Monthly Processing

| | Count | Min | Base | Rate | Monthly | Annual |
|---|---|---|---|---|---|---|
| ADP Comprehensive Services Bundle | 79 | $1,951.25 | - | See Below | $4,165.00 | $49,980.00 |
| ▪ Comprehensive HR | | | | | | |
| ADP Comprehensive Services Ancillary Modules | 79 | - | - | $6.55 | $517.45 | $6,209.40 |
| ▪ Talent Bundle | | | | | | |
| ▪ Recruiting Embedded Intelligence | | | | | | |
| ▪ Enhanced Insights | | | | | | |
| Non-Paid Employees | 10 | - | - | $7.25 | $72.50 | $870.00 |
| Employment and Income Verification | 79 | - | - | - | $0.00 | $0.00 |
| ▪ Employment Verification | | | | | | |
| ADP Comprehensive Services Bundle | | 1 - 50 | | | $55.75 | |
| | | 51 - 150 | | | $47.50 | |
| | | 151 - 250 | | | $39.50 | |
| | | 251 - 500 | | | $31.25 | |
| | | 501 - 1000 | | | $25.25 | |

### 📄 Annual Processing

| | Count | Min | Base | Rate | Annual |
|---|---|---|---|---|---|
| Year End Forms, W2s or 1099s | 79 | - | - | $6.95 | $549.05 |

### 💲 Total Annual Investment

| | Total Annual |
|---|---|
| Workforce Now Services | $57,608.45 |

### 🧭 Other Considerations

Hardware and Other Fees

| | Count | Rate | Total |
|---|---|---|---|
| ▪ Included Standard Connection - Aetna - Preferred Carrier | 1 | $0.00 | $0.00 |
| ▪ Included Standard Connection - Mutual of Omaha - Preferred Carrier | 1 | $0.00 | $0.00 |
| ▪ Included Standard Connection - Guardian - Preferred Carrier | 1 | $0.00 | $0.00 |

Implementation
Health & Welfare Benefit Carrier Feed Setup included at no charge: 3

**Exhibit 3_034**   Page 34





## Sales Order
Quote Number 02-2024-241122 4

### Important Project & Billing Information

Billing for Comprehensive Services shall begin the monthly billing cycle following the initial kickoff call. The billing counts are based on all "All Non-Archived" employees excluding terms. Any lives classified as Non-Paid will be billed a separate lower rate. 1099 Contractors paid through a specific 1099 Contractor company code will also be billed via a separate rate.

All Time software, add-on modules and hardware (clocks) will continue to be charged, as they are today.

SUI Management Annual Volume: Processing of claim cases equal to 10% of Client's employee count within a 12-month period is included for no additional fee. Processing of additional claim cases will be billed at a rate of $35 per claim case. Optional services: Appeals filing and Hearing Representation are subject to additional fees to be approved by client in advance.

Other
ADP's Fees for Service will be debited directly out of client's bank account of their choosing seven (7) days from invoice date. ADP will send invoices to tina@irwinnaturals.com
Expiration Date: 5/21/2024

### Summary

| | | | |
|---|---|---|---|
| Estimated Annual Net Investment: | $57,608.45 | Total Implementation: | $0.00 |

The ADP Services Listed on this Sales Order are provided at the prices set forth herein and in accordance with the ADP Master Services Agreement (or other similar agreement governing ADP's services), which shall include any appendix, exhibit, addendum, schedule or other similar document attached thereto or accompanying this Sales Order. By signing below you are acknowledging and agreeing to such terms and conditions and to the listed prices.

ADP, Inc.

Signature: *Emily Bahr*

Name: Emily Bahr

Title: HRO DM

Date: 05-17-2024

Client: Irwin Naturals

Signature: *Mark Green*

ADP eSignature    1009925935
Info              38.76.113.130
5/20/2024
5:00:21 PM

Name: Mark Green

Title: CFO

Date: 5/20/2024

**Exhibit 3_035**    Page 35

Sales Order
Quote Number 02-2024-241122 4

## Workforce Now Included Services

### Comprehensive HR

- Enhanced Payroll
- Enhanced HR with Onboarding & EI-9
- Enhanced Benefits with Essential ACA
- Decision Support
- Strategic Partner
- Compensation Analysis
- Wellness & Employee Assistance Program
- Employee Discount Program
- COBRA Administration
- Job Descriptions
- Essential Learning Plus
- Risk & Safety Support
- MyLife Advisors (EE & Mgr Service Center)

