DAVID M. POITRAS – Bar No. 141309
SUSAN K. SEFLIN – Bar No. 213865
JESSICA L. BAGDANOV – Bar No. 281020
JESSICA S. WELLINGTON – Bar No. 324477
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Telephone:  (818) 827-9000
Facsimile:  (818) 827-9099
Email:      dpoitras@bg.law
            sseflin@bg.law
            jbagdanov@bg.law
            jwellington@bg.law

Attorneys for Chapter 11 Debtors and
Debtors in Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:24-bk-11323-VK |
| Irwin Naturals *et al.*, | Chapter 11 |
| Debtors and Debtors in Possession. | Jointly Administered with:<br><br>Case No. 1:24-bk-11324-VK<br>Case No. 1:24-bk-11325-VK<br>Case No. 1:24-bk-11326-VK |

☐  Affects Irwin Naturals

☐  Affects Irwin Naturals Inc.

☐  Affects 5310 Holdings, LLC

☐  Affects DAI US HoldCo Inc.

☒  Affects All Debtors

**DEBTORS' EMERGENCY MOTION FOR STAY PENDING APPEAL**

**Hearing:**

Date:   TBD
Time:   TBD
Place:  Courtroom 301
        United States Bankruptcy Court
        21041 Burbank Blvd
        Woodland Hills, CA 91367

## TABLE OF CONTENTS

Page

**I.** INTRODUCTION ....... 1

**II.** RELEVANT BACKGROUND ....... 4

**A.** Circumstances Leading to the Bankruptcy Filing ....... 4

**B.** The Debtors' Cases Meet the Definition of a Complex Chapter 11 Case ....... 5

**C.** The Debtors' Cases Have Been Extremely Active Since Commencement of the Cases ....... 6

**D.** The Debtors Have Been Negotiating with Creditors in Good Faith to Form a Consensual Chapter 11 Plan ....... 9

**E.** The Terminate Motion and Appeal ....... 15

**III.** ISSUANCE OF A STAY IS APPROPRIATE UNDER THE CIRCUMSTANCES ....... 20

**A.** Legal Standard ....... 20

**B.** The Debtors are Likely to Succeed on the Merits ....... 21

**1.** FitLife Failed to Meet Its Burden to Demonstrate Cause to Terminate the Debtors' Exclusive Periods ....... 22

**2.** The Debtors' Exclusive Period to File a Chapter 11 Plan had Not Terminated Prior to Entry of the Termination Order ....... 31

**3.** The Debtors' Second Amended Plan Relates Back to the Prior Plans ....... 31

**C.** The Debtors Will Suffer Irreparable Harm Absent a Stay Pending Appeal ....... 32

**D.** The Balancing of the Equities Tips Strongly in the Debtors' Favor ....... 34

**E.** The Public Interest Weighs in Favor of Granting the Motion ....... 34

**IV.** CONCLUSION ....... 35

# TABLE OF AUTHORITIES

Page

## CASES

*Acton v. Fullmer (In re Fullmer)*,
    323 B.R. 287 (Bankr. D. Nev. 2005) ...........................................................34

*Al Otro Lado v. Wolf*,
    952 F.3d 999 (9th Cir. 2020) .............................................................21, 32

*Arizona Dream Act Coalition v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ................................................................32

*Commodity Futures Trading Com'n v. Weintraub ("Commodity")*,
    471 U.S. 343 (1985)..............................................................................2

*In re Adelphia Communications Corp. ("Adelphia")*,
    352 B.R. 578 (Bankr. S.D. N.Y. 2006)....................................................28

*In re Allegheny Int'l, Inc.*,
    118 BR 282 (Bankr. W.D. PA 1990) .........................................................1

*In re DBSD North America, Inc. ("DBSD I")*,
    421 B.R. 133 (Bankr. S.D. N.Y. 2009)....................................................27

*In re DBSD North America, Inc. ("DBSD")*,
    634 F.3d 79 (2d Cir. 2010)...................................................................26

*In re Dow Corning Corp. ("Dow Corning")*,
    208 B.R. 661 (Bankr. E.D.Mich. 1997)..............................................23, 28

*In re Energy Conversion Devices, Inc. ("Energy Conversion")*,
    474 B.R. 503 (Bankr. E.D. Mich. 2012)............................................24, 35

*In re Energy Conversion Devices, Inc.*,
    474 B.R. 503 (Bankr. E.D. Mich. 2012)...................................................35

*In re Fitger Ltd.*,
    118 F.3d 635 (9th Cir. 1997) .............................................................1, 26

*In re Fla. Coastal Airlines, Inc. ("Coastal")*,
    361 B.R. 286 (Bankr. S.D. Fla. 2007) ....................................................32

*In re Geriatrics Nursing Home, Inc.*,
    187 B.R. 128 (D.N.J. 1995) ........................................................... passim

*In re Henry Mayo Newhall Mem'l Hosp. ("Henry Mayo")*,
    282 B.R. 444 (B.A.P. 9th Cir. 2002).................................................22, 31

*In re Interco, Inc.*,
    137 B.R. 999 (Bankr. E.D. Mo. 1992)....................................................23

*In re Keyworth*,
    47 B.R. 966 (D. Colo. 1985)................................................................26

ii

*In re MacLeod Co., Inc.*,
    63 B.R. 654 (Bankr. S.D. Ohio 1986)................................................................1, 26

*In re New Meatco Provisions, LLC ("New Meatco")*,
    2014 WL 917335 (Bankr. C.D. Cal. Mar. 10, 2014) ...............................................3, 26

*In re Save Our Springs (S.O.S.) All., Inc.*,
    388 B.R. 202 (Bankr. W.D. Tex. 2008),
    *aff'd sub nom, In re Save Our Springs (S.O.S.) All., Inc.*,
    632 F.3d 168 (5th Cir. 2011) ............................................................................32

*In re Silva*,
    2015 Bankr. LEXIS 842 (Bankr. C.D. Cal. March 17, 2015) ...........................................34

*In re Situation Management Systems, Inc. ("Situation Management")*,
    252 B.R. 859 (Bankr. D. Mass. 2000) .................................................................26

*In re Washington Group, Inc.*,
    476 F.Supp. 246 (MDNC 1979),
    *aff'd sub nom. Johnston v. Gilbert*, 636 F.2d 1213 (4th Cir. 1980),
    *cert. denied*, 452 U.S. 940 (1981)......................................................................2

*Index Newspapers LLC v. U. S. Marshals Serv.*,
    977 F.3d 817 (9th Cir. 2020) ............................................................................21

*Lair v. Bullock*,
    697 F.3d 1200 (9th Cir. 2012) ...........................................................................20

*Lee v. City of Los Angeles*,
    250 F.3d 668 (9th Cir. 2001) ..............................................................................4

*Leiva-Perez v. Holder*,
    640 F.3d 962 (9th Cir. 2011) ........................................................................21, 32

*Murray v. Bammer (In re Bammer)*,
    131 F.3d 788 (9th Cir. 1997) (en banc) .................................................................22

*Nat'l Urb. League v. Ross*,
    977 F.3d 770 (9th Cir. 2020) ............................................................................21

*Nken v. Holder*,
    556 U.S. 418 (2009).......................................................................21, 32, 34, 35

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ............................................................................33

*Wolf v. Weinstein*,
    372 U.S. 633 (1963)........................................................................................2

## **STATUTES**

11 U.S.C.,
    Section 1121...............................................................................................35

11 U.S.C.,

3043196

Section 1121(b)..............................................................................................22

11 U.S.C.,
Section 1121(c)..............................................................................................22

11 U.S.C.,
Section 1121(d)(1)..........................................................................................23

## <u>RULES</u>

Central District Local Bankruptcy Rules,
Rule 9075-1(a)................................................................................................1

Federal Rules of Bankruptcy Procedure,
Rule 8007(a)(1)...............................................................................................1

Federal Rules of Evidence,
Rule 201.........................................................................................................4

Local Bankruptcy Rules,
Rule 9013-1(g)...............................................................................................17

## <u>TREATISES</u>

March & Shapiro,
Rutter Group California Practice Guide: Bankruptcy
¶ 11:232  (Dec. 2024) ...................................................................................31

iv

3043196

1    Irwin Naturals, a Nevada corporation ("Irwin Nevada"), and its related debtor entities

2    (collectively, the "Debtors"), hereby file their emergency motion (the "Motion") for a stay pending

3    appeal of the *Order (A) Granting Motion for an Order (I) Terminating the Exclusive Periods in*

4    *Which the Debtor may File a Plan and Solicit Acceptances and (II) Permitting FitLife Brands, Inc.*

5    *to File an Alternative Plan and Disclosure Statement; and (B) Granting Related Relief* entered on

6    March 31, 2025 [Doc. No. 469] (the "Termination Order"), pursuant to Rule 8007(a)(1) of the

7    Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 9075-1(a).  On March 31, 2025,

8    the Debtors filed a notice of appeal of the Termination Order [Doc. No. 470] (the "Appeal").  In

9    support of the Motion, the Debtors respectfully represent as follows:

10    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

11    **I.    INTRODUCTION**

12    FitLife Brands, Inc. ("FitLife") is a direct competitor of the Debtors.  FitLife has expressed

13    an interest in acquiring the Debtors' assets, by way of a low-ball offer that ignores the enterprise

14    value of these Debtors.  In bad faith and in order to obtain "standing" in these cases, FitLife bought a

15    single unsecured claim in the face amount of $7,498.00, representing less than 0.03% of the claims

16    in these cases, and filed the transfer of that claim with the Court on January 22, 2025 (the same day

17    that it filed its first objection to the Debtors' proposed first amended disclosure statement).  *See, e.g.*,

18    *In re Fitger Ltd.*, 118 F.3d 635, 639 (9th Cir. 1997) (noting that courts have found bad faith where

19    "creditors were associated with a competing business and desired to destroy the debtor's business in

20    order to further own") (citing *In re MacLeod Co., Inc.,* 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986)

21    and *In re Allegheny Int'l, Inc.*, 118 BR 282, 289 (Bankr. W.D. PA 1990)).  In response to FitLife's

22    interest in acquiring the Debtors' assets, Debtors' counsel communicated with FitLife's counsel with

23    respect to the sale process that the Debtors were willing to set up.  Instead of engaging in any further

24    discussions and after it had consented to a short four-week continuance of the Debtors' exclusive

25    periods, mere days later, FitLife filed a motion for an order terminating the Debtors' exclusive

26    periods and for permission to file an alternative plan [Doc. No. 349] ("Terminate Motion").

27    Unlike most of the chapter 11 bankruptcy proceedings filed in this district, the Debtors are

28    solvent, they operate profitably and their customers are large corporations (such as Walmart, Costco,

3043196

1   etc.).  In the Terminate Motion, FitLife portrayed the Debtors as acting only in the self-interest of

2   equity holders without any evidence to support that argument.  However, even if true, which it is not,

3   this argument ignores the fact that these cases are solvent.  Solvent debtors owe fiduciary duties not

4   only to their creditors and bankruptcy estates, but also to their shareholders. *See, e.g., Commodity*

5   *Futures Trading Com'n v. Weintraub ("Commodity")*, 471 U.S. 343, 355-56 (1985) ("[T]he

6   fiduciary duty of the trustee runs to shareholders as well as to creditors …. If a trustee is not

7   appointed – the debtor's directors bear essentially the same fiduciary obligation to creditors and

8   shareholders as would the trustee for a debtor out of possession.  Indeed, the willingness of courts to

9   leave debtors in possession 'is premised upon an assurance that the officers and managing

10  employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'"), *quoting*

11  *Wolf v. Weinstein*, 372 U.S. 633, 649-652 (1963) *and citing In re Washington Group, Inc.*, 476

12  F.Supp. 246, 250 (MDNC 1979), *aff'd sub nom. Johnston v. Gilbert*, 636 F.2d 1213 (4th Cir. 1980),

13  *cert. denied*, 452 U.S. 940 (1981).  The Debtors have 230 public shareholders whose interests they

14  have fiduciary duties to protect.

15         Further, the Terminate Motion, and the Court's ruling on the motion, were premised

16  primarily on FitLife's illusory argument that it could file a better plan than the Debtors' proposed

17  plan.  However, case law is clear that statements made by parties in interest that they are prepared to

18  file a more favorable plan is not sufficient cause to terminate the debtor's exclusive periods.  *In re*

19  *Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 132–34 (D.N.J. 1995) (finding that the bankruptcy

20  court erred as a matter of law when it found cause to terminate the debtor's exclusive periods

21  because of the potential for alternative more favorable plans).  Moreover, FitLife utterly failed to

22  meet its heavy burden to demonstrate cause to terminate the Debtors' exclusive periods.

23         The Debtors are in an untenable situation where all decisions lead them to massive losses for

24  shareholders from the expedited timeframe forced upon them by a competitor who wants to acquire

25  the Debtors for cheap so that the FitLife shareholders benefit (at the expense of the Debtors'

26  shareholders).  The Debtors submit that this is the opposite of what Congress intended with Chapter

27  11.  There is no case law that Debtors' counsel could find in the Ninth Circuit or elsewhere where a

28  debtor's exclusive period was terminated earlier than 10 months after the petition date – and the one

2

case cited by FitLife for this proposition, *In re New Meatco Provisions, LLC ("New Meatco"),* 2014 WL 917335, at *1 (Bankr. C.D. Cal. Mar. 10, 2014), terminated exclusivity ten months post-petition in a non-operating case. *Id.* (terminating the debtor's exclusive period ten months into the case where the debtor was a non-operating entity, there was no business to reorganize, and it was a liquidation case that was neither large nor complex). Those facts are simply inapposite to the facts in these cases.

Here, the Debtors' cases meet the Central District's definition of complex cases, and the Debtors are a profitable, operating business valued conservatively at approximately $79 million [Doc. No. 424, p. 5, ¶ 16]. The Debtors have been negotiating in good faith with all creditor constituencies and equity holders to formulate a consensual chapter 11 plan during the short seven months these cases have been pending, and the Debtors have recently made progress with one such constituency. The Debtors have been paying their obligations as they come due, including approximately $255,000 per month to the Debtors' secured creditor as adequate protection. Further, the Debtors have demonstrated reasonable prospects for filing a viable plan in that the record contains uncontroverted evidence that the Debtors have received a term sheet for a line of credit up to $20 million, which would be used to make required payments of the effective date of the Debtors' plan, and alternatively, at a minimum, if no higher bids are received, FitLife will be a stalking horse bidder in an equity transaction, which would also pay all creditors in full. The record is simply devoid of evidence of cause for the Court to have granted the Terminate Motion.

The Debtors submit that in entering the Termination Order, the Court (a) incorrectly found that the Debtors' exclusive period to file a plan of reorganization had already expired, (b) incorrectly found that the Debtors' soon to be filed chapter 11 plan would not relate back to the Debtors' previous plan, and (c) incorrectly held that, in any event, FitLife established cause to terminate the Debtors' exclusive period to file a plan and solicit acceptances thereof, even though these bankruptcy cases have been pending for a mere seven (7) months and the solvent Debtors have made substantial progress toward reorganization (and at all relevant times herein have represented that that they will be paying all allowed claims in full under their plan – albeit under different timelines). Indeed, the Debtors were able to negotiate a consensual plan with the Official Committee of

3

1   Unsecured Creditors.  Although EWB was not happy with the Debtors' proposed plan of

2   reorganization, that is not sufficient cause to terminate the Debtors' exclusivity periods.  *Geriatrics*

3   *Nursing*, 187 B.R. at 134 (concluding that sufficient cause did not exist to undermine the debtor's

4   chances of winning final confirmation of its plan during the exclusivity period where one creditor

5   constituency was not happy with the debtor's plan).

6          Accordingly, the Debtors filed the Appeal to protect the Debtors' estates' interests in these

7   cases.  The Debtors respectfully submit that there is cause to grant the Motion because, as discussed

8   below, the Debtors are likely to succeed on the merits of the Appeal, the Debtors' will be harmed

9   absent a stay pending the Appeal, no other parties will be injured by a stay and the public policy

10  underpinning section 1121 of the Bankruptcy Code supports granting the Motion.  Thus, the Debtors

11  respectfully request a stay of the Termination Order pending the Appeal.

12  **II.      RELEVANT BACKGROUND**

13          **A.      <u>Circumstances Leading to the Bankruptcy Filing</u>**

14          The Debtors operate a nutraceutical business that has operated successfully for most of its

15  history since its inception in 1994.  Irwin Nevada formulates, markets, and distributes vitamins and

16  supplements.  In addition to its Irwin Naturals® supplement brand, Irwin Nevada also has two other

17  supplement brands, Nature's Secret® and Applied Nutrition®.  Irwin Nevada's product line currently

18  includes over 130 formulas, which are distributed in more than 100,000 retail locations, including

19  health food stores such as Whole Foods and mass-market retailers such as Costco, Walmart, and

20  CVS.  The Debtors' 2023 gross sales were $91 million.  The Debtors employ approximately 73

21  people in the County of Los Angeles.  Declaration of Klee Irwin, Doc. No. 425, ¶ 5.[1]

22          For almost three decades, Irwin Nevada enjoyed financial stability and profitability from its

23  long-trusted dietary supplement brands.[2]  Pre-petition, Irwin Nevada sought to expand its footprint,

24  and the Debtors had financial difficulties arising out of that attempted expansion.  The Debtors were

25  _____

26  [1] Pursuant to Rule 201 of the Federal Rules of Evidence, the Debtors request that the Court take
    judicial notice of the pleadings filed in these cases, which are all matters of public record.  *Lee v.*
27  *City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (explaining that a court may take judicial
    notice of "matters of public record").

28  [2] On an adjusted EBITDA basis, when accounting for extraordinary expenses.

4

3043196

able to regain their financial footing; however, the Debtors' relationship with their secured lender,

East West Bank ("EWB") continued to devolve.  The Debtors ultimately filed their respective

bankruptcy cases after EWB exerted control over their business and bank accounts.  At the time

these cases were filed, EWB was sweeping the Debtors' bank accounts daily (which left the Debtors

with no liquidity other than what EWB determined was necessary to pay), and the Debtors were

unable to retain bankruptcy counsel pre-petition as they were unable to fund a retainer due to EWB's

control.

      The Debtors filed these cases to regain control over their businesses and to reorganize their

debt in order to return to their prior financial stability and profitability.

**B.**     **The Debtors' Cases Meet the Definition of a Complex Chapter 11 Case**

      On August 9, 2024, the Debtors filed voluntary petitions for relief under chapter 11 of Title

11 of the United States Code (the "Bankruptcy Code").  The Debtors filed their bankruptcy cases

without bankruptcy counsel, and Irwin Nevada's general counsel, Joseph Axelrod, was listed as

counsel of record on each of the Debtors' dockets.  On August 13, 2024 (or four days after their

respective bankruptcy filings), the Debtors retained BG Law LLP as their substitute bankruptcy

counsel.

      On August 14, 2024, the Court entered an order authorizing the joint administration of the

Debtors' cases [Doc. No. 11].  The Debtors continue to operate their business and manage their

affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

      On August 31, 2024, the United States Trustee for the Central District of California

appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section

1102(a) of the Bankruptcy Code [Doc. No. 69].

      Pre-petition, Irwin Nevada was a publicly traded company on the Canadian Securities

Exchange through Irwin Naturals, Inc. ("Irwin Canada"), which was an existing Canadian public

company.  Declaration of Klee Irwin, Doc. No. 22, ¶ 9.  As of the filing of this Motion, there are

approximately $27 million in scheduled and filed claims in the Debtors' cases, excluding

administrative expense claims and disputed IRS claims, and approximately 480 parties in interest,

including over 250 creditors and approximately 230 public shareholders. *See List of Equity Security*

*Holders*, Doc. No. 17 in Irwin Canada's bankruptcy case, Bankr. Case No. 1:24-bk-11324-VK. Accordingly, the Debtors' chapter 11 cases meet the definition of a complex chapter 11 case as set forth in General Order 23-02 for the United States Bankruptcy Court for the Central District of California entered on July 31, 2023.  General Order 23-02, p. 1, lines 20-25 ("A Complex Case is a case or group of affiliated cases in which (i) the total liabilities of the debtor (a single debtor or a group of affiliated debtors whose cases are intended to be jointly administered) exceeds $10 million; (ii) there are more than 50 parties in interest; or (iii) any claims against or interests in the debtors are publicly traded, all as reported on the debtor(s) bankruptcy petition(s).")

The general bar date for filing proofs of claim in these cases was December 20, 2024 [Doc. No. 199], and the deadline for governmental units to file their proofs of claim was February 5, 2025 [Doc. No. 200].  As of the filing of this Motion, 76 proofs of claim have been filed in these cases.

As demonstrated through their monthly operating reports, the Debtors' estates are solvent, and the Debtors have been operating profitably throughout the pendency of the chapter 11 cases. The Debtors' most recently filed monthly operating reports indicate that as of February 28, 2025, the Debtors had approximately $4.5 million in cash [Doc. Nos. 453, 454, 455, 456].  Indeed, the Court recognized as much at the evidentiary hearing on the Terminate Motion.  Exhibit 2 (Hearing Transcript Dated 3-21-2025), p. 192, line 3 ("They are paying their bills as the [*sic*] come due.").

**C.      The Debtors' Cases Have Been Extremely Active Since Commencement of the Cases**

The Debtors' bankruptcy cases have been extremely active since the commencement of the cases.  Indeed, as of the filing of this motion, there are 476 docket entries in the lead case, which equates to approximately 67 docket entries per month during the pendency of the Debtors' cases.

The Debtors' and their counsel's efforts during the early part of these cases focused on obtaining authority to, among other things, secure use of cash collateral over the objection of EWB, maintain certain prepetition accounts, pay certain critical vendors, and pay pre-petition wages, salaries, and other compensation, which were each critical elements of the continuation of the Debtors' business operations.  *See* Doc. Nos. 35, 80, 81, 266.

The Debtors filed several applications to employ professionals, which were approved by the Court, including bankruptcy counsel [Doc. No. 109], an auditing accountant [Doc. No. 121], a noticing and claims agent [Doc. No. 134], a financial advisor [Doc. No. 136], valuation services expert [Doc. No. 135], and a tax accountant and bookkeeper [Doc. No. 181].  In addition to those employment applications, the Debtors also filed a motion for the employment of ordinary course professionals [Doc. No. 129] and for procedures for interim compensation of professionals of the estates [Doc. No. 124].  After objections by the United States Trustee, those motions were granted by the Court [Doc. Nos. 202 and 214, respectively].

In compliance with the United States Trustee's guidelines, on August 23, 2024, the Debtors served several Notices of Setting/Increasing Insider Compensation [Doc. Nos. 155, 156].  Despite weeks of communication throughout which the Debtors answered EWB's informal requests for information regarding compensation for certain insiders [Doc. No. 157, Exhibit 3], EWB objected to two of those notices and requested a hearing [Doc. No. 157].  Thereafter, the Debtors continued to negotiate with EWB, and EWB ultimately withdrew its objection [Doc. No. 174].

Obtaining use of cash collateral was a highly contested matter that took months of efforts by the Debtors and their counsel.  On August 15, 2024, the Debtors filed their *Emergency Motion for Authority to: (A) Use Cash Collateral on an Interim Basis Pending a Final Hearing; (B) Grant Replacement Liens; and (C) Set Final Hearing* [Doc. No. 19] (the "Cash Collateral Motion").  Prior to the hearing on the Cash Collateral Motion, the Debtors were able to negotiate with EWB and came to an agreed upon proposed form of order granting the Cash Collateral Motion on an interim basis [Dos. No. 33].  The Court entered the agreed-upon order on August 16, 2024, and continued the hearing on the Cash Collateral Motion to September 5, 2024 [Doc. No. 34].  In connection with its use of cash collateral, the Debtors agreed to begin paying EWB $155,000 per month beginning on September 1, 2024.

Thereafter, EWB filed an objection to the Cash Collateral Motion [Doc. No. 70].  However, prior to the continued hearing on September 5, 2024, the Debtors and EWB came to an agreement regarding continued use of cash collateral on an interim basis.  Accordingly, on September 6, 2024,

1    the Court entered the second agreed-upon order granting the Cash Collateral Motion on an interim

2    basis and continuing the hearing to September 26, 2024 [Doc. No. 71].

3    On September 19, 2024, the Debtors filed a supplement to the Cash Collateral Motion [Doc.

4    No. 91], which included a declaration by Wayne Platt of Marula Capital Group LLC, the Debtors'

5    valuation professional, regarding the enterprise value and brand value of the Debtors, and a copy of a

6    valuation of the Debtors' business on a going concern enterprise basis as of September 3, 2024 [Doc.

7    No. 91, Exhibit B] (the "September Valuation").  Pursuant to the September Valuation, the fair

8    market value of the Debtors' business as a going concern was valued at approximately $100 million.

9    On September 25, 2024, EWB filed a supplemental objection to the Cash Collateral Motion [Doc.

10   No. 108].

11   Thereafter, the Debtors continued to negotiate with EWB and the parties were able to come

12   to an agreement regarding the continued use of cash collateral on an interim basis [Doc. No. 112].

13   On September 27, 2024, the Court entered its third interim order granting the Cash Collateral Motion

14   on an interim basis and continuing the hearing to November 7, 2024 [Doc. No. 115].  As part of their

15   negotiations with EWB, the Debtors agreed to file a chapter 11 plan of reorganization and related

16   disclosure statement by October 31, 2024.  *Id.*  At that point, the Court had not even held a chapter

17   11 status conference in these cases, set a bar date, or set a deadline to file a chapter 11 plan (and yet

18   the Debtors filed their first plan and disclosure statement).  The first chapter 11 status conference in

19   these cases was held on October 31, 2024 [Doc. No. 186].

20   On October 24, 2024, the Debtors filed another supplement to the Cash Collateral Motion

21   [Doc. No. 175].  On November 4, 2024, EWB filed another supplement to its objection to the Cash

22   Collateral Motion [Doc. No. 198].  Thereafter, the parties stipulated to the continued use of cash

23   collateral on an interim basis and to continue the hearing on the Cash Collateral Motion to December

24   4, 2024 [Doc. No. 206], which stipulation was approved by the Court [Doc. No. 207].

25   On November 13, 2024, the Debtors filed a stipulation with EWB regarding extending the

26   briefing deadlines with respect to the continued hearing on the Cash Collateral Motion because the

27   parties were attempting to reach consensual final cash collateral terms [Doc. No. 225], which

28   stipulation was approved by the Court [Doc. No. 229].  The parties continued their negotiations, and

on November 18, 2024, the Debtors filed another supplement to the Cash Collateral Motion, which contained an agreed upon form of final order [Doc. No. 235].  On December 9, 2024, the Court entered the parties' consensual form of order for the final use of cash collateral [Doc. No. 266] (the "Cash Collateral Order").  Through the Cash Collateral Order, the Debtors agreed to continue paying EWB $155,000 per month in interest payments and $100,000 per month in principal payments beginning on December 1, 2024.  The Debtors have remained current on these payments.

On September 12, 2024, EWB served a request for production of documents on the Debtors in connection with the Cash Collateral Motion, which contained 37 requests for production.  On December 13, 2024, EWB served a second set of requests for documents on the Debtors, which included an additional 15 requests for production.  The Debtors have spent significant time and resources responding to these discovery requests, produced thousands of responsive documents and participated in no less than six meet and confers as requested by EWB regarding the status of the Debtors' production.  The Debtors' production recently concluded in March 2025.  *See* Exhibit 1, pp. 20-21.

As set forth above, in large part because of EWB's overly aggressive litigation tactics, especially given that EWB is oversecured and has been receiving monthly interest and principal payments, the Debtors were forced to spend a large portion of their time and resources to date in these cases prosecuting the Cash Collateral Motion and responding to voluminous discovery requests.

**D.**     **The Debtors Have Been Negotiating with Creditors in Good Faith to Form a Consensual Chapter 11 Plan**

Notwithstanding that it was only approximately two months after the Debtors filed their chapter 11 petitions and that the Court had not set a deadline for filing a chapter 11 plan, at the request of EWB, on October 31, 2024, the Debtors filed an initial chapter 11 plan of reorganization and related disclosure statement [Doc. Nos. 185, 187].  The Debtors' original disclosure statement disclosed that the Debtors' chapter 11 plan would be funded by obtaining exit financing, in which case allowed claims would be paid in full on the effective date, or through the Debtors' ongoing business operations with all allowed claims being paid in full by 2028 [Doc. No. 187] (the "Original

3043196

DS").  The Original DS further disclosed that if the claims were not paid in full by 2028, the Debtors would obtain financing to pay the remaining claims in full or sell the Debtors' business.  *Id.*  The hearing on the approval of the Original DS was set for January 8, 2025 [Doc. No. 223].

On November 12, 2024, the Debtors filed their first motion to extend their exclusive periods to file and confirm a chapter 11 plan of reorganization [Doc. No. 219] (the "First Exclusivity Motion").  The Debtors' statutory exclusive periods were set to expire on December 7, 2024, and February 5, 2025, respectively.  EWB filed an objection [Doc. No. 239].  The First Exclusivity Motion was granted over EWB's objection pursuant to the Court's order entered on December 11, 2024 [Doc. No. 269] (the "Exclusivity Order").  Through the Exclusivity Order, the Debtors' exclusivity periods were extended for a short period to February 5, 2025, and April 4, 2025.

After the Debtors filed the Original DS, the Debtors received several comments from EWB, the United States Trustee and the Committee.  Based on those comments and the Debtors' negotiations with those parties, the Debtors agreed to file an amended disclosure statement and chapter 11 plan to address the parties' concerns.  Accordingly, on December 16, 2024, the Debtors filed a stipulation with EWB, the United States Trustee and the Committee to continue the hearing on the approval of the disclosure statement to January 22, 2025, and setting December 23, 2024, as the deadline for the Debtors to file an amended chapter 11 plan of reorganization and related disclosure statement [Doc. No. 274].  On December 17, 2024, the Court entered an order approving that stipulation [Doc. No. 275].

On December 23, 2024, the Debtors filed their *First Amended Chapter 11 Plan of Reorganization* [Doc. No. 286] and related disclosure statement [Doc. No. 287] (the "First Amended DS").  The First Amended DS disclosed that the Debtors' chapter 11 plan would be funded by obtaining exit financing or a partial or full equity investment, in which case an upfront payment would be made to EWB and, if applicable, upfront pro rata payments to holders of general unsecured claims, or through the Debtors' ongoing business operations with all allowed claims being paid in full by 2027.  Doc. No. 287.  The First Amended DS further disclosed that if the claims were not paid in full by 2027, the Debtors would obtain financing to pay the remaining claims in full or sell

the Debtors' business, and that the Debtors were interviewing investments bankers to act as

consultants for an equity investment.  *Id.*

On January 9, 2025, the Debtors filed a second stipulation with EWB, the United States

Trustee and the Committee to continue the hearing on the First Amended DS for approximately two

weeks because the Palisades Fire destroyed the home of the Debtors' principal and certain of the

Debtors' offices located on the property [Doc. No. 293].  On the same day, the Court entered an

order approving that stipulation [Doc. No. 294].

In accordance with the Debtors' representations in the First Amended DS, on January 15,

2025, the Debtors filed an application to employ Essex Capital Group, Inc. as consultants with

respect to debt solicitation [Doc. No. 298].  After negotiations with the United States Trustee, the

Court approved the application on February 14, 2025 [Doc. No. 343].

The Debtors also filed an application to employ STS Capital Partners M&A Advisers Inc

("STS") as their investment banker with respect to a potential equity transaction [Doc. No. 336].

EWB and FitLife both initially objected to that application [Doc. Nos. 346, 348].  However, after

negotiations with the Debtors both parties withdrew their objections ultimately withdrew their

objections (though FitLife did not withdraw its objection until March 20, 2025 [Doc. Nos. 402, 442].

Yet, the result of EWB and FitLife's objections was that STS's employment application was not

approved until <u>March 21, 2025</u> [Doc. No. 450] (or less than a week and a half ago), and STS was not

able to begin marketing the Debtors' business until after that date (and any other expectation that

STS would commit serious resources and expense to prepare a data room and CIM is unreasonable

at best given that its employment was not approved).

On January 22, 2025, approximately a month after the Debtors filed the First Amended DS,

FitLife filed a transfer of claim agreement [Doc. No. 304], whereby a general unsecured claim in the

amount of $7,498 was transferred to FitLife.  This represents 0.12% of the general unsecured claims

filed in the Debtors' cases, and approximately 0.03% of all claims.  On the same day that FitLife

filed the transfer of claim, it filed an objection to the First Amended DS [Doc. No. 308]. But for its

de minimis purchase of a general unsecured claim, FitLife would have no standing in these cases.

After good faith negotiations with EWB, the United States Trustee and the Committee, the Debtors agreed to make substantial changes to the First Amended DS [Doc. No. 317, ¶ I].  In order to allow sufficient time to prepare a further amended disclosure statement, the parties and FitLife entered into a stipulation to further continue the hearing on the approval of the Debtors' proposed disclosure statement [Doc. No. 317], which the Court approved on January 28, 2025 [Doc. No. 323] (the "Stipulation Order").  Pursuant to the Stipulation Order, the hearing on the approval of the Debtors' proposed disclosure statement was set for March 5, 2025.  Additionally, through the Stipulation Order, the Debtors' exclusive period to file a plan of reorganization was extended consensually for 30 days to March 5, 2025, and the Debtors' exclusive period to obtain acceptances of a plan of reorganization was extended consensually for 30 days to May 2, 2025.  To be clear, FitLife <u>voluntarily agreed</u> to the extension of the Debtors' exclusive periods.

On February 7, 2025, the Debtors filed their *Notice of Submission of (1) Proposed Redline to Debtors' First Amended Disclosure Statement Describing Debtors' First Amended Chapter 11 Plan of Reorganization and (2) Revised Exhibit B to Disclosure Statement* [Doc. No. 342] (the "Redline Notice").  Exhibit 1 to the Redline Notice was the Debtors' proposed second amended disclosure statement (the "Proposed Second Amended DS").  The Proposed Second Amended DS disclosed that the Debtors' chapter 11 plan would be funded by obtaining exit financing or an equity investment, in which case an upfront payment would be made to EWB and, if applicable, upfront pro rata payments to holders of general unsecured claims, or through the Debtors' ongoing business operations with all allowed claims being paid in full by 2027.  Doc. No. 287.  The Proposed Second Amended DS further disclosed that the Debtors proposed to pay interest to holders of certain claims and that if the claims were not paid in full by 2027, the Debtors would obtain financing to pay the remaining claims in full or sell the Debtors' business.  *Id.*  The Proposed Second Amended DS included provisions requested by the parties, including provisions requested by Karled Enterprises I ("Karled"), the Debtors' former landlord whose claim makes up approximately 19.3% of the general unsecured claims in the Debtors' cases.

Notwithstanding, on February 19, 2025, EWB and FitLife filed objections to the adequacy of the Debtors' proposed disclosure statement [Doc. Nos. 345 and 347, respectively] (the "DS

Objections").  Both objections argued, among other things, that the Debtors needed to market test the value of the equity in the Debtors' during the pendency of the Debtors' chapter 11 cases, and alleged that the Debtors' principal was conflicted.  In order to address these concerns, the Debtors agreed to implement a fulsome sale process during the Debtors' bankruptcy cases and to install an independent director (who has ultimate control on any decision related to exit financing, the plan or a sale).

Although the Debtors attempted to negotiate with EWB regarding dates for a fulsome sale process, the parties were unable to come to an agreement prior to the March 5, 2025, hearing on the approval of the Debtors' proposed disclosure statement.  However, the Debtors were able to come to an agreement with the Committee.

Accordingly,  on February 26, 2025, the Debtors and the Committee entered into a stipulation wherein the Debtors agreed to a fulsome sale process during the Debtors' bankruptcy cases, which would culminate in a 363 sale motion or plan confirmation hearing to be held no later than July 31, 2025, with a sale closing or the effective date of a plan to occur no later than August 15, 2025 [Doc. No. 384] (the "Sale/Plan Process Stipulation").  Through the Sale/Plan Process Stipulation, the Debtors reserved their right to take out all creditors in full through refinancing prior to the July 31, 2025 deadline.  Additionally, through the Sale/Plan Process Stipulation, the Committee consented to an extension of the Debtors' exclusive periods through August 15, 2025, in order to provide the Debtors with sufficient time to adequately market the Debtors' business to maximize value to creditors and the 230 public shareholders.  Through the Sale/Plan Process Stipulation, the Debtors agreed that all creditors would be paid in full on the effective date of the Plan, i.e., no later than August 15, 2025.

On the same day, the Debtors filed their omnibus reply to the DS Objections [Doc. No. 387] (the "DS Reply").  In the DS Reply, the Debtors argued that the Sale/Plan Process Stipulation resolved the objections set forth in the DS Objections and requested that the Court set a deadline for the Debtors to file a further amended disclosure statement and chapter 11 plan and to set a hearing on the approval of the soon to be filed amended disclosure statement.  The Debtors filed the declaration of Vince Willis in support of the DS Reply [Doc. No. 388].

On March 3, 2025, EWB filed a statement in response to the Sale/Plan Process Stipulation [Doc. No. 398] (the "EWB Statement").  In the EWB Statement, among other things, EWB requested that the Court set a bid date of May 1, 2025, and a sale closing date of May 30, 2025.  The sale closing date proposed by EWB was only two and a half months earlier than the date the Debtors and the Committee agreed to but was made at a time when the Debtors' investment banker had not been approved and EWB and FitLife had objected to its employment.

On March 5, 2025, the Court held a hearing on the approval of the Debtors' disclosure statement.  At the hearing, the Debtors requested that the Court continue the hearing on the approval of the Debtors' disclosure statement for approximately 30 days.  Exhibit 1 (Hearing Transcript Dated 3-5-2025), p. 3, lines 12-25.  The Court continued the hearing to March 21, 2025, to be heard in connection with an evidentiary hearing on the Terminate Motion as discussed below.  At the March 21, 2025 hearing, the Court did not set a continued hearing on the approval of the Debtors' amended disclosure statement.  *See* Exhibit 2.

On March 5, 2025, the Debtors filed a motion to extend the Debtors' exclusive period to file a chapter 11 plan of reorganization and disclosure statement [Doc. No. 405] (the "Second Exclusivity Motion").  FitLife filed an objection to the Second Exclusivity Motion [Doc. No. 438], and the Committee filed a non-opposition to the motion [Doc. No. 439].  The hearing on the Second Exclusivity Motion was set for April 2, 2025, and on March 31, 2025, the Court vacated the hearing based on the Termination Order.

On March 6, 2025, the Court entered an order denying approval of the Sale/Plan Process Stipulation [Doc. No. 406].

On March 31, 2025, the Debtors filed a second amended chapter 11 plan [Doc. No. 473] (the "Second Amended DS") and a second amended disclosure statement [Doc. No. 474].  Among other things, the Second Amended DS proposes to pay EWB and general unsecured creditors in full within 14 days of the effective date and pay 14% interest to general unsecured creditors accruing as of the petition date.

The Second Amended DS further discloses that the Debtors have appointed Bradley Sharp as the independent director of Irwin Nevada effective as of March 18, 2025 pursuant to a Resolution of

3043196

the Board of Directors of Irwin Nevada dated March 18, 2025, a Written Consent of Shareholders of

Irwin Naturals to Elect Special Restructuring Independent Director dated March 18, 2025, an

engagement agreement between the Debtors and Development Specialists, Inc. dated March 4, 2025,

and an Indemnification Agreement dated March 5, 2025.  Pursuant to the aforementioned

documents, Mr. Sharp is vested with the sole authority to approve all liquidation event(s) on behalf

of Irwin Nevada, including a sale of Irwin Nevada's equity or assets, a re-financing and/or the

Debtors' chapter 11 plan.

    The Court has not set a hearing on the approval of the Second Amended DS for May 21,

2025 at 1:30 p.m.

### E.    The Terminate Motion and Appeal

    Prior to FitLife acquiring the $7,498 general unsecured claim, FitLife was (and is) a direct

competitor of the Debtors and had expressed an interest in purchasing the Debtors' business pre-

petition.  FitLife was never a creditor of the Debtors prior to its purchase of a de minimus claim.  As

such, none of FitLife's actions in these cases have been made in good faith in an attempt to

maximize its claim.  Rather all of FitLife's actions have been a bad faith attempt to frustrate the

Debtors' reorganization efforts, and to destroy the Debtors' business in order to acquire the Debtors'

business at a fire sale price (well below market value) to further FitLife's own business and to enrich

FitLife's shareholders (at the direct expense of the Debtors' shareholders).

    On February 7, 2025, after the Debtors filed their proposed Second Amended DS, FitLife's

principal sent a non-binding expression of interest to the Debtors' principal that was contingent on a

due diligence period and confirmation of the Debtors' financials [Doc. No. 367, Sealed Exhibit A to

Terminate Motion].  The Debtors responded that FitLife was welcome to participate in bidding when

the Debtors' business went to market.  Exhibit 1, p. 35, lines 11-16.  Rather than continue to

negotiate with the Debtors, in an attempt to steal the Debtors' 30-year-old, reputable and profitable

business for a bargain basement amount, FitLife filed the Terminate Motion.

    On February 19, 2025, a mere few weeks after consensually agreeing to an extension of the

Debtors' exclusive periods, FitLife filed the Terminate Motion and an application to set a hearing on

the Terminate Motion on shortened notice [Doc. No. 351].  The only basis that FitLife provided for

1    requesting a hearing on shortened notice was that it wanted the Court to consider the Terminate

2    Motion at the same time as the approval of the Proposed Second Amended DS. *Id.* There was no

3    other cause given for why the motion should be heard on shortened notice. Notwithstanding the

4    oppositions filed by the Debtors [Doc. Nos. 352 and 356], the Court granted the application and set

5    the hearing on the Terminate Motion on shortened notice for March 5, 2025 [Doc. No. 358].

6        The Terminate Motion is filled with pejoratives claiming that the Debtors are not proceeding

7    in good faith in these cases. Yet, as discussed above, the Debtors have worked throughout the

8    pendency of their cases to come to agreements with creditors and the United States Trustee and in

9    many instances the Debtors have been successful in doing so. In actuality, the Terminate Motion is

10    premised on FitLife's assertion it could acquire the Debtors' business for an amount sufficient to pay

11    creditors in full on an alleged shorter timeframe than the Debtors' proposed plan. I.e, that FitLife

12    can propose a better plan than the Debtors. The Terminate Motion was not supported by an

13    admissible declaration attesting to any of the alleged facts set forth in the motion. Accordingly, the

14    Debtors filed an evidentiary objection to the Declaration of Todd A. Feinsmith [Doc. No. 393]. The

15    Court never ruled on that evidentiary objection. Karled [Doc. No. 395] and EWB [Doc. No. 355]

16    each filed responses to the Terminate Motion.

17        On February 27, 2025, the Debtors filed an opposition to the Terminate Motion [Doc. No.

18    392] (the "Terminate Motion Opposition") and declarations of the Debtors' principal [Doc. No. 394]

19    (the "Irwin Exclusivity Declaration") and Vince Willis of STS [Doc. No. 388] in support of the

20    Terminate Motion Opposition. On the same day, the Committee filed a joinder to the Debtors'

21    opposition [Doc. No. 396]. In the Irwin Exclusivity Declaration, the Debtors' principal testified in

22    relevant part:

23        5.  The Debtors' customers are large corporations (such as Walmart,
            Costco, etc.), and they have one primary supplier (which supplies
24        approximately 90% of the Debtors' products). I am very concerned
            that a competing plan process will detrimentally and negatively impact
25        the Debtors' business operations. I am concerned that the Debtors'
            suppliers will all move to COD, which will immediately negatively
26        affect the Debtors' cash flow, and that a competing plan process will
            alienate or scare away the Debtors' customers. Post-petition, the
27        Debtors' business has to date operated smoothly and as expected and it
            is imperative that we preserve the going concern value of this business.

28

3043196

Doc. No. 394, ¶ 5.

This testimony regarding the impact of competing plans on the Debtors' business is unconverted in record.  Mr. Irwin further testified that on February 26, 2025, the Debtors received a term sheet for a line of credit up to $20 million, with current availability between $12 million and $14 million based on certain factors.  Doc. No. 394, ¶ 9.

On March 3, 2025, FitLife filed its reply to the Terminate Motion Opposition [Doc. No. 399] (the "Terminate Motion Reply") and a declaration of Dayton Judd, FitLife's principal, in support for the reply [Doc. No. 400] (the "Judd Declaration").  Contrary to FitLife's repeated assertions that its offer is not subject to a financing contingency, in the Judd Declaration, Mr. Judd testified that FitLife's "Proposal for a Consensual Plan" was subject to a due diligence period to confirm that the Debtors' reported EBITDA is accurate.  *Id.* at ¶ 9.  Further, in contravention of Local Bankruptcy Rule 9013-1(g), the Judd Declaration addressed matters that were not set forth in the Terminate Motion Opposition.

Although the Terminate Motion Reply has entire sections arguing that termination of the Debtors' exclusive periods would not be disruptive to the Debtors' supply chain nor cause harm to the Debtors, there was no evidence filed in support of these arguments.  Further, the Terminate Motion Reply makes the unsupported allegation that the Debtors' business has been marketed for almost two years and that the Debtors have refused to consummate a sale.  Again, these arguments were not supported by any evidence, and the allegations could not have been because the allegations are simply not true.  As the Debtors disclosed in the Second Amended DS:

> Furthermore, in an attempt to pay off EWB, the Debtors offered to EWB to put the Irwin Companies up for sale, including signing an engagement agreement in October 2023 with a well-respected investment banker with prior experience selling foundational companies in the nutrition and wellness equity markets. Unfortunately, the investment banker never went to market in any form because EWB refused to cooperate in the process. Eventually the Debtors were able to convince the same investment banker to re-engage and initiate the sale process again in the fall of 2024; however, a complaint filed by EWB against the Debtors (but never served on them) in the summer of 2024 garnered negative media attention and caused the investment banker to terminate the engagement prior to ever marketing the business, contacting any third parties, and/or taking any other actions that would constitute 'going to market' in an equity sale.

3043196

. . .

EWB and FitLife have made repeated false allegations in publicly filed pleadings that the Debtors' business was marketed pre-petition and that the Debtors refused to consummate any sale.  This is simply not true.  Pre-petition the Debtors engaged one investment banker that ultimately withdrew due to the complaint filed EWB and the publicity surrounding it.  The Debtors obtained one other investment banker pre-petition to solicit take-out financing. The Debtors obtained a pre-petition [term sheet] (*sic*) that would have taken out the Lenders' debt in full. This attempted take-out financing was ultimately not successful due to EWB's actions and its complaint (and the publicity related thereto).  The Debtors informed EWB during this time period that it was very difficult for them to close a refinancing deal while the complaint and related litigation were pending; nevertheless, EWB refused to dismiss the complaint and the aforementioned term sheet was withdrawn.  To be clear, the Debtors reached final negotiations with one lender for take-out financing and that deal was terminated by the potential lender due to EWB's complaint and refusal to dismiss the litigation. Subsequently (and apparently after realizing that its own actions prevented a re-financing), EWB did dismiss its complaint (on July 5, 2025) but by that point it was too late to get any of the aforementioned lender[s] (*sic*) back to the table.

Second Amended DS, p. 28, lines 8-17 and p. 28, Footnote 8, lines 20-27.

At the March 5, 2025 hearing on the Terminate Motion, the Court requested that the Debtors file a motion to approve bidding procedures with respect to a potential sale of the Debtors' business and expressed that it would like to see date earlier than those set forth in the Sale/Plan Process Stipulation.  *See* Exhibit 1.  Accordingly, on March 14, 2025, the Debtors filed a motion for entry of an order approving preliminary bidding procedures [Doc. No. 423] (the "Bid Procedures Motion") and the declarations of Wayne H. Platt [Doc. No. 424], Klee Irwin [Doc. No. 425] and Vince Willis [Doc. No. 430] in support of the Bid Procedures Motion.  The dates in the Bid Procedures Motion were the same dates set forth in the Sale/Plan Process Stipulation.  The declarations in support of the Bid Procedures Motion explained why the Debtors' proposed timeline for a sale was reasonable given the Debtors' solvency, their profitability, the fact that they are paying their obligations as they come due, the Debtors' valuation, and the Debtors' desire to remain in business as a going concern and to keep all 73 of their employees employed in Los Angeles County.  The Debtors' proposed timeline was especially reasonable given that STS' employment application had not even been approved yet because of FitLife's objection, and therefore, STS had not begun to market the Debtors' business.  As set forth in Mr. Willis' declaration, a fully orderly sale proceed for a business

18

1    like the Debtors' is typically 6-9 months [Doc. No. 430, p. 2, n.1].  Yet, the Debtors and the

2    Committee agreed to a much shorter timeline in an effort to get creditors paid as soon as possible.

3         On March 21, 2025, the Court held an evidentiary hearing on the Terminate Motion where

4    the Court heard multiple hours of testimony from Mr. Willis, Mr. Platt and Mr. Judd as to the

5    valuation of the Debtors' business and timing for a sale process.  On cross examination, Mr. Judd

6    conceded multiple times under oath that FitLife's "offer" to buy the Debtors was not firm because he

7    had not been able to conduct due diligence.  Exhibit 2, p. 158, lines 4-21, p. 163, lines 3-20.  Thus,

8    the entire premise of the Terminate Motion that FitLife could pay all creditors in full quicker than

9    the Debtors can is entirely illusory.

10         Minutes after conclusion of the evidentiary hearing, the Court heard brief oral argument and

11   ruled not only that FitLife had established cause to terminate exclusivity, but also that the Debtors

12   were not within their exclusive periods despite the timely filed pending Second Exclusivity Motion.

13   *See* Exhibit 2, pp. 204-205, 212.  With respect to the factors for terminating the Debtors' exclusive

14   periods, the Court made the following findings:

15              THE COURT: -- is it's not a complex case, not complex. Not -- it's not
               particularly large. It's been going on for a long time. there have been
16             several extension of the exclusivity period. The Debtor is trying to
               pressure people into its plan because of what Equity wants, you know,
17             that Equity wants more time to make more money, which is -- I mean,
               that's fine. You know, they can try. They can see what happens with
18             their sale process. And -- and – what are the other factors? Let me
               make sure I look at them all to talk about all of them.
19
               (Pause.)
20
               THE COURT: Okay. Good faith progress toward
21
22   Exhibit 2, p. 191, lines 14-25.

23              reorganization. I don't know about good faith. There's been progress.
               They keep filing amended plans under pressure. They are paying their
24             bills as the come due. Reasonable preference for filing a viable plan, I
               don't know because the plans have been filed so far are not viable in
25             the sense that they were -- Equity was holding on without putting in
               more money and without marketing the company, and creditors were
26             not going to get paid in full on confirmation.

27              Why would the Debtors made progress in negotiations with their
               creditors? I guess they're negotiating with the Committee or at least
28             two people on the Committee, but they're not negotiating. They're all

19

with East West Bank, and I'm really -- I mean, really, the Debtors just want more time, which, I mean, I don't see any negotiation process going on.

Amount of time which has elapsed, plenty of time for a case like this.

Whether the Debtors are seeking an extension of exclusivity order to pressure or require us to submit, I mean -- I mean, you know, it looks to me like they are because East West Bank and their largest unsecured creditor, a landlord, is -- you know, is being request -- required to wait around for the Debtors to market as long as they would like to.

Exhibit 2, p. 192, lines 1-25.

And whether there's (audio glitch) contingency, well, there isn't and it was our contingency because we don't know what the Debtor's going to be sold for or if they're going to be able to release equity to -- or money to pay off their debt. So, far it doesn't look like they can raise enough money to pay off their debt because they haven't been able to do it so far, and they've been trying to do that at least since the beginning of the case. And they had another professional involved to do that who wasn't able to do that.

So, these are all reasons. If -- assuming we even have to terminate exclusivity, which I don't even know if we have to in the context of just them filing their plan, there would be grounds to terminate exclusivity. And I don't see it as being catastrophic. It's already being put into the sale process.

Exhibit 2, p. 193, lines 1-16.

On March 31, 2025, the Court entered the Termination Order and the Debtors filed the Appeal. Additionally, the Debtors filed an emergency motion with the BAP for an expedited briefing schedule and requesting that the BAP issue a ruling on the Appeal by May 2, 2025. A true and correct copy of that motion is attached hereto as Exhibit 3.

## III.    ISSUANCE OF A STAY IS APPROPRIATE UNDER THE CIRCUMSTANCES

### A.    <u>Legal Standard</u>

A stay pending appeal is an exercise of judicial discretion dependent on the circumstances of the particular case. *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012). The exercise of such discretion is guided by four factors:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;

(2) whether the applicant will be irreparably injured absent a stay;

3043196

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) where the public interest lies.

*Nken v. Holder*, 556 U.S. 418, 434 (2009).  "[T]he first two *Nken* factors are the most critical, and the second two factors are only considered if the first two factors are satisfied." *Index Newspapers LLC v. U. S. Marshals Serv.*, 977 F.3d 817, 824 (9th Cir. 2020).  Although the test is not elemental, the party seeking a stay must always satisfy the first two factors.  *Nken*, 566 U.S. at 435 ("Once an applicant satisfies the first two factors, the traditional inquiry calls for assessing the harm to the opposing party and weighing the public interest.").

The standard for obtaining a stay pending appeal substantially overlaps with the standard for preliminary injunctions. *Nken*, 556 U.S. at 434.  The "sliding scale" approach applicable to balancing the elements for a preliminary injunction apply "to the consideration of stays pending appeal" and "a flexible approach is even more appropriate in the stay context."  *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011)) (internal quotes and citation omitted; emphasis in original).

Furthermore, in the Ninth Circuit, the party requesting a stay has a higher burden regarding the second factor, irreparable injury.  *Leiva-Perez*, 640 F.3d at 968.  In the Ninth Circuit, a court may not issue a stay unless either "irreparable harm is probable" *and* the appellant proves (a) that there is a strong likelihood of success on the merits and that public interest does not weigh heavily against a stay, *or* (b) that there is a substantial question as to the merits and the balance of hardships tips sharply in the appellant's favor.  *Id.*, at 970.  Importantly, "[t]he minimum threshold showing for a stay pending appeal requires that irreparable injury is likely to occur during the period before the appeal is likely to be decided." *Al Otro Lado*, 952 F.3d at 1007 (citing *Leiva-Perez*, 640 F.3d at 968).

The movant bears the burden of demonstrating that the issuance of a stay is appropriate under the circumstances.  *Nken*, 556 U.S. at 433-34; *Nat'l Urb. League v. Ross*, 977 F.3d 770, 775 (9th Cir. 2020).

## B.    The Debtors are Likely to Succeed on the Merits

The Ninth Circuit has explained that to obtain a stay pending appeal, an appellant must show

"at a minimum, that she has a substantial case for relief on the merits." *Leiva-Perez*, 640 F.3d at 968. The Debtors respectfully submit that they are able to demonstrate, that at minimum, the Debtors have a substantial case for relief on the merits.

The substantive issues in the Appeal are narrow: whether the Court committed error in (a) holding that the Debtors' exclusive period in which to file a plan had expired (even though a Second Exclusivity Motion was timely filed on file on March 5, 2025 prior to the expiration of their exclusive period to file a chapter 11 plan), (b) holding that the Debtors' current plan does not relate back to its prior plan and (c) terminating the Debtors' exclusive periods under section 1121(d) for cause.

**1.      FitLife Failed to Meet Its Burden to Demonstrate Cause to Terminate the Debtors' Exclusive Periods**

"[T]he question of § 1121(d) 'cause' is subject to de novo review as a mixed question of law and fact in which the historical facts are established, the rule of law is undisputed, and the issue is whether the facts satisfy the rule." *In re Henry Mayo Newhall Mem'l Hosp.("Henry Mayo")*, 282 B.R. 444, 452 (B.A.P. 9th Cir. 2002) (citing *Murray v. Bammer (In re Bammer),* 131 F.3d 788, 792 (9th Cir. 1997) (en banc)). In determining whether the known facts satisfy the legal requirement of "cause," the reviewing court should "proceed, in the manner of de novo review, with a 'careful' consideration of the 'circumstances' of [the] appeal 'with a view to encouraging a fair and equitable resolution' of the case." *Id.* The Debtors submit that the known facts in these cases do not satisfy the legal requirement for cause to terminate the Debtors' exclusive periods.

Section 1121(b) provides that, "Except as otherwise provided in this section, only the debtor may file a plan until after 120-days after the date of the order for relief under this chapter." 11 U.S.C. § 1121(c) further provides:

> Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if
> _
> (1) a trustee has been appointed under this chapter;
>
> (2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

(3) the debtor has not filed a plan that has been accepted, before 180
days after the date of the order for relief under this chapter, by each
class of claims or interests that is impaired under the plan.

11 U.S.C. § 1121(d)(1) provides that the court may, for cause, reduce or increase the debtor's 120-day exclusivity period.

A party seeking to terminate exclusivity "bears the burden of proof since it is the moving party who seeks to change the status quo … [M]ost cases state that the standard of proof for such motions is a heavy one." *In re Dow Corning Corp. ("Dow Corning")*, 208 B.R. 661, 663 (Bankr. E.D.Mich. 1997); *see also Geriatrics Nursing*, 187 B.R. at 132 ("A party in interest which seeks to establish cause' to terminate the exclusivity period 'bears a heavy burden'") (quoting *In re Interco, Inc.*, 137 B.R. 999, 1000 (Bankr. E.D. Mo. 1992)).  FitLife utterly failed to meet its heavy burden as the Terminate Motion was not even supported by any admissible evidence.  Further, although the Bankruptcy Code does not define cause, the district court in *Geriatrics Nursing* listed several instances where courts have found cause to terminate the debtor's exclusive periods:

> This court previously pointed out in *In re Texaco, Inc.,* 76 B.R. 322 (Bankr.S.D.N.Y.1987) that in those cases where the exclusivity periods were reduced, factors such as gross mismanagement of the debtor's operations, as in *In re Crescent Beach Inn, Inc.,* 22 B.R. 155 (Bankr.D.Me.1982), or acrimonious feuding between the debtor's principals, as in *Texas Extrusion Corp. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.),* 68 B.R. 712, 725 (N.D.Tex.1986), were major obstacles to a successful reorganization and were regarded as "cause" for the reduction of the exclusivity periods. Similarly, the legislative history accompanying 11 U.S.C. § 1121 indicates that the plan exclusivity provisions should not be employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory.

*Geriatrics Nursing*, 187 B.R. at 132.

None of these situations are present in these cases.  The Debtors' cases are not being grossly mismanaged.  Instead, the opposite is true.  The Debtors are operating profitability during the pendency of these cases without any debtor in possession financing (even though the Debtors sought, and obtained, Court authority to pay over $3 million in pre-petition critical vendor claims – i.e., they reduced pre-petition debt by over $3 million post-petition and yet have still managed to accumulate over $5.7 million in their DIP accounts as of April 1, 2025). The Debtors' post-petition performance illustrates that these estates are solvent and they are profitable under any analysis.

1    Furthermore, there is no feuding between the Debtors' principals and there is no evidence in the

2    record that the exclusive periods have been used by the Debtors as a tactical device to put pressure

3    on the Debtors' creditors.

4        Rather, the primary argument in the Terminate Motion was that FitLife is prepared to

5    propose a plan that is allegedly better than the Debtors' proposed plan.  Case law is clear that this is

6    not sufficient cause to terminate exclusivity.  "Where creditors and parties in interest argue for

7    termination of the exclusivity period on the basis that 'they [are] prepared to offer more favorable

8    plans if the court were to terminate the exclusivity period,' that does not constitute 'sufficient cause

9    to cut short the debtor's window of opportunity …".  *In re Energy Conversion Devices, Inc.*

10   *("Energy Conversion")*, 474 B.R. 503, 508 (Bankr. E.D. Mich. 2012) (emphasis added) (quoting

11   *Geriatrics Nursing*, 187 B.R. at 134).

12       Indeed, the facts in these cases are analogous to the facts in *Geriatrics Nursing*.  In that case,

13   the district found that the bankruptcy court erred in finding cause to terminate the debtor's exclusive

14   periods reasoning, in relevant part, as follows:

15           At the April 4, 1995 hearing, the Bankruptcy Judge set forth her
             reasons for terminating the exclusivity period and allowing the filing
16           of alternative plans. The court found that Congress intended to balance
             the interests of debtors and creditors in Chapter 11, and that maximum
17           return on creditors' claims coupled with the continued survival and
             viability of the debtor are the goals of the Code in this area. However,
18           the court expressed favor for the interests of the creditors: "[T]o some
             extent, creditors' rights are paramount, not the only interest, but first
19           among equals in some sense." *Id.* at pp. 66–67 (*see also* page 69 at
             lines 20–22). Based on that view of the process, the court found that
20           the traditional inclination of bankruptcy judges to extend the period of
             exclusivity was at odds with Congressional intent. The opportunity to
21           negotiate its plan unimpaired by competition, the court held, is meant
             to allow the debtor time to satisfy all creditors and win support for its
22           restructuring scheme and thus ensure its survival as a business. In
             regard to the instant Debtors, the court found that they "had that
23           opportunity here." *Id.* at p. 68. The Bankruptcy Judge recognized that
             the Debtors' plan "made its unsecured creditors happy[,]" but that "one
24           of the main creditor constituencies [was] not particularly happy with
             its treatment under the plan[.]" *Id.*

25
             Permitting the filing of alternative plans would, in the Bankruptcy
26           Court's view, lead to "the best of all possible worlds." The judge, in
             essence, found that the existence of alternative plans would create a
27           discourse among the various parties in interest which would weed out
             unfavorable plans and lead to the best possible result for all concerned.
28           *Id.* at 69. The court stated:

1    I have no intention and no desire to hold this reorganization process
     up. On the other hand, I do have every intention that all creditor
     constituencies get the best possible deal.... I am somewhat perplexed
2    how could I get the confirmation in this case and make a best good
     faith result determination without having considered whether
3    competing plans are viable or not.

4    *Id.* At the hearing on the Debtors' motion for reconsideration, the
     Bankruptcy Judge restated her view that the potential for alternative—
5    more favorable—plans constituted sufficient cause to terminate the
     Debtors' exclusivity period. *See* Appellant's Record on Appeal 44,
6    page 7, lines 9–17.

7    Applying the standards accepted for a showing of "cause" to justify
     termination of a debtor's exclusivity period under 11 U.S.C. § 1121(d)
8    to the instant case, this Court finds that the Bankruptcy Court erred in
     its legal conclusion that "cause" existed to terminate the Debtors'
9    exclusivity period.

10   This Court is not satisfied that statements made by creditors and
     parties in interest that they were prepared to offer more favorable plans
11   if the court were to terminate the exclusivity period constitutes
     sufficient cause to cut short the debtor's window of opportunity opened
12   by Congress 11 U.S.C. § 1121(b) and (c). Likewise, the Court is not
     satisfied that the Bankruptcy Court's view that creditors' interests are
13   paramount in Chapter 11—at least during the exclusivity period—
     comports with Congressional intent. *See* discussion, *supra.* Further, the
14   Court cannot conclude, based on reasoning of the Bankruptcy cases
     treating of "cause" under 11 U.S.C. § 1121(d) (discussed *supra* ), that
15   the fact that one creditor constituency is not happy with the debtor's
     plan constitutes cause to undermine the debtor's chances of winning
16   final confirmation of its plan during the exclusivity period.

17   While the aim of expediting the process of reorganization is
     commendable, and the prospect of not getting confirmation of debtor's
18   plan might make the potential for other plans appear inviting, this
     Court is not satisfied that such justifications rise to the level of "cause"
19   for terminating the debtor's exclusivity period.

20   *Geriatrics Nursing*, 187 B.R. at 132-34.

21       The Court here made similar findings as the bankruptcy court in *Geriatrics Nursing*.  Exhibit

22   1, p. 33, lines 2-7, p. 45, lines 4-6; Exhibit 2, p. 195, lines 8-15, p. 196, lines 16-18, p. 210, lines 4-

23   24.  As in *Geriatrics Nursing*, the fact that FitLife has given an "Expression of Interest" that remains

24   contingent and is a competitor of the Debtors seeking only to acquire the Debtors' business at a

25   bargain basement price is not a basis for "cause" to terminate the Debtors' exclusive periods to file

26   and confirm a chapter 11 plan.  Further, the fact that EWB and Karled were unhappy with the

27   Debtors' proposed plan is not sufficient cause to terminate exclusivity prematurely.

28

1    The only cases cited by FitLife to support its argument are readily distinguishable from the

2    facts in this case.  In *New Meatco*, 2014 WL 917335, at *1, the bankruptcy court terminated the

3    debtor's exclusive period ten months into the case **where the debtor was a non-operating entity,**

4    **there was no business to reorganize, and it was a liquidation case that was neither large nor**

5    **complex**).  In *In re Situation Management Systems, Inc. ("Situation Management")*, 252 B.R. 859,

6    866-67 (Bankr. D. Mass. 2000), the bankruptcy court terminated the debtor's exclusive period **two**

7    **and a half years after the petition date** where a potential acquiror sought to offer a competing

8    plan.  The Debtors submit that both cases terminating exclusivity (and cited by FitLife in support of

9    their Terminate Motion) can easily be distinguished from the Debtors' cases in that (a) the New

10   Meatco case dealt with a non-operating entity that only had to distribute funds under its plan and

11   exclusivity was terminated 10 months into the case, and (b) the Situation Management case dealt

12   with a debtor that had not yet confirmed a plan two and half years after the petition date.

13   To be clear, FitLife, a competitor of the Debtors, has acted in bad faith in these cases.  In

14   order to gain standing in these cases, FitLife, who was never a creditor of the Debtors, acquired a

15   single unsecured claim in the face amount of $7,498.00.  In the Ninth Circuit, if a "person seeks to

16   secure some untoward advantage over other creditors for some ulterior motive, that will indicate bad

17   faith." *Fitger, supra*, 118 F.3d at 639.  As the Ninth Circuit eloquently stated in *Fitger*:

18   Courts … have been sensitive to situations **where a company, which**
     **was not a preexisting creditor, has purchased a claim** for the
     purpose of blocking an action against it. They have seen that as an

19   indication of bad faith.  The same has been true **where creditors were**
     **associated with a competing business and desired to destroy the**

20   **debtor's business in order to further their own**.

21   *Fitger*, 118 F.3d at 639 (emphasis added), *citing In re Keyworth*, 47 B.R. 966, 971-72 (D. Colo.

22   1985); *In re MacLeod Co.*, 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986); *see also In re DBSD North*

23   *America, Inc. ("DBSD")*, 634 F.3d 79, 105, fn. 12 (2d Cir. 2010) ("Courts have been especially

24   wary of the good faith of parties who purchase claims against their competitors") (citing *In re*

25   *MacLeod Co.*, 63 B.R. 654 at 655 (Bankr. S.D. Ohio 1986).

26   Similar to the DBSD case, FitLife purchased a claim after the filing of the Debtors' first

27   amended plan and disclosure statement solely to attempt to acquire the Debtors' business at a fire

28

3043196

1  sale price.[3]  *See, In re DBSD North America, Inc. ("DBSD I")*, 421 B.R. 133 (Bankr. S.D. N.Y.

2  2009) ("The Court finds that DISH made its investment in this chapter 11 case, and has continued to

3  act, not as a traditional creditor seeking to maximize its return on the debt it holds, but as a strategic

4  investor, 'to establish control over this strategic asset' … this Court observed in its earlier vote

5  designation case …. 'bad faith' – i.e., an absence of the requisite good faith – may be found where a

6  claim holder attempts to extract or extort a personal advantage not available to other creditors in the

7  class, or, as relevant here, **where a creditor acts in furtherance of an ulterior motive, unrelated**

8  **to its claim or its interest as a creditor"**) (emphasis added).

9  　　　Indeed, FitLife meets the four requirements that courts have found are "badges of bad faith"

10  which qualify to justify disqualification of voting under a plan: "(1) assume control of the debtor; (2)

11  put the debtor out of business or otherwise gain a competitive advantage; (3) destroy the debtor out

12  of pure malice; or (4) obtain benefits available under a private agreement with a third party which

13  depends on the debtor's failure to reorganize." *DBSD I* at 138.  Here, FitLife, a self-proclaimed

14  acquirer of companies through bankruptcies, knows that competing plans will harm the Debtors'

15  business and devalue it – thus increasing the chance that FitLife can acquire the Debtors' business at

16  a below market rate.  The Debtors have acted in good faith throughout the pendency of their

17  bankruptcy cases, are operating profitably, and are paying their post-petition obligations as they

18  come due and yet FitLife has managed to succeed in forcing the Debtors into an expedited timeline

19  that will force them to sell their business at a below market rate.

20  　　　Indeed, the Debtors submit that the evidence in the record supports that it was error for the

21  Court to find that there was cause to terminate the Debtors' exclusive periods.  The factors that

22  courts consider upon the filing of a motion to terminate exclusivity are:

23  　　　　　(a) the size and complexity of the case;

24  　　　　　(b) the necessity for sufficient time to permit the debtor to negotiate a
25  　　　　　plan of reorganization and prepare adequate information;

26

27  [3] On February 20 and 21, 2025, the Debtors served discovery requests on EWB and FitLife related to the contested Terminate Motion and potential collusion between the parties.  Tellingly, **EWB and**
28  **FitLife have refused to produce any documents to the Debtors in response to this discovery.**

3043196

(c) the existence of good faith progress toward reorganization;

(d) the fact that the debtor is paying its bills as they become due;

(e) whether the debtor has demonstrated reasonable prospects for filing
a viable plan;

(f) whether the debtor has made progress in negotiations with its
creditors;

(g) the amount of time which has elapsed in the case;

(h) whether the debtor is seeking an extension of exclusivity in order
to pressure the debtor's reorganization demands; and

(i) whether an unresolved contingency exists.

*In re Adelphia Communications Corp. ("Adelphia")*, 352 B.R. 578, 587 (Bankr. S.D. N.Y. 2006)

(citing *Dow Corning*, 208 B.R. 661, 664 (Bankr. E.D.Mich. 1997)).

Here, the Debtors submit that these factors weigh in their favor as follows:

1.    <u>Size and Complexity of Case.</u>  The Debtors cases meet the definition of a complex

chapter 11 case in the Central District.  The Debtors have over two hundred creditors and over two

hundred shareholders – most of whom have not yet participated in these cases as the Debtors'

original plan proposed for all shareholders to essentially maintain their existing equity. There are

three financial advisors active in these cases (one employed by the Debtors, one employed by the

Committee and one retained by EWB – all of which the Debtors are responsible for the fees).  This

fact alone is evidence that these cases are complex. The Debtors have approximately $26 million in

debt and their annual revenue is approximately $100 million. These cases are by far more complex

and complicated than most cases filed in the Central District of California. Accordingly, this factor

weighs in the Debtors' favor.

2.    <u>Sufficient Time To Negotiate a Plan and Prepare Adequate Information.</u>  The Debtors

have been actively attempting to obtain exit financing since at least November 2024 and

unfortunately have been met with a few hurdles, including that the Debtors' principal's residence

was destroyed in the Palisades Fire along with offices of the Debtors. The Palisades Fire absolutely

resulted in the Debtors' CEO being unable to participate in the exit financing process for weeks.

Notwithstanding those hurdles, the Debtors have made progress with refinancing efforts, they

3043196

1  received a term sheet on February 26, 2025 for up to $20 million and now expect to receive

2  additional term sheets from various sub debt lenders (who were waiting on the amount of the ABL

3  term sheet).  The Debtors hope to have refinancing locked in within the next six to eight weeks

4  which would allow them to pay all allowed claims in full; however, they recognize that their

5  bankruptcy cases have been pending for seven months which is why they are committed to a fulsome

6  sale process while simultaneously pursuing exit financing.  The Debtors are prepared to go forward

7  with their Second Amended DS, which incorporates the Debtors' agreement to conduct a fulsome

8  sale process if it is unable to secure sufficient exit financing.  Furthermore, the Debtors have already

9  installed an independent director.  The Debtors think that given their progress made, that this factor

10  should weigh in their favor.

11      3.    The Existence of Good Faith Progress Toward Reorganization.  The Debtors submit

12  that the progress they have made towards obtaining exit financing, coupled with the strict deadlines

13  agreed to with the Committee in the Sale/Plan Process Stipulation evidence the Debtors' good faith

14  efforts to ensure an outcome where all allowed claims are paid in full prior to equity retaining their

15  interests.  Furthermore, the fact that the Debtors continued to respond and produce thousands of

16  documents in connection with EWB's discovery requests related to cash collateral (even after there

17  was an order authorizing final use of cash collateral) is evidence of the Debtors' good faith in these

18  cases (especially considering that both EWB and FitLife have refused to produce any documents in

19  response to the Debtors' discovery requests to both parties relating to alleged collusion between

20  them).  Lastly, the Debtors have installed a special restructuring independent director on the Irwin

21  Nevada board of directors who will have the final decision-making authority with respect to any sale

22  of the business, any refinancing, and the terms of a plan.  Even though the Debtors have at all times

23  been acting in good faith in these cases and in the best interest of their estates, creditors and

24  shareholders, this action by the Debtors was done to further ensure that the ultimate decision on a

25  sale or restructuring of the business is in independent hands with no potential conflicts.

26      4.    The Fact that the Debtor is Paying its Bills as They Become Due.  The Debtors have

27  been operating their business smoothly and have been paying their bills as they become due.  *See*,

28  generally, the Debtors' monthly operating reports.  This factor is in the Debtors' favor.

3043196

5.      Whether the Debtor has Demonstrated Reasonable Prospects for Filing a Viable Plan.
The Debtors have now begun to receive exit financing term sheets and expect to receive more
shortly, which will hopefully allow the Debtors sufficient funds to pay all allowed claims in full
through the plan process.  However, if that does not happen, the Debtors are now forced to proceed
in an expedited sale process given the Court's decision to enter the Termination Order, which gives
FitLife or any other party the ability to file a competing plan. Even though STS's employment was
only recently approved, the Debtors are forced to obtain exit financing sufficient to pay off all
creditors or, in the alternative, name a stalking horse bidder by no later than the second week of
May, which is an incredibly short timeframe to market and sell a profitable business such as the
Debtors.  Accordingly, there is no evidence in the record that the Debtors' proposed plan will not
pay all creditors in full on the effective date.

6.      Whether the Debtor has Made Progress in Negotiations with Its Creditors.  The
Debtors have made significant progress with the Committee as illustrated by the Sale/Plan Process
Stipulation.  The Debtors are still engaged in discussions with EWB regarding a potential resolution
and hope to continue those negotiations. The Debtors made a settlement offer to EWB prior to the
hearing on the Terminate Motion that EWB has not yet responded to. This factor weighs in the
Debtors' favor.

7.      The Amount of Time Which has Elapsed in the Case. The Debtors have been in
bankruptcy for a mere seven months. However, the Debtors believe that the strict timeline provided
for in the Sale/Plan Process Stipulation would ensure that all allowed claims will be paid in full
within one year of the petition date (and hopefully sooner if they are able to secure sufficient exit
financing).

8.      Whether the Debtor is Seeking an Extension of Exclusivity in Order to Pressure the
Debtor's Reorganization Demands. This factor is not relevant to the Terminate Motion. The Debtors
have at no time pressured any party in these cases.

9.      Whether an Unresolved Contingency Exists. There are no unresolved contingencies
in these cases.

1    Accordingly, the Debtors respectfully submit that they are likely to succeed on the merits of

2  their Appeal.

3    **2.    The Debtors' Exclusive Period to File a Chapter 11 Plan had Not**

4    **Terminated Prior to Entry of the Termination Order**

5    The Debtors respectfully submit that the Court's holding that the Debtors' exclusive period

6  to file a chapter 11 plan had terminated on March 5, 2025, was a legal error because the Debtors

7  filed the Second Exclusivity Motion prior to the expiration of the Debtors' exclusive period, and the

8  Court has not yet ruled on the Second Exclusivity Motion.

9    In *Henry Mayo*, the debtor did not file a plan by its exclusivity deadline but rather filed

10  another motion to extend exclusivity.  The BAP found as follows:

11    The fact that a subsequent extension of exclusivity is pending in
     bankruptcy court enables us to fashion effective relief in this appeal
12    from the order on the first extension. Reversal of one extension would
     necessarily be fatal to all subsequent extensions because § 1121(d)
13    forbids retroactive requests: "On request of a party in interest made
     within the respective periods specified in subsection (c) of this section
14    ...." 11 U.S.C. § 1121(d). A subsequent request that is made during an
     extension that does not survive appeal is not made "within" a
15    qualifying exclusivity period. As a reversal would alter the status quo
     in favor of appellant, we are thus able to fashion effective relief.
16

17  *Henry Mayo*, 282 B.R. at 450. *See also*, March & Shapiro, Rutter Group California Practice Guide:

18  Bankruptcy ¶ 11:232  (Dec. 2024) ("So long as the motion is filed before the exclusivity period

19  expires, it can be heard after the period expires. [11 U.S.C. § 1121(d)(1) (request must be 'made'

20  within respective periods)]. If granted, the extension of time will apply retroactively from the date it

21  would have expired to the new extended date") (emphasis in original).

22    Because the Debtors timely filed their Second Exclusivity Motion, the Debtors' exclusive

23  period to file a chapter 11 plan had not yet terminated and the Debtors submit that it was legal error

24  for the Court to hold that it had.

25    **3.    The Debtors' Second Amended Plan Relates Back to the Prior Plans**

26    At the March 21, 2025 hearing, the Court further found that there was no possibility that the

27  Second Amended Plan would relate back to their first two plans.  The Debtors submit that this

28

3043196

1    analysis is incorrect as each of the Debtors' plans contemplated (i) a partial or full[4] equity

2    investment and/or a sale of assets, (ii) a refinancing and (iii) payment in full of all allowed claims.

3    Each of the plans contemplated a sale – with the first plan proposing 3 years, the second plan

4    proposing 2 years and the third plan (the Second Amended Plan) providing for a sale within a few

5    months. The Debtors submit that the Second Amended Plan is merely be a "cleaned-up" version of

6    their earlier plans. *In re Fla. Coastal Airlines, Inc. ("Coastal")*, 361 B.R. 286 (Bankr. S.D. Fla.

7    2007) ("The Debtor's amended plan is fundamentally a cleaned-up version of its original plan. As

8    such, I find that the amended plan relates back to the date of the original plan. . . "); *see also In re

9    Save Our Springs (S.O.S.) All., Inc.*, 388 B.R. 202, 224-25 (Bankr. W.D. Tex. 2008), *aff'd sub nom,

10   In re Save Our Springs (S.O.S.) All., Inc.*, 632 F.3d 168 (5th Cir. 2011) (same). Accordingly, the

11   Debtors submit that it was legal error for the Court to hold that the Second Amended Plan would not

12   relate back to the Debtors' previously filed plans.

13   **C.    The Debtors Will Suffer Irreparable Harm Absent a Stay Pending Appeal**

14          "An applicant for a stay pending appeal must show that a stay is necessary to avoid likely

15   irreparable injury to the applicant while the appeal is pending." *Al Otro Lado*, 952 F.3d at 1007

16   (citing *Nken*, 556 U.S. at 434). "[S]imply showing some possibility of irreparable injury" is

17   insufficient. *Id.* (internal quotation marks omitted). "The minimum threshold showing for a stay

18   pending appeal requires that irreparable injury is likely to occur during the period before the appeal

19   is likely to be decided." *Al Otro Lado*, 952 F.3d at 1007 (citing *Leiva-Perez*, 640 F.3d at 968).

20   "Thus, under the sliding scale approach, a stay applicant's 'burden with regard to irreparable harm is

21   higher than it is on the likelihood of success prong, as she must show that an irreparable injury is the

22   more probable or likely outcome.'" *Id.*

23          Irreparable harm is "harm for which there is no adequate legal remedy, such as an award for

24   damages." *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "Because

25   ────────────────

26   [4] A plan that provides for a new equity investor to acquire 100% of a debtor's equity in exchange for
     a capital infusion is the equivalent of a sale of the business through the 363 process. In both

27   instances, the acquiring party can acquire a debtor's business as a going concern free of non-
     assumed liabilities (in the plan, the debtor obtains a discharge and in a 363 sale, the assets are sold

28   free and clear of all liens, claims and encumbrances).

3043196

intangible injuries generally lack an adequate legal remedy, 'intangible injuries [may] qualify as irreparable harm.'" *Id.* (quoting *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)).

Here, the unconverted evidence in the record is that a competing plan process will negatively impact the Debtors' business operations, likely causing, among other things, (a) at least some of the Debtors' suppliers to move to COD because of the uncertainty of a hostile takeover via a competing equity plan, which will negatively impact the Debtors' cash flow immediately, and (b) their customers to re-evaluate their contracts with the Debtors or otherwise seek to find alternate suppliers. Doc. No. 394, ¶ 5.  This will lead to the further devaluation of the Debtors' business and will wreak havoc on the Debtors' bankruptcy proceedings.  Indeed, the increased administrative costs that will be incurred as a result of the Debtors prosecuting confirmation of their own Second Amended Plan while fighting any alternative plan directly harms creditors of the Debtors' estates and the Debtors' 230 public shareholders.  Based on the Debtors' supply chain and their customers, it is imperative to their ability to preserve the value of the Debtors' business that the Debtors remain in control.

The irreparable harm the Debtors will suffer to the value of their business if the Termination Order was to go into effect pending the Appeal is cause to grant the Motion.  The Debtors have agreed to a sale process designed to test the market and maximize the value of their estates and pay creditors in full in a mere four months. As discussed above, the Debtors have been working in good faith to negotiate a consensual chapter 11 plan and the Debtors' proposed sale closing date/chapter 11 plan confirmation date is only two and half months later than what EWB requested.  Indeed, it is egregious that solvent Debtors proposing to pay all allowed claims in full on or shortly after the effective date of their plan now have to deal with a competitor attempting to take over their business for a fire sale amount only seven months after the petition date.

The Debtors respectfully submit that the unconverted testimony in the record demonstrates that the Debtors will likely suffer irreparable harm to their business if a stay pending appeal is not granted.

**D.    The Balancing of the Equities Tips Strongly in the Debtors' Favor**

The third factor is "whether issuance of the stay will substantially injure the other parties interested in the proceeding." *Nken*, 556 U.S. at 434.  The Debtors submit that a stay pending the Appeal, especially given that the Debtors have filed a motion for expediting briefing, will not injure any other parties to these proceedings.  In fact, a stay of the Termination Order during the Appeal will only improve the position of the Debtors' creditors and 230 public shareholders because it will provide time for the Debtors to market test the equity in the Debtors.  A competitive bidding process, which allows sufficient time for the Debtors to market their business and all interested parties being provided the opportunity to bid will only maximize the return to creditors.  Specifically with respect to EWB, it will not be injured by a stay of the Termination Order because it is receiving monthly interest payments and principal payments from the Debtors.

While the Debtors' creditors and shareholders will only benefit from a stay, FitLife will not be injured in any way by a stay of the Termination Order.  Indeed, there is no deadline by which FitLife must consummate a sale to receive financing.  As discussed above, the only reason that FitLife even filed the Terminate Motion in the first place was to ensure that it would be the only party able to bid on the equity in the Debtors and force a hostile takeover for a bargain basement price.  Such egregious acts are antithetical to the purpose of chapter 11 and should not be countenanced by the Court.

The Debtors respectfully submit that this factor tips strongly in the Debtors' favor.

**E.    The Public Interest Weighs in Favor of Granting the Motion**

The fourth factor is "whether the relief requested would affect the public at large, as opposed to the immediate parties to the [proceeding]." *In re Silva*, 2015 Bankr. LEXIS 842 *20 (Bankr. C.D. Cal. March 17, 2015) (quoting *Acton v. Fullmer (In re Fullmer)*, 323 B.R. 287, 305 (Bankr. D. Nev. 2005)).  Here, the Debtors submit that this factor is neutral as the public at large would not be affected by the Court granting the Motion.  However, the public policy underpinning section 1121 would be greatly served by granting the Motion.  As aptly explained by the district court in *Geriatrics Nursing*:

The legislative history of 11 U.S.C. § 1121, and its provision for an

1
2
3
4
5
6
7

> exclusivity period, bespeak a Congressional intent to facilitate the
> rehabilitation of debtors in Chapter 11. The exclusivity period affords
> the debtor the opportunity to negotiate the settlement of its debts by
> proposing and soliciting support for its plan of reorganization without
> interference—in the form of competing plans—from its creditors or
> others in interest. In crafting this legislation, Congress succeeded in
> balancing two competing interests: the interest of the debtor in the
> survival of its business (thus its resort to Chapter 11), and the interest
> of the creditors in avoiding undue delay in the satisfaction of the
> debtor's obligations. H.R.Rep. No. 595, 95th Cong., 2d Sess. 231–232
> (1978), reprinted in 1978 U.S.C.C.A.N. 5787. *See, e.g., Matter of
> Newark Airport/Hotel Ltd. Partnership,* 156 B.R. 444, 451
> (Bankr.D.N.J.), *aff'd,* 155 B.R. 93 (D.N.J.1993).

8
9
10
11

187 B.R. at 131–32; *see also In re Energy Conversion Devices, Inc.*, 474 B.R. 503, 509 (Bankr. E.D. Mich. 2012) ("The Committee's arguments about how creditors should have a choice of plans to vote on, simultaneously; and how the serial approach involves more expense and delay, described above, are simply at war with the policy choice that Congress made in § 1121").

12
13
14
15
16
17

The purpose of section 1121 of the Bankruptcy Code will be served by granting the Motion. Indeed, the intent of the exclusive periods is to facilitate rehabilitation of the Debtors' business and creditors' interests in avoiding undue delay will be protected because the Debtors have requested expedited briefing on the Appeal and that the BAP issue a ruling by May 2, 2025, i.e., the expiration of the Debtors' exclusive period to solicit acceptances of their Second Amended Plan.  Thus, creditors will not be forced to wait an unduly long period during the pendency of the Appeal.

18
19

Accordingly, the Debtors submit that this factor weighs in favor of granting the Motion.

**IV.    CONCLUSION**

20
21
22
23
24

Each of the *Nken* factors for a stay pending appeal is satisfied by the Debtors with the sufficient degree of substantial or probable outcomes that are required for each factors.  Accordingly, the Debtors respectfully request that the Court grant the Motion, stay the Termination Order pending the Debtors' Appeal and stay FitLife's or any other party's ability to file a competing plan and disclosure statement pending resolution of the Appeal.

25

DATED:  April 1, 2025                              BG LAW LLP

26
27

By: /s/ Jessica S. Wellington
      Jessica S. Wellington
Attorneys for Chapter 11 Debtors and
Debtors in Possession

28

EXHIBIT 1

1                    UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                             --oOo--

4   In Re:                        ) Case No. 1:24-bk-11323-VK
                                  )
5   IRWIN NATURALS and IRWIN      ) Chapter 11
    NATURALS INC,                 )
6                                 ) Woodland Hills, California
            Debtors.             ) Wednesday, March 5, 2025
7   _____) 1:30 p.m.

8                                 CREDITOR FITLIFE BRANDS,
                                  INC.'S MOTION FOR AN ORDER
9                                 (I) TERMINATING THE EXCLUSIVE
                                  PERIODS IN WHICH ONLY THE
10                                DEBTOR MAY FILE A PLAN AND
                                  SOLICIT ACCEPTANCES AND
11                                (II) PERMITTING FITLIFE BRANS,
                                  INC. TO FILE AN ALTERNATIVE
12                                PLAN AND DISCLOSURE STATEMENT

13                                FIRST AMENDED DISCLOSURE
                                  STATEMENT HEARING DESCRIBING
14                                DEBTORS' CHAPTER 11 PLAN OF
                                  REORGANIZATION
15
                                  STATUS CONFERENCE RE: CHAPTER
16                                11 CASE

17
                        TRANSCRIPT OF PROCEEDINGS
18            BEFORE THE HONORABLE VICTORIA KAUFMAN
                  UNITED STATES BANKRUPTCY JUDGE
19
    APPEARANCES:
20
    For the Debtors:              DAVID M. POITRAS, ESQ.
21                                SUSAN K. SEFLIN, ESQ.
                                  BG Law LLP
22                                21650 Oxnard Street, Suite 500
                                  Woodland Hills, California
23                                  91367
                                  (818) 827-9115
24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

```
                                                                    ii
 1  APPEARANCES:  (cont'd.)

 2  For FitLife Brands:          TODD A. FEINSTEIN, ESQ.
                                 ArentFox Shiff, LLP
 3                               800 Boylston Street
                                 32nd Floor
 4                               Boston, Massachusetts 02199
                                 (617) 973-6100
 5
                                 SOPHIA R. WANG, ESQ.
 6                               ArentFox Shiff, LLP
                                 555 South Flower Street
 7                               43rd Floor
                                 Los Angeles, California 90071
 8                               (213) 629-7400

 9  For the United States        KATHERINE C. BUNKER, ESQ.
       Trustee:                  Office of the United States
10                                  Trustee
                                 915 Wilshire Boulevard
11                               Suite 1850
                                 Los Angeles, California 90017
12                               (213) 894-3326

13  For East West Bank:          ERIN FAY, ESQ.
                                 DALE R. BISH, ESQ.
14                               Wilson, Sonsini, Goodrich &
                                    Rosati
15                               650 Page Mill Road
                                 Palo Alto, California 94304
16                               (650) 804-4018

17  For the Official Committee   JEFFREY I. GOLDEN, ESQ.
       of Unsecured Creditors:   Golden Goodrich, LLP
18                               3070 Bristol Street, Suite 640
                                 Costa Mesa, California 92626
19                               (714) 966-1000

20  For Karled Enterprises:      MATTHEW G. BOUSLOG, ESQ.
                                 Allen Matkins
21                               2010 Main Street, 8th Floor
                                 Irvine, California 92614
22                               (949) 553-1313

23  Court Recorder:              Patty Garcia
                                 United States Bankruptcy Court
24                               21041 Burbank Boulevard
                                 Woodland Hills, California
25                                  91367
```

iii

1  Transcriber:                    Jessica Reuter
                                   Echo Reporting, Inc.
2                                  9711 Cactus Street
                                   Suite B
3                                  Lakeside, California 92040
                                   (858) 453-7590

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

1    WOODLAND HILLS, CALIFORNIA WEDNESDAY, MARCH 5, 2025 1:30 PM

2                              --oOo--

3        (Call to order of the Court.)

4              THE COURT:  So why don't we have appearances for

5    the Irwin Naturals matters.

6              MR. FEINSMITH:  Good morning (sic), your Honor.

7    Todd Feinsmith from Arent Fox on behalf of FitLife.

8              MS. WANG:  Good afternoon, your Honor.  Sophia

9    Wang, Arent Fox, on behalf of FitLife Brands, Inc.

10             MS. BUNKER:  Good afternoon, your Honor.

11   Katherine Bunker on behalf of the United States Trustee for

12   numbers eight and nine -- eight and nine only.

13             THE COURT:  Okay.

14             MR. POITRAS:  Good afternoon, your Honor.  David

15   Poitras, a member of BG Law, LLP, along with Susan Seflin on

16   Zoom, appearing on behalf of the Debtors.

17             Also on Zoom we have the Debtor's CEO, Klee Irwin.

18   We have the investment bankers from STS, Vincent Willis.  We

19   have Province, Paul Huygens and Tanner James.  And I think

20   that's it.

21             MR. FEINSMITH:  Your Honor, I should note for the

22   record, too -- excuse me -- that Dayton Judd, who is the CEO

23   of FitLife, is in the courtroom as well.

24             THE COURT:  Okay.  Thank you.

25             MS. FAY:  Good afternoon, your Honor.  Erin Fay of

2

1   Wilson, Sonsini, Goodrich and Rosati, on behalf of East West

2   Bank.  I'm here with my partner Dale Bish.

3           MR. GOLDEN:  Good afternoon, your Honor.  Jeffrey

4   Golden of Golden Goodrich, on behalf of the Official

5   Committee of Unsecured Creditors.

6           THE COURT:  Good afternoon.

7           Okay.  So, I think maybe it'd be good first to

8   hear if there have been any updates that aren't reflected in

9   the filings that have been made with the Court.  Because the

10  Court -- well, filings of like -- filings as of -- the last

11  one I saw was on the STS application to employ about

12  changing the terms of the application.  That's the last one

13  I saw.  I don't know if there's any since then.

14          UNIDENTIFIED SPEAKER:  I don't --

15          MR. BOUSLOG:  Your Honor, if I may just quickly.

16  Sorry.  This is Matt Bouslog from Allen Matkins.  I hadn't

17  had a chance to make an appearance.  Wanted to note that for

18  the record --

19          THE COURT:  Thank you.

20          MR. BOUSLOG:  -- on behalf of Karled Enterprises.

21          THE COURT:  Thank you.

22          MR. BOUSLOG:  Thank you.

23          MR. POITRAS:  Your Honor, to the best of my

24  knowledge, there's nothing new and different, other than

25  what's on file for today's hearings.

3

1          THE COURT:  Okay.  So -- well, maybe it would help

2   to clarify, Mr. Poitras.  What's happening with the

3   disclosure statement that was -- sorry, originally for

4   today, for a plan that apparently has been out moted?

5          MR. POITRAS:  The plan has been what, your Honor?

6          THE COURT:  Out moted, in the sense that you're

7   changing the terms of the --

8          MR. POITRAS:  Okay.

9          THE COURT:  -- filed plan.

10          MR. POITRAS:  Understood.  Understood.

11          THE COURT:  The most recently filed plan.

12          MR. POITRAS:  In terms of the disclosure

13   statement, I think what we'd like to do, we'd like to

14   request a continued hearing date about 30 days out as a

15   holding date, just so we have it on calendar.  There's a lot

16   of moving parts, as your Honor can determine based upon the

17   papers.  And I think if we have a holding date out there,

18   that will give us something to work with and shoot for.  And

19   if we need to move it up or move it back, we can always

20   reach out to the Court.  And I would ask that the status

21   conference be continued to the same date at whatever point

22   we deal with the status conference.

23          THE COURT:  Okay.  Well, I think we definitely can

24   continue -- well, let's -- let's see what happens with the

25   exclusivity motion, then we'll decide about those other

4

1  dates.

2          MR. POITRAS:  Okay.

3          THE COURT:  Okay.  So why don't we talk about

4  FitLife Brands' motion for an order terminating the

5  exclusive periods and permitting FitLife Brands to file an

6  alternative plan and disclosure statement.

7          MR. FEINSMITH:  Your Honor, it's our motion.  I'd

8  be happy to speak first.

9          THE COURT:  Okay.

10         MR. FEINSMITH:  And I should also add, your Honor,

11 thank you for allowing me to appear pro hac vice on this

12 matter.

13         So we've seen your preliminary ruling, your Honor,

14 and we read it with great interest.  And one of the

15 important things that we've noted in each of the cases that

16 were cited, and those cases are the <u>Energy Conversion</u> case,

17 the <u>Geriatrics</u> case and the <u>Newhall Hospital</u> case, is that

18 in each of those cases the termination of exclusivity was

19 sought during the 120-day statutory exclusivity period.

20         In the <u>Energy Conversion</u> case, the court had

21 already approved the disclosure statement.  And the largest

22 unsecured creditor body in that case, which was the ad hoc

23 creditors committee, was in favor of exclusivity being

24 preserved.

25         The plan was scheduled for confirmation, and that

5

1  confirmation was expected to happen and scheduled to happen

2  before the 180-day solicitation period expired.  So those

3  were very important factors in that case, and it's simply

4  not the same as what's happening in our case.

5       In our case two extensions of exclusivity have

6  already been granted.  The disclosure statement has not been

7  approved.  In fact, the disclosure statement, as we just

8  heard, is being withdrawn, and the plan is going to be re-

9  filed.  And in this case, the largest unsecured creditor,

10 Karled Enterprise --

11      THE COURT:  Please be seated, Mr. Poitras.

12      MR. FEINSMITH:  -- support --

13      THE COURT:  You'll have a chance.

14      MR. FEINSMITH:  -- support --

15      THE COURT:  -- to talk next.  Okay.

16      MR. FEINSMITH:  -- support -- supports the

17 termination of the exclusivity period.

18      In the Geriatrics Nursing Home case, the court

19 held that a more favorable plan was not grounds for

20 termination, but this case also involved a motion to

21 terminate exclusivity within the first 120-day statutory

22 exclusivity period.

23      Critically in this case, the court considered no

24 other factors.  It didn't go through the Dow factors, which

25 I know your Honor wants to apply.  In this case, each of the

6

1    <u>Dow</u> factors, when applied to the facts of this case,

2    supports the termination of exclusivity.

3            And I should add, your Honor, that it is the case

4    that there are courts who have ruled that a better plan is a

5    sufficient basis to terminate exclusivity.  And I'll refer

6    specifically to a case called <u>Situation Management</u>, that was

7    decided by Judge Feeney in the District of Massachusetts.

8            And in that case the debtor, like here, had

9    proposed a new-value plan.  And because of that, your Honor,

10   Judge Feeney ruled that it was appropriate to terminate

11   exclusivity to allow a competing plan to be proposed in

12   order to meet the requirements of the Supreme Court's

13   decision in <u>LaSalle</u>.  That requirement being to market test

14   the value of the equity in the reorganized debtor.

15           We do not dispute, your Honor, that it is a high

16   burden to terminate the exclusivity period during the 120-

17   day statutory period.  In fact, <u>Energy Conversion</u> noted that

18   there were only two reported decisions at the time that case

19   was decided in 2012 that have done so during that period.

20   However, there are many cases where exclusivity has been

21   terminated during an extension.  In fact, we think what's

22   most telling is the decision of this very court in the <u>New</u>

23   <u>Meat Company</u> case, decided by Judge Carroll, which is cited

24   in our papers at page 15 and page 20.  And in that case the

25   court terminated exclusivity seven months into the case, the

7

1  exact same time period that we have here.  And in doing so,

2  the court applied the <u>Dow</u> factors and came to the conclusion

3  that exclusivity should be terminated.

4       In another case that we think is very similar, a

5  case called <u>All Seasons Industries</u> from the Bankruptcy Court

6  from the District of Indiana, exclusivity was terminated

7  eight months into the case when the court found that the

8  debtor's financial projections were unrealistic.

9       With that as backdrop, your Honor, we think that

10 most importantly, the application of the <u>Dow</u> factors to the

11 facts of our case supports the termination of exclusivity

12 quite clearly.  And we've discussed that at some length in

13 our papers, in both filings, our original motion and then

14 our subsequent reply.  But I'll go through them very

15 quickly, your Honor, for the record here.

16      Factor one is the size and complexity of the case.

17 This case is not large and it's not complex.  There are only

18 two creditors in this case that hold 85-percent of the debt.

19 And those are East West Bank and Karled Enterprises.  and

20 both of those creditors support termination of the

21 exclusivity.  So we think that the size and complexity

22 factor weighs very heavily in support of terminating

23 exclusivity.

24      The second factor is whether the Debtor had

25 adequate time.  Here there have been multiple extensions of

*Echo Reporting, Inc.*

8

1  exclusivity, and there's been no material progress after

2  seven months.  The Debtor has only incrementally improved

3  the treatment that it's proposed for creditors, and there

4  was a chart in our papers that explained that.  And now the

5  Debtor is seeking another six months in order to run a

6  speculative sale process.  So we think that there's already

7  been adequate time and no progress has been shown.

8         Factor three is whether the Debtor is making good-

9  faith progress.  We think Mr. Irwin's commencement of an

10 involuntary proceeding that preceded this case that was

11 filed on the voluntary basis, smacks of bad faith from the

12 very start.  His intent has been to preserve his equity at

13 all costs, even knowing that there was a superior proposal

14 that was on the table, and that proposal was reflected in

15 the document that we filed under seal.

16        He's filed a new-value plan, but with no

17 contribution of new value.  There would be no payments at

18 confirmation to creditors, no market testing of equity was

19 proposed.  Until very recently, the Debtor has now proposed

20 a sale process only because it's been pressured to do so by

21 our interest in filing a competing plan.  So we think all of

22 those things taken together, your Honor, demonstrates that

23 the Debtor is not trying to make process in good faith.

24        The fourth factor is whether there's a reasonable

25 prospect for confirmation of the plan.  Simply put, your

9

1  Honor, the Debtor has not demonstrated the financial

2  wherewithal to confirm a plan in this case.  The Debtor has

3  engaged four different bankers, starting even before the

4  case was filed, and is now proposing a fifth banker, STS.

5         The Debtor will not -- admittedly, will not have

6  cash at confirmation to make any payments to creditors, and

7  it also has admitted that it may not even have sufficient

8  cash to pay the professional fees in full, which is

9  necessary to do as an element of confirmation under the

10  code.

11         The Debtor also recently said that it's received a

12  term sheet for $20,000,000 in financing, but to my

13  knowledge, no party has received that term sheet.  There's

14  been no explanation of what conditions there are.  And most

15  importantly, Mr. Irwin's own affidavit, he's indicated that

16  even though that term sheet is for $20,000,000, there will

17  only be 12- to $14,000,000 available.  That's not even half

18  of the amount necessary to pay the claims in this case.  So

19  we think this fourth factor, reasonable prospect for

20  confirmation of a plan, also weighs very heavily in favor of

21  termination of exclusivity.

22         The fifth factor, your Honor, is the timely

23  payment of bills.  We think that the Debtors' admitted

24  inability that it may not have sufficient cash to pay

25  professional fees at confirmation speaks for itself in terms

10

1  of the ability to pay for the administrative costs of this

2  estate.

3         Factor number six is progress with creditors.  As

4  I mentioned before, 85-percent of the creditors in this case

5  -- the creditors' claims in this case support -- are

6  supporting termination of exclusivity, and the plan is not

7  consensual.  There's been only incremental progress made in

8  the different iterations of the plan that have been filed.

9  So we don't think that there's been progress with creditors,

10  not meaningful progress.

11         Factor number seven, the time elapsed.  Seven

12  months have elapsed so far in this case without meaningful

13  progress, and now the plan and disclosure statement are

14  going to be withdrawn and re-set.  And in addition to that,

15  the Debtor is also seeking now a six-month sale period.  So,

16  time has elapsed, and it's clear that a lot more time is

17  going to elapse before this case is moved forward in a

18  meaningful way.  So that factor weighs in favor of

19  terminating exclusivity.

20         Factor number eight is whether exclusivity is

21  being used to pressure creditors.  The Debtor in this case

22  is proposing an equity retention plan with no new value, and

23  only immaterial improvements thus far in the plan.  Eight-

24  five-percent of the claims want termination, and we think

25  that's the best evidence that exclusivity is being used as a

11

1  cudgel to try to coerce the Debtor's wishes to confirm a

2  new-value plan that would allow equity to retain its equity.

3          And the last factor, factor number nine, is

4  whether there's an unresolved contingency.  Your Honor, we

5  submit that this whole case is one big, unresolved

6  contingency.  It's completely based on the Debtor's ability

7  to refinance or to do a sale, and it's tried both for many

8  months now, as much as 18 months, including the prepetition

9  period, utilizing four, and now, potentially, five bankers.

10 The Debtor hasn't succeeded either before or after the case

11 to fulfill these contingent -- to fulfill this contingency,

12 and we don't think there's a reasonable prospect that it

13 will in light of past history.

14         So, in sum, your Honor, we think the time has come

15 to terminate exclusivity to permit a competing plan to be

16 proposed for the best interests of creditors and the estate.

17 Thank you.

18         THE COURT:  Okay.

19         So who wants to go next?  Okay.

20         MS. FAY:  Good afternoon, your Honor.  Erin Fay of

21 Wilson Sonsini on behalf of East West Bank.  Do you want

22 statements in support before responses?

23         THE COURT:  I think that's fine.

24         MS. FAY:  Okay.  Your Honor, the agent believes

25 that exclusivity should be terminated, and that that will be

*Echo Reporting, Inc.*

12

1   the best path forward for these cases.  FitLife adeptly set

2   out why each of the standard factors for termination are met

3   here, and I do not intend to be repetitive of anything that

4   they've set forth, but just wanted to highlight a few

5   things.

6           As to the factors of whether the Debtor has been

7   negotiating the plan in good faith and whether there's

8   progress in creditor negotiations, we just note that the

9   agent often learns of things in this case, major happenings

10  for the first time in the Debtor's pleadings.

11          As recently as last week we learned about the sale

12  timeline, we learned about hiring an independent director,

13  and we learned about receiving a financing term sheet,

14  notwithstanding the fact that we have outstanding discovery

15  requests that cover that term sheet, and notwithstanding

16  that our final cash collateral order requires us to be

17  provided updates.  That was ultimately provided to us at our

18  request, but it was not offered out of the gate.

19          And again, all of this is news that the agent

20  learns only upon the filings.  There's been no meaningful

21  negotiation around a plan or an exit with the agent, and

22  instead it appears that the Debtor has agreed solely with

23  the U.C.C. to an undefined sale process with some

24  independent director with unclear authority, and while

25  continuing to seek exit financing.  This is not negotiating

13

1 a plan at all, your Honor, much less in good faith.  And the

2 Debtor's prior plan, which seems to have been overcome by

3 events here, was also wholly unacceptable to the agent.

4        The Debtors state that they engaging with the

5 agent in their pleadings, but the Court should take that

6 with a grain of salt.  The Debtors also argue that the agent

7 is somehow operating in bad faith in these cases because it

8 has had to object, but let's unpack that a little bit.

9        What have the Debtors attempted to accomplish in

10 this case where the agent was compelled to object?  Well,

11 use of cash collateral for an extended period of time

12 without customary protections or agreements.  Engaging a

13 conflicted personal counsel of Mr. Irwin to be company

14 counsel.  Proposing three iterations of a Chapter 11 plan,

15 all of which may now be abandoned, that provided significant

16 benefits to the Debtors' key stakeholder -- I'm sorry, key

17 equity holder, without negotiating with the agent, all while

18 leaving creditor recoveries to a speculative, long-term

19 recovery.  It's hard to see how any of that could be

20 acceptable to the agent.

21        And as to the factor of a reasonable prospect for

22 a confirmable plan, it seems that the Debtor will now

23 further amend the plan that they filed in October to provide

24 for an entirely different structure.  It's unclear what that

25 plan will look like or when it will be proposed.  Perhaps

14

1  we'll talk about timing, but it's of upmost importance that

2  if the Court permits that to happen, that this happens with

3  expediency.

4         We need this process to move along at a pace that

5  actually ties the Debtor to a process and that gets

6  creditors to a result.  And without those things, it's

7  really an uncertain basis upon which any plan could be

8  proposed, which is not a reasonable prospect under the Dow

9  factor in the agent's view.

10        The Debtors are 100-percent using their exclusive

11  period as a sword and a shield to pressure creditors into

12  whatever process their conflicted principal desires on a

13  particular given day.  The Debtors' constant refrain that

14  this is appropriate because they have stockholders and they

15  may be solvent is not convincing in the face of their

16  inability to raise financing over the last two years.  And

17  it is also a little bit disingenuous, as noted in the Willis

18  declaration, because the non-insider public stockholder base

19  here, which is to say the entire non-insider stockholder

20  base, is 2.5-percent of the stockholder base.  So let's call

21  it what this is.  This is Mr. Irwin's equity.

22        Finally, as to the factor of unresolved

23  contingencies.  This case is nothing but unresolved

24  contingencies and has been since day one.  These include

25  whether the Debtors will receive takeout financing now with

15

1  their second banker post-petition -- I am repeating Mr.

2  Feinsmith so I'll move along.  Whether a sale occurs,

3  whether extended us of cash collateral will be permitted or

4  approved, wetter -- whether the Debtors' repeated claims

5  against the agent will somehow get resolved in these

6  processes, and most basically, whether the Debtors will be

7  able to pay their mounting administrative costs.

8          Now the Debtors have admitted finally that absent

9  sufficient exit financing, which has not been forthcoming in

10 two years, that absent that they will need to sell, right.

11 That means they will not reorganize in all likelihood.  And

12 as a result, the deference that the Court might otherwise

13 have for a debtor maintaining control just really doesn't

14 resonate.

15         The Debtor cited Adelphia (phonetic) in their

16 response for the overarching statement that when we're

17 thinking about exclusivity and whether it should be

18 terminated, the primary consideration for the Court in

19 determining that very matter is whether doing so will move

20 the cases forward.  And while the Adelphia court was

21 admittedly unwilling to do so because the noteholders that

22 presented the motion did not have a defined exit strategy,

23 here we have a defined exit strategy that could be run in a

24 dual tracks path as set forth in our statement and response

25 to those stipulation between the company and the creditors.

16

1   They could get to a result in a reasonable time frame.

2          And as an -- as a side note, the <u>Adelphia</u> court

3   also noted at page 182 of its decision:

4                  "That it, like other courts, have

5              been quite willing to terminate

6              exclusivity when..."

7          And I quote:

8          "...a debtor has been unduly

9              intransigent in dealing with its

10             creditors; has inappropriately sought to

11             favor equity or another stakeholder

12             group; has sought to feather the nest of

13             incumbent management; or has caused the

14             court to lose confidence that it would

15             ever come up with a confirmable plan."

16         And we submit that all of those circumstances

17  exist here, and that the factors considered under <u>Dow</u> and

18  <u>Adelphia</u> are all met and exclusivity should be terminated.

19  Thank you.

20         THE COURT:  Thank you.

21         MR. BOUSLOG:  Your Honor, I -- it's Matt Bouslog,

22  again on behalf of Karled Enterprises.  I believe my client

23  -- we were the other one that filed something in support of

24  the FitLife motion.  Can you hear me okay?

25         THE COURT:  Yes.

17

1          MR. BOUSLOG:  Okay.  Thank you.  So I'm not going

2    to repeat what counsel for the parties have already said.  I

3    will try to just be brief.

4          From what I understand, my client holds the

5    largest unsecured claim in the case.  And we're concerned

6    about the direction these cases have gone, and really the

7    fact that nothing has appeared to be accomplished in this

8    case, except in response to this external pressure from

9    FitLife.  That it seems like is the only time that this case

10   has taken a step forward, but it still seems too little, too

11   late.

12         Clearly, admittedly working for the interests of

13   equity.  Only now it seems like there's a proposal to put in

14   some kind of an independent director.  But even then, it's

15   not clear that a sale process is really going to get kicked

16   off in earnest.  There's no -- there's no real firm, near-

17   term deadlines.  There's no commitment to even taking a

18   stalking horse for another four months.

19         And so our position is, we want to get paid.  I --

20   the Debtors are saying that there's tremendous value here,

21   and it -- you know, the fact that they have really only been

22   motivated to action in response from this external pressure,

23   we think it's appropriate to maintain that same pressure and

24   terminate exclusivity.  Allow FitLife to propose a plan.

25         To be totally transparent, my client doesn't care

*Echo Reporting, Inc.*

18

1  who the -- who the ultimate successful plan proponent is

2  here.  If the Debtor in response to all of this is able to

3  put forward a plan that pays unsecured creditors in full at

4  confirmation, fantastic, right?

5      And if FitLife isn't able to get a plan together

6  in time, such that the Debtors are able to propose a plan

7  that it proposes with the kind of treatment that we think

8  should be the case here in a case like this, with a value

9  that they're saying exists, then creditors may choose the

10  Debtors' plan.  But if they can't get it together, then our

11  concern is its value with deteriorate.

12      And this option that the Debtors are pursuing to

13  preserve the potential equity value here at the expense of

14  creditors, our concern is that that will deteriorate.  And

15  that if we're forced to wait, then whatever value appears to

16  exist today may not exist in the future.

17      So that's our concern.  That's why we think it is

18  appropriate to terminate exclusivity.  Allow this

19  competition, to the extent it's going to exist, to go

20  forward.  We don't think that this is going to increase in

21  any material way the administrative cost to the estate.  I

22  know there's been some discussion or concern about that.

23  The Debtors and the committee, they're pursuing apparently,

24  you know, the path that they're going down.  The fact that

25  FitLife may at the same time be pursuing some kind of a

19

1  parallel, competitive path that keeps everybody on track and

2  disciplined, I think it's going to be a good thing and has

3  the potential to reduce costs.

4          In fact, in response to the FitLife objection,

5  we've already seen concessions from the Debtors in their

6  willingness to reduce committed professional fee payments,

7  including for the investment banker.  Again, it's not clear

8  that any of these -- these developments would have happened

9  absent the FitLife involvement.  So we think this is a

10 positive for creditors, and, therefore, support the motion.

11         THE COURT:  Thank you.

12         MR. POITRAS:  I think it's my turn, your Honor.

13 David Poitras for the Debtors.  Your Honor, I'll respond

14 briefly to some of the comments made by counsel, and then

15 kind of switch over to the comments that I brought with me

16 today.

17         In terms of the extensions of exclusivity, we've

18 had two short extensions so far.  And we are today under a

19 short extension that FitLife agreed to, and only filed this

20 motion after we did not accept -- the Debtors did not accept

21 their proposal.

22         And so, clearly -- I think it's fairly clear

23 what's going on.  Either accept our proposal or we come in

24 and try and terminate exclusivity and, you know, basically

25 take these assets at value that doesn't represent the

20

1  enterprise value of these businesses.

2          Mr. Feinsmith said at least two times that the

3  disclosure statement has been withdrawn.  It has not.  The

4  disclosure statement will be amended.

5          Mr. Feinstein -- Feinsmith continues to represent

6  that the new-value plan is the plan that's going forward.

7  He knows full well that the new-value plan is not going

8  forward.  This is going to be a plan that's funded either

9  through exit financing, where creditors will be paid in full

10 on the effective date, or through a sale of the Debtors'

11 assets or equity, again, where the Debtors' creditors will

12 be paid in full on the effective date.

13         And, you know, one can look at as sort of the

14 baseline, we think that the FitLife offer is less than half

15 of what the Debtors' worth, but I will concede that the

16 FitLife offer at the amounts stated would be sufficient to

17 pay creditors, but little or nothing for equity.

18         In terms of the bank's comments, I believe the

19 term sheet that was referenced was received on Thursday.  We

20 had pleadings due Wednesday, Thursday and Friday.  I believe

21 we provided the bank with a copy of the term sheet on

22 Friday.  And I just don't agree with Ms. Fay in terms of the

23 Debtors not interacting with the bank.

24         We interact with the bank on a weekly basis,

25 myself included, in terms of these overreaching discovery

21

1  requests they've had pending since September, initially

2  regarding the cash collateral, and now regarding the plan.

3  So we're speaking all the time.  And it was a busy week last

4  week, so it's not surprising that we weren't in a position

5  to sit and negotiate, you know, in terms of the plan sale

6  process, although there were e-mails going back and forth.

7       We had pleadings due on shorten notice for today's

8  hearing on -- on Thursday.  Pleadings in terms of the

9  disclosure statement, Wednesday, and the status conference

10 on Friday.  There's a lot going on in these cases.  And so

11 it is our hope and intent to continue with dialogue with the

12 bank.  You know, there is a fairly contentious relationship

13 between the bank and the Debtors.

14      You know, we've set forth in pleadings previously,

15 one of the reasons why prepetition financing wasn't

16 available is through the actions of the bank.  And so, it's

17 a little disingenuous to stand here and say that all of this

18 time passed and a lot of the things that happened

19 prepetition, as your Honor knows, the bank was essentially

20 in control of the Debtors between May and August of 2024.

21      I'll also add that the bank is adequately

22 protected.  There's never been an argument to the contrary.

23 There's evidence in the record of an investment banker, a

24 valuation expert.  These Debtors are worth between, I

25 believe it's 78- and $112,000,000.  Mr. Willis' declaration,

22

1  which was filed in connection with today's motion, sets

2  forth that the value of these Debtors is at least

3  $75,000,000.

4         And Mr. Bouslog said that the stalking horse won't

5  be picked for four months.  The process agreed to at the

6  committee specifically provides that a stalking horse will

7  be picked by June 16th at the latest.

8         And so with those points, I'll kind of switch over

9  to what I came here to say, and it's really just going

10 through the factors, as your Honor set forth in your

11 tentative.

12        The size and complexity of these cases.  We have

13 five related cases, one of which is a public company.  We

14 have revenue in excess of $100,000,000 a year, year over

15 year.  We have 200 creditors -- over 200 creditors and over

16 200 shareholders.

17        At this point in order to get creditors paid, with

18 a goal of protecting shareholders as well, the Debtors are

19 running parallel paths to attain exit financing, an orderly

20 sale process, ongoing business operations in -- as your

21 Honor can see from the news every day, you know, it's an

22 unsettled environment these days.  And we're seeking to

23 continue to negotiate with the various constituencies in the

24 case.  Clearly, we made progress with the committee, and I

25 remain ever hopeful that we will make progress with the

23

1 bank.  And, in fact, there's -- I kind of laugh, and this

2 was otherwise toward the end of my comments, but I'll move

3 it up.

4        FitLife and the bank have been telling the Debtors

5 and telling anybody that will listen, that all they want is

6 an orderly sale process.  That's what the Debtors have

7 proposed.  The main difference is, they want it done on a

8 very, very, very short time frame, which will make it

9 difficult for the Debtors and their investment banker to

10 reach strategic buyers, as opposed to financial buyers.

11 Strategic buyers being buyers in this same space that would

12 have synergies that are typically large companies, and would

13 need additional time to do their diligence and make a full-

14 value offer.

15        FitLife, who is in a similar space, has had over

16 six months to look at the Debtor and its books and its

17 operations.  FitLife was talking to the Debtor pre-

18 bankruptcy, and clearly nothing came of that.

19        In terms of the size and complexity, there's a lot

20 of activity going on in these cases, and there's a lot going

21 on with the Debtors' business.  Not that it's directly at

22 issue, but in terms of timing, I think this has been set

23 forth in some pleadings, but we had some delay.  The

24 Debtor's principal's house burned down in the Palisades

25 fire.  And as you might imagine, that is something that

24

1  would take away from the focus for at least a period of time

2  as we're trying to move these cases forward.  It's settled

3  now, but it is material as to what's been going on here.

4         Necessity of sufficient time to permit the Debtors

5  to negotiate a plan and prepare adequate information.  Your

6  Honor, the Debtors and the committee have put forth a plan

7  sale process which addresses the bank's concerns about

8  getting a sale in these cases.  All of the arguments about

9  new value go out the window.  All we're talking about is the

10 time frame at this point.

11        In addition to the orderly sale process, as we've

12 set forth in both the committee's stipulation and our

13 pleadings, the Debtors reserve the right to obtain exit

14 financing to pay off creditors in full.  That process has

15 really started to ramp up recently.  There's been some

16 activity today, and our hope is to keep that process moving

17 forward.

18        The way it's going to work is, your Honor, there

19 will be an asset-based loan for the principal portion.  We

20 think that will 14- or $15,000,000.  There will be a

21 mezzanine piece behind that for we hope 10- to $12,000,000.

22 And additional capital put in to fill up the bucket to get

23 creditors paid in full.

24        That process is moving a pace.  I'm not going to

25 stand here and tell you that it's a done deal, but we're

25

1   optimistic.  And to the extent that we have information that

2   we can share with the bank and the committee, we will do

3   that as soon as possible.  It is an ongoing, active process.

4   As I said, if the Debtors are able to attain exit financing,

5   creditors get paid in full from that.  Otherwise, creditors

6   will get paid from a sale of the Debtors' business.

7           I think the evidence in the record establishes

8   that these are solvent entities.  Equity is in the money.

9   There are 230 public shareholders.  Depending upon how much

10  the Debtor is worth, the value there -- and I believe it was

11  Mr. Feinsmith that pointed out that Mr. Irwin owns

12  approximately 97-percent or ninety-seven-and-a-half-percent

13  of the equity in the Debtors, a company that he's built up

14  over 31 years.  Two-hundred-and-thirty people own stock in

15  the Debtor, but if you have a  $75,000,000 valuation, that

16  stock is worth millions of dollars for those people.  It's

17  not nothing, it's something.

18          And under the code, if you have a solvent estate,

19  equity has -- shareholders have a seat at the table.  They

20  need to be protected.  So a sale process or a plan process

21  going down the path of pursuing assets below fair-market

22  value is not fair and equitable to the equity holders, the

23  shareholders in this estate.

24          Your Honor, the timeline proposed by the Debtors

25  is really when you get down to it, only about 60 days longer

*Echo Reporting, Inc.*

26

than the timeline proposed by the bank.  The bank says, have

everything done by May 31.  If that's the case, then you're

not going to have any strategic buyers.  You'll have maybe

some financial buyers kicking around, but they're going to

offer much less than a strategic buyer might offer.

The committee stipulation provides that there will

be a sale or confirmation hearing by July 31.  Sixty short

days to make a difference between realizing full value or

something closer to fire-sale value.  That is what the

committee stipulation provides.

In terms of the actual dates, within the next week

or two the intent is to file a sale procedures motion with

the Court, and parties can, you know, weigh in on that and

comment.  So we will have firmly established sale procedures

in place, which the parties have been requesting.

And the Debtor has also agreed to bring on an

independent director.  There have been allegations that Mr.

Irwin has a conflict or potential conflict because he's

running these cases solely for his own benefit, which is not

true.  Again, equity has a seat at the table.  He's not the

only equity holder.  But in order to dispel those

allegations, we are bringing in, subject to your Honor's

approval -- I mean, we're in the final stages of the

paperwork, and we've identified Brad Sharp as the

independent director.  I think Mr. Sharp is above reproach

27

1  in this community.  He does a lot of this work, and he is

2  one of the -- the main principal people suited for a role

3  like this.

4         And so, you have an orderly sale process supported

5  by the committee that's 60 days longer than what the bank

6  wants, with an independent director in there having final

7  decision making authority over the terms of the plan, over

8  refinancing and over a sale.  And so, what we have put in

9  place, in my humble opinion, dispels most of the arguments

10 raised by both FitLife and the bank in terms of the Debtors'

11 plan and the Debtors' process.  We have agreed to do what

12 they'd like us to do, just not on their time frame.

13        And, your Honor, if you have questions of the

14 investment banker in terms of process, they're on the phone

15 and we can do that.

16        In terms of this short, additional period of time

17 as between, again, the bank and what the committee and the

18 Debtors have agreed to, no creditors or parties-in-interest

19 will be prejudiced in any way whatsoever.  These Debtors are

20 operating profitably post-petition without DIP financing of

21 any kind.

22        As of January -- the end of January, the Debtors

23 adjusted EBITDA is $2.79 million to the positive.  As we

24 stand here today, the Debtor has five-and-a-half-million

25 dollars in cash in the bank, again, without any financing.

28

1  The Debtor is paying -- even though East West Bank is
2  adequately protected based upon the value of the businesses,
3  the Debtors are paying East West Bank monthly interest at
4  the contract rate, plus $100,000 principal pay down each
5  month.  Nobody's going to be harmed by an extension.
6        Arguments that professionals aren't going to get
7  paid, creditors aren't going to get paid, again, that is the
8  old plan.  There is no doubt that there's sufficient monies
9  under a sale process or an exit financing process to pay all
10  creditors pre- and post-petition professionals, everybody.
11  So arguments about professionals getting deferred under the
12  plan that's not going forward, really have no import
13  anymore.
14        Another factor in the negotiating process and why
15  this motion should be denied, is a competing plan process
16  and the involvement of creditors can be extremely damaging
17  and disruptive to this business.  It is a fragile ecosystem.
18  I think your Honor's aware of it.
19        The Debtors' customers are entities like Walmart
20  and Costco, which can get products from other suppliers.
21  And the concern is that if there's a competing plan process
22  and all kinds of notices going out to creditors about this,
23  that or the other thing, that there's a real chance that
24  suppliers will put the Debtors on COD, which will be
25  extremely disruptive.  I mean it's difficult enough to do

29

1   that if you have financing.  It is extremely difficult to

2   that if you don't have financing.

3           Likewise, as I've said, customers may seek --

4           THE COURT:  Well, I don't understand that point

5   actually.  Because you're going to be selling it anyway,

6   then I don't understand the difference.  I don't understand

7   why suppliers would feel differently --

8           MR. POITRAS:  It's -- I think it's --

9           THE COURT:  -- whether there's a plan that

10  involves -- like, I mean, first of all, it's been in

11  bankruptcy for so much -- you know, for a while now.  Now

12  there's a plan that says by some deadline we're going to

13  sell it or we're going to raise -- we don't know what we're

14  going to do.  We don't -- you know, somebody wants to buy

15  it, right, that would pay off enough to pay all the debt.  I

16  don't understand why that would be disruptive to -- I mean,

17  I don't understand why suppliers would find that to be a

18  scary situation where they wouldn't -- where they would

19  change to COD.

20          MR. POITRAS:  Your Honor, I think --

21          THE COURT:  Especially if -- if they can look at

22  the financials, right --

23          MR. POITRAS:  Your Honor, I think it creates --

24          THE COURT:  -- to see how it's doing.

25          MR. POITRAS:  -- instability and uncertainty, and

30

1  it's unnecessary.

2          THE COURT:  I mean, there's uncertainty now.

3          MR. POITRAS:  Well, there's uncertainty in most

4  every Chapter 11 case.

5          THE COURT:  I don't understand why a competing

6  plan would create more uncertainty, other than the fact that

7  it's one or the other if people are definitely going to get

8  paid --

9          MR. POITRAS:  But it's --

10         THE COURT:  -- right?

11         MR. POITRAS:  But it's not necessary.  Under the

12 facts of this case, it's not necessary.  Because, again,

13 we've agreed to the sale process, and what we're talking

14 about is timing of the sale process.

15         THE COURT:  But we don't know what the sale

16 process is, other than we have an investment banker that's

17 proposed, right?

18         MR. POITRAS:  Well --

19         THE COURT:  We don't have any -- know anything

20 about the sale process --

21         MR. POITRAS:  Well, now --

22         THE COURT:  -- other than the -- some -- the

23 committee signed off on these kind of generalized, like now

24 our plan is going to be paid on the effective date, and now

25 we're going to do x or y, but we don't know if we're going

31

1 to be able to do x -- we assume we could do x or y, but

2 there's nothing specific about it.  There's no stalking

3 horse now.  There won't be a while, if ever.

4         MR. POITRAS:  Well, there --

5         THE COURT:  I mean, really the Debtors wants to

6 have -- to keep all of its options, right?  Want to keep all

7 of its options, which I understand.  Debtor want to keep all

8 of its options, in case like equity comes through, you know,

9 somebody comes through, which hasn't come through in the

10 past or --

11         MR. POITRAS:  Your Honor, I think it's pretty

12 clear that there will be a stalking horse.  We don't believe

13 that FitLife should be the stalking horse because its bid is

14 not --

15         THE COURT:  Why is it clear that there's going to

16 be a stalking horse?

17         MR. POITRAS:  Well, again, because FitLife's here

18 bidding essentially $36,000,000.  And so at the end of the

19 day, that's seemingly the floor.  And so there's people out

20 there that are going to pay at least that much for this

21 business.  And so the Debtors' proposal -- and again, we're

22 going to come back and this is -- come together fairly

23 quickly, but we're going to come back with a sale procedures

24 motion but -- and the other thing is, these folks have

25 objected to the employment of STS.  STS has been working

32

1  notwithstanding.  There's a hearing set on that next week.

2  We remain hopeful -- East West Bank withdrew its objections.

3  We remain hopeful that FitLife will do the same.  But

4  basically the process is, they are in the process of putting

5  together, via the diligence room -- they've already received

6  inquiries from serious prospective buyers.  They'll be in

7  the market soliciting bids in April.

8          THE COURT:  Well, then why do we need to wait

9  until July --

10          MR. POITRAS:  For people to have --

11          THE COURT:  -- if they're already getting

12  interested buyers without even having set up this data room

13  yet?

14          MR. POITRAS:  For strategic buyers to have --

15          THE COURT:  Why is that different?  I don't

16  understand.  I would think strategic buyers would be easier

17  to find because they know about the business, as opposed to

18  a company who doesn't know --

19          MR. POITRAS:  They --

20          THE COURT:  -- about the business.

21          MR. POITRAS:  -- they just don't move as quickly.

22          THE COURT:  Well, who says?

23          MR. POITRAS:  The investment bankers say.  I mean,

24  I'd be happy to let Mr. Willis address --

25          THE COURT:  Okay.

33

1        MR. POITRAS:  -- your Honor's --

2        THE COURT:  Well, I -- it just -- I, you know, I

3 think everybody -- you know, it's -- I understand why people

4 would want longer versus shorter, people who, you know, hope

5 that they're going to get the maximum, but in the meantime

6 there's the cost of the case.  There's the cost of running

7 the case.

8        MR. POITRAS:  Which will come out of equity, not

9 out of creditors.

10        THE COURT:  If there's enough money.

11        MR. POITRAS:  Your Honor, I think there's in the

12 record a framework that establishes that there will be

13 enough money.  There's an offer sitting here today that's

14 enough --

15        THE COURT:  Why isn't there sales procedures right

16 this second?  Like why can't I look at it right now?  Why

17 didn't the committee for it with the stipulation?

18        MR. POITRAS:  Well, your Honor, that was between I

19 think last Wednesday and this Wednesday.  And so if your

20 Honor would like a sales procedures motion within the next

21 week, we can certainly do that.  But there is a process in

22 place, and that is to get out to market in April, after STS

23 has had sufficient time to go through --

24        THE COURT:  Well, they've already been working for

25 a month you said?

*Echo Reporting, Inc.*

34

1        MR. POITRAS:  No.  No, no, no.  I'd have to defer

2   to Ms. Seflin as to when they initially came onboard, but

3   it's been I think maybe three weeks or so.  And again,

4   they're not employed.  I mean objections to their employment

5   were filed.  And so the process is moving forward, but it is

6   the earnest belief that without sufficient time, again, a

7   six --

8        THE COURT:  What if you don't get another

9   extension as through -- after May, what are you going to do

10  then, because that's when it expires?

11       MR. POITRAS:  Understood.

12       THE COURT:  So --

13       MR. POITRAS:  Well, we're hoping at that point

14  that we're going to have offers in hand that we can push

15  forward.  And if mister -- Mr. Fitlife (sic) -- if FitLife

16  comes in then and files a plan, I think that -- they won't

17  need to file a plan.  They can bid.  So that's the whole

18  thing that's going on here.  They don't want to bid.  They

19  want to get out with their own plan on a lock-up deal, and

20  not have to expose this asset to the marketplace.

21       So, initially, gee, Judge, you can't approve this

22  disclosure statement because it's a new-value plan and it's

23  not confirmable because we're not testing the market.  Now

24  really what they're doing is trying to establish a process

25  where they don't have to test the market.  They get out

35

1  front.  They lock up the creditors.  They squeeze out

2  equity, and the shareholders get nothing.  That isn't how

3  this process is supposed to work in my humble opinion.

4          If they have to wait until May 2, they can --

5  we've invited them as part of the process to do whatever

6  they need to do to make their highest and best bid.  So the

7  response that got, or the response that's set forth in the -

8  - their reply pleadings is that -- or their motion, is that

9  they made the offer to the Debtors in February and it was

10  summarily rejected.  That's not true.

11          What the Debtor said was, we have retained STS.

12  We are going to implement an orderly sale process.  You're

13  welcome to participate in that process and bid.  That's

14  exactly where we are right now.  They don't want to bid.

15  They just want to plow forward with their lowball offer and

16  not have to put these assets on the marketplace.

17          So if you deny the motion and the Debtors have

18  until May 2 at least, and I'm not saying that --

19          THE COURT:  Well, at all maybe.

20          MR. POITRAS:  Maybe.  We would have --

21          THE COURT:  Because we're not -- I mean, if

22  they're not -- if it doesn't look like something's happening

23  May 2, all lined up, every single little thing, other than,

24  you know, bidding, then there's not going to be cause to

25  extend exclusivity.

36

1          MR. POITRAS:  I agree.  I agree 100-percent.

2          THE COURT:  So I --

3          MR. POITRAS:  But my point is, by that point

4    either FitLife can simply bid, and it's going to have to bid

5    what is a fair-market-value price for this asset, or

6    exclusivity will be terminated and they can go ahead and

7    file their plan at this point.  But I'm fairly certain that

8    by that point in time there will be meaningful bids in terms

9    of the Debtors' assets, as well as serious potential for

10   exit financing.

11          So again, this is not a huge extension being

12   sought.  This is -- and we're not even seeking an extension

13   right now.  We're just talking about not terminating the

14   extension that we have through May 2, to allow our process

15   to go forward sufficiently to try and preserve value for the

16   shareholders.

17          Your Honor, the next factor is good-faith progress

18   toward reorganization.  I think that the guidelines agreed

19   to with the committee show that the Debtors have made

20   significant progress towards reorganization.  And, again,

21   the process whereby the assets will be marketing (sic) and

22   sold in conjunction with court-supervised procedures and

23   with the independent director, protects all of the parties

24   in this case in my humble opinion.

25          Debtors are in fact paying their bills as they

37

1  come due.  As I said before, Debtors are profitable post-

2  bankruptcy.  You haven't seen anybody in court here saying

3  that they're not getting their bills paid, and the Debtors

4  sitting on five-and-a-half-million dollars of cash from

5  operations.

6       Whether the Debtors have demonstrated reasonable

7  prospects for filing a viable plan, again, the sale/plan

8  process will pay all creditors in full, or exit financing

9  will pay all creditors in full.  And so I think those

10 elements, which, again, are what was being encouraged by the

11 bank and FitLife prior to today, show that the Debtors have

12 demonstrated a viable basis for not only a confirmable plan,

13 but hopefully a consensual plan.

14       Again, whether the Debtors have made progress in

15 negotiations with their creditors, we would point to the

16 agreement with the committee.  And again, as I said before,

17 we'll continue to talk to the bank.  We will talk to the

18 landlord -- the prior landlord, Mr. Bouslog's client, in

19 trying to come to consensus.  But again, the main issue here

20 is in terms of timing, not in terms of actual process.

21       The amount of time that elapsed in these cases,

22 seven months in cases of this size is not an eternity or

23 unduly long.  There has been a lot going on, and, you know,

24 I -- I guess I would say that the Debtors are where they

25 are.  And that's recently brought in Essex (phonetic) to

38

1  look for exit financing, and recently brought in STS for the

2  investment banker stuff, and that stuff is proceeding

3  forward.  And so far as I can tell, it's proceeding

4  positively, and I truly think that there will be exit

5  financing options, and, you know, sale offer bids, you know,

6  in the May time frame, April perhaps for the exit financing,

7  we just need to see.

8         Whether the Debtors are seeking an extension of

9  exclusivity in order to pressure creditors.  This is kind of

10 flipped, right, because this is FitLife seeking to terminate

11 exclusivity, and I think it's fairly clear that they're

12 seeking to pressure the Debtors to acquire the Debtors'

13 assets at a price below what their fair value is.

14        In terms of the Karled claim, it's 20-percent of

15 the unsecured creditor body.  That creditor is the Debtors'

16 former landlord who's no longer doing with -- business with

17 the Debtor, so it doesn't really care what happens to the

18 Debtors' business.  It wants to get paid, no doubt, and I

19 don't dispute that.  But in terms of the Debtors' business

20 and shareholders, I don't think there's, you know, any

21 really import there.

22        Your Honor, and I think Mr. Feinsmith conceded

23 this.  There is a heavy burden of proof to terminate

24 exclusivity in a bankruptcy case.  The Debtors submit that

25 FitLife has not come close to meeting its heavy burden of

39

1   proof.  In fact, the motion was not supported by any

2   evidence whatsoever.

3          And so with that, and the other factors that we've

4   talked about today, we respectfully request that the motion

5   be denied.

6          THE COURT:  Thank you.

7          MR. POITRAS:  Thank you, your Honor.

8          MR. GOLDEN:  Good afternoon, your Honor.  I'd like

9   to just briefly just focus on the committee's position, your

10  Honor, which we had filed a short joinder.  Basically, your

11  Honor, the committee does oppose termination of exclusivity

12  at this time.

13         The committee has spent an extensive amount of

14  energy and effort, along with its financial advisor,

15  analyzing and looking at this Debtor, and we do believe that

16  this Debtor has value that goes -- that should be able to

17  pay creditors 100 cents on the dollar with interest, as well

18  as to have money for equity.

19         We do want to have a transaction earlier rather

20  than later.  There's no question about that.  And the

21  stipulation that we negotiated -- amongst other things we

22  negotiated, has a process that within less than six months

23  from now, there would be a sale that would be closed with a

24  few milestones.  And if the Debtor is not making progress

25  during this time period or at the conclusion, the committee

40

1  would, you know, be concerned about the notion of

2  terminating exclusivity or seeking a trustee, or other -- or

3  other redress.  But the reality is, is we think that the

4  Debtor is moving forward towards a sale process, and we want

5  them to file the sales procedures motion as soon as

6  possible.  I heard that they're filing it within -- I think

7  he said two weeks.  That would --

8          THE COURT:  He said a week.  You said a week, I

9  thought you said.

10          MR. GOLDEN:  Was it a week?  Sorry.  It may have

11  been a week, your Honor.  I apologize.

12          THE COURT:  I mean, I would think before the

13  hearing, the STS hearing.

14          MR. GOLDEN:  I'm sorry?

15          THE COURT:  Before the hearing on that employment

16  of STS.

17          MR. GOLDEN:  Right.  So -- well, we welcome that.

18  We welcome the -- not welcome.  We want -- we want that

19  motion to be filed.  We want the sales procedure to be set

20  forth.  We're looking at these dates as outside dates.

21  We're hoping that they don't wait until the end of this

22  period, the July 31st or the August 15th, because they can

23  do things earlier --

24          THE COURT:  Well, by the way, just because -- this

25  Court is not -- it dark from July 31st to August 8th.

41

1          MR. GOLDEN:  Okay.

2          THE COURT:  So --

3          MR. GOLDEN:  Well, in theory, I think under their

4  proposed -- under our stipulation --

5          THE COURT:  Yeah.

6          MR. GOLDEN:  -- I think that the sale has to be

7  done by then, but it can close I think up until early

8  August.  So I think at least in theory that would work.  We

9  hope that that would happen earlier.

10          Now I'll tell you, your Honor, that we -- the

11  concern about termination of exclusivity in part is that we

12  don't see how termination of exclusivity, now given this --

13  this process that's being laid out in our stipulation,

14  speeds anything up.  If exclusivity's terminated -- if we

15  were looking at a year before they were going to get to a

16  sales process with the two-year plan they had before, or

17  nine months or something like that, that might be different.

18          But here, your Honor, if exclusivity were

19  terminated now, people will file plans to get disclosure

20  statements, and you'll have a confirmation, competing

21  confirmation hearings, and in our view, we're distracted

22  from -- from the milestones and -- that the Debtor has and

23  the Debtors' putting into play for these procedures, to get

24  this thing done.  And I'm not sure that we see how the sale

25  process is even going to go forward until a much later

42

1  period of time than what's currently contemplated.

2          And in our view, if, again, if the Debtor falters

3  and doesn't do what we contemplate, or doesn't achieve

4  what's contemplated, then the committee does want that

5  process to go into a different direction, whether it's

6  termination of exclusivity or otherwise.

7          And, quite frankly, with the time frame that we

8  have right now, I think that's roughly the time frame that

9  would occur anyway with just a lot more administrative

10 expense and other things going on before you would even be

11 able to start that sales process anyway.  But here, with

12 the --

13         THE COURT:  Okay.  I have a question for you.  So

14 if exclusivity ends May 2nd and is not extended, right,

15 then, I mean I would think that the committee would be

16 looking for meaningful information before May 2nd, correct?

17         MR. GOLDEN:  Yes, your Honor.

18         THE COURT:  Right, like -- like specifics about

19 what's happening.  Like what -- what's happening for

20 (indiscernible), what's happening for, you know,

21 (indiscernible)  interested in the Debtors.  What's

22 happening as far as like stalking horse, what's happening in

23 -- right?  I mean, we wouldn't wait.  I mean it wouldn't

24 take until after that to know those things, right?

25         MR. GOLDEN:  Yes, your --

43

1          THE COURT:  I mean if they're really, you know,

2   committed to this process, then we would be able to see

3   meaningful developments by May 2nd, correct?  That's, you

4   know, that's most of March and all of April.

5          MR. GOLDEN:  Yes, your Honor.  I think that --

6   absolutely.  And I think the sale -- not just the sale

7   procedures motion, but I think -- yes, I think

8   (indiscernible), they should be making significant headway

9   along that time.  I agree.

10          THE COURT:  With specific information about --

11   right?  And I think the committee is getting -- going to be

12   getting reports, and the bank is supposed to be getting

13   reports, too, right, about the process?

14          MR. GOLDEN:  I mean --

15          THE COURT:  Equity or --

16          MR. GOLDEN:  -- I mean, the committee expects to

17   get regular information and reports, and we've been in

18   discussions with the Debtor about making sure that happens,

19   your Honor, yes.  And so, yes, I agree with the Court.

20          THE COURT:  The reality is, this Debtor has a

21   credibility problem, not because of the involuntary, which I

22   mean I understand why in that specific situation, with the

23   feeling a bank was in control and maybe was jeopardizing the

24   value of the company and payment to creditors why -- I mean,

25   you may want to reach out to creditors about filing an

44

1    involuntary.  I don't think that that's wrong necessarily.

2    I mean it was focused I think more on its -- the situation

3    with its secured creditor, rightly or wrong.

4            You know, so I don't -- I'm just saying in

5    general, like the fact that the first plan is like, well, I

6    mean, you know, we'll pay you out sometime in the future.

7    And then the plan doesn't go.  Well, we'll pay you out

8    sometime in the future, but we'll give you some interest if

9    we don't pay you within six months.

10           And then now it's -- now, with the -- you know,

11   with -- after getting the FitLife term sheet or whatever,

12   now we get with the committee, yeah, yeah, yeah, we're

13   really going to like pay you on that effective date, and

14   we're going -- you know, so that the tune has changed and --

15   but the initial tune, if this company's worth so much money

16   and is solvent, doesn't really jive with the sense that they

17   are really trying to -- that they recognize the value of the

18   entity and the importance of paying creditors.

19           MR. GOLDEN:  So --

20           THE COURT:  So, I'm just saying.  So to me, like I

21   would be looking for very definite progress, not, you know,

22   not in the sense of like, this time, okay, like whoever --

23   whatever the reason -- I don't know the reason why prior

24   investment -- you know, prior efforts didn't work.  I don't

25   know for sure, right, but I can tell you now that they

45

1  better take it seriously.  Because if they don't take it

2  seriously, it's going to happen whether they like it or not.

3          MR. GOLDEN:  So, your Honor --

4          THE COURT:  And they've got to be realistic about

5  enterprise value, which is one of the good things about

6  having bidding, right?  That's the real world, right?

7          MR. GOLDEN:  So, respect to the committee, your

8  Honor, the committee had -- at one point had an opposition

9  to the disclosure statement prepared that we had discussed

10  with the Debtor.  We had opposition to the plan that we

11  intended to pursue and avail ourselves of.  So, we -- the

12  committee had not acted, your Honor, in response to what

13  FitLife had done.  The committee has been -- it hasn't been

14  all visible --

15          THE COURT:  Not the committee, the Debtors is -- I

16  mean, not -- I'm not saying the committee lacks credibility.

17  I'm saying that the Debtor lacks credibility.

18          MR. GOLDEN:  No, I understand, your Honor.  I'm

19  just -- I understood everything you said.  I was making a

20  different point.  I apologize.

21          THE COURT:  Okay.

22          MR. GOLDEN:  I heard you, your Honor.  I -- and I

23  understand what you said.  What I was saying is -- but one

24  of the points I think you made was that the committee would

25  want to see this kind of information and would want this

46

1  kind of data and the like.

2         And what I wanted to explain to the Court is, the

3  Court may not have seen the committee as visible during --

4  you know, filing pleadings and the like during this process,

5  but we've been very actively involved, and we were preparing

6  to be more aggressive, if needed, but then we negotiated a

7  number of different things, including the stipulation,

8  because we felt that this would serve our purpose of having

9  a sale within a reasonable time.

10        But I -- we agree with the Court, your Honor, that

11 there should be -- there should be progress that's made

12 throughout the process.  That it shouldn't be June, you

13 know, June or July 15th that we see, you know, here's a

14 buyer or something like that.  It needs to be -- it needs to

15 show progress --

16        THE COURT:  Well, and the new plan needs to be

17 filed, right?  The plan that is going to be the basis of

18 this whatever, right?

19        MR. GOLDEN:  Yes, your Honor, although from our

20 perspective, the sale can proceed --

21        THE COURT:  Right, but if they're going to go

22 forward on two tracks, that means -- that also means going

23 forward on two tracks, right?

24        MR. GOLDEN:  From our -- yes, your Honor.  Agreed.

25 So that's sort of the, I think the sum and substance of -- I

47

1  agree with you, your Honor.

2       I think that did accept it -- except that the

3  committee does intend to continue to be vigilant and if --

4  and to watch the progress, and if things take a different

5  turn, then to take an appropriate turn with respect to this

6  Court.  But at this point that that timeline is reasonable,

7  your Honor.

8       THE COURT:  Okay.  Thank you.

9       MR. GOLDEN:  Thank you.

10      MR. POITRAS:  Your Honor, just very briefly.  If

11  your Honor has questions today about the specific process,

12  the sale process and the marketing, Mr. Willis of the

13  investment banker, STS, is available to address the Court.

14      THE COURT:  Thank you.  I appreciate him being

15  available.

16      MR. FEINSMITH:  Your Honor, Todd Feinsmith for

17  FitLife.  Excuse me.  Just a few brief but I think very

18  important points to make.

19      One is that we've heard the Debtors say that the

20  value here is 50,000,000, 75,000,000,  100,000,000.  There

21  was even an affidavit filed by Mr. Willis to that effect.

22  If that's the case, then we can't understand why this Debtor

23  hasn't been able to refinance a bank debt that's only

24  $20,000,000.  If this company is really worth 100,000,000 or

25  even 50,000,000 or 40,000,000, that should have happened

48

1  long ago.

2         We think it's completely speculative and fantasy

3  what the Debtor thinks this company is worth.  And Mr. Judd

4  is in the courtroom today, like I mentioned before.  I'd be

5  happy to put him on the stand and he can explain to you why

6  he thinks the Debtors' valuations are just irrational, but I

7  think those numbers that I've just described speak for

8  themselves.

9         The second point, your Honor, is that a plan and a

10 sale here will not result in the same value.  And I want

11 everybody in the courtroom to hear this, especially the

12 creditors committee.  Under a plan, FitLife has the ability

13 to preserve net operating losses, tax attributes, which have

14 significant value.  In a 363 sale, that's not the case.  So

15 nobody here should expect that FitLife is going to be

16 willing to bid the same amount that it's proposed in a

17 consensual plan.  It's not going to happen.

18        Number three, your Honor, the length of the sale

19 process.  FitLife has not had an opportunity to do

20 meaningful due diligence.  It only needs 30 days to conduct

21 its due diligence.  Why the Debtor thinks that four months,

22 five months, six months are necessary to run a sale process,

23 when we're able to do our diligence in 30 days, is something

24 that we don't understand.  We think this is really just

25 delay with the intention of ultimately proposing the same

49

1  plan that they've already proposed in this case.

2          Number four, the STS objection.  We think that

3  STS' engagement, the structure of it, is designed to chill

4  FitLife's bid in this case.  It's designed to devalue the

5  bid, because what they've proposed is a minimum $3,000,000

6  fee, so --

7          THE COURT:  That doesn't apply to FitLife.

8          MR. FEINSMITH:  Well, it does, your Honor, because

9  if -- what they said when you read the stipulation

10  carefully, it says, "it doesn't apply to FitLife's current

11  offer."  But if FitLife were to increase its offer by

12  500,000, a million, then it does -- then the fee does apply.

13          Now we haven't addressed that with the Debtor yet

14  because the hearing isn't until next week, but we plan to.

15  But as currently -- as currently proposed, it's not a

16  concession.  We have no objection to STS earning an

17  incremental amount if FitLife were to increase what its --

18  the amount that it's proposed.  But if it's only increased

19  slightly, it doesn't -- it doesn't make any sense and it

20  still has that same chilling effect.

21          There was also an argument made that there wasn't

22  evidence that supports FitLife's motion.  In fact, that

23  untrue.  The Judd affidavit contains evidence.  And beyond

24  that, the record in this case is replete with everything the

25  Court needs to know about the arguments that we've -- that

50

1  we've made.  But the extent that it's not based on the

2  record, the Judd affidavit fills in any factual averments

3  that are necessary.

4        And finally, we think not only if we propose a

5  plan could we accomplish a successful result, an end to this

6  case quicker than the sale timeline that's being proposed,

7  but even more importantly than that, it's a much more

8  certain path.  It's not based on a speculative refinancing

9  or a sale that the Debtor hasn't been able to achieve for 18

10 months.  We know for sure we can do what we say we're going

11 to do.

12       And the proposal that we made only has the

13 diligence contingency.  It doesn't have a financing

14 contingency.  Provided the diligence reveals and confirms

15 what we've seen in the financials, then we have no reason to

16 believe why we can't provide complete certainty to get this

17 done.  Thank you, your Honor.

18       MS. FAY:  Two quick points, your Honor, if I may,

19 or quick topics.  First being process.  So there was lots of

20 lawyer speculation testimony today about what will come to

21 be in 60 days if the Debtors maintain exclusivity.  But the

22 bank attempted to purport a structure in our statement that

23 proposed real timing, real generous timing in our view, but

24 also all of the other things that need to be laid out, not

25 just two dates.

51

1          So what is before the Court today?  There's the

2     sale procedures motion hasn't been filed.  You have two

3     dates agreed to by two parties in the case.  Again, the bank

4     construct -- suggested a much more robust framework, and we

5     did that just a few days after learning of the dates that

6     the committee and the Debtors were proposing.

7          We understand STS has been helping for a month.

8     In our line of work, April is a lifetime away for going out

9     to market.  And it really doesn't make sense to us how they

10    can go out to market in mid-April with buyer that

11    essentially -- or apparently, excuse me, take a lot of time

12    to put together offers.  How do you go to market and have

13    offers two weeks later, if that's the type of buyer that

14    you're approaching and that's the reason for your timing?

15         And that's why as a part of our proposed dates we

16    had May 1 as the deadline for bids.  It lines up with

17    exclusivity against parties, a picture of what is to happen,

18    and we propose that that occur for the certainty reason that

19    Mr. Feinsmith articulated alongside a completing plan

20    process.

21         On the independent -- on the independent director,

22    the scope of the independent director cannot be just a final

23    thumbs up or thumbs down.  The process is so important in

24    these cases to getting to a place where there's something to

25    have a thumbs up or a thumbs down to.  And we think the

52

1  process that the Debtor seems to be proposing is basically

2  to be exactly here with these issues in two months.

3          Just one quick note about evidence.  So, your

4  Honor, this is not an evidentiary hearing as I understand

5  it, and the valuation evidence that's in the declaration we

6  believe is speculative.  It's untested.  It should not form

7  the basis for the Court's ruling today, and we fully reserve

8  all rights with respect to both valuation testimony, and

9  also any adequate protection arguments as raised by Debtors'

10 counsel.  Thank you.

11         MR. POITRAS:  Briefly, your Honor.  My

12 understanding is that the potential tax attributes in this

13 case are about $2,000,000, and the process that the Debtor

14 is proposing is sort of a parallel path.  Either do the sale

15 through a plan, if that's what a buyer wants to do, or a 363

16 sale, so we can preserve the tax attributes.

17         My understanding is that the STS minimum fee is

18 not going to apply in the -- in the context of a FitLife

19 bid.  I think the maximum fee would be $1,000,000, and it

20 would essentially come out of equity.  It wouldn't come out

21 of the creditors --

22         THE COURT:  I don't understand -- I don't

23 understand.  What?  I don't -- how does that work?  When you

24 say it doesn't apply in the context of the --

25         MR. POITRAS:  So --

*Echo Reporting, Inc.*

53

1          THE COURT:  -- FitLife bid?

2          MR. POITRAS:  -- so the initial fee I believe was

3   a minimum of $3,000,000.  And so that is not going -- that

4   minimum doesn't apply in the FitLife offer.  The fee in the

5   FitLife offer I believe is $1,000,000.  We'll -- I think we

6   can resolve this with Mr. Feinsmith between now and next

7   week.  But I'm just telling you that the minimum is not --

8   the minimum that was proposed wasn't intended -- wasn't

9   envisioning the FitLife offer.  And so the intent is not to

10  have any chilling of the bid with FitLife.  We'll work

11  around that for the STS fee in the context of the FitLife

12  offer.

13         THE COURT:  So there would be a fee but less of a

14  fee?

15         MR. POITRAS:  Correct.

16         THE COURT:  Depending on how much more they bid

17  than their original bid --

18         MR. POITRAS:  Correct.

19         THE COURT:  -- if they do?

20         MR. POITRAS:  Correct.  And again, I'm sensing you

21  don't want to hear from -- from Mr. Willis, but if you --

22         THE COURT:  Well, I just didn't set it up for

23  testimony today, although I appreciate people's

24  availability.  I -- you know, I mean, I supposed be, you

25  know --

54

1          MR. POITRAS:  It doesn't need to --

2          THE COURT:  I mean, I did -- I did -- I mean, I

3  basically get to do everything on the 2:00 o'clock calendar,

4  so I didn't have to have people sitting around waiting for

5  this hearing.  And so they're now moved for a week, nothing

6  particularly time sensitive in that calendar, so it wasn't

7  really a problem, I mean, in the Court's view, to move

8  those.

9          So we have the time, but I -- I think it would be

10 more productive if -- if we were going to have testimony to

11 see -- to be closer to -- well, first of all, having --

12 whether they're being employed or not, and also to see what

13 the -- the sale procedures would be if it goes that way.

14 So, we have that in that context.  All right.  You know, I

15 -- you know, your average -- okay.

16         So, when someone's trying to sell something they

17 own, there's a reason why people tell them it's worth a lot

18 of money, because they don't want to hear that it's not.

19 And this happens at all levels, right.  This happens -- you

20 know what I mean.  So like when you're trying to line up a

21 gig to be -- to sell something for somebody, you don't want

22 to like burst their bubble by telling them it's not worth

23 what they think it is, right?

24         So it's hard -- I think hard for investment

25 bankers to be forthright, and they're more likely to be

55

1  optimistic because that's what their client wants to hear.

2  And so, I'm not saying that that doesn't mean there's not

3  support, but the Court does take the valuation, in addition

4  to the issues that were pointed out, with a bit -- with a

5  grain of salt, you know, for a lot of reasons, in addition

6  to when you're trying to be picked as the seller of

7  something for somebody, you want it to look like you think

8  that their stuff is worth a lot, right?

9        So -- and that's -- and you want to argue that,

10  but really it's -- I thought that there was some very good

11  points made in the -- in the FitLife declarations about why

12  it's probably not worth what it's been represented to be

13  worth.  But, you know --

14        MR. POITRAS:  Well, your Honor, Mr. Willis --

15        THE COURT:  -- we'll see, right?

16        MR. POITRAS:  -- does not have -- he doesn't have

17  to testify.  He can address the Court --

18        THE COURT:  Right.

19        MR. POITRAS:  -- to provide information.

20        THE COURT:  I mean, we could set it up for another

21  day.

22        All right.  I'm thinking of -- since we have

23  another hearing, you know, in a week, and I want to look at

24  some of the cases about terminating exclusivity that are

25  raised by FitLife.  I did look at the cases that were --

56

1  that the Court mentioned and that were in -- and did point

2  out some of the reasons why those cases were different than

3  this case, in the sense that this is not within the initial

4  exclusivity term.  But I want to maybe look at the case that

5  was mentioned -- well, among other cases, the case that

6  mentioned about -- the Massachusetts case.  So -- and I can

7  do that before the next hearing in a week, so then I can

8  think it through, okay?

9        So I'm thinking that's what -- and I'm just going

10 -- I know you flew all the way, so -- presumably flew all

11 this way.  So -- and -- but I think it may be a good idea to

12 wait a week until I have a chance to look at what's been

13 presented and maybe some of the other cases, okay, so I can

14 lay it out.

15       I'm fairly confident that there will be no more

16 extensions of exclusivity.  So, we're going to -- so this is

17 a chance to show like what's going to -- like, you know,

18 like what -- like if we went to May, this would be a chance

19 to show by -- before then, like to start getting a head

20 start, because I'm also sensitive that I did -- we don't

21 want to unfairly row the deck in favor of one buyer who may

22 be trying to buy at a lower than -- at a lower value than is

23 otherwise appropriate.

24       Okay.  But I do want to also keep in mind that it

25 may not be as much as what equity wants.  And so -- and

57

1  equity may not be realistic about what it's worth.  So --

2  and the best way to know that is to start getting -- to set

3  a bid deadline that's -- that's in the near future-ish,

4  okay?

5        Okay.  So we're going continue this.  Don't --

6  please, no need to come in person, although we really

7  appreciate people being here in person.  So we'll continue

8  it for a week, okay?  We're going to continue everything for

9  a week.  Maybe you'll file something new in a week.

10       And then we'll see what's happening with STS.  I

11  mean, you already saw the one thing about STS.  Maybe they

12  can clarify how it would apply to FitLife, and see the sale

13  procedures, okay, and anything else that's meaningful that

14  you can get in within a week, okay?

15       And I also understand that maybe it would be

16  counterproductive to be dealing with competing plans where

17  you haven't -- when you've just hired the investment banker.

18  So, I mean, it may be a good idea to give some window before

19  we have competing plans to see what happens.  But I'm not --

20  you know, I'll think about it more over the next week.

21       MR. FEINSMITH:  Your Honor, just one point of

22  clarification.  So there's a hearing next week on the STS

23  employment application?

24       THE COURT:  Yeah.  Yeah.

25       MR. FEINSMITH:  The sale procedures are going to

58

1 be -- are going to be filed, but will we have an opportunity

2 to respond to them or to review them, or is it -- or is your

3 Honor anticipating that they'll be filed like right before

4 the hearing?

5          THE COURT:  Well, you can always -- you know, I

6 don't -- what are you thinking, Mr. Poitras?

7          MR. POITRAS:  My thought was to file it.  It will

8 be on file.  People can come, and your Honor can look at it

9 in the context of the motion.  We might just set it for

10 regular notice.  I'm --

11          THE COURT:  Well, you know, we -- the Court has

12 where you can do it on five days.  Five days sale

13 procedures, right?

14          MR. GOLDEN:  You mean sale --

15          THE COURT:  Is it five days' notice?

16          MR. GOLDEN:  -- procedures motions, your Honor?

17          THE COURT:  I think aren't they -- isn't it five

18 days' notice?

19          MR. GOLDEN:  I think -- it might be five.  I think

20 it was seven, but I could be -- I could be in error.  But

21 five or seven, your Honor.  I know the local rules.  I know

22 what you're referring to.  A motion to approve --

23          THE COURT:  Sale procedures.

24          MR. GOLDEN:  -- sale -- sales procedures.  Yes,

25 your Honor.  It's within a week or less.  Yes, your Honor.

59

1           MR. POITRAS:  That wouldn't be timely for the 12th

2   unless we filed it by today.  So, my thought was we would

3   file it before the hearing on the 12th so people could see

4   it and comment, and your Honor would have it in the context

5   of the hearing for the 12th.  But it wouldn't necessarily be

6   at issue --

7           THE COURT:  Well, maybe we should move the hearing

8   on the 12th to the 19th.  That way we could do it at the

9   same time.

10          MR. POITRAS:  The 19th doesn't work for me.  If

11  Ms. Seflin can do that.  I'm otherwise in court in another

12  matter that day.

13          THE COURT:  Well, why don't you find out if Ms.

14  Seflin can do it.  That's more -- and then we can do both at

15  the same time.

16          MR. POITRAS:  Suzie?

17          MS. SEFLIN (via Zoom):  I'm -- your Honor, I'm

18  available on March 19th.

19          THE COURT:  Great.  Let me see what else is on

20  there.

21          MS. SEFLIN:  And I double checked the local rules,

22  and it is seven days.  And we could get the sale procedures

23  on file by next week.

24          MR. POITRAS:  For the hearing on the 19th.

25          THE COURT:  So what would that -- are you

60

1  available the 19th?

2          MR. FEINSMITH:  Yes, your Honor.

3          THE COURT:  What about -- okay.  So we have other

4  matters the 19th, but we can see about -- well, we don't

5  have to pick -- maybe we won't have to pick a Thursday, then

6  we have more time.

7          How about the 18th?  Does that work?  That way

8  we're not --

9          MR. FEINSMITH:  Yeah.

10         THE COURT:  -- crushed in with a lot of other

11 matters.  We have more time.  And if we want to take

12 testimony we can set that up.

13         Ms. Seflin, are you good on the 18th?

14         MS. SEFLIN:  Your Honor, I'm not -- I am not

15 available on the 18th.  I'm available on the 19th or the

16 20th.  I have -- I have multiple other hearings on the 18th.

17         THE COURT:  What about you, Mr. Poitras?

18         MR. POITRAS:  The 20th works for me, your Honor.

19         THE COURT:  Not the 18th?

20         MR. POITRAS:  No.  The 18th is not good.

21         THE COURT:  What about the 17th?

22         MR. POITRAS:  The 17th is okay with me.

23         THE COURT:  The 17th?  That's a Monday.

24         UNIDENTIFIED SPEAKER:  Yes, your Honor.

25         MR. FEINSMITH:  Your Honor, I have a conflict on

1  the 17th.  I'm sorry.

2          THE COURT:  That's all right.  Well, maybe we

3  could do the -- the 20th in the morning.

4          MR. FEINSMITH:  The 21st?

5      (Pause.)

6          THE COURT:  Well, you want more -- what about the

7  21st?

8          MR. FEINSMITH:  The 21st is fine with me, your

9  Honor.

10          MS. SEFLIN:  The 21st is fine with me, your Honor.

11          MR. GOLDEN:  Yes, your Honor.

12          MR. POITRAS:  Me as well.

13          THE COURT:  Okay.  Let's do the 21st.

14          MR. POITRAS:  Okay.

15          THE COURT:  Okay.  So we'll continue these things.

16  And we have -- whenever -- when do you want to start?  After

17  -- anytime 10:00 or later, 10:00 a.m. or later.  Do you want

18  to do 10:00 a.m.?

19          MR. POITRAS:  I'll defer to the East Coast people.

20          MR. FEINSMITH:  That's fine, your Honor.

21          THE COURT:  Okay.  So let's continue to March 21st

22  at -- I'm sorry.  For the investment banker it's getting

23  delayed, but maybe we'll work things out in the meantime.

24          MR. FEINSMITH:  And so it's STS and also this

25  hearing on the motion to --

62

1          THE COURT:  Yeah.  Well, yeah.

2          MR. FEINSMITH:  -- terminate exclusivity?  Is

3 it --

4          THE COURT:  Yeah.  We're going to continue --

5          MR. FEINSMITH:  -- is it possible your Honor would

6 rule between now and then, because I -- I know your Honor

7 had said that you're going to be reviewing the cases and --

8          THE COURT:  I may review between now and then.  I

9 may rule.

10          MR. FEINSMITH:  Okay.

11          THE COURT:  You know, I -- I just don't know

12 how --

13          MR. FEINSMITH:  I'm just imagining, your Honor,

14 what would be happening at that hearing.  Is it just to have

15 it set up so that there will be an evidentiary hearing, or

16 is it set up to hear further arguments or --

17          THE COURT:  Well, I don't need further arguments.

18 I want to look at -- I don't know if I want to do a big --

19 well, does anyone want an evidentiary hearing?  Because we

20 have -- I mean, you're entitled to cross-examine the

21 witnesses.  You know, we take in declarations unless there's

22 evidentiary objections.  I mean to me, the evidence mostly

23 the FitLife evidence, in addition to the issue about the

24 value of the company was about the fact that the Debtors

25 been a bit intransigent with the plans that they've filed.

63

1 And maybe -- and the issue about not property availing --

2 you know, making it available for market.  And when we'll --

3 it would be good to see what's happening in that respect,

4 so.

5        MR. POITRAS:  We would like to offer testimony on

6 those issues, both in terms of valuation and process.  I

7 don't it will take --

8        THE COURT:  Okay.

9        MR. POITRAS:  -- particularly long, but I think

10 it's critical to the case.

11        THE COURT:  Okay.  So that would be the 19th --

12 the 21st.

13        MR. POITRAS:  " The 21st."

14        MS. FAY:  Your Honor, Erin Fay for East West.  If

15 we're having valuation testimony, we either will need to

16 agree that it's only for the purposes of the present motion

17 or it will be a very long hearing.

18        THE COURT:  I would think it's only for the

19 purposes of the present motion.

20        MR. POITRAS:  That's fine, your Honor.

21        MS. FAY:  Okay.  Thank you.

22        THE COURT:  Okay.  Okay.  So, March 21st at 10:00.

23 So the answer.  We'll have to time to -- well, first of all,

24 we'll hear the testimony, right, if there's going to be

25 testimony about valuation.  We're going to get to see the

64

1   motion that -- the sale procedures motion, and that's going

2   to be set for hearing that day, right, on the notice that's

3   provided under the local rules.

4          MR. POITRAS:  Correct, your Honor.

5          THE COURT:  And -- and I guess to the extent --

6   well, if there's going -- more evidence, I guess there may

7   be more argument that would directed to the evidence that's

8   presented at the hearing, but not to the things that they've

9   already mentioned, right.  So anything that's been -- that's

10  the testimony or that -- the bidding procedures, okay.  And

11  maybe there will be more information about how STS'

12  employment applies to the FitLife bidding.

13         And I think it was interesting point about the

14  taxes.  Maybe that's something that the investment bankers

15  can talk about, is if the bidding -- how the bidding's

16  different based on whether it's through the plan or

17  otherwise, right?

18         MR. POITRAS:  Understood.

19         MS. FAY:  One more clarification, your Honor.

20         THE COURT:  Yes.

21         MS. FAY:  If it's an evidentiary hearing, do you

22  prefer that in person or by Zoom?

23         THE COURT:  Well, the Court's -- do people have a

24  preference?

25         MR. POITRAS:  The Debtors --

65

1          THE COURT:  You know, I always think about saving
2  money.  So I -- that's what -- you know, I think about terms
3  of saving money, but as long as people have good wi-fi and
4  we don't have to like -- then we can really get their
5  testimony.  But if other people feel uncomfortable with it
6  being remote, then we won't do that.
7          MR. POITRAS:  The Debtors have no objection to
8  Zoom, your Honor.
9          MR. GOLDEN:  I think remote is fine for witnesses
10  as well, your Honor.
11          MR. FEINSMITH:  Your Honor, I think we would
12  prefer to be in person.
13          THE COURT:  Do you mind if other people are remote
14  or do you want everybody to be in person?
15          MR. FEINSMITH:  I don't have an objection if
16  they're remote.
17          THE COURT:  Okay.  Well, we can do -- we have it
18  all set up for hybrid, so people can decide what's best for
19  them, right?  And we can have the people who are --
20  testimony remote, just maybe good to know ahead of time
21  who's going to be here and who's going to be remote.
22          MR. POITRAS:  We'll do that, your Honor.
23          THE COURT:  Okay.  And so by "ahead of time," I
24  mean like at least by -- by the 19th.
25          MR. POITRAS:  Yes, your Honor.

66

1           THE COURT:  Okay.  All right.  So that's it.  So
2  we'll see you then, or either remote or in person.  All
3  right.  Thank you very much.
4           MR. POITRAS:  Thank you very much, your Honor.
5           ALL PARTIES:  Thank you, your Honor.
6           THE COURT:  Court's adjourned.
7       (Proceeding concluded.)
8
9
10
11          I certify that the foregoing is a correct
12  transcript from the electronic sound recording of the
13  proceedings in the above-entitled matter.
14  /s/Jessica Reuter_____    3/7/25
    Transcriber                        Date
15
16  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
17
    /s/L.L. Francisco_____
18  L. L. Francisco, President
    Echo Reporting, Inc.
19
20
21
22
23
24
25

EXHIBIT 2

1                    UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              --oOo--

4  In Re:                       ) Case No. 1:24-bk-11323-VK
                                )
5  IRWIN NATURALS AND IRWIN     ) Chapter 11
   NATURALS, INC.,              )
6                               )
           Debtors.            ) Woodland Hills, California
7  _____) Friday, March 21, 2025
                                  10:00 a.m.
8
                                 EVIDENTIARY HEARING RE:
9                                CREDITOR FITLIFE BRANDS,
                                 INC.'S MOTION FOR AN ORDER (1)
10                               TERMINATING THE EXCLUSIVE
                                 PERIODS IN WHICH ONLY THE
11                               DEBTOR MAY FILE A PLAN AND
                                 SOLICIT ACCEPTANCES AND (II)
12                               PERMITTING FITLIFE BRANDS,
                                 INC. TO FILE AN ALTERNATIVE
13                               PLAN AND DISCLOSURE STATEMENT

14                               APPLICATION TO EMPLOY STS
                                 CAPITAL PARTNERS M&A ADVISERS,
15                               INC. AS INVESTMENT BANKER
                                 DEBTOR'S APPLICATION TO RETAIN
16                               AND EMPLOY STS CAPITAL
                                 PARTNERS M&A ADVISORS INC. AS
17                               INVESTMENT BANKER WITH RESPECT
                                 TO POTENTIAL EQUITY
18                               TRANSACTION EFFECTIVE AS OF
                                 JANUARY 31, 2025
19
                                 FIRST AMENDED DISCLOSURE
20                               STATEMENT HEARING DESCRIBING
                                 DEBTORS' CHAPTER 11 PLAN OF
21                               REORGANIZATION

22                               STATUS CONFERENCE RE: CHAPTER
                                 11 CASE
23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

ii

```
 1                              DEBTORS' MOTION FOR ENTRY OF
                               AN ORDER (A) APPROVING
 2                             PRELIMINARY BIDDING PROCEDURES
                               IN CONNECTION WITH SALE OF THE
 3                             DEBTORS' ASSETS, (B)
                               SCHEDULING HEARING TO CONSIDER
 4                             THE SALE, AND (C) APPROVING
                               FORM AND MANNER OF NOTICE
 5                             THEREOF

 6                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE VICTORIA KAUFMAN
 7                 UNITED STATES BANKRUPTCY JUDGE

 8  APPEARANCES:

 9  For the Debtors:          DAVID M. POITRAS, ESQ.
                              SUSAN K. SEFLIN, ESQ.
10                            JESSICA BAGDANOV, ESQ.
                              BG Law LLP
11                            21650 Oxnard Street, Suite 500
                              Woodland Hills, California
12                               91367
                              (818) 827-9115
13
     For FitLife Brands:       TODD A. FEINSMITH, ESQ.
14                            ArentFox Shiff, LLP
                              JAMES BRITTON, ESQ.
15                            800 Boylston Street
                              32nd Floor
16                            Boston, Massachusetts 02199
                              (617) 973-6100
17
                              SOPHIA R. WANG, ESQ.
18                            ArentFox Shiff, LLP
                              555 South Flower Street
19                            43rd Floor
                              Los Angeles, California 90071
20                            (213) 629-7400

21  For East West Bank:        ERIN FAY, ESQ.
                              DALE R. BISH, ESQ.
22                            Wilson, Sonsini, Goodrich &
                                 Rosati
23                            650 Page Mill Road
                              Palo Alto, California 94304
24                            (650) 804-4018

25
```

iii

1 | APPEARANCES:  (Cont'd.)

2 | For the Official Committee       JEFFREY I. GOLDEN, ESQ.
      of Unsecured Creditors:       Golden Goodrich, LLP
3 |                                  3070 Bristol Street, Suite 640
                                     Costa Mesa, California 92626
4 |                                  (714) 966-1000

5 | For Karled Enterprises:          MO KEBEH, ESQ.
                                     Allen Matkins
6 |                                  2010 Main Street, 8th Floor
                                     Irvine, California 92614
7 |                                  (949) 553-1313

8 | Court Recorder:                  J. Cetulio
                                     United States Bankruptcy Court
9 |                                  21041 Burbank Boulevard
                                     Woodland Hills, California
10 |                                  91367

11 | Transcriber:                    Jordan Keilty
                                     Echo Reporting, Inc.
12 |                                  9711 Cactus Street, Suite B
                                     Lakeside, California 92040
13 |                                  (858) 453-7590

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

iv

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Wayne Platt | -- | 4 | 43 | -- |
| Vince Willis | -- | 53 | 92 | 107 114 |
| Dayton Judd | 117 | 141 | -- | -- |

| EXHIBITS | | IDENTIFIED | IN EVIDENCE |
|---|---|---|---|
| 1 | Debtor's supplement to cash collateral motion | 5 | 5 |
| 2 | Platt Declaration | 54 | 54 |
| 3 | Judd Declaration | 216 | 216 |
| 4 | Platt Declaration | 6 | 6 |
| 6 | Comp Table | 124 | 126 |
| 7 | Performance Report | 128 | 130 |

1

1    WOODLAND HILLS, CALIFORNIA FRIDAY, MARCH 21, 2025 10:00 A.M.

2                        --oOo--

3        (Call to order of the Court.)

4            THE COURT:  Good morning.  This is Judge Kaufman.

5    Today we're hearing Irwin Naturals matters.

6            Do I have appearances, please?  Who wants to

7    start?  Shall we start -- why don't we start with Debtors'

8    counsel.

9            MS. SEFLIN (via Zoom):  Good morning, your Honor.

10   Susie Seflin, David Poitras and Jessica Bagdanov, on behalf

11   of the Debtors.

12           THE COURT:  Good morning.

13           And ho do we have for FitLife?

14           MR. FEINSMITH (via Zoom):  Good morning, your

15   Honor.  This is Todd Feinsmith from Arent Fox Gotlieb.  With

16   me from my firm are James Britton, Sophia Wang, my

17   colleagues, and also Dayton Judd, the CEO of FitLife is --

18   has joined as well.

19           THE COURT:  Good morning.

20           So, and then I see somebody from East West Bank?

21           MS. FAY (via Zoom):  Good morning, your Honor.

22   Erin Fay of Wilson, Sonsini, Goodrich and Rosati, along with

23   my partner, Dale Bish on behalf of East West as agent.

24           THE COURT:  And then someone for the Unsecured

25   Creditor's Committee?

*Echo Reporting, Inc.*

2

1          (No response.)

2                THE COURT:  Okay.  So, is anybody else going to

3    want to speak to the Court during the hearing?

4                MR. KEBEH (via Zoom):  Good morning, your Honor.

5    I better make my appearance.  This is Mo Kebeh on behalf of

6    Creditor Karled Enterprises.

7                THE COURT:  Okay.

8                MR. BISCONTI:  Your Honor -- and good morning,

9    your Honor.  This is Tony Bisconti of Bienert Katzman and

10   Littrell Williams, on behalf of interested party and

11   creditor Robinson Pharma, Inc.  We're just monitoring today.

12               MR. GOLDEN (via Zoom):  Your Honor, Jeffrey Golden

13   of Golden Goodrich on behalf of the Official Committee of

14   Unsecured Creditors.

15               THE COURT:  Okay.

16               MS. ANDRASSY (via Zoom):  Good morning, your

17   Honor.  Kyra Andrassy of Raines, Feldman, Littrell, for

18   Clever Irwin individually in his capacity as a shareholder.

19               THE COURT:  Okay.  All right.  So, how do people

20   want to start today?  We have -- we have -- do you want to

21   start with the exclusivity motion or anything else -- the

22   termination of exclusivity motion?

23          (No response.)

24               THE COURT:  Do people have a preference?

25               MR. POITRAS:  That's fine by us, your Honor.

3

1          THE COURT:  Alternatively, we could start with the

2   bidding procedures motion.  It's up to -- but maybe, what do

3   you think?

4        (No response.)

5          THE COURT:  Well, if there's no preference, then

6   why don't we start with the one that's involved witnesses,

7   in case they can then go.  Okay.  So, that's the exclusivity

8   -- the one about terminating exclusivity, correct?

9          MR. POITRAS:  Correct, your Honor.

10          THE COURT:  Okay.  So, I guess we're starting with

11   -- so, I guess FitLife is going to call its witnesses first,

12   correct?

13          MR. POITRAS:  Correct, your Honor.  And -- and our

14   direct testimony is in by declaration.  That was filed along

15   with the DIP procedures motion.  It also relates to -- these

16   are the valuation issues which we touched on at the last

17   hearing on determination of exclusivity motion, and they're

18   also relevant to the bid procedures in terms of the value we

19   believe will -- will drive, you know, what the timeline of

20   the a sale process might be.  So, with that, we would refer

21   to or submit Mr. Platt's declaration into evidence.  And, as

22   your Honor can see from that declaration, the main estimated

23   value conclusion of Mr. Platt is approximately $79 million.

24   That's as of November 2024.  And -- and his declaration goes

25   through his background and his methodology, and it was our

4

1 premise that this would be his direct testimony and that

2 counsel for FitLife and/or counsel for East West Bank who,

3 as set forth in the status report that we filed, reserved

4 the right to cross examine Mr. Platt.  And, so, we would

5 then open the floor to either of those counsel to cross

6 examine Mr. Platt on his declaration.

7          THE COURT:  So -- yes?

8          MR. FEINSMITH:  Yes, your Honor.  Todd Feinsmith

9 for FitLife.  We -- we would like to cross examine Mr. Platt

10 and are prepared to do so.

11          THE COURT:  Okay.  So, is Mr. Platt on by Zoom?

12          MR. PLATT:  I am, your Honor.  Here I am.

13          THE COURT:  Okay.  Hello.  Can you raise your

14 right hand.

15          WAYNE PLATT - DEBTOR'S WITNESS - SWORN

16          THE COURT:  Thank you.

17          So, who wants to cross?

18          MR. FEINSMITH:  We're happy to go first, your

19 Honor.

20          THE COURT:  Okay.

21          MR. FEINSMITH:  If you like.

22          THE COURT:  Yes.

23                   CROSS EXAMINATION

24 BY MR. FEINSMITH:

25 Q    Good morning, Mr. Platt.  My name is Todd Feinsmith.

5

1 I'm a lawyer at Arent Fox, and I represent the Debtor.

2      Mr. Platt, you conducted an initial valuation of the

3 Debtor's business in September of 2024, is that correct?

4 A    Correct.

5          MR. FEINSMITH:  Your Honor, we'd like to introduce

6 our Exhibit Number 1, which is the Debtor's supplement to

7 its cash collateral motion, and that document includes as

8 part of Exhibit 1 Mr. Platt's declaration.

9          THE COURT:  Okay.  So, I guess we'll be admitting

10 that.

11 BY MR. FEINSMITH:

12 Q    Mr. Platt, do you have that document in front of you?

13 A    I do not.

14 Q    You do not?  Okay.  At the time that you did that

15 valuation, you conclude that the fair market value of the

16 Debtor's business was approximately $100 million, with a

17 range of 93.7 million on the low end and 112 million on the

18 high end.  Is that correct?

19 A    That sounds correct, yes.

20 Q    Okay.  What revenue estimates did you use for your

21 valuation?

22 A    So, I -- I don't have it in front of me.  I -- the --

23 the most recent version that we looked at had a revenue

24 estimate -- I'm going from memory -- of approximately 73 or

25 74 million.  But without having it in front of me, I can't

6

1 answer that 100 percent accurately.  Going back to that

2 original valuation, I don't recall.  And you showed -- if

3 you --

4 Q    Where -- where did those revenue estimates come from?

5 Were they given to Yoo by the Debtor?

6 A    Yes, they were.

7 Q    They were.  Okay.

8        MR. FEINSMITH:  Your Honor, I'd like to admit into

9 evidence Exhibit 4, our Exhibit Number 4, which is Mr.

10 Platt's declaration in support of the bidding procedures

11 which the Debtor is seeking to approve today.

12       THE COURT:  Okay.  Submit that.  That's on the

13 docket as 424.  And the first exhibit is on the docket as

14 Number 91.  Okay.

15 BY MR. FEINSMITH:

16 Q    Okay.  I'd like to walk through the revenue estimates

17 with Mr. Platt -- with Mr. Platt, and I -- I realize you

18 don't have this document in front of you, but the Court does

19 I believe.  And, so -- so, I think that that, you know,

20 should be sufficient for our purposes.

21       MR. FEINSMITH:  Your Honor, I would refer to --

22 back to Exhibit 1, and if you look at Exhibit 1, page 31 of

23 Exhibit 1 -- and the page numbers on the exhibit are in the

24 bottom right-hand corner of the page.  So, the entire

25 exhibit is set up numerically.

7

1          THE COURT:  Okay.

2   BY MR. FEINSMITH:

3   Q    So, Mr. Platt, for 2024, the revenue estimate that you

4   used for this valuation was $71.7 million.  Do you recall

5   that?

6   A    That sounds vaguely familiar, but I don't have it in

7   front of me.  And, just to clarify, you're referring to the

8   valuation conclusion at $100 million, not the updated one at

9   979?

10  Q    That -- that's correct.  That's correct.

11  A    Okay.  Yeah.  I don't recall the specifics of that --

12  that older valuation.

13  Q    Okay.  Well, to -- I -- I will tell you what -- what it

14  says then in the document that's attached to your -- in the

15  valuation that's attached to your declaration.

16        In 2025, the revenue figure was $79.5 million.  In

17  2026, the revenue number -- revenue projection was 87.4

18  million.  And in 2027, it was 96.2 million.

19          MR. FEINSMITH:  And those are all reflected, your

20  Honor, in Exhibit 1 -- page 31 of Exhibit 1.  Your Honor has

21  that exhibit in front --

22          THE COURT:  Yes.

23          MR. FEINSMITH:  -- of her.

24          THE COURT:  I do.

25  //

8

1  BY MR. FEINSMITH:

2  Q    So, Mr. Platt, two months after that, you produced the

3  second valuation, is that correct?

4  A    Correct.  Todd, you've gone on mute.

5  Q    I'm sorry about that.  And that -- that valuation is

6  appended to your declaration that we've attached as Exhibit

7  4, and that's dated -- that declaration is dated March 14th,

8  2025.  Now, even though that declaration was filed in March

9  of 2025, it's based on and it appends a valuation that you

10 did in November 2024 which, again, is only two months after

11 the original valuation.  Is that correct?

12 A    Correct.

13 Q    And in that November 12th valuation, you dramatically

14 reduced your valuation of the Debtor.  Is that correct?

15 A    We reduced the valuation, yes.

16 Q    Okay.  The new valuation, in fact, was 79 million with

17 a low end of 71.8 million and a high end of 86.8 million.

18 Do you recall that?

19 A    Yes, I do.

20        MR. FEINSMITH:  And for your Honor's purposes,

21 that information is in Exhibit 4, Mr. Platt's declaration,

22 paragraph 16, which is entitled "Updated Enterprise

23 Valuation".

24        THE COURT:  Yes.  Thank you.

25 //

9

1  BY MR. FEINSMITH:

2  Q    So, Mr. Platt, this is a $21 million downward

3  adjustment, 20 -- a 21 percent change from the original

4  valuation after only two months.  Why is that?

5  A    I believe the reason -- I believe -- again, I don't

6  have it in front of me, and I wasn't focusing on that older

7  valuation, but I recall we may have been using a management

8  case projection -- excuse me -- from the original -- the

9  original analysis, and then I believe we used a base case

10 projection for the second analysis, and we relied on the

11 base case one that was more conservative.

12 Q    So, to put it in a little bit more simple terms, is --

13 is it the case that the Debtor adjusted its revenue

14 estimates and that's what triggered the change in the

15 valuation?

16 A    That's not what I'm saying, no.  I believe there were

17 different cases -- different projection cases.  There was a

18 management case, and there was a base case, and there were

19 different assumptions made as to the revenue projection and

20 the management case relative to the base case.  We used the

21 base case, and it was the lower projection, and we were

22 being conservative.

23 Q    Do you recall if the Debtor adjusted its revenue

24 estimates?

25 A    I don't recall if there was an -- when you're comparing

10

1  apples to apples, if you're comparing the management case to

2  the management case or the base case to the base case

3  between the two dates, I don't recall if there was a

4  difference on an apples-to-apples basis.

5  Q    Okay.  Well, let me refresh your recollection.

6        MR. FEINSMITH:  So, I'm going to refer, your

7  Honor, to Exhibit Number 4, and this is the Platt valuation

8  that's attached to Mr. Platt's declaration, and I'm going to

9  refer specifically to page 29 of Exhibit 4.  And, again,

10  that's 29, the -- the numbered page that is sequential in --

11  in this -- in this exhibit.  And -- and the heading on that

12  page, just so it's clear for your Honor, it says in the

13  upper left-hand column, "Royalty Model Irwin Naturals Brand

14  Valuation".

15  BY MR. FEINSMITH:

16  Q    So, these are the Debtor's revenue estimates that were

17  appended to your valuation, and what they say is -- and I

18  know you don't have it in front of you, Mr. -- Mr. Platt.

19  So, I'll read it, but your Honor can see it, is that in

20  2024, the projected revenue was 70.2 million.  In 2025, it

21  was 73.4 million.  2026 was projected to be 75.9 million,

22  and in 2027, 78.4 million.

23      So, in fact, these estimates were dramatically lower

24  than those you utilized only two months earlier.  For

25  example, the estimate for 2027 declined from 96.2 million to

11

1  78.4 million.  Is that correct?

2  A    Again, without refreshing what I did back in the -- the

3  original valuation, it's my understanding that the original

4  valuation was using a -- a management case set of

5  projections, and the updated valuation was using a base

6  case.  So, you're comparing -- I believe you're comparing

7  apples to oranges because the -- the base case was always

8  lower than the management case, and in our updated

9  valuation, we relied on the base case.

10 Q    But -- but it is -- it is true, is it not, that after

11 only two months, the Debtor dramatically changed its revenue

12 estimate?

13 A    That's not what I'm saying.

14 Q    Isn't that true?

15 A    I'm saying we used --

16 Q    But I'm asking you if that's true.

17 A    I don't know what their internal revenue estimates are.

18 What I'm trying to tell you is that in the original

19 valuation, I believe we relied on management case

20 projections, and in the -- in the updated valuation, I

21 believe we relied on base case projections.  There were

22 different assumptions that went into each of those cases.

23 So, the base case had a certain level of assumption.  The

24 management case had a different level of assumptions.  I --

25 if you were to compare the 2027 management case projection

12

1  two months ago to the management case projections two months

2  later, I don't know if there's a decline or not.  And the

3  decline you're referring to is -- is comparing apples to

4  oranges.

5  Q    Well, you -- you did, in fact, know what those

6  projections are because they're appended to your -- to your

7  affidavit, for part of your valuation?

8  A    Correct.  One is a base case --

9  Q    We just walked -- we just walked through that.

10 A    Right.  One was a management case.  One is a base case.

11 They're different -- they're prepared on different bases.

12 It doesn't mean that one -- it doesn't mean that they are

13 projecting a decrease in performance.  I'm not attesting to

14 that at all.  I'm just saying the projections from the

15 original valuation were based on one set of assumptions, and

16 there was a set of assumptions at the time.  It wasn't a

17 base a case at the time.  So, we used the management case.

18 As of the updated valuation date, we decided more

19 conservatively to go with the base case projections.

20     So, comparing 96 million on a management case to the 78

21 million on a base case is not apples to apples.

22 Q    Mr. Platt, have you read the Debtor's disclosure

23 statement, the second amended disclosure statement?

24 A    I don't recall.

25 Q    Okay.  Would you have reason to be familiar with the

13

1  projections that were included in that document?

2  A    It would depend when they were prepared and for what

3  purpose and if they were shared with me.

4  Q    Okay.  The Debtor's amended disclosure statement was

5  filed in February of 2025.  And -- and in that document --

6  and this is not an exhibit, but it is in the court records

7  because it's a publically filed document.  It's at Docket

8  Number 338 for your Honor's purposes.  And I refer to page

9  80 of 88 of that document, the amended -- the second amended

10  disclosure statement.

11      As it turns out, the 2024  revenue number was 30 -- was

12  $66.1 million, and then the forward looking projections that

13  were included as part of the disclosure statement, for 2025,

14  it was 66.9 million, 2026 it was 67 million, and 2027 it was

15  67.1 million.

16      So, we have, it appears, a decline in the revenue

17  projections in a very short period of time from -- for 2027,

18  for example, from 96.2 million in the first valuation, then

19  two months later to 78.4 million, and then in February, only

20  a few months after that, down to 67 million.

21          MS. BAGDANOV:  Objection, your Honor.  Is there a

22  question pending or if we can have a document shown to the

23  witness?

24  BY MR. FEINSMITH:

25  Q    My question is are you aware of that, Mr. Platt?

14

1  A    Our analysis -- our second analysis, if you will, was

2  done in roughly November.  So, if there were projections

3  that came out subsequent to that, I don't believe I would

4  have seen them.

5       I do want to just correct one thing you said because

6  you restated this a number of times.  You're saying there's

7  a decline in the revenue from 96.2 million to two months

8  later 78.4 million.  I'm not sure that you're comparing

9  apples to apples.  And, so, I cannot say as to whether that

10 is a true statement you're making.  But I do raise the

11 question as to whether you're comparing a management case

12 projections to a set of base case projections.  As to the

13 February numbers, I don't recall having seen those or

14 including them in our analysis.

15 Q    Do you think, Mr. Platt, that the revenue projections

16 provided to you by the Debtor to do your valuations were

17 accurate projections?

18 A    Well, a projection can never be accurate.  A projection

19 is an estimate on what you expect to happen in the future.

20 So, I can't answer that question.

21 Q    Do you -- do you think that they were reasonable?

22 A    I believe the projections we were given were

23 reasonable.  I think they assumed a fairly nominal growth

24 from 25 onwards in the -- from memory -- I don't have it in

25 front of me -- of three to five percent, which is quite

15

1 reasonable.

2 Q    And did they -- with the benefit of hindsight, did

3 they, in fact, turn out to be accurate?

4 A    Well, we haven't hit '25 or '26 or '27 yet.  So, we

5 don't know.

6 Q    For '24?

7 A    I don't know what the full year 2024 came in at.

8 Q    Have -- have you had occasion to revise your valuation

9 more recently than November 2024?

10 A    No.

11 Q    But you may have said you haven't, is that correct?

12 A    We have not.

13 Q    Okay.  Would you expect that a valuation of the Debtor

14 now, if you were to do one, would be higher or lower than in

15 November 2024?

16 A    There's no way of knowing without doing an analysis.  A

17 valuation depends on many factors.  One is actual

18 performance.  One is the outlook for the industry.  One is

19 the public markets.  One is, you know, historical

20 transactions that have happened.  Without analyzing all of

21 those together, it's -- it's not possible to determine that.

22 You cannot look at one aspect and just pick 2024 actual and

23 say because they were lower than -- than projected, that

24 value's gone down.  It's possible that, you know, many

25 factors could have caused a -- a decrease in one factor.

16

1  That doesn't impact overall valuation.

2  Q    What is your assessment of the impact of the current

3  presidential administration's tariffs on the Debtor's value?

4         MR. POITRAS:  Objection, your Honor.  Outside the

5  scope of the direct testimony.

6         MR. FEINSMITH:  Your Honor, this goes directly to

7  valuation.

8      (Pause.)

9         MR. FEINSMITH:  I'm sorry.  Was there a ruling?

10        THE COURT:  Overrule -- overrule the objection.

11  BY MR. FEINSMITH:

12  Q    Okay.  You may answer.

13  A    Can you repeat the question?

14  Q    Yes.  What is your assessment of the impact of the

15  current presidential administration's tariffs on the value

16  of the Debtor?

17  A    If I could answer that, I'd be a billionaire, and I

18  wouldn't be here.  I don't think we can tell.  We all know

19  what the political environment is like and that tariffs

20  could be harmful in the short term and beneficial in the

21  long term.  You know, I don't believe there's any way to

22  assess that at the moment.

23  Q    Do you -- do you think it's more likely than not that

24  the Debtor's value would increase or decrease?

25  A    I cannot comment on that.

17

1 Q    In the last several weeks, the equity markets in the

2 U.S. have dropped significantly.  Would you expect that

3 those changes have -- would have a positive or negative

4 affect on the company's valuation?

5 A    Again, you cannot look at one set of events or one fact

6 set and say that's determinative of a directional change in

7 value.  It also depends on the industry.  It depends on the

8 niche focus of the industry.

9      So -- so, again, I cannot -- I cannot draw any

10 conclusions from that.

11 Q    In your September 2024 valuation, you performed a

12 market multiple approach in your valuation.  Is that

13 correct?

14 A    Correct.

15      MR. FEINSMITH:  Your Honor, I'd like to refer to

16 Exhibit 1, and I'm -- I'm going to refer specifically to

17 page -- pages six and seven of 21.  And, in fact, if your

18 Honor's going by the -- if your Honor's going by the -- by

19 the tab that we --

20      THE WITNESS:  Todd, you went mute again.

21      (Pause.)

22      MR. FEINSMITH:  I'm sorry about that.  If your

23 Honor is going by the tab that we've used, to track the page

24 that was in the exhibit, it's actually page 19 of Exhibit

25 1 --

18

1          THE COURT:  Okay.

2          MR. FEINSMITH:  -- as it appears in the bottom

3   right-hand corner of the page.

4          THE COURT:  Yes.  Thank you.

5   BY MR. FEINSMITH:

6   Q    So, Mr. Platt, you specifically used a revenue multiple

7   of .8 to 1.0.  Do you recall that?

8   A    Again, you're talking about the original valuation, the

9   $100 million valuation?

10  Q    That's -- that's correct.

11  A    That sounds correct, yes.  Again, I don't have it in

12  front of me, but if you're reading my report, I would agree

13  to it, yes.

14  Q    Okay.  Thank you.  What data points did you consider to

15  determine that that multiple was appropriate?

16  A    So, whenever we do an analysis, be it an EBITDA

17  multiple or revenue multiple or any other multiple that

18  we -- that we would consider under any circumstance, we look

19  at a group of comparable companies that we deem comparable.

20  And -- and the way to identify what companies are comparable

21  is go -- go to the different data aggregators like CapIQ and

22  Pitchbook and -- and identify comparable companies and see

23  what multiple these comparable companies are trading at.

24       We then try and do some other risk assessment looking

25  at the company being valued relative to the public

19

1  companies.  And there are many factors that come into play.

2  There's size.  There's profitability, and there's growth.

3  There are how many -- many different factors.  And

4  ultimately we're looking for public companies, and we say if

5  they're trading at X, do we think we're a greater risk or a

6  lesser risk.  If we're a greater risk, then we would apply a

7  risk adjustment multiple to our company being valued based

8  on what the public companies are showing, so that eight to

9  one midpoint of point nine would be reflective of what

10 discount we felt was relevant to the public company median

11 multiple.

12 Q    And you -- and you use the same approach to derive your

13 EBITDA multiple, I assume --

14 A    Correct.

15 Q    -- is that correct?

16 A    Correct.

17 Q    Okay.  And, for the record -- and this is for your

18 Honor's benefit -- on that same page 19, there also is a

19 reference to the EBITDA multiple that was used.  This is

20 under the heading of the column Current Fiscal Year.  You

21 can see the revenue line item, and the -- and the revenue

22 multiple that I mentioned a minute ago and then the EBITDA

23 multiple, and the EBITDA multiple that you used, Mr. Platt

24 was 6.0 to 8.0.  Does that sound correct to you?

25 A    It does.

20

1  Q    Okay.  When you -- well, I -- okay.  When you updated

2  your valuation in November 2024, you used different revenue

3  projections to arrive at those multiples, is that correct?

4  A    We used, I believe, a base case compared to originally

5  what would have been a management case.

6  Q    And -- and when you did that updated valuation, you

7  actually arrived at a lower revenue multiple which was in

8  the range of .7 to .9.  Do you recall that?

9  A    I do.

10        MR. FEINSMITH:  Okay.  And for -- for your Honor's

11 benefit, I refer to Exhibit 4 of the Platt valuation, and

12 that is in -- in the -- in the documents themselves, it's

13 page seven of 21.  And if you're following along based on

14 our tab -- tab on the document in the bottom right, it's

15 page 4 of 17.

16        MS. BAGDANOV:  Counsel, excuse me.  Do you mean

17 Exhibit 4, page 17 at the bottom right-hand corner?

18        MR. FEINSMITH:  That's exactly right, Exhibit 4,

19 page 17.

20        MS. BAGDANOV:  Thank you.

21        MR. FEINSMITH:  Sorry if I misspoke.

22 BY MR. FEINSMITH:

23 Q    So, can you explain why you used a lower multiple in

24 this valuation?

25 A    I would have to see.  It would have been based on an

21

1  updated conversation when the company would have been based

2  on an updated analysis of the public multiples and an

3  updated analysis based on outlook.  It would have been a

4  function of all those three things and maybe some other

5  factors that would have changed between the different dates.

6        MS. BAGDANOV:  And I'm going to object based on

7  misstates the document as to revenue multiples or EBITDA

8  multiples, Counsel.

9        MR. FEINSMITH:  I'm talking about the revenue

10 multiples right now.

11       MS. BAGDANOV:  Thank you.

12 BY MR. FEINSMITH:

13 Q    The -- the EBITDA multiples, as you mention it, that --

14 that multiple actually stayed the same in both valuations.

15 Do you recall that?

16 A    I -- I do now.  And those do make sense, yes.

17 Q    Okay.  And how is it?  How did it stay the same,

18 particularly in light of the fact that the revenue

19 projections changed dramatically?  And I know that you --

20 A    That --

21 Q    -- you testified about the difference between the base

22 case and so forth, but please explain that.

23 A    So, there was a correlation between profitability i.e.

24 margins, and the revenue multiple.  And, so, if margins come

25 down, an argument could -- can be made that you should apply

22

1 a low revenue multiple.  And what I mean by that, let's

2 assume you have two companies and they're identical, but one

3 company for every $100 of revenue it makes, it sells, it

4 makes $20 in -- in profit.  And company B, for every $100 it

5 sells, makes $10 in profit.  So, the margins in company one

6 are twice that of company two.  So, therefore, every dollar

7 of revenue of company one, you can argue is more valuable

8 than a dollar of revenue of company two.  So, you'd pay a

9 higher multiple.

10      So, there is a relationship between margins and revenue

11 multiple.  And there are many -- it's not linear, but there

12 are many factors that go into consideration.  Without

13 looking at the 20 -- the original September valuation, I

14 would assess that we reduced that revenue multiple slightly

15 because the margins came down slightly because we were now

16 looking at a base case as opposed to a management case that

17 had higher margins.  I would imagine that would be the

18 reason for the -- the decline in the -- the slight decline

19 in the selected revenue multiple.

20 Q    You may recall that a few minutes ago I mentioned the

21 Debtor's second amended disclosure statement that was filed

22 in February, and I referred the Court to that document, and

23 in that document, it indicated that the revenue for 2024 was

24 actually $66.1 million.  Would that -- would that cause you

25 to lower the revenue multiple that you used in valuing the

23

1  Debtor?

2  A     Not necessarily.  It would depend on many things.

3  Q     Like what?

4  A     Well, what are the projections?  Has there been a

5  change in the projections?  Is there a change in market

6  multiples?  Have they introduced new products that are going

7  to come in in the future?  There's so many other factors

8  that go into play.  So, if your question is would we reduce

9  the revenue multiple because revenues are lower, the answer

10 not simply based on that factor, no.

11 Q     If -- if the projections were also lower, the future

12 looking projections, if those were lower, would that

13 negatively affect your valuation?

14 A     Not necessarily, because these companies trade at

15 certain multiples.  If your revenue is lower and your EBITDA

16 is lower, you would -- the multiple doesn't necessarily

17 change because one comes down.  In other words, here's a

18 little primer, though.  If you're ever -- if your

19 profitability remains the same but the actual numbers -- if

20 you make $10 on $100 or $5 on $50, your margins are the

21 same, but in one case you're doing 50 million in revenue.

22 In another, you're doing 5 million in revenue.  So, the

23 multiples apply to a lower -- to a lower level.

24       But it's possible there are situations when lower

25 numbers lead to a higher multiple because you're looking to

24

1 the future.  So, I cannot answer that in a vacuum.

2 Q    I want to refer now to Exhibit 7, and I know you don't

3 have this document in front of you, Mr. Platt.  But for your

4 Honor's benefit, this -- this is a document that was

5 prepared by FitLife.  The foundation will be laid for it

6 when Mr. Judd testifies but the piece of information that

7 I'd like to refer to for purposes of asking Mr. Platt a

8 question is in the upper left-hand corner of that document,

9 Net Revenue.  These are the actual revenue figures of --

10        MS. BAGDANOV:  Counsel, I'm going to object.  I

11 object, your Honor, just to reserve the Debtor's objection

12 to the admissibility of this document.

13        MR. FEINSMITH:  And that's fine, your Honor.

14 We're -- we're using this for discussion purposes for now,

15 and --

16        THE COURT:  Okay.

17        MR. FEINSMITH:  -- it will -- it will be admitted

18 into evidence, if at all, based on the foundation that Mr.

19 Judd lays for it when he testifies.

20        THE COURT:  Okay.  Thank you.

21 BY MR. FEINSMITH:

22 Q    So, the -- the information that's relevant in this

23 document, again, in the upper left-hand corner, are the

24 actual revenue numbers of the Debtor which in 2021 was $103

25 -- $100.3 million --

25

1 A    Is there any way -- I'm sorry.  Can we make that screen

2 a little bigger so I can -- maybe one more, a couple.  Yeah,

3 perfect.  Okay.  Great.

4 Q    Okay.  Great.  So, you can see there in 2021, it's

5 $100.3 million.  Then it decreased in 2022 to 87.5, then in

6 2023, 71.4 and then 66.1 in 2024.

7          MS. BAGDANOV:  Objection to the characterization

8 that these are the true numbers.  Just to instruct the

9 witness to, I guess, assume that counsel is correct.

10          MR. FEINSMITH:  Okay.

11 BY MR. FEINSMITH:

12 Q    What revenue multiple and EBITDA multiple, Mr. Platt,

13 would you consider to be reasonable for a nutritional

14 supplement company where revenue has declined by this?  And

15 if you do the math, it's a -- it's an average decline of

16 about 13 percent per year for three years.

17          MS. BAGDANOV:  Objection.  Calls for speculation.

18          MR. FEINSMITH:  Well, your Honor, this is a -- you

19 know, a customary thing that a valuation expert would have

20 to analyze --

21          THE COURT:  Overrule the objection --

22          MR. FEINSMITH:  -- if they're defining revenue.

23          THE COURT:  -- in this context.

24          MR. FEINSMITH:  I'm sorry.  I didn't hear.

25          THE COURT:  Overruling the objection.

26

1  BY MR. FEINSMITH:

2  Q    Okay.  You may answer, Mr. Platt.  Thank you.

3  A    Okay.  Can you repeat the question?

4  Q    The question is where you have a decline in revenue

5  like this which, if you do the math, amounts to a 13 percent

6  average decline three years in a row, what revenue multiple

7  and EBITDA multiple would you consider to be reasonable to

8  apply to a nutritional supplement company?

9  A    So, that -- that question cannot really be answered

10  from the snapshot you've given me because it depends on so

11  many other things.  I can make a general statement that the

12  multiples don't necessarily -- as I just stated previously,

13  the multiples don't in a vacuum change simply because

14  revenue goes up or down.  The multiples might be the same,

15  but they would apply to a lower number.  So, the revenue

16  multiple, assuming in the theoretical, which we haven't

17  done, but if we were to apply a multiple in 2024 six to

18  eight times, which is what we used for 2025, we could have

19  used a value -- we could have used -- applied that same

20  multiple to 2021.  So, we could say in 2021 the value using

21  six to eight million -- a six to eight times EBITDA or a .8

22  to one times revenue would have valued the company at $100

23  million back then and using the same multiple now would be

24  66 million.  So, the multiple itself doesn't necessarily

25  change just because the revenue declined.  The numbers to

27

1 which it applies to obviously are different.

2 Q    When you did your valuations -- well, let's say your

3 November valuation, your November 2024 valuation, did you

4 arrive at the multiples you did based on expected increasing

5 revenues or declining revenues?

6 A    We looked at the projections per the valuation analyses

7 you have, and we applied them to 2025 projection --

8 projections.

9 Q    So -- so, you -- so, you were basing it on an

10 expectation that there would be increasing revenues, not

11 declining revenues?

12 A    Correct.  Correct.  We applied a -- we applied a risk

13 adjustment multiple to the 2025  projection, which takes

14 into consideration it doesn't guarantee the 2025 numbers are

15 in place.  If we could say these numbers are guaranteed, the

16 multiple would be higher.

17    We applied a risk adjustment multiple that says, All

18 right, they're projecting a higher increase.  Let's look at

19 the company overall and look at the way the businesses

20 perform.  So, well, we don't know that it's a guarantee

21 they're going to go up.  So, we apply risk adjustment

22 multiple.  We believe the multiple we pick accurately

23 reflects the risk in achieving those projections.

24 Q    So, now with the knowledge that, in fact, revenues have

25 been declining as a trend, wouldn't it be more appropriate

28

1  to reduce those multiples rather than --

2          MS. BAGDANOV:  Objection.  Documents in the

3  testimony.

4          MR. FEINSMITH:  Your Honor, it's a theoretical

5  question.

6          THE COURT:  All right.  We're assuming that that

7  these are the right numbers right now.  So, we're -- and

8  we're assuming that the numbers went down, right?  Would you

9  have a different risk adjusted multiple -- would you have a

10 different risk adjustment for the multiple?

11         THE WITNESS:  So, as I've mentioned I believe

12 three or four times to Mr. Feinsmith, the multiple doesn't

13 change just because the revenue declines or the EBITDA

14 declines.  The multiple may or may not change, but the

15 multiple applies to a certain type of company.  If the mult

16 -- if the company does 2 million in EBITDA or 10 million in

17 EBITDA, it doesn't mean you have a different multiple.  It

18 just means one company is going to be worth five times more

19 than the other because -- yeah, because its revenue or

20 EBITDA's five times more.

21    So, you don't change -- the point I'm trying to make is

22 the multiple doesn't necessarily come down because the

23 revenues have come down over time.

24         THE COURT:  I thought the risk adjustment --

25         THE WITNESS:  EBITDA is coming --

29

1          THE COURT:  -- would change?  The risk adjustment

2   doesn't change?

3          THE WITNESS:  Well, the risk adjustment is really

4   forward looking because we're looking at the 2025

5   projections.  So, we look at the -- well, yeah, there've

6   been problems and they've been in -- and they've been in

7   bankruptcy, and there might be some issues with that, but

8   what does the core business look like going forward?  The

9   company is getting a -- an expectation that it should be

10  increasing over time.  And, so, we look at that, and then we

11  apply a risk adjustment multiple to the projection, and that

12  risk adjustment multiple takes into consideration the

13  historical performance.

14  BY MR. FEINSMITH:

15  Q    So, is it fair to say that the company was forecasting

16  growth at the time that you did those valuations, the

17  November valuation let's say?

18  A    Correct.  The company was -- the projections we were

19  provided with showed an increase in revenue for 2025 through

20  2027 and -- and through the forecast period.

21  Q    Do you recall what the rate of growth was roughly?

22  A    I believe it was in the three to five percent, without

23  having it in front of me, but I -- I believe it was in the

24  -- I believe it was in the three to five percent range, as

25  well as --

30

1      (Zoom glitch.)

2           MR. FEINSMITH:  Your Honor, I'd like to refer

3   again to the Debtor's second amended disclosure statement

4   which, again, is Docket Number 338, and, again, page 80 of

5   88.  And I know this document isn't in evidence, but it's in

6   the court filing.  I know Mr. Platt doesn't have it in front

7   of him, but I'm going to say what it says, and that is that

8   in that document, the Debtor projected the following

9   revenue.  In 2024, which was actually an actual revenue

10  number, it was 66.1 million.  In 2025, it was 66 point -- it

11  was projected to be 66.9 million, and in 2026, it was

12  projected -- it's projected to be 67 million.

13          If you do the math, that's a very low rate of

14  growth.  It's only half of a percent, 0.5 percent.

15  BY MR. FEINSMITH:

16  Q    I heard you say a minute ago, Mr. Platt, that when you

17  did your valuation, the projections as to revenue growth

18  were in the three to five percent range.  Is that correct?

19  A    I -- I said from my recollection, that's what it was,

20  yes.

21  Q    So, if the Debtor is now projecting only a half a

22  percent of grown, how would that affect the valuations, the

23  valuation that you did?

24  A    Well, my first question would be is this a -- is this a

25  -- is this an optimistic, pessimistic, or a base case set of

31

1  projections.  So, I -- I don't know that.  I -- you know,

2  just in a vacuum, our multiples probably wouldn't change.

3  But, again, it would apply to a lower number.  So, we keep

4  this -- so, in this theoretical world we're talking about,

5  if your 2025 projection is 66.9, we would apply the same

6  multiple that I think you said was .7 to .9.  So, it would

7  keep -- the multiple would probably remain unchanged for

8  that slight difference, but it would apply to a low number.

9  So, value would come down, you know, a smidgeon.  So, if we

10  were at -- if we were looking at for 2025 73 million and now

11  we're looking at a value of 70 million, that's a delta -- or

12  67 million, that's a delta of roughly 6 million.  That would

13  imply value might decline by .8 times 5 million or 6

14  million, roughly 5 million dollars, in this theoretical

15  world.

16  Q    So, it -- it would be less?  The value -- if you were

17  to do the valuation today based on these numbers, it would

18  be less?

19  A    If you were to tell me do the analysis, don't change

20  anything else, just assume the rest of the world remains

21  unchanged but these numbers are lower, the value would be

22  down slightly.  But, again, you can quantify that by saying

23  what was the multiple and on a revenue basis, we were

24  looking at .7 to .9, and you'd pick a midpoint of .8.  We'd

25  say .8 times the decline in revenue of 7 -- of 6 -- 6

32

1   million roughly.  So, 80 percent of 6 million, call it

2   roughly 5 million would be the decline.

3   Q    So, do you think, Mr. Platt, that your November 2024

4   valuation reflects the current true value -- true fair

5   market value of the company?

6   A    As I said up front, without doing a fair analysis, I

7   can't answer that.

8   Q    Considering, Mr. Platt, that the revenue and EBITDA

9   projections -- well, let's -- let me back up.

10       Considering the factors that we just discussed and the

11  tariffs and the turmoil in the market, do you think that the

12  value that you were -- that you -- that you arrived at in

13  November 2024 accurately reflects the value of the Debtor

14  today?

15       MS. BAGDANOV:  Objection.  If you know.  It calls

16  for speculation to a certain degree.

17       THE WITNESS:  There's no --

18       MR. FEINSMITH:  Your Honor, a valuation is

19  inherently speculative.  So, I think he can answer.

20       THE COURT:  I will overrule the objection.

21  BY MR. FEINSMITH:

22  Q    You may answer, Mr. Platt.

23  A    I'm sorry.  Repeat the question, just to make sure I'm

24  addressing the question.

25  Q    Yes.  Yes.  In light of the fact -- in light of what we

33

1  just discussed about the -- the lower growth rate relative

2  to the growth rate that you were utilizing when you did your

3  November valuation, coupled with the fact that there are now

4  significant tariffs in the marketplace and also turmoil

5  generated in the market, do you think that your November

6  2024 valuation accurately reflects the value of the Debtor

7  today?

8  A    So, there's no way to determine the impact of the

9  tariffs.  As I said previously, they could have a negative

10 or positive value on the company once the dust settles.

11 Some of this information might also have been in the public

12 domain, you know, after the election with the anticipation

13 of what might happen.  So, some of that might have been

14 there.

15      If you -- getting into more the specifics, if you're

16 telling me your 2025 projection are now 67 million of

17 revenue as opposed to 73 million, I believe that's a very

18 slight change.  And, so, if that's the only thing we're

19 looking at, I would say the valuation range that we came up

20 with is still appropriate, yes.

21 Q    Because you've described there being so many variables

22 in the valuation, can you express with confidence any

23 opinion on the fair market value of the Debtor today?

24 A    I can express with strong confidence the fair market

25 value that we predicted at the time we did our analysis

34

1  being in a range of roughly 72 to 86 million.

2  Q    But how about today?

3  A    We haven't done that updated analysis today.  So, I

4  cannot comment because we haven't done an analysis.  If you

5  told me the only change from my previous analysis to the

6  current analysis is the fact that revenue is down by $6

7  million, then I can firmly say that -- strongly say that,

8  yes, I believe the value remains in that same range.

9         MR. FEINSMITH:  Your Honor, I have no more

10 questions.  Thank you.

11     Thank you, Mr. Platt.

12         THE WITNESS:  Thank you.

13         THE COURT:  Okay.

14         MS. FAY:  Good afternoon, your Honor.  Again, Erin

15 Fay of Wilson Sonsini on behalf of East West.  I have just a

16 few questions if that's all right.

17         THE COURT:  Okay.  Thank you.

18                FURTHER CROSS EXAMINATION

19 BY MS. FAY:

20 Q    Hello, Mr. Platt.  Nice to meet you.

21 A    Hi.

22 Q    I represent East Bank as agent in this matter.  And my

23 questions will be much more abbreviated than Mr.

24 Feinsmith's.

25     My first question is do you have any experience in

35

1  constructing a sale timeline in a Chapter 11 case?

2  A    So, I've been dealing with, you know, sales of

3  companies for 35 years.  There are always nuances when the

4  courts are involved.  So -- so, I couldn't give you a

5  specific.  I can say that generally when you're looking to

6  sell a company, it's a 3 to 12-month process in my

7  experience.  It typically takes a little longer than three

8  months.

9  Q    But do you have a view on -- based on work that you've

10  done for a company as a banker or selling assets on what a

11  typical sales process would look like in a Chapter 11 case?

12  A    Not recently.

13  Q    Now, you were retained or, rather, your firm was

14  retained on August 28th, 2024.  Does that sound right?

15  A    It does.

16  Q    And if I represented to you that that was a Thursday,

17  would you have any reason to disagree with that or any

18  recollection of -- I'm sorry -- a Wednesday -- of what day

19  this matter plopped on your lap?

20  A    I would have no reason to question that.

21  Q    And your -- your valuation is dated September 3rd.  Is

22  that right?

23      (Zoom glitch.)

24  A    If that's what it is, that's what it is.  Okay.

25  Q    Okay.  And that is six days after you were retained,

36

1  correct?

2  A      From the date you called me, correct.

3  Q      And there's a weekend in the middle there, correct?

4  A      We're investment bankers, but correct.

5  Q      And how many hours does it usually take you to complete

6  a valuation for a company like this?

7  A      That's such a large question (Zoom glitch) on the

8  following.  Our engagement letter was dated the -- whatever

9  date it was.  It's possible we started doing a little work

10 just before that, prep work.  Maybe.  I don't know, but it

11 is possible, but it's not -- the hours that it takes depends

12 on the situation, and the speed it takes depends on how many

13 resources you throw at it.  And, so, I think I get where

14 you're going with it.  I think we had sufficient time to do

15 a thorough analysis for the company.  We've done analyses

16 over weekends before.  We just throw resources at it.  You

17 know, and the data's all available.  It's just a matter of

18 having people to pull the data, speak to the company, get

19 information, and then we pull all nighters if we have to.

20 Q      And, so, do you have an estimate of how many kind of

21 base hours that would take across all professionals working

22 on it?

23 A      In general, I can't.  It -- it depends on so many

24 factors.  It depends on whether the information given to us

25 in a concise way or is it given to us hidden in a data room

37

1   and we have to dive through it.  I -- I -- I can't -- I

2   can't give you that specifically going to here.

3   Q    And would you have any reason to disagree with me that

4   your retention applications in this case show that there was

5   about 13 hours of work total for the first -- for the first

6   valuation?

7   A    I think you're -- I think from a stand -- not to

8   correct you, but I believe you're looking at an analysis

9   that was done subsequent to the valuation being performed.

10  I believe the valuation was done separately, and a separate

11  fee was paid for that.

12  Q    I'll come back to that in a moment.  Do you have a

13  recollection of how long the second valuation took?

14  A    The second valuation might have been in the 13 hours

15  you're referring to.  I just don't recall.  It could have

16  been -- I -- I don't know.  But we spent sufficient time to

17  make sure we dotted all the I's and crossed all the T's and

18  did a thorough professional job.

19  Q    Were there any constraints placed on Morello

20  (phonetic)?  Is that how you say it?  That's the firm's

21  name?

22  A    Correct.

23  Q    (Zoom glitch) part of the engagement and its team?

24  A    No, they weren't.

25  Q    And were you given access to management to review and

38

1  discuss the projections?

2  A    Yes, we were.

3  Q    So, what does it mean for a valuation to be as of a

4  particular date?

5  A    It means the data points that we take into

6  consideration are as of that date.  So, if the valuation

7  date is September the 13th or whatever it is, you know, if

8  the market crashed on September the 14th, we would not take

9  that into consideration.  If the country went to war on the

10 14th, we wouldn't take that into consideration.  It's based

11 on information that was known or knowable as of that date.

12 Q    And, so, a valuation that is four months old, how

13 reliable is that?

14 A    Um, depends on what's happened since.

15 Q    And would a change in the market be a significant thing

16 that happened in the meantime?

17 A    It could.  It would be one of the things that would

18 (Zoom glitch).

19 Q    In FitLife Exhibit 2 at page nine -- which would be

20 very helpful if we could bring that on screen or I can try

21 to share if that's permissible.  Thank you very much.

22      This is your valuation dated as of September 3rd as

23 noted on the top left.  What --

24 A    Okay.

25 Q    -- does it say under "Representative Level"?

39

1   A    2025 base case.

2   Q    And, so, did you use the base case or the management

3   case for the September 3rd valuation?

4   A    So, you -- you raise a good question.  I said from

5   memory, I thought we did a management case because the

6   management case projections were significantly greater.  So,

7   it does look, from looking at this, that it says base case.

8   So, unless someone misstated that, then it was base case.

9   And you see the EBITDA was significantly greater, and that

10  might have been what I was going off of.  We might have used

11  the updated -- managed the updated base case then.

12  Q    And, so, does that mean both the September and the

13  November valuations were both, for lack of a better word,

14  based on the base case?

15  A    I -- I -- again, that's what it says.  I would have to

16  double check to make sure we didn't mislabel that because,

17  at the time, we didn't know there was going to be a second

18  valuation.  So, we didn't really -- sometimes you don't pay

19  attention to all the headings.  We just use the specific

20  number.  I don't know.  There will be a factual answer to

21  that because there was a second set -- there was a set of

22  projections that would have had a management case, and it

23  would have had a base case.

24  Q    Would you normally label something base case if it was,

25  in fact, a management case?

40

1  A    We usually get it right.

2        MS. FAY:  Okay.  I'm done with that exhibit.

3  Thank you very much for bringing it up.

4  BY MS. FAY:

5  Q    A -- a discounted cash flow method is another typical

6  valuation methodology to value companies.  Would you agree

7  with me?

8  A    Correct.

9  Q    And you did not prepare a DCF valuation here.  Is that

10 correct?

11 A    If it's not included, then we didn't.  Correct.

12 Q    Why did you not prepare it?

13 A    Just on a cash flow approach, firstly, you need cash

14 flows to discount.  So, we need to look at what the

15 projections look at.  The other reason -- the majority of

16 times, deals are done based on multiples.  If you look at

17 the Wall Street Journal, you'll read Company A acquired

18 Company B at a multiple of X.  They don't say Company A

19 acquired Company B using an implied discount rate of 24

20 percent and three percent growth annually until a certain

21 date.  It's not how it's really done.  It's done on a

22 multiple basis.

23     The problem with a discounted cash flow approach, if

24 you have projections that are -- that are -- they are, let's

25 say, aggressive, you're going to have to compensate by

41

1  picking a higher discount rate.  At some point you get into

2  situations where it' garbage in, garbage out.  And, so, when

3  we're in a situation where there are solid multiples, we

4  prefer to rely on the multiple approach.

5  Q    Why did you not do a DCF here?

6  A    We believed there were good market comparables.

7  Q    And did you believe that the base projections were

8  garbage in and, therefore, the result would be garbage out?

9  A    That's not what I'm saying.  We believed there were

10 good comparable companies with good multiples, and we relied

11 on those.  And there were a number of transactions in the

12 industry as well that had occurred, and those multiples

13 happened to be -- there were a number of data points from

14 good companies.

15 Q    And had you prepared a DCF, how would that have

16 impacted your determination of the fair market value here?

17 A    Well, it's a zero because we wouldn't do that.

18 Usually, when we do analyses -- and this is just a general

19 comment -- you know, there are different approaches.  They

20 should all come to the same rough conclusion.  If not, we

21 investigate further and figure out did we pick the wrong

22 multiple or we -- did we pick the wrong discount rate, for

23 example.

24      But, in this case, again, we didn't use the discounted

25 cash flow because we believed the market multiple approaches

42

1  were more appropriate.

2  Q    And based on your experience, what does the fact that a

3  company has not been successful in refinancing existing debt

4  suggest about its valuation?

5        MS. BAGDANOV:  Objection.  Incomplete

6  hypothetical.

7        THE COURT:  Overruled.

8        THE WITNESS:  Repeat the question, please.

9  BY MS. FAY:

10  Q    Based on your experience, what does the fact that a

11  company has not been successful in raising refinancing mean

12  or suggest about the valuation of the company?

13  A    I don't know that it has anything to do with the

14  valuation of a company.  There could be so many factors that

15  come into play in terms of raising capital, and we've --

16  we're in the investment bank, and we've tried to raise

17  capital for many companies that have great businesses and we

18  couldn't get -- we couldn't get capital.  It just depends on

19  investor appetite at any point in time.  I don't necessarily

20  believe it goes to -- to the valuation.  You can raise more

21  amount.  You can raise less amount.  There's so many factors

22  that go into play.

23  Q    And I'm asking specifically about debt financing,

24  meaning someone underwriting to the value or the collateral

25  of the business.  Do you have a different answer for that?

43

1  A    No.  It depends on everybody's risk profile.  I don't

2  know that it -- I think they look at the ability to repay

3  debt.  It depends on how long the debt is for, when the term

4  is.  There's so many factors that -- that come into play.

5  It's not necessarily an indication of value.  It's more of

6  an indication on the ability to repay the debt within a

7  certain time frame absent the sale of the company.

8        MS. FAY:  Thank you, Mr. Platt.  I have no further

9  questions.

10        THE COURT:  Okay.  Does Debtor's counsel want to

11  do any redirect?

12        MS. BAGDANOV:  Yes, your Honor.

13        THE COURT:  Okay.

14        MS. BAGDANOV:  Jessica Bagdanov for the Debtor

15     (Zoom glitch).

16        THE WITNESS:  Apologies --

17     (Zoom glitch.)

18                REDIRECT EXAMINATION

19  BY MS. BAGDANOV:

20  Q    Can you hear me okay?

21  A    I can now.  Great.

22  Q    And if I may ask when -- when the documents are pulled

23  up on the screen for you, are you able to see them?

24  A    Once they're made a little bigger.

25  Q    Got it.  Understood.  You've been talking this morning

44

1  about EBITDA, multiples, different tests for valuation.  In

2  a nutshell, what were you retained to do for the Debtors?

3  Q    We were retained to provide an estimate of value that -

4  - that the company could be sold for in its entirety.

5  Q    And what is that report typically used for?

6  A    A report like that can be used in a whole host of

7  different -- different reasons.  But, you know, we -- it

8  could be used to help companies figure out their strategy so

9  they know what the value is.  It could give management an

10 estimate of value so they can do some estate planning.

11 There are a whole host of reasons why we do valuations like

12 this.

13 Q    In this case, are you aware of what the Debtor needed

14 your report for, to do?

15 A    We understood there was obviously a bankruptcy

16 situation, and they wanted to get a sense of what -- what

17 value might be given -- you know, given the hearings coming

18 up.

19 Q    And you testified you've had 35 years of experience in

20 this -- in this valuation area.  Is that correct?

21 A    That is correct.  And I've done over 3,000 valuations

22 in my career.

23 Q    I was going to ask you if you could estimate how many

24 companies you've valued.  Three thousand is fair to say?

25 A    Three thousand is fair to say, yes.

45

1  Q    And you've done it for many different reasons, correct?

2  A    Yes.  We've done it for -- yes.  We -- we give -- we

3  and I in my history and my company now, we've given fairness

4  opinions and -- in multi-jurisdictional international

5  transactions.  We've valued startup companies and everything

6  in the middle.

7  Q    In this case for Irwin Naturals, you were provided -- I

8  think Mr. Feinsmith asked you whether you were provided

9  financial projections from the Debtor when you prepared your

10 September report, and you received updated financials for

11 purposes of preparing the November report.  Is that right?

12 A    Correct.

13 Q    Do you recall a different -- do you recall that in

14 preparing the November report, you received projections also

15 from the Debtor's financial advisor, Province?

16      (Zoom glitch.)

17 A    I'm sorry.  Somebody jumped in.  Could -- could you

18 repeat that?

19 Q    Do you recall for the November valuation that you had

20 received financial projections from Province, the Debtor's

21 financial advisor?

22      MS. FAY:  Objection, your Honor.  Leading.

23      (No response.)

24      MS. FAY:  Objection.  Leading.

25      THE COURT:  Overruled.

46

1 BY MS. BAGDANOV:

2 Q    You can answer if you know, Mr. Platt.

3 A    We -- we received projections.  Management provided

4 information, and there was a third party that had provided

5 some -- that had prepared some of those projections.

6 Q    Do you know --

7      (Zoom glitch.)

8 BY MS. BAGDANOV:

9 Q    Do you remember if the third party was Province or not?

10 A    I believe it was Province.

11 Q    All right.  In your 35 years of experience, have you

12 done valuations for bankruptcy sales other than Irwin

13 Naturals?

14 A    I have.

15 Q    Are you familiar with the type of projections used for

16 a debtor in their plan and disclosure statement process?

17 A    What do you mean by type?

18 Q    Do you know if a debtor uses conservative or otherwise

19 projections for a plan and disclosure statement?

20 A    Each company would be different, but I know that  the

21 -- you know, that they try to be accurate and certainly not

22 optimistic.

23 Q    Turning to what -- what you do, specifically talking

24 about these multiples in order to assess the -- is it to

25 assess the enterprise value of the company?

47

1  A    Correct.

2  Q    And the multiples are used against EBITDA or the

3  company's earnings.  Is that right?

4  A    It would be used against EBITDA, which is the

5  operational cash flow of the company and characterized by

6  EBITDA, earnings before interest, taxes and depreciation.

7  And we would also apply a multiple to revenue.

8  Q    When you are looking at multiples, do you consider

9  historical performance of the company?

10  A    We do, yes.

11  Q    Do you consider forward looking projections as well?

12  A    We do, yes.

13  Q    And I'd like to pull up Exhibit 7, which Mr. Feinsmith

14  asked you about if that's possible.  Mr. Feinsmith asked you

15  to assume that Irwin Naturals', you know, numbers are

16  correct and that this is an accurate representation.  Where

17  -- if you would take a minute and look at this, where do you

18  see the document taking into account forward looking

19  projections?

20  A    Could you make that a little bigger?  I don't see any

21  projections here.

22  Q    If you scroll to the right and take a look at the

23  column called "Annualized Totals" under the EBITDA Based on

24  Monthly Operating Reports, do you see that?

25  A    I do.

48

1  Q    This appears to be a time period of August 2024 through

2  January 2025.  What is the normal time period you as a -- as

3  a valuation expert would look at for determining accurate

4  EBITDA?

5  A    So, we would look back, you know, three years

6  typically, you know, to see what has the company shown its

7  capability of doing.  And, so, looking back, we -- we try to

8  get three or five years going historically.  But we look at

9  the last three to four years and see, you know, were those

10 projections -- were those historical numbers reasonable

11 relative to the projections.  So, if a company's never done

12 more than 10 million in -- in performance and how is

13 projecting 50 million, we would take that with a grain of

14 salt.  But if they're projecting 50 million and in the past

15 they've done 50 million, then we understand, all right, this

16 is not a -- this is not a -- a blowing smoke projection.

17 It's quite achievable if certain things come right.  And

18 that's why projections are important.

19        MS. BAGDANOV:  Thank you.  I'm -- no questions on

20 this exhibit.  Thank you for sharing the exhibit.

21 BY MS. BAGDANOV:

22 Q    Now, how do you decide what to take with a grain of

23 salt and what not to?

24 A    That depends on the circumstances.  It depends on -- on

25 the information we're given.  It depends on the

49

1  reasonableness of the projections.  Again, if the company is

2  projecting 25 percent growth a year, we would take that with

3  a grain of salt.  If they're projecting three to five

4  percent, that's much more reasonable.  So, we -- we assess

5  everything based on, A, logic and, B, our experience.

6  Q    Why is three percent reasonable?

7  A    Well, three percent's reasonable because inflationary

8  grown alone gets you to three percent every year.

9  Q    But if you're looking at a company that has loss -- or

10  declining revenue in the past, why is a three percent growth

11  considered reasonable for this year?

12  A    Um, we speak to the company.  We try and get a sense of

13  their projections.  And if they -- again, if they're losing

14  money and they're projecting they're suddenly going to

15  generate, you know, 25 percent growth, we're going to --

16  we're going to -- to question that.  But if a company's, you

17  know, focusing on the top line, if it just keeps sales flat,

18  with price increases, you should be able to generate -- just

19  inflationary price increases, you should be able to generate

20  a -- you know, a three percent growth.  So, it's not

21  unreasonable.

22      When we do many of our analogies -- and when we do a

23  discounted cash flow approach, the company, excuse me, will

24  oftentimes give us projections for a short period of time.

25  When we look at growth beyond that, we typically drop it to

50

1  three percent.  So, when we do build out those discounted

2  cash flow analyses, we'll use a three percent terminal

3  growth rate typically.  We might use two.  We might use

4  four.  But it's -- it's in that ballpark because that's a

5  growth rate that's relatively achievable through inflation

6  alone.

7  Q    When you are looking at a business' historical success

8  I guess or historical numbers, do you ask for backup or

9  information from the company as to what happened or if there

10 are any factors or do you just look at the numbers and not

11 go deeper?

12 A    We question the company.  We do a thorough due

13 diligence to understand the story.  I like to say we -- we

14 understand the story.  We're -- we want to understand the

15 story.  Where was the company?  Where is the company?  And

16 where is it going?  And that's the (Zoom glitch) --

17 Q    Did you do that here?

18 A    -- due diligence.

19 Q    Did you do that here, sir?

20 A    Yes, we did.

21 Q    Do you have an understanding today as to any issues in

22 the past with the Debtor that would show a decline in

23 revenue but also you say three percent is still reasonable

24 for growth?

25 A    I -- you know, we had these conversations a while back,

51

1 but I will say, at the time, nothing was brought to our

2 attention that would make it seem that three percent growth

3 was not achievable.

4          MS. BAGDANOV:  Okay.

5      (Pause.)

6          MS. BAGDANOV:  May I have a moment, your Honor?

7          THE COURT:  Yes.

8          MS. BAGDANOV:  Thank you.

9      (Pause.)

10 BY MS. BAGDANOV:

11 Q    Just a couple more questions, Mr. Platt.  Thank you for

12 your time this morning.  Do you have any reason to believe

13 that the Debtor's projections that were provide to you were

14 inaccurate?

15 A    No.

16 Q    And you did testify that you received financials from

17 different sources, the Debtor and a third party, right?

18 A    Correct.

19 Q    And you recall that being Province?

20 A    Correct.

21 Q    Okay.  And do you recall reviewing the Debtor's plan

22 and disclosure statement projection?

23 A    I do not.

24          MS. BAGDANOV:  Okay.  All right.  No further

25 questions.

52

1       (Pause.)

2           MS. BAGDANOV:  And, your Honor, I would ask if

3  possible if Mr. Platt may be excused.  He is out of the

4  country.

5           THE COURT:  Oh.  Does anyone have anything else to

6  ask from Mr. Platt?

7       (No response.)

8           THE COURT:  Okay.  So, thank you very much, Mr.

9  Platt.

10          THE WITNESS:  Thank you.  Thank you everyone.  Bye

11 bye.

12          THE COURT:  Bye.

13      (Pause.)

14          MS. BAGDANOV:  Your Honor, the Debtor's next

15 witness would be Mr. Vince Willis.

16          THE COURT:  Okay.  Okay.  Hello, Mr. Willis.

17          MR. WILLIS:  Hello, your Honor.

18          THE COURT:  Are we going to be starting with

19 questions on him now or -- because then we'll swear him in.

20          Mr. Willis, can you raise your right hand.

21           VINCE WILLIS - DEBTOR'S WITNESS - SWORN

22          MS. BAGDANOV:  Your Honor, Mr. Willis' direct

23 testimony is FitLife's Exhibit 2 -- no?  I'm sorry -- 5,

24 Bankruptcy Docket Number 430.

25          THE COURT:  Well, there's two declarations of

53

1 Vince Willis.

2         MS. BAGDANOV:  Yes.  We intended that to be the

3 direct testimony just as with Mr. Platt.  And, so, I believe

4 Mr. Feinsmith will cross examine first.

5         THE COURT:  Okay.

6         MR. FEINSMITH:  Yes, your Honor.  We're -- I'm

7 happy to do so.

8                    CROSS EXAMINATION

9 BY MR. FEINSMITH:

10 Q    Hello, Mr. Willis.  My name is Todd Feinsmith.  I

11 represent FitLife.  It's nice to meet you.

12 A    Nice to meet you as well, Mr. Feinsmith.

13 Q    Can you tell me, sir, when you started working on this

14 engagement for the Debtor?

15 A    We started becoming involved in this -- I believe it

16 was right around the beginning of February.

17 Q    Okay.  And your proposed engagement, which is pending

18 before the Court, is proposed to be retroactive to January

19 31st, is that correct?

20 A    That sounds about right, yes.

21 Q    And the Debtor filed its application to employ FTS on

22 February 5th, 2025.  Does that sound correct to you?

23 A    That sounds again -- yes.

24 Q    Okay.  On February 26th, you filed a declaration in

25 support of the Debtor's response to certain disclosure

54

1 statement objections that were made.  And in that

2 declaration, you stated that you believe the value of the

3 Debtor is between 112 million and 216 million dollars.  Is

4 that correct?

5 A    Yes.

6         MR. FEINSMITH:  And I'd like -- I'd like to refer,

7 your Honor --

8 BY MR. FEINSMITH:

9 Q    By the way, Mr. Willis, do you have copies of the

10 exhibits in front of you?

11 A    I do not.

12         MR. FEINSMITH:  Okay.  I'd like to refer the Court

13 to Exhibit Number 2, which is Court Docket 388, and this is

14 the Willis declaration.  And I'd like to refer specifically

15 to paragraph number two.

16 BY MR. FEINSMITH:

17 Q    And, Mr. Willis, you didn't perform your own valuation

18 of the Debtor, did you?  And you can actually remove that

19 screenshot now.  I'm going to come back to that.

20     (No response.)

21 BY MR. FEINSMITH:

22 Q    So, I'm happy to ask that question again.  Mr. Willis,

23 you didn't perform your own valuation of the Debtor, did

24 you?

25 A    We did in the sense that we certainly spent some time

55

1 looking at comparable transactions and getting some sense of

2 the business and its prospects to get a sense of what we

3 thought it could be worth.

4 Q    Okay.  But with respect to your declaration of February

5 2025, in fact, you attached the valuation that was prepared

6 by Morello, by Mr. Platt, who just testified, is that

7 correct?

8 A    We did, yes.

9 Q    And -- and Mr. Platt works for Morello, not STS?

10 They're not affiliated in any way?

11 A    That's my understanding.

12 Q    But you were involved dating back to the end of January

13 or the beginning of February, correct?

14 A    Correct.

15 Q    So, there wasn't time over that period for you to

16 prepare your own value -- valuation?  IS that why you relied

17 on the Morello valuation?

18 A    Well, we -- we relied most heavily and most

19 specifically on comparable transactions that had been

20 completed, which is how we generally get a sense of what we

21 think an asset will trade for in a fair process.

22 Q    What conclusion about value did Mr. Platt reach in his

23 November 2024 valuation?

24 A    I believe Mr. Platt has testified that he thought the

25 company was worth somewhere in the, you know, 70's.

56

1  Q    Yes, he --

2  A    Seventy million.

3  Q    -- he thought it was -- exactly, $79 million, with a

4  range of between 71.8 and 86. 8 million.  Given that you

5  attached his valuation to your declaration, and considering

6  that he reached a conclusion that the value of the Debtor

7  was $79 million, how is it that you arrive at a valuation

8  that's much higher?

9  A    You know, at the end of the day, Mr. Feinsmith, what

10 determines value is a market.  People with checkbooks

11 actually determine value, and in looking at the comparable

12 transactions in this space in general, including those that

13 are listed in the Morello exhibits, in talking with the

14 company's bankruptcy advisor, Province, to get a sense of

15 not only what their estimate of EBITDA is but also the basis

16 upon which that estimate was created, in talking with the

17 company and getting a sense of what they thought the range

18 of EBITDA was for the company for the coming year, that's

19 how we were able to come up with our perspective on value

20 based on how we believed the market will react to this asset

21 both in qualitative and quantitative factors.

22 Q    So, do you think the Morello valuation was wrong?

23 A    No, I don't think the Morello valuation is wrong.  I'll

24 just reiterate what I said.  All of us can give you

25 different estimates of value based on different constraints

57

1  and different ways of looking at value.  What we focus on is

2  what we believe the company will trade for in a fair process

3  between a willing buyer and a willing seller.

4  Q    So, why -- why attach the Morello valuation if it's so

5  much less?  Why not just provide your own analysis?

6  A    Well, perhaps the most -- we think when you look at how

7  companies trade in a controlled transaction where you're

8  selling 100 percent of the company, the most important part

9  of the Morello valuation for figuring out the value of this

10 estate is actually the comparable transactions that were

11 listed in the report.

12 Q    Okay.  Let's -- let's talk a little bit about that.

13 So, on March 14th, 2025, you filed a second declaration.

14 This time it supported the bidding procedures.  And in that

15 declaration, you opined that the company had the same value,

16 112 million to 216 million --

17 A    Um-hmm.

18 Q    -- is the amount that you referenced in your original

19 declaration.  Is that correct?

20 A    Correct.

21       MR. FEINSMITH:  And I -- I would refer to Exhibit

22 5, your Honor, and, specifically, paragraph four of Exhibit

23 5.

24 BY MR. FEINSMITH:

25 Q    Now, this time for this more recent valuation, you

58

1 didn't attach Mr. Platt's or Morello's valuation.  Instead,

2 you attached a valuation from a different firm -- a market

3 report from a different firm, Meridian Capital.  Is that

4 correct?

5 A    We did provide additional support for the range of

6 value, yes.

7 Q    From -- from Meridian Capital?

8 A    I believe there were three different reports, one of

9 them which is Meridian, yes.

10 Q    Is Meridian an investment bank?

11 A    They are.

12 Q    And -- and you describe in your declaration that STS is

13 also an investment bank.  Is that correct?

14 A    That is correct.

15 Q    Why would STS as an investment bank put forward the

16 opinion of a different investment bank as it relates to

17 valuations in the nutritional supplement industry rather

18 than providing its own independent analysis?

19 A    We thought it was relevant to data from how the market

20 is going to treat the estate in an actual fair sale, the

21 contentional data points.

22 Q    So, this is March 14th, and you were involved at the

23 very beginning of February, so about six weeks.  Would --

24 would that have been enough time for you to perform an

25 analysis of your own?

59

1  A    We have performed an analysis, including looking at

2  what other data points are going to tell us how the market's

3  going to treat this asset.

4  Q    But that analysis wasn't appended to your declaration,

5  was it?

6  A    There's no formal production of the report or anything

7  the way that Mr. -- the gentleman that testified before me

8  has done, Mr. Platt.

9  Q    Would you typically provide a report of your own

10  valuation in support of a declaration that you file with the

11  court?

12  A    I guess it depends on what you mean by report.  I mean,

13  I guess what maybe I could help you understand how we do it

14  or how I tend to do it by telling you like best, right.

15  Like, my basic best and experience is that markets get paid

16  value.  So, when we get asked to look at an opportunity, the

17  first thing I almost always have to do is talk to the person

18  that's selling the company about why their idea of valuation

19  is way too high.  Then next we try to get them down to

20  something that we believe is realistic based on what's going

21  on with the market and with comps as it relates to their

22  particular set of qualitative and quantitative factors.

23      We then have to go to an internal review committee to

24  get approval to even proceed to spend any type of firm

25  resources on pursuing a transaction, and we then go out and

60

1  look at all the data sources we can find, including the

2  reference controls that -- that Mr. Platt looked at, like

3  Pitchbook and -- and its things.  It tends to have a

4  compendium and a list of all the transactions.

5      We then go through, and we have to go back and get a

6  second approval from our kind of investment committee on

7  whether or not we can come up with a fair pricing strategy

8  for that deal.  So, we did all of that work in this case.

9  Q    Have you ever sold a supplements company?

10 A    No.

11 Q    Has STS ever sold a supplements company?

12 A    Yes.

13 Q    What was the name of that company?

14 A    I'd have to go back and get that for you.  I'm not

15 prepared -- I don't have that data right in front of me.

16 Q    How long ago was it?

17 A    Again, I don't know.

18 Q    Okay.  Now, referencing back to the Meridian market

19 update that's appended to your March 14th declaration,

20 there's an acquisition that's referenced in that document of

21 a company called Foreign Health Tech.  Do you recall that?

22 A    I did.

23      MR. FEINSMITH:  Okay.  And for your Honor's

24 benefit, I can refer to Exhibit 5.  It's -- it's page 27 of

25 Exhibit 5, and the reference to 27 is in our page count on

61

1  the bottom right.

2  BY MR. FEINSMITH:

3  Q    Do you consider that transaction, that Foreign

4  transaction, to be one that's a comparable -- comparable to

5  a possible sale here?

6  A    I think there's some attributes of Thorn that are

7  similar to what's going on with the asset in this estate,

8  and there's other things that Thorn has that are, you know,

9  broadly different in terms of some of their clinical and

10 some of their distribution from what I can tell.  I'm also

11 aware that that valuation is a -- you know, a pretty high on

12 one side of the curve.  I tend to not look -- I look really

13 hard to kind of look at the averages as opposed to the

14 actual outliers in either direction.

15 Q    Do you know what Thorn's run rate -- that is, to say,

16 its estimated future performance was at the time of that

17 transaction?

18 A    I didn't have access to the actual financings that they

19 used to project to know.

20 Q    Do you know how the gross margins of Thorn compared to

21 the Debtor's or -- or what the EBITDA was of Thorn at the

22 time of the transaction?

23 A    I believe it was much higher.

24 Q    Now, you --

25 A    I mean, if I can remember correctly, somewhere in the

62

1 20's.

2 Q    Are you familiar with Thorn's sales channels?

3 A    Like I said, I -- I believe that they do a lot through

4 professionals, both nutritionists and doctors and things

5 like that.

6 Q    Okay.  Okay.  Thank you.  We'll hear more about Thorn

7 from Mr. Judd in a few minutes.

8      So, the market update from Meridian Capital that's

9 attached to your declaration is dated summer of 2024.  And

10 you can see that if you look at Exhibit 5, the face page of

11 the Meridian report.  It indicates summer of 2024.  Do you

12 recall that, Mr. Willis?

13 A    Yes.

14 Q    There have been some significant changes in the market

15 since that time.  Isn't that correct?

16 A    There have been changes, of course.

17 Q    For example, tariffs, is that correct?

18 A    There have been new tariffs imposed, yes.

19 Q    And overall, the equity markets have declined fairly

20 substantially recently.  Isn't that correct?

21 A    I seem to have -- that seems to be the headlines in the

22 news.

23 Q    Given those factors, would you expect that the value of

24 a company in the supplement space would increase or decrease

25 since the summer of 2024?

63

1  A    That question is so broad and speculative, I couldn't

2  feel comfortable giving you an answer.  What I can give you

3  -- maybe this will be helpful -- is it's somewhat -- I don't

4  -- we have one job in this case.  I -- I know my role.  My

5  job is to take the quantum of value that exists in this

6  estate and make sure that we get it realized to the fullest

7  extent possible.  I'm agnostic on everything else.  In other

8  words, I think Mr. Platt did a nice job, in listening to his

9  testimony.  To talk about the impact of tariffs on the

10 valuations of any company or, in particular this company, is

11 just speculation.

12 Q    If all other factors were the same other than the

13 tariffs, would it be more likely that the value would

14 increase or decrease?

15 A    Could you repeat that one more time.  There was a lot

16 of -- I'm not sure I followed your question.

17 Q    Yeah.  So, you -- you've said -- in response to my

18 question about the effects of tariffs, you said that there's

19 a lot of other factors that come into play.  My question is

20 if all other factors have remained the same except for

21 tariffs, would that increase -- is that likely to increase

22 or decrease the value of a company in the supplements space?

23 A    It just totally depends on so many factors.  I really

24 can't give you a -- a accurate answer to that, Mr.

25 Feinsmith.

64

1   Q    So, I'm saying if the factors haven't changed.  If the

2   factors in the summer of 2024, let's say, were X and they

3   remain X, except the only valuable that's different is that

4   there are now tariffs that we -- that we're aware of based

5   on the policy of the new administration.  Wouldn't that be

6   likely to decrease the value of the company in the

7   supplement space?  I mean, it seems like common sense,

8   frankly.

9   A    Yeah, you know what?  I think that might be a faulty

10  conclusion that it's common sense, right, because wouldn't

11  it depend so much more on how much of that tariff was

12  actually going to impact my cost, how much of that tariff

13  the company could pass on to -- to its customers, whether

14  that would increase or decrease the EBITDA that Mr. Platt

15  talked for, would that spur my company to do things like

16  change my channels?  Like it's -- it's just -- it's too -- I

17  don't know how to answer that question if you would like me

18  to give you an accurate answer.

19  Q    I don't disagree that there could be circumstances that

20  could make it go one way or another.  But what I'm asking

21  you is if it's more likely than not --

22         MR. POITRAS:  Objection.  Argument.  Asked and

23  answered three times now.

24         THE COURT:  Okay.  Sustained.

25         MR. FEINSMITH:  I have no more questions, your

65

1   Honor.

2          THE COURT:  Okay.  Thank you.

3          MS. FAY:  Good afternoon, your Honor.  Erin Fay of

4   Wilson Sonsini on behalf of East West.

5          Your Honor, are we asking questions -- I just want

6   to ask a housekeeping question.  Are we asking questions of

7   witnesses for both matters or do you intend to have the

8   witnesses come back to the extent it relates to the sale

9   timeline and the like?  I had assumed we were doing it all

10  at once but just wanted to check.

11         MR. POITRAS:  Your Honor, I would say, if I might,

12  that the testimony vis-a-vis the bid procedures motion is

13  the direct testimony in evidence.  It only relates to

14  valuation in terms of the timeline.  So, normally -- and I

15  don't think we were -- just I wasn't contemplating there

16  being an evidentiary hearing on the bid procedures motion.

17  So, typically, we file declarations, and people can file

18  counter-declarations, and the Court determines those issues

19  based upon the declarations in evidence.

20         THE COURT:  So, are you saying that there aren't

21  being questions asked of the -- regarding the bid procedures

22  declarations or --

23         MR. POITRAS:  To the extent that -- and they

24  really just go to valuation.

25         THE COURT:  I mean --

66

1        MR. POITRAS:  And they go to the -- the bid

2  procedures timeline for Mr. Willis to the extent that he can

3  answer questions about the process and he has testified to

4  that, we're happy to answer questions about what we call the

5  -- the fulsome sale process and what he needs to -- to

6  maximize value for the estate.  So, Mr. Platt obviously

7  isn't going to testify to that.  He was asked a question

8  about that, but Mr. Willis is here, and he can answer those

9  questions.

10       THE COURT:  I -- I think -- so, if somebody

11  submitted a declaration in support of the bidding

12  procedures, then I think this is the time to ask him that as

13  well as anything about ending exclusivity, rather than

14  splitting them up.

15       MS. FAY:  Thank you, your Honor.

16                 FURTHER CROSS EXAMINATION

17  BY MS. FAY:

18  Q    Good afternoon, Mr. Willis.

19  A    Hello, Ms. Fay.

20  Q    Just a few questions along the lines of Mr. Feinsmith.

21  So, as we discussed, you used the Meridian report to

22  indicate the median or at least one view of median key

23  public benchmarks.  Is that right?

24  A    No.  We -- just to be really precise, we used

25  comparable transactions that are never going to change, from

67

similar companies, and we used the data that came from

Province to set one end point because that was the most

conservative estimate of EBITDA I could find based on my

conversations with the principals of Province.

The way we're looking at it is if you just take the

report as it is in the Morello report, you have an average

multiple of 16 and you have a range of EBITDA.  On one end

it's conservative, can get at a seven as a kind of

optimistic is that the company's estimate is somewhere in

the 13's, and that would tell us we expect this company's

going to trade somewhere in that, you know, roughly 100 to

200 million dollar range.

Q    So, is the media key public benchmark for the vitamin

sector in the Meridian report irrelevant to your view?

A    We think in this particular case it's -- I don't want

to call it irrelevant, but we think it's not going to be the

determining factor.

Q    And, so, why did you include it in your declaration as

something that -- that presumably the Court should consider

in support of the valuation being proposed to support the

bidding procedures?

A    Because it's been a report that otherwise is a list of

transactions that we think's helpful.

MS. FAY:  Can we pull up Mr. Willis' declaration

that's at Docket Item 430?  Unfortunately, I don't recall

68

1 the number that FitLife gave it.

2      (Pause.)

3          MS. FAY:  Thank you.

4 BY MS. FAY:

5 Q    And paragraph seven is where you go into the multiples

6 from the Meridian report, and it states that the report

7 indicates the median key benchmarks of the VMS sector -- and

8 it goes on with numbers.

9      And, so, tell me again what the purpose was of

10 including that information for the Court's consideration?

11 A    I think it gives the -- it gives everybody just a

12 better sense or a more fulsome sense of the different

13 factors that are going to impact what the value of the

14 estate asset is or are.

15          MS. FAY:  Can we go to page eight of the Meridian

16 report, which -- which is -- that had the 16 at the bottom.

17 It's page 16 of 37.  It's the next one down.  It says,

18 "Vitamins, Minerals and Supplements."  There we are.

19 BY MS. FAY:

20 Q    And, so, on this page, this is the information that was

21 reflected in the text of your declaration with respect to

22 the vitamins, minerals and supplements category.  Is that

23 correct?

24 A    Um-hmm.  Yes.  I -- I can't read this based on the

25 size, just so you know.

69

1  Q    Okay.  I'll help you along the way.  And it's -- and

2  Irwin Naturals falls into this category in your view?

3  A    It certainly does, yes.

4  Q    And what does this list for the 2024 estimated EBITDA

5  margin on the lower left as the median -- sorry, the lower

6  right.

7  A    I'm not -- I'm sorry.  I can't see that.  Oh, yeah.

8  This one is the -- it's 13.8 if they just take the public --

9  what they're calling their public market benchmarks

10 Q    And what does it list for the 2024 estimated revenue

11 growth?

12 A    13.8.

13 Q    Sorry.  I meant the revenue growth.

14 A    Oh, I'm sorry.  Two percent.

15 Q    And do you know what Irwin's 2024 EBITDA margin was?

16 A    Their EBITDA margin was somewhere in like the -- I

17 believe it was like in the low double digits.

18 Q    If I re-presented to you that based on the Debtor's

19 most recent plan projections it was 10.2 percent, would you

20 find that to be comparable to 13.8?

21 A    I'm sorry.  The 13.8 I think is the expected value.

22 It's the EBITDA multiple, not the margin.

23 Q    Oh, I'm sorry.  The margin is on the bottom.

24 A    Yeah.  Then it's 14 percent.

25 Q    Okay.  So, I misspoke.  If I represented to you that

70

1 Irwin's was 10.2 and this says 14, would you view that as

2 comparable?

3 A    I think -- yes.

4 Q    Comparable in what way?

5 A    Comparable to be kind of in the same neighborhood in a

6 -- in a way that's not getting to -- I think it's in the

7 same neighborhood.

8 Q    And if I represented to you that the Debtor's last

9 filed plan projections for revenue growth was negative 7.4

10 for 2024, would you find that similarly irrelevant in

11 comparison to a two percent increase that's demonstrated

12 here?

13 A    It would -- you know, again, this is where you have to

14 get very specific about why it came down, what's the impact

15 on that revenue with EBITDA.  I'm sorry.  I'm getting a lot

16 of feedback off of somebody's mic.

17     (Pause to confer with clerk.)

18         THE COURT:  If you can -- oh, if Mr. Willis can

19 get closer?

20         THE CLERK:  (Indiscernible.)

21         THE COURT:  Mr. Willis, can you get closer to the

22 mic?  I think that might help with the feedback.

23         THE WITNESS:  I'll do the best I can, your Honor.

24 But I'm actually using headphones.

25         THE COURT:  Oh, headphones.

1          THE WITNESS:  That I've been using for the whole

2  time.  So --

3          THE COURT:  I can -- oh, you're not hearing --

4          THE WITNESS:  The -- it's gone away now.

5      (Pause.)

6          THE COURT:  Oh, okay.

7          THE WITNESS:  Thank you, your Honor.

8  BY MS. FEY:

9  Q    Was your answer complete, Mr. Willis, before we had

10 feedback?

11 A    Yes.

12 Q    And, so, then is there a -- a valuation methodology

13 that actually would go in depth on the items that you just

14 mentioned that would look at the actual financials of the

15 company, meaning the target company?

16 A    Whatever valuation method or methodologies we use, it

17 wouldn't change our opinion that the company is going to

18 trade in the range that we put in the -- that I put in my

19 declaration based on this company's attributes and the

20 market.

21 Q    And, so, you also utilized the first page Sage

22 (phonetic) report, which is referenced back up in your

23 declaration in paragraph seven.  Did you review that report

24 in its entirety before citing it here?

25 A    I looked at the relevant cases.  I did not read it like

72

1 page for page, no.

2 Q    And it's -- it's not attached to the declaration.  So,

3 the Court also can't review it, correct?

4        MS. BAGDANOV:  Objection --

5 BY MS. FAY:

6 Q    But it's not attached?

7    (No response.)

8 BY MS. FAY:

9 Q    It's a simple question.

10 A    Is that question for me?

11 Q    Well, I think there was an objection.  So --

12        THE COURT:  What was the objection?  Sorry.

13        MS. BAGDANOV:  Objection to the comment that it's

14 not before the Court in any way, that his source in his

15 report is accessible if necessary.

16        THE COURT:  But it's not attached, right?

17    (No response.)

18        THE COURT:  So, I understand the point, but I

19 mean, it isn't attached.  I mean, I guess we could access it

20 if we went online maybe.  I don't know because I didn't do

21 it.  I haven't checked.

22        MS. FAY:  I'll move on, your Honor.

23        THE COURT:  Okay.

24 BY MS. FAY:

25 Q    Mr. Willis, First Page Sage a valuation source you use

73

1  regularly?

2  A     It's one of the people that come up from our -- our

3  research department periodically.

4  Q     Do you know what First Page Sage is?

5  A     Yeah.  It's kind of a -- I'm wondering the right way to

6  -- what I would call it, a -- like a media.  I don't know.

7  I wouldn't know how to describe them.

8  Q     Would it surprise you to learn that its website

9  indicates it's a SEO, meaning a search engine optimization

10 and thought leadership marketing company?

11 A     No.  Like I said, I know it's some type of a medica

12 company.

13 Q     Do you what an SEO company is?

14 A     I do.

15 Q     What is it?

16 A     I mean, I have a general idea.  It's not my area of

17 expertise, but my understanding is they do a lot of work to

18 optimize their people appear in searches.

19 Q     Does that sound like a valuation firm?

20 A     Well, it sounds like someone that probably has a lot of

21 data on markets and how markets are behaving in terms of

22 multiples, which is --

23 Q     Are you actually aware of what expertise First Page

24 Sage has in valuation for M and A?

25 A     My understanding is they were aggregating a bunch of

74

1  data and telling us what the transactions were.  But I am

2  not -- I am not an expert in First Page Sage.

3  Q    I'm going to move to the actual process that's being

4  proposed here.

5       Mr. Willis, what's in court Section 363 sale processes

6  have you constructed before?

7  A    I have not sold a company in a 363 process.

8  Q    That means you've neither constructed procedures nor

9  actually ran a bankruptcy sale process?

10 A    That's correct.

11 Q    And do you know who crafted the sale timeline and

12 procedures here?

13 A    We were asked -- talking to input into that is we were

14 asked what we thought it would take to get a reasonable

15 process for folks to be able to -- for the market to

16 actually come up with a number as to what's the quantum of

17 the value that the estate is worth, so that could be

18 realized by the estates, but who actually drafted the whole

19 thing, I don't know.

20 Q    So, did you bring to bear any bankruptcy experience you

21 or STS in thinking about what a sale process should look

22 like?

23 A    Our question was what type of process and timeline

24 would we have to run to be able to get to, you know, a

25 reasonable determination of the value of the estates.

75

1  Q    And what -- what type of sale processes does STS

2  usually run?

3  A    We generally sell companies like the asset in this

4  estate, strategic companies, and we sell them in a -- a

5  process that is designed to maximize the value of that

6  asset.

7  Q    Outside of court?

8  A    Outside of the bankruptcy process and that -- that

9  process usually takes kind of in the 6 to 12 month range and

10 somewhere in kind of the, you know, 6 to 8 month I think is

11 a pretty reasonable way to get to what you want to get done.

12 Q    And are --

13 A    Depending on --

14 Q    Sorry.

15 A    That's okay.

16 Q    Are those companies that you're selling usually

17 distressed?

18 A    Distressed in the sense of the come with a whole range

19 of distresses, right.  Sometimes they have pressure on them

20 because of performance.  Sometimes they have pressure on

21 them because of ownership issues.  Sometimes they have

22 pressure on them because of debt issues or other capital

23 issues.  So, distress is one of those words that's -- you

24 know, it can mean a lot of different things, but there's a

25 lot of times that we get involved in things that there's an

76

1  urgent need to get something done.

2  Q    And in those urgent situations, what's you typical

3  timeline?

4  A    Well, the process to get a real -- to get a deal done

5  is somewhere in that kind of -- you know, if everything

6  goes, oh, my God, like miraculously, it can take -- I think

7  Mr. Platt got it right.  It can take three months, although

8  those of us that do this for a living, that's a very rare

9  set of circumstances.  In cases like this asset, we are

10 expecting based on pre-process interest and our experience,

11 to have significant interest from strategic buyers.

12 Strategic buyers tend to take a little bit longer than

13 financial buyers for a host of reasons.  So, I think

14 somewhere in that kind of -- if you're really just looking

15 to one lens -- and I understand there's other lenses here,

16 but your only lens is how do I make sure -- or how do I do

17 justice to the value that exists to this estate, you know,

18 I'd love to have six plus months to get this done, again,

19 because we do believe there will be significant strategic

20 interest in this asset for factors I'm happy to discuss with

21 the Court or not depending on what would be most helpful to

22 the Court.

23 Q    And has anybody talked to you about typical timelines

24 in bankruptcy cases for sale processes?

25 A    Only --

77

1          MS. BAGDANOV:  Could we instruct the witness you

2   don't need to disclose confidential communications in

3   answering her question.

4          MS. FAY:  One clarification.  Do you mean

5   attorney-client privileged?

6          MS. BAGDANOV:  Yes.

7          MS. FAY:  I don't intend to ask for your

8   discussions specifically with Ms. Seflin or anyone in her

9   firm.  So, this is more generally.

10         THE WITNESS:  Could you repeat your question, Ms.

11  Fay.  I just want to make sure I'm being accurate in my

12  answer.  So, I need to understand your question.

13  BY MS. FEY:

14  Q    Did you speak with anyone about the typical timelines

15  for sale processes in Chapter 11 case?

16  A    Oh.  Well, I mean, just because I haven't actually sold

17  one, I -- I do pay attention to these things, and in my

18  career, like, you know, it seems to me bankruptcy cases have

19  a lot of variability based on a whole set of factors, and

20  bankruptcy courts have a lot of discretion to do what they

21  think's for the best interest of the assets and the estate.

22  Q    And, so, your answer is, no, you didn't speak to anyone

23  about what these timelines look like typically?

24  A    I -- let me be really precise.  Are you asking me have

25  I spoken with anyone about what timelines for bankruptcy

78

1  sales look like since I've become engaged to be the pending

2  banker for this asset?

3  Q    As a part of your becoming engaged or once becoming

4  engaged, I assumed you would -- you knew you were pitching

5  for a company that was in bankruptcy.  So, I'm curious what

6  you considered in taking on an engagement where you

7  typically have longer lead times with sales when in

8  bankruptcy, they're often shorter.

9  A    Yeah.  So, in taking on this case, as I put in my

10 declaration, we're going to provide an outcome for the

11 estate of whatever the Court decides that they think is

12 appropriate here, and we've certainly thought about how we

13 will run a -- the best process possible, irrespective of

14 what you all decide or what we're doing today.

15 Q    And other than counsel, whose conversations I don't

16 want to know about, who else did you speak to with -- in

17 connection with Irwin Naturals about the sale process here?

18 A    Mostly my internal team.  Like, I think I put in -- I

19 know I put in my declaration that our founder, Rob Gallos,

20 is really going to be involved in this, and he and I have

21 quite a bit of time and then my team that's been assigned to

22 this with STS.

23 Q    Did you speak to anyone that's employed by Irwin

24 Naturals?

25 A    Since we -- yeah.  I've talked to their CFO, Mark

79

1   Green.  I've talked to Stephanie, whose last name I'm not

2   even going to try to butcher.  I apologize.  And I've talked

3   to Mr. Irwin.

4   Q    Have you ever spoken to someone -- oh, I'm sorry.

5   A    Go ahead.

6   Q    Have you ever spoken to someone named Bradley Sharp?

7   A    No, I've not spoken with Mr. Sharp as of this date.

8   Q    Do you know who Mr. Sharp is?

9   A    Only from what I've been told through the court

10  process, that he is I believe what's called an independent

11  director.

12          THE COURT:  Can I ask a question about the bidding

13  procedures?  I -- I'm wondering like when you do bidding --

14  when you like look at outside of bankruptcy, do you use

15  stalking horse bidders?

16          THE WITNESS:  Not in the sense that I think the

17  Court's talking about it, your Honor.  But it is often that

18  we have people that are involved in a process early, and,

19  yes.  Were we would get to -- I'm sorry, your Honor.

20          THE COURT:  Oh, so, sorry.  Go ahead.  Yeah.  Let

21  me know what -- what is a stalking horse bidder in your

22  context?

23          THE WITNESS:  Well, it kind of goes something like

24  this if I'm going to try to make an analogy that might make

25  sense, your Honor.

80

1        So, typically, when we get towards the end of a

2   process, like we'll have all people that we need their kind

3   of best and final offer in by a certain date.  Let's just

4   say we get three of those, and somebody's -- at that point,

5   the stalking horse bidder becomes the person that has the

6   most valuable bid or the bid that we're going to call number

7   one, and then we go through usually a defined period of time

8   to see if anybody wants to come in and put a better best and

9   final offer in.  And that's can you come up with a better

10  best and final?  Sometimes it doesn't happen, and sometimes

11  it can go through multiple rounds.

12       (Pause.)

13       THE COURT:  So, do you identify who the buyer is

14  who's given the best one offer so far and what that offer

15  is?

16       THE WITNESS:  Oftentimes no.  But everyone does

17  this a little bit differently, and every process is a little

18  bit differently.  And there are times because, similar to

19  this case where we have already received inbound calls that

20  people have "heard" that we're representing Irwin Naturals,

21  which I know is not even officially true yet.

22  Unfortunately, in the world I work in, confidentiality

23  doesn't seem to hold as much as it does in some other

24  worlds.  So, sometimes people already know what's going on.

25       THE COURT:  Do -- when you pick someone, have --

*Echo Reporting, Inc.*

81

1  as the one you're going to tell other people about, do they

2  get any money for the due diligence they've done or like do

3  you pay -- I mean, do you --

4           THE WITNESS:  I typically --

5           THE COURT:  -- compensate them for being the best

6  but being overbid so to speak when you like tell people that

7  that's the best one you're looking at so far?

8           THE WITNESS:  Sometimes there are overbid periods

9  that come up with breakup fees.  More typically, not.

10      (Pause.)

11          MS. FAY:  I'm happy to continue if --

12          THE COURT:  Okay.  I was -- I just wanted to ask

13 him about that since you were talking about the bidding

14 process.  I wasn't sure if anybody was going to ask him

15 about that.

16          Thank you.

17          THE WITNESS:  Thank you, your Honor.

18 BY MS. FAY:

19 Q   So, a few questions about the -- the process.  So, are

20 you aware whether it's customary to exclude a senior secured

21 lender who has a lien over the assets being sold from being

22 consulted as a part of the sale process?

23          MR. POITRAS:  Your Honor, objection.

24 Argumentative.

25          THE COURT:  Overruled.

*Echo Reporting, Inc.*

82

1    (Pause.)

2         THE COURT:  Do you ever -- I guess --

3         THE WITNESS:  I'm sorry, Ms. Fay.

4         THE COURT:  Yeah.

5  BY MS. FAY:

6  Q    The question is whether you're aware whether it's

7  customary to exclude a senior secured lender who has a lien

8  over the assets being sold as a part of a consulting group

9  or generally a party you would give updates to and speak

10 with as a part of the process?

11 A    I am not.

12 Q    And in your experience, would you normally speak or

13 provide updates to someone like a senior secured lender with

14 liens on the assets being sold as a regular part of the sale

15 process and then ultimately if there's an auction, as a part

16 of that auction process?

17 A    Yes.

18 Q    And are you aware whether it's customary to require

19 disclosure of insider participation in a bid as a part of an

20 open bankruptcy bidding process?

21 A    I'm not aware -- if that means do I have like factual

22 knowledge, no.

23 Q    Do you have a view on whether that would be a good

24 idea?

25 A    I'm going to rely back to when I said earlier, however,

83

1 my role is to maximize the quantum of value that existed to

2 the estate and keep it to the estate.  I'm going to be

3 relatively agnostic on other things.

4 Q    Have you ran a sale process before where the company

5 that was trying to sell itself or its assets was publically

6 messaging that it may stop the sale process at some point in

7 favor of a different process?

8 A    That's the world I live in, Ms. Fay.

9 Q    I didn't catch the answer.

10 A    Yes.

11 Q    And did that have any effect on the sale process?

12 A    Yes and on.  Where I'll say yes is all of these noise

13 factors all come into my valuation of whether or not we even

14 want to be involved with an asset, but the truth is in

15 general, in selling a private company and a company that has

16 attributes like this, buyers are way more focused on what

17 the value of those assets are to them than they are to

18 anything they're doing with how it's being run or operated

19 now, right.  So, the noise is always a factor, but it's

20 never been a problem that we haven't been able to get to a

21 successful conclusion, because I think -- and the point is,

22 just like I said earlier, markets determine value.  So, we

23 can bring up all this data and all this other stuff, but at

24 the end of the day, what buyers are focusing on is what the

25 value of those assets are in their hands as opposed to the

84

1  hands of the equity and the debt that's been operating, the

2  manner it's operating it to date, and one of the things that

3  we believe that the estate here will trade at least at the

4  midpoint of the multiples is because they have a lot of

5  factors that are going for them that tend to -- tend to push

6  companies towards the upper end of the valuation ranges.

7  Q    So, I meant actually a little bit more from the

8  potential buyer perspective.  Have you had situations where

9  a buyer was concerned about getting involved in a process

10 that would take significant time and energy to become a

11 bidder where it was unclear whether there was a willing

12 seller?

13 A    The buyers make that decision all the time about

14 whether or not they're going to get involved in a process

15 based on all of those factors, and buyers still show up.

16        MS. FAY:  Thank you, Mr. Willis.  No further

17 questions.

18        THE WITNESS:  Thank you, Ms. Fay.

19        MR. GOLDEN:  Your Honor, can I ask a question or

20 two?

21        THE COURT:  Yes.

22                FURTHER CROSS EXAMINATION

23 BY MR. GOLDEN:

24 Q    Hello, Mr. Willis.  This is Jeff Golden.

25 A    Nice to speak with you again, yes.

85

1  Q    Yes.  Just a couple of questions.  Through the sales

2  process that's been outlined, do you believe that it is

3  going to result in a reasonable offer and sale?

4  A    I do believe that we can come up with a reasonable

5  outcome based on the procedures that are in front of the

6  Court, and I would love to have more time if I could.

7  Q    All right.  But you still believe it will result in a

8  -- in a -- in a good reasonable offer in your opinion?

9  A    Yes, sir.

10 Q    And -- and, also, do disputes regarding valuation have

11 any effect on the sales processes?

12 A    Could you help me understand your question a little bit

13 more, sir, so I can be more responsive?

14 Q    Sure.  If -- if there are disputes regarding the

15 valuation of the company that you're in the process of

16 selling, does that have any effect or impact with the sales

17 process?

18 A    Yes.  Look, all of that what I call noise factors, we

19 always like those to be minimal, but it doesn't trump what I

20 said earlier, right.  It would be great for maximizing value

21 of this estate if we could keep the noise lower, but clients

22 tend to come up with two numbers in a process.  The first

23 number they come up with is what they're willing to pay, and

24 that number is based solely on what they think they can do

25 with those assets, how they can operate them.

86

1       The second number that savvy buyers always come up with
2   is what do I think I have to pay, right.  And to the extent
3   that the -- the larger that gap is between what someone
4   thinks they have to pay and what they're willing to pay,
5   effectively, the injustice that occurs is we take the value
6   out of the estate and we give it to the buyer.  So, the
7   noise is certainly going to affect what people think they
8   have to pay.  It probably doesn't change what they think
9   they were willing to pay based on their valuation of what
10  the asset would be worth to them.

11      Does that make sense, sir?  I want to make sure I'm
12  being precise with you.

13          MR. GOLDEN:  Yes.  I appreciate it.

14          I have no further questions, your Honor.

15          THE COURT:  Okay.  I have another question.  Okay.
16  So -- so, this -- there's a -- there's a suggestion of a
17  standalone sale, right, where the asset, you know, whatever,
18  get sold.  Then there's also the possibility of a sale
19  through a plan.  Have you ever been involved with a sale
20  through a confirmed Chapter 11 plan?

21          THE WITNESS:  No, your Honor.

22          THE COURT:  When people are buying assets, do they
23  take into account possible tax advantages through a Chapter
24  11 plan process?  Are you familiar with any tax advantages
25  through a Chapter 11 process?

87

1          THE WITNESS:  Yes, your Honor.  Well, first of

2    all, the answer to the first part of your question is yes.

3    People certainly value tax assets when they come up with a

4    plan or a valuation of what they're willing to pay for sure,

5    100 percent.

6          THE COURT:  So, have you had a chance to think

7    about tax benefits to a buyer if a company is sold through a

8    plan versus sold outside of a plan?

9          THE WITNESS:  The short answer is no, your Honor.

10   We have that on the -- as soon as we're confirmed, we've

11   done some preliminary tax work that tells us there may not

12   be a ton of value in the assets here, but we haven't gone

13   through the tax consequences specifically on this deal

14   because, candidly, we're not hired yet.  So, we're being

15   very --

16         THE COURT:  Right.

17         THE WITNESS:  -- respectful and conservative about

18   who we talk to about this engagement, including when I get

19   calls from people that said, I heard you're showing Irwin.

20         THE COURT:  Yeah.  But, so, just -- because there

21   was a suggestion by -- well, I think FitLife had mentioned

22   because, you know, FitLife, I think people know, is

23   interested in buying.  They've mentioned that, and they said

24   that to them it's very important to buy through a plan

25   because of tax advantages.

88

1          Do you -- does that ring bells to you?

2          THE WITNESS:  Yeah.  That may turn up --

3          THE COURT:  I mean, I'm not saying that's true or

4   not, but like does it sound like something that would be

5   important to other buyers?

6          THE WITNESS:  It -- when we're hired officially,

7   assuming that's the way the Court choose to go in this part,

8   we will dig into every aspect and angle of how to maximize

9   value, including tax assets.

10         THE COURT:  Okay.  So, just so -- just on your --

11  on one of your employment, those -- as far as I understand,

12  there is no opposition to the employment anymore, but

13  there's an order that's lodged, and the Court needs to know

14  if anybody has issues with that form of the order.  So, I'm

15  not -- I mean, I think we have a hearing on your employment,

16  but there's -- the objections have been withdrawn.  Am I

17  incorrect about that?  Can anyone tell me?

18         MR. POITRAS:  That's correct, your Honor.

19         THE COURT:  So -- so, it's really just a matter

20  of, I mean, from the Court's perspective, knowing if anybody

21  has questions about the lodged order.  Even though

22  oppositions have been withdrawn, the Court wants to be sure

23  that they -- that the order reflects people's understanding

24  about why they withdrew their opposition, that it accurately

25  reflects.  So, I don't know.  Have y'all -- has anybody else

89

1  looked at the lodged order?  Is everybody fine with the

2  lodged order?

3       (No response.)

4            THE COURT:  Has anybody else seen the lodged

5  order?

6            MS. SEFLIN:  Your Honor, Mr. Feinsmith approved

7  the form of the lodged order before we lodged it.

8            THE COURT:  Who -- who approved it?

9            MR. FEINSMITH:  That's correct, your Honor.

10           THE COURT:  Oh.

11           MS. SEFLIN:  Mr. Feinsmith, FitLife's counsel,

12  approved the form of the order prior to --

13           THE COURT:  Oh, okay.

14           MS. SEFLIN:  -- it being lodged.

15           THE COURT:  Okay.  So, we're going to have an

16  order, right, on -- I mean, the Court's not going to stop

17  entry of the order if the people who had filed oppositions

18  are fine with the form of the order.

19      Okay.  So, Mr. Willis, one less thing for you to worry

20  about because we're going to be entering an order on your

21  employment.

22           THE WITNESS:  Thank you, your Honor.

23           THE COURT:  Okay.  So, okay.  Does anybody else

24  want to ask about the questions the Court asked about the

25  tax issues and the plan -- sale --

90

1        MS. SEFLIN:  Your Honor, I don't know if this

2   helps you or not, but because it's come up right now, we

3   were actually planning -- the Debtor's were planning to

4   structure -- you know, we -- we're going to be filing an

5   amended plan and disclosure statement.  That was going to

6   include the bid procedure dates in it.  So, because you can

7   include in a plan also an auction process.  So, we were

8   going to incorporate all those dates so that whoever the

9   potential buyer is has the option on the same timeline of

10  either purchasing the assets through a 363 sale or through a

11  Chapter 11 plan, depending on whether they have determined

12  it's in their own best interest to take advantage of the tax

13  attributes or not.

14       We have preliminarily had Province look into this

15  issue, and Province actually believes there would be more

16  tax attributes in a 363 sale to a potential buyer than sale

17  plan.

18        THE COURT:  Oh.

19        MS. SEFLIN:  But we want to preserve that option,

20  especially because FitLife has indicated it may prefer to do

21  this through a plan.  So, we are going to preserve that

22  option for all potential buyers.

23        THE COURT:  So, okay.

24        MS. SEFLIN:  So, we're going to --

25        THE COURT:  Right.

91

1           MS. SEFLIN:  -- incorporate the --

2           THE COURT:  I just --

3           MS. SEFLIN:  -- sales process --

4           THE COURT:  I just want to let people know that

5  the Court -- you know, the Court has not decided that doing

6  it through a 363 sale is the proper way to handle it as

7  opposed to through a plan.

8           So, and the Court has other concerns about using a

9  -- and that it's -- about using 363 sale versus using a plan

10 because a 363 sale doesn't really define where the money

11 goes.  So, I mean, the Court's had experience with 363

12 sales, which get the secured creditors paid, which is good,

13 and the professionals paid, but unsecured creditors can end

14 up waiting a while for plan confirmation, and the Garatchy

15 Partners (phonetic) case, which was talked about in -- by

16 East West Bank, that case is actually a situation where we

17 had a 363 sale.  Creditors -- secured creditors got paid.

18 Professionals got paid.  That case ended up getting

19 converted because of conflicts with the insider managing the

20 money from the proceeds, and those proceeds have still not

21 gone out to unsecured creditors more than a year later.

22          So, the Court in general has -- and I think this

23 is what the Code should be is unless there's some urgency

24 about a 363 sale or a real reason why it's going to generate

25 more, it creates the risk of what's happening with the money

92

1 once -- you know, once you have the proceeds.

2          And the other issues about, you know -- there are

3 other issues which are handled if you do it in a sale as

4 opposed to through a plan.  So, that doesn't mean we

5 wouldn't approve a 363 sale, but -- but the Court's a little

6 -- you know, would like there to be a very good reason to go

7 with a sale outside of a plan process if the plan process

8 can accommodate, you know, maximizing the value of the

9 assets and also making sure that everybody -- you know,

10 making sure that there's an understanding of where the

11 proceeds are going and how fast.  Okay.  So, that was just a

12 general comment.

13          Sorry to interrupt Mr. Willis's examination about

14 that.  But only because you mention about filing the plan.

15 Okay.

16          Okay.  So, is there anything else for Mr. Willis?

17 Sorry.  I interrupted you, Ms. Fay, I think.

18          MS. BAGDANOV:  Your Honor, I believe that Ms. Fay,

19 Mr. Feinsmith, and Mr. Golden asked cross examination

20 questions, and if it's possible for me to ask some questions

21 on redirect --

22          THE COURT:  (Zoom glitch.)

23                    REDIRECT EXAMINATION

24 BY MS. BAGDANOV:

25 Q    All right.  Good morning -- afternoon, Mr. Willis.

93

1  Setting aside that the -- the fact that you are on the cuff

2  of being employed officially, there's still a couple of

3  outstanding things going on with the hearing today, and

4  number one is the termination of exclusivity motion filed by

5  FitLife and the bid procedures that are pending before the

6  Court.  So, I think valuation is still something that we

7  need to talk about.

8       How critical is it in your process as an investment

9  banker to accurately value a company or at least get

10  yourself comfortable with the range of value to that

11  company?

12  A    It's -- it's the most important thing before I decide

13  to allocate either my or my firm's resources to a project.

14  As I mentioned earlier, I'd be hard pressed to think of any

15  time I've ever been involved where I didn't have to start by

16  lowing the expectation of the seller (Zoom glitch).  You

17  know, every entrepreneur thinks that they have, you know,

18  Amazon, right.  Like, everyone thinks they have this thing

19  that's just like the best thing ever.  And that's great, and

20  they take a lot of risks to get there, but we spend a lot of

21  time using market numbers to bring down a range of values

22  that we think is objectively supported by the market and by

23  the factors of how that market relates to the company's

24  attributes that is being sold.

25       And then there's two really things that matter, and,

94

1  you know, typically, investment banking contracts have

2  escalators, so we get more fuller values.  We get a higher

3  percentage of the incremental dollars, and that's really

4  important to the economics of the firm.

5       And, also, you know, we take an enormous amount of

6  risk, and we spent a lot of time and money, and if we take

7  on a project and we can't close that sale because the value

8  range -- the -- the seller won't sell, we don't get paid

9  anything.  So, getting aligned to make sure that we have an

10  actual seller and that that seller will close a transaction

11  in a reasonable range of market objectively based values is

12  my most important thing in deciding who we work with or not.

13  Q    Well, so you in your declaration, I think the most

14  recent one, you've accepted a -- an approximately $7 million

15  EBITDA, and is it correct that you think a 16 multiplier is

16  reasonable, is within a range -- and I understand that

17  everything is speculative to a certain extent, but is that

18  fair to say?

19  A    Yes.  And in -- yes, and, you know, the -- the data is

20  the data.  I -- I -- you know, whether I like it or not,

21  it's still the data.  Based on my conversations with

22  Province and how they came up with the 7 million, it feels

23  like a very reasonable floor, and then there's certain

24  attributes of the asset in this estate, the principal asset

25  in this estate that we think will get it to trade in the

95

1  middle to upper end of the valuation of the comparable

2  transactions of what the data tells us.  So, yes.

3  Q    Well, what if it only trades at five?

4  A    Then it only trades at five.  But we don't think that

5  would be reasonable based on the data.

6  Q    Why?

7  A    It -- well, when we looked at the company, there seems

8  to have been quite a bit of activity around companies like

9  this in the M and A markets, which is one way of saying that

10  means for every time a company gets sold in an active

11  process, there's other parties that weren't successful in

12  meeting their strategic needs by buying that asset.  You

13  know, the asset in this estate seems to have what I

14  generally refer to loosely as scarcity value.  There's not a

15  lot of other legacy brands in the space of the size and

16  magnitude they're at.  That does a lot for -- for certain

17  buyers.

18      The brand seems to have done -- to developed a -- a

19  good market presence based on some of the data, with not

20  using traditional market spin in particular.  You know,

21  their format of using both liquid gels and moving to gummies

22  is something that's going to be helpful to people.

23      And then, particularly for buyers that are good at

24  using D to C channels, Amazon type channels as opposed to

25  mass market channels and, you know, two of the things that

96

just appear to be under-represented for the company, which
is a different way of saying we'll be appealing to buyers
that have these strengths, is the ability to move to more of
a D to C matric or mix in their product or their
distribution mix and to be able to use the brand
internationally.

So, when we see a company that has what I would call
scarcity value, that's really good at brand attributes with
under kind of spent marketing and has the ability increase
value based on how they go to market and where they go to
market, that tends to be the type of factors that get
companies valued highly by strategics.  Strategics being
code for other people in the space that want to accelerate
their end strategy through acquisition.

Q    Okay.  And in your declaration dated March 14th, 2025,
you had a comment, and I think you testified earlier that
typically this process is outside the bankruptcy state more
like 6 to 9 months minimum.  Is that fair?

A    Yeah, I think that would be fair, that, you know,
someone said, Geez, like what would you want to really have
the highest chance of getting full value for the asset?  I'd
love to have, you know, 6 to 9 months.  That would be great.

Q    In a bankruptcy context --

A    Um-hmm.

Q    -- which is where we are --

1 A    Um-hmm.

2 Q    -- and the bid procedures motion proposes a shorter

3 time period, right?

4 A    Yes.

5 Q    And you had testified in your declaration that a

6 shorter time frame -- this is footnote one just for counsel

7 and the Court's reference.  Footnote one on page two of his

8 declaration that is Docket Number 430 -- I think it's marked

9 as Exhibit 5 in the proceedings, you say:

10              "And a shorter time frame will most

11         likely result in lower bids and a

12         fortiori, the shorter sale process --

13         the shorter the sale process, the more

14         likely the bids will even -- will be

15         even lower."

16      How -- do you see that on your declaration?  Do you

17 remember that sentence?

18 A    Yes, ma'am.

19 Q    So, how do you approach this from -- how do you

20 maximize value if the concern is that, you know, even a July

21 bidding deadline is -- is too short for comfort?  How do you

22 do it?

23 A    So, the way we're going to do it is whatever the Court

24 decides that the Court wants to do, we're going to maximize

25 value within that set of parameters.  So, we'll do things

98

1 like we'll probably have a narrower set of initial outreach

2 that we can do more in -- we'll -- we'll go to the people

3 that we think have the highest probability of buying, which

4 it will be more people that are directly in this space

5 instead of somebody strategically since we have about

6 adjacent buyers that aren't in this space that might come

7 in.  We will more quickly -- we'll accelerate each step of

8 the process.  We'll go right to pre-bid data rooms.  We'll

9 get NDA's.  We'll start working with buyers, and we'll just

10 find a way to truncate the -- the actual typical process to

11 fit what the Court thinks is the best outcome in this

12 particular case, and we'll do the best we can to maximize

13 value within that -- within that set of parameters.

14 Q    Do you think four weeks would be enough to test the

15 market?

16 A    Well, I mean, I guess the factual answer to that

17 question is.  The real question is how good of a test is

18 that, right.  Like is that really a test of value, and, you

19 know, the Court has a lot of factors to balance, but the way

20 I kind of look at it is there's a quantum of value in this

21 estate that belongs to the people in the estate, and the

22 more fulsome a job I can do of running a process, the better

23 it's going to be that that quantum of value goes to the

24 people that are in this estate instead of the people that

25 are going to succeed this estate, right, because what

99

1 happens when we run processes that are too fast and don't

2 give people time to bid is we take existing value that

3 otherwise would be captured, and we give that to the people

4 that are the new buyers.

5 Q    So, a shorter time frame perhaps results in a lower

6 transaction price?

7 A    Yes, almost --

8 Q    And that --

9 A    Yes, that would be the most likely outcome.

10 Q    And that would benefit the buyer of the company, right,

11 to the extent they're buying the asset at the lowest

12 possible transaction price?

13 A    Yes.

14 Q    Okay.  In your normal process, is it normal for you to

15 talk to lenders -- so, outside bankruptcy, is it normal for

16 you to be in communication with the creditors or lenders --

17 secured lenders of companies that you're selling?

18 A    That's -- that's highly variable.  Yes and no.  I mean,

19 I wouldn't want to call it typical, but it's not unusual for

20 us to be in communication with all of the interested

21 parties.

22 Q    Okay.  And I think Ms. Fay asked you about a situation

23 where the company -- I think you called it -- where the

24 company is also trying to find alternatives like debt

25 refinancing as opposed to a sale.  Do you remember that line

100

1  of questioning?

2  A     I do.

3  Q     Is that normal in your nonbankruptcy experience in the

4  process?

5  A     Could you help me understand?  Is what part normal?

6  Q     Is it normal for a company to be looking at different

7  -- different outcomes for itself, looking at debts, looking

8  at a sale at the same time, is that customary?

9  A     It certainly doesn't happen infrequently.  Like,

10 there's plenty of times -- and sometimes it can actually

11 help in terms of valuation because when I talked earlier

12 about, you know, there's two numbers, right, what I'm

13 willing to pay as a buyer and what I think I have to pay.

14 And, candidly, if what I'm willing to pay is X, you know, if

15 I think the company has other options, I might be willing to

16 pay closer to what I'm willing to pay than what I think I

17 have to pay.

18     So, those factors are always in play, and there's

19 always multiple kind of factors involved in every process

20 that I work on.

21     (Pause.)

22         MS. BAGDANOV:  Sorry.  One moment.  I'm just

23 pulling together all my random notes.

24 BY MS. BAGDANOV:

25 Q     Can you quantify right now if -- and if you can't,

101

1  that's okay.  Can you quantify right now in maybe

2  percentages the value that you would expect to raise -- s

3  o, let's say your options are a four-week sale process and a

4  four-month sale process.  Can you quantify for Irwin

5  Naturals an estimate --

6          MS. FAY:  Objection (Zoom glitch).

7  BY MS. BAGDANOV:

8  Q    -- of the amount that you would receive higher after

9  four months as opposed to a one-month period?

10          MS. FAY:  Objection, your Honor.  Calls for

11  speculation.

12          THE COURT:  Sustained.

13          MS. BAGDANOV:  Your Honor, everything is

14  speculating, as the Court had said in valuation.

15          THE COURT:  Okay.  Fine.

16          MS. FAY:  Same objection.  It's highly speculative

17  here as to what --

18          THE COURT:  And I'm already keeping -- keep in

19  mind that it's really -- I guess, there's no way of knowing,

20  but you can have him answer the question.

21  BY MS. BAGDANOV:

22  Q    I guess in your experience, Mr. Willis, have you seen

23  situations where a longer sale process tends to be more

24  valuable?

25          MS. FAY:  Objection.  Speculation.  How could you

*Echo Reporting, Inc.*

102

1  possibly know what a longer process than the process you did

2  run would value?

3          MS. BAGDANOV:  How is this not the answer that

4  needs to be given?  We need to know if a longer process as

5  proposed by the Debtor or a four-week process is better?

6          THE COURT:  Well, I think he's already answered

7  when he said that he thinks longer is better.

8          MS. BAGDANOV:  Okay.  Fair enough.

9          THE COURT:  Right?  He said longer is better.

10 Well, but he'll work within whatever, you know, timeline he

11 has.

12         MS. BAGDANOV:  Fair enough.

13         THE WITNESS:  Well, am I supposed to be speaking

14 now or being silent because I don't want to violate any

15 rules, your Honor?

16         THE COURT:  Well, I -- I mean, do you -- I -- I --

17 it just seemed like -- do you have a sense of like each

18 month and why -- how much of a difference it would make if

19 you had one more month, two more months, three more months?

20         THE WITNESS:  Yeah.  So, I'm not going to give --

21 I'm not going to give a quantitative answer to that

22 question.  But I will tell you this, your Honor, just to

23 give a little better sense.

24         So, there's two broad sets of buyers.  There's

25 financial buyers, and there's strategic buyers.  Strategic

103

1  buyers are people like Proctor and Gamble that might want to

2  buy an estate like this to put into their portfolio and

3  their distribution channel.

4      If we try to run a four-week process, the chance

5  of having any strategic buyers show up with any type of

6  reasonable bids is -- is not very high, right.  Like, broken

7  clocks will ring twice a day, but I don't like to bank on

8  them, not very high at all.  Strategics need time.  They

9  have processes.  They have a different set of motivations

10  than financial buyers.

11      Financial buyers are in the business of buying

12  companies and are also in the business of maximizing, you

13  know, what they have to pay versus what they're -- they

14  could pay.  So, you will get some of them.  But even that,

15  even a financial buyer needs to have bandwidth.  They need

16  to have a team available.  They need to think that there's a

17  reasonable chance that they can win to get involved in a

18  process like this.

19      So, when you talk about something like four weeks,

20  that doesn't feel like you're exposing the quantum of value

21  and testing it in the market.

22      Now, whether at four months you're X percent or Y

23  percent, I just don't feel like I can put a number on that,

24  your Honor.  But the factors that would lead to you, the

25  Court, really getting the -- the asset exposed in this case

104

1 where you have a performing asset, you know, trying to do

2 four weeks, I don't think I would feel is a reasonable test

3 of market value.

4        THE COURT:  Okay.  So, there was an order that was

5 submitted for sale procedures that has a minimum bid, blank.

6 So, is your -- do you have thoughts about setting a minimum

7 bid?

8        THE WITNESS:  So, again, your Honor, you know, I

9 -- you have a different -- the Court has a different set of

10 constraints.  In general, I don't like to tell the market

11 what the minimum bid is.  I like to tell the market to tell

12 me what the bids are going to be because I generally get a

13 higher bid.

14        THE COURT:  So, you wouldn't normally set a

15 minimum bid?

16        THE WITNESS:  I would not normally set a minimum

17 bid.  What I would do is expose the asset to the right set

18 of buyers and let them get as interested as possible.  I

19 spend a lot of time helping buyers understand why this asset

20 helps them strategically and they should be willing to pay a

21 boat ton of money for it.

22        THE COURT:  How do people react when you have a --

23 I will say -- well, you have a different kind of stalking

24 horse, but you have this idea of this -- this bidder that

25 comes in, right, that you've picked as --

1          THE WITNESS:  Yeah.

2          THE COURT:  -- the best one so far, but then you

3   publicly announce it to the world, right, and you have an

4   overbidding process.  Okay.

5          THE WITNESS:  Um-hmm.

6          THE COURT:  Have you dealt with like formalized

7   overbidding processes?

8          THE WITNESS:  Not as a participant, no, not as

9   someone selling a company, just as people on the buy side

10  and watching assets trade.

11         THE COURT:  Did you look at the proposed bidding

12  procedures and the proposed -- anything about the proposed

13  increments on bids or -- the stalking horse or like when

14  would you -- how long would it take for you to find a

15  stalking horse?  Like, how long would that take?

16         THE WITNESS:  Well, I think the way it's laid out

17  now, the way I understand it, your Honor, is that the

18  stalking horse would be named by, you know, somewhere in the

19  beginning and middle of June.  And what I saw -- when I saw

20  -- I think that's a reasonable time to get a stalking horse

21  in this case, but it's at the lower end of reasonable.

22         THE COURT:  What about creating the asset purchase

23  agreement?  How do you go about doing that?

24         THE WITNESS:  Typically, what we would do is draw

25  up the assert purchase agreement now and -- and it -- there

106

1  were no constraints.  I always like to have the APA actually

2  draft it and make people have to either agree to it or

3  redline it with their firm offer because I want to know what

4  the structure of the deal's going to look like.

5           THE COURT:  So, it wouldn't take long then to have

6  a draft APA, right, that you would use to go to market?

7           THE WITNESS:  A draft APA typically takes a few

8  weeks.

9           THE COURT:  Well, how many is a few?

10          THE WITNESS:  Three to four has been my experience

11 if you're really going to understand the nuances and the

12 risks of the deal and how you're going to allocate them.  I

13 think the last one -- I was trying to go back to last April.

14 I think the last one I did took just under a month, and that

15 was with counsel that was very intimate with the asset that

16 was being sold.  They had been the outside counsel for a

17 number of years.

18          THE COURT:  Okay.  Thank you.

19          Does anybody have any questions about that?

20               FURTHER REDIRECT EXAMINATION

21 BY MS. BAGDANOV:

22 Q   Mr. Willis, could you do an APA in two weeks or a week

23 with counsel's input in this case?

24 A   Sure, if we -- if we had to, we could.

25          MS. BAGDANOV:  Great.  I have no more questions,

107

1 your Honor.

2          THE COURT:  Thank you.

3          Does anybody else have more questions?

4          MR. FEINSMITH:  Yes, your Honor.  We have a -- I

5 have a few more questions.

6          THE COURT:  Okay.

7                    RECROSS EXAMINATION

8 BY MR. FEINSMITH:

9 Q    Mr. Willis, have you -- are you aware of the fact that

10 the Debtor has sought debt financing or an equity

11 transaction for many months now?

12 A    I'm only -- I'm only, you know, first person aware of

13 how the Debtor's been behaving and acting since I was asked

14 to get involved in this process, which is basically the

15 beginning of February.

16 Q    And if I told you it was more than a year, would you be

17 surprised by that?

18 A    No.

19 Q    Would that change your opinion on how long it takes to

20 market this asset to get full value?

21 A    No.

22 Q    If the Debtor's been marketing it for more than a year

23 for -- for debt financing or an equity transaction and

24 hasn't achieved that transaction, what -- what would that

25 say to you about value?

108

1  A    Nothing.

2  Q    It doesn't concern you?

3  A    No.

4  Q    Do you know how many other bankers have been involved

5  before you?

6  A    My understanding that in this process, there's been

7  one.

8  Q    If I told you there were four, would that surprise you?

9  A    No.  Over what time period?  What are you talking

10 about?

11 Q    Going back to more than a year pre-petition.  Are --

12 are you -- are you aware of FitLife's interest as a

13 potential buyer?

14 A    A hundred percent.  Mr. Judd called me.

15 Q    Has the Debtor ever said to you that it's opposed to

16 FitLife being a stalking horse for this transaction?

17 A    I have no recollection of the Debtor ever communicating

18 to me about FitLife.

19 Q    Have you -- have you read the joinder that Mr. Irwin

20 filed in support of the sale procedures?

21 A    I have not.

22 Q    Would it surprise you if Mr. Irwin said in that joinder

23 that he was opposed to FitLife being the stalking horse?

24 A    It wouldn't surprise me either way.  It wouldn't.

25 Q    Do you know if there's any good reason why FitLife

109

1  shouldn't be the stalking horse in this transaction?

2  A    Yeah.  I believe I said in -- in my declaration my

3  concern -- it's not that it's FitLife bine the stalking

4  horse.  It's the number, and my concern is that that number

5  is so far below both the appraised value and our estimate of

6  market value that it could have a chilling effect on the

7  overall process.

8  Q    Has anybody expressed an interest to pay a higher

9  number than what you think FitLife's number would be?  Now,

10 I'm not saying FitLife's number has been established.  It

11 may be -- it may be less than what people think it is, but

12 are you aware of anybody that's suggested that they would

13 pay more?

14 A    I haven't had a valuation discussion with anyone

15 because that is something that I'd like this lodged order to

16 be signed before I actually do it, but I have mentioned that

17 we've had significant pre-process interest in this.  And, to

18 repeat what I said earlier, I -- I couldn't -- I'm so

19 agnostic about who actually buys these assets.  Like, I just

20 want to get full value for the estate.  That's my job.

21 Q    Are you familiar with whether a buyer at bankruptcy

22 sale is likely to negotiate an indemnity?

23 A    The buyer -- well, my -- again, I'm going to stay out

24 of this.  I'm going to do this with whatever you all decide

25 you're going to do, but one of the things that -- as I

110

1 mentioned, you know, I am an attorney.  One of the things I

2 understand that you can get some pretty special protections

3 under bankruptcy sales that aren't available in other

4 places.

5 Q    Are you familiar with Section 365 of the Bankruptcy

6 Code, and specifically, the provisions that govern

7 assumption of contracts in a sale?

8 A    No.

9 Q    Are you familiar with the provisions of the Bankruptcy

10 Code that authorize a buyer to acquire assets free and clear

11 of liens and claims?

12 A    I'm aware that that's true.  I couldn't cite a Code

13 reference for you.

14        MR. FEINSMITH:  Okay.  I have no more questions,

15 your Honor.

16        THE WITNESS:  Thank you, sir.

17        MS. BAGDANOV:  Your Honor, briefly?

18    (No response.)

19        MS. BAGDANOV:  Your Honor, briefly?

20        THE COURT:  Yes.

21        MS. BAGDANOV:  Thank you.

22            FURTHER REDIRECT EXAMINATION

23 BY MS. BAGDANOV:

24 Q    Mr. Willis, outside of the bankruptcy context, do any

25 of your asset purchase agreements ever include terms for

111

1  assumption of certain contracts or leases?

2  A    Almost all of them.  That's why we do APA's.

3  Q    What -- you said a moment ago that you were concerned

4  that the FitLife bid as you currently understand it -- and

5  it may be higher, it may be lower at the end of the day, but

6  as it -- as you currently understand it, that you're

7  concerned it will chill bids.  Is that right?

8  A    Yes.

9  Q    (Zoom glitch.)

10  A    My experience is when there's an expectation of value

11  and everybody has access to all of those market multiples,

12  we all can subscribe to the data sources that provide those

13  market multiples, I have two general concerns that people

14  would think if the number was too low or relatively -- much

15  lower than they would expect, that it would communicate that

16  there's either a problem with the assets or that the process

17  itself might have some -- some issues in it.

18  Q    And with regard to the process, I -- I'd like to

19  refresh your recollection if I may.  Designated Exhibit 2 is

20  Docket Number 388, your first declaration filed February 26,

21  2025.  And paragraph nine of your declaration on page three

22  says that based on documentation you've reviewed with

23  respect to Irwin Nevada's prior attention of investment

24  bankers, no prior investment banker ran a fulsome sale

25  process from what I have reviewed.  At two different times,

112

1 initial sales steps were started but never moved beyond the

2 preliminary stages.  As such, you don't believe the business

3 has been previously vetted in the market.

4      Do you remember testifying to that?

5 A     Not only is that not true, to be really candid with

6 you, I mentioned earlier that I have to go through a two-

7 step internal review process to get approved to do a deal.

8 A deal that's heavily marketed isn't necessarily -- prior to

9 us being involved isn't necessarily dispositive in terms of

10 turning it down, but it's very hard to get a deal that's

11 been marketed fully approved by our firm.

12 Q    I want to make sure I have your testimony correct.

13 You're saying your paragraph nine is still true today or not

14 true?

15 A     It's totally true.

16 Q    Can you elaborate on why you said no prior investment

17 banker ran a fulsome sale process?  What does that mean?

18 A     Yeah.  My understanding is that there was a banker

19 involved during this process that resigned that never really

20 got to market, and I heard that there were some banks that

21 looked and talked with the company about taking the company

22 to market in the past but really never got there and that

23 some of that was driven by some of the company's strategic

24 interests beyond the kind of the core asset that we're going

25 to sell here.

113

1    So, to my knowledge, there's never really been a

2 fulsome process run to sell this asset the way we would sell

3 it.

4 Q   Okay.  So, it may be the case that it was -- that the

5 number of previous investment bankers was two, maybe it was

6 four, maybe it was 10.  You had testified with Mr. Feinsmith

7 that it's not really relevant to your process, correct?

8 A   Yeah.

9    (Simultaneous speaking.)

10 BY MS. BAGDANOV:

11 Q   Mr. Willis, is what's relevant whether it has been

12 vetted in the market?

13 A   I'm sorry.  Could you just -- could you repeat that one

14 more time?  I didn't catch the question.

15 Q   So, the number of investment bankers may be irrelevant

16 to you, as you testified to Mr. Feinsmith, but it's a

17 relevant question and it's part of your due diligence

18 deciding that you're comfortable that this -- this asset

19 hasn't been adequately vetted and marketed yet?

20 A   Correct.

21    MS. BAGDANOV:  Okay.  I have no further questions,

22 your Honor.

23    MS. FAY:  One question, your Honor, with

24 apologies.

25 //

114

1                    FURTHER RECROSS EXAMINATION

2    BY MS. FAY:

3    Q    Mr. Willis, can you clarify -- I didn't quite catch --

4    why it was that the prior processes didn't get off the

5    ground or didn't go to market?

6    A    I just know that the process that preceded us was

7    terminated.

8    Q    You have no information about why -- you said the

9    investment banker -- I think you said the investment banker

10   quit.  You have no knowledge about why that happened?

11   A    I don't have any primary knowledge of why that

12   happened.

13             MS. FAY:  Okay.  Thank you.

14             THE WITNESS:  You're welcome.

15        (Pause.)

16             THE COURT:  So, then nothing, Mr. Willis can be

17   excused, correct?

18             MS. BAGDANOV:  Yes, your Honor.

19             THE COURT:  Okay.

20             MS. BAGDANOV:  Thank you, Mr. Willis.

21             THE COURT:  Thank you, Mr. Willis.

22             THE WITNESS:  Thank you, your Honor.  Good luck

23   with everything.

24             THE COURT:  So, it's -- I know we have people in a

25   variety of locations, but it's a quarter to 1:00 here, about

115

1 a quarter to 1:00.  Does anyone have an issue with us taking

2 a break?  Is somebody in a rush?  Is Mr. Judd in a rush?

3 Because we could go through if we want to get him done.

4          MS. BAGDANOV:  I would like five minutes if

5 possible.

6          THE COURT:  Well, I'm just wondering if we should

7 take more of a lunch break.  The west -- a West Coast lunch

8 break or if we should just take a quick break and then come

9 back for our -- I think the only other -- the only remaining

10 witness.

11          Does anybody --

12          MR. FEINSMITH:  I would just ask if Mr. Judd has a

13 preference.  I'm not -- I'm not sure of his schedule.  All I

14 know is he's next to testify.

15          THE COURT:  Right.

16          MR. JUDD:  Yeah, I Can do whatever's best for the

17 Court.

18          THE COURT:  Okay.  So, does anyone else have a

19 preference?

20          UNIDENTIFIED SPEAKER:  Whatever the Court's --

21          THE COURT:  Well, my preference would be a West

22 Coast lunch break.  So -- so, I'm thinking we'll be back in

23 an hour.  So, that's 1:45.  Okay.  That's 1:45 Pacific Time.

24 Thank you.

25      (Proceedings recessed to reconvene.)

*Echo Reporting, Inc.*

116

1                    AFTERNOON SESSION

2                        --oOo--

3          THE COURT:  Good afternoon.  This is Judge

4  Kaufman.

5          So, we are -- have one  more witness left.  Are we

6  going to go ahead with that witness, Mr. Judd?

7          MS. BAGDANOV:  Yes, your Honor.

8          THE COURT:  Okay.  So, Mr. Judd, can you raise

9  your right hand.

10          DAYTON JUDD - FITLIFE'S WITNESS - SWORN

11          THE COURT:  Okay.  Can you just state your name

12  for the record.

13          THE WITNESS:  Sure.  My name is Dayton Judd.

14          THE COURT:  Thank you.

15          So --

16          MR. FEINSMITH:  Good afternoon, your Honor.  Shall

17  -- shall we proceed?

18          THE COURT:  Yes.

19          MR. FEINSMITH:  Okay.  Thank you, your Honor.  So,

20  we -- we have already filed a declaration on behalf of Mr.

21  Judd in support of the motion that we filed to terminate

22  exclusivity.  But, in addition to that, we have direct

23  testimony today that we'll do as well.

24  //

25  //

117

1                         DIRECT EXAMINATION

2    BY MR. FEINSMITH:

3    Q    Good afternoon, Mr. Judd.

4    A    Hi.

5    Q    Please state your name for the record.

6    A    I'm Dayton Judd.

7    Q    And what is your position at FitLife?

8    A    I am the Chairman of the Board and the CEO of FitLife.

9    Q    Can you please describe your educational and

10   professional background?

11   A    Yeah.   Educationally, I have a Bachelor's Degree and a

12   Master's Degree in Accounting.   I'm a CPA with an active

13   license from the State of Colorado.   I have an MBA from

14   Harvard Business School where I was a Baker Scholar, which

15   is a top five percent of graduates.   Yeah.   So, that's my

16   educational background.

17       Professional background, I spent the first chunk of my

18   career with a consulting firm called McKinsey and Company,

19   spent between 9 and 10 years with them.   Left in 2007 and

20   went to work for a hedge fund called Q Investments, a multi-

21   billion-dollar hedge fund based in Forth Worth, Texas.   I

22   left Q Investments and started my own hedge fund called

23   Sudbury Capital in 2012.   So, in addition to running

24   FitLife, being the Chairman and the CEO of FitLife, I'm also

25   the founder and managing partner of Sudbury Capital, which

118

1  is a hedge fund focused on micro cap and small cap stocks.

2  Q     Thank you.  Can you please explain the nature of

3  FitLife's businesws?

4  A     Yeah.  FitLife owns and operates a portfolio of brands,

5  primarily nutritional supplement brands.  We own 13 brands

6  in total, 11 of which are nutritional supplements and two of

7  which are skincare brands.

8  Q     Please describe your experience valuing businesses

9  generally.

10 A     Well, generally, my -- my time that I spent with

11 McKinsey, part of that time I spent with the corporate

12 finance practice in New York City that did valuations for

13 Fortune 500 companies.  You know, the last 18 years of my

14 professional life, I've been working, you know, for a hedge

15 fund or running my own hedge fund.  And the decisions you

16 make in a hedge fund are entirely based on valuations,

17 valuations of whole companies or valuations of securities

18 issued by companies.  So, valuation is something I do every

19 day.

20 Q     And please explain your experience that's specific to

21 valuing companies in the supplement space.

22 A     Sure.  So, I mean, I -- I initially bought into

23 FitLife, just as an outside investor, so valued it as a

24 public company.  In my fund, I've owned shares in public --

25 other publically traded nutritional supplement companies.

119

1 And since becoming the CEO of FitLife, we as a company and I

2 as CEO have personally looked and -- looked at and

3 participated in over 60 sale side transactions where I'd

4 sell, you know, supplement company brands that are being

5 sold and -- and participated in those -- those processes to

6 various degrees.

7 Q    Have you reviewed the declaration submitted by Mr.

8 Willis of FTS, which --

9 A    I have.

10 Q    -- was filed in support of the Debtor's objection?

11 A    I have.

12 Q    Okay.  Great.  And have you also reviewed Mr. Willis's

13 subsequent declaration in support of the proposed bidding

14 procedures?

15 A    Yes.

16 Q    And have you also reviewed the declaration submitted by

17 Mr. Platt of the Morello Capital Group?  There were two, one

18 dated September 19th, 2004 and a second March 14th, 2025.

19 A    I have.

20 Q    What do you understand Mr. Willis's assessment of the

21 Debtor's value to be?

22 A    His assessment was somewhere between I think 100

23 something million and 200 million.  I don't have the numbers

24 right here in front of me, but 16 times EBITDA, you know, up

25 to a 16 times pro forma EBITDA.

120

1  Q    And --

2  A    He said highly confident over 100 million I believe

3  were his words.

4  Q    And what do you understand Mr. Platt's assessment of

5  the Debtor's value to be?

6  A    His first assessment was approximately 100 million.

7  His range was 93 to 110.  The second valuation he did in

8  November his assessment was 79 million with a range of 72 to

9  87.

10 Q    Can you please explain why you think those valuations

11 are incorrect?

12 A    Sure.  To -- to start with Mr. Platt, I -- I will say

13 his methodology I believe is sound, and his approach is

14 sound.  We -- we have bought -- FitLife has bought other

15 supplement companies in the past.  When we buy supplement

16 companies, we're required to get a valuation done by an

17 independent third party, and it looks very much like the

18 work that Mr. Platt did.  The issue I have with Mr. Platt's

19 valuation was -- is not his approach or his methodology.

20 IT's the inputs that he had.  You know, part -- I think an

21 extensive part of his testimony or the discussion with Mr.

22 Platt was about the revenue and EBITDA projections that he

23 received which in September were, you know, pretty

24 substantial, which were subsequently walked back by the

25 company in November to lower ranges.  The initial estimates

121

1 were more than 10 percent growth.  The second round of

2 estimates were more like, you know, three to almost four

3 percent growth.  And then, you know, he didn't -- he didn't

4 -- he didn't do a subsequent valuation with the Debtor's

5 most recently filed projections.

6 Q    And you heard Mr. Platt's testimony before, correct?

7 A    Yes.

8 Q    And he gave testimony about the effect or noneffect of

9 declining revenue projections on value, and in conjunction

10 with that testimony he tried to draw a distinction between

11 the management case and the base case.  Do you have a view

12 on the testimony he gave with respect to those issues?

13 A    I do.

14 Q    Could you please tell the Court?

15 A    Sure.  Well, I -- Ms. Fay pointed out part of it,

16 right.  I think he -- he made several assertions during his

17 testimony that the first time they did it it was a

18 management case and the second time they did it, it was a

19 base case.

20      Ms. Fay pointed out that it's labeled base case.  Also,

21 his own declaration makes it very clear that he received a

22 second set of projections from the Debtor and used that

23 second set of projections for his valuation in November.

24 Q    And what is your opinion on the effect of value if

25 there's declining revenue projection?

122

1  A     Yeah.  Value will go down, right, all other things
2  equal.  There's two things, only two things that drive value
3  in -- in terms of what a company is worth, and it's growth
4  and profitability.  And, so, even if you hold profitability
5  constant, if you have, you know, a company that's growing
6  very quickly and a company that's declining very quickly,
7  there is no scenario, other things equal, where they're
8  going to trade at the same multiple.
9       So, a company -- you know, the first time he did his
10 valuation, if it's growing at more than 10 percent, it
11 should -- it should be valued at a higher multiple.  When
12 it's growing at a lower rate of growth, it should be valued
13 at a lower multiple, and when a business is declining or
14 flat, it should be valued at an even lower multiple.
15 Q     Thank you.  So, let's talk for a minute about Mr.
16 Willis's assessment of value.  Mr. Willis in one of his
17 declarations appended the work that Mr. Platt did, the
18 valuation that Mr. Platt did, but he arrived at a much
19 higher value, as you heard during his testimony.
20      Do you take issue with Mr. Willis's assessment of
21 value?
22 A     I do.
23 Q     For what reason?
24 A     His methodology is simply to take the highest possible
25 observed multiple in a comparable transaction in the market

*Echo Reporting, Inc.*

123

1  and apply it to the Debtor's business when, in fact, the

2  Debtor's underlying business is completely different from

3  and in no way representative of those -- those other

4  businesses that were traded at higher multiples.

5  Q    With respect to his second declaration, he appended a

6  market update from a investment bank called Meridian

7  Capital.  Are you familiar with that market update?

8  A    I am.

9  Q    And in that document, he's referring to an M and A

10 transaction involving a company called Thorn.  Do you recall

11 that?

12 A    Yes, I do.

13 Q    Do you have a view about whether that transaction is

14 comparable to the potential sale of the Debtor here?

15 A    I do.

16 Q    And can you please tell the Court what that is?

17 A    Yeah.  I think it's completely irrelevant and not at

18 all representative of Irwin.

19 Q    And why is that?

20 A    So, Thorn is a company that, first of all, is growing

21 very very quickly, right.  Before, at the time it had got

22 bought, it had grown revenue at a compounded annual growth

23 rate of about 28 percent per year for several years, right.

24 By the same token, looking at Irwin's own reported numbers,

25 they're declining 13 percent.  So, in terms of revenue

124

1 growth, they look completely different.

2      In terms of the margin profile of Thorn at the time it

3 was bought, it had gross margins in excess of 50 percent, a

4 full 20 percentage points higher than Irwin's.  Irwin's are

5 around 31 or 23 percent.

6      Their EBITDA margin was, Yoo know, higher.  There's --

7 their challenges to market were completely different, right.

8 Thorn's strategy was to go through the practitioner route.

9 So, a doctor's offices, chiropractors, et cetera.  And when

10 a doctor is recommending a supplement to you, they -- they

11 tend -- and they -- and they well it to you, they sell it to

12 you at a higher price, right, hence the higher margins.

13 They had a partnership with the Mayo Clinic.  They had

14 partnership with the Mayo Clinic.  They had partnerships

15 with the U.S. Olympic Team.  It was just completely

16 different and not at all representative of Irwin or its

17 business.

18 Q    Speaking of comparables, I'd like to focus your

19 attention on Exhibit 6 that we have submitted --

20      MR. FEINSMITH:  And -- and this was one of the

21 documents, your Honor, that we put into evidence.

22 BY MR. FEINSMITH:

23 Q    This document is labeled "Comparables Nutrition

24 Products".  Can you please describe, Mr. Judd, what this

25 document is?

125

1  A     Sure.  This is called a comp table and in the investing

2  world where you list comparable companies and you look at

3  how they're valued.  These are all public companies.  All of

4  these are companies whose primary business is nutritional

5  supplements.

6  Q     Would you --

7  A     You look at how they are valued in the market.  You

8  look at their -- their financial performance, which is kind

9  of the section in the middle, the financial metrics, and

10 operating metrics, and you look at how they're valued in the

11 market in terms of multiples, both revenue and EBITDA

12 multiples.

13 Q     Did you produce this document or was it produced under

14 your supervision?

15 A     Yes.

16 Q     And where was the information derived from that made

17 its way into this document?

18 A     From company -- all of these companies, again, are

19 publicly traded.  So, they file financials with the

20 Securities and Exchange Commission, audited financials, I

21 will add, and also Bloomberg.  I use Bloomberg for investing

22 purposes, and I can pull these numbers from Bloomberg.

23 Q     And as you look at this document, do you believe its

24 contents are true and correct?

25 A     I -- I do, with one exception that I need to point out.

126

1 After we submitted this to the Court and I was reviewing it,

2 the -- the gross margin number for Herbalife, which in the

3 chart is at 45.2 percent, as I was reviewing it after the

4 fact, I noticed that that was typed incorrectly, and their

5 -- their correct gross margin is 77.9 percent.  Other than

6 that, I do believe that this is a true and correct

7 representation of these companies' performance and value as

8 of last Friday, which is when we pulled the numbers.

9        MR. FEINSMITH:  Your Honor, based on the

10 foundation that Mr. Judd has laid for this document, we'd

11 like to have it admitted into evidence.

12        MS. BAGDANOV:  Objection.  Insufficient

13 foundation.

14        MR. FEINSMITH:  I don't -- I don't know what more

15 of a foundation we could lay.  Mr. Judd prepared this

16 document.  He explained where he got the information from.

17 I don't know what else would be needed as a foundation.  I

18 think it should be admitted, your Honor.

19        THE COURT:  We're going to admit this document.

20 I'm going to overrule the objection.  It's based on publicly

21 traded companies and data.

22        MR. FEINSMITH:  Thank you, your Honor.

23 BY MR. FEINSMITH:

24 Q    Mr. Judd, could you please explain what the information

25 in this Exhibit 6 regarding comparables tells you about the

127

1  value of the Debtor?

2  A     Sure.  So, I've included -- below the blue line where

3  it says the median, I've included the numbers for Irwin

4  Naturals.  All of these numbers are numbers that the

5  themselves have reported.  These are not my numbers.

6  They're the Debtor's numbers.

7        So, you can see the revenue of 66.1 million, their

8  EBITDA of 6.7, their three-year revenue growth rate being a

9  decline of 13 percent per year, their gross margin of --

10 it's a little bit small on my screen, but I think that says

11 31.8 percent, and their EBITDA margin of 10.1 percent.

12       What it tells me, right, is I -- I look at Irwin

13 Naturals' performance, again, objectively, right.  None of

14 this is an opinion.  These are -- these are reported

15 financial metrics both by the Debtor and by these audited

16 publicly traded companies.

17       Irwin Naturals is in the bottom three of the companies

18 on this list in terms of their revenue growth rate, right.

19 Every other company is performing better on the top line

20 than Irwin Naturals.  Irwin Naturals' gross margin is in th

21 bottom three of all of the companies on this list.  Their

22 gross margins -- maybe not bottom three but well below the

23 median, right.

24       So, this -- this is a company that objectively, right,

25 is among the worst performers in the supplement industry,

128

1  and the challenge that I have with the testimony  that we've

2  heard and the declarations that have been submitted to the

3  Court is that they want to argue that a company that is

4  objectively one of the worst performing companies in the

5  industry should be valued at the highest possible multiples,

6  right, in terms of what you can see on the right, either

7  EBITDA multiples, revenue multiples, comparable transaction

8  multiples.  So, that -- that is why I believe this is

9  particularly relevant.  It doesn't -- it indicates, right --

10 you can kind of look down the list and say, Okay.  If I'm

11 going to look at the companies that are declining, what

12 multiples are they valued at.  I mean, they're all valued at

13 less than 6.  There's one company at 6.3 times EBITDA, and

14 the rest are, you know, quite a bit below that, 3.6, 5.2,

15 you know, 4.7.

16      So, these -- you know, there is no precedent, no

17 indication, it's unconscionable almost that somebody would

18 assert that a company that's declining like this is is going

19 to trade, you know, at a Thorn type multiple.

20 Q   And what does this analysis tell you about the

21 multiples that have been advanced by Mr. Platt and Mr.

22 Willis?

23 A   Yeah.  I think the word I used was unconscionable, but

24 there -- there's -- there's no precedent, no basis for it

25 whatsoever.

129

1  Q    Okay.  I'd like to refer now to Exhibit 7 from our

2  exhibit package, and this is the Operational Performance

3  Report.

4        Mr. Judd, was Exhibit 7 prepared by you or under your

5  supervision?

6  A    Yes, it was.

7  Q    From where does the information contained in Exhibit 7

8  derive?

9  A    Yeah.  So, on the left-hand side of the page, the

10 numbers for FitLife Brands comes from our public SEC

11 filings.  The only exception there is we have not filed our

12 10K for 2024.  That will be filed next week.  We did do a

13 press release with a pre-release of our earnings and so that

14 our revenue number of  64.5 that we're including in this

15 chart and the adjusted EBITDA of 14.1 that we're including

16 in this chart represents the midpoint of the range that we

17 provided to the investing public in that press release from

18 last week.

19       The Irwin Naturals numbers in this spreadsheet all come

20 directly from the Debtor.  The historical numbers are filed

21 with the Court in their -- their budget and their appendix

22 to their disclosure statements.  All of the data on the

23 right is -- is simply a summary of their MORs as filed with

24 the Court.

25 Q    The Monthly Operating Reports?

130

1  A    Yeah, sorry, Monthly Operating Reports.

2          MR. FEINSMITH:  Thank you.

3          Your Honor, we'd like to admit this Exhibit 7 into

4  evidence.

5          THE COURT:  We'll admit it.

6          MS. BAGDANOV:  Objection based on hearsay, but I

7  understand that you can give the worth that it's due.

8          THE COURT:  Okay.

9          MR. FEINSMITH:  Your Honor, I don't know how this

10 is hearsay.  It's all -- the FitLife information is all

11 publicly filed.  The information about the Debtor is all in

12 public filings with this Court and the MORs that have been

13 submitted to the U.S. Trustee.

14         THE COURT:  Well, I mean, we could take judicial

15 notice of the Irwin Naturals numbers.  Just the FitLife

16 numbers, I don't -- I mean, it seems to me --

17         MS. BAGDANOV:  Well, that's the argument, your

18 Honor, annualized totals of EBITDA -- I guess the

19 conclusions you can make from this are the (indiscernible)

20 as opposed to the document itself.

21         THE COURT:  Well, maybe since -- maybe -- how

22 involved were you on the -- in the preparation of SEC

23 filings and the data for FitLife?

24         THE WITNESS:  Is that a question for me?

25         THE COURT:  Yes.

131

1          THE WITNESS:  Yeah.  Intimately.  I have to sign

2  every 10Q and every 10K before it's filed with the SEC.

3          THE COURT:  And what do you do before you do that?

4  Like how are the records kept by the company?  Do you know?

5          THE WITNESS:  I -- I missed the first part of your

6  question.

7          THE COURT:  How does the company keep its records

8  about its financial performance?

9          THE WITNESS:  In -- in an account -- an ERP system

10 called --

11         THE COURT:  No, but like how --

12         THE WITNESS:  -- Epicor.

13         THE COURT:  -- do you track them?  Maybe you can

14 lay a foundation, Mr. Feinsmith, about the company --

15         THE WITNESS:  How do I track our --

16         THE COURT:  -- about FitLife's data.

17         THE WITNESS:  If I can just add --

18         THE COURT:  Yeah.

19         THE WITNESS:  Like, there isn't a number on this

20 page that has not been publicly reported by either FitLife

21 in its SEC filings or by the Debtor in a filing with this

22 Court.

23         THE COURT:  Well, I know the Debtor -- I don't

24 have an issue with the Debtor's because it's -- they're --

25 they're in filings with the Court.  They're admissions of

132

1 the Debtor.  They're from Debtor's documents, right.  I'm

2 just -- the FitLife numbers are the issue as far as hearsay

3 goes.

4        MR. FEINSMITH:  Well, your Honor, we -- we -- we

5 can move on and Mr. Judd's testimony will be evidence as he

6 describes this document, and we can utilize the document in

7 effect as a chart to aid in his testimony.

8        THE COURT:  Oh, okay.

9        MR. FEINSMITH:  If that's acceptable.

10        THE COURT:  Yes.

11        MR. FEINSMITH:  Okay.

12 BY MR. FEINSMITH:

13 Q    Mr. Judd, can you please explain what Exhibit 7

14 indicates to you about the Debtor's value?

15 A    Oh, yeah.  What I would say, I don't think there's any

16 assessment of value on this page, and that's not what it's

17 intended to be.  It's an -- it's an input into a valuation

18 decision.  Everything on this page is backward looking.

19 There's no forward looking statements.  It's all, again

20 publicly reported and -- and it's math.  Even the annualized

21 total is just math.

22        What it tells me is, you know, again, for FitLife

23 Brands what it tells me is that, you know, we have a

24 business.  It's growing 32 percent per year, has grown 32

25 percent per year for the last three years, right, whereas

133

1   Irwin Naturals is -- has declined 13 percent per year for

2   the last three years.

3       In terms of gross profit, you can see, you know,

4   continued growth in FitLife's gross profit while Irwin

5   Naturals is declining.  You know, our gross margin is 10 to

6   15 percentage points higher than Irwins.  You know, our

7   adjusted EBITDA is -- is growing rapidly.  You know, Irwins'

8   is declining.  Our adjusted EBITDA margin is 10 percentage

9   points to 15 percentage points higher.

10      The -- the reason this -- this factors into value is,

11  again, a declining -- a growing business is worth more and

12  should trade at a higher multiple than a declining business.

13  Again, it's -- that's a very widely accepted and -- and

14  really hard to refute point.

15      You know, we as FitLife are a publicly traded company.

16  These numbers are out there, right.  We as a publicly traded

17  company are growing 30 something percent per year.  We have

18  higher gross margins.  We have higher EBITDA margins, right.

19  And we have a publicly observed or a number that any one of

20  us on this call can go and look up and see what that

21  business is worth that displays that operating performance.

22  And, as of today, that number is about 125 million and about

23  135 million, you know, including debt and a total enterprise

24  value.

25      So, as a public company, FitLife right now is valued

134

1  somewhere around nine times EBITDA.  And, again, objectively

2  -- everything on this page is objective.  There's no

3  opinion.  It should be valued higher, right, because it's

4  growing and it's more profitable, and it has higher profit

5  margins.

6       So, an argument, you know, when you have an argument,

7  you know, when you have a publicly traded comparable,

8  nutritional supplement brands, trading for -- in a business

9  objectively performs better trading at nine times, for

10 someone to argue that Irwin should be trading at 16 times or

11 will trade at 16 times or -- or greater, it just -- it just

12 makes no sense.

13 Q    So, Mr. Willis contends in his March 14th declaration

14 that there's a high probability of the Debtor selling for

15 over $100 million.  Do you think that's correct?

16 A    I think that's correct what he said.  I -- I think

17 that's very very unlikely to happen.

18 Q    And why?  Why do you say that?

19 A    For all -- for all the reasons I've just said.  This is

20 a -- this is an asset that is declining.  This is a broken

21 business.  This is not a  Thorn, you know, that's growing

22 quickly, that's very profitable, that -- that people want.

23 I'm not saying people don't want Irwin.  I'm just saying

24 it's -- it's very different profile of a business.  And, so,

25 when you have, you know, companies with very strong

135

1  performance that that are trading for substantially less

2  than what they're proposing for this asset just calls into

3  question their judgment.

4  Q    Now, getting back to Mr. Platt's valuation for a

5  second, his valuation was as of what date?

6  A    His first -- his first valuation was as of September

7  3rd, 2024.  His second valuation was as of November 12th,

8  2024.

9  Q    And have there been any changes in the market

10 conditions as it relates to the supplement business since

11 that time?

12 A    Yeah.  Yeah, absolutely.  Well, a couple of things.

13 One, tariffs, which have been already talked about and then

14 market conditions that even are more broad than the

15 supplement industry, right.  Just the -- the markets have

16 sold off quite a bit.  I think the time we -- we filed our

17 declaration I believe was March the 4th, and at that time,

18 you know, I think our market cap was 140 million.  You know,

19 we're down more than 10 percent in -- in just the two and a

20 half weeks since we filed that declaration, and that is

21 despite, you know, putting out a press release reporting the

22 highest revenue, the highest, you know, EBITDA, the highest

23 net income the company's ever achieved.  So, yeah, there's

24 -- there's some dislocation in the market.

25 Q    And do you thin, this difficulty -- the difficulties in

136

1  the market will affect potential buyers of the Debtor?

2  A    I -- I definitely do.

3  Q    Does Mr. Willis account for the effect of the changes

4  in the market in his affidavit?

5  A    No, he does not.

6  Q    There was a footnote I think where he mentioned that

7  the market could affect it, but he wasn't specific as to in

8  what way.  Do you think there's any possibility that these

9  changes in the market could be positive for the valuation?

10  A    No.  I believe the footnote you're referring to, he

11  said that the company believes that any impact of tariffs

12  can be passed along to consumers, and I do not believe from

13  -- from personal experience that that is the case.

14  Q    And why is that?

15  A    Because we see it all the time in our industry.  So, we

16  -- we do a lot of protein.  FitLife does a lot of protein.

17  I know that's not a category that Irwin is involved in.

18  Protein prices have gone up significantly over the last six

19  to eight months, and we have not been able to pass those

20  prices along.  If others don't pass the price increase

21  along, then you can't pass it along.

22      And, so, any assertion like to -- to just basically say

23  we're going to do it and it's going to have no impact is, I

24  don't know a very unresponsible thing to say.

25  Q    So, to be clear, even if the market conditions

137

1  improved, then you still don't think that this business has

2  a real prospect of selling for over $100 million.  Is that

3  correct?

4  A     That's correct.

5  Q     How much are the claims in this case, to your

6  knowledge?

7  A     I -- I believe they're -- the last disclosure statement

8  that was filed indicated claims between 31 and 33 million, I

9  think roughly 19 million for the bank, 4.7 million of

10 scheduled general unsecured claims, although there's

11 reference in the disclosure statement to those potentially

12 being as high as 6.  There's several million of operating

13 and other administrative claims, and there are some tax

14 claims, and I believe the total was somewhere between 31 and

15 33 million.

16 Q     If the Debtor's value in fact, north of $100 million,

17 as Mr. Willis has suggested, or even north of 70 million, as

18 Mr. Platt has suggested, do you think the Debtor should have

19 difficulty in refinancing based on those valuations given

20 the amount of the debt in this case?

21 A     You know, I -- if the question was do I think they

22 should have difficulty, I don't think it should be

23 difficult.  And, in particular, I would say prior to the

24 commencement of these cases, the total amount of outstanding

25 debt was substantially below 20, and -- and they couldn't

138

1 refinance that.

2        So, I -- I do find it very surprising that a company

3 supposedly worth more than $100 million cannot raise 18

4 million of debt capital.

5 Q    What efforts do you understand the Debtor to have taken

6 to raise debt financing or do an equity transaction?

7 A    My understanding is that they hired Canecord (phonetic)

8 in the summer of 2023, so, almost two years ago, to -- to do

9 a sale of the business.  They then hired Oberon Securities

10 to do a debt capital raise, which was apparently also

11 unsuccessful.

12       Following the bankruptcy filing, they hired Province to

13 do a debt capital raise, which was unsuccessful.  They then

14 subsequently hired Essex (phonetic) to do a debt capital

15 raise, and that is ongoing but thus far unsuccessful.  And

16 now they are proposing to hire STS to do an equity -- a full

17 -- a full sale transaction or equity capital raise.

18 Q    What is your understanding of the present status of the

19 Debtor's efforts to obtain debt financing?

20 A    Obviously I'm not in the information flow on that.

21 There was a filing that indicated they had received one term

22 sheet for up to 20 million, and I believe Mr. Irwin's

23 declaration indicated that based on the company's current

24 borrowing base, the facility would offer around between 12

25 and 14 million of -- of debt capital.

139

1 Q    Let's talk for a minute about this sale.  What is your

2 understanding of the timeline that's proposed by the Debtor

3 to run a sale process?

4 A    Again, I don't -- I don't have it in front of me.  I

5 think it was stalking horse bidder in by the end of June if

6 I'm not mistaken, and I think the close was anticipated to

7 be August 15th.  But, again, I -- I know it's in some of the

8 filings.  I just don't have it in front of me.

9 Q    Do you think that length of time -- knowing what you

10 know about the supplements business, do you think that

11 length of time is necessary to maximize the value generated

12 by the sale?

13 A    My -- my -- I'm not a banker obviously.  My -- my --

14 having participated in a number of these processes, I don't

15 -- I don't think that it's required.  I think it can

16 absolutely be done on a shorter time frame.

17 Q    If the Debtor entered into a liquidation scenario as

18 compared to a going concern sale, do you think its value

19 would be less or more?

20 A    Less or more than a going concern?

21 Q    Yes, in a liquidation.

22 A    I mean, I -- we -- I have not done any analysis in that

23 regard.  I -- I think my hunch is that it would be less.  It

24 -- it generally is less.  I believe Mr. Platt in his two

25 scenarios used the relief from royalty methods to calculate

140

1  a liquidation value or I should say a -- a brand -- an

2  intangible value for the brand and -- and that number was --

3  I think it was 30 million in its first one and 26 million in

4  the second one.  But, yes, substantially -- or certainly

5  lower than what at the time the expected going concern value

6  for the company would have been.

7  Q    If exclusivity is terminated, would FitLife be ready,

8  willing, and able to propose a plan?

9  A    Yes.  I think we've indicated that.

10  Q    Would here be any due diligence that's necessary?

11  A    Yes.  We would -- we -- we would need to.  We would

12  want to, and we've been ready and willing and able to engage

13  in that but have not been permitted to do so, but, yes, we

14  would want to do that.

15  Q    And would --

16  A    As any buyer would.

17  Q    Would -- would there be any financing contingency?

18  A    No.

19          MR. FEINSMITH:  Thank you.

20          No more questions, your Honor.

21          THE COURT:  Okay.  Thank you.

22          Is there going to be cross examination of Mr.

23  Judd?

24          MS. BAGDANOV:  Yes.  Thank you.

25  //

141

1                    CROSS EXAMINATION

2   BY MS. BAGDANOV:

3   Q    Good afternoon, Mr. Judd.

4   A    Hi.

5   Q    My name is Jessica Bagdanov.  I'm one of the counsel

6   here for the Debtor.  Nice to meet you.

7        How did you become aware that the Debtor engaged

8   Canecord pre-petition?

9   A    Um --

10           MR. FEINSMITH:  Objection, your Honor.  It's

11  irrelevant, and it's outside the scope of the report that we

12  filed agreeing on the scope of evidence.

13           MS. BAGDANOV:  He testified -- if I may, your

14  Honor, he testified that he understands that the Debtor

15  hires Canecord pre-petition.  I'm just asking how he knows

16  that.

17           MS. BAGDANOV:  Well, how he knows that's

18  irrelevant.

19           THE COURT:  I think it's -- I think it's within

20  the scope.  He talked about it.  It's within the scope.

21  BY MS. BAGDANOV:

22  Q    How did you learn about that, Mr. Judd?

23  A    I'm sorry.  So, that was -- I should answer the

24  question?  I missed the ruling.

25           THE COURT:  Yes.  Yes.

142

1          THE WITNESS:  Yes.  Yeah, happy to answer it.

2          I'm not 100 percent sure on Canecord.  There was

3 -- there's an article -- I could try and find it -- in an

4 online publication that follows companies involved in the

5 cannabis and CBD space that talked about -- again, I can't

6 tell you for certain if that was the one that talked about

7 Canecord.  Also, when -- and, again I -- again, I just don't

8 know if this was Canecord or Oberon or one of the others,

9 but there was a teaser that was sent out in an attempt to

10 kind of find people that might be interested in this

11 transaction, and that teaser went to a member of our board

12 of directors.

13          THE COURT:  Do you remember when?

14          THE WITNESS:  I -- I don't.  I don't.  It -- many

15 many many months ago.  It was -- if it was from the teaser,

16 it was from the time that -- that -- that they were engaged,

17 but I -- I couldn't tell you, but I'm happy to go back and

18 try and find out.

19 BY MS. BAGDANOV:

20 Q    Yes.  So, you think it was pre the Debtor's bankruptcy

21 filing or after?

22 A    It was absolutely prebankruptcy filings.

23 Q    Okay.  Now, I'm not going to sit here and try to deny

24 that you have quite a solid experience in company

25 valuations.  Is that fair?

143

1  A    I appreciate that, yes.  I agree with that.

2  Q    And having -- having been the manager of a multi-

3  billion-dollar hedge fund, this is not your first rodeo, and

4  you've bought and sold a fair number of companies in your

5  day, yeah?

6  A    Yes, or -- or shares of companies, yes.

7  Q    And your words in the declaration were that the 16

8  times multiple was wildly unrealistic and factually

9  unsupportable, right?

10 A    That's correct.

11 Q    Yes.  And is that -- do you have that same opinion if

12 we show you Exhibit 4 that your counsel marked on the

13 updated valuation where Mr. Willis and Platt use a 10X

14 multiple?  Is that also factually unsupportable?

15 A    It -- it's certainly a stretch.  Again, I would just

16 point you back to the comparables table, and there's no

17 company that is declining that trades for higher than six

18 times.  So, I -- I -- I think that's -- it's still a

19 stretch.

20 Q    In your comment that the company is declining, you are

21 looking at historical data, correct?

22 A    That is correct.

23 Q    Not taking into account projected growth, correct?

24 A    There is no projected growth, by the Debtor's own

25 numbers.

144

1  Q    There is no projected growth by the Debtor's own

2  numbers in it disclosure statement?

3  A    Correct.

4  Q    It's not even of marginal growth?

5  A    It's a 0.5 percent compounded annual growth rate, which

6  is a negative growth rate adjusted for inflation.

7  Q    Okay.  And in Chapter 11 bankruptcies, are you -- do

8  you have an opinion about whether a debtor typically uses

9  conservative or not conservative projections in plans?

10  A    I would hope that whatever they choose to file with the

11  Court is accurate.

12  Q    If there's any -- okay.  So, we have a range, right?  I

13  think something that's become obvious to me today is that

14  valuation is more of an art and there's wide ranges.  Is

15  that fair?

16  A    There are ranges.  I don't know if I would agree that

17  there are wide ranges.

18  Q    Well, perhaps it would depend on the circumstances,

19  correct?

20  A    Sure.  Yeah.

21  Q    When you have a debtor that's trying to propose a plan

22  of reorganization or liquidation and they use -- would you

23  say that it would be more prudent for a Debtor then to use

24  the more conservative range as opposed to a more optimistic

25  range?

145

1  A    No.  I -- I think it would be very prudent for the

2  Debtor to file -- what ever the Debtor files with the Court

3  to be their best representation of what they think the

4  future will hold.

5  Q    Don't you think it --

6  A    Any decision to do otherwise I think calls into doubt

7  their credibility.

8  Q    Don't you think -- so, the former statement, are you

9  aware, is the time where the Debtor discloses to all

10 creditors and parties in interest, among other things, risk

11 factors of what could happen to the company if things go

12 poorly in the next few years, yes?

13 A    Okay.

14        MR. FEINSMITH:  Objection.  Calls for a legal

15 conclusion.

16        THE COURT:  Sorry.  What was the question?

17        MS. BAGDANOV:  I said disclosure statements are a

18 Debtor's chance to tell creditors and parties in interest --

19 disclose things like risk in their business and what could

20 happen in the future.

21        THE COURT:  I -- I sustain the objection.

22 BY MS. BAGDANOV:

23 Q    Are you aware what a disclosure statement is for,  Mr.

24 Judd?

25 A    I am.

146

1  Q    Can you tell me what a disclosure statement is for?

2  A    A disclosure statement presents the facts and

3  circumstances, the classes of claims, and how they -- well,

4  in a plan -- and in conjunction with a plan, how they would

5  be treated in a reorganization, presents the company's

6  financial projections, and, you know, that -- that's my --

7  the extent of my knowledge about a disclosure statement.

8  Q    In your capacity as a hedge fund manager, CPA, have you

9  ever been in a position where you've been asked to vote on a

10 Chapter 11 plan?

11 A    Yes.

12 Q    Have you received a disclosure statement?

13 A    I have.

14 Q    Do you know or recall if that disclosure statement

15 contains risk factors in it?

16 A    I -- I don't recall, but -- but it would make sense to

17 me that they do.

18 Q    So, wouldn't it make sense then for a Debtor's who is

19 proposing a disclosure statement to include conservative

20 valuation numbers?

21 A    I -- I'm going to agree -- again, I -- I -- I -- I

22 don't know why a debtor wouldn't file what they believe to

23 be the most accurate projections that they have.

24 Q    Back to Exhibit 4, 10X multiple of a $7 million EBITDA

25 is a stretch?

147

1  A    Given the facts and circumstances, I believe it's a

2  pretty  significant stretch, yes.

3  Q    Now, you would agree, would you not, that the facts and

4  circumstances are a myriad, that there's many factors that

5  get considered in -- in not only creating an EBITDA number

6  but also the multiple that's appropriate, right?

7  A    Yes.

8  Q    And some of those factors would be financial

9  performance of the company in the past, right?

10 A    Yes.

11 Q    The management?

12 A    Maybe.

13 Q    Change -- potential changes to management?

14 A    Potentially.  Again, it's not management.  It's what

15 the management can do, right.  So -- so, yeah, what -- what

16 should be driving value is the -- the future cash flows that

17 the business can generate.  So --

18 Q    Okay.

19 A    -- yeah, if -- yeah, if somebody's better at -- new

20 management's better at doing that, then so be it, yeah.

21 Q    Right.  And, so, in that regard, you're familiar with

22 control premiums, are you not?

23 A    I am very familiar with control premiums.

24 Q    Where a buyer looking at company will -- could

25 potentially pay more because they see themselves as being

148

1  able to fix something that's wrong with the company's

2  operations or management, is that fair?

3  A    That's -- that's a fair -- yes, that is a true

4  statement.

5  Q    Okay.

6  A    That's one of many reasons why somebody might want

7  control.

8  Q    One of many reasons other than --

9  A    There could be other reasons behind a transaction than

10 because they think they can do it better.

11 Q    But --

12 A    That's all I'm saying.  I didn't -- yeah.

13 Q    Now, EBITDA is the measure of a company's health today.

14 Would you agree?

15 A    I would partially agree, right.  EBITDA is a proxy for

16 operating cash flow.  It's a proxy for the amount of non-tax

17 affected, non-capital structure affected cash flows that a

18 business throws off.

19 Q    And multiples are growth potential, right?

20 A    Not necessarily, right.  Multiples are -- yeah, growth

21 potential is one thing that can factor into a multiple.

22 Q    What's other things?

23 A    Profitability.

24 Q    Profitability in --

25 A    Margins.

149

1  Q    -- in the past or the future?

2  A    I'm sorry?

3  Q    Profitability in the past or in the future or both?

4  A    In the future, in the future.  I mean, past is only

5  relevant to the extent it's a prediction -- predictor of the

6  future.

7  Q    Okay.

8  A    Valuations are forward looking.

9  Q    Understood.  So, let's look, if you could, at Exhibit

10  6.  Oh, I'm sorry.  One question -- I apologize -- in

11  Exhibit 7.

12       MS. BAGDANOV:  I apologize, Madam Clerk.  Exhibit

13  7.  Thank you.  I apologize.

14  BY MS. BAGDANOV:

15  Q    You testified, Mr. Judd, that FitLife Brands' data came

16  from the publicly filed SEC filings.  Is that -- am I right?

17  A    Yes, that is correct.

18  Q    And you did not get Irwin Naturals numbers from its

19  publicly filed SEC filings, is that right?

20  A    That is correct.

21  Q    Is that because it's not a publicly traded company?

22  A    It was a publicly traded company.  It's because we --

23  we -- well, two things.  Number one, when it was a publicly

24  traded company, it included -- and it's publicly reported

25  financials included the Ketamine business that the company

150

1  had entered into, which is obviously not relevant for this

2  discussion.  The company, the Debtor, reported these numbers

3  in its disclosure statement, Docket 342 filed February 7th.

4  Q    Fair enough.  So, today, the Debtor is not a publicly

5  traded company, right?

6  A    That is correct.

7  Q    Okay.  Let's turn to Exhibit 6.  I think you testified

8  there's maybe 15 or so business on this, including your own,

9  yes?

10 A    Yes.

11 Q    And you're all publicly traded?

12 A    That is correct.

13 Q    So, Irwin Naturals is not publicly traded?

14 A    Correct.

15 Q    Okay.  So, you're comparing a private company to 15

16 different publicly traded companies, right?

17 A    That is correct.

18 Q    Are you aware of whether control premiums are used when

19 public company comps are used to determine a valuation?

20 A    I -- I'm very familiar with how control premiums would

21 factor into the math, if that's what you're asking.

22 Q    I am asking that.

23 A    Yeah.

24 Q    Are they used with public companies?

25 A    They -- well, if you -- if you acquire a public

1  company, yes, right.  So -- so, I believe where you're going

2  -- and feel free to redirect me if -- if I'm off base,

3  right, but these are trading premium -- or trading

4  multiples.  There's no control premium in here, right.  So,

5  if you wanted to -- if you wanted to take one of these

6  companies private, like let's say if we wanted to take Nu

7  Skin private or Herbalife since it's there on the top row,

8  it's trading at 4.4 times EBITDA.  That's the trading

9  multiple.  A typical control premium is -- you know, I mean,

10  people usually throw around 20 percent or maybe 20 -- how

11  about this, 25 percent is what Mr. Platt used in his

12  analysis.  So, we'll say 25 percent premium.  That would

13  bring the multiple, the transaction multiple to 5.5 times

14  for Herbalife.

15      But if you're using a comparable transaction multiple,

16  that already includes the control premium.

17  Q    Can you say that again?

18  A    If you're using a comparable transaction -- if you're

19  looking at previous transactions where companies have been

20  traded, that includes the control premium.

21  Q    Right.  And that's what Mr. Platt and -- or what Mr.

22  Platt did, right, with the comp --

23  A    Correct.

24      (Simultaneous speaking.)

25          THE WITNESS:  Yeah, he -- he applied a multiple,

152

1 and then he applied I believe -- again, I don't have it in

2 front of me, but I'm pretty sure it was a 25 percent control

3 premium.

4 BY MS. BAGDANOV:

5 Q    Right.  Okay.  Now, in your experience in valuing

6 companies, don't you always start with private company

7 comparables?

8 A    I'm sorry.  What do you mean by that question?

9 Q    As opposed to comparing a company right out of the gate

10 with public companies, don't you start with private

11 companies?

12 A    Well, there's really no comparables for private

13 companies unless somebody, you know, announces to the world

14 that a -- a private transaction happened and here were the

15 terms.

16 Q    So, the --

17 A    They're generally not publicly available.

18 Q    But they use past transactions, right?

19 A    They use past -- again, if -- if you're talking about a

20 transaction of a private company, those comparables are not

21 readily available, right, unless there is an -- an

22 investment bank that was involved in the process that

23 reports that information so that it's accessible to the

24 public.

25 Q    Okay.  Now, when preparing your declaration and

153

1  specifically with regard to -- I -- I think in your

2  declaration in Docket 400, you said that -- that FitLife at

3  the time, which was a few weeks ago, trades at about a 10X

4  multiple, right?

5  A    At that time that was correct, and that is what I

6  included in my declaration.

7  Q    Does it change so quickly that that's different today?

8  A    Yes, it did.

9  Q    When you assessed the Debtor's proposed multiples, you

10  assessed -- you assumed that growth would be -- would be

11  poor in the future, did you not?

12  A    I did.

13  Q    Because of the past performance of the Debtor, right?

14  A    That was one input but not the only input.

15  Q    But if you're looking at trying to figure out a

16  multiple, and that's an indicator of future growth, how do

17  you not consider the -- the potential future for the

18  company?

19  A    I -- I did consider the potential future for the

20  company.

21  Q    But you said there was no future?

22  A    No, that's not -- that is not what I said.  I said the

23  company -- the company's -- the Debtor's projections imply

24  no material growth for the company, a growth rate of 0.5

25  percent.

154

1 Q    And, in fact, that was a negative growth to you,

2 correct?

3 A    Negative in real terms, adjusted for inflation.

4 Q    When managing a hedge fund portfolio and you're looking

5 at all of this data, you try to buy a company or the shares

6 of a company at a price where you could make a profit in the

7 future.  Is that true?

8 A    That is correct.

9 Q    Do you ever try to buy a company for a higher price

10 than you could sell it for later?

11 A    No.

12 Q    And you testified in your declaration that at least as

13 to 50 percent of your business, you're not a direct

14 competitor of the Debtor, right?

15 A    I'm happy to answer that.  Is that a scope issue, Todd?

16 I mean, this goes to whether we're competitive.  I'm happy

17 to answer it, but it's not within the scope of what we

18 agreed, but I -- I have no --

19         THE COURT:  Well, it's in your declaration, which

20 has been admitted, right.

21         THE WITNESS:  Okay.

22         THE COURT:  So --

23         THE WITNESS:  Okay.

24         THE COURT:  -- it was not on your direct.  It's

25 included in your declaration.  So, that's within the scope

155

1  of it so that Ms. Bagdanov -- (Zoom glitch).

2      THE WITNESS:  I want to make sure we're playing by

3  the rules.

4      THE COURT:  Yeah, I understand, but that --

5      THE WITNESS:  Yes.

6      THE COURT:  You have a written declaration.  It

7  isn't what you're talking about today.  So, she's asking

8  about --

9      THE WITNESS:  Yes.

10     THE COURT:  -- it.

11     THE WITNESS:  I -- I did include that in my

12 declaration, and that statement is true.

13 BY MS. BAGDANOV:

14 Q   Okay.  So, you are -- now, half of your company, would

15 you say, is a direct competitor or is that not --

16 A   No, no.  No, not at all.  All I said was more than half

17 of our company is sports nutrition.  We have skincare, which

18 is obviously not a direct competitor.  I -- it's -- I --

19 there's no way I can do the math to say what the percentage

20 overlap is because the Debtor has not provided any

21 information to me.  So, I -- I couldn't tell you what the

22 overlap is.  I can just tell you definitively the majority

23 of our business doesn't overlap because Irwin does not do

24 sports nutrition, and Irwin does not do skincare.

25 Q   Fair enough.  And, so, is it -- is it then also fair to

156

1  say that FitLife and Irwin Naturals are not in the same

2  submarkets of supplements businesses?

3  A    Again, I -- I -- there are probably some areas where we

4  do compete in -- in similar categories or where we have

5  products in similar categories, but, again, without --

6  without having access to Irwin's data, I just couldn't tell

7  you whether that's a one percent overlap or a 10 percent

8  overlap or -- or something different.

9  Q    In looking at just broad strokes, you agree 50 percent

10 of your company at least is not in direct competition with

11 the Debtor, right?

12 A    I would say well -- yeah, well more than 50 percent,

13 but I -- I can't put a number on it.

14 Q    Okay.  Now, if the -- when you prepared -- because you

15 prepared Exhibit 6 or your team, correct?

16 A    Exhibit 6 I prepared.

17 Q    As you sit here today, do you know how many, if any, of

18 these companies are direct competitors of the Debtor?

19 A    I -- whatever I said would be I think a -- a

20 speculation, but I'll -- I'll make a general statement that

21 I think addresses your question.

22     This -- this category, nutritional supplements in the

23 United States, is roughly a $60 billion market.  It's

24 massive.  And there's just not -- this is not Coke versus

25 Pepsi where there's like six -- and, by the way, it's

157

1  growing.  It tends to grow every year.  Even during the

2  global financial crisis, it grew every year.  It grows six

3  to nine percent per year.  So, this isn't like you -- you're

4  beating each other up trying to steal shares.  It's a --

5  it's a very very big pie.

6      I mean, to give you another data point, Irwin is

7  roughly, again, company's own number, $66.1 million of

8  revenue.  If you have a market in the U.S. that's $60

9  billion, Irwin is 0.1 percent of the -- of the U.S. market.

10 FitLife is a comparable size.  I'm 0.1 percent of the U.S.

11 market.  That's not -- this is not an example of

12 competition, right.  It's a -- it's a big space, and we do

13 not go up against each other head to head and, you know, try

14 and knock each other out.  It's just not the way it works,

15 despite how others might try and characterize it.

16 Q    Well, when you are considering valuation multiples,

17 projected growth, would it be fair to say that FitLife and

18 the Debtor are not going after the same consumer?

19 A    Well, again, I go back to my previous -- I am sure that

20 on some products, there may be a -- a similar consumer.

21 Most of our products, again, are sports nutrition.  They

22 tend to be, you know, gym rat type people, people lifting

23 weights in the gym.  You know, on that I think we're not

24 going after the same consumer for the most part.  But --

25 Q    And --

158

1 A    -- it's very -- very hard for me to make conclusions

2 about Irwin's customers when I've been provided no

3 information.

4 Q    You've said that a few times, that you've been provided

5 no information now.  Are you referring to the fact that the

6 Debtor is not a publicly traded company, so, unlike

7 Herbalife and Nu Skin, you don't have the data readily

8 available on the -- on the website?

9 A    No, no, not at all, right, because they don't provide

10 information to me about their customers either.  No.  Just

11 simply, again, I'm talking about due diligence type

12 information.  Like in due diligence, I would be able to see

13 what products Irwin is selling, how much of them they're

14 selling, right, and who their customers are, how -- how much

15 of each product is going through each channel.  Until I -- I

16 look at that, there's no way I can accurately answer your

17 question.

18 Q    Fair.  And before you look at that, there's really not

19 a way for you to provide a truly informed offer for the

20 assets, is there?

21 A    Correct.  That says to me to do due diligence.

22 Q    Right.  And -- and this is not your first time.  I

23 think you mentioned in your declaration that you were

24 involved in the Muscle Farm bankruptcy in 2023, correct?

25 A    Correct.

159

1  Q    Now, in the normal process -- hear me out for a minute

2  -- isn't it true that a debtor like Muscle Farm hires an

3  investment banker, there's a -- to market process, stalking

4  horse bidder is accepted in a few months, and then a sale

5  happens, and then the sale closes.  Generally speaking, is

6  that how it goes?

7          MR. FEINSMITH:  Objection.  Objection, your Honor.

8  Calls for a legal conclusion.

9          MS. BAGDANOV:  He is very very --

10         THE COURT:  I -- I overrule --

11         MS. BAGDANOV:  -- knowledgeable.

12         THE COURT:  Yeah.  I'm going to overrule.

13         THE WITNESS:  I -- I believe that the way you

14  characterized it is true in the event of a 363 sale.

15 BY MS. BAGDANOV:

16 Q    As opposed -- 363 sale as opposed to what, sir?

17 A    As opposed to a plan process.

18 Q    Okay.  But the Muscle Farm case I guess in particular

19 was a 363 sale, was it not?

20 A    That is correct.

21 Q    And do you recall that FitLife was designated as a

22 stalking horse bidder in that case?

23 A    I do recall that, yes.

24 Q    Do you recall about how long after the bid procedures

25 started and you were approved that that took place?

160

1 A    I -- I do not recall.  I would say it was -- it was

2 weeks, not months.

3 Q    If I represented to you that the bid procedures motion

4 filed by the Debtor in Muscle Farm was in May of 2023 and

5 that you were designated as the stalking horse bidder in

6 September of 2023, does that sound right?

7 A    The September part I -- I definitely know sounds right.

8 I can't speak to when the -- the bidding procedures motion

9 was filed.

10 Q    Okay.  Well, if I have a minute, I can go find the -- I

11 can pull it up for you myself if necessary.  But --

12        MR. FEINSMITH:  Objection, your Honor.  There were

13 -- I -- I was involved in that case, and there were all

14 sorts of factors that had a bearing on the timeline in that

15 case.

16        THE COURT:  Well I guess --

17        MS. BAGDANOV:  I'm not asking --

18        THE COURT:  I guess I'm -- I mean, I don't think

19 we're expecting Mr. Judd to know all the issues about it,

20 but, I mean, you're not saying -- and there may be factors

21 like that, but the point is that those were the dates,

22 right?

23        MS. BAGDANOV:  That's correct, your Honor.  Thank

24 you.

25        THE COURT:  Okay.

161

1  BY MS. BAGDANOV:

2  Q    Now -- just a moment, Mr. Judd.  Sorry.

3  A    Yeah.  Sure.

4  Q    That happens when you go out of order.

5       (Pause.)

6  BY MS. BAGDANOV:

7  Q    Now, I want to go back to go back to this conversation

8  that we're having about competition.  Do you think it's fair

9  to compare the financial performances of a company against a

10 company that it doesn't directly compete with?

11 A    Yes.  Every company on this page that we're looking at,

12 again, competes to some degree or not degree, right.  I

13 don't -- I don't know how -- what else you would compare it

14 to if it's not to -- to one of those companies, yes.  I

15 mean, yeah, should we compare it to a car company?  Of

16 course, I would -- I would compare it to a supplement

17 company.

18 Q    Okay.  So, but there's a lot of range of supplements,

19 and the -- and the market continues to grow, correct?

20 A    Yes.

21 Q    How important is it when you're trying to figure out a

22 multiple -- and I'm -- I'm asking you to put on your hedge

23 fund hat for a moment.  How important is it when you're

24 looking at the multiples and looking at the -- the

25 comparables that the -- that the businesses that you're

162

1  comparing are apples and apples?

2  A    Well, tell me what you mean by apples and apples.

3  Q    That they are directly relevant to each other, that

4  they -- that they fight for the same dollar, they fight for

5  the same consumers.

6  Q    I think it's -- what's relevant is cash flow, right.  A

7  business -- the only reason you buy a business is for its

8  future cash flows.  And -- and businesses are different

9  along tons of different dimensions, again, whether it's

10  product or channel or whatever, right.  So, I -- I look at

11  the cash flows that the business generate and -- and that's

12  what determines what it's worth and what the multiples

13  should be and not, you know, was it a competitor to someone.

14  Q    I think you testified, right, that -- that two of the

15  most important things are growth and profitability.  Is that

16  true?

17  A    Yeah.  Those are the things that if you look at the

18  academic theory, right, what creates value is growth and --

19  and profitability.  Or technically, that's not

20  profitability.  It's called -- it's the spread of the

21  company's return on invested capital less its weighted

22  average cost of capital, yes.

23  Q    So, those are definitely things you -- do you use a

24  team of analysts, perhaps yourself included, as one of those

25  analysts?

163

1  A    Right now I don't have any analysts, but I have in the

2  past, yes.

3  Q    And you get all the analysts in a room and -- and

4  somebody has a conservative multiple, and somebody has a

5  maybe optimistic multiple.  How do you -- how do you pick

6  the right one?

7  A    Again, there -- I'm happy to go as far down this rabbit

8  hole as you want.  THERE are -- you have to have -- you need

9  to have expectations about future growth, and you need to

10 have expectations, right, about what -- what you -- the

11 profitability of the business is going to be.  And the

12 -- the multiple that you think is right is going to be a

13 function of where you settle on what that growth and what

14 that profitability is.  So, I -- I don't know how to -- how

15 to articulate it any differently than that.

16 Q    No, you -- you articulated it clearly enough for me.

17 A    Okay.

18 Q    The -- is it fair to say you haven't completed due

19 diligence on the Debtor yet?

20 A    That is an accurate statement.

21 Q    You testified that tariffs are real depressed value in

22 this market.  Is that true?

23 A    I believe that is a true statement.

24 Q    But isn't it safe to say that a lot of things have

25 happened in the last two months and that maybe it's safer to

164

1 say that there's not enough clarity yet to see what's going

2 to happen in the long run with respect to tariffs?

3 A    I disagree completely with that statement.

4 Q    Why is that?

5 A    Because I run a supplement company.  I know which of my

6 ingredients come from China.  I know which of them are

7 subject to a tariff.  I can tell you in dollar terms exactly

8 how much my costs are going to go up on each ingredient in

9 each product.  My costs will go up.  Irwin's costs will go

10 up, right, to the extent they get product from China.  And

11 anyone that -- that tells you tariffs are somehow a positive

12 thing does -- is -- is just not being, you know, very

13 honorable in -- in their opinions.

14 Q    Does it matter how long the tariffs last?

15 A    It does.

16 Q    It's fair to say you don't know how long the tariffs

17 are going to last, do you?

18 A    That is correct.  I do not know that.

19 Q    So, long term, none of us know the true impact that

20 tariffs will have on the market, fair?

21 A    That is correct.  All I do -- I know that they were --

22 the first one was implemented February 4th.  The second one

23 was implemented March 4th.  They're in place right now.

24 They're affecting the market right now.  But can I tell you

25 when they're going to end?  No.

165

1  Q    Fair enough.  We're here today because FitLife -- you -
2  - you filed a motion to determinate the Debtor's exclusivity
3  to file a plan because FitLife -- is it fair to say that
4  FitLife would like to acquire the Debtor through a plan?
5  A    FitLife would like to acquire the Debtor for a fair
6  price through a plan or possibly some other mechanism.
7  Q    Fair price can be a range, can it not?
8  A    I think, yeah, different people may have different
9  perspectives on what that -- that range is.
10 Q    And the market really tells us, right, what a willing
11 buyer will give a willing seller?
12 A    Yes.
13 Q    And is it fair to say you understood as a hedge fund
14 manager that you acquire businesses at the lowest
15 transaction price that you can?
16 A    No.
17        MR. FEINSMITH:  Object -- objection, your Honor.
18 I don't know what the business strategy of Mr. Judd's hedge
19 fund has to do with what's before the Court today.
20        THE COURT:  Sustained.
21        MS. BAGDANOV:  It is exactly relevant to what he
22 is --
23        THE COURT:  I mean, we know that they made an
24 offer, right.  I don't think we need to get into his --
25 like, they're interested, right.

166

1          MS. BAGDANOV:  Fair.

2          THE COURT:  I don't think anybody tries to buy --

3 I mean, I think we had testimony from Mr. Willis about how

4 there's a difference between what you're willing to pay and

5 what you think you have to pay.  So --

6          MS. BAGDANOV:  (Zoom glitch.)

7          THE COURT:  And the reason why I have to pay is

8 because if they can pay less, they do or if it's too much,

9 then you don't, right.

10 BY MS. BAGDANOV:

11 Q    Right.  If you can pay less, you will.  But the

12 question I guess I have is outside of Irwin for a moment,

13 just in the hedge fund world, in the transaction purchase

14 world, the goal is to sell it in the future at a higher

15 price than what you paid, yes?

16          MR. FEINSMITH:  Objection, your Honor.  This -- I

17 don't know what that has to do with what's before the Court.

18 It isn't --

19          THE COURT:  Yeah.  I mean --

20      (Simultaneous speaking.)

21          THE COURT:  There's a sale pros -- I mean, the

22 Debtor is proposing a sale process either way.  Anyone --

23 FitLife, anyone is going to be approaching it I imagine the

24 same, right?  So, whatever's applicable is going to be

25 applicable is going to be applicable to the Debtor's plan

167

1 too -- the Debtor's sale strategy.  So, I don't know why we

2 should think of FitLife outside of this concept of maybe

3 them, you know, if they were a competitor, trying to get rid

4 of another competitor, like why we should see them

5 differently than the other people who are going to be

6 bidding or valuating.

7      (Pause.)

8           MS. BAGDANOV:  Now -- may I move on?

9           THE COURT:  Yeah.

10           MS. BAGDANOV:  Thank you.

11 BY MS. BAGDANOV:

12 Q    Mr. Judd, is it fair to say that a shorter marketing

13 process would -- FitLife would stand to benefit from that?

14 A    I don't know if I would agree with that statement.

15 Q    Why is that?

16 A    Because it's going to be a function of how long it

17 takes each party to do their due diligence.  I'm not -- I

18 haven't done any.  I'm at roughly the same place as any

19 other prospective buyer.  So, like, it's not like I've had

20 some head start.  The company shared virtually nothing with

21 us.  So, it's just a function of how quickly each buyer can

22 do their due diligence.

23 Q    Part of the due diligence is looking at or making your

24 own conclusions about growth potential, right?

25 A    Yes.

168

1   Q    And do you do that in the due diligence period after

2   you sign an NDA and get into the data room?

3           MR. FEINSMITH:  Objection, your Honor  I don't

4   know what the practice -- the due diligence practices of Mr.

5   Judd have to do with anything before the Court today.

6           MS. BAGDANOV:  I'm just asking how it works.

7           MR. FEINSMITH:  Well, it's not within the scope of

8   what's --

9           THE COURT:  Well, it's not really in this --

10  right.  I don't see it being within the scope of his

11  declaration or his testimony.

12          MS. BAGDANOV:  You're saying it's not within the

13  scope, your Honor?  I'm sorry.

14          THE COURT:  I don't.  No, for this purpose

15  regarding --

16          MS. BAGDANOV:  For the -- the bid procedures?

17          THE COURT:  Right, remaining about his -- you

18  know, about his valuation, evaluation.

19          MS. BAGDANOV:  Valuation and timing, right?  The

20  timing of the sale?

21          THE COURT:  I guess --

22          MR. FEINSMITH:  That's right.  You're not asking

23  about the timing.  You're asking about what his practices

24  are in due diligence.

25          MS. BAGDANOV:  Part of what we're doing is

*Echo Reporting, Inc.*

169

1  establishing a multiple, and I'm trying to understand from

2  Mr. Judd's perspective how -- what factors are taken into

3  consideration, among other things, growth potential, and Mr.

4  Judd has testified multiple times today he doesn't know the

5  growth potential because he hasn't had to -- a chance to be

6  in the -- in the data room, to -- to make his own

7  conclusions about the growth potential.

8          THE COURT:  I don't think that's what he said.  I

9  think he talked about he doesn't know about who the

10 particular customers are.  He looked at the growth potential

11 from the Debtor's projections.  He said he needed -- so, he

12 wanted more specifics about -- he would need for due

13 diligence -- you know, for due diligence, you need more

14 about the information about who are the customers, what are

15 the channels, what products sell what, you know, for like

16 kind of the -- the more specific information.

17 BY MS. BAGDANOV:

18 Q    Mr. Judd, putting te company to market will test how

19 much other companies are willing to pay, yes?

20 A    Yes.

21 Q    And the market is really the decider, right?

22 A    (No response.)

23 Q    The analysts (Zoom glitch) what they can say.  The

24 market gets to decide, right?

25 A    In -- in a sale process, yeah, that is correct.

170

1  Q    Isn't it true for a plan process?

2  A    Sure, as long as there's opportunity to put forward

3  more than one plan, yes, I think that's true.

4  Q    Well, have you been in a bankruptcy where FitLife

5  terminated exclusivity and proposed a competing plan?

6  A    I have not.

7  Q    It's not typically how the process goes in a normal

8  case, right?

9         MR. FEINSMITH:  Objection, your Honor.  This is --

10  calls for legal conclusion.

11         THE COURT:  Also it's just -- I don't think he's

12  the witness for that.

13         MR. FEINSMITH:  Yeah.

14         THE COURT:  I don't know what the relevant is to

15  his evaluation.

16         MS. BAGDANOV:  Okay.  Well --

17      (Pause.)

18         MR. FEINSMITH:  And I'll also add, your Honor,

19  that it's a bit ironic because FitLife has been the one

20  that's trying to promote a competitive process here for

21  months and has been denied from doing that.

22         MS. BAGDANOV:  Your Honor, I'm going to object

23  that also --

24         THE COURT:  All right.  Well, I'd like to ask --

25  so, it's now five of 3:00.  We've been doing this testimony.

*Echo Reporting, Inc.*

171

1  I'm finishing at 4:00.  So, either we're going to have to

2  think about another day or we have to wrap it up and get

3  through all the other matters on the calendar because that

4  gives us an hour and five minutes.

5       So, how much more do you have for Mr. Judd, Ms.

6  Bagdanov?

7           MS. BAGDANOV:  I have no further questions, your

8  Honor.

9           THE COURT:  Okay.  Does anyone else want to ask

10  any questions of Mr. Judd, who's -- Mr. Feinsmith, did you

11  want to follow up on anything?

12          MR. FEINSMITH:  No, your Honor.  No need.  Thank

13  you.

14          THE COURT:  Okay.  All right.  Thank you very

15  much, Mr. Judd.  You're -- or you may want to hang around.

16  You're excused as a witness.

17          Okay.  So, that's the end of testimony, right?

18          MS. BAGDANOV:  I believe so, your Honor.

19          THE COURT:  Okay.  So, I guess what we can do is

20  having that information, do we want to -- what do we want to

21  -- because it was applicable both to I think the sale

22  procedures, some of the information, and also to the

23  termination of exclusivity.

24          So, the Court -- oh, and about STS, the Court is

25  entering the order employing STS.  In fact, you may have

172

1  seen it already if you're looking through CM.  So, that's

2  off -- that's off.

3        So, what order fo you want to go in as far as like

4  discussing termination of exclusivity or the sale

5  procedures?

6     (Pause.)

7        MS. BAGDANOV:  One moment, your Honor.

8     (Pause.)

9        MS. SEFLIN:  Your Honor, I guess to some extent

10  the issue is combined.  I head what you said earlier, that

11  perhaps if there is going to be a sale process, that you'd

12  prefer that it be through the plan so that --

13        THE COURT:  Yeah.  I'd prefer plans.

14        MS. SEFLIN:  -- you can ensure that creditors are

15  paid in full.  And, so, having heard what you said, the

16  Debtor is willing to withdraw its bid procedures motion but

17  confirm for you that we will include all of the same dates

18  in an amended plan and disclosure statement to be filed no

19  later than March 31st, and that to address your concern with

20  respect -- because you raised multiple questions in

21  conjunction with the bid procedures motion.  In connection

22  with whether, you know, could the Debtor at the last minute

23  bring in exit financing.  We will agree that by the

24  designated stalking horse date, the -- June 16th, we will --

25  if we don't have exit financing locked in by then, the

*Echo Reporting, Inc.*

173

1  Debtor will confirm that, and we'll just move forward with

2  the sale process through the plan.  So, that will be done by

3  June 16.

4        You had some other concerns, and so did other

5  parties, which I could go through those if you think that

6  would be helpful.

7        A couple of parties brought up the independent

8  director.  There is an independent director in place.  His

9  name is Brad Sharp.  Those documents were signed this week.

10 The Debtor will be filing a 363 ordinary course motion to

11 approve the payments that will be made to him.  His duties

12 as an independent director include the final decision making

13 on any sale, the plan, or financing.  So, that's been done.

14       With respect to the issues about the stalking

15 horse bid, yes, the Debtor agrees that there will be a 15

16 percent cash deposit and that they'd have to be free of all

17 contingencies.  And that will all be included in the plan

18 process to do a equity sale through the plan, and we will

19 have the auction and everything included in the plan.

20       THE COURT:  Well, there wouldn't be --

21       MS. SEFLIN:  Everything will --

22       THE COURT:  -- an equity sale through the -- oh,

23 there would be an equity sale if you don't -- if it's before

24 June 16th, right?

25       MS. SEFLIN:  Well, okay --

174

1          THE COURT:  Oh, you mean a -- sell the whole

2 business?

3          MS. SEFLIN:  Yeah, yeah.

4          THE COURT:  Right.

5          MS. SEFLIN:  An equity sale.

6          THE COURT:  Right.

7          MS. SEFLIN:  And I'm not talking about a partial

8 equity sale.

9          THE COURT:  Right.

10          MS. SEFLIN:  I think, you know, whatever party

11 submits -- purchases it, they're purchasing it by --

12          THE COURT:  The whole thing.

13          MS. SEFLIN:  -- acquiring equity.

14          THE COURT:  Right.  Okay.

15          MR. FEINSMITH:  Your --

16          THE COURT:  Right.

17          MR. FEINSMITH:  Your Honor, we --

18          THE COURT:  Or is it the assets?  I'm not sure --

19 okay.  Yes?  I mean, we haven't seen the APA yet.  So, I'm

20 not quite sure why -- right, because the -- I'm not sure if

21 it's being sold by the equity -- is the equity being -- I'm

22 not sure what's being sold, honestly.  I mean, it's the

23 business and the intellectual property.  Are they buying

24 equity or are they buying the assets?

25          MS. SEFLIN:  So, I've done sales many times,

175

1 whether it's through 363 or through a plan.  And when it's

2 through a plan, at least when I have done it, the buyer has

3 wanted to do it where they are acquiring equity, and they're

4 keeping it as a going concern, and they're acquiring the --

5 the actual entity itself.  So, that's how I've done it in

6 the past.  I guess theoretically, we could set up a 363

7 process through the plan.

8         THE COURT:  Well, I wasn't sure what people had in

9 mind.  I don't know what people have in mind.

10        MR. FEINSMITH:  Your Honor, we -- we -- we -- we

11 object to this.  I mean, this is a -- this is a continuing

12 effort by the Debtor to retain sole control over the

13 process.  We think that exclusivity should be terminated so

14 that FitLife can file its own plan and get on with it.  You

15 know, this business about retaining control, we don't know

16 anything about the independent director.  We haven't been

17 consulted about that.  We've seen no agreement.

18         And -- and if the --

19        THE COURT:  All right.  I guess -- I -- from what

20 -- I guess I think the point is -- the most important point

21 from which is that we're not going to be forward with a 363

22 process right now, right?  You're not -- you're withdrawing

23 that?  You're not going to use that.  You're not going to --

24 because -- okay.  And I just want people to understand when

25 the Court denied approval of the stipulation between the

176

1   Committee And the Debtor, it felt like what is the point of

2   this stipulation.  This is only one party agreeing with the

3   Debtor.  Does this mean I agree with this timing?  Does this

4   mean that the Court says nobody else can interfere with this

5   timing?  It was -- there was no one else who had had a

6   chance to weigh in on the stipulation.  It -- it just didn't

7   seem -- it wasn't noticed.

8           So, it wasn't about the timing per se.  It was

9   about what is the point of the Court approving a stipulation

10  between one party in interest, I mean, and the Committee on

11  certain members of the Committee, because one of the members

12  of the Committee apparently had different issues -- and the

13  Debtor.

14          So, and the Court has said today its reticence for

15  a 363 process because -- well, when it's out side of a plan

16  for no real reason.  It didn't appear to be for any good

17  reason right now with the deadlines that were in there  And

18  the Court far prefers a plan process that shows where the

19  money is going when the business is sold.

20          So, and I think then people have more of a say.

21  Also, because the plan will either impair people or not

22  impair classes, and then they get to vote, they don't get to

23  vote.  See what I mean?  Like there's important issues.

24  They get to know where the money's going, when it's going,

25  who's distributing the money, this issue about the -- you

177

1 know, all that stuff would be in a plan.

2          So, I -- so, I think what Ms. Seflin's saying is

3 we're not going to -- not going to do something outside of a

4 plan, at least not as of now, right?

5          MS. SEFLIN:  Yes, your Honor.

6          THE COURT:  I mean, and there's no point in me

7 approving that timing right now because there's no point.

8 You could -- if you wanted to do a 363 sale, you could do it

9 faster later, right?

10          MS. SEFLIN:  Correct, your Honor.

11          THE COURT:  If it needed to happen.  So -- so, I

12 would like -- so, I think we should think about it in terms

13 of the plan, right?  And then it becomes the issue about,

14 you know, exclusivity and whether it makes sense to

15 terminate exclusivity.

16          And also, you know, right now, I mean, the plan

17 that's on file is not the plan that -- that the Debtor's now

18 saying they're going to do.

19          And, so, I don't have the plan on file, and there

20 isn't exclusivity for that -- for filing a plan right now.

21 There's no exclusivity for filing a plan right now because

22 that date ran.  There's only exclusivity for obtaining

23 acceptances of a plan.  But right now, the only plan on file

24 is a stale, unuseable plan.

25          So, I don't understand when we have a plan on file

178

1  that is stale and the exclusivity period for filing a plan

2  has run and we have a solicitation agreement for a plan that

3  is stale, which goes through May 2nd.  I don't -- what's the

4  big deal about like letting another plan in to be filed, and

5  a disclosure statement being approved, as long as we can

6  kind of concurrently time them.

7        MS. SEFLIN:  Your Honor, I'd like the opportunity

8  --      THE COURT:  Yeah.

9        MS. SEFLIN:  -- because I didn't even finish what

10  I was starting to say.  So -- so, the plan that's on file

11  actually includes -- it does include as an option.  So, the

12  current plan can be amended, and we did file a motion to --

13        THE COURT:  It also has a non-sale action.  It is

14  not -- it is not what the Debtor -- it is -- it has lots of

15  options.  I has the option of stretching debt our.  It has

16  the option of paying people out of that disposable income.

17        MS. SEFLIN:  I understand.  I'm just saying --

18        THE COURT:  Is that the option you're going to be

19  keeping?  I mean --

20        MS. SEFLIN:  No, no.  We're not going to keep all

21  those documents anymore.  We're going to just have two log

22  sheets that either we get exit financing by June  16th, and

23  then there's going to be the sale procedures in there.  And

24  those are the -- those are the only things.  And I really

25  don't understand why if we're able to get expert financing

179

1   that pays every creditor in full but then preserves equity

2   for equity, I don't know why any part would have an issue

3   with that.

4          The Debtor -- we're only seven months into the

5   case.  In our reply to the direction of exclusivity and in

6   the business features motion, we put in peaceful.  And in

7   the case law that already -- everyone had cited, there was

8   no circumstance where a Debtor termin -- I mean, a judge

9   terminated exclusivity before 12 months in.  We're only

10  going Debtor in.  Debts going to do everything it can to

11  appease all the parties.  The Debtor's agree do a sale

12  process, and is still agreeing to do it, and the reason we

13  agreed to those dates was the Committee most definitely knew

14  it couldn't other parties.  It was only intended bo buying

15  the Debtor so that all of the parties in case, including the

16  creditors, new that no matter what, they're getting paid in

17  full in August 2025.  And we've agreed that unsecured

18  creditors get 14 percent interest they will be compensated

19  for the additional; delay, which is not that much.  I don't

20  -- what's the big deal about like letting another plan in,

21  sign it and the disclosure statement be approved.

22          As long at we --

23          MR. FEINSMITH:  Your Honor, I'd like the

24  opportunity to --

25          THE COURT:  Yeah.

180

1        MR. FEINSMITH:  -- because I didn't even read this

2  letter.  I was starting to say, so -- so, the plan that's on

3  file actually includes -- it does include a stale option.

4        So, the current plan can be amended, and he did

5  file a motion to --

6        THE COURT:  It also has a non-sale option  It --

7  it's not -- it is not what the Debtor -- it has lots of

8  options.  It  is not -- it is not what the Debtor --

9        MS. SEFLIN:  Thank you, your Honor.

10        THE COURT:  It is -- it has lots of options.  It

11  has the option of stretching debt out.  It has the option of

12  paying people out of that disposable income.

13        MS. SEFLIN:  I understand.  I'm just saying --

14        THE COURT:  Is that the option you're going to be

15  keeping?

16        MS. SEFLIN:  No, no.

17        THE COURT:  I mean --

18        MS. SEFLIN:  No, no.  We're not going to keep all

19  those documents anymore.  We're going t just have two log

20  sheets that either w get everybody a lamp by June 16, and

21  then there's going to be the ale procedures in there.  And

22  those are the -- those are the only thing.  And I really

23  don't understand why if we're able to get extra financing,

24  that pays every creditor in full but then preserves equity

25  for equity.

181

1            I don't know why any -- any parties would happen

2    if she was at -- the Debtor -- we're only seven months into

3    the case.  In our reply to the direction of exclusivity and

4    in the business proceedings motion, we put in case law, and

5    the case law that already everyone cited, there was no

6    circumstance where a debtor term -- I mean, a judge

7    terminated exclusivity before 12 months.  We're only seven

8    months in.  The Debtor's doing everything it can to appease

9    all the parties.  The Debtor's agreed to do a sale process

10   and is still agreeing to do it, and the reason we agreed to

11   those dates was the Committee -- was because we know it

12   couldn't bind other parties.  It was only intended to bind

13   the Debtor so that all of the parties in the case, including

14   the creditors, knew that no matter what, they're getting

15   paid in full in August 2025.  And we've agreed that

16   unsecured creditors get 14 percent interest.  So, they will

17   be compensated for the additional delay, which is not that

18   much.

19            THE COURT:  Is that --

20            MS. SEFLIN:  And I --

21            THE COURT:  -- in the -- they're getting how much

22   interest?

23            MS. SEFLIN:  Fourteen percent, your Honor.

24            THE COURT:  Is that in the stipulation?

25            MS. SEFLIN:  That was not in the stipulation.

182

1  That was agreed to with the Debtor and the Committee in

2  connection with the plan.

3         THE COURT:  So, is this plan to be filed?

4         MS. SEFLIN:  But I was just letting you know.

5         THE COURT:  This is this to be filed plan?

6         MS. SEFLIN:  Yes, uh-huh.

7         MR. FEINSMITH:  Your Honor, based -- based --

8  based on what?  Where -- where is an interest coming from?

9  And -- and there have been cases where exclusivity's been

10 terminated well within a year.  We cited them the last time,

11 the New Meat Company case in this very District.

12        THE COURT:  No.  The New Meat Company case --

13     (Simultaneous speaking.)

14        THE COURT:  -- was 12 months, Mr. Feinsmith.

15     (Simultaneous speaking.)

16        MR. FEINSMITH:  Frankly, your Honor -- frankly,

17 your Honor, we're getting very tired of the Debtor trying to

18 frustrate us at every turn.  I've never been involved in a

19 case where the Debtor claims to be wanting to hire an

20 investment bank to go out and find a buyer when there's a

21 buyer at the doorstep, who doesn't even have a financing

22 contingency, who's ready, willing, and able to proceed with

23 the plan, and it just continually is frustrated.  It's high

24 time that exclusivity be terminated, we be permitted a very

25 brief due diligence period, as Mr. Judd described, and we

183

1  propose our own plan, and creditors can decide whether they

2  want to accept it or not.

3        MS. SEFLIN:  Your Honor, can I please finish my

4  argument?  I wasn't done when Mr. Feinsmith interrupted me.

5        THE COURT:  Okay.  So -- well, I think what we

6  were asking was, so, the Debtor -- well, what I want to

7  understand, so, you have a different plan you're going to

8  bed filing, and this new plan, okay, has more interest being

9  paid to unsecured creditors, allegedly, right?  I mean, we

10 would need a disclosure statement too, right, because you're

11 going to be filing the plan and disclosure statement by

12 March 31st.

13       MS. SEFLIN:  Yes.

14       THE COURT:  Right?

15       MS. SEFLIN:  Yes.

16       THE COURT:  Based on -- it's not included in the

17 stipulation which the Court didn't approve because the Court

18 felt like what was the reason.

19       Okay.  So, and what would it -- would it bind?

20 Who would it bind?

21       So -- okay.  So, by -- so, given that you have not

22 yet filed that plan, right, there is now a plan, right.  The

23 only plan on file has terms that are not going to be in your

24 new plan, right?

25       (No response.)

184

1           THE COURT:  So, if you --

2           MS. SEFLIN:  Your Honor, it has some terms that

3   were --

4           THE COURT:  So, the current -- so, there is --

5       (Simultaneous speaking.)

6           THE COURT:  And right now, there is no exclusivity

7   period for a plan on file, correct?

8           MS. SEFLIN:  I -- I don't agree with that.  We

9   filed our motion to --

10          THE COURT:  Okay.  Why don't you agree that

11  there's no -- because you filed a motion?

12          MS. SEFLIN:  Yeah.

13          THE COURT:  You say --

14      (Simultaneous speaking.)

15          THE COURT:  -- because you filed a motion and --

16  and the exclusivity period for the plan of -- has already --

17  you know, the exercise period to file a plan is terminated,

18  you think that's automatically extended, because you have a

19  pending motion to extend it?

20          MS. SEFLIN:  I think that the Court ultimately

21  ruled -- granted it, yeah.  So, it's extended.

22          THE COURT:  But right now it's not.  You're saying

23  it's -- you're saying you get tolling because you filed your

24  -- you're going to be filing a new plan?

25      (No response.)

185

1          THE COURT:  Even though you're not going forward

2  with the filed plan?

3          MS. SEFLIN:  Okay.  Your Honor, I --

4          THE COURT:  I just don't even know if exclusivity

5  even applies right now is what I'm -- I don't even

6  understand if there is an --

7          MS. SEFLIN:  I think there is a --

8          THE COURT:  -- exclusivity preventing them from --

9      (Simultaneous speaking.)

10          THE COURT:  -- filing a plan.

11          MS. SEFLIN:  I think the Debtor has the right to

12  amend its current plan --

13          THE COURT:  Right.

14          MS. SEFLIN:  -- with these terms.

15          THE COURT:  Okay.  But that doesn't mean you have

16  exclusivity right now.  You had exclusivity for that plan

17  through March, and now you have exclusivity to solicit on

18  that plan till May.  But the only plan you have on file,

19  you're not going to be soliciting acceptance for that plan.

20  You're -- you've got a new plan.

21          So, given that I -- why can't they file a plan

22  without violating exclusivity as long as they -- then they

23  can't solicit acceptances right now anyway.  They need to

24  have an approved disclosure statement.

25          MS. SEFLIN:  So, your Honor --

186

1          THE COURT:  I don't see why exclusivity --

2          MS. SEFLIN:  I -- I want --

3          THE COURT:  -- goes on and on.  I mean, you --

4    anybody at any time could just be like, Oh, we're filing

5    another one," right.  You know, like even after the first

6    exclusivity period had terminated, it can't -- I don't think

7    that that's the intention.

8          MS. SEFLIN:  I don't know, your Honor.  It's my

9    understanding that if we have a plan on file and what we are

10   amending --

11         THE COURT:  You're not -- yeah, but you're not

12   going with that plan.

13         MS. SEFLIN:  No, he's -- hold on.

14         THE COURT:  You're not using that plan.

15         MS. SEFLIN:  But it will be substantially the --

16   it's not actually that different.

17         THE COURT:  It's not substantially.  It's totally

18   different.  It's got an interest rate to unsecured

19   creditors.  It's taking out a big chunk of the plan.

20         MS. SEFLIN:  They haven't --

21         THE COURT:  It's totally changing the --

22         MS. SEFLIN:  We haven't --

23         THE COURT:  -- terms for East West Bank.

24         MS. SEFLIN:  And, frankly, they haven't -- your

25   Honor, they have an interest rate in the current plan.  It's

187

1 rally not that different.

2        THE COURT:  They -- they had an interest rate that

3 kicked in at some later time if thy didn't get paid, within

4 six months.

5        MS. SEFLIN:  Okay.  Your Honor, I really -- I --

6        THE COURT:  I don't know if there is exclusivity

7 right now, not if I'm filing a plan.  I don't think I need

8 to terminate it.  I think that it's done.  I think there is

9 no exclusivity to them filing a plan because the exclusivity

10 period for the plan on file has ex -- as far as filing a

11 plan, has expired, and you're not soliciting acceptances of

12 that plan, and I don't think that that period changes

13 because you intend to file an amended plan  I don't -- I

14 don't see anything about that.

15        I mean, you should have gotten the plan in before

16 this newest version.

17    (Pause.)

18        THE COURT:  So, I mean --

19        MS. SEFLIN:  Your Honor --

20        THE COURT:  -- I think that there -- I think they

21 should be able to file their plan.

22        Now, they're going to -- still you need to get a

23 disclosure statement approved, and then people get to vote.

24        MS. SEFLIN:  Your Honor, may I just --

25        THE COURT:  I understand.

188

1          MS. SEFLIN:  Can I just --

2          THE COURT:  If they're impaired.

3          MS. SEFLIN:  Your Honor, please can I --

4          THE COURT:  Yeah.

5          MS. SEFLIN:  -- please just -- I -- you're making

6  a decision that's going to have catastrophic consequences on

7  this bankruptcy case.  Whether --

8          THE COURT:  How is it catastrophic?

9          MS. SEFLIN:  -- or not, I -- I am telling you a

10  competing plan con -- a competing plan process in this case

11  is -- will not be good for the estate.  There are things

12  that are at risk.

13          THE COURT:  Who?  Who's it going to be bad for?

14          MS. SEFLIN:  Okay.  Well, I think the company for

15  one.  I think there is a good chance that if we go to a

16  competing plan, it brings uncertainty into an operating

17  business.  I can't think of a single --

18          THE COURT:  There's already going to be bidding.

19  There's going to be bidding under the Debtor's claim.  We

20  don't know who the buyer's going to be.  We don't know

21  what's going to happen.  I mean, that was the testimony is

22  we don't know what's going to happen when it goes to market.

23      (Pause.)

24          MS. SEFLIN:  I don't know, but with a competing --

25  with a competing plan process, there's another party sending

189

1 documents and correspondence to creditors, and that gets

2 confusing.

3          THE COURT:  Not unless -- they're not soliciting

4 unless the Court approves their disclosure statement.

5 Nobody should be soliciting right now.  Nobody's supposed to

6 be soliciting right now.  We don't have approved disclosure

7 statement frm anyone.  No one is soliciting.

8          MS. SEFLIN:  Okay.  Your Honor, I -- I just asked

9 because this would be a major consequence to this case, and

10 I -- I'm telling -- like, FitLife has come in, and FitLife

11 thinks that it has the best offer, and FitLife is only to

12 spend all this time and energy and money because they think

13 $36 million is a steel.  If anything, that should tell you

14 that this company is worth significantly more than that and

15 that <u>Must Grow Farm</u> case that they still keep talking about,

16 that case, the big procedures motion was filed, and four

17 months later, they were designated as the stalking horse

18 bidder.

19          So, that Debtor got four months to market

20 exclusive, and we submit that we should also have four

21 months, whether it's through the plan process or a sale

22 process.  They want to --

23          THE COURT:  You can have all the time you want.

24     (Simultaneous speaking.)

25          THE COURT:  Take all the time you want in your

190

1  plan.  Take all the time you want.  There's going to be

2  another plan, and then people get to decide what plan that

3  they prefer.  So, take as much time as you'd like for your

4  plan.  Take as much time as you like for your process, but

5  people will have a choice of a different process.  And then

6  people can decide.  You know what, based on the disclosure

7  statement and based on the plan, you know what?  We prefer

8  the Debtor's plan because we're going to get this huge

9  interest rate.

10         Great.  Awesome.  You know, then they'll decide.

11  I mean, right now, I mean, we're -- I mean, the thing is

12  that I don't see that there's an exclusivity to them filing

13  a plan right now because there is no operative plan right

14  now on file that is the Debtor's intended plan  They're not

15  soliciting acceptances.  They're not even trying.  They'll

16  have a disclosure statement that is totally wrong, can't

17  possibly be approved because it's about a different plan.

18  So, I don't even have an approved disclosure statement,

19  because I don't have a plan on file.  I don't have an APA,

20  which Mr. Willis said they could get ready in like a month.

21  You know, I don't have -- that's an Asset Purchase

22  Agreement.  I don't have -- you know, I don't -- these --

23  these things are not on file, and you can't solicit right

24  now.  So, all these other cases, I mean, this is just -- you

25  know, so, I don't think it's catastrophic in the context

191

1   that they're already planning to sell the business.  This is

2   just -- and I think that people can look at it and say, just

3   like you're thinking, Well, maybe that's a lowball offer,

4   and the Debtor has another plan, and we're going to go in

5   through that process.  Fine.

6           MS. SEFLIN:  Your Honor, I --

7           THE COURT:  People get to --

8           MS. SEFLIN:  -- I just --

9           THE COURT:  -- decide --

10          MS. SEFLIN:  I'd just ask --

11          THE COURT:  -- what they want to do.  You know, I

12  mean the point --

13          MS. SEFLIN:  Your Honor --

14          THE COURT:  -- is it's not a complex case, not

15  complex.  Not -- it's not particularly large.  It's been

16  going on for a long time.  there have been several extension

17  of the exclusivity period.  The Debtor is trying to pressure

18  people into its plan because of what Equity wants, you know,

19  that Equity wants more time to make more money, which is --

20  I mean, that's fine.  You know, they can try.  They can see

21  what happens with their sale process.  And -- and -- what

22  are the other factors?  Let me make sure I look at them all

23  to talk about all of them.

24      (Pause.)

25          THE COURT:  Okay.  Good faith progress toward

192

1  reorganization.  I don't know about good faith.  There's

2  been progress.  They keep filing amended plans under

3  pressure.  They are paying their bills as the come due.

4  Reasonable preference for filing a viable plan, I don't know

5  because the plans have been filed so far are not viable in

6  the sense that they were -- Equity was  holding on without

7  putting in more money and without marketing the company, and

8  creditors were not going to get paid in full on

9  confirmation.

10       Why would the Debtors made progress in

11 negotiations with their creditors? I guess they're

12 negotiating with the Committee or at least two people on the

13 Committee, but they're not negotiating.  They're all with

14 East West Bank, and I'm really -- I mean, really, the

15 Debtors just want more time, which, I mean, I don't see any

16 negotiation process going on.

17       Amount of time which has elapsed, plenty of time

18 for a case like this.

19       Whether the Debtors are seeking an extension of

20 exclusivity order to pressure or require us to submit, I

21 mean -- I mean, you know, it looks to me like they are

22 because East West Bank and their largest unsecured creditor,

23 a landlord, is -- you know, is being request -- required to

24 wait around for the Debtors to market as long as they would

25 like to.

1          And whether there's (audio glitch) contingency,

2   well, there isn't and it was our contingency because we

3   don't know what the Debtor's going to be sold for or if

4   they're going to be able to release equity to -- or money to

5   pay off their debt.  So, far it doesn't look like they can

6   raise enough money to pay off their debt because they

7   haven't been able to do it so far, and they've been trying

8   to do that at least since the beginning of the case.  And

9   they had another professional involved to do that who wasn't

10  able to do that.

11         So, these are all reasons.  If -- assuming we even

12  have to terminate exclusivity, which I don't even know if we

13  have to in the context of just them filing their plan, there

14  would be grounds to terminate exclusivity.  And I don't see

15  it as being catastrophic.  It's already being put into the

16  sale process.

17         MS. SEFLIN:  Well, your Honor, I would -- I -- I

18  would just ask, your Honor, because having dual competing

19  plans in a Chapter 11 does make a difference in the case.

20  It does make it more complicated.  It makes it more

21  expensive, and I would just ask at the very least that you

22  continue a decision on this until April 2nd to give us the

23  chance to file a plan.  This is a Chapter 11 Debtor.  Their

24  first choice is to stay in business as a going concern, and

25  we've been clear about that.  They have -- they have

194

1  received --

2           THE COURT:  Well, it's going to stay in

3  business --

4           MS. SEFLIN:  Given that also --

5           THE COURT:  -- as a going concern.  They're buying

6  it as a going concern.

7           MS. SEFLIN:  Well, I -- your Honor, I just -- I

8  just -- okay.  This is just such an important decision in

9  this case, and --

10          THE COURT:  It is important.

11          MS. SEFLIN:  -- this is a business that employs 70

12 people in L.A. County, and I'd just ask that you not make a

13 decision that actually could harm the business.  Like,

14 you're -- you'd -- you're confident that it's not, but I'm

15 the one who's been in the weeds day to day, and I'm the one

16 who understands and hah -- has had to deal with their

17 largest supplier multiple times, including times when that

18 supplier goes to COD, and if that happens here, your Honor,

19 the -- the company will run out of cash immediately, and

20 that will have an immediate detrimental effect on the

21 business.  So, I just beg of you please don't make this

22 decision at this point, and at least give the Debtor until

23 April 2nd to file the plan that it's -- it has agreed to

24 now.

25          MR. FEINSMITH:  Your Honor, there's -- there's no

195

1  evidence that any of that would happen.  And, in fact, if

2  there's competing plans, it's going to be better for the

3  estate.  And, beyond that, if a more solvent buyer came in

4  and ran the business more effectively, that's better for

5  vendors than worse, and vendors realize that.

6          MS. SEFLIN:  Your Honor, in my experience in this

7  case --

8          THE COURT:  I -- I -- I've been in -- I've seen --

9  I've had cases -- I have had a -- I had a -- you know, cases

10  with competing plans where actually everybody ended up doing

11  better because of competing plans.  Creditors got paid in

12  full, and then it just became a matter of like how much was

13  Equity getting.  And, I mean, Equity didn't get to stay in

14  place in some of those plans because somebody else was

15  willing to pay more for the equity than the equity people --

16          MS. SEFLIN:  Well, I also think --

17          THE COURT:  -- were willing to -- than the -- than

18  the insiders were willing to pay.  So, you know, it all

19  worked out fine, and actually the -- you know, it all worked

20  out fine.  I don't -- it's not that complicated case for a

21  competing plan.  This is already set up for a sale process.

22  That's the intention is to sell it.

23          And, so, I don't know why you think there's going

24  to be 75 employees in L.A. under the Debtor's plan but not

25  under the certified plan.  We don't know what's going to

196

1  happen to these employees under the Debtor's plan.  We don't

2  know what the buyer's going to want to do with these

3  employees.  We don't know if they're going to want to stay

4  in L.A.  I mean, that same prospect is subject to the

5  Debtor's plan.  And if there's just -- and if there's just

6  uncertainty with respect to the supplier, then taking

7  longer, I don't know if that's so -- if that's so great.

8  You know, so, I mean, it just creates another issue among

9  the Debtor's business that -- about uncertainty with the

10  business.  What do you do if the supplier leaves?  I mean,

11  that's why we paid out the supplier two and a half million

12  dollars as a -- as a critical vendor early in the case.

13        I mean, does that sound like a stable business to

14  you?

15      (No response.)

16        THE COURT:  I -- you know, I -- maybe it would be

17  better for everybody if somebody else comes in who has more

18  supplier contacts.

19        MS. SEFLIN:  Your Honor, I --

20        THE COURT:  So --

21        MS. SEFLIN:  -- think --

22        THE COURT:  -- I think there's -- I -- I think we

23  should  move ahead by -- to the extent it's even -- even

24  necessary to remove exclusivity to -- for FitLife to file a

25  plan and disclosure statement, then there's grounds to do

197

1 that.  There's cause to do that.  It's justified in this

2 case.

3         And -- and Debtor can go ahead and pursue its

4 plan, and -- and it can -- and once it has an approved

5 disclosure statement, it can -- we can set up, you know,

6 times for solicitation.

7         MS. SEFLIN:  Well, your Honor, I just --

8         THE COURT:  And -- and --

9         MR. FEINSMITH:  Your Honor --

10        THE COURT:  And I imagine it would be on the same

11 timeline.  I don't see why it shouldn't be on the same

12 timeline, honestly, but --

13        MR. FEINSMITH:  Your Honor, we -- in that regard,

14 we would -- we would just ask that the Debtor be ordered to

15 cooperate with us in due diligence.  We've been frustrated

16 in that regard, and based on what we're hearing now, we

17 anticipate that we could be continued to be frustrated.

18 And, so, we would appreciate respectfully, if you would

19 order the Debtor to cooperate in due diligence so that we

20 can get a plan on file as soon as possible.

21        MS. ANDRASSY:  Your Honor, may I be heard?

22        THE COURT:  Yes.

23        MS. ANDRASSY:  Thank you.  I represent Klee Irwin,

24 who is the majority shareholder in this case, and I think

25 after hearing the testimony today, there's no question that

198

1  this estate is solvent.  The question is how solvent it is.

2  And there are fiduciary duties that are owed to

3  shareholders, and those are applicable even in a Chapter 11

4  case.

5         I want to let the Court know that we -- I was

6  retained last week.  We have made a global settlement

7  proposal to East West Bank this week because Mr. Irwin also

8  has an individual loan with them.  So, it was intended to be

9  a global offer.  So, we are making progress on that front.

10        I am gravely concerned --

11        THE COURT:  We're talking about settlement

12  communications.

13        MS. SEFLIN:  I'm not disclosing the contents of

14  it.  I just wanted the Court to know that those discussions

15  are ongoing or we believe may --

16     (Zoom glitch.)

17        MS. SEFLIN:  This is a case where East West Bank

18  is being paid principle and interest.  It's only been

19  pending for seven months.  The investment banker was

20  employed today.  I'm really concerned about the effect that

21  competing plans might have on the sales process in terms of

22  chilling bidding.

23        I don't know what FitLife's plan looks like, if

24  it's going to be the only one who is able to acquire the

25  assets under its plan, however it proposes it.  But it may

199

1 have been assessed on the sale process.  And that's not a

2 good thing.

3        The Debtor has made significant progress.  It's in

4 active discussions with -- with the -- with lenders.  It's

5 getting term sheets.  And all these things have happened

6 really recently, and just hasn't had a chance to play out

7 yet.  So, I understand the Court's frustration, you know,

8 with a couple of different iterations of the plan, but at a

9 minimum, I would beg the Court to at least continue this

10 hearing until April 2nd, when the Debtor's motion to extend

11 exclusivity is set for so we can all take a breathing space

12 and reflect on today's testimony and choose the path forward

13 that benefits everyone.  I mean, my prize goal is to get

14 everyone paid quickly, with handsome interest, but there are

15 200 and something other shareholders out there whose

16 interests haven't even been represented in this case.  And

17 this decision greatly potentially impacts them.

18        So, I would urge the Court at a minimum to

19 continue this to April 2nd.

20        THE COURT:  Once the Debtors -- I mean, you know,

21 the Debtor can file their plan, and the Debtor can tell

22 people that their plan is better, Yoo know.  I mean, no,

23 we're not going to anecdote and explain why the -- any other

24 plan is worse.

25        MS. ANDRASSY:  But it may interfere with the sale

200

1  process, your Honor, and I --

2         THE COURT:  How's it going to interfere with the

3  sale process?

4         MS. ANDRASSY:  -- that's the road that this is

5  going down, and if that chills bidding, that's not a good

6  thing for creditors or the shareholders.

7         THE COURT:  Maybe creditors -- you know, like I

8  can just see it being on -- you know, first of all, I don't

9  understand why the Debtor didn't file this plan already.

10 They've followed several procedures.  They've had this old

11 plan on file for a long time, knowing it wasn't -- you know,

12 knowing it wasn't what they were doing, and without it

13 including the sale process and -- and --

14        MS. ANDRASSY:  Well, your Honor, they didn't have

15 an investment banker employed a that time.

16        THE COURT:  They've had an investment banker

17 working with them.

18        MS. ANDRASSY:  They've just gotten a valuation.

19        THE COURT:  They've been waiting.  I mean, the

20 only reason -- I mean, they've been making movement because

21 they've been forced to make movement.  You can see that from

22 the first plan and the second plan that they filed.  And now

23 there's sales procedures.  They're only moving under

24 pressure.  They are moving under pressure, and -- and -- and

25 there's no knowing once -- if there isn't that pressure,

201

1  what's going to happen.

2          MS. SEFLIN:  Your Honor --

3          MS. ANDRASSY:  Your Honor, this -- but this is all

4  in good faith.  I mean there is no question everyone is

5  going to get paid in full.  The question is just a matter of

6  when, and we're now moving down with concrete days that are

7  on a short leash, shorter than shareholders would prefer,

8  but I understand we're trying to balance the considerations

9  here.  So, I -- I do think progress has been made,

10 substantial progress, and we're about to make substantial

11 progress more.

12         MR. FEINSMITH:  Your Honor, there's --

13         MS. SEFLIN:  And --

14         MR. FEINSMITH:  Oh.

15         MS. SEFLIN:  Your Honor, any delay in filing the

16 plan I feel so terrible now.  Like, that's my -- I wanted to

17 wait until I got your order on the dates before I -- you

18 know, if -- if you had approved the Committee stipulation

19 where we're agreeing to those dates, then I would have

20 improved them.  I don't want to have to file two more

21 amended plans.  So, I was just waiting.  I thought dates

22 would be set at this hearing, and then I would include them

23 in the amended plan and disclosure statement.  So, that is

24 the only reason it's not on file is my fault.

25         MR. FEINSMITH:  Your Honor, the bottom line is

202

1  there's no harm in having competing plans.  There's a long

2  history that it puts the cases of competing plans doing

3  better for the estate.  When you have competition, that's

4  better.  And the Debtor has tried to frustrate us at every

5  single turn, and absolutely that's going to make it worse

6  for creditors because we have our winners.  It's high time

7  that exclusivity be terminated.  I think your Honor's

8  already said that it's terminated with respect to filing a

9  plan.

10        We would simply like the Debtor to be ordered to

11 cooperate in due diligence so that we get the information

12 that we need, and we'll file a plan as quickly as we can.

13 And if your Honor, approves our disclosure statement, we'll

14 go out and solicit.

15        MR. GOLDEN:  Your Honor, this is Jeff Golden.

16 Yes, the Committee, as we indicated in the pleading that we

17 filed, we really would like to see the bid procedure, sale

18 procedure put into place.  That's what we understood was

19 going to be purposeful here today because we think today the

20 -- a -- the prompt transaction which were some of the dates

21 that had been laid out or thereabouts would be the fast way

22 to sort of get things administered and -- and moved forward.

23        Is the Court entertaining setting down bid

24 procedures today?

25        THE COURT:  No, because the -- no, because I don't

203

1  think we need to do those bid procedures through a

2  standalone motion when the timing in there is as long as it

3  is.  And that avoids a plan processed.

4      People -- I mean, there is no reason -- there --

5  you know, the plan process is the best process.  When people

6  use sale procedures outside of a plan, it's because of major

7  -- because of problems with liquidity, problems with use of

8  cash collateral, problems with the bank pressure.  There is

9  no reason right now to -- to force a 363 sale when we could

10 do this through a plan process.  Plus, it may be the bidders

11 want to use a plan processed.  If in the future I hear that

12 we need to do a 363 and there's an explanation of why, why

13 it's critical to do a 363 process, the Court is open to it.

14 But aside from some kind of exigent circumstances, the Court

15 thinks that the best process is a plan process.  That is the

16 best process, a process which shows people where is the

17 money going, when am I getting my money, not just the

18 secured creditors but unsecured creditors, because I have

19 seen unsecured creditors not get their money timely after a

20 -- after a sale, for whatever reason, even though it's

21 sitting there.  And I don't understand why people are

22 resistant to the plan process in this case.  There should be

23 a plan process, and there could be more than one plan, and

24 it isn't a big deal to have more than one plan in a case

25 like this.  It's not like -- I mean, this is really not that

204

1  complicated of a case.  There's like one major secured

2  creditor, and there's like not that much unsecured debt

3  that's all pretty much on the same level.

4         And then there's -- and -- and there's a -- I

5  mean, obviously the administrative expenses, but, you know,

6  we know that those will get -- also we know those will get

7  paid through a plan process.  It's better to have a plan

8  process to know we're going to get administrative expenses

9  paid.

10        MS. ANDRASSY:  Your Honor, I agree.  I agree with

11 that.  I would just request that this Court continue the

12 motion to terminate exclusivity until April 2nd so that we

13 can reflect on the testimony --

14        THE COURT:  I don't even understand.  Nobody's

15 explained to me why I even need to terminate when, I mean,

16 the plan on file is not the operative plan, and the

17 disclosure statement can't possibly be approved, and there

18 -- there is no -- there is no -- there is no exigency right

19 now for filing a plan.

20        MS. SEFLIN:  But there is if your Honor grants the

21 motion.

22        THE COURT:  What?

23        MS. SEFLIN:  I believe that there is if the Court

24 grants the motion on April 2nd.

25        THE COURT:  Well, then why didn't they file the

205

1  motion before?  Why do I have to -- why is it -- it's -- if

2  I do that in the future -- I'm saying right this second,

3  right now, there is no exclusivity for filing a plan.

4  There's exclusivity for soliciting, and the Debtor has a

5  plan on soliciting on the plan it has filed.

6          And there's cause -- if there is -- and if there

7  is exclusivity, then there would be cause to terminate it.

8  I mean, we have to look at what's happened through the case,

9  which is plans in which Equity was trying to retain its

10 position without putting any money in or market testing the

11 company.  That's what was happening for a long time.  And --

12 and Equity has been trying to raise debt -- money to pay off

13 the debt for months, and even before, for months, since the

14 very beginning of the case.  And now -- and, as I'm saying,

15 I'm not trying to stop Equity -- the Court is not stopping

16 Equity from putting whatever time process it wants into its

17 plan.  And the Court doesn't think that -- that there's

18 going to be -- and I -- I think what people have said or

19 what the -- what the Debtors and the bankers said ips people

20 look at what they have to pay and what they're willing to

21 pay, and I think people can look at FitLife if it has some

22 kind of low all offer and be like, That plan is not going to

23 be approved or that's a ridiculous number, and we think we

24 have more value.  We -- we think it's worth more, and -- and

25 I think they're going to see that.

206

1          So, the issue is -- and -- and -- and why

2    shouldn't FitLife be able to get the data, because maybe it

3    will get through the Debtor's plan so that it -- maybe it

4    won't be able to get the company through its plan, and maybe

5    it will see other people bidding, and then it will decide

6    that it wants to be part of that process.

7          Why not?  Maybe that's the best way for them to

8    get there.  Maybe that would be better and cheaper for them

9    too, right.

10         So, it's just there's not reason to extend

11   exclusivity right now based on the -- there's not reason to

12   not terminate right now given what's happened so far in the

13   case.

14         MS. SEFLIN:  Your Honor, could we go through the

15   (indiscernible) again?  I -- I disagree, respectfully --

16      (Pause.)

17         THE COURT:  So, I guess now we're just talking

18   about like what should we do to make sure -- and I think you

19   all should try and talk about what -- you know, I think,

20   first of all, I don't want to order anything until I see

21   what the NDA -- what the nondisclosure agreement is.  So,

22   I'm not ordering them to make available due diligence

23   without knowing what -- like, what FitLife's willing to do

24   as far as the nondisclosure.

25         So, I think you all should work that out.

207

1  Whatever they're going to be doing for other bidders, they

2  should do for FitLife.

3          MS. SEFLIN:  Your Honor --

4          THE COURT:  Because we have an investment banker

5  hired now.

6          MS. SEFLIN:  Your Honor, I know you don't -- I

7  know you don't want to hear this, but this could potentially

8  have big consequences on this business, and I'm just -- and

9  I do believe that we filed the ex -- the motion to extend

10 exclusivity before the expiration of the deadline, I do

11 believe it extended.  That's my -- that's my recollection of

12 the law.  And, so, I'd just ask that you continue us to

13 April 2nd and you give the Debtor a chance -- I've seen you

14 in other cases give Chapter 11 Debtors chances, and I'm just

15 asking you to --

16         THE COURT:  Nothing's stopping the Debtor from

17 doing what it wants with its plan.

18         MS. SEFLIN:  I know, but -- I know that you don't

19 think a competing plan process will harm this Debtor, but I

20 really believe with all my heart that I will to this point

21 where it's starting to panic me.  So, I'm asking you --

22         THE COURT:  The Unsecured Creditors Committee

23 usually they do a plan.  They want to do a -- they want to

24 do a 363 sale.  I mean, like --

25         MS. SEFLIN:  No, they're fine with state

208

1   procedures through a plan.  We -- remember we talked about

2   you --

3            THE COURT:  Well, I mean, like, I mean the point

4   is like why -- why is a 363 sale less disruptive than plan,

5   than a competing plan, I mean, outside of a plan?  It's --

6            MS. SEFLIN:  Well, first of all, your Honor --

7            THE COURT:  You know, I -- you know, I -- I mean,

8   I --

9       (Simultaneous speaking.)

10           THE COURT:  Not to mention the issues with that --

11  what was filed with the Court as far as the bidding

12  procedure goes.

13           MS. SEFLIN:  Your Honor, a competing plan will

14  assess the Debtor's ability to get exit financing.  It will

15  affect the Debtor's ability to run a sale process because

16  now you've got another party filing something, and having

17  rights in this bankruptcy case, it is going to affect the

18  Debtor's ability to --

19           THE COURT:  Well, maybe the Debtor -- maybe that's

20  because of what the Debtor's done to on the case so far.

21           MS. SEFLIN:  Well, we're only seven months into --

22           THE COURT:  That's a result of the Debtor's

23  prosecution of the case so far, and don't -- it's not your

24  fault.  Don't blame yourself.  It's not your fault.  You

25  have a client.  You were working with your client.  You were

209

1  doing what you thought was right, right?  But -- but it's

2  taken as long as this and even longer to even have this new

3  plan on file.  We don't even have a thing about this

4  independent director.  We don't even -- I mean, the first

5  we're hearing about it is now, now.  And I haven't even seen

6  their plan.  And that's --

7        MS. SEFLIN:  Your Honor, I --

8        THE COURT:  -- not your fault.

9        MS. SEFLIN:  There's --

10        THE COURT:  I mean, you know, I don't -- I mean,

11  if anything --

12    (Simultaneous speaking.)

13        THE COURT:  -- I mean, the fault would be like why

14  you left the steel plan on file for as long as you did.

15  You're filing redlines of a disclosure statement, and you're

16  not filing a totally different plan, and you can't -- and

17  you could tell me it's an amended plan, but it is a totally

18  different plan.  It is totally -- it is different in many

19  many respects.  It drops out major portions of the old plan,

20  and it changes the interest rate payable to unsecured

21  creditors, and apparently it changes other things, and it

22  has -- it changes other things too.  It changes the timing.

23  It's very different.

24        And just like say that -- that it -- it's

25  different.  It's different, and I don't think it's going to

210

1 be that -- I don't think it's going to be that bad.  I -- I

2 think it's going to -- I don't think it's going to be that

3 bad.

4         So, I'm going to rule.  I'm ruling, rules -- I'm

5 sorry.  I feel I sound like somebody else.  And we'll see

6 what happens.  I don't think it's going to be as disastrous

7 as you believe, you know.  You've got good -- I mean, you've

8 gotten -- the Debtor has the investment banker they wanted.

9 They have another -- another entity in there looking for

10 their debt financing to the extent that it's going to be

11 possible for them to get, because it hasn't been before.  I

12 don't know why it would be now.  And -- and creditors will

13 be able to look at plans, their plan options.  So, that's a

14 good thing.  And equity holders can look at their plan

15 options too, and if creditors were unimpaired, maybe they

16 don't even get to vote.  So, in now we'll just have to look

17 at what Equity wants, right.

18         And it sounds like competing plans.  We can look

19 at equity when creditors are paid in full.  So, it may be

20 that if Equity's better treated under the Debtor's plan,

21 right, and creditors are unimpaired, that it's going to be

22 up to what's best for Equity, but we need to see a competing

23 plan, and we need to see your latest plan, the Debtor's

24 latest plan.

25         Okay.  So, I'd like an order on that.  Who's

211

1   submitting that order?  Mr. Feinsmith, you're submitting

2   that order.

3         Now, we're going to have to wait to talk about the

4   due diligence stuff because I want to see what the NDA is.

5   You guys can talk about that, right?

6         So, when do -- when should be do that?  We h ave a

7   status conference.  Should we continue for that?

8      (Pause.)

9         MR. FEINSMITH:  That's fine with us, your Honor.

10  When is the status conference?

11        THE COURT:  Well, we had one -- I think today we

12  had a status conference, but we'll continue it.  So, how

13  long do you need, because I think you will need to meet.  I

14  mean, you will need to work it out.

15     (Pause.)

16        MR. FEINSMITH:  Oh, an NDA should be very simple.

17  I don't think the issues here are complicated.  We do them

18  all the time.  I mean, that could be done within the space

19  of a couple of days.  I don't think there are material

20  issues that need to be negotiated.  In fact, there already

21  is an NDA -- there already is an NDA between FitLife and the

22  pre-petition Debtor.  We would be perfectly willing to just

23  adopt that order.

24

25        THE COURT:  Well, I don't know if I -- I mean, I

212

1 don't know if -- I think they have a new investment banker,

2 and I think you should do what -- I think that that

3 investment banker should let you use the same NDA as

4 whatever other people are going to be using for the Debtor's

5 plan, right.  I mean, it shouldn't be different.  So --

6            MR. FEINSMITH:  Yeah, I don't know that they've

7 developed one yet, but --

8            THE COURT:  Well, when they develop one, I mean,

9 it's not -- you know, I mean, it's not -- I don't -- I don't

10 -- it's -- so, why don't we --

11           MR. FEINSMITH:  We just -- we just didn't want

12 there to be -- we just didn't want there to be --

13           THE COURT:  I mean, there was a hearing set on

14 April 2nd.  You know, it's going to be moot because we're

15 not extending exclusivity because we're terminating

16 exclusivity to the extent we even need to terminate

17 exclusivity based on the current situation.

18           So, that's what, the 2nd at 1:30, right?

19           MR. FEINSMITH:  I'm actually out of the country on

20 the 2nd.

21           THE COURT:  Oh.  Well, then we can continue it to

22 April 23rd.

23           MR. FEINSMITH:  That long?

24           THE COURT:  Yeah.

25           MR. GOLDEN:  Your Honor, could that day be

213

1  afternoon, your Honor?

2          THE COURT:  Pardon?

3          MR. GOLDEN:  It -- what time would that be on the

4  23rd, your Honor?

5          THE COURT:  That would be at 1:30 or we could do

6  April 30th also.

7          MR. GOLDEN:  The 23rd in the afternoon and the

8  30th work for us, your Honor.

9          THE COURT:  So, April 23rd or April 30th?

10          MR. FEINSMITH:  Your Honor, we just are concerned

11  about a delay that long just to get an NDA in place.  I

12  mean, this is usually something that can happen within the

13  space of a day between ordinary parties.  I mean --

14          THE COURT:  Well, if you done, then --

15      (Simultaneous speaking.)

16          MR. FEINSMITH:  -- it's not a complicated --

17          THE COURT:  I mean, if you get it done, you get it

18  done.  But if you can't get it done, we'll have a hearing on

19  April 23rd.

20          MR. FEINSMITH:  Well, I'm -- I'm concerned about

21  not being able to get it done because you hear what's going

22  on with the Debtor, and, you know, they want to try to bar

23  us from the process at all costs.

24          THE COURT:  I don't say -- they're not going to

25  bar you from the process.

214

1     MS. SEFLIN:  No one has said that.  We never said

2  that, Mr. Feinsmith, and you know that because I had the

3  discussion with you.  The only thing the Debtor ever said is

4  that we thought your current bid was too low.  We never said

5  we bar FitLife from the process or --

6     THE COURT:  I -- I don't think there was anything

7  wrong with the Debtor saying they wouldn't let you -- they

8  didn't want FitLife as a stalking horse.  Fine.  Don't use

9  FitLife as a stalking horse.  You want to be -- don't use

10 them.  FitLife can do their own plan.  We'll see what

11 FitLife offers, and, you know, but I understand that they

12 need to give the due diligence.  So, I don't understand what

13 -- I mean, this -- I think it's fine.  The 23rd is fine.

14 So, if you don't reach an agreement, we'll deal with it by

15 April 23rd, but it should be the same NDA as -- as the

16 bidders are going to be getting under the Debtor -- with the

17 Debtor's investment banker.

18     MR. FEINSMITH:  Okay.  Thank you, your Honor.

19     THE COURT:  Whenever they develop it.  I imagine

20 they're going to develop it soon because I think that

21 they're going to want to, you know, move the process along

22 as best they can, right.

23     MR. FEINSMITH:  So, that status conference is --

24 just -- just so I have the time right, it's 10:00 a.m.?

25     THE COURT:  No, no.  1:30 p.m.

215

1          MR. FEINSMITH:  1:30, okay.

2          THE COURT:  Pacific time.

3          MR. FEINSMITH:  Okay.

4      (Pause.)

5          MR. FEINSMITH:  We -- we can prepare an order,

6 your Honor, to submit.

7          THE COURT:  Yeah.  So, I mean, Number 4 was the

8 status conference, and we're going to continue that to 1:30

9 on April 23rd.  And we can get a status report from the

10 Debtors by like I guess -- well, we're going to see their

11 plan, right?  So, but why don't we see the status report by

12 -- well, I don't even need a status report.  Let's just have

13 a status conference on April 23rd at 1:30.

14          MS. SEFLIN:  Your Honor, can we see the form of

15 the order from today, please, before it's lodged?

16          THE COURT:  Can you see -- can you have what --

17 oh, the form of order, yes.

18          MS. SEFLIN:  Yes.

19          THE COURT:  And then we're going to have -- oh, so

20 the motion for preliminary bidding procedures is being

21 withdrawn as I understand it, and the disclosure statement

22 is denied, this one, because it's -- the plan is not the

23 plan the Debtor's using.

24          And we already granted the app to employ STS, and

25 then we're going to get the order, right, the order on the

216

1  -- FitLife's motion to grant.

2          Okay.  Thank you so much.

3          THE CLERK:  Excuse me, your Honor.

4          THE COURT:  Yes?

5          THE CLERK:  Just to complete, on those exhibits --

6          THE COURT:  Oh, right.  Uh-huh.

7          THE CLERK:  I -- the only ones I see that I'm

8  going to -- I don't think you actually -- Exhibit 3.

9          THE COURT:  Oh, okay.

10         THE CLERK:  I just wonder when we're going --

11 well, actually, 7, 2 and 5 are the ones that IP --

12         THE COURT:  Yeah.  We'll enter it, right?  We were

13 going to enter -- well, the declarations, right.  I don't

14 know if -- was 1 being admitted?  I guess it was the

15 declarations, right?  So, I think 1 --

16         THE CLERK:  Yes.

17         THE COURT:  -- 2, which the -- is the declaration

18 of Mr. Willis in support of reply to the objection to

19 disclosure statement.  3 was the declaration of Dayton Judd.

20 4 is the declaration of Wayne Platt, which is Docket 424.  5

21 is the declaration of Vincent Willis, which is Docket 430.

22 6, did you want to move into evidence I think Number 6 ?

23 This is a FitLife exhibit.  We had testimony about that, and

24 7, which is another FitLife exhibit.  So, those are all

25 admitted, correct?

217

1      (No audible response.)

2           THE COURT:  Yes.  Thank you.

3           ALL:  Thank you, your Honor.

4      (Proceedings adjourned.)

218

1          I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   /s/Jordan Keilty               3/25/2025
    Transcriber                    Date
6
    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8   /s/L.L. Francisco
    L.L. Francisco, President
9   Echo Reporting, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

EXHIBIT 3

BAP No. 25-[forthcoming]

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## FOR THE NINTH CIRCUIT

---

In re Irwin Naturals, *et al.,*

Bankr. Case No. 1:24-bk-11323-VK

---

IRWIN NATURALS, *et al.*,[1] Appellants,

v.

FITLIFE BRANDS, INC., Appellee.

---

Appeal from Order Terminating Exclusivity Pursuant to 11 U.S.C. § 1121(d)

---

## EMERGENCY MOTION FOR EXPEDITED BRIEFING SCHEDULE AND SETTING OF ORAL ARGUMENT

David M. Poitras – Bar No. 141309
Susan K. Seflin – Bar No. 213865
Jessica L. Bagdanov – Bar No. 281020
Jessica S. Wellington – Bar No. 32447
BG LAW LLP
21650 Oxnard Street, Suite 500
Woodland Hills, CA 91367
Tel: 818-827-9000
Fax: 818-827-9099
dpoitras@bg.law, sseflin@bg.law, jbagdanov@bg.law, jwellington@bg.law

---

[1] The Appellants in this appeal are the affiliated chapter 11 debtors as follows: Irwin Naturals (1:24-bk-11323-VK), Irwin Naturals Inc. (1:24-bk-11324-VK), 5310 Holdings, LLC (1:24-bk-11325-VK), and DAI US HoldCo Inc. (1:24-bk-11326-VK) (collectively referred to herein as the "Debtors" or "Appellants").

## TABLE OF CONTENTS

Page

I.      INTRODUCTION AND REQUESTED RELIEF ..........................................1

II.     RELEVANT BACKGROUND.......................................................................4

     A.      RELEVANT PROCEDURAL HISTORY FOR THESE CHAPTER 11 CASES .......4

     B.      THE DEBTORS' EXCLUSIVITY AND BANKRUPTCY COURT'S

         TERMINATION THEREOF .......................................................................6

III.    ARGUMENT..............................................................................................9

IV.     COMPLIANCE WITH NOTICE REQUIREMENTS .................................11

V.      CONCLUSION.........................................................................................11

VI.     CERTIFICATION AS TO INTERESTED PARTIES................................12

VII.    STATEMENT OF RELATED CASES.......................................................12

VIII.   CERTIFICATE OF COMPLIANCE .........................................................12

# TABLE OF AUTHORITIES

Page

## CASES

*Ahern Rentals, Inc. v. Goldman Sachs Palmetto State Credit Fund, L.P. (In re Ahern Rentals, Inc.),*
2013 WL 150489 (D. Nev. Jan. 14, 2013) ........................................................10

*In re New Meatco Provisions, LLC ("New Meatco"),*
2014 WL 917335 (Bankr. C.D. Cal. Mar. 10, 2014) ..........................................10

*Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hospital (In re Henry Mayo Newhall Mem'l Hospital),*
282 B.R. 444 (9th Cir. BAP 2002) ............................................................. 6, 9, 10

## STATUTES

11 U.S.C.,
Section 1102(a) .........................................................................................4

11 U.S.C.,
Section 1107(a) .........................................................................................4

11 U.S.C.,
Section 1108 ..............................................................................................4

11 U.S.C.,
Section 1121(d) ......................................................................................1, 4

28 U.S.C.,
Section 158(a)(2) .........................................................................................1

## RULES

Federal Rules of Bankruptcy Procedure,
Rule 8013 .....................................................................................................9

Federal Rules of Bankruptcy Procedure,
Rule 8013(a)(2)(B) ....................................................................................1, 9

Federal Rules of Bankruptcy Procedure,
Rule 8013(d) ................................................................................. 1, 9, 11, 13

Rules of the United States Bankruptcy Appellate Panel fo the Ninth Cir,
Rule 8013(d)-1(a) .......................................................................................11

## TREATISES

March & Shapiro,
Rutter Group California Practice Guide: Bankruptcy ¶ 11:232  (Dec. 2024)........7

Appellants Irwin Naturals, a Nevada corporation ("Irwin Nevada"), and its related debtor entities (collectively, the "Debtors"), hereby file their emergency motion (the "Motion"), pursuant to Rule 8013(a)(2)(B) and (d) of the Federal Rules of Bankruptcy Procedure, for entry of an order expediting the briefing schedule in this appeal and setting of oral argument **during the month of April, 2025** in order to avoid irreparable injury given the unique time sensitivities of this appeal. **As explained herein, this appeal will become moot by no later than May 2, 2025**, thus, resolution of the appeal prior to that date is critical.

The Debtors have filed their Statement of Issues and Designation of Record with the bankruptcy court, and respectfully request that this Panel grant this Motion to protect the Debtors' substantive right of appeal, and to protect the value of the estates' business from immediate irreparable injury.

## I.    INTRODUCTION AND REQUESTED RELIEF

By this appeal, the Debtors seek emergency review of the bankruptcy court's *Order (A) Granting Motion for an Order (I) Terminating the Exclusive Periods in Which Only the Debtor May File a Plan and Solicit Acceptances and (II) Permitting FitLife Brands, Inc. to File an Alternative Plan and Disclosure Statement; and (B) Granting Related Relief* (the "Order Terminating Exclusivity"), entered March 31, 2025. *See* Appendix, **Exhibit 1.** An order reducing a debtor's exclusive periods under 11 U.S.C. § 1121(d) is interlocutory but reviewable on appeal specifically by statute. 28 U.S.C. § 158(a)(2).

The Debtors operate a nutraceutical business that has operated successfully for most of its history since its inception in 1994.  Irwin Nevada formulates, markets, and distributes vitamins and supplements. In addition to its Irwin Naturals® supplement brand, Irwin Nevada also has two other supplement brands, Nature's Secret® and Applied Nutrition®. Irwin Nevada's product line currently includes over 130 formulas, which are distributed in more than 100,000 retail

1

locations, including health food stores such as Whole Foods and mass-market retailers such as Costco, Walmart, and CVS.

As discussed below, the Debtors' bankruptcy cases were proceeding normally, as the Debtors had obtained approval to use cash collateral on a final basis, and had begun the negotiation process for formulating a revised plan of reorganization. However, on January 23, 2025, FitLife Brands, Inc. ("FitLife"), a publicly traded supplement business and a direct competitor of the Debtors, purchased a $7,498 unsecured claim[2] in these cases to obtain standing as a party in interest. Just weeks later, FitLife filed a motion to terminate exclusivity for cause in order to allow it to propose a competing plan, solicit the Debtors' creditors, and engage with the Debtors' main customers. Such a result will undoubtedly negatively affect the Debtors' business, which has been a family business for over 30 years.

Prior to entry of the Order Terminating Exclusivity, the Debtors had obtained one previous extension of exclusivity by motion, and one extension stipulated to by interested parties (including FitLife). At the time of this appeal, the Debtors' current exclusive periods to file their chapter 11 plan of reorganization and obtain acceptances thereof expired on March 5, 2025, and May 2, 2025, respectively. Because the bankruptcy court terminated exclusivity, the Debtors' competitor, FitLife, is now able to file a plan and disclosure statement and will presumably be able to solicit the Debtors' creditors and other interested parties immediately after the bankruptcy court approves FitLife's disclosure statement (notwithstanding the fact that the Debtors timely filed their plan and disclosure statement and had expected to file a motion to further extend their current exclusivity periods).

---

[2] The Debtors' bankruptcy cases include over $25 million of scheduled and filed claims.

2

In entering the Order Terminating Exclusivity, the bankruptcy court
(a) incorrectly found that the Debtors' exclusive period to file a plan of
reorganization had already expired and (b) held that, in any event, FitLife
established cause to terminate the Debtors' exclusive period to file a plan and
solicit acceptances thereof, even though these bankruptcy cases have been pending
for a mere seven (7) months and the **solvent** Debtors have made substantial
progress toward reorganization (and at all relevant times herein have represented
that that they will be paying all allowed claims in full under their plan – albeit
under different timelines).

By this Motion, the Debtors respectfully request this Panel to impose an
expedited briefing schedule, as follows (hereinafter, the "Proposed Expedited
Briefing and Argument Schedule"):

| Filing | Proposed Deadline |
|---|---|
| Appellants' Statement of Issues and Designation of Record | March 31, 2025 |
| Appellee's Supplemental Statement of Issues and Designation of Record | April 3, 2025 |
| Appellants' Opening Brief | April 10, 2025 |
| Appellee's Brief | April 17, 2025 |
| Appellants' Reply Brief | April 22, 2025 |
| Disposition | Prior to May 2, 2025[3] |

The Debtors are sensitive to the fact that the proposed schedule asks much of
this Panel and opposing counsel. However, the Debtors submit the substantive
issues in this appeal are narrow: whether the bankruptcy court committed error in
(a) holding that the Debtors' exclusive period in which to file a plan had expired

---

[3] May 2, 2025 is the Debtors' current deadline to obtain acceptances on their plan.
The Debtors intend on filing a motion to further extend that deadline pending the
outcome of this appeal.  The Debtors expect the bankruptcy court to deny such a
motion given its Order Terminating Exclusivity absent a ruling to the contrary by
this Court.

(even though a motion for extension of exclusivity was on file on March 5, 2025 prior to the expiration of their exclusive period to file a plan), (b) holding that the Debtors' current plan does not relate back to its prior plan and (c) terminating the Debtors' exclusive periods under section 1121(d) for cause. Furthermore, any perceived prejudice to the opposing party (a direct competitor and owner of, at most, .03% of the estates' liabilities) is dwarfed by the harm the Order Terminating Exclusivity will cause to the Debtors, their business operations and their employees if not resolved promptly.

## II.    RELEVANT BACKGROUND

### A.    Relevant Procedural History for these Chapter 11 Cases

On August 9, 2024, the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the Bankruptcy Code.  The Debtors filed their bankruptcy cases without bankruptcy counsel, and Irwin Nevada's general counsel was listed as counsel of record on each of the Debtors' dockets.  On August 13, 2024 (or four days after their respective bankruptcy filings), the Debtors retained BG as their substitute bankruptcy counsel.

On August 14, 2024, the bankruptcy court entered an order authorizing the joint administration of the Debtors' cases [Bk. Doc. No. 11].  The Debtors continue to operate their business and manage their affairs as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  On August 31, 2024, the United States Trustee for the Central District of California appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to Section 1102(a) of the Bankruptcy Code [Bk. Doc. No. 69].

The Debtors' and their counsel's efforts during the early part of these cases focused on obtaining authority to, among other things, secure use of cash collateral, maintain certain prepetition accounts, pay certain critical vendors, and

4

pay pre-petition wages, salaries, and other compensation, which were each critical elements of the continuation of the Debtors' business operations.  *See* Bk. Doc. Nos. 35, 80, 81, 266.  The Debtors obtained approval to use cash collateral on a final basis on December 9, 2024 [Bk. Doc. No. 266].

On November 12, 2024, the Debtors filed their motion to extend their exclusive periods to file and confirm a chapter 11 plan of reorganization [Bk. Doc. No. 219] (the "First Exclusivity Motion").  The Debtors' secured creditor, East West Bank ("EWB") filed an objection [Bk. Doc. No. 239].  The First Exclusivity Motion was granted over EWB's objection pursuant to bankruptcy court order entered on December 11, 2024 [Bk. Doc. No. 269].

On October 31, 2024, the Debtors filed their initial chapter 11 plan of reorganization and related disclosure statement [Bk. Doc. Nos. 185, 187].  On December 23, 2024, the Debtors filed their *First Amended Chapter 11 Plan of Reorganization* [Bk. Doc. No. 286] and related disclosure statement [Bk. Doc. No. 287].

The bar date for filing proofs of claim in these cases was December 20, 2024 [Bk. Doc. No. 199], except for governmental units which had until February 5, 2025, to file their proofs of claim [Bk. Doc. No. 200].  So far, 75 proofs of claim have been filed in these cases.  The Debtors and their professionals are in the process of reviewing the claims and determining which claims are objectionable.

On January 27, 2025, the Debtors filed a stipulation to continue the hearing on approval of the Debtors' proposed disclosure statement [Bk. Doc. No. 317], which the Court approved on January 28, 2025 [Bk. Doc. No. 323] (the "Stipulation Order").  Pursuant to the Stipulation Order, the hearing on the approval of the Debtors' proposed disclosure statement was set for March 5, 2025. Additionally, through the Stipulation Order, the Debtors' exclusive period to file a plan of reorganization was extended to March 5, 2025, and the Debtors' exclusive

5

337

period to obtain acceptances of a plan of reorganization was extended to May 2, 2025.

After lengthy negotiations and discussions among the Debtors, the Committee, creditors, and their respective counsel, on February 7, 2025, the Debtors filed their *Notice of Submission of (1) Proposed Redline to Debtors' First Amended Disclosure Statement Describing Debtors' First Amended Chapter 11 Plan of Reorganization and (2) Revised Exhibit B to Disclosure Statement* [Bk. Doc. No. 342] (the "Redline Notice"). Exhibit 1 to the Redline Notice was the then-current version of the Debtors' proposed second amended plan (the Debtors have since filed a different version of their second amended plan and disclosure statement on March 31, 2025).

**B.**     **The Debtors' Exclusivity and Bankruptcy Court's Termination Thereof**

On January 23, 2025, FitLife filed a claim transfer agreement, becoming involved in these bankruptcy cases for the first time by purchasing a $7,498 general unsecured claim. Bk. Doc. No. 304. On February 19, 2025, FitLife filed a motion for an order terminating the Debtors' exclusive periods and to file an alternative plan [Bk. Doc. No. 349] (the "Terminate Motion") pursuant to which FitLife is attempting a hostile takeover of the Debtors in an amount that is significantly less than what the Debtors' business is valued at. On February 27, 2025, the Debtors filed an opposition to the Terminate Motion [Bk. Doc. No. 392]. On the same day, the Committee filed a joinder to the Debtors' opposition [Bk. Doc. 396].

On March 5, 2025, the Debtors filed a motion to further extend exclusivity. Bk. Doc. No. 405 (the "Second Exclusivity Motion"), set for hearing on April 2, 2025. *See, e.g., Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hospital (In re Henry Mayo Newhall Mem'l Hospital)*, 282 B.R. 444 (9th

Cir. BAP 2002) ("The fact a request for a further extension of time was pending on the date scheduled for expiration of the extended exclusivity prevents the appeal from being moot"); *see also* March & Shapiro, Rutter Group California Practice Guide: Bankruptcy ¶ 11:232  (Dec. 2024) ("So long as the motion is *filed* before the exclusivity period expires, it can be *heard after* the period expires. [11 U.S.C. § 1121(d)(1) (request must be 'made' within respective periods)]. If granted, the extension of time will apply retroactively from the date it would have expired to the new extended date") (emphasis in original)).

FitLife's Terminate Motion was initially set for hearing on March 5, 2025. At the March 5, 2025 hearing on the Terminate Motion, the bankruptcy court continued the hearing on the Terminate Motion to March 21, 2025, and provided that testimony regarding the Terminate Motion could be taken at the continued hearing.

On March 21, 2025, the bankruptcy court heard multiple hours of testimony from the Debtors' investment banker, valuation expert, as well as from the Chief Executive Officer of FitLife, Dayton Judd. Minutes after conclusion of the evidentiary hearing, the bankruptcy court heard brief oral argument and ruled not only that FitLife had established cause to terminate exclusivity, but also ruled that the Debtors were not within their exclusive periods despite the Second Exclusivity Motion being pending:

> THE COURT: I don't even understand. Nobody's explained to me why I even need to terminate when, I mean, the plan on file is not the operative plan, and the disclosure statement can't possibly be approved, and there -- there is no -- there is no -- there is no exigency right now for filing a plan.
>
> MS. SEFLIN: But there is if your Honor grants the motion [the Second Exclusivity Motion].
>
> THE COURT: What?

MS. SEFLIN: I believe that there is if the Court grants the motion on April 2nd.

THE COURT: Well, then why didn't they file the motion before? Why do I have to -- why is it -- it's – if I do that in the future -- **I'm saying right this second, right now, there is no exclusivity for filing a plan. There's exclusivity for soliciting, and the Debtor has a plan on soliciting on the plan it has filed.** And there's cause -- if there is -- and if there is exclusivity, then there would be cause to terminate it.

. . .

THE COURT: I mean, there was a hearing set on April 2nd. You know, it's going to be moot because we're not extending exclusivity because we're terminating exclusivity to the extent we even need to terminate exclusivity based on the current situation.

*See* Appendix, **Exhibit 2** (Hearing Transcript Dated 3-21-2025), pp. 204-205, 212 (emphasis added).

This appeal ensued. Because the bankruptcy court opened the door for the Debtors' competitors to engage in the solicitation process which will likely, among other things, (a) cause at least some of the Debtors' suppliers to move to COD due to the uncertainty of a hostile takeover via a competing equity plan (which would negatively affect the Debtors' cash flow immediately), (b) cause the Debtors' customers to re-evaluate their contracts with the Debtors or otherwise seek to find alternate suppliers, and (c) greatly increase the administrative expenses in this case, the Debtors seek resolution of this appeal on an expedited basis.  It is egregious that solvent Debtors proposing to pay all allowed claims in full on or shortly after the effective date of their plan now have to deal with a competitor attempting to take over their business for a fire sale amount.  The bankruptcy court's decision has resulted in the Debtors being forced to now accelerate a sale process for their business in order to prevent a takeover from their competitor under its own plan.

## III.    ARGUMENT

Rule 8013 of the Federal Rules of Bankruptcy Procedure allows for appeals to be expedited when "justified" given the circumstances of an appeal. Fed. R. Bankr. P. 8013(a)(2)(B). These types of motions may be brought as an emergency motion. *Id.,* Fed. R. Bankr. P. 8013(d).

Orders terminating exclusivity present unique issues warranting expedited scheduling on appeal in order to protect the appellant's substantive right of appeal and to address Congress' concern that these matters be decided promptly. In *Official Comm. of Unsecured Creditors v. Henry Mayo Newhall Mem'l Hospital (In re Henry Mayo Newhall Mem'l Hospital)*, 282 B.R. 444 (9th Cir. BAP 2002), the BAP imposed an expedited briefing schedule, and explained the "special scheduling challenges" as follows:

> Exclusivity adjustments are unique among bankruptcy appeals because they comprise the sole category of interlocutory orders that may be appealed as of right. . . .
>
> The fact that Congress took the extraordinary step of authorizing appeals of right from interlocutory exclusivity adjustments has several implications for courts. First, it must be presumed that Congress meant for the courts to take steps to assure that these appeals are resolved on the merits. Second, it follows that we cannot manage such appeals in a manner that makes the right of appeal illusory.
>
> Timing is critical if we are to fulfill our duty to resolve these appeals on the merits without allowing them to become moot. Exclusivity orders are inherently transitory and are easily mooted either by the passage of time or by the occurrence of further events that make it impossible to fashion effective appellate relief. In order to avoid reducing the right to appeal to an illusion, it follows that we are obliged to resolve such appeals with dispatch.

282 B.R. at 448-449 (emphases added).

In *Henry Mayo*, the bankruptcy court order was entered on May 15, 2022; oral argument was held a mere two months later on July 19, 2002; and the published decision was issued days later on August 2, 2002 (i.e., appeal pending for less than three months).

In the instant appeal, the Debtors respectfully submit that an even shorter time schedule is appropriate under the unique procedural issues and circumstances of this case. Of utmost importance is that this appeal will become moot on approximately May 2, 2025. Indeed, the bankruptcy court held that, despite the Debtors having timely filed the Second Exclusivity Motion, exclusivity had already expired. *See* Appendix, **Exhibit 1**. The bankruptcy court will undoubtedly deny the Second Exclusivity Motion when it is heard on April 2, 2025.[4] It follows, therefore, that if this appeal is not resolved before May 2, 2025, the Debtors will be deprived of their substantive right of appeal.

The Debtors are indeed in an untenable situation where all decisions lead them to massive losses for shareholders from the expedited timeframe forced upon them by a direct competitor who wants to acquire the Debtors for cheap so that the FitLife shareholders benefit.  The Debtors submit that this is the opposite of what Congress intended with Chapter 11.  There is no case law that Debtors' counsel could find in the Ninth Circuit where a debtor's exclusive period was terminated earlier than 10 months after the petition date – and the one case cited by FitLife for this proposition, *In re New Meatco Provisions, LLC ("New Meatco"),* 2014 WL 917335, at *1 (Bankr. C.D. Cal. Mar. 10, 2014), terminated exclusivity ten months post-petition **in a non-operating case**.  *Id.* (terminating the debtor's exclusive

---

[4] Orders denying a motion for extension of exclusivity are interlocutory and may only be appealed with leave of court. *Ahern Rentals, Inc. v. Goldman Sachs Palmetto State Credit Fund, L.P. (In re Ahern Rentals, Inc.)*, 2013 WL 150489 (D. Nev. Jan. 14, 2013).

10

period ten months into the case where the debtor was a non-operating entity, there was no business to reorganize, and it was a liquidation case that was neither large nor complex) (emphasis added).

On balance, the Debtors will irreparably suffer if this appeal is not decided forthwith. Again, the Debtors recognize the extreme time requirements to be imposed in the next month on the parties and this Panel, but the Debtors respectfully submit that the equities of these cases demand nothing less.

## IV.    COMPLIANCE WITH NOTICE REQUIREMENTS

The Debtors have complied with the notice requirements regarding emergency motions as required by Fed. R. Bankr. P. 8013(d)(2); Ninth Cir. B.A.P. R. 8013(d)-1(a).

In accordance with Fed. R. Bankr. P. 8013(d)(2)(B), this Motion was not first submitted to the bankruptcy court, because the bankruptcy court cannot determine the briefing schedule appropriate for this appeal. However, the Debtors raised all of their substantive arguments in opposition to the Terminate Motion with the bankruptcy court. The Debtors will substantively address the legal error of the bankruptcy court in their opening brief.

## V.    CONCLUSION

Based on the foregoing, the Debtors respectfully request that this Panel enter an order granting this Motion, issuing the Proposed Expedited Briefing and Argument Schedule, and granting to the Debtors such other and further relief as is appropriate under the circumstances.

Dated: March 31, 2025                    BG LAW LLP


                                         By: /s/ Jessica L. Bagdanov_____
                                            Susan K. Seflin
                                            Jessica L. Bagdanov
                                         Attorneys for Appellants

11

## VI.   CERTIFICATION AS TO INTERESTED PARTIES

The undersigned certifies that the following parties have an interest in the outcome of this appeal.  These representations are made to enable the judges of the Panel to evaluate possible disqualification or recusal:

1.   Chapter 11 Debtors Irwin Naturals (1:24-bk-11323-VK), Irwin Naturals Inc. (1:24-bk-11324-VK), 5310 Holdings, LLC (1:24-bk-11325-VK), and DAI US HoldCo Inc. (1:24-bk-11326-VK);

2.   FitLife Brands, Inc., Appellee;

3.   East West Bank;

4.   Klee Irwin; and

5.   Karled Enterprises I.

## VII.   STATEMENT OF RELATED CASES

Appellants and their counsel are not aware of any cases that would be deemed related to this appeal.

## VIII.   CERTIFICATE OF COMPLIANCE

The text in this brief is proportionally spaced.  The typeface is Times New Roman, 14-point.  The word count generated by Word for the portions subject to the restrictions of Rule 8013(f) of the Federal Rules of Bankruptcy Procedure, inclusive of text and footnotes, is **3,277.**

Dated:  March 31, 2025                           BG LAW LLP


                                          By: /s/ Jessica L. Bagdanov
                                              Susan K. Seflin
                                              Jessica L. Bagdanov
                                          Attorneys for Appellants

# DECLARATION OF JESSICA L. BAGDANOV

I, Jessica L. Bagdanov, declare:

1.      I am an attorney duly licensed to practice before all courts of the State of California and this Court. I am a partner at BG Law LLP, general bankruptcy counsel for the Debtors and appellants herein. I have personal knowledge of the facts contained in this declaration and if called as a witness, I would and could competently testify thereto under oath.

2.      I make this declaration in support of the Debtors' emergency motion for expedited briefing and oral argument schedule, to which it is appended. Initial capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

3.      I also make this declaration in compliance with the requirements of Rule 8013(d) regarding the filing of emergency motions before the BAP.

4.      My office filed a notice of appeal of the Order Terminating Exclusivity on March 31, 2025. Prior to filing the appeal and on March 26, 2025, my office had filed pleadings in the bankruptcy court related to the Debtors' Second Exclusivity Motion, stating the Debtors' intent to appeal the order.

5.      Also on March 31, 2025 at 4:27p.m. Pacific Time, prior to filing this Motion, I sent an email to Todd Feinsmith, Esq., counsel for FitLife, that the Debtors would be filing a motion for expedited briefing and scheduling of oral argument, and that the Debtors sought relief on an emergency basis. My email to Mr. Feinsmith included the chart setting forth the Proposed Expedited Briefing and Argument Schedule.

6.      On March 31, 2025, concurrently with filing the notice of appeal, my office filed the appellants' statement of issues on appeal and designation of record in order to comply with the Proposed Expedited Briefing and Argument Schedule set forth in the Motion.

7.      An Appendix is being filed concurrently with this Motion, which contains a copy of the Order Terminating Exclusivity (Exhibit 1), as well as the transcript of the hearing held before the bankruptcy court on March 21, 2025 (Exhibit 2) and Notice of Appeal (Exhibit 3).

8.      This Motion is being filed on an emergency basis given the unique scheduling issues raised by this appeal. As set forth in the Motion, the Appellants are requesting that briefing in this appeal be complete by April 22, and that the appeal is resolved by May 2. Thus, a ruling on this Motion on an emergency basis is needed because of the fast deadlines approaching (i.e., deadlines to file the Appellants' opening brief next week, in order to give the Merits Panel as much time as possible to consider the briefing).

9.      The Debtors will be filing an emergency motion for stay pending appeal with the bankruptcy court. If the bankruptcy court denies that motion, the Debtors will bring that motion before this Panel. However, given the requested briefing timeline, the Debtors believe that this Motion must also be brought on an emergency basis (in addition to and separate from the emergency motion for stay pending appeal).

10.      The contact information for counsel for the appellee, FitLife Brands, Inc., is as follows:

Todd A. Feinsmith (admitted pro hac vice)
ARENTFOX SCHIFF LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
Telephone: 617.973.6100
todd.feinsmith@afslaw.com

Sophia R. Wang
ARENTFOX SCHIFF LLP
555 South Flower Street, 43rd Floor

Los Angeles, CA 90071
Telephone: 213.629.7400
sophia.wang@afslaw.com

11.    The contact information for the other interested parties listed in the
above Certification as to Interested Parties is as follows:

**Counsel for East West Bank**

WILSON SONSINI GOODRICH &
ROSATI
Professional Corporation

Matthew A. Macdonald (SBN
255269)
matthew.macdonald@wsgr.com
Dale R. Bish (SBN 235390)
dbish@wsgr.com
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: (323) 210-2900
Facsimile: (323) 210-7329

Erin R. Fay (admitted pro hac vice)
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 304-7600
efay@wsgr.com

**Counsel for the Official Committee
of Unsecured Creditors of Irwin
Naturals and Irwin Naturals Inc.**

GOLDEN GOODRICH LLP

Jeffrey I. Golden (Bar No. 133040)
jgolden@go2.law
Ryan W. Beall (Bar No. 313774)

**Counsel for Creditor Karled Enterprises
I**

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP

Matthew G. Bouslog (Bar No. 280978)
2010 Main Street, 8th Floor
Irvine, California 92614-7214
Phone: (949) 553-1313
Fax: (949) 553-8354
E-Mail: mbouslog@allenmatkins.com

Alphamorlai L. Kebeh (Bar No. 336798)
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone: (213) 622-5555
Fax: (213) 620-8816
E-Mail: mkebeh@allenmatkins.com

**Counsel for Klee Irwin**

RAINES FELDMAN LITTRELL LLP
Kyra E. Andrassy (State Bar No. 207959)
kandrassy@raineslaw.com
4675 MacArthur Court, Suite 1550
Newport Beach, CA 92660
Telephone: (310) 440-4100
Facsimile: (310) 691-1943

15

347

rbeall@go2.law
3070 Bristol Street, Suite 640
Costa Mesa, California 92626
Telephone: (714) 966-1000
Facsimile: (714) 966-1002

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 31st day of March, 2025 at Moorpark, California.

Jessica L. Bagdanov

## CERTIFICATE OF SERVICE
## FOR DOCUMENTS FILED USING CM/ECF

**Certificate of Service When All Case Participants Are CM/ECF Participants**

~~I hereby certify that on _____, 2025, I electronically filed the foregoing document with the Clerk of the Court for the Bankruptcy Appellate Panel for the Ninth Circuit by using the CM/ECF system.~~

I certify that all parties of record to this appeal either are registered CM/ECF users, or have registered for electronic notice, or have consented in writing to electronic service, and that service will be accomplished through the CM/ECF system.

On **March 31, 2025,** I served the foregoing document by E-MAIL to the following parties:

Counsel for FitLife Brands, Inc.
Todd A. Feinsmith, Esq.
James E. Britton, Esq.
ArentFox Schiff LLP
800 Boylston Street, 32nd Floor
Boston, MA 02199
todd.feinsmith@afslaw.com
james.britton@afslaw.com

Counsel for FitLife Brands, Inc.
Sophia R. Wang, Esq.
Arentfox Schiff LLP
555 South Flower Street, 43rd Floor
Los Angeles, CA 90071
sophia.wang@afslaw.com

/s/ Mela Galvan
Mela Galvan

349

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367**.

A true and correct copy of the document(s) entitled: **DEBTORS' EMERGENCY MOTION FOR STAY PENDING APPEAL** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the document(s) were served by the court via NEF and hyperlink to the document. On **April 1, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Kyra E Andrassy**    kandrassy@raineslaw.com, bclark@raineslaw.com;jfisher@raineslaw.com
- **Jessica L Bagdanov**    jbagdanov@bg.law, ecf@bg.law
- **Ryan W Beall**    rbeall@go2.law, kadele@go2.law;dfitzgerald@go2.law;rbeall@ecf.courtdrive.com;cmeeker@go2.law
- **Anthony Bisconti**    tbisconti@bklwlaw.com, 1193516420@filings.docketbird.com,docket@bklwlaw.com
- **Matthew Bouslog**    mbouslog@allenmatkins.com, ncampos@allenmatkins.com
- **Katherine Bunker**    kate.bunker@usdoj.gov
- **Robert Allen Curtis**    rcurtis@foleybezek.com
- **Erin R. Fay**    efay@wsgr.com, lmcgee@wsgr.com
- **Jeffrey I Golden**    jgolden@go2.law, kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;dfitzgerald@go2.law;golden.jeffreyi.b117954@notify.bestcase.com
- **Alphamorlai Lamine Kebeh**    MKebeh@allenmatkins.com, mdiaz@allenmatkins.com
- **Alexandria Lattner**    alattner@sheppardmullin.com, ehwalters@sheppardmullin.com
- **Matthew A Macdonald**    matthew.macdonald@wsgr.com
- **Sina Maghsoudi**    sinalegal@gmail.com, g8645@notify.cincompass.com;maghsoudi.sinab128731@notify.bestcase.com
- **David W. Meadows**    david@davidwmeadowslaw.com
- **Douglas A Plazak**    dplazak@rhlaw.com
- **David M Poitras**    dpoitras@bg.law
- **Terrel Ross**    tross@trcmllc.com
- **Susan K Seflin**    sseflin@bg.law
- **Jonathan Seligmann Shenson**    jshenson@greenbergglusker.com, calendar@greenbergglusker.com;cmillerwatkins@greenbergglusker.com
- **Yuriko M Shikai**    yshikai@neufeldmarks.com
- **Ashley M Teesdale**    ateesdale@bg.law, ecf@bg.law
- **United States Trustee (SV)**    ustpregion16.wh.ecf@usdoj.gov
- **Ronghua Sophia Wang**    sophia.wang@afslaw.com, yvonne.li@afslaw.com
- **Pamela Kohlman Webster**    pwebster@buchalter.com, smartin@buchalter.com
- **Jessica Wellington**    jwellington@bg.law, ecf@bg.law

☐    Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**: On **_____, 2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**\*\*JUDGE'S COPY NOT REQUIRED IF LESS THAN 25 PAGES (GENERAL ORDER 23-01)**

☐    Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **_____, 2025**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 1, 2025 | Jessica Studley | /s/ Jessica Studley |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.