WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
Matthew A. Macdonald (SBN 255269)
matthew.macdonald@wsgr.com
Dale R. Bish (SBN 235390)
dbish@wsgr.com
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: (323) 210-2900
Facsimile: (323) 210-7329

Erin R. Fay (*pro hac vice*)
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 304-7600
efay@wsgr.com

*Counsel to East West Bank, as Agent*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>Irwin Naturals, *et al.*,<br><br>        Debtors and Debtors<br>        in Possession. | Case No.: 1:24-bk-11323-VK<br><br>Chapter 11<br><br>(Jointly Administered with: Case No. 1:24-bk-11324-VK. Case No. 1:24-bk-11325, and Case No. 1:24-bk-11326-VK) |
| ☐ Affects Irwin Naturals<br><br>☐ Affects Irwin Naturals Inc.<br><br>☐ Affects 5310 Holdings, LLC<br><br>☐ Affects DAI US HoldCo Inc.<br><br>☒ Affects All Debtors | **AGENT'S (I) JOINDER TO CREDITOR FITLIFE BRANDS, INC.'S OPPOSITION TO DEBTORS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND (II) OBJECTION TO DEBTORS' EMERGENCY MOTION FOR STAY PENDING APPEAL**<br><br>**Hearing**:<br>Date:    April 14, 2025<br>Time:    1:30 p.m. (PT)<br>Place:   Courtroom 301<br>           21041 Burbank Blvd<br>           Woodland Hills, CA 91367 |

1

East West Bank, a California state banking corporation, in its capacity as administrative agent (the "Agent") on behalf of the lenders (the "Lenders") under the prepetition senior secured credit agreement between, among others, the Debtors, the Lenders, and the Agent (the "Credit Agreement"), hereby (a) objects to the *Debtors' Emergency Motion for Stay Pending Appeal* (the "Motion") [Docket No. 478] and (b) joins and expressly incorporates by reference the objection filed by FitLife Brands, Inc. ("FitLife") that responds to the Motion (the "FitLife Objection") [Docket No. 509]. In furtherance hereof, the Agent respectfully represents as follows:

## PRELIMINARY STATEMENT[1]

1. These cases have been pending for 241 days. After the Debtors' repeated failure to propose a chapter 11 plan that paid creditor claims in a timely fashion or to engage in a value maximizing marketing exercise, instead favoring equity retaining its stake at all costs, this Court entered the Termination Order. As this Court has previously explained, the decision to terminate exclusivity in these cases rests on two grounds: (i) that exclusivity terminated through the Debtor's own actions and (ii) that, in the alternative, FitLife demonstrated "cause" to terminate exclusivity.

2. Rather than accept this consequence of how the cases have been run and honor their fiduciary obligation to creditors, the Debtors now seek to (i) pursue an interlocutory appeal of the Termination Order and (ii) hold these proceedings hostage until a decision on the appeal is rendered. In the Motion, the Debtors point the finger at the Agent (as they always do), making a number of unfounded allegations and stating that "[a]lthough EWB was not happy with the Debtors' proposed plan of reorganization, that is not sufficient cause to terminate the Debtors' exclusivity periods." Motion at p. 4. It is, however, an additional consideration relevant to the decision now facing this Court—whether to let the Debtors maintain exclusive control of these cases while the appeal of the Termination Order pends so that the only path is the Debtors' new placeholder plan. *See* Motion at p. 5. The Court should deny the Motion for several reasons.

---

[1] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to such terms below.

2

3.	First, given the lack of progress to date and the Debtors' propensity for delay, the harm to creditors of disrupting a competitive plan process and forward progress in these cases is not speculative. The Debtors' proposed stay will not only further deplete assets of the estates by increasing administrative expenses but will also delay the proposal of alternatives in a fair and open process to reorient the trajectory of these cases toward a successful outcome. Second, the Debtors have identified no actual harm they will experience, let alone probable irreparable harm, absent a stay. Further, there is little chance that the Debtors will prevail in their appeal as the Court's determination that "cause" existed to terminate the Debtors' exclusivity was not legally erroneous.

4.	Thus, the Motion must be denied because entry of the Termination Order is supported by both the facts of these cases and applicable law and because the Debtors have failed to meet the showing required for a stay pending appeal.

## BACKGROUND

**A.	General Background**

5.	Debtors Irwin Naturals, Irwin Naturals Inc., and DAI US HoldCo Inc. are parties to the Credit Agreement, dated as of February 1, 2023, with the Lenders, and East West Bank, as Agent. Under the Credit Agreement, the Lenders provided a $40,000,000 senior secured credit facility to Debtors Irwin Naturals and Irwin Naturals Inc., consisting of a revolving loan and letter of credit facility in the aggregate principal amount of $20,000,000 and a delayed-draw term loan facility in the principal amount of $20,000,000.

