**FILED & ENTERED**

**APR 15 2025**

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fisherl    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>Irwin Naturals *et al.*,<br><br>Debtors and Debtors in Possession. | Case No.: 1:24-bk-11323-VK<br><br>Chapter 11<br><br>Jointly Administered with:<br><br>Case No. 1:24-bk-11324-VK<br>Case No. 1:24-bk-11325-VK<br>Case No. 1:24-bk-11326-VK |
| ☐ Affects Irwin Naturals<br><br>☐ Affects Irwin Naturals Inc.<br><br>☐ Affects 5310 Holdings, LLC<br><br>☐ Affects DAI US HoldCo Inc.<br><br>☒ Affects All Debtors | **MEMORANDUM RE: TERMINATION OF DEBTORS' EXCLUSIVE PERIOD TO FILE A CHAPTER 11 PLAN**<br><br><u>Hearing:</u><br>Date:    March 21, 2025<br>Time:    10:00 a.m.<br>Place:    Courtroom 301<br>            21041 Burbank Blvd.<br>            Woodland Hills, CA 91367 |

1    This memorandum decision sets forth this Court's findings of fact and conclusions of law

2    regarding termination of the debtors' exclusive period to file a chapter 11 plan.

3    **I.      BACKGROUND**

4         ***A.      The Parties***

5              ***1.      Debtors***

6         On August 9, 2024, Irwin Naturals and related entities (collectively, "Debtors") filed

7    voluntary chapter 11 petitions. Debtors operate a nutraceutical business that includes

8    formulating, marketing and distributing vitamins and dietary supplements. *Declaration of Klee*

9    *Irwin in Support of the Debtors' First Day Emergency Motions*, ¶¶ 4, 7-8 [doc. 22]. In the United

10   States, the nutritional supplements category is a roughly $60 billion market. *Transcript of*

11   *Hearings Held on March 21, 2025*, pp. 160-61 of 222 [doc. 466]. Debtors represent 0.1% of that

12   market. *Id*.

13        Klee Irwin is the founder and CEO of Debtors. *Id*., ¶¶ 1, 6. Mr. Irwin individually and

14   through a trust owns approximately 97.5% of the equity in Debtors. *See, e.g., Amended Plan*,

15   Section III.C.4, p. 25 [doc. 286]. The remaining 2.5% of the equity in Debtors is owned by

16   approximately 230 non-insider shareholders in Debtors' Canadian entity. *Declaration of Vincent*

17   *Willis*, ¶ 113 [doc. 388]; *List of Equity Security Holders* [1:24-bk-11324-VK, doc. 17].

18        On September 23, 2024, Debtors filed a schedule A/B, in which Debtors disclosed

19   matured promissory notes payable by Mr. Irwin (the "Notes"). *Schedule A/B*, ¶ 71 and Exhibit

20   AB71 thereto [doc. 96]. As of December 23, 2024, based on the Notes, Mr. Irwin owed Debtors

21   $4,134,304.45. *Amended Plan*, Section III.D.7, p. 29 [doc. 286]. As of September 23, 2024,

22   Debtors' other assets consist of accounts receivable with a scheduled value of $10,918,233.99,

23   inventory with a scheduled value of $11,497,158.47, equipment with a scheduled value of

24   $47,645.88 and intellectual property with a scheduled value of $30,441,000.00. *Schedule A/B*

25   [doc. 96]; *Schedule A/B for 5310 Holdings, LLC* [1:24-bk-11325-VK, doc. 16].

26        Mr. Irwin is paid a salary of $240,000 per year through his corporation Greenmark

27   Services Corp. *Amended Disclosure Statement*, Section III.D.3 [doc. 286]. Mr. Irwin's wife,

28   Margareth Irwin, receives $100,240.16 per year in insider compensation. *Notice of*

*Setting/Increasing Insider Compensation* [doc. 155]. Mr. Irwin's sister, Leta Paz, receives $101,197.00 per year in insider compensation. *Notice of Setting/Increasing Insider Compensation* [doc. 156]. As of February 28, 2025, Debtors' estates had incurred professional fees in the amount of $2,233,207. *Monthly Operating Report for February 2025* [doc. 453].

In schedule D, Debtors disclose only one secured creditor: East West Bank. *Schedule D*, ¶ 2 [doc. 96]. In schedule E/F, Debtors disclose unsecured claims in the aggregate amount of $4,671,046.04, comprised of 21 priority claims and 115 nonpriority claims. The aggregate amount of the unsecured debt does not include the claims of certain critical vendors who were paid $3,512,281.98 on September 11, 2024. *See Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to Pay Certain Prepetition Wage Claims of Critical Vendors; (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief* [doc. 18] and interim and final orders thereon [docs. 61 and 81].

