WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
Matthew A. Macdonald (SBN 255269)
matthew.macdonald@wsgr.com
Dale R. Bish (SBN 235390)
dbish@wsgr.com
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: (323) 210-2900
Facsimile: (323) 210-7329

Erin R. Fay (*pro hac vice*)
222 Delaware Avenue, Suite 800
Wilmington, Delaware 19801
Telephone: (302) 304-7600
efay@wsgr.com

*Counsel to East West Bank, as Agent*

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>IN Holdings, Inc., *et al.*,<br><br>　　　　Debtors and Debtors<br>　　　　in Possession. | Case No.: 1:24-bk-11323-VK<br><br>Chapter 11<br><br>(Jointly Administered with: Case No. 1:24-bk-11324-VK. Case No. 1:24-bk-11325, and Case No. 1:24-bk-11326-VK) |
| ☐ Affects IN Holdings, Inc.<br>☐ Affects IN Holdings Canada, Inc.<br>☐ Affects 5310 Holdings, LLC<br>☐ Affects DAI US HoldCo Inc.<br>☒ Affects All Debtors | **AGENT'S OBJECTION TO FOURTH AMENDED DISCLOSURE STATEMENT AND THE DEBTORS' AND COMMITTEE'S MOTION FOR APPROVAL THEREOF**<br><br>**Hearing**:<br>Date:　　October 1, 2025<br>Time:　　2:00 p.m. (PT)<br>Place:　　Courtroom 301<br>　　　　　21041 Burbank Blvd<br>　　　　　Woodland Hills, CA 91367 |

East West Bank, a California state banking corporation, in its capacity as administrative agent (the "Agent") on behalf of East West Bank and CFG Bank, as the lenders (the "Lenders" and together with the Agent, the "Secured Parties") under the prepetition senior secured credit agreement between, among others, the Debtors, the Lenders, and the Agent (the "Credit Agreement"), hereby submits this objection (this "Objection") to the *Debtors' and Committee's Motion for Entry of Order: (I) Approving Their Disclosure Statement; (II) Approving the Form of Ballots and Proposed Solicitation and Tabulation Procedures; (III) Fixing the Voting Deadline with Respect to the Debtors' and Committee's Joint Chapter 11 Plan; (IV) Fixing the Last Date for Filing Objections to the Joint Chapter 11 Plan; and (V) Scheduling a Hearing to Consider Confirmation of the Plan* [Docket No. 806] (the "Disclosure Statement Motion") and the related Disclosure Statement [Docket No. 804].[1]  In support of this Objection, the Agent respectfully represents as follows:

## PRELIMINARY STATEMENT

1.     The Debtors have already spent over a year in Chapter 11 pursuing a variety of unproductive and expensive strategies. For example, the Debtors and Irwin (i) hired four different parties to either raise equity or debt financing or sell the Debtors' assets - only to find that financing was unavailable and the two parties interested in their assets – FitLife and Robinson Pharma - were already at the table prepetition, (ii) engaged an expert to value their businesses, whose analysis the Court found lacking, and (iii) proposed three different Chapter 11 plans that contemplated only speculative creditor recoveries while providing generous personal benefits to Irwin.  Each plan was based on inflated valuations and unclear and unrealistic financial projections that required discovery and detailed analysis by the Secured Parties and their advisors. The Debtors' strategy has prolonged these Chapter 11 cases, driven up administrative expenses, and caused the Secured Parties to incur substantial professional fees and expenses protecting their interests.

---

[1] Capitalized terms used but not defined herein shall have the meanings given to such terms in the Disclosure Statement Motion.

2

2. Only after exclusivity had been terminated and the Debtors faced the prospect of competing plans did the Debtors agree to appoint an independent director and run a sale process. However, Irwin's control over the Debtors persisted and, along with it, the Debtors' litigious and unproductive approach. For example, in July, the Agent attempted to work with the Debtors to narrow or resolve issues pertaining to the sale and use of cash collateral, only to be met with delay, obfuscation, and continued unreasonable efforts to prejudice the Secured Parties' interests. During a time when the parties had agreed to pursue a global mediation, the Debtors strung the Agent along with regards to narrow comments to the Sale Order, never providing a substantive response, and instead asked the Court to strip the Agent's liens via meritless arguments raised for the first time in a reply, one week before the sale hearing.