- ACA Center of Excellence
- ADP DataCloud: Analytics
- Document Cloud
- Voice of Employee
- Designated WFN Technology Specialists
- Designated HR Specialist
- Designated Open Enrollment Specialist
- Tax Registration Services
- Wage and Hour Compliance on Demand
- Talent Strategy Support
- Labor Law Posters
- Customized Employee Handbook
- 5 Standard Management Reports

### Talent Bundle

- Recruitment and Talent Acquisition
- Performance and Goal Management
- Recruiting Embedded Intelligence
- Industry and Geographic Compensation Benchmarks

- Compensation Management
- Talent Center of Excellence
- ZipRecruiter Job Slots
- Succession Planning

### Enhanced Insights

- Visual comparisons between your data and market averages
- Annual compensation explorer for deep compensation insight

- Filters to obtain granular benchmarks

### Employment Verification

- Commercial Employment and Income Verifications

- Client access to Electronic Reports and Tools

## Thank you for your consideration

**Exhibit 3_036**    Page 36

## EXHIBIT C

## Critical Vendors

1. Robinson Pharma
2. Haddy Warehousing dba Coast Warehouse / Coast Transportation dba Coast 3PL
3. TLS Transportation Services, Inc.

**Exhibit 4_001**

1:17 PM
08/09/24
Accrual Basis

ROBINSON PHARMA, INC.
Customer Open Balance
All Transactions

Case 1:24-bk-11323-VK    Doc 22    Filed 08/15/24    Entered 08/15/24 11:42:11    Desc
Main Document    Page 59 of 61