6.	In connection with the Credit Agreement, the Debtors and certain non-Debtor affiliates entered into a guarantee and security agreement, dated as of February 1, 2023 (the "Guarantee and Security Agreement"), pursuant to which the Debtors and such non-Debtor affiliates granted the Agent, for the benefit of the Lenders, a security interest in substantially all of their assets as collateral to secure repayment of the Loan. The collateral includes, but is not limited to, all of the Debtors' intellectual property, accounts receivable, inventory, deposit accounts, and all money, cash, and cash equivalents. Additionally, in connection with the Credit Agreement, on February 1, 2023, Klee Irwin and Klee and Margareth Irwin Children's Trust dated December 28, 2012 (the "Trust"), as equity holders of Debtor Irwin Naturals, entered into an equity pledge agreement (the

"Equity Pledge Agreement") in favor of the Agent, for the benefit of the Lenders, granting to the Agent a security interest in, among other things, all of their Class B shares of stock in Debtor Irwin Naturals.

7. As this Court has been informed through prior filings, the Debtors' businesses were severely impacted by the unsuccessful implementation of their ketamine clinic expansion and the failure of their strategy to uplist into the public markets. *See Declaration of Klee Irwin in Support of the Debtors' First Day Emergency Motions* [Docket No. 22 at ¶¶ 9-12]. The Debtors then failed to comply with multiple covenants, failed to meet minimum borrowing base availability requirements, and refused to make required repayments, among other defaults. The Agent and the Debtors discussed various course corrections that would alleviate the Debtors' defaults and permit repayment of the amounts owed to the Lenders under the Credit Agreement. The Agent even approved and provided a proposed amendment and waiver to remedy the defaults under the Credit Facility, which was rejected by the Debtors.

8. After the Credit Facility had been in default for approximately a year and following exhaustive and unproductive discussions with the Debtors, on May 13, 2024, to protect its collateral against mismanagement and create the opportunity for much needed independent decision making, the Agent exercised certain of its rights under the Guaranty and Security Agreement and the Equity Pledge Agreement to appoint an independent director to the boards of Debtors DAI US HoldCo Inc. and Irwin Naturals. Almost three months later, such independent director abruptly resigned on August 8, 2024, whereafter Mr. Irwin reinstated himself as the sole conflicted decisionmaker at such entities.

9. One day later, on August 9, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under Chapter 11 of the Bankruptcy Code. Involuntary petitions were filed against certain of the Debtors on the same day, which involuntary petitions appear to have been orchestrated by the Debtors' principal and majority stockholder. *See* Docket No. 349, at p. 9-10. As of the Petition Date, the Debtors were in default of their obligations under the Credit Agreement and remain in default today.

### B. Termination of Exclusivity

10. On February 19, 2025, FitLife filed that certain *Motion for an Order (I) Terminating the Exclusive Periods in Which Only the Debtor May File a Plan and Solicit Acceptances and (II) Permitting FitLife Brands, Inc. to File an Alternative Plan and Disclosure Statement; Memorandum of Points and Authorities; and Declaration of Todd A. Feinsmith in Support Thereof* (the "Termination Motion") [Docket No. 349]. Issues related to the Termination Motion were discussed at hearings held before the Court on March 5, 2025 and March 21, 2025. The Court entered an order granting the relief requested by the Termination Motion on March 31, 2025 (the "Termination Order") [Docket No. 469].

### C. The Appeal

11. Also on March 31, 2025, the Debtors filed a notice of appeal of the Termination Order (the "Appeal"). *See* Docket No. 470. The Appeal will be heard by the Bankruptcy Appellate Panel of the United States Court of Appeals for the Ninth Circuit (the "B.A.P."). The Debtors requested that the B.A.P. issue a decision with respect to the Appeal no later than May 2, 2025.

12. On April 1, 2025, the Debtors filed a motion with the B.A.P. to expedite briefing related to the Appeal (the "Motion to Expedite"). The Motion to Expedite requested that all briefing be completed by April 22, 2025. FitLife filed a response to this motion on April 4, 2025. On April 8, 2025, the B.A.P. entered an order granting the Motion to Expedite in part and requiring that briefing conclude by May 6, 2025 at the latest.