## 2.    *East West Bank*

On February 1, 2023, Debtors entered into a credit agreement with East West Bank and CFG Bank (the "Credit Agreement"), with East West Bank as agent, in order for Debtors to obtain a syndicated lending facility to support Debtors' day-to-day operations. *Proof of Claim no. 48-1; see Declaration of Klee Irwin in Support of the Debtors' First Day Emergency Motions*, ¶ 11 [doc. 22]. Under the Credit Agreement, East West Bank and CFG Bank provided a $40,000,000 senior secured credit facility to Debtors, consisting of a revolving loan and letter of credit facility in the aggregate principal amount of $20,000,000 with a variable interest rate of 8.50% as of the petition date (prime + 0) and a delayed-draw term loan facility in the principal amount of $20,000,000 with a variable interest rate of 9.50% as of the petition date (prime + 1). *Proof of Claim no. 48-1.*

On December 19, 2024, East West Bank filed proof of claim no. 48-1, in which it asserts a secured claim in the amount of $19,381,507.84 arising out of the Credit Agreement. East West Bank's claim is secured by personal property of Debtors. *Schedule D* [doc. 96]. The Court authorized Debtors to use East West Bank's cash collateral, provided that Debtors made monthly

interest payments to East West Bank in the amount of $155,000 and monthly principal payments in the amount of $100,000. *See Order Authorizing Debtors to Use Cash Collateral on Final Basis and Granting Replacement Liens*, ¶ 7 [doc. 266].

### 3. *FitLife Brands, Inc.*

On December 17, 2024, Mark Judkins Consulting Company filed proof of claim no. 39-1 (the "Consulting Claim"). The Consulting Claim asserts a nonpriority unsecured claim in the amount of $7,498 arising out of "Recruiting services: placement of Quality Control Technician." On January 22, 2025, FitLife Brands, Inc. ("FitLife") filed a *Transfer of Claim Other Than for Security* (the "Consulting Claim Transfer") [doc. 310], in which FitLife requested to be substituted as the original claimant of the Consulting Claim. Because no objection was filed to the Consulting Claim Transfer, FitLife was substituted as the original claimant without further order of the Court. *See Notice of Transfer of Claim Other Than for Security* [doc. 313].

Dayton Judd is the CEO of FitLife. *Declaration of Dayton Judd*, ¶ 1 [doc. 400]. FitLife is a publicly traded company (Nasdaq: FTLF) with a market capitalization of approximately $140 million. *Id.*, ¶ 3. FitLife owns and markets 13 nutritional supplement and wellness brands comprising over 250 individual products that are sold online as well as through a number of national retail chains. *Id*. Mr. Judd testified that FitLife is not a direct competitor of Debtors. *Id*., ¶ 4. Of the roughly $60 billion market for nutritional supplements, FitLife's share of the market is comparable to Debtors at roughly 0.1%. *Transcript of Hearings Held on March 21, 2025*, pp. 160-61 of 222 [doc. 466].

### 4. *The Official Committee of Unsecured Creditors*

On August 31, 2024, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") [doc. 69]. The Committee is comprised of the following unsecured creditors: Paragon Laboratories, Inc., Zapp Packaging Inc., and Sheri L. Orlowitz. *Id*.

### 5. *Karled Enterprises I*

Karled Enterprises I ("Karled") holds an unsecured claim against Debtors in an amount exceeding $1,157,780.00 for past due rents, holdover rent charges, attorneys' fees, late fees and other charges arising out of a lease agreement. Proof of Claim 42-1. Karled is Debtors' largest

unsecured creditor and, together with East West Bank, holds approximately 85% of the scheduled claims in Debtors' cases. *See Schedule D* [doc. 96].

### B.    Debtors' Employment of Province, LLC

On September 17, 2024, Debtors filed an application to employ Province, LLC ("Province") as Debtors' financial advisor [doc. 87]. In the application, Debtors sought to employ Province, effective as of August 29, 2024, to among other things, assist Debtors in their "efforts to raise sufficient exit capital desirable in relation to ... a restructuring, plan of reorganization, or sale transaction." *Id.*, Ex. C (Engagement Agreement).

In addition to Province's hourly fees, Debtors proposed to pay Province 2% of the gross amount of any funds loaned to Debtors during the pendency of Debtors' cases. *Id.* As of December 31, 2024, Province had incurred $747,355.00 in fees. *First Interim Fee Application of Province, LLC for Allowance of Compensation for Services and Reimbursement of Expenses for the Period August 29, 2024 Through December 31, 2024* [doc. 324]; *Order on Application for Payment of Interim Fees and/or Expenses* [doc. 362]. As of March 21, 2025, Province's efforts had not generated Debtors' desired exit capital.

### C.    Debtors' Employment of Marula Capital Group LLC

On September 19, 2024, Debtors filed an application to employ Marula Capital Group LLC ("Marula") [doc. 89]. In the application, Debtors sought to employ Marula, effective as of August 28, 2024, to provide valuation services, including an opinion as to the fair market value of Debtors' company and certain intellectual property and intangible assets held by Debtors. *Id.*, Section VI.1, p. 6. Marula is a merger and acquisition, capital raising and valuation firm. *Declaration of Wayne Platt*, ¶ 7 [doc. 89]. Wayne Platt is the CEO and founding partner of Marula. *Id.*, ¶ 1.  On October 8, 2024, the Court entered an order approving the application to employ Marula [doc. 135].

On September 3, 2024, Mr. Platt estimated the mean enterprise value of Debtors' business as a going concern was $103 million, with a low of $93 million and a high of $112 million (the "September 2024 Valuation"). *Declaration of Wayne Platt*, ¶ 8 [doc. 91].

On November 12, 2024, Mr. Platt revised his September 2024 Valuation; as of November 2024, he estimated the mean enterprise value of Debtors' business as a going concern was $79 million, with a low of $71 million and a high of $86 million (the "November 2024 Valuation"). *Declaration of Wayne Platt*, ¶ 16 [doc. 424].