3. As stated on the record of the sale hearing, the Debtors ultimately acknowledged that the Secured Parties' liens attached to the proceeds of the sale and agreed to make an adequate protection payment in an amount estimated as of July 30th. Since then, the Debtors have attempted to re-write the record in service of yet another meritless and unproductive position asserted in recent pleadings and now the Disclosure Statement - that the Secured Parties have been "paid in full" and are no longer secured. Among other things, the Debtors ignore the terms of the Sale Order, the Secured Parties' accruing claims for professional fees and expenses, accrued amounts not included in the July 30th estimate (which are known to the Debtors), the fact that the alleged "payoff" was subject to a reservation of rights to claw back amounts paid, and that the Secured Parties have long asserted contingent indemnification claims in connection with the Debtors' alleged claim objections and affirmative causes of action that the Disclosure Statement confirms the Debtors intend to pursue.

4. As the foregoing makes clear, Irwin intends for the Debtors to litigate with the Secured Parties well into the future. This will result in the Secured Parties accruing substantial additional claims for (among other things) their reasonable attorneys' fees and indemnification, which they are entitled to under the Credit Agreement.[2] Accordingly, at a minimum, the Secured

---

[2] Notably, even if the Debtors are correct that the Secured Parties have been "paid in full" and are required to release their liens - and they are not – these indemnification rights survive termination of the Credit Agreement. As such, the
(continued...)

3

Parties' claims must be fully reserved for in any plan and the Debtors' attempt to strip the Secured Parties of their liens and other bargained-for protections should not be countenanced.

5.  Like each that preceded it, the Plan is filed in bad faith and should not be confirmed. For one, notwithstanding that the Plan attempts to strip the Secured Parties' liens and deprive them of their rights under the Credit Agreement, it classifies the Secured Parties' claims as unimpaired and deemed to accept. At the same time, the Plan artificially impairs junior creditor classes, including general unsecured claims and a class comprised of three scheduled priority wage claims totaling less than $6,000, in an attempt to avoid the implications of section 1129(a)(10) of the Bankruptcy Code.

6.  Additionally, the Debtors' pivot to a "reorganization" appears intended to obtain benefits to which the liquidating Debtors are not entitled. While the Debtors point to certain NOLs as an alleged basis for this strategy, the Disclosure Statement contains no analysis regarding their actual value or utility. Similarly, the Disclosure Statement refers to potential new business ventures but lacks any detailed information that might permit stakeholders to understand if any real prospects exist. Thus, it is unclear if the Plan is intended to accomplish a legitimate Chapter 11 objective.

7.  The Agent acknowledges that, in accordance with the Court's prior ruling, the Debtors' good faith in proposing the Plan and ability to satisfy section 1129(a)(10) of the Bankruptcy Code (or not) are to be addressed in connection with confirmation, and it intends to do so. Nevertheless, as set forth more fully below, the Disclosure Statement should not be approved because it contains inadequate and materially misleading information. Among other issues, the Disclosure Statement: (a) contains incomplete, inaccurate and misleading information regarding the Secured Parties' claims, which, for the avoidance of doubt, are fully secured and continue to accrue; (b) contains inadequate information concerning the Debtors' pivot to a "reorganization," including a lack of detail regarding the value of any tax attributes and the prospects for a new business venture; (c) presents the Plan as risk-free when, for example, it may be unconfirmable

---

Secured Parties indemnification claims would either be secured or general unsecured claims under the Plan, which would still need to be paid in full, with interest, before equity could receive any recovery.

and there is risk the Reorganized Debtors could delay and dissipate stakeholder recoveries pursuing worthless litigation claims and/or fruitless business ventures; (d) does not adequately explain the purpose of the Plan Distribution Trust, which appears to have no authority or role other than facilitating payments that the Reorganized Debtors (*i.e.*, Irwin) determine should be paid to creditors; and (e) contains inadequate disclosures regarding the Reorganized Debtors post-Effective Date "operations," including with regard to the administration of the Plan and Irwin's role and compensation.

8.  Lastly, the Agent intends to conduct discovery concerning, among other issues, the Debtors' good faith (or lack thereof) in soliciting the Plan and the reasoning for Committee's support of the Plan. To the extent the Court approves the Disclosure Statement, the schedule for solicitation and confirmation should be sufficiently long as to accommodate such discovery.

## BACKGROUND

**A.    General Background**

9.  Debtors Irwin Naturals, Irwin Naturals Inc., and DAI US HoldCo Inc. are parties to the Credit Agreement, dated as of February 1, 2023, with the Lenders, and East West Bank, as Agent. Under the Credit Agreement, the Lenders provided a $40,000,000 senior secured credit facility to Debtors Irwin Naturals and Irwin Naturals Inc., consisting of a revolving loan and letter of credit facility in the aggregate principal amount of $20,000,000 and a delayed-draw term loan facility in the principal amount of $20,000,000.