| Type | Date | Num | P. O. # | Due Date | Open Balance | On Hand $ |
|------|------|-----|---------|----------|--------------|-----------|
| Invoice | 07/15/2024 | 162942 | 26495 | 08/14/2024 | 44,103.78 | $ 42,493.50 |
| Invoice | 07/15/2024 | 162943 | 26363 | 08/14/2024 | 61,181.14 | $ 42,026.62 |
| Invoice | 07/15/2024 | 162944 | 26357 | 08/14/2024 | 69,793.50 | $ - |
| Invoice | 07/15/2024 | 162945 | 26357 | 08/14/2024 | 24,702.00 | $ 19,057.80 |
| Invoice | 07/16/2024 | 162946 | 26453 | 08/15/2024 | 108,201.50 | $ 108,201.50 |
| Invoice | 07/16/2024 | 162947 | 26453 | 08/15/2024 | 47,663.20 | $ - |
| Invoice | 07/16/2024 | 162948 | 26453 | 08/15/2024 | 22,532.48 | $ 22,532.48 |
| Invoice | 07/16/2024 | 162949 | 26409A | 08/15/2024 | 48,414.65 | $ 48,414.65 |
| Invoice | 07/16/2024 | 162950 | 26409A | 08/15/2024 | 40,449.00 | $ 36,028.80 |
| Invoice | 07/16/2024 | 162955 | 26404 | 08/15/2024 | 62,435.34 | $ 30,143.34 |
| Invoice | 07/16/2024 | 162956 | 26424 | 08/15/2024 | 36,279.36 | $ 15,622.32 |
| Invoice | 07/16/2024 | 162958 | 26409A | 08/15/2024 | 32,738.76 | $ 32,738.76 |
| Invoice | 07/17/2024 | 162982 | 26364 | 08/16/2024 | 60,484.23 | $ 28,301.31 |
| Invoice | 07/17/2024 | 162983 | 26410 | 08/16/2024 | 28,281.12 | $ 28,281.12 |
| Invoice | 07/17/2024 | 162984 | 26410 | 08/16/2024 | 55,301.40 | $ 55,301.40 |
| Invoice | 07/17/2024 | 162985 | 26396 | 08/16/2024 | 15,636.60 | $ 15,636.60 |
| Invoice | 07/17/2024 | 162986 | 26415 | 08/16/2024 | 40,191.48 | $ 40,191.48 |
| Invoice | 07/17/2024 | 162987 | 26442 | 08/16/2024 | 84,480.84 | $ 64,826.64 |
| Invoice | 07/17/2024 | 162988 | 26442 | 08/16/2024 | 49,480.82 | $ 49,480.82 |
| Invoice | 07/17/2024 | 162989 | 26442 | 08/16/2024 | 17,448.72 | $ 17,448.72 |
| Invoice | 07/17/2024 | 162990 | 26357 | 08/16/2024 | 9,729.00 | $ 9,729.00 |
| Invoice | 07/17/2024 | 162991 | 26414 | 08/16/2024 | 33,365.82 | $ 33,365.82 |
| Invoice | 07/18/2024 | 163014 | 26472 | 08/17/2024 | 20,322.36 | $ - |
| Invoice | 07/18/2024 | 163015 | 26396 | 08/17/2024 | 119,077.90 | $ 119,077.90 |
| Invoice | 07/19/2024 | 163084 | 26394 | 08/18/2024 | 109,670.22 | $ 109,670.22 |
| Invoice | 07/19/2024 | 163085 | 26396 | 08/18/2024 | 19,623.60 | $ 19,623.60 |
| Invoice | 07/19/2024 | 163086 | 26438 | 08/18/2024 | 26,254.80 | $ 26,254.80 |
| Invoice | 07/19/2024 | 163087 | 26438 | 08/18/2024 | 22,508.64 | $ 22,508.64 |
| **Invoice** | **07/19/2024** | **163088** | **26430** | **08/18/2024** | **148,136.58** | **$ 85,324.68** |
| Invoice | 07/22/2024 | 163099 | 26402 | 08/21/2024 | 22,536.91 | $ 21,255.19 |
| Invoice | 07/22/2024 | 163100 | 26402 | 08/21/2024 | 13,639.68 | $ 13,639.68 |
| Invoice | 07/22/2024 | 163101 | 26402 | 08/21/2024 | 53,466.00 | $ 5,586.00 |
| Invoice | 07/23/2024 | 163117 | 26449 | 08/22/2024 | 35,076.60 | $ 35,076.60 |
| Invoice | 07/23/2024 | 163118 | 26432 | 08/22/2024 | 62,226.60 | $ 45,088.20 |
| Invoice | 07/23/2024 | 163119 | 26303 | 08/22/2024 | 3,038.04 | $ 3,038.04 |
| Invoice | 07/23/2024 | 163120 | 26437A | 08/22/2024 | 13,107.70 | $ 13,107.70 |
| Invoice | 07/24/2024 | 163148 | 26403 | 08/23/2024 | 44,541.90 | $ 37,042.11 |
| Invoice | 07/24/2024 | 163149 | 26408 | 08/23/2024 | 48,990.00 | $ 48,824.40 |
| Invoice | 07/24/2024 | 163150 | 26450 | 08/23/2024 | 41,704.00 | $ 28,788.00 |
| Invoice | 07/25/2024 | 163184 | 26398 | 08/24/2024 | 4,170.00 | $ - |
| Invoice | 07/25/2024 | 163185 | 26437A | 08/24/2024 | 50,445.00 | $ 50,445.00 |
| Invoice | 07/25/2024 | 163186 | 26419 | 08/24/2024 | 64.92 | $ - |
| Invoice | 07/26/2024 | 163255 | 26484 | 08/25/2024 | 57,822.10 | $ 57,822.10 |
| Invoice | 07/26/2024 | 163256 | 26398 | 08/25/2024 | 4,170.00 | $ - |
| Invoice | 07/26/2024 | 163257 | 26360 | 08/25/2024 | 5,401.76 | $ 5,401.76 |
| Invoice | 07/26/2024 | 163258 | 26440 | 08/25/2024 | 73,551.85 | $ 73,551.85 |
| Invoice | 07/26/2024 | 163259 | 26440 | 08/25/2024 | 28,856.40 | $ 28,856.40 |
| **Invoice** | **07/26/2024** | **163260** | **26411** | **08/25/2024** | **56.40** | **$** |
| Invoice | 07/29/2024 | 163273 | 26419 | 08/28/2024 | 114,984.14 | $ 109,011.50 |
| Invoice | 07/29/2024 | 163274 | 26398 | 08/28/2024 | 4,236.72 | $ 4,236.72 |
| Invoice | 07/29/2024 | 163275 | 26447A | 08/28/2024 | 40,077.72 | $ 40,077.72 |