13. On April 3, 2025, notwithstanding the fact that the Debtors and the Agent had agreed to a stipulation in principle (the "Cash Collateral Stipulation") regarding the Debtors' use of cash collateral in these cases, the Debtors filed a procedurally improper motion for stay pending appeal in the B.A.P. proceedings, asserting that a stay was required due to the cessation of use of cash collateral pursuant to the Court's *Order Authorizing the Debtors to Use Cash Collateral on a Final Basis and Granting Replacement Liens* (the "Final Cash Collateral Order") [Docket No. 266]. Although the Court entered an order approving the Cash Collateral Stipulation on April 3, 2025

[Docket No. 496], the Debtors did not inform the B.A.P. of this development until nearly 3 p.m. (PT) on April 4, 2025.

### D.    The Debtors' New Factual Assertions in the Motion

14.    The Debtors also took the opportunity in the Motion to add new facts and relitigate their initial objection to the Termination Motion. While the Agent does not think that is appropriate and will not respond to the Debtors' lengthy recitation of their view of the cases and prepetition events, the Agent is compelled to note several inaccurate characterizations. First, the Agent fully disagrees with the Debtors' assertions about whether, when, and why the Debtors were or were not engaged prepetition with investment bankers to locate replacement financing or a transaction. Indeed, the Court need not look further than the record of these cases on this issue. FitLife made its original offer in October. FitLife Objection at p. 2. It received almost zero engagement from the Debtors other than a threatening letter. FitLife Objection at p. 2. Then, the Debtors hired one, and then another, investment banker to seek exit financing, followed by a third investment banker during these cases to seek other strategic alternatives. Even after hiring such professionals, the Debtors apparently refused to meaningfully engage with FitLife for months, such that, at the last hearing, FitLife requested the Court reserve time to address its inability to obtain a non-disclosure agreement from the Debtors. Ex. B, Transcript of March 21, 2025 hearing, p. 211-213. Now, the cases are plagued with an appeal, a motion for stay, and a fourth plan that still has no clarity of path forward. This is not indicative of a process intended to maximize value for all stakeholders.

15.    Additionally, the Debtors' one-sided recitation of events in these cases omits the key fact that at no time have the Debtors proposed a plan with any certainty for creditor recoveries. Yet, at all times, the Debtors have pursued a path intended to inure to the benefit of their controlling stockholder and CEO. That was the case in October when the first plan was filed and remains the case today, as the most recently filed plan is a continuing effort to maintain optionality for the Debtors' controlling stockholder without regard to impact on creditor recoveries. While the Motion asserts that the newly filed plan proposes to pay creditors in full, there is no actual disclosed transaction that would accomplish this proposal nor is the new plan

6

relevant for purposes of demonstrating the Debtors' have met the standard for a stay pending appeal.

### OBJECTION

16. The Motion should be denied because the Debtors are not entitled to a stay pending appeal. A stay pending appeal lies within the discretion of the Court but is "extraordinary" relief. *In re Thomases*, 28 B.R. 961, 962 (Bankr. S.D.N.Y. 1983) ("[A] stay pending appeal involves extraordinary relief and is discretionary with the court."); *see also Winston-Salem/Forsyth Cty. Bd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971) (Burger, C.J., circuit justice) (noting "the heavy burden for making out a case for such extraordinary relief being on the moving parties"); *Adelson v. Smith (In re Smith)*, 397 B.R. 134, 136 (Bankr. D. Nev. 2008) ("[c]ourts [must be] mindful that a discretionary stay pending appeal is viewed as an extraordinary remedy").

17. Before a court may issue a stay pending appeal, it must determine whether (i) the movant has made a "strong showing" that it is likely to succeed on the merits, (ii) the movant will be irreparably harmed if the stay is not granted, (iii) issuing the stay will "substantially injure" other parties in the proceeding, and (iv) the public interest is vindicated by issuing the stay. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). As the Debtors concede, under this analysis "the first two *Nken* factors are the most critical" and must be satisfied before the court can evaluate the latter two. *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 824 (9th Cir. 2020); *see also* Motion at p. 21.

18. Additionally, in the Ninth Circuit, a court cannot grant a stay based on a movant's mere demonstration of irreparable injury. Instead, the movant must show that "irreparable harm is probable" and that (a) the movant has a strong likelihood of success on the merits and the public interest does not weigh heavily against a stay *or* (b) there is a substantial question as to the merits and the balance of hardships tips in the movant's favor. *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011). Because "these standards represent the outer extremes of a continuum," the Court's consideration of "the relative hardships to the parties provid[es] the critical element in

7

1 determining at what point on the continuum a stay pending review is justified." *Id.* (internal citations
2 and quotations omitted).