### D.    The Plan and Disclosure Statement

On October 31, 2024, Debtors filed *Debtors' Chapter 11 Plan of Reorganization* (the "Plan") [doc. 185] and a related disclosure statement describing the Plan [doc. 187]. The Plan provides for Debtors' principals and their affiliates to retain their equity in the reorganized Debtors without any contribution of new value. *See Plan*, Section III.C.4 [doc. 185]. The Plan increases Mr. Irwin's salary from $240,000 a year to $790,000 a year. *Id.,* Section III.D.3. Creditors would be paid a portion of the reorganized Debtors' net disposable income regularly until February 1, 2028, after which Debtors would make a balloon payment to creditors if they had not already been paid in full. *Id.*, Section III.C. The Plan did not address Mr. Irwin's debt under the Notes.

### E.    The November 2024 Extension Order

On November 12, 2024, Debtors filed a motion to extend Debtors' exclusivity periods to file a plan and to solicit acceptances of that plan (the "November 2024 Motion to Extend Exclusivity") [doc. 219]. On December 11, 2024, the Court entered an order granting that motion (the "November 2024 Extension Order") [doc. 269]. The order provides, in relevant part:

> The exclusivity period for the Debtors to file a plan of reorganization shall be extended for sixty (60) days from December 7, 2024, through and including February 5, 2025.

> The exclusivity period for the Debtors to obtain acceptances of a plan of reorganization shall be extended for sixty (60) days from February 5, 2025, through and including April 4, 2025.

*Id.*, ¶¶ 2-3 [doc. 269].

### F.    The December 2024 Extension Order

On December 16, 2024, Debtors, East West Bank and the Committee entered into a *Stipulation to Continue Hearing on Approval of the Debtors' Proposed Disclosure Statement and*

*Related Deadlines and Continued Chapter 11 Status Conference* [doc. 274]. On December 17, 2024, the Court entered an order approving the stipulation (the "December 2024 Extension Order") [doc. 275]. Pursuant to the December 2024 Extension Order, the deadline for Debtors to file an amended chapter 11 plan and related disclosure statement was extended to December 23, 2024.

### G.    The Amended Plan and Disclosure Statement

On December 23, 2024, Debtors filed *Debtors' First Amended Chapter 11 Plan of Reorganization* (the "Amended Plan") [doc. 286] and a related disclosure statement describing the Amended Plan (the "Amended Disclosure Statement") [doc. 287]. Like the Plan, the Amended Plan provides for Debtors' principals and their affiliates to retain their equity in the reorganized Debtors without any contribution of new value. *See Amended Plan*, Section III.C.4 [doc. 286]. The Amended Plan similarly increases Mr. Irwin's salary, post-confirmation, from $240,000 a year to $790,000 a year. *Id.,* Section III.D.3.

The Amended Plan differs from the Plan in that creditors would be paid the remaining net disposable income regularly until February 1, 2027 (as opposed to 2028), after which Debtors would make a balloon payment to creditors if they had not already been paid in full. *Id*., Section III.C. The Amended Plan discusses Mr. Irwin's debt under the Notes, stating:

> The Debtors' principal and CEO Klee Irwin currently owes the Debtor $4,134,304.45 in unsecured loans as of the Petition Date, which loans are offset by $1 million owed from the Debtors to Mr. Irwin. The Debtors do not currently intend to pursue collection against Mr. Irwin because [the N]otes are not currently collectible. The majority of Mr. Irwin's assets are subject to liens held by [East West Bank] pursuant to a separate loan agreement entered into between [East West Bank] and Mr. Irwin. The [N]otes in question are collateralized by Mr. Irwin's equity in the Debtors so at the time all Allowed Claims are satisfied, the Debtors can realistically re-evaluate the collectability of such [N]otes and the Debtors reserve their rights to do so.

*Id*., Section III.D.7, pp. 29-30. On December 31, 2024, Debtors filed a notice of Debtors' submission of revised plan projections for the Amended Plan and Amended Disclosure Statement [doc. 292].

**H.      Debtors' Employment of Essex Capital Group, Inc.**

On January 15, 2025, Debtors filed an application to employ Essex Capital Group, Inc. ("Essex") as Debtors' consultants [doc. 298]. In the application, Debtors sought to employ Essex, effective as of January 10, 2025, "for the sole purpose of raising debt." *Id*., Ex. 2 (Engagement Agreement dated January 10, 2025). Debtors proposed to pay Essex a due diligence and preliminary analysis fee in the amount of $25,000, plus a 3% contingent success fee to be paid from closing proceeds of any financing. *Id*. On February 12, 2025, the Court entered an order approving the application to employ Essex [doc. 343]. As of March 21, 2025, Essex's efforts (like those of Province) had not generated sufficient exit financing for Debtors.

**I.      The First and Second January 2025 Extension Orders**

On January 9, 2025, Debtors, East West Bank and the Committee entered into a *Second Stipulation to Continue the Hearing on Approval of the Debtors' Proposed Disclosure Statement and Related Deadlines and to Continue Chapter 11 Status Conference* [doc. 323]. The Court entered an order approving that stipulation (the "First January 2025 Extension Order"), which continued certain deadlines by at least two weeks [doc. 294].