10.  In connection with the Credit Agreement, the Debtors and certain non-Debtor affiliates entered into a guarantee and security agreement, dated as of February 1, 2023 (the "Guarantee and Security Agreement"), pursuant to which the Debtors and such non-Debtor affiliates granted the Agent, for the benefit of the Lenders, a security interest in substantially all of their assets as collateral to secure repayment of the Loan. The collateral includes, but is not limited to, all of the Debtors' intellectual property, accounts receivable, inventory, deposit accounts, and all money, cash, and cash equivalents. Additionally, in connection with the Credit Agreement, on February 1, 2023, Klee Irwin and Klee and Margareth Irwin Children's Trust dated

December 28, 2012 (the "Trust"), as equity holders of Debtor Irwin Naturals, entered into an equity pledge agreement (the "Equity Pledge Agreement") in favor of the Agent, for the benefit of the Lenders, granting to the Agent a security interest in, among other things, all of their Class B shares of stock in Debtor Irwin Naturals.

11. The Agent perfected its liens on the Collateral by filings with the Secretaries of State for California, Florida, Iowa, Nevada, Tennessee, and the District of Columbia, as well as registering the Guarantee and Security Agreement with British Colombia, the Debtors' cash being held in accounts with the Agent, and the filing of the Copyright Agreement and the Trademark Agreement with the United States Patent and Trademark Office.

12. Under that certain *Further Order Authorizing Debtors to Use Cash Collateral and Granting Replacement Liens* [Docket No. 545], the Debtors stipulated and acknowledged that the principal amount due under the Loan as of the Petition Date was $18,339,389.44, plus certain interest, fees, and other costs (including, without limitation, $459,028.00 in respect of letter of credit commitments under the Credit Agreement and related documents), and that the Agent, for the benefit of the Lenders, held valid and perfected liens in and to the Collateral.

13. The "Obligations" owed under the Credit Agreement and guaranteed under the Guarantee and Security Agreement include the following:

> the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing on or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrowers, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding and whether or not at a default rate) the Loans, the obligation to reimburse drawings under Letters of Credit (including the contingent obligation to reimburse any drawings under outstanding Letters of Credit), and all other obligations and liabilities of the Loan Parties to the Agent and the Lenders, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, the Loans, any other Loan Document, any Letter of Credit and any other document made, delivered or given in connection herewith or therewith, including any and all obligations under Lender Hedging Agreements and any and all Cash Management Obligations, whether on account

> of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all reasonable fees and disbursements of counsel, and the allocated reasonable cost of internal counsel, to the Agent and the Lenders that are required to be paid by any Loan Party pursuant to the terms of this Agreement, the other Loan Documents and any Lender Hedging Agreement); provided that "Obligations" shall not include Excluded Swap Obligations.

Credit Agreement, p. 22.

14. The Credit Agreement provides for, among other things, the payment of "reasonable legal fees and disbursements of outside counsel to the Agent and the Lenders" incurred in connection with, among other things, the enforcement of preservation of rights under the Loan Documents (as defined in the Credit Agreement) and in any insolvency or bankruptcy proceedings. Credit Agreement, § 9.5(a). The Credit Agreement further provides broad indemnity by the Debtors in favor of the Agent and Lenders for a variety of "losses, claims, damages, liabilities, and related expenses (including the reasonable fees, charges and disbursements of any counsel for [the Secured Parties,])" including without limitation for actual or prospective claims and litigation related to the Loan Documents. Credit Agreement, § 9.5(b). Further, the Credit Agreement provides that agreement to pay such fees and indemnification obligations "shall survive . . . the repayment, satisfaction or discharge of all of the other Obligations." Credit Agreement, 9.5(c).

**B.    The Debtors' Defaults Under the Credit Agreement and the Filing of These Chapter 11 Cases**

15. As Irwin has acknowledged, the Debtors' businesses were severely impacted by the unsuccessful ketamine clinic business line and failed strategy to uplist into the public markets, which business decisions caused the Debtors to incur "tens of millions of dollars of losses and/or liabilities." *See Declaration of Klee Irwin in Support of the Debtors' First Day Emergency Motions* [Docket No. 22], ¶¶9-12. Further, the Debtors experienced a downturn in sales in or around March of 2023, which Irwin attributed to abnormally high return rates from retailers, a general downturn in the retail market, and slow growth in digital sales. *Id*.

16. The Agent first sent default notices under the Credit Agreement in March 2023 and continued to notice further defaults for the next year. As detailed in the default letters,

the defaults were manifold, perhaps most critically including the failure to (i) meet minimum borrowing base availability requirements, (ii) make required prepayments, and (iii) failure to comply with key financial covenants.³ The Debtors have attempted to characterize these defaults as "technical" and claim to have "never been late on any debt service payments to EWB." Disclosure Statement, p. 25. But these statements obfuscate the facts. For example, the Term Loan was to support the Debtors' ketamine clinic expansion, which was a complete failure, and its operation provided no collateral support and instead only represented liabilities.