Exhibit 5_001    1 of 3

Case 1:24-bk-11323-VK    Doc 22    Filed 08/15/24    Entered 08/15/24 11:42:11    Desc
Main Document    Page 120 of 161

ROBINSON PHARMA, INC.
Customer Open Balance
All Transactions

| Type | Date | Num | P. O. # | Due Date | Open Balance | On Hand $ |
|------|------|-----|---------|----------|-------------|-----------|
| Invoice | 07/29/2024 | 163276 | 26548 | 08/28/2024 | 31,948.50 | $ 31,948.50 |
| Invoice | 07/29/2024 | 163277 | 26395 | 08/28/2024 | 73,452.60 | $ 73,452.60 |
| Invoice | 07/29/2024 | 163278 | 26433 | 08/28/2024 | 71.04 | $ - |
| Invoice | 07/29/2024 | 163279 | 26413 | 08/28/2024 | 55.08 | $ - |
| Invoice | 07/29/2024 | 163280 | 26395 | 08/28/2024 | 56.16 | $ - |
| Invoice | 07/29/2024 | 163281 | 26548 | 08/28/2024 | 57.00 | $ - |
| Invoice | 07/29/2024 | 163282 | 26447A | 08/28/2024 | 46.44 | $ - |
| Invoice | 07/29/2024 | 163295 | TESTING - 6/24 | 08/28/2024 | 74,865.00 | |
| Invoice | 07/30/2024 | 163296 | 26398 | 08/29/2024 | 4,203.36 | $ - |
| Invoice | 07/30/2024 | 163297 | 26433 | 08/29/2024 | 52,374.24 | $ 50,669.28 |
| Invoice | 07/31/2024 | 163342 | 26508 | 08/30/2024 | 56.88 | $ - |
| Invoice | 07/31/2024 | 163343 | 26494 | 08/30/2024 | 47.28 | $ - |
| Invoice | 07/31/2024 | 163344 | 26485 | 08/30/2024 | 47.04 | $ - |
| Invoice | 07/31/2024 | 163345 | 26445 | 08/30/2024 | 34.44 | $ - |
| Invoice | 07/31/2024 | 163346 | 26445 | 08/30/2024 | 40,880.28 | $ 40,880.28 |
| Invoice | 07/31/2024 | 163347 | 26411 | 08/30/2024 | 98,700.00 | $ 90,136.60 |
| Invoice | 07/31/2024 | 163348 | 26398 | 08/30/2024 | 4,203.36 | $ - |
| Invoice | 08/01/2024 | 163364 | 26487 | 08/31/2024 | 47.40 | $ - |
| Invoice | 08/01/2024 | 163365 | 26405 | 08/31/2024 | 80.16 | $ - |
| Invoice | 08/01/2024 | 163366 | 26405 | 08/31/2024 | 54,983.08 | $ 54,976.40 |
| Invoice | 08/01/2024 | 163368 | 26398 | 08/31/2024 | 4,203.36 | $ - |
| Invoice | 08/01/2024 | 163369 | 26445 | 08/31/2024 | 16,743.58 | |
| Invoice | 08/02/2024 | 163386 | 26520 | 09/01/2024 | 63.84 | $ - |
| Invoice | 08/02/2024 | 163387 | 26413 | 09/01/2024 | 110.16 | $ - |
| Invoice | 08/02/2024 | 163388 | 26441 | 09/01/2024 | 79.68 | $ - |
| Invoice | 08/02/2024 | 163389 | 26500 | 09/01/2024 | 50.76 | $ - |
| Invoice | 08/02/2024 | 163390 | 26398 | 09/01/2024 | 9,507.60 | $ 9,507.60 |
| Invoice | 08/02/2024 | 163391 | 26459 | 09/01/2024 | 20,462.40 | $ 20,358.53 |
| Invoice | 08/02/2024 | 163392 | 26508 | 09/01/2024 | 35,597.40 | $ 35,597.40 |
| **Invoice** | **08/02/2024** | **163393** | **26447A** | **09/01/2024** | **5,015.52** | $ 5,015.52 |
| Invoice | 08/05/2024 | 163397 | 26520 | 09/04/2024 | 63.84 | $ - |
| Invoice | 08/05/2024 | 163398 | 26443 | 09/04/2024 | 51.84 | $ - |
| Invoice | 08/05/2024 | 163399 | 26443 | 09/04/2024 | 51.84 | $ - |
| Invoice | 08/05/2024 | 163400 | 26444 | 09/04/2024 | 57.24 | $ - |
| Invoice | 08/05/2024 | 163401 | 26349A | 09/04/2024 | 88,851.35 | $ 17,974.10 |
| Invoice | 08/05/2024 | 163402 | 26494 | 09/04/2024 | 28,537.42 | $ - |
| Invoice | 08/06/2024 | 163428 | 26446 | 09/05/2024 | 64.20 | $ - |
| Invoice | 08/06/2024 | 163429 | 26398 | 09/05/2024 | 16.68 | $ - |
| Invoice | 08/06/2024 | 163430 | 26398 | 09/05/2024 | 8,670.82 | $ 8,537.38 |
| Invoice | 08/06/2024 | 163431 | 26349A | 09/05/2024 | 11,118.00 | $ - |
| Invoice | 08/06/2024 | 163432 | 26409A | 09/05/2024 | 10,419.18 | $ 10,419.18 |
| Invoice | 08/07/2024 | 163437 | 26448 | 09/06/2024 | 90.12 | $ - |
| Invoice | 08/07/2024 | 163438 | 26448 | 09/06/2024 | 169.80 | $ - |
| Invoice | 08/07/2024 | 163439 | 26431 | 09/06/2024 | 66.84 | $ - |
| Invoice | 08/07/2024 | 163440 | 26349A | 09/06/2024 | 11,118.00 | $ - |
| Invoice | 08/07/2024 | 163441 | 26441 | 09/06/2024 | 20,298.48 | $ 20,298.48 |
| Invoice | 08/07/2024 | 163442 | 26500 | 09/06/2024 | 44,021.61 | $ 43,514.01 |
| Invoice | 08/07/2024 | 163443 | 26485 | 09/06/2024 | 33,680.64 | $ 33,680.64 |
| Invoice | 08/08/2024 | 163474 | 26520 | 09/07/2024 | 14,108.64 | $ 14,108.64 |
| Invoice | 08/08/2024 | 163476 | 26402 | 09/07/2024 | 28,472.64 | $ 28,472.64 |
| Invoice | 08/08/2024 | 163477 | 26487 | 09/07/2024 | 42,438.80 | $ 42,438.80 |