3         19.     Here, the Debtors have made neither showing. The Debtors' stated harm, i.e.,
4 that some of their customers may find other suppliers or some of their suppliers may reevaluate
5 contractual terms, is speculative and a risk that exists to most businesses on most days of the week.
6 The fact that Mr. Irwin stated in a declaration that these concerns would be heightened if exclusivity
7 was terminated is not evidence of harm and certainly not probable irreparable harm. *See* Motion at
8 p. 33; *see also* Ex. A, Transcript of March 5, 2025 hearing, p. 30: 5-8 (Court stating that, "I don't
9 understand why a competing plan would create more uncertainty, other than the fact that it's one or
10 the other if people are definitely going to get paid . . .").

11         20.     Moreover, because the risks of a breakdown in supplier and customer
12 relationships may increase simply due to the length of time that the chapter 11 cases remain pending,
13 a competing plan that provides actual clarity on go-forward business that is solicited and confirmed
14 in short order could actually reduce these risks. Finally, in an analysis of relative hardships, creditors
15 will be more injured if enforcement of the Termination Order is stayed than the Debtors.

16         i.    *The Requested Stay Risks Substantial Harm to Creditors*

17         21.     Contrary to the Debtors' claim that the stay "will not injure any other parties
18 to these proceedings[,]" granting the stay will substantially harm creditors. *See* Motion at p. 34.
19 Although the Debtors claim that they have been "paying their obligations as they come due," Motion
20 at p. 3, this assertion is false. The Debtors' most recently filed budget estimates that there is $2
21 million of accrued professional fees as of this week. *See* Docket No. 505. Upon information and
22 belief, $1.4 million of such unpaid estate professional fees have received interim approval yet
23 inexplicably remain unpaid. Further, the Debtors operated at a loss in January and February 2025
24 and have generated cumulative net losses totaling $1,353,648 during the pendency of these cases
25 through February 2025, as reflected in the Irwin Naturals February 2025 Monthly Operating Report
26 [Docket No. 453, at p. 2]. Although the Debtors claim that "[the Agent] is oversecured" and has
27 engaged in "overly aggressive litigation tactics" that have deprived the Debtors of time to focus
28 their attention and resources on an orderly resolution of these chapter 11 cases, s*ee* Motion at p. 9,

8

the Agent has merely done what is necessary to protect its senior secured claim in these cases. By contrast, during the eight months that these cases have been pending, the Debtors have proposed four different plans and have unsuccessfully searched for sufficient exit financing with two different investment bankers.

22. Indeed, the Debtors have made very little progress toward reorganization and at the time the Termination Order was entered were not making promising headway. *See* Motion at p. 30; *see also* Ex. B, Transcript of March 21, 2025 hearing, p. 205: 8-11 (Court finding "I mean, we have to look at what's happened through the case, which is plans in which Equity was trying to retain its position without putting any money in or market testing the company. That's what was happening for a long time.").

23. Unwarranted delay of this kind can play an important role in a court's determination not to extend a debtor's exclusivity period. *See In re Yellowstone Mt. Club*, Case No. 08-61570-11, 2009 Bankr. LEXIS 4462, *1, *16 (Bankr. D. Mont. Feb. 18, 2009) ("A key requirement for extending a debtor's exclusivity period is proof by the debtor of promise of probable success for the debtor's reorganization."). Because delay begets increased administrative costs of chapter 11 proceedings, granting the relief requested by the Motion risks permitting the Debtors to continue their thus far fruitless efforts to reorganize, further depleting estate assets that may be available for distribution to creditors. To avoid such prejudice to creditors' interests, the Motion should be denied.

       i. *The Debtors Do Not Face Risk of Irreparable Harm in the Absence of a Stay Pending Appeal.*

24. The Motion should also be denied because the Debtors have failed to show that they would suffer irreparable harm in the absence of a stay. The Debtors claim to have provided "uncontroverted evidence in the record that a competing plan process will negatively impact the Debtors' business operations" by "likely causing . . . (a) at least some of the Debtors' suppliers to move to COD" and "(b) their customers to re-evaluate their contracts with the Debtors or otherwise seek to find alternate suppliers." *See* Motion at p. 33. These assertions are speculative at best, and,

1 as noted above, could just as easily result from a protracted chapter 11 process including the
2 Debtors' failure to confirm a chapter 11 plan.