On January 27, 2025, Debtors, East West Bank and the Committee entered into a *Stipulation to Continue Hearing on Approval of the Debtors' Proposed Disclosure Statement and Related Deadlines and to Continue Chapter 11 Status Conference* [doc. 317]. The Court entered an order approving that stipulation (the "Second January 2025 Extension Order") [doc. 323]. The Second January 2025 Extension Order extended Debtors' exclusive period to file a chapter 11 plan from February 5 to March 5, 2025, and extended Debtors' exclusive period to obtain acceptances of a chapter 11 plan from April 4 to May 2, 2025. Id., ¶ 6.

**J.      Debtors' Employment of STS Capital Partners M&A Advisers Inc.**

On February 5, 2025, Debtors filed an application to employ STS Capital Partners M&A Advisers Inc. ("STS") as Debtors' investment banker [doc. 336]. Vincent Willis is the managing director of STS. *Declaration of Vincent Willis*, ¶ 1 [doc. 388].

In the application, Debtors seek to employ STS, effective as of January 31, 2025, to provide consultant and advisory services with respect to a potential sale of all or a part of

Debtors' shares or assets or any other like transaction. *STS Employment Application*, Ex. 3 (Specific Transaction Fee Agreement dated January 31, 2025). Debtors proposed to pay STS $30,000.00 on execution of the agreement, as well as $30,000.00 per month thereafter (starting on February 1, 2025), plus a success fee of at least $3,000,000 in the event STS closes such a transaction. *Id*.; *see also Supplement to STS Employment Application* [doc. 403]. On March 21, 2025, the Court entered an order approving the application to employ STS [doc. 450].

### K.    *The Redlined Amended Disclosure Statement*

On February 7, 2025, Debtors filed a notice of Debtors' submission of: (1) a redline to the Amended Disclosure Statement and (2) further revised projections, as Exhibit B to the Amended Disclosure Statement (the "Redlined Amended Disclosure Statement") [doc. 342]. In the Redlined Amended Disclosure Statement, Debtors describe their intended second amended plan (the "Anticipated Second Amended Plan"). *Id*., Section II.67, p. 20. Debtors never filed such a second amended plan.

According to the Redlined Amended Disclosure Statement, the Anticipated Second Amended Plan would revest Debtors' equity in the current ownership upon confirmation without any contribution of new value. *Id*., Section IV.D.7, p. 49. Debtors acknowledged that upon confirmation, their funds may be insufficient to pay the fees of estate professionals in full, such that Debtors will request that estate professionals defer payments owed to them as set forth in the plan projections. *See id.*, p. 64. The Redlined Amended Disclosure Statement further states, in relevant part:

> ~~59.~~60. **Net Disposable Income.** Net Disposable Income is the amount remaining after the Debtors have paid all necessary and ordinary business expenses and taxes subject to the $3 million minimum cash on hand.

* * *

The following chart sets forth the description and treatment of the Debtors' known Secured Claims.

| CLASS # | DESCRIPTION | IMPAIRED (Yes/No) | TREATMENT |
|---|---|---|---|
| 1 | Secured claim of East West Bank, as Agent | Treatment A: Yes. | **Treatment A:** ... $1 mm paid quarterly, commencing |

| | | | |
|---|---|---|---|
| | ("EWB") ... | ... | June 30, 2025. Additionally, 60% of Net Disposable Income ~~net disposable income ("NDI")~~ shall be paid quarterly to EWB. See Plan Projections for details (Cash Available for Discretionary Debt Repayment). If the EWB claim is not paid in full prior to the maturity date of February 1, 2027, the Debtors shall pay the remaining lump sum to EWB on or before February 1, 2027, through a cash payment or, if needed, by obtaining replacement financing or through a sale of the business. If the Debtors obtain exit financing and/or an equity investment during the pendency of their bankruptcy cases, then EWB shall receive an up-front payment in an amount to be determined within one week of the Effective Date. ... |

\* \* \*

General Unsecured Claims are classified and treated as follows:

| CLASS # | DESCRIPTION | IMPAIRED (Yes/No) | TREATMENT |
|---|---|---|---|
| 3 | General Unsecured Claims [Excluding Insider Claims] ... | Yes. | Allowed General Unsecured Claims will be paid 40% of the ~~NDI~~ Net Disposable Income as set forth in the Plan Projections (Cash Available for Discretionary Debt Repayment). If Allowed General Unsecured Claims are not paid in full prior to February 1, 2027, the Debtors shall pay the remaining balance of Allowed General Unsecured Claims in full on or before February 1, 2027. If the Debtors obtain exit financing and/or an equity investment, then holders of Allowed General Unsecured Claims shall receive an up-front payment (paid on a pro rata investment) in an amount to be determined within one week of the Effective Date.

Allowed General Unsecured Claims will accrue interest at Prime plus 1%. If Allowed General Unsecured Claims are paid off in full within six (6) months of the Effective Date, then no interest is due. |

\* \* \*

Equity Investment or Sale

> The Debtors ... currently expect a sale six to eight months after the Effective Date....
> The Debtors and STS believe that a sale along this timeline will result in net
> proceeds that will be sufficient to immediately pay all Allowed Claims at the time
> of such sale and to maximize return for existing shareholders.
>
> No Exit Financing or Equity Investment
>
> If the Debtors are unable to obtain Exit Financing and/or an Equity Investment, or
> determine that it is in their best interests not to do so, then the Plan will be funded
> by the Debtors' ongoing business operations as set forth in the Plan Projections as
> well as a lump sum payment from either a sale of the Debtors' business as a going
> concern or refinancing on or before February 1, 2027. ... The Debtors will file a
> status report with the Court by October 5, 2026 setting forth the status of payments
> that have been made, whether the Debtors have been able to obtain takeout
> financing or whether the Debtors have begun a sale process.