17.     Further, the Debtors' failure to meet borrowing base availability requirements placed the loan in over-advance status, which, in addition to being a default, exposed the Secured Parties to significant risk in the same manner as a failure to pay amounts when due (i.e., when a loan is in "over-advance" there is insufficient collateral support for the loaned funds and the borrower is to paydown the debt to reduce the imbalance).

18.     After unproductive discussions with the Debtors, on May 13, 2024, to protect its collateral against mismanagement and create the opportunity for independent decision making, the Agent exercised certain of its rights under the Guaranty and Security Agreement and the Equity Pledge Agreement to appoint an independent director to the boards of Debtors DAI US HoldCo Inc. and Irwin Naturals. Almost three months later, on August 8, 2024, such independent director abruptly resigned, whereafter Mr. Irwin reinstated himself as the sole conflicted decisionmaker at such entities.

19.     One day later, on August 9, 2024, the Debtors filed these Chapter 11 cases. Involuntary petitions were filed against certain of the Debtors on the same day, which appear to have been orchestrated by Irwin. *See* Docket No. 349, at p. 9-10.

**C.    The Proofs of Claim**

20.     On December 19, 2024, the Agent, on behalf of itself and the Lenders, filed a proof of claim against each of the Debtors (collectively, the "Proofs of Claim"). As set forth

---

³ Other noted defaults included the failure to obtain insurance endorsements, failure to timely deliver financial statements and compliance certificates, failure to make third-party debt payments, failure to timely deliver lien terminations, breach of other third-party obligations, and incurrence of debt over permitted amounts. The filing of the chapter 11 cases and Irwin's orchestration of the involuntary bankruptcy petition filings were also defaults.

therein, as of the Petition Date, there was not less than $19,381,507.84 owing in respect of the Obligations, plus other accruing interest, charges, fees and other costs, including reasonable attorneys' fees and expenses of the Secured Parties' advisors, plus certain contingent amounts for additional obligations that continue to accrue.

21. Notwithstanding the Proofs of Claim, the Debtors have previously asserted that the Secured Parties "have not filed any claim asserting default interest or professional fees or other costs." *See* Sale Motion, p. 8. Among other things, the Debtors ignore substantial portions of the Addendum to the Proofs of Claim, including paragraph 4 (noting the Debtors' numerous defaults and reserving all rights under the Credit Agreement in connection therewith), paragraph 5 (indicating the stated claim amount of "at least" $19,381,507.84 as of the Petition Date and specifying that the claims continue to accrue), and paragraph 7 (discussing the Debtors' obligations to the Agent and Lenders for indemnification, attorneys' and advisor fees, and other amounts continuing to accrue). Further, the Agent expressly reserved the right to amend or supplement the Proofs of Claim at any time and in any respect and intends to file amended Proofs of Claim prior to the hearing on approval of the Disclosure Statement, consistent with the accounting previously provided to the Debtors with recent updates.

**D.    The Debtors' Prior Plans Proposed Generous Benefits to Insiders at the Expense of Creditors**

22. As detailed in prior pleadings filed by the Agent and others in these Chapter 11 cases, over six months into these Chapter 11 cases, the Debtors had no independent governance, had proposed three iterations of a Chapter 11 plan that impaired secured and unsecured creditors while permitting existing shareholders to retain their interests in full and receive additional benefits without any contribution of new value and with no competitive marketing process. The Debtors' unproductive strategy led to multiple litigated contested matters, increasing administrative costs and requiring the Secured Parties to incur significant legal expenses to protect their interests. For example, the Debtors' serial proposal of unconfirmable Chapter 11 plans has required the Secured Parties to review and analyze such plans and the related disclosure statements, engage in discovery, and prepare multiple objections to protect their interests.

**E.    The Sale**

23.    On June 6, 2025, after FitLife and Robinson Pharma expressed a preference to proceed by sale rather than plan, the Debtors filed a second bidding procedures motion, which was approved by the Court on June 18, 2025, and which designated FitLife as stalking horse bidder. Thus, nearly a year after the Chapter 11 cases were filed, the Debtors were in the exact position as they were prior to the Petition Date – pursuing an exit process with oversight of an independent director. Perhaps more importantly, the Debtors were in the position they could have been in November 2024 had they not rebuffed FitLife's initial outreach in favor of their litigious and unproductive Chapter 11 strategy.