Exhibit 5_002    Page 2 of 3

1:17 PM
08/09/24
Accrual Basis
Case 1:24-bk-11323-VK    Doc 22    Filed 08/15/24    Entered 08/15/24 11:42:11    Desc
ROBINSON PHARMA, INC.
Main DocumentOpen BalancePage 61 of 61
Customer Open Balance
All Transactions

| Type | Date | Num | P. O. # | Due Date | Open Balance | On Hand $ |
|------|------|-----|---------|----------|-------------:|----------:|
| Invoice | 08/08/2024 | 163478 | 26431 | 09/07/2024 | 47,835.16 | $ 44,225.80 |
| Invoice | 08/08/2024 | 163479 | 26349A | 09/07/2024 | 11,118.00 | $ - |
| Invoice | 08/08/2024 | 163480 | 26402 | 09/07/2024 | 63.84 | $ - |
| Invoice | 08/08/2024 | 163481 | 26481 | 09/07/2024 | 44.88 | $ - |
| Invoice | 08/08/2024 | 163482 | 26481 | 09/07/2024 | 86.16 | $ - |
| Invoice | 08/08/2024 | 163483 | 26481 | 09/07/2024 | 47.28 | $ - |
| Invoice | 08/09/2024 | 163521 | 26510 | 09/08/2024 | 82.92 | $ - |
| Invoice | 08/09/2024 | 163522 | 26480 | 09/08/2024 | 81.96 | $ - |
| **Invoice** | **08/09/2024** | **163523** | **26480** | **09/08/2024** | **160.20** | $ - |
| | | | | | 3,110,585.30 | $ 2,419,343.87 |
| | | | | | 3,110,585.30 | |

Product delivered after July 20, 2024          1,652,096.46

Exhibit 5_003          Page 3 of 3