3   25. The Debtors also claim that, absent a stay, they will suffer irreparable harm
4 by being unable to conduct their sale process on the proposed timeline. According to the Debtors,
5 their proposed "sale process [is] designed to test the market and maximize the value of their estates
6 and pay creditors in a mere four months." Motion at p. 33. Although the Debtors characterize FitLife
7 as a competitor and opportunistic buyer, the fact remains that FitLife stands poised to promulgate a
8 chapter 11 plan and purchase the Debtors' assets in a reasonable timeframe, one that this Court
9 agreed was a viable path. *See* Ex. B, Transcript of March 21, 2025 hearing, p. 210: 5-14 (Court
10 stating, "we'll see what happens. I don't think it's going to be as disastrous as you believe, you
11 know . . . And – and creditors will be able to look at both plans, their plan options. So, that's a good
12 thing.").

13     i. *The Debtors' Appeal is Unlikely to Succeed on the Merits*

14   26. The Debtors also cannot show a possibility—much less a strong likelihood—
15 that their appeal has any chance of succeeding on the merits. *Golden Gate Rest. Ass'n v. City of San*
16 *Francisco*, 512 F.3d 1112, 1119 (9th Cir. 2008) ("[T]he standard for granting a stay is a continuum.
17 At one end of the continuum, if there is a 'probability' or 'strong likelihood' of success on the merits,
18 a relatively low standard of hardship is sufficient . . . At the other end, if 'the balance of hardships
19 tips sharply in . . . favor' of the party seeking the stay, a relatively low standard of likelihood of
20 success on the merits is sufficient.") (internal citations and quotations omitted).

21   27. The Debtors argue that this Court improperly found that (i) the Debtors'
22 subsequently filed chapter 11 plan would not "relate back" to their previous plan, and (ii) FitLife
23 had established "cause" to terminate the Debtors' exclusivity. *See* Motion at p. 3. The Debtors
24 mischaracterize the Court's ruling in several respects.

25   28. The Debtors did not file their second amended plan and second amended
26 disclosure statement [Docket Nos. 473 & 474] until the day the Court entered the Termination Order.
27 Consequently, even though the Debtors' exclusive period to solicit acceptances of their plan runs
28 until May 2, 2025, as of March 21, 2025, when the Court issued its transcript ruling on the

Termination Motion, the only means by which the extended solicitation period could "save" exclusivity with respect to the originally filed plan and disclosure statement was if the Court found that the later filed versions related back to the originals.

29. On this point, the Debtors' arguments as to why the later-filed plan and disclosure statement do relate back are unpersuasive—namely that all of the plans have contemplated an equity investment or an asset sale, a refinancing, and a payment in full of allowed claims. Motion, p. 32. At this level of abstraction, nearly every bankruptcy plan and disclosure statement would "relate back" to previously filed versions in the same case, effectively swallowing the rule. Moreover, as the Court ruled, the Debtors' proposed amended plan and their filed plan were "not substantially [the same]," but were "totally different." *See* Ex. B, Transcript of March 21, 2025 hearing, p. 209: 17-23; *see also* Ex. B, Transcript of March 21, 2025 hearing, p. 186: 17-19 (Court stating that, "you could tell me it's an amended plan, but it is a totally different plan . . . it is different in many respects. It drops out major portions of the old plan, and it changes the interest rate payable to unsecured creditors, and apparently, it changes other things . . . It changes the timing. It's very different.").

30. The limited case law discussing "relation back" in the context of bankruptcy plans has found relation back when a later plan is merely "fundamentally a cleaned-up version of [the] original plan" but not when the plans "differ substantially." *See In re Save Our Springs Alliance, Inc.*, 388 B.R. 202, 224-25 (Bankr. W.D. Tex. 2008) (citing cases) (internal citations and quotations omitted). Given the lack of resemblance between the Debtors' initially filed plan and disclosure statement and their amended iterations, the Debtors are unlikely to prevail in their appeal of the Court's determination that the plans did not "relate back" enough to save exclusivity.

31. Moreover, even if the subsequently filed plan and disclosure statement were deemed to "relate back" to the previously filed versions, the solicitation period in these cases runs on May 2, 2025. There is no possibility that the Debtors can complete solicitation in this timeframe.