*Id.*, pp. 19, 39-40, 42, 44-45 (font color, strikethrough and underlining as set forth in Redlined

Amended Disclosure Statement).

### L.    The Motion to Terminate Exclusivity

On February 19, 2025, FitLife filed a *Motion for Order (I) Terminating the Exclusive
Periods in Which Only the Debtors May File a Plan and Solicit Acceptances and (II) Permitting
FitLife Brands, Inc. to File an Alternative Plan and Disclosure Statement* (the "Motion to
Terminate Exclusivity") [doc. 349]. Karled Enterprises I filed a response in support of the
Motion to Terminate Exclusivity [doc. 395].

On February 27, 2025, Debtors filed an opposition to the Motion to Terminate
Exclusivity [doc. 392] and declarations of Mr. Irwin and Mr. Willis [docs. 394 and 388]. Mr.
Irwin's declaration states, in relevant part:

> Debtors' customers are large corporations (such as Walmart, Costco, etc.), and they
> have one primary supplier (which supplies approximately 90% of the Debtors'
> products). I am very concerned that a competing plan process will detrimentally
> and negatively impact the Debtors' business operations. I am concerned that the
> Debtors' suppliers will all move to COD, which will immediately negatively affect
> the Debtors' cash flow, and that a competing plan process will alienate or scare
> away the Debtors' customers.

* * *

> Debtors received a term sheet on February 26, 2025 which was for a line up to $20 million, with availability based upon certain factors. It is my understanding that the current availability under the terms in the term sheet would be between $12 million and $14 million.

*Declaration of Klee Irwin*, ¶¶ 5, 9 [doc. 394]. The Committee filed a joinder to Debtors' opposition [doc. 396]. On March 3, 2025, FitLife filed a reply to Debtors' opposition [doc. 399].

### M.    *The Sale Procedures Stipulation*

On February 26, 2025, Debtors filed a stipulation between Debtors and the Committee regarding a potential sale and plan process, exclusivity and related deadlines (the "Sale Procedures Stipulation") [doc. 384]. The Sale Procedures Stipulation set a date of July 31, 2025, for a potential sale hearing, set a deadline of June 16, 2025, for Debtors to select a stalking horse bidder (unless extended with the Committee's consent) and required that Debtors provide updates to the Committee every other week. *Sale Procedures Stipulation*, ¶¶ 1, 2, 5 [doc. 384]. On March 3, 2025, East West Bank filed a statement in response to the Sale Procedures Stipulation, noting its dissatisfaction with the terms of the Sale Procedures Stipulation [doc. 398]. Debtors did not set a hearing on the Sale Procedures Stipulation.

### N.    *The March 5, 2025 Hearings*

On March 5, 2025, the Court held a hearing on the Amended Disclosure Statement and a continued chapter 11 case status conference. *See Transcript of Hearings Held on March 5, 2025* [doc. 414]. Concurrently, the Court held a hearing on the Motion to Terminate Exclusivity. *See id*. As of that time, Debtors still had not filed the Anticipated Second Amended Plan.

At the hearing, FitLife, East West Bank and Karled each argued that the Motion to Terminate Exclusivity should be granted. *Id*., pp. 7-19. The Court found that Mr. Irwin's testimony that a competing plan would cause adverse consequences with Debtors' vendors and customers was not credible. *See id*., p. 30. The Court remarked that Debtors had a "credibility problem" because of their filing of the Plan, the Amended Plan and the Redlined Amended Disclosure Statement which described the Anticipated Second Amended Plan, each of which provided beneficial treatment to holders of equity interests, without an infusion of new value, and delayed and uncertain payment to creditors. *See id*., pp. 43-44.

At Debtors' request, the Court set an evidentiary hearing on the Motion to Terminate Exclusivity. *See id.*, pp. 62-63; *Order: (1) Denying Approval of Stipulation Between Debtors and Official Committee of Unsecured Creditors Regarding Sale and Plan Process, Exclusivity and Related Deadlines; (2) Setting Evidentiary Hearing; and (3) Continuing Hearings and Chapter 11 Case Status Conference* [doc. 406].

### O.    The March 2025 Motion to Extend Exclusivity

On March 5, 2025, Debtors filed a motion to extend Debtors' exclusive period to file a chapter 11 plan from March 5, 2025, to April 5, 2025 [doc. 405] (the "March 2025 Motion to Extend Exclusivity"). On March 19, 2025, FitLife filed an opposition to the March 2025 Motion to Extend Exclusivity [doc. 438]. Debtors set the March 2025 Motion to Extend Exclusivity for hearing on April 2, 2025.