24.    Notwithstanding that the Debtors were proposing to embark on a sale process, on June 9, 2025, the Debtors filed a third amended plan and related disclosure statement [Docket No. 618] (the "Third Amended Disclosure Statement"). On June 27, 2025, the Court issued a tentative ruling denying approval of the Third Amended Disclosure Statement, which the Court later affirmed on the record as its ruling.

25.    On June 30, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing and Approving (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances (Other Than Those Expressly Assumed by Buyer) Pursuant to 11 U.S.C. §§ 363(b) and (f); (B) Assumption and Assignment of Executory Contracts and Unexpired Leases and Determining Cure Amounts; (C) Waiving the 14-Day Stay Periods of Bankruptcy Rules 6004(h) and 6006(d); (D) Determining That Buyer is Entitled to Protection Pursuant to 11 U.S.C. § 363(m); and (E) Granting Related Relief* [Docket No. 666] (the "Sale Motion"). Consistent with their pattern in these Chapter 11 cases, the Debtors sought to leverage approval of the sale to prejudice the Secured Parties' rights.

26.    On July 10, 2025, the Agent provided limited comments to the proposed sale order intending to confirm that the Secured Parties' liens attached to the proceeds of the sale of their collateral and to preserve disputes over the Secured Parties' claims for mediation.

27. On July 15, 2025, having received no response, the Agent was compelled to object to the Sale Motion. Indeed, despite repeated representations from Debtors' counsel that a response was forthcoming, the Debtors provided no meaningful response prior to filing a reply on July 23, 2025 [Docket No. 720] (the "Sale Reply").

28. In the Sale Reply, the Debtors argued – for the first time, just a week prior to the hearing – that the Secured Parties should be compelled to provide a "payoff" amount (when the Debtors knew the Secured Parties have accruing claims for professional fees and expenses and have asserted indemnification claims on account of the Debtors' repeated threats of litigation and attempts to prejudice the Secured Parties' interests). Further, the Debtors argued, again for the first time, that the Secured Parties' liens should be permanently stripped from their collateral and limited to a $5 million cash reserve. In support of such relief, the Debtors cited section 552 of the Bankruptcy Code, which was not mentioned in the Sale Motion, and which is entirely inapplicable.

29. As stated on the record at the Sale Hearing, to resolve the Agent's adequate protection objection, the Debtors "agreed that they will pay the ***current claim amount*** and have the secured parties' interest attached to the sale proceeds with the same validity, force, effect and in the same order of priority as existed in the purchase assets prior to …". *See* Docket No. 745, transcript of July 30, 2025 hearing, at 48:16-21.

30. On July 31, 2025, the Court entered an order [Docket No.740] (the "Sale Order") approving the sale. The parties' agreement is reflected in the Sale Order, which (among other things) provides that the Debtors will pay the Secured Parties the undisputed principal amount and estimated interest, professional fees, and other costs ***as of July 30th***. The Sale Order contains no reference to a "payoff" and provides that the Secured Parties' liens attach to the proceeds of the sale. In accordance with the Sale Order, the Debtors paid the Agent, for the benefit of the lenders, $23,247,134.75 at closing, reserving the right to later object and seek to claw-back amounts paid.

**F.    The Debtors Attempt to Re-Write the Record**

31.    Following the Sale Hearing, the Agent attempted to work with the Debtors on a form of sale order reflecting the parties' agreement as stated on the record at the Sale Hearing. The parties were unable to reach agreement and, as the Court knows, submitted competing orders. *See* Docket Nos. 733, 734 & 739.

32.    In the Agent's notice of its proposed order, the Agent described the parties' agreement as follows, which is consistent with its description on the record at the hearing and the Sale Order's provision of payment of amounts estimated "as of July 30th": "(a) the Debtors agreed that the Lenders' liens, claims, and encumbrances will attach to all proceeds of the Sale with the same priority, validity, force, and effect as they now have in or against the Purchased Assets; (b) ***the Debtors agreed to pay the Agent, on behalf of the Lenders, the estimated outstanding amount due under the Loan Documents as of July 30, 2025, subject to a reservation of rights***, and (c) all of the parties' respective rights would otherwise be fully reserved." *See* Docket No. 735. Consistent with the parties' agreement and the Secured Parties' rights under the Loan Documents, the Agent did not refer to "payoff" or "payment in full," as the Secured Parties' claims continue to accrue.

33.    The Debtors mischaracterized the Agent's statement in their response to the notice, stating: "***As represented by the Bank in paragraph 1 of their Sale Order Redline pleading, at the sale hearing on July 30, 2025, the Debtors agreed to pay the Bank in full as of the sale closing*** and the Debtors agreed that the Bank's liens, claims and encumbrances will attach to the sale proceeds with the same priority, validity, force and effect as the Bank now has against the purchased assets." *See* Docket No. 738.