32. Further, whether exclusivity has already terminated may well be fully irrelevant because the Court acted within its discretion to conclude that FitLife had shown "cause" to terminate exclusivity. As the *In re Adelphia Communications Corporation* court explained,

exclusivity may be properly terminated when, among other things "a debtor has been unduly intransigent in dealing with its creditors; has inappropriately sought to favor equity or another stakeholder group; has sought to feather the nest of incumbent management; or has caused the court to lose confidence that it would ever come up with a confirmable plan." 336 B.R. 610, 677 (Bankr. S.D.N.Y. 2006). In evaluating these factors, the "decision whether to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court and is fact-specific." *In re Adelphia Communs. Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006). The factors cited by the *Adelphia* Court are all present in these cases: the Debtors have been unwilling to meaningfully negotiate with the Agent since the Petition Date; every plan the Debtors have proposed has prioritized a return to equity despite being unacceptable to the majority of the Debtors' creditor base; Mr. Irwin, the principal equity holder in these cases, has sought to prosecute these cases in a manner which "feather[s] his own nest;" and the Court appears to have lost confidence in the Debtors' ability to ever devise, solicit, and confirm a plan. *See* Ex. B, Transcript of March 21, 2025 hearing, p. 200: 7-25; p. 201: 1 (Court stating, "[Y]ou know, first of all, I don't understand why the Debtor didn't file this plan already . . . They've been waiting. I mean, the only reason – I mean, they've been making movement because they've been forced to make movement. You can see that from the first plan and the second plan that they filed. And now there's sales procedures. They're only moving under pressure. They are moving under pressure, and – and – and – and there's no knowing once – if there isn't that pressure, what's going to happen.").

33. The Debtors assertion that the Court's "cause" finding was "premised primarily on FitLife's illusory argument that it could file a better plan than the Debtors' proposed plan," s*ee* Motion at 2, is merely an incorrect strawman characterization and a strategically myopic view of both FitLife's position and the Court's ruling. Instead, consistent with the Court's preliminary ruling, which focused the parties on issues other than a competing plan, the Court's transcript ruling reviewed the many applicable factors. In fact, it is far from clear that the Court

12

was at all focused on the presence of a potential competing plan as opposed to the Debtors' conduct in these cases.[2]

34. The Court's finding that "cause" exists to terminate exclusivity was made after it faithfully applied the *Adelphia* factors and was based on its view that the Debtors have not demonstrated an ability to propose, solicit, and confirm a viable plan in the eight months that these cases have been pending. *See* Ex. B, Transcript of March 21, 2025 hearing, p. 191-193 (reviewing factors); *see also* Ex. B, Transcript of March 21, 2025 hearing, p. 190: 13-24 ("[T]here is no operative plan right now on file that is the Debtors' intended plan. They're not soliciting acceptances. They're not even trying. They'll have a disclosure statement that is totally wrong, can't possibly be approved because it's about a different plan. So, I don't even have an approved disclosure statement because I don't have a plan on file. I don't have an APA . . . I don't have – you know, I don't – these – these things are not on file, and you can't solicit right now."); *see also In re Express One Int'l*, 194 B.R. 98, 101 (Bankr. E.D. Tex. 1996) ("The issue to be determined, however, is not whether some other plan may exist which provides greater recovery; the issue is whether the debtor has been diligent in its attempts to reorganize.").

35. Additionally, where the *Adelphia* factors militate in favor of terminating exclusivity and "cause" to do so exists, it is immaterial which party in the bankruptcy proceedings filed the motion demonstrating "cause." On this point, the Motion repeatedly notes that FitLife acquired an unsecured claim in the cases in the amount of $7,498.00 to gain standing in the cases. *See* Motion at p. 1, 11, 15, and 26. This is a red herring, regardless of the amount or provenance of FitLife's claim. Holding such claim makes FitLife a party in interest in these cases on equal footing with any other similarly situated creditor. *See In re Borders Grp., Inc.*, 460 B.R. 818, 821 (Bankr. S.D.N.Y. 2011) ("The Bankruptcy Code allows the court, for cause, on request of *any party in*

---

[2] Moreover, had the Court focused on the presence of a competing plan or the possibility for a competing plan process, given that the then-filed plan was a new value plan where creditors were impaired and equity retained its stake without injecting any new value and without a market test, these facts alone could have provided a basis to terminate exclusivity. *See In re Situation Management Sys., Inc.*, 252 B.R. 859, 862 (Bankr. D. Mass 2000) (terminating exclusivity in the circumstance of a new value plan "because the Debtor's exclusive right to propose and gain acceptance of a plan has effectively been forfeited because any party can bid on the Debtor's equity interest and assume control of the Debtor if the bidder is successful.").

*interest*, to reduce or increase the exclusivity periods[.]") (emphasis added); *see also* 11 U.S.C. § 1121(d)(1). Perhaps most tellingly, the Agent and the Debtors' former landlord, Karled Enterprises I ("Karled"), supported the Court's determination to terminate the Debtors' exclusivity. Together, the Agent and Karled comprise 85% of the creditor pool in these cases.