### P.    The Sale Procedures Motion

On March 14, 2025, Debtors filed a *Motion for Entry of an Order (A) Approving Preliminary Bidding Procedures in Connection with Sale of the Debtors' Assets, (B) Scheduling Hearing to Consider the Sale, and (C) Approving Form and Manner of Notice Thereof* (the "Sale Procedures Motion") [doc. 423]. Debtors set the Sale Procedures Motion for hearing on 7 days' notice. On March 20, 2025, East West Bank, FitLife, Karled and the Committee filed responses to the Sale Procedures Motion [docs. 444, 445, 446 and 448].

The dates for a potential sale process set forth in the Sale Procedures Motion were the same dates as those set forth in the Sale Procedures Stipulation. As of that time, Debtors did not have a stalking horse bidder, had not prepared a proposed form of an asset purchase agreement (an "APA") setting forth the terms of the sale and were not committed to selling their business, rather than refinancing their debt.

### Q.    The March 21, 2025 Hearings

On March 21, 2025, the Court held: (1) a six-hour-long evidentiary hearing on the Motion to Terminate Exclusivity, (2) a continued hearing on the Amended Disclosure Statement, (3) a hearing on the Sale Procedures Motion, and (4) a continued chapter 11 case status conference. *See Transcript of Hearings Held on March 21, 2025* [doc. 466].

1    At the hearing, the Court heard testimony concerning the value of Debtors' business from

2    Messrs. Platt, Willis and Judd. Mr. Platt could not recall the reasons for the $24 million reduction

3    between the mean enterprise values set forth in the September 2024 Valuation and in the

4    November 2024 Valuation. *See id*. In general, Mr. Platt's valuation testimony was unconvincing.

5    The valuation testimony of Mr. Judd was more compelling than the testimony of Messrs. Platt

6    and Willis, yet Mr. Judd's opinion may underestimate the value of Debtors' business, when sold

7    as a going concern.

### 1.    *Debtors' New Changes to the Anticipated Second Amended Plan*

9    Following the conclusion of testimony, Debtors' counsel represented that Debtors and the

10   Committee had agreed on changes to be made to the Anticipated Second Amended Plan. *Id*., pp.

11   181-82.  As described by Debtors' counsel, the revised chapter 11 plan would pay unsecured

12   creditors 14% interest on their claims until paid in full. *Id*. Moreover, Debtors allegedly would

13   commit themselves to a deadline of June 16, 2025, to secure exit financing, after which deadline

14   Debtors would pursue only the sale of their business. *Id*., p. 172-73. Debtors' counsel stated that

15   their revised plan and related disclosure statement would be filed no later than March 31, 2025.

16   *Id*., p. 172. Debtors' counsel did not explain why Debtors were filing their revised plan by that

17   date, in particular.

### 2.    *The Court's Application of the Dow Corning Factors*

19   At the conclusion of the hearing, the Court applied the *Dow Corning* factors and granted

20   the Motion to Terminate Exclusivity. *Id*., pp. 191-98. The Court found that the latest intended

21   chapter 11 plan, as discussed by Debtors' counsel at the hearing, was not substantially the same

22   as the Amended Plan or the Anticipated Second Amended Plan. The Court noted that if Debtors'

23   exclusive period to file a chapter 11 plan is terminated, "[n]othing's stopping the Debtor from

24   doing what it wants with its plan." *Id*., p. 208:16-17. The Court found that Mr. Irwin's testimony

25   that "a competing plan process will alienate or scare away Debtors' customers" or suppliers was

26   not credible, given that Debtors had filed the Sale Procedures Stipulation and the Sale

27   Procedures Motion. *Id*., p. 188. The Court also determined that Debtors used exclusivity to

28   pressure creditors.  *Id*., p. 192:19-25.

### 3.    *Debtors' Withdrawal of the Sale Procedures Motion*

Additionally, the Court identified numerous issues with the Sale Procedures Motion, which lacked specificity regarding the terms of the sale and did not ensure that a sale would take place, if Debtors decided to pursue a different path. *Court's Tentative Ruling* [doc. 451]. In response, during the hearing, Debtors withdrew their Sale Procedures Motion. *See id*., pp. 176, 219 of 222 [doc. 466].

### R.    *The Order Terminating Exclusivity*

On March 31, 2025, the Court entered an order granting the Motion to Terminate Exclusivity (the "Order Terminating Exclusivity") [doc. 469]. The Order Terminating Exclusivity provides, in relevant part:

> The Court finds that the exclusive period to file a plan of reorganization pursuant to Bankruptcy Code § 1121(c) expired by its terms on March 6, 2025; however, to the extent that any party contends that it did not, the Court further finds that there is cause within the meaning of Bankruptcy Code § 1121(d)(1) to terminate the Debtor[s'] exclusive period and hereby declares that the Debtor[s'] exclusive period to file and/or solicit a plan of reorganization is hereby terminated, so that FitLife, either on its own, or in conjunction with one or more parties-in -interest, may in its discretion, and at the time of its choosing, file a plan of reorganization....

## II.    LEGAL STANDARDS

11 U.S.C. § 1121 provides, in relevant part:

(b) Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.

(c) Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if--

  (1) a trustee has been appointed under this chapter;

  (2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

  (3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class of claims or interests that is impaired under the plan.

> (d)(1) ... on request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, **the court may for cause reduce or increase** the 120-day period or the 180-day period referred to in this section.