34.    As has become apparent, this mischaracterization was not an oversight. Rather, the Debtors were, and have since been, attempting to re-write the record in support of their baseless claim that the Secured Parties no longer have an interest in Cash Collateral. The purpose of this mischaracterization is evident from the Sale Reply, in which the Debtors argued that upon alleged "payment in full" the Secured Parties must release their liens on the Debtors' assets under

12

a flawed reading of the Guarantee and Security Agreement. The Agent did not have the opportunity to address this contention – which fails legally and factually - with the Court because the Debtors raised it for the first time in the Sale Reply and the parties reached a consensual resolution prior to the Agent presenting argument at the Sale Hearing.  Nonetheless, as is clear from the Sale Order and hearing transcript, the Agent never agreed that the Sale Order payment constituted "payment in full" and it is not "payment in full."

35. Similarly, following entry of the Sale Order, the Debtors demanded a "payoff amount" from the Agent as of sale closing. Consistent with the Sale Order and the parties' agreement as stated on the record at the hearing, the Agent advised the Debtors they did not agree to a "payoff," and the Sale Order did not contemplate a "payoff," so the Debtors should pay the amount specified in the Sale Order.

36. The Debtors continued their mischaracterization of the parties' agreement in their application to retain Brown White & Osborn, defining the Sale Order payment as "the Payoff" and suggesting that the Secured Parties' claims have been "paid in full." *See, e.g.*, Docket No. 759, p. 3. This continued in the Debtors' most recent cash collateral motion [Docket No. 773] (the "Third Cash Collateral Motion"), where the Debtors state that they "believe that they have paid the Lenders in full and therefore do not need a Court order or the Lenders' consent to use their cash …." *See* Third Cash Collateral Motion, pp. 2, 7, 12.  In fact, notwithstanding the terms of the Sale Order, the Debtors have been acting as though the sale proceeds are not the Secured Parties' cash collateral.  For example, the Debtors refused to deposit the sale proceeds with East West Bank at closing and, without the Agent's consent, either have moved or intend to move them from Debtors' counsel's client trust account to a new bank.[4]

37. On September 10, 2025, the Debtors filed the Plan [Docket No. 802] and Disclosure Statement. Consistent with the foregoing mischaracterizations of the Sale Order payment, the Debtors allege therein that the Secured Parties' claims have been "paid in full," are no longer secured, and that the Secured Parties are not "otherwise entitled to charge fees and costs

---

[4] The Agent reserves all rights in connection with the foregoing and the Third Cash Collateral Motion.

13

to the estates after August 11, 2025." Disclosure Statement, p. 4. This position has no basis in fact or law. As set forth above, the Secured Parties' liens attached to the sale proceeds in accordance with the Sale Order, and, under the Credit Agreement, they are entitled to (among other things) their reasonable attorneys' fees and expenses in connection with these Chapter 11 cases, as well as indemnification in connection with any claim objections or litigation, which the Disclosure Statement makes clear the Debtors intend to pursue. Further, those rights survive payment in full of all other obligations under the Credit Agreement (which has not occurred) and the termination of the Credit Agreement (which has also not occurred).

## **OBJECTION**

### A.  The Disclosure Statement Fails to Provide Adequate Information as Required Under Section 1125 of the Bankruptcy Code

38.  The Disclosure Statement does not provide "adequate information" as required under Section 1125 of the Bankruptcy Code and should not be approved. Disclosure is the "pivotal" concept in a chapter 11 reorganization. *Westland Oil Dev. Corp. v. MCorp Mgmt.*, 157 B.R. 100, 102 (Bankr. S.D. Tex. 1993); citing 5 Collier on Bankruptcy, ¶ 1125.03 (15th ed. 1992); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'").

39.  Section 1125 of the Bankruptcy Code conditions a debtor's solicitation of votes on a proposed chapter 11 plan on a judicial determination that the disclosure statement contains "adequate information," which is defined in the Bankruptcy Code as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1). *See also, In re Cal. Fid., Inc.*, 198 B.R. 567, 571 (B.A.P. 9th Cir. 1996) ("The purpose of a disclosure statement is to give all creditors a source of information which allows them to make an informed choice regarding the approval or rejection of a plan."); *In re Lower*

14

*Bucks Hosp.*, 571 F. App'x 139, 142 (3d Cir. 2014) ("Section 1125 of the Bankruptcy Code requires that a court approve a disclosure statement as containing 'adequate information,' which is 'information of a kind, and in sufficient detail, ... that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.'") (quoting 11 U.S.C. § 1125(a)(1)); *In re Commonwealth Grp.-Mocksville Partners, LP*, No. 12-34319, 2013 WL 1728056, at *3 (Bankr. E.D. Tenn. Apr. 22, 2013) ("In short, a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.") (quoting *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991)).