36.    The Debtors also utilize the Motion as a procedurally inappropriate vehicle to relitigate the Termination Order, reviewing the *Adelphia* factors and adding new information and mischaracterizations along the way. *See O'Donnell v. Harris Cty.*, 260 F.Supp.3d 810, 815 (S.D. Tex. 2017) ("As with a motion for reconsideration, a motion to stay should not be used to relitigate matters, submit new evidence, or 'raise arguments which could, and should, have been made before the judgment issued.'") (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863-64 (5th Cir. 2003)). The Agent is compelled to react to several of the assertions the Debtors make in reviewing such factors.

37.    First, as to size and complexity, the Debtors argue that for this Court, these cases are complex. That, however, is not the standard and the Court is best suited to determine whether it believes the matter before it is large and complex. Moreover, the Debtors' insinuation that they are paying the Agent's professional fees is erroneous and they know it. In fact, the Debtors have refused to pay the Agent's professional fees during the cases, which payment is, of course, common in large and complex cases for an oversecured creditor.

38.    As to good faith progress toward a reorganization, the Debtors' attempt to paint their required and incomplete participation in discovery related to a now abandoned and unconfirmable plan as evidence of good faith progress is incredible.[3] The vast majority of document production did not relate to cash collateral (as the Debtors insinuate), but rather to a prior plan that the Agent asserted was unconfirmable and which would have required a contested confirmation proceeding touching on a wide variety of issues from valuation to claim treatment to

---

[3] It is also incredible that in a footnote the Debtors accuse the Agent of some sort of collusion with FitLife on account of the Debtors' own discovery prosecution. First, there is absolutely no basis for such allegations, and it is not even clear what the Debtors are alleging. Second, the Debtors served irrelevant document requests while no contested matter was active. The Agent timely responded with objections and responses, to which there has been no response from the Debtors. The fact that the Agent has not further responded is therefore not surprising but simply how litigation works.

the absolute priority rule and new value to conflicts with the Debtors' controlling stockholder and CEO. It is unsurprising that discovery would occur in connection with such a proceeding, but the Debtors' participation in such discovery is not evidence of the Debtors' good faith towards executing on a restructuring.

39. As to negotiations with creditors, the Debtors state that they are engaged in settlement discussions with the Agent. There has been a sum total of one unacceptable settlement offer made by Mr. Irwin's personal counsel (but somehow also on behalf of the Debtors). That offer has been rejected by the Agent. There are no other ongoing global resolution discussions. None.

40. The Debtors incredibly say that the factor of whether they are pressuring creditors through maintaining exclusivity is not relevant when it was a crux of the Court's ruling and is borne out as true by the facts of these cases. And, as to unresolved contingencies, this case is nothing but unresolved contingencies. There is no exit financing. There is no present sale. There is no equity buyer. Yet, there is a plan premised on one of those occurring in the future.

41. At bottom, the standard to terminate exclusivity is "cause" and this Court is and was uniquely situated to make such determination after observing these Debtors' actions and interactions with their creditors for the past eight months. The Court's ruling on the Termination Motion was justified and appropriate and there is no likelihood of success on the merits no matter how much the Debtors attempt to relitigate the issues.

iv. *The Stay Would Not Further the Public Interest*

42. The Debtors also fail to demonstrate that a stay would further the public interest. As a general matter, denial of a stay serves the "strong public 'need for finality of decisions, especially in a bankruptcy proceeding.'" *In re Calpine Corp.*, 2008 Bankr. LEXIS 217, *1, *19 (Bankr. S.D.N.Y. Jan. 24, 2008) (quoting *In re Twenty-Six Realty Assocs., L.P.*, No. 95-cv-1262, 1995 WL 170124, at *16 (E.D.N.Y. Apr. 4, 1995)).

43. Here, for the reasons set forth above, the need for finality is especially great. Finality with respect to the Termination Order will allow an open process with competing proposals, which will foster competition and put these cases on a clearer track to exit, thereby benefitting

creditors. Further, unstayed enforcement of the Termination Order will not preclude the Debtors from going forward with their plan process on their proposed timeline. *See In re Grossinger's Assoc.*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) ("[L]oss of plan exclusivity does not mean that the debtor is foreclosed from promulgating a meaningful plan of reorganization; only that the right to propose a Chapter 11 plan will not be exclusive with the debtor."); *see also* Ex. B, Transcript of March 21, 2025 hearing, p. 208: 16-17 (Court noting that "[n]othing's stopping the Debtor from doing what it wants with its plan."). In sum, unstayed enforcement of the Termination Order provides clarity regarding the Debtors' exit from these cases and creditor recoveries that otherwise does not exist. By contrast, granting the Motion furthers only the Debtors' desire to continue in complete control of these cases to further the interests of their stockholder.