(emphasis added). In determining whether "cause" exists to terminate a chapter 11 debtor's exclusive period to file a plan, the bankruptcy court considers the following factors:

1. the size and complexity of the case;
2. the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information;
3. the existence of good faith progress toward reorganization;
4. the fact that the debtor is paying its bills as they become due;
5. whether the debtor has demonstrated reasonable prospects for filing a viable plan;
6. whether the debtor has made progress in negotiations with its creditors;
7. the amount of time which has elapsed in the case;
8. whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and
9. whether an unresolved contingency exists.

*In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997). *See also Henry Mayo*, 282 B.R. at 452 (affirming grant of extension of exclusivity periods in case of nonprofit debtor; in addition to factors set forth in *Dow Corning Corp.*, bankruptcy court found cause as it was debtor's first extension and debtor was not "depriving the Committee of material or relevant information"); *In re Energy Conversion Devices, Inc.*, 474 B.R. 503, 507 (Bankr. E.D. Mich. 2012) (denying motion of Official Committee of Unsecured Creditors to terminate exclusivity, within debtors' initial plan exclusivity periods and following court's entry of order granting preliminary approval of debtors' disclosure statement).

"Statements made by creditors and parties in interest that they [are] prepared to offer more favorable plans if the court were to terminate the exclusivity period" does not constitute sufficient cause "to cut short the debtor's window of opportunity opened by Congress." *In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 134 (D.N.J. 1995).

## III.    ANALYSIS

In issuing its oral ruling, the Court considered three issues: (1) whether Debtors' exclusive period to file a chapter 11 plan expired after March 5, 2025; (2) whether cause existed

1    to terminate Debtors' exclusive period to file a chapter 11 plan; and (3) whether the latest

2    intended chapter 11 plan, as discussed by Debtors' counsel at the hearing, would not relate back

3    to the Amended Plan or the Anticipated Second Amended Plan, as described in the Redlined

4    Amended Disclosure Statement (which chapter 11 plan Debtors had not yet, and have never,

5    filed).

6          If cause existed to terminate Debtors' exclusive period to file a chapter 11 plan, the Court

7    need not consider the first and third issues because finding "cause" is, by itself, a sufficient basis

8    to terminate exclusivity. *See* 11 U.S.C. § 1121(d)(1). Accordingly, the Court will first analyze

9    whether cause existed to terminate Debtors' exclusive period to file a chapter 11 plan.

10                    *1.      Whether Cause Existed to Terminate Exclusivity*

11                        *a)      The Size and Complexity of Debtors' Cases*

12          Debtors' cases are neither large nor complex. Although Debtors have approximately 230

13    non-insider shareholders in Debtors' Canadian entity, those shares represent only 2.5% of the

14    equity in Debtors. Mr. Irwin and his affiliates hold the remaining 97.5% of the equity. East West

15    Bank and Karled together hold 85% of the scheduled claims in these cases. In these cases, a

16    global settlement would primarily involve four parties (Debtors, Mr. Irwin, East West Bank and

17    Karled) and a Committee with three unsecured creditors. This stands in contrast to the line of

18    cases in which courts have found this factor to weigh against terminating exclusivity. *See, e.g.,*

19    *Dow Corning*, 208 B.R. at 665 (citing *In re Dow Corning Corp.*, 86 F.3d 482, 486 (6th Cir.

20    1996) (finding case to be complex where global settlement contemplated creation of a $4.25

21    billion fund to cover approximately 440,000 plaintiffs, "one of the world's largest mass tort

22    litigations").

23          Debtors contend that Debtors' cases are "complex cases" as that term is defined in

24    General Order 23-02. That definition is inapposite because General Order 23-02 concerns certain

25    pre-filing procedures and the ability to obtain certain hearing procedures in a chapter 11 case; it

26    does not concern complexity with respect to the *Dow Corning* factors. Debtors also note that

27    their cases are complex because of the number of professionals retained. However, Debtors'

28

reason for retaining Essex and STS, in addition to Province, is because Debtors have been unable to secure sufficient exit financing on terms acceptable to Debtors' current management.

Accordingly, this factor weighs in favor of terminating exclusivity.

### b) *Adequacy of Debtors' Time to Negotiate and Amount of Time Elapsed*

Debtors have had adequate time to negotiate a chapter 11 plan. Debtors filed their cases more than seven months prior to the hearings on March 21, 2025. During those seven months, Debtors filed (or represented that Debtors intended to pursue) successive chapter 11 plans, each of which provided for delayed payment in full of secured and unsecured allowed claims, without a clear path for paying such claims in full, and for Debtors' equity holders to retain their interests without providing new value or for market testing of Debtors' value.  The Court acknowledged such at the hearings on March 21, 2025. *Transcript of Hearings Held on March 21, 2025*, p. 205:8-11 ("I mean, we have to look at what's happened through the case, which is plans in which equity was trying to retain its position without putting any money in or market testing the company. That's what was happening for a long time."). Accordingly, these factors weigh in favor of terminating exclusivity.

### c) *Debtors' Progress Towards Reorganization and in Negotiations with Creditors*

This factor also weighed in favor of terminating exclusivity. As analyzed above, Debtors had not made good faith progress towards reorganization and in negotiations with their creditors. In the Plan, the Amended Plan, and the Anticipated Second Amended Plan, as described in the Redlined Amended Disclosure Statement, Debtors proposed to revest Debtors' equity in the current ownership upon confirmation without any contribution of new value, did not provide for market testing and estimated that if an equity sale was required to pay unsecured creditors in full, it would not take place until six to eight months after the effective date of the Anticipated Second Amended Plan.