40. The Disclosure Statement does not contain full and accurate disclosures regarding issues that would be material to any party voting to accept or reject the Plan. The Disclosure Statement contains at least the following inadequate and / or misleading disclosures:

a. The Disclosure Statement contains misleading information concerning the Secured Parties' claims against the Debtors' estates. As set forth above, there is no basis for the Debtors' position that the Secured Parties have been "paid in full" under the Sale Order or otherwise, or that they can be "paid in full" while the Debtors continue to reserve the right to assert claim objections, seek to claw back amounts paid, threaten to bring (meritless) post-Effective Date claims, and otherwise seek to prejudice the Secured Parties' rights through the Plan and other pleadings filed in these Chapter 11 cases. The Disclosure Statement should be amended to make clear that the Secured Parties remain secured creditors with significant rights and accruing claims under the Credit Agreement and related documents. Relatedly, the Disclosure Statement should be revised to explain how the Debtors will account for the Secured Parties' accruing claims for professional fees and expenses and asserted contingent indemnification claims, which, as noted above, survive full payment of all other Obligations under the Credit Agreement (which has not occurred) and termination of the Credit Agreement (which has also not occurred). Accordingly, the Disclosure Statement should explain that, even if the Debtors are correct that the Secured Parties no longer hold secured claims, they would hold unsecured claims that would be entitled to full payment, with interest, before any distributions could be made to equity. The Disclosure Statement must also explain the potential impact of the Secured Parties' accruing claims on the Debtors' recovery estimates and assumptions.

b. The Disclosure Statement contains inadequate information concerning the Debtors' pivot to a "reorganization," including a lack of detail regarding the value of any tax attributes and the prospects for a new business venture. The Debtors should be required to provide additional information so that the Court and parties entitled to vote on the Plan can determine whether the Plan is intended to serve a legitimate bankruptcy purpose. Similarly, creditors and interest holders would require this information to determine whether the Plan is (or is not) preferable to conversion.

    c. The Disclosure Statement presents the Plan as risk-free when it is not. For example, it may be unconfirmable and there is risk the Reorganized Debtors could delay and dissipate stakeholder recoveries pursuing worthless litigation claims and/or fruitless business ventures. The Debtors should be required to inform parties entitled to vote on the Plan of such risks, consistent with the Court's ruling denying approval of the Third Amended Disclosure Statement.

    d. The Disclosure Statement does not adequately explain the purpose of the Plan Distribution Trust, which appears to have no authority or role other than facilitating payments that the Reorganized Debtors (*i.e.*, Irwin) determine should be paid to creditors. Similarly, the Debtors should be required to provide further detail regarding the implications of the Plan Distribution Trust potentially being underfunded if, for example, the Debtors' estimate of general unsecured claims is too low or if the costs associated with such trust are higher than anticipated (or both).

    e. The Disclosure Statement contains an inadequate description of the amount and proposed use of funds to be retained by the Reorganized Debtors, which appear subject to no oversight notwithstanding their role in administering the Plan and the possibility that the Plan Distribution Trust funding could prove insufficient to fund recoveries. Relatedly, the Disclosure Statement should be updated to provide further explanation of Irwin's proposed role with the Reorganized Debtors and what salary and other benefits he will receive as a part of such position.

41. Without (at least) the revisions and clarifications specified above, parties may be misinformed about their likely recoveries under the Plan and the alternative options available. Unless the Debtors clearly explain the risks to execution of the Plan and provide more complete and accurate disclosures regarding the facts and circumstances of these Chapter 11 cases, the Disclosure Statement should not be approved as containing adequate information.

**B.    Additional Objections**

42. In addition to the issues raised above, the Agent has the following concerns with the Proposed Disclosure Statement Order:

    a. As set forth above, the Debtors' claim that the Secured Parties have been "paid in full" and no longer have any rights under the Credit Agreement is legally and factually inaccurate. The Secured Parties continue to hold secured claims against the Debtors' estates, which claims continue to accrue and will for the foreseeable future in light of the Debtors' chosen Chapter 11 strategy. The Secured Parties are impaired and entitled to vote under the Plan and must therefore be provided a ballot.

    b. Also as noted above, the Agent intends to take discovery in connection with the Disclosure Statement and Plan, including in connection with the Debtors' good faith (of lack thereof) and the reasoning for the Committee's support of the Plan. The Debtors have requested only that the Court schedule a confirmation hearing as soon as possible but have not otherwise specified a preferred timeline. The Agent respectfully

submits that any approved timeline for solicitation of the Plan should be sufficiently long as to permit fulsome discovery.