**JOINDER**

44.     The Agent expressly joins, and incorporates by reference, the FitLife Objection, including all facts and arguments set forth therein.

**RESERVATION OF RIGHTS**

45.     The Agent expressly reserves its rights to supplement this Joinder and to make such other and further objections as it may deem necessary or appropriate.

# CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Agent respectfully requests that the Court (i) deny the relief requested by the Motion; and (ii) grant such other and further relief as the Court deems just and proper.

Dated: April 10, 2025

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

*/s/ Erin R. Fay*
Erin R. Fay
Matthew A. Macdonald
Dale R. Bish

*Counsel to East West Bank, as Agent*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: **222 Delaware Avenue, Suite 800, Wilmington, DE 19801**.

A true and correct copy of the foregoing document entitled (*specify*): **AGENT'S (I) JOINDER TO CREDITOR FITLIFE BRANDS, INC.'S OPPOSITION TO DEBTORS' EMERGENCY MOTION FOR STAY PENDING APPEAL AND (II) OBJECTION TO DEBTORS' EMERGENCY MOTION FOR STAY PENDING APPEAL** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 10, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
**\*\*JUDGE'S COPY NOT REQUIRED IF LESS THAN 25 PAGES (GENERAL ORDER 23-01)**

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 10, 2025 | Erin R. Fay | *Erin R. Fay* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                                         **F 9013-3.1.PROOF.SERVICE**

**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

Courtesy NEF/on behalf of Other Professional Klee Irwin
Kyra E. Andrassy
kandrassy@raineslaw.com, bclark@raineslaw.com, jfisher@raineslaw.com

Attorney for Debtor
Jessica L Bagdanov
jbagdanov@bg.law, ecf@bg.law

Attorney for Official Committee of Unsecured Creditors
Ryan W Beall
rbeall@go2.law; kadele@go2.law; dfitzgerald@go2.law; rbeall@ecf.courtdrive.com; cmeeker@go2.law

Attorney for Robinson Pharma, Inc.
Anthony Bisconti
tbisconti@bklwlaw.com, 1193516420@filings.docketbird.com; docket@bklwlaw.com

Attorney for Interested Party Karled Enterprises, a California general partnership
Matthew Bouslog
mbouslog@allenmatkins.com; ncampos@allenmatkins.com

United States Trustee
Katherine Bunker
kate.bunker@usdoj.gov

Courtesy NEF
Robert Allen Curtis
rcurtis@foleybezek.com

Attorney for East West Bank
Erin R. Fay
efay@wsgr.com; lmcgee@wsgr.com

Attorney for Official Committee of Unsecured Creditors
Jeffrey I Golden
jgolden@go2.law; kadele@ecf.courtdrive.com; cbmeeker@gmail.com; lbracken@wgllp.com; dfitzgerald@go2.law; golden.jeffreyi.b117954@notify.bestcase.com

Attorney for Karled Enterprises I
Alphamolai Lamine Kebeh
MKebeh@allenmatkins.com; mdiaz@allentmatkins.com

Interested Party
Alexandria Lattner
alattner@sheppardmullin.com; ehwalters@sheppardmullin.com

Attorney for East West Bank
Matthew A Macdonald
matthew.macdonald@wsgr.com

Attorney for Creditor Herman and Jasminn Reese
Sina Maghsoudi
sinalegal@gmail.com; g8645@notify.cincompass.com; maghsoudi.sinab128731@notify.bestcase.com

Interested Party
David W. Meadows
david@davidwmeadowslaw.com

Interested Party
Douglas A Plazak
dplazak@rhlaw.com

Attorney for Debtor
David M Poitras
dpoitras@bg.law

Interested Party TR Capital Management LLC
Terrel Ross
tross@trcmllc.com

Attorney for Debtor
Susan K Seflin
sseflin@bg.law

Interested Party
Jonathan Seligmann Shenson
jshenson@greenbergglusker.com; calendar@greenbergglusker.com; cmillerwatkins@greenbergglusker.com

Interested Party
Yuriko M Shikai
yshikai@neufeldmarks.com

Interested Party
Ashley M Teesdale
ateesdale@bg.law; ecf@bg.law

United States Trustee
ustpregion16.wh.ecf@usdoj.gov

Attorney for FitLife Brands, Inc.
Ronghua Sophia Wang
Sophia.wang@afslaw.com; yvonne.li@afslaw.com

Interested Party
Pamela Kohlman Webster
pwebster@buchalter.com; smartin@buchalter.com

Attorney for Debtor
Jessica Wellington
jwellington@bg.law; ecf@bg.law