### d) *Whether Debtors Are Paying Their Bills as They Become Due*

At the hearings on March 21, 2025, the Court found that Debtors are paying their bills as

they become due. However, in the Redlined Amended Disclosure Statement, Debtors

acknowledge that upon confirmation, their funds may be insufficient to pay in full the fees of

estate professionals, such that Debtors intended to request that estate professionals defer

payments owed to them. Accordingly, this factor is neutral.

> ### e)    *Reasonableness of Debtors' Prospects for Filing a Viable Plan*

As of March 21, 2025, Debtors have been unable to secure sufficient exit financing on

terms acceptable to Debtors' management. In the Redlined Amended Disclosure Statement,

Debtors acknowledged that they may be unable to pay in full the fees of estate professionals

upon confirmation, if refinancing or a sale of their business takes place after confirmation.

Nonetheless, it appears that Debtors could file a viable plan. Accordingly, this factor is neutral.

> ### f)    *Whether Debtors Seek Extension of Exclusivity to Pressure*
> ### *Creditors to Submit to Debtors' Plan*

At the hearings on March 21, 2025, the Court found that Debtors were using exclusivity

to pressure creditors to submit to Debtors' chapter 11 plan. Debtors sought to maintain a path in

which Mr. Irwin and minority equity holders retained their equity interests upon confirmation

without any contribution of new value. Accordingly, this factor weighs in favor of terminating

exclusivity.

> ### g)    *Existence of Unresolved Contingency*

A large contingency remains unresolved in these cases, namely, whether Debtors can

secure sufficient refinancing or receive sufficient funds from selling their business to pay

administrative expenses, secured debt and unsecured creditors in full, as Debtors have proposed.

Although Mr. Irwin testified that Debtors received a term sheet for a line of credit up to

$20 million, he acknowledged that the line of credit would yield only $12 million to $14 million

in available funds (which is an insufficient amount to pay the secured claim of East West Bank

and other debts) and that the amount of available funds was contingent on certain undisclosed

factors. Accordingly, this factor weighs in favor of terminating exclusivity.

1    Because none of the *Dow Corning* factors weighed against terminating exclusivity when

2    applied to Debtors' circumstances, cause exists to terminate Debtors' exclusive period to file a

3    chapter 11 plan.

4    ### 2.    *Whether Debtors' Exclusive Period to File a Chapter 11 Plan Expired*

5    ### *After March 5, 2025*

6    Even if cause did not exist to terminate exclusivity, Debtors must demonstrate that

7    exclusivity did not expire after March 5, 2025, the deadline set forth in the Second January 2025

8    Extension Order. Relation back for purposes of § 1121 occurs when "an amended plan is not

9    substantially different from the original plan." *See In re Save Our Springs Alliance, Inc.*, 388

10    B.R. 202, 224-25 (Bankr. W.D. Tex. 2008) (collecting cases); *In re Florida Coastal Airlines,*

11    *Inc.*, 361 B.R. 286 (Bankr. S.D. Fla. 2007) (finding that chapter 11 debtor's amended plan

12    related back because it was "fundamentally a cleaned-up version of its original plan").

13    Although Debtors filed the Redlined Amended Disclosure Statement describing the

14    Anticipated Second Amended Plan on February 7, 2025, Debtors never filed the Anticipated

15    Second Amended Plan. Instead, at the hearing on March 21, 2025, Debtors' counsel represented

16    that Debtors intended to seek approval of a different second amended disclosure statement and

17    solicit acceptances of a different second amended plan, neither of which were on file at that time

18    and which Debtors did not anticipate filing until March 31, 2025.[1] In other words, Debtors' basis

19    for seeking relation back is a plan they had not filed, with materially different terms than their

20    filed plans, which terms were first disclosed by Debtors' counsel at the hearing on whether to

21    terminate their exclusivity periods. This is not a sufficient basis on which relation back could

22    apply to prevent the expiration of exclusivity.

23    Even if it were a sufficient basis on which relation back could apply, this different plan,

24    as described by Debtors' counsel at the hearing on the Motion to Terminate Exclusivity, was

25    substantially different from: (1) the Amended Plan filed on December 23, 2024 and (2) the

26

27    ---
[1] On March 31, 2025, i.e., more than three weeks after the termination of Debtors' exclusive period to file a chapter 11 plan, Debtors filed a second amended chapter 11 plan of reorganization [doc. 473] and a related disclosure statement [doc. 474]. A hearing on the adequacy of this disclosure statement is set for May 28, 2025.
28

Anticipated Second Amended Plan, which Debtors described in the Redlined Amended

Disclosure Statement and never filed.  Accordingly, relation back is not available to prevent

exclusivity from expiring after March 5, 2025, in accordance with the deadline set forth in the

Second January 2025 Extension Order.

## IV.    CONCLUSION

For the reasons set forth above, the Court determines that cause exists to terminate

Debtors' exclusive period to file a chapter 11 plan. Alternatively, Debtors' exclusive period to

file a chapter 11 plan expired after March 5, 2025.

# # #

Date: April 15, 2025

Victoria S. Kaufman
United States Bankruptcy Judge