## RESERVATION OF RIGHTS

43. The Agent expressly reserves its rights to supplement this Objection and to make such other and further objections as it may deem necessary or appropriate. Further, the Agent reserves all rights and objections related to confirmation of the Plan (or any other plans proposed in these Chapter 11 cases) and with respect to discovery.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Agent respectfully requests that the Court (i) deny approval of the Disclosure Statement unless and until it provides adequate information, as described above, and (ii) grant such other and further relief as the Court deems just and proper.

Dated: September 17, 2025

**WILSON SONSINI GOODRICH & ROSATI, P.C.**

*/s/ Erin R. Fay*
Erin R. Fay
Matthew A. Macdonald
Dale R. Bish

*Counsel to East West Bank, as Agent*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: **222 Delaware Avenue, Suite 800, Wilmington, DE 19801**.

A true and correct copy of the foregoing document entitled (*specify*): **AGENT'S OBJECTION TO FOURTH AMENDED DISCLOSURE STATEMENT AND THE DEBTORS' AND COMMITTEE'S MOTION FOR APPROVAL THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **September 17, 2025**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.
**\*\*JUDGE'S COPY NOT REQUIRED IF LESS THAN 25 PAGES (GENERAL ORDER 23-01)**

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 17, 2025 | Erin R. Fay | *Erin R. Fay* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*  **F 9013-3.1.PROOF.SERVICE**

**SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

Courtesy NEF/on behalf of Other Professional Klee Irwin
Kyra E. Andrassy
kandrassy@raineslaw.com, bclark@raineslaw.com, csantiago@raineslaw.com

Attorney for Debtor
Jessica L Bagdanov
jbagdanov@bg.law, ecf@bg.law

Attorney for Official Committee of Unsecured Creditors
Ryan W Beall
rbeall@go2.law; kadele@go2.law; dfitzgerald@go2.law; rbeall@ecf.courtdrive.com; cmeeker@go2.law

Attorney for Robinson Pharma, Inc.
Anthony Bisconti
tbisconti@bklwlaw.com, 1193516420@filings.docketbird.com; docket@bklwlaw.com

Attorney for Interested Party Karled Enterprises, a California general partnership
Matthew Bouslog
mbouslog@allenmatkins.com; ncampos@allenmatkins.com

United States Trustee
Katherine Bunker
kate.bunker@usdoj.gov

Courtesy NEF
Robert Allen Curtis
rcurtis@foleybezek.com

Attorney for East West Bank
Erin R. Fay
efay@wsgr.com; lmcgee@wsgr.com

Creditor Fair Harbor Capital, Inc.
Fred Glass
fglass@fairharborcapital.com

Attorney for Official Committee of Unsecured Creditors
Jeffrey I Golden
jgolden@go2.law; kadele@ecf.courtdrive.com; cbmeeker@gmail.com; lbracken@wgllp.com; dfitzgerald@go2.law; golden.jeffreyi.b117954@notify.bestcase.com

Attorney for Karled Enterprises I
Alphamorlai Lamine Kebeh
MKebeh@allenmatkins.com; mdiaz@allentmatkins.com

Interested Party
Alexandria Lattner
alattner@sheppardmullin.com; ehwalters@sheppardmullin.com

Attorney for East West Bank
Matthew A Macdonald
matthew.macdonald@wsgr.com

Attorney for Creditor Herman and Jasminn Reese
Sina Maghsoudi
sinalegal@gmail.com; g8645@notify.cincompass.com; maghsoudi.sinab128731@notify.bestcase.com

Interested Party
David W. Meadows
david@davidwmeadowslaw.com

Interested Party
Douglas A Plazak
dplazak@rhlaw.com

Attorney for Debtor
David M Poitras
dpoitras@bg.law

Interested Party TR Capital Management LLC
Terrel Ross
tross@trcmllc.com

Attorney for Debtor
Susan K Seflin
sseflin@bg.law

Interested Party
Jonathan Seligmann Shenson
jshenson@greenbergglusker.com; calendar@greenbergglusker.com; cmillerwatkins@greenbergglusker.com; milanaECF@ggfirm.com

Interested Party
Yuriko M Shikai
yshikai@neufeldmarks.com

Interested Party
Ashley M Teesdale
ateesdale@bg.law; ecf@bg.law

United States Trustee
ustpregion16.wh.ecf@usdoj.gov

Attorney for FitLife Brands, Inc.
Ronghua Sophia Wang
Sophia.wang@afslaw.com; yvonne.li@afslaw.com

Interested Party
Pamela Kohlman Webster
pwebster@buchalter.com; smartin@buchalter.com

Attorney for Debtor
Jessica Wellington
jwellington@bg.law; ecf@bg.law