FILED

FEB 2 3 2026

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY:_____ Deputy Clerk

1  Reorganized Debtors and/or Klee Irwin,
   Chairman/CEO of Reorganized Debtors,
2      Creditor and 99.5% Equity Security Holder
   1968 S. Coast Hwy #5310
3  Laguna Beach, CA 92651
   Telephone: (310) 433-3009
4  Email: Klee@quantumgravityresearch.org
5  Appearing Pro Se

6              UNITED STATES BANKRUPTCY COURT

7              CENTRAL DISTRICT OF CALIFORNIA

8              SAN FERNANDO VALLEY DIVISION

9
   In re                              Case No.  1:24-bk-11323-VK
10
   IN Holdings, Inc, *et al.*,        Chapter 11
11
              Reorganized Debtors.    Jointly Administered With:
12
                                      Case No. 1:24-bk-11324-VK
13                                    Case No. 1:24-bk-11325-VK
                                      Case No. 1:24-bk-11326-VK
14
15                                    **MEMORANDUM IN SUPPORT OF
                                      OBJECTION TO FINAL FEE
16                                    APPLICATION OF BG LAW LLP [DOC.
                                      945]**
17
18
                                      Date:      February 25, 2026
19                                    Time:      10:30 a.m.
                                      Crtrm:     Courtroom 301
20                                    Location:  United States Bankruptcy Court
21                                               21041 Burbank Blvd.
22                                               Woodland Hills, CA 91367
23
24
   **TO THE HONORABLE VICTORIA S. KAUFMAN, U.S. BANKRUPTCY JUDGE:**
25
26
27
28

                                i

1

## TABLE OF CONTENTS

2    I. SUMMARY OF OBJECTION ...................................................................................1

3        A. The Two Pillars of This Objection ..................................................................2

4    II. THE SYSTEMATIC DESTRUCTION OF A $200 MILLION ENTERPRISE ............. 3

5        Layer 1: Fee Oversight Was Engineered Away ...............................................8

6        Layer 2: The Solvent Debtor Paradox .............................................................9

7        Layer 3: The Adversarial Fee Machine ..........................................................10

8        The Perfect Storm: Every Safeguard Failed Simultaneously .....................……..10

9    III. THE SOLVENT DEBTOR: THIRTY YEARS OF PROFITABILITY AND A

10   COMPANY THAT COULD NOT BE BROKEN.................................................... 11

11   IV. THE PROPORTIONALITY FRAMEWORK: $17.1 MILLION IN FEES ON $22

12   MILLION IN DEBT ........................................................................................ 13

13   V. TEN STUDIES CONFIRM FEES EXCEED EVERY BENCHMARK BY 7x TO 36x...

14   ............................................................................................................ ………14

15   VI. § 330 REQUIRES AGGREGATE PROPORTIONALITY REVIEW IN A SOLVENT

16   CASE ...................................................................................................... 17

17       A. Section 330 Requires Reasonableness Measured Against Results, Not Activity.............. 17

18       B. Empirical Data Confirms the Anomaly .......................................................... 20

19       C. Solvent Debtor Context Heightens Scrutiny ................................................. 20

20       D. Bankruptcy Courts May Apply a Global Proportionality Reduction ................................21

21       E. The "Economy of the Estate" Defense Is a Red Herring .................................................22

22       F. Failure to Impose a Global Cap Would Set a Dangerous Precedent ...................................23

23       G. Requested Relief: A Reasoned Global Reduction .............................................................23

24   VII. BG LAW–SPECIFIC OBJECTIONS ...............................................................24

25   VIII. INTER-FIRM DUPLICATION AND REDUNDANCY ..........................................29

26   IX. REQUESTED REMEDY .............................................................................. 29

27       A. Primary Relief: Aggregate Cap at 300% of Benchmark ...................................... 29

28       The Residual Equity Calculation.............................................................30

1    BG Law-Specific Allocation and $1.5 Million Ceiling ..........................................30

2    Alternative Relief: Individual Reductions ............................................................31

3    Reservation of Excess Fees Pending Appeal ......................................................31

4    Disgorgement ......................................................................................................31

5    **X. PRELIMINARY STATEMENT AND STANDING** ....................................... 31

6    **XI. DENIAL OF THE REORGANIZED DEBTORS' RIGHT TO BE HEARD** ...............33

7    **XII. RESERVATION OF RIGHTS**.......................................................................34

8    **XII. CONCLUSION**..............................................................................................35

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I. SUMMARY OF OBJECTION

Professionals in this case have billed approximately $17.1 million to reorganize approximately $22 million in debt -- in a solvent case where every creditor was paid in full with premium interest. For every dollar of debt reorganized, professionals have claimed approximately eighty cents. This Court itself found these cases to be "neither large nor complex" (Doc. 516 at 16). Ten published empirical studies spanning five decades of bankruptcy research establish that professional fees in this case exceed every published benchmark by a factor of seven to thirty-six. (See **Exhibit A** [Lodestar Audit of BG Law LLP], which includes the Empirical Benchmark Comparison Table.)

BG Law LLP seeks $3,156,673.72 -- more than the entire amount that all professionals combined should have billed under the national benchmark. BG Law alone seeks 14% of the total debt being reorganized. The FTI/ABI national benchmark for ALL professionals in a Chapter 11 case is 3.7% of liabilities. BG Law's fee request, standing alone, exceeds the benchmark for every professional in the case by a factor of nearly four.

This is not a line-item case. It is an aggregate disproportionality case. The Reorganized Debtors do not contend that each .2-hour entry is indefensible in isolation. They contend that the aggregate professional fee pool is so far outside any empirical norm -- exceeding every published benchmark by a factor of seven to thirty-six -- that no amount of atomistic nibbling can cure the



1    systemic defect. The pool itself is the problem, and it requires correction at the aggregate level.

2    **The Two Pillars of This Objection**

3    This objection invokes two fundamental principles from the case law governing professional

4    compensation under section 330. Every argument in this Memorandum and in the four firm-

5    specific memoranda filed concurrently herewith rests on one or both of these pillars.

6    **Pillar One: Proportionality.** Professionals retained in bankruptcy have an affirmative duty

7    to scale their fees to the reasonably expected recovery of the estate -- not the potential optimum

8    recovery, not the theoretical maximum engagement, but the realistic economic stakes. In re

9    Kitchen Factors, Inc., 143 B.R. 560, 562 (9th Cir. BAP 1992). When professionals fail to exercise

10   that restraint, the Court has both the authority and the duty to impose it retroactively -- including

11   by abandoning the lodestar entirely and applying a blunt proportionality cap. Id. at 562-63. This

12   principle exists because financially self-interested professionals, billing by the hour with no

13   external constraint, will generate fee churn grossly out of proportion to the benefit delivered. That

14   is precisely what happened here: $17.1 million to reorganize $22 million in debt, in a case this

15   Court found "neither large nor complex." The aggregate fee pool itself -- not any individual time

16   entry -- is the problem, and it requires correction at the aggregate level.

17   **Pillar Two: Value.** Section 330(a)(4)(A) mandates that the Court "shall not allow

18   compensation" for services that were not "reasonably likely to benefit the debtor's estate." Lamie

19   v. U.S. Trustee, 540 U.S. 526, 534 (2004). This is not a discretionary weighing of factors. It is a

20   mandatory prohibition. Where a professional cannot demonstrate that its services produced an

21   identifiable, tangible, and material benefit to the estate, In re Smith, 317 F.3d 918, 926 (9th Cir.

22   2002), the inquiry ends and the fee must be denied regardless of the hours logged.

23   These two pillars produce different results depending on the professional. Province, LLC

24   illustrates the proportionality pillar: the financially sophisticated, solvent Reorganized Debtors

25   desired and asked for no financial advice from Province. What the estate actually received was

26   the reporting and Excel spreadsheet work of a single employee, Tanner James, who worked

27   approximately 25 hours per week over 16 months. The open-market value of that work -- based

28   on the CEO's 30-plus years of experience hiring dozens of financial professionals in the Los

## TWO PILLARS OF THE FEE OBJECTION





**PILLAR 1: PROPORTIONALITY**

Fees must scale to the estate

Kitchen Factors, 143 B.R. 560:
"Scale fees to reasonably
expected recovery"

**Example: PROVINCE: Billed
2.19M for 138,889 of work
(11.7x markup)**

The estate did not ask for it.
It got spreadsheets.

**PILLAR 2: VALUE**

No benefit = no compensation

Smith, 317 F.3d 918:
"Identifiable, tangible benefit"
"Shall not" means shall not

**Example: GG and Force Ten $1.34M in fees,
$0 incremental recovery for creditors**

Fee churn only created temporal drag
delaying creditor payment.

17.1 MILLION to reorganize 22 MILLION in debt —
80 cents per dollar — in a case the Court found
"neither large nor complex"

In re IN Holdings, Inc. et al., Case No. 1:24-bk-11323-VK

Angeles market -- is less than 10% of what Province billed. Province seeks $2,189,985 for work worth $138,889 to $187,000. That is the proportionality problem in its purest form. Golden Goodrich LLP and Force Ten Partners LLC illustrate the value pillar: no financial or business argument can be made to demonstrate that the Committee's professionals' fee churn was reasonably likely to produce a single dollar of financial benefit to the general unsecured creditors whose recovery was guaranteed at 100% with 14% premium interest. Indeed, the Committee professionals' combined $1.34 million in fees served only to create temporal drag -- delaying creditor payment while generating invoices that consumed 89% of the very claims they were appointed to protect.

## II. THE SYSTEMATIC DESTRUCTION OF A $200 MILLION ENTERPRISE

The professional fee disproportionality documented in this Memorandum is not an accident. It is the direct, traceable consequence of East West Bank's adversarial campaign inside the bankruptcy -- a campaign that was itself retaliation for the Irwin family's refusal to surrender their

1    constitutional right to due process of law.

2        After a trivial technical default -- overwhelmingly administrative in nature (late insurance

3    endorsements, late financial statements, late compliance certificates; zero payment defaults) --

4    EWB offered to continue the lending relationship. But the waiver was not a normal forbearance

5    agreement. At the time of these technical defaults, the company's trailing debt service coverage

6    ratio was approximately 6.0x -- nearly five times the 1.25x minimum generally required for

7    commercial bank pricing -- and its solvency ratio exceeded 4.0x. Those metrics describe an over-

8    secured, high-cash-flow borrower, not a distressed credit. Yet the documentation EWB demanded

9    was characteristic of a litigation settlement or formal workout, not a routine waiver of technical

10    defaults for a strongly solvent borrower. The waiver stacked five elements typical of adversarial

11    workout templates: (1) an acknowledgment that the borrower had no defenses, claims, or set-offs;

12    (2) a full release of all claims against EWB, known or unknown; (3) an express waiver of

13    California Civil Code section 1542 protections; (4) an affirmative acknowledgment that EWB had

14    "fully performed all undertakings and obligations owed"; and (5) ratification of all liens and a jury

15    trial waiver. On top of that, the waiver imposed a $4 million cash sweep at five times the

16    contractual paydown rate -- stripping the company of operating liquidity -- a $2 million super-

17    priority lending facility, and subordination of Mr. Irwin's personal guarantor position. The gap

18    between the company's financial strength and the severity of EWB's demands was not consistent

19    with credit risk management. It was consistent with a bank positioning itself for strategic control

20    and comprehensive lender-liability insulation. (Irwin Decl. Ex. 8; Platt Decl. paras. 17-19.)

21        Mr. Irwin refused to sign. He would not surrender his constitutional right to due process of

22    law. That refusal triggered everything that followed.

23        When Mr. Irwin refused to waive his rights, EWB began coring out approximately five times

24    the contractual rate of principal paydown through cash sweeping. After approximately five

25    months, the business was being materially harmed. EWB simultaneously blocked profit

26    distributions -- the only mechanism by which Mr. Irwin could service his personal debt to the

27    bank. EWB knew this. EWB financed Mr. Irwin personally and required regular updates on his

28    personal financial condition. EWB knew that Mr. Irwin had almost no net worth outside his equity

1  in the family business, and that there were two and only two ways he could service the personal

2  debt: through profit distributions or through a sale of the company. EWB then systematically

3  destroyed both paths. (Irwin Decl. paras. 15-18.)

4      On May 7, 2024, Mr. Irwin's counsel at Greenberg Glusker LLP sent EWB a 36-page

5  demand letter documenting the laws EWB was breaking, including Civil RICO statutes, tortious

6  interference, breach of fiduciary duty, and economic duress. (Irwin Decl. Ex. 9.) Approximately

7  two business days later, EWB executed a hostile governance takeover of the Irwin family

8  business: installing Michael Tucker as a board member, hiring consultants at rates up to $1,250

9  per hour, with total forced consultant costs approaching $4 million annualized. EWB then directed

10 Tucker to cut Mr. Irwin's salary by 50%. The purpose was transparent: deliberate burning of

11 equity to subvert due process. (Irwin Decl. paras. 19-23.)

12     After approximately five months of the costly hostile takeover, Mr. Irwin approached the

13 CEO and General Counsel of FTI Consulting. FTI's CEO informed Mr. Irwin that EWB had not

14 shown FTI the 36-page demand letter -- a material omission. Upon reviewing it, FTI pulled

15 Tucker's support within approximately two business days. Mr. Irwin filed for Chapter 11

16 protection before EWB could install a second puppet. The filing was not driven by financial

17 distress -- the company was profitable. It was driven by the recognition that without court

18 protection, EWB would continue burning the family's equity until the family could no longer

19 afford to exercise their legal rights. (Irwin Decl. para. 25.)

20     Inside the bankruptcy, EWB's adversarial campaign continued: (a) EWB intimidated

21 Canaccord Genuity, the investment bank retained to sell the enterprise for approximately $200

22 million, by threatening on a Zoom call: "I have a bigger stick than you," causing Canaccord to

23 resign because prospective buyers would not acquire a company with a hostile bank; (b) EWB

24 supported a competing plan by FitLife Brands -- a competitor that purchased a $7,000 debt to

25 acquire standing -- that wiped out the family's 99.5% equity; (c) EWB ran up approximately $7

26 million in its own bankruptcy professional fees in a solvent case where its secured claim was

27 overcollateralized 4:1 to 8:1; (d) EWB resisted being paid -- because its objective was not debt

28 recovery but preventing a second bad faith verdict; and (e) EWB lied to this Court, claiming Mr.

1  Irwin had tried to sell his company with different investment bankers and could not or would not
2  -- when in fact there was one investment bank and EWB chased them off. (Irwin Decl. paras. 24-
3  28; Platt Decl. paras. 17-19; Irwin Decl. paras. 13-16.)
4      This Court observed conduct sufficiently troubling to state on the record that EWB was
5  "acting in bad faith" and that "maybe you do need to be sued." EWB's conduct cannot be
6  understood without reference to F&F, LLC v. East West Bank (LASC Case No. BC462714), in
7  which a California jury in 2014 awarded $38,914,610 against EWB -- the 54th largest jury verdict
8  in the United States that year -- for an identical pattern of predatory lending conduct. A second
9  jury finding of bad faith lending would carry reputational consequences far exceeding the debt at
10 stake. As Mr. Platt concludes: the only business rationale for EWB's conduct is that the cost of a
11 second bad faith verdict exceeds the cost of scorched-earth litigation. (Platt Decl. paras. 17-19.)
12     As Mr. Platt observes: "A lender that systematically destroys a borrower's ability to pay
13 cannot then claim the non-payment as evidence of bad faith." (Platt Decl. para. 19.) That is
14 precisely what happened here. EWB cored out the company's cash through sweeps at five times
15 the contractual rate, blocked profit distributions that would have enabled service of the personal



6

1  guarantee, and then pointed to non-payment on the personal guarantee as evidence justifying

2  further aggression. The professional fees now claimed are the final chapter in that destruction.

3  This Court has the power -- and the duty -- to ensure that the bankruptcy process does not become

4  the instrument by which the destruction is completed.

5      The trajectory is now complete. Before EWB's campaign, the Irwin family's equity in a

6  profitable enterprise had an estimated market capitalization averaging well above $200 million.

7  EWB's refusal to accept a routine cure -- and its demand for litigation-grade releases from a hyper-

8  solvent borrower -- triggered a cascade of destruction: cash sweeps at five times the contractual

9  rate stripped operating liquidity; blocked profit distributions made the personal guarantee

10  unserviceable; a hostile governance takeover burned equity at $4 million per year in forced

11  consultant costs; the bankruptcy filing -- driven not by insolvency but by EWB's conduct --

12  opened the door to $17.1 million in professional fees; and those fees consumed 80% of the

13  reorganized debt. The family's net worth has gone from approximately $200 million to negative -

14  - and how far negative depends on how much of the remaining equity this Court transfers to the

15  professionals who were supposed to be protecting the estate, not consuming it. The forbearance

16

17



7

1    agreement that started this process is Exhibit 8 to Mr. Irwin's declaration. The Court can read it

2    and judge for itself whether the terms demanded of a 6.0x DSCR borrower were proportionate to

3    the credit risk -- or were designed to coerce surrender of legal rights.

4        Each EWB filing triggered multiplicative responses across all five estate-retained firms. BG

5    Law had to respond as primary counsel. Province had to analyze the financial implications.

6    Golden Goodrich had to protect the committee's interests. Force Ten had to provide independent

7    financial analysis. Brown White had to evaluate litigation exposure. A single adversarial filing by

8    EWB could generate billing entries across all five firms. The fee machine was self-perpetuating -

9    - and EWB fed it deliberately.

10   **Layer 1: Fee Oversight Was Engineered Away**

11       When this case commenced, Klee Irwin was the natural person to exercise fee oversight on

12   behalf of equity and the more than 200 investors whose capital was at stake. He was actively

13   monitoring professional billing, challenging the necessity of certain engagements, and attempting

14   to replace service providers who were not delivering value -- including STS Capital Partners,

15   which had gone months without introducing a single prospective buyer.

16       The estate's primary professionals -- BG Law and Province -- pressured Mr. Irwin to

17   relinquish operational control over fee matters to Bradley Sharp, the independent director they

18   recommended installing. Mr. Irwin was told that failing to cede authority would result in the

19   appointment of a Chapter 11 Trustee. Mr. Irwin challenged this directly: trustees are installed

20   when management threatens collateral or acts illegally, yet he was running the business so

21   profitably that it was accumulating cash, paying all post-petition obligations, and covering 80%

22   of interim professional fees in real time. No court motion stripped Mr. Irwin's authority. No

23   judicial order replaced him. No finding of mismanagement was ever made. The professionals

24   pressured him until he signed away his authority.

25       Mr. Irwin was assured that Brad Sharp would take informal direction from him because, in

26   a solvent corporation, a board member's fiduciary duty runs to shareholders, not to creditors. Mr.

27   Irwin relied on that representation. What followed was the opposite of what was promised: (a)

28   Sharp refused to gate or police professional fees; (b) Sharp refused to allow Mr. Irwin to replace

1    STS Capital Partners after months of non-performance; (c) Sharp turned down Robinson Pharma's

2    bid, which would have provided approximately $5 million more in value than the bid ultimately

3    accepted; (d) on June 9, 2025, during a Zoom status call attended by Sharp, BG Law partners

4    Seflin and Poitras, and three other professionals, Mr. Irwin stated his desire to replace STS. The

5    next day, both Sharp and BG Law's Susan Seflin separately called STS's Vince Willis to disclose

6    Mr. Irwin's intention. Sharp then unilaterally negotiated terms with STS that Mr. Irwin had never

7    authorized, causing STS's owner to lock in terms that were worse than what Mr. Irwin could have

8    negotiated directly -- financially damaging the estate. Mr. Irwin documented these events

9    contemporaneously in emails to his General Counsel and outside counsel. Sharp did not deny the

10   accusation. (Irwin Decl. paras. 27-27D.)

11       BG Law's involvement in the STS disclosure was not an isolated incident. Mr. Irwin

12   documented in contemporaneous emails to counsel that Ms. Seflin had previously threatened to

13   call the adversary -- East West Bank -- and inform EWB that Mr. Irwin was "being uncooperative"

14   if he did not comply with her demand to speak with his hired debt broker on her preferred timeline.

15   BG Law's lead partner used the threat of disclosure to an adversary as a tool to compel the CEO's

16   obedience. The attorney who made these threats is the lead partner of the firm now seeking

17   $3,156,674 from the estate and asking this Court to certify that its services were "reasonable."

18   (Irwin Decl. para. 27D.)

19       With Mr. Irwin sidelined, no person with an economic incentive to constrain professional

20   fees remained in a position of authority. Sharp was compensated at approximately $240,000 per

21   year -- paid from the estate, just like the professional fees he was supposed to oversee. His

22   economic incentive was aligned with the professionals who recommended his appointment, not

23   with the equity holder whose interests he was supposed to protect. The independent director was

24   independent of the shareholders, not of the professionals who put him there.

25   **Layer 2: The Solvent Debtor Paradox**

26       In a typical Chapter 11, impaired creditors serve as the natural fee police -- every dollar of

27   excess fees reduces their recovery. Congress designed the creditors' committee system on this

28   principle: give creditors a seat at the table, and they will police costs because their own money is

1   at stake.

2       In a solvent debtor case, that mechanism fails completely. Creditors here were guaranteed

3   100% recovery with premium interest of approximately 14%. They had no economic incentive to

4   police fees. The guard dog had no reason to bark. As Professor Nancy Rapoport has described,

5   the result is "the tragedy of the commons" in professional fees: each professional's individually

6   defensible billing decision produces a collectively indefensible aggregate.

7       The Committee's own professionals -- Golden Goodrich LLP ($757,960) and Force Ten

8   Partners LLC ($424,813) -- billed a combined $1,182,773 in this case. In a case where the 3.7%

9   FTI/ABI benchmark applied to $20.5 million in effective liabilities would yield approximately

10   $758,500 for ALL professionals combined, the Committee's two professionals alone exceeded the

11   entire national benchmark by more than $424,000 -- 156% of the benchmark. Rather than policing

12   aggregate fees, the Committee's professionals joined the feast. (Irwin Decl. paras. 32-36.)

13   **Layer 3: The Adversarial Fee Machine**

14       East West Bank's litigation posture created a multiplicative billing effect. EWB spent

15   approximately $7 million in professional fees pursuing an $18 million corporate loan that was

16   overcollateralized 4:1 to 8:1, with a DSCR of 4.68x to 8.28x. A rational, commercially motivated

17   lender with this level of collateral coverage does not spend 41% of its principal position on

18   litigation costs. The adversarial campaign was not protecting a credit position -- it was preventing

19   a jury trial. The fee machine was a feature of EWB's strategy, not a bug. (Platt Decl. paras. 17-

20   19; Irwin Decl. paras. 13-16.)

21   **The Perfect Storm: Every Safeguard Failed Simultaneously**

22       Unsecured creditors had no incentive to object -- guaranteed 100% recovery with premium

23   interest. The equity holder was stripped of authority by the very professionals whose fees were at

24   issue. The Committee's professionals were participants in the fee accumulation, not watchdogs

25   policing it. The independent director was installed by the fee applicants, compensated by the

26   estate, and loyal to the professionals who put him there. And EWB generated unlimited billable

27   activity through an adversarial campaign driven by verdict prevention, not credit protection.

28       When every market-based constraint has been disabled, the Court's independent duty under

section 330 is not merely one safeguard among many. It is the only safeguard remaining. The more than 200 investors who placed their trust and capital in this company have no one else to turn to.



**Answering the Anticipated Defense.** The fee applicants will argue: "Where were the Reorganized Debtors? If the fees were excessive, why didn't management object earlier?" This Section answers that question. Management did object. Management was blocked. The professionals designed a governance structure that prevented the one person with economic incentive to police fees from doing so, and then installed a person with no such incentive in his place. The absence of timely fee objections is not evidence of acquiescence -- it is evidence of the professionals' success in engineering their own impunity.

## III. THE SOLVENT DEBTOR: THIRTY YEARS OF PROFITABILITY AND A COMPANY THAT COULD NOT BE BROKEN

Before East West Bank entered the picture, the Irwin family business had operated continuously for over thirty years with unbroken profitability, generating more than $250 million in cumulative profit on over $3 billion in cumulative sales. Irwin Naturals was a GAAP-compliant public company with independent audits and three attorneys on staff. Its CEO had never missed a loan payment to any lender in thirty years of operation. Six independent sources -- Canaccord Genuity, J.P. Morgan, Cantor Fitzgerald, H.C. Wainwright, Maxim Group, and GreenWave

1    Advisors -- valued the enterprise at $100 million to $200 million. The family had been donating

2    nearly 100% of surplus profits after debt service to charity for the previous seventeen years. (Irwin

3    Decl. paras. 4-5; Platt Decl. paras. 8-9.)

4        On December 3, 2021, Dominic Ng -- the Chairman and CEO of East West Bank, an $80

5    billion state-chartered institution -- personally courted Mr. Irwin on a Zoom videoconference,

6    offering Prime plus zero percent -- a rate reserved only for the most profitable and solvent

7    borrowers. By early 2023, EWB was embedded in every dimension of the Irwin family's financial

8    life: approximately $18 million for the family business and approximately $7 million personally.

9    The collateral-to-debt ratio was 4:1 at the most conservative valuation and 8:1 at the higher range.

10    A bank does not offer Prime plus zero percent to a borrower whose collateral is at risk. The rate

11    itself is the evidence of solvency. (Irwin Decl. paras. 6-10; Platt Decl. paras. 17-19.)

12        On August 9, 2024, the Debtors filed voluntary petitions for relief under Chapter 11. Total

13    Scheduled Liabilities: $23,111,029.57. Within weeks of filing, the Debtors paid critical vendors

14    $3,512,281.98, reducing effective liabilities to approximately $20.5 million. The Debtors were

15    solvent throughout. No creditor faced any risk of non-payment. Creditors were paid in full with

16    premium interest of approximately 14% (40% above the 10% statutory rate for solvent debtors).

17        Wayne Platt, CEO and Founding Partner of Marula Capital Group, has submitted a

18    Declaration analyzing the Debtors' financial condition. Mr. Platt spent over twenty-five years at

19    Houlihan Lokey, serving on its International Fairness Opinion Review Committee, Solvency

20    Opinion Review Committee, and Technical Standards Committee. He holds an MBA from the



Wharton School and carries FINRA Series 7, 24, 63, and 79 registrations. He testified under oath before this Court and was subject to cross-examination by EWB's counsel. (Platt Decl. parg. 1-5.)

Mr. Platt's analysis establishes that the company was financially indestructible: (a) enterprise value of approximately $100 million (conservative); (b) DSCR of 4.68x to 8.28x, exceeding the 1.25x covenant minimum by more than three times; (c) even under a Multi-Case Adverse scenario combining simultaneous revenue decreases, margin compression, increased operating expenses, and rate increases, DSCR remained 4.64x; (d) an interest rate of approximately 49-50% -- six times the prevailing market rate -- would be required to cause a covenant breach; and (e) the company was stronger than nineteen industry peers including Estee Lauder, Coty, Herbalife, and Sally Beauty, with a DSCR nearly double the peer median of 1.7x. (Platt Decl. paras. 8-9.)

Despite the professionals' fee machine and EWB's adversarial campaign, the company's performance in bankruptcy was extraordinary: it paid off half its unsecured debt within weeks of filing; needed no DIP financing; stayed profitable throughout; self-funded 80% of professional fees -- approximately $4.7 million -- from operating cash flow; and accumulated approximately $6 million in cash. The question this performance raises is the central question before this Court: if a company can self-fund 80% of $17.1 million in professional fees from cash flow, stay profitable, need no outside financing, and still maintain a DSCR of 4.68x to 8.28x -- how is this a case that requires $17.1 million in professional services? What were the professionals doing that justified this expense?

**IV. THE PROPORTIONALITY FRAMEWORK: $17.1 MILLION IN FEES ON $22 MILLION IN DEBT**

The central indictment of the professional fee pool requires no budgetary analysis -- the raw numbers are sufficient. Professionals in this case have billed approximately $17.1 million to reorganize approximately $22 million in debt. For every dollar of debt reorganized, professionals have claimed approximately eighty cents. The five fee applicants alone seek $6,778,889.

**The Plan preserves the right to object.** The confirmed Plan expressly states: "Nothing in the Plan or Disclosure Statement and nothing set forth in the above chart should be construed as an admission by the Plan Proponents or any other party as to the validity of the asserted / projected

Professional Fee Claims." (Doc. 838, p.52.) The Plan further requires: "The Bankruptcy Court must approve, or must have previously approved on a final basis, all Professional Fee Claims listed in the foregoing chart before they may be paid." (Doc. 838, pp.52-53.)

**The Plan itself calls EWB's professional fees "unreasonable."** The confirmed Plan states that the Debtors reserve the right to pursue claims against EWB for "unreasonable aggressive actions EWB took pre-petition including, but not limited to... forcing the Debtors to incur and pay unreasonable fees of EWB's professionals and professionals that EWB forced the Debtors to retain." (Doc. 838, p.66.) If the Plan Proponents -- including the Debtors and the professionals themselves -- acknowledged in the confirmed Plan that EWB forced "unreasonable" professional fees, this Court cannot now approve those fees as reasonable under section 330.

**Brad Sharp, who refused to gate fees, is now the Plan Distribution Trustee.** The Plan appointed "Bradley Sharp of Development Specialists, Inc. ('DSI')" as the initial Plan Distribution Trustee (Doc. 838, p.60). This is the same Brad Sharp who, as independent director, refused to exercise fee oversight, refused to replace non-performing service providers, turned down a $5 million higher offer from Robinson Pharma, and disclosed privileged board deliberations to a third party. The governance failure that produced the fee explosion has been institutionalized into the post-confirmation structure.



**V. TEN STUDIES CONFIRM FEES EXCEED EVERY BENCHMARK BY 7x TO 36x**

Empirical Chapter 11 fee data spanning five decades provides a "reality-check" cross-reference that courts routinely use to detect windfalls and gross disproportionality. Movant has compiled ten published empirical studies -- from Warner (1977) through Antill (2024) and FTI/Kokini (2025) -- including a Federal Reserve Bank of New York meta-analysis and a study published in the Review of Financial Studies -- and compared their benchmarks to the fees in this case. The results are set forth in the Empirical Benchmark Comparison Table (**Exhibit A**) and are summarized here.

The most recent and comprehensive study -- Kokini & Yozzo, published by the American Bankruptcy Institute in November 2025, analyzing 338 Chapter 11 cases filed from 2019 to 2024 -- found average total professional fees of 3.7% of liabilities. Applied to this case's effective liabilities of $22.6 million, the benchmark yields approximately $836,200 for ALL professionals combined. Actual fees of approximately $17.1 million exceed this benchmark by 20.5 times. BG Law alone ($3,156,674) exceeds the total benchmark for all professionals by a factor of nearly four.

Under the Lubben/ABI combined measure (assets plus liabilities), which produces the most conservative ratio, this case's fees still exceed the benchmark by approximately seven times. Under every published methodology -- fees as a percentage of liabilities, fees as a percentage of assets, fees as a combined measure -- the conclusion is invariant: these fees are an order of magnitude above every published norm.

The Federal Reserve Bank of New York confirmed these findings in a meta-analysis of seven independent empirical studies, reporting that median professional fees in Chapter 11 range from 1.4% to 3.4% of pre-petition assets, with professional fees specifically averaging 1.4% to 1.8% of assets. (Federal Reserve Bank of New York, Liberty Street Economics, "Lehman's Bankruptcy Expenses" (Jan. 2019).) Applied to this case, even the highest end of the Fed's range -- 3.4% -- would yield approximately $768,000 for all professionals combined. Actual aggregate fees of $17.1 million exceed the Federal Reserve's upper-bound benchmark by a factor of 22.

In December 2024, the Review of Financial Studies -- one of the three most prestigious peer-

reviewed journals in academic finance -- published a study examining precisely this question. Samuel Antill, "Are Bankruptcy Professional Fees Excessively High?", 37 Rev. Fin. Stud. 3595 (2024), analyzed optimal trustee commission structures and found that the fee level preferred by creditors themselves was 2-3% of estate value. Even by the standard that creditors themselves endorse, this case's fees -- at 78% of reorganized debt -- exceed the creditor-endorsed optimum by a factor of 26 to 36.

The empirical research also demonstrates significant economies of scale. Professor Lubben found that for every 1% increase in debtor size, professional fees increase only 0.38%. Smaller, simpler cases should have lower fee ratios than large complex cases, not higher ones. This Court itself found these cases to be "neither large nor complex" (Doc. 516 at 16). That finding -- by the judge who presided over the entirety of this case -- is the most authoritative possible endorsement of the benchmark comparison.

The Ninth Circuit has endorsed precisely this methodology. In In re Bluetooth Headset Products Liability Litigation, 654 F.3d 935, 942 (9th Cir. 2011), the Court endorsed the practice of a proportionality cross-check to ensure that fee awards are reasonable and not the product of structural incentives that inflate fees divorced from actual benefit. The empirical benchmarks cited above provide exactly that cross-check. Moreover, in In re York International Building, Inc., 527 F.2d 1061, 1068 (9th Cir. 1975), the Ninth Circuit held that "[b]ankruptcy judges are themselves experts on the value of services rendered in a bankruptcy proceeding and are not bound by the evidence offered." This Court's own assessment -- informed by its experience presiding over this case for sixteen months -- is an independent and authoritative basis for determining that fees at this level are unreasonable.

This Court's own track record confirms the disproportionality. In In re Meruelo Maddux Properties, Inc., Case No. 2:09-bk-13356-VK -- a case involving a portfolio of commercial real estate and development projects significantly more complex than the vitamin supplement business here -- professional fees represented approximately 2-4% of liabilities. The professionals in Meruelo Maddux did not require 76 cents per dollar of debt to accomplish a genuinely complex reorganization. The professionals in this case cannot explain why they required 76 cents per dollar

1 | to reorganize a profitable, solvent vitamin company.

2 | **VI. §330 REQUIRES AGGREGATE PROPORTIONALITY REVIEW IN A SOLVENT CASE**

3 | **A. Section 330 Requires Reasonableness Measured Against Results, Not Activity**

4 |     Section 330(a)(1) permits compensation only for "reasonable" services. Section
5 | 330(a)(4)(A) prohibits compensation for services that were not "reasonably likely to benefit the
6 | debtor's estate" or were not "necessary to the administration of the case." This is a mandatory bar
7 | -- not discretionary. The word "shall not" means shall not. Lamie v. U.S. Trustee, 540 U.S. 526
8 | (2004). Congress enacted this statute with precisely this scenario in mind. The Senate Report
9 | accompanying the Bankruptcy Reform Act warned that payments to debtors' attorneys pose "a
10 | serious potential for overreaching" and must be "subject to careful scrutiny." S. Rep. No. 95-989,
11 | at 40 (1978). The House Reports further stated "the need to reduce administrative expense," H.R.
12 | Rep. No. 95-595, at 329-30, and the 1994 amendments to section 330 were "intended to curb
13 | excessive fees." H.R. Rep. No. 103-835, at 55 (1994). The legislative history is unmistakable:
14 | section 330 is a gatekeeping statute designed to prevent the exact outcome before this Court.

15 |     In the Ninth Circuit, reasonableness is not a mechanical lodestar exercise. The lodestar is
16 | only a starting point. In re Puget Sound Plywood, Inc., 924 F.2d 955, 958 (9th Cir. 1991). Counsel
17 | must exercise "billing judgment" and consider the "maximum probable recovery" before incurring
18 | fees. That principle is heightened in a solvent-debtor case. When creditors are being paid in full
19 | with interest, the "benefit to the estate" inquiry must focus on whether the services preserved or
20 | enhanced residual value for equity -- the true economic stakeholder. The Supreme Court has
21 | emphasized that "reasonable compensation" implies loyal service to the client, not self-interested
22 | fee maximization. Baker Botts L.L.P. v. ASARCO LLC, 576 U.S. 121, 126 (2015). Under Baker
23 | Botts, time spent preparing or defending fee applications is categorically non-compensable under
24 | section 330.

25 |     The Ninth Circuit has made clear that what ultimately matters is the result obtained. In
26 | Lowery v. Rhapsody Int'l, Inc., No. 22-15162 (9th Cir. 2023), the Court stressed in an analogous
27 | fee context that effort alone does not justify fees -- results do. Here, the results are stark:
28 | approximately $22 million of debt reorganized; approximately $17.1 million in professional and

1    process fees asserted; roughly 78% of the debt amount. This ratio dwarfs any plausible measure

2    of proportionality.

3        **The "results obtained" principle has been applied to slash fees in bankruptcy with full**

4    **circuit-court authority.** In In re Village Apothecary, Inc., 45 F.4th 940 (6th Cir. 2022), the Sixth

5    Circuit -- addressing the issue as one of first impression -- held that bankruptcy courts may

6    consider "results obtained" when determining whether fees are reasonable under section

7    330(a)(3), notwithstanding Congress's omission of that factor from the 1994 amendments. The

8    statute directs courts to consider "all relevant factors, including" those enumerated -- the word

9    "including" is non-exclusive, and the Sixth Circuit held that "results obtained" remains available

10   under that catch-all. Id. at 949-50. Critically, the Village Apothecary court affirmed a 50%

11   reduction where special counsel recovered $38,000 for the estate but sought $37,063 in fees -- a

12   fee-to-recovery ratio of 97%. If a circuit court affirmed a 50% reduction at a 97% ratio on a

13   $38,000 recovery, the ratios in this case compel reduction a fortiori:

14       No published decision in any circuit has approved a fee-to-debt ratio approaching 78% in a

15   solvent reorganization. Movant respectfully submits that this case, if approved at the requested

16   levels, would set a national record for fee disproportionality in a solvent Chapter 11. Village

17   Apothecary establishes that a bankruptcy court not only may, but should, reduce fees where the

18   ratio of cost to result is facially unconscionable -- and it establishes that such a reduction will

19   survive appellate review.

20       **Section 330(a)(3) requires assessment of "the value of such services."** The word "value"

21   is deliberately separate from "cost." The statute does not ask merely whether hours were worked.

22   It asks whether the services delivered value to the estate. Section 330(a)(3)(D) requires services

23   to be "performed within a reasonable amount of time commensurate with the complexity,

24   importance, and nature of the problem, issue, or task addressed." This Court found these cases to

25   be "neither large nor complex." That finding compresses the universe of compensable services.

26       **Professionals are fiduciaries who must conduct cost-benefit analysis.** As the Seventh

27   Circuit held in In re Taxman Clothing Co., 49 F.3d 310, 315 (7th Cir. 1995), professionals are

28   fiduciaries of the estate who must weigh costs against expected benefits before undertaking work.

Chief Judge Posner condemned a case where a "meager" estate was "entirely consumed by the fees." Fees disproportionate to the benefit conferred may be disgorged. The Supreme Court itself recognized in Hensley v. Eckerhart, 461 U.S. 424, 436 (1983), that where a party "has achieved only limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." The professionals in this case achieved limited success for equity: creditors who were always going to be paid in full received full payment; meanwhile, equity -- the true residual beneficiary in a solvent estate -- was annihilated.

**Answering the anticipated defense: "Services were reasonably likely to benefit the estate at the time."** Section 330(a)(4)(A)(ii) bars compensation for services that were not "reasonably likely to benefit the debtor's estate." The Ninth Circuit applies this as a prospective test: the court asks whether the services appeared likely to benefit the estate at the time they were rendered. In re Mednet MPC Corp., 251 B.R. 103 (9th Cir. BAP 2000). The professionals will argue that EWB's aggression justified their billing. Three responses:

First, the prospective test does not excuse failure to scale. Even if EWB's conduct justified a defense, a fiduciary must calibrate the response to what is at stake. Puget Sound Plywood requires counsel to "scale his or her fee at least to the reasonably expected recovery." 924 F.2d at 958. In a case where creditors were being paid in full, no amount of adversarial activity by a third party justifies $17.1 million in defensive billing. A fiduciary who spends more defending the estate than the estate is worth has breached the fiduciary duty, not fulfilled it. Taxman, 49 F.3d at 315.

Second, the test asks whether services were likely to benefit the estate -- not whether they were likely to benefit the professionals. Much of the billing in this case falls into the latter category. Fee defense, multi-attorney conferencing, and duplicative monitoring across five firms did not benefit the estate. They benefited the firms.

Third, the results speak for themselves. The company was profitable when the case began and profitable when it ended. No DIP financing was needed. Creditors were always going to be paid. The professionals cannot point to a single outcome that would have been materially different with $2.7 million in fees instead of $17.1 million. The $14.4 million differential bought nothing

19

1  for the estate. It was pure wealth transfer to the professional class.

2

3  **B. Empirical Data Confirms the Anomaly**

4      Published empirical research analyzing hundreds of Chapter 11 cases demonstrates that total

5  professional fees average approximately 3.7% of liabilities. ABI Journal (2025, Kokini & Yozzo).

6  Those cases predominantly involved insolvent debtors, averaged longer durations, and often

7  involved significantly larger capital structures. Even accepting that complex cases warrant

8  deviation from averages, this Court has already stated on the record that this case was neither

9  large nor complex. A 78% fee-to-debt ratio is not a deviation. It is an extreme outlier by an order

10  of magnitude. Section 330 does not permit approval of compensation that effectively consumes

11  the economic subject of the reorganization. (See Section V above for the complete ten-study

12  empirical analysis.)

13  **C. Solvent Debtor Context Heightens Scrutiny**

14      This Court itself has recognized the danger of professionals overworking cases. In In re

15  Duncan, 2019 WL 1397424 (Bankr. C.D. Cal. Mar. 27, 2019) (Kaufman, J.), this Court reduced

16  fees where the complexity of services was disproportionate to the needs of the case. In a solvent

17  estate: creditors are unimpaired; risk of non-payment is minimal; litigation intensity cannot be

18  justified as existential. Yet professionals billed at rates exceeding $1 million per month over a 16-

19  month case. Where the payout was assured and the case was not complex, excessive staffing and

20  churn cannot be justified under section 330(a)(4)(A).

21      **The counterfactual exposes the mathematical absurdity.** Imagine this case administered

22  at the benchmark cost of $2.7 million instead of $17.1 million. The outcomes would be identical:

23  creditors paid in full, premium interest paid, company survives and operates profitably. The only

24  difference: $14.4 million in additional equity destruction. The additional $14.4 million in fees

25  generated no additional value for the estate. It was pure wealth transfer from the company's equity

26  -- from Mr. Irwin and the 200-plus public investors -- to the professionals' bank accounts.

27      In a solvent case, the calculus of professional value inverts. In an insolvent case, professional

28  services can create enormous value: the difference between 20 cents and 80 cents on the dollar

1    for creditors. In a solvent case, the professional's contribution to creditor recovery is zero --

2    recovery was already assured. The only value professionals can add is speed, efficiency, and

3    preservation of equity. On all three metrics, these professionals failed: median duration, costs 20

4    times the national average, and equity consumed by fees. The solvency that should have made

5    this case easier made it more expensive -- because solvency removed the constraint of impaired

6    creditors watching the store. (Platt Decl. paras. 10, 16.)

7    **D. Bankruptcy Courts May Apply a Global Proportionality Reduction**

8        Bankruptcy courts are not required to audit every 0.1-hour entry where the aggregate level

9    is facially excessive. Courts routinely apply across-the-board percentage reductions where the

10   overall request is disproportionate. The foundational Ninth Circuit authority is Digesti & Peck v.

11   Kitchen Factors, Inc. (In re Kitchen Factors, Inc.), 143 B.R. 560 (9th Cir. BAP 1992), which

12   established three controlling principles: First, professionals have an affirmative duty to scale their

13   fees to the estate: "an attorney must scale his or her fee at least to the reasonably expected

14   recovery." Id. at 562. Second, the scaling obligation runs to "reasonably expected recovery," not

15   "potential optimum recovery." Id. Third, and most critically for this Court, when the lodestar

16   method produces a number that is "grossly disproportionate to the amounts at stake," the

17   bankruptcy court may abandon the lodestar entirely and impose a blunt proportionality cap. Id. at

18   562. The Kitchen Factors court imposed a 50% cap on fees as a percentage of recovery -- affirming

19   that because the attorney failed to proactively limit billing, "the bankruptcy judge was correct in

20   doing so after the fact." Id. at 563. The Ninth Circuit has called this the "meat-axe approach."

21   Gates v. Deukmejian, 987 F.2d 1392, 1399-1400 (9th Cir. 1993) (recognizing that across-the-

22   board reductions have "obvious utility" where the court finds the fee request is inflated); see also

23   In re Puget Sound Plywood, supra (aggregate billing judgment review). The so-called "meataxe"

24   approach is not arbitrary slashing. It is a judicial recognition that the overall quantum of fees

25   exceeds any reasonable relationship to the size, complexity, and economic stakes of the case.

26       Other courts have imposed even steeper reductions. In In re XO Communications, Inc., 323

27   B.R. 330, 336-37 (Bankr. S.D.N.Y. 2005), the court reduced a claimed $20 million fee by 80% to

28   $4 million under section 330, emphasizing that "the Court has an independent duty to review all

21

1   fee applications." A reduction from $6.66 million to $2.275 million (approximately 66%) is

2   moderate by comparison. Similarly, almost 35% of Chapter 11 cases result in no payment

3   whatsoever to the professionals. Lubben, "The Direct Costs of Corporate Reorganization: An

4   Empirical Examination of Professional Fees in Large Chapter 11 Cases," 74 Am. Bankr. L.J. 509,

5   537 (2000). Professional fees are not automatic. They are earned -- and when they are not earned,

6   they must be reduced.

7        The Ninth Circuit BAP has given this authority real teeth. In In re Gilsvik, BAP Nos. EC-

8   25-1077-CBS & EC-25-1079-CBS (B.A.P. 9th Cir. Nov. 17, 2025) (published), the BAP

9   endorsed comparison to fees charged by similarly-situated professionals as a methodology for

10  assessing fee reasonableness, affirming a reduction where the bankruptcy court found the fees

11  exceeded what the market would bear. And in In re Mehr Group of Companies Holding, Inc.,

12  Case No. 8:23-bk-10760-SC (Bankr. C.D. Cal.), the bankruptcy court allowed only $5,000 of

13  approximately $93,000 requested -- an approximately 95% reduction -- finding the amount

14  reflected "reasonable value." The Sixth Circuit's decision in In re Village Apothecary, Inc., 45

15  F.4th 940 (6th Cir. 2022), provides additional persuasive circuit-level authority: a 50% fee

16  reduction based on "results obtained" survived appellate review where the fee-to-recovery ratio

17  was 97%. A reduction from $6.66 million to $2.275 million (approximately 66%) is well within

18  the range of judicial authority demonstrated by these cases -- and is more conservative than the

19  reductions affirmed in Village Apothecary and Mehr Group.

20  **E. The "Economy of the Estate" Defense Is a Red Herring**

21       The fee applicants will argue that professionals should not be penalized for the estate's

22  solvency. This argument confuses the overruled "economy of the estate" doctrine -- which held

23  that rates should be lower merely because it is a bankruptcy case -- with proportionality. Movant

24  does not argue reduced rates. Movant argues that fewer hours were necessary given the actual

25  complexity, and that the value delivered was not commensurate with cost -- both express statutory

26  factors. The distinction is between reduced rates (overruled) and reduced volume based on actual

27  necessity (required by the statute). As the court in Busy Beaver held: the question is what an

28  economically motivated private client would pay. In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d

1   833, 852 (3d Cir. 1994). No rational business owner would pay 76% of the total debt being

2   reorganized for professional services in a solvent case.

3   **F. Failure to Impose a Global Cap Would Set a Dangerous Precedent**

4   This case presents a solvent reorganization in the Central District of California where equity

5   was the residual beneficiary; professional fees approach 80% of the debt being reorganized; and

6   market capitalization before the precipitating events averaged well above $200 million. If

7   allowed, this would establish a de facto precedent permitting administrative expenses to eclipse

8   the economic subject of the reorganization itself. That outcome is inconsistent with section 330,

9   with Puget Sound's billing-judgment mandate, and with the equitable function of this Court.

10   The Ninth Circuit BAP has been building a proportionality doctrine with real teeth -- through

11   Puget Sound Plywood and Gilsvik (2025). This Court sits at the leading edge of that trajectory. If

12   $17.1 million in professional fees on a $22 million solvent reorganization passes muster -- in a

13   case this Court itself found to be "neither large nor complex" -- that number becomes the ceiling

14   for every fee applicant in the Central District. Every professional in the Southern California

15   bankruptcy community will understand that if 76% can survive scrutiny in Judge Kaufman's

16   courtroom, there is effectively no upper bound. Conversely, if this Court enforces proportionality

17   as the BAP has been developing it, this ruling will stand as the Central District's definitive

18   statement that section 330 means what it says.

19   **G. Requested Relief: A Reasoned Global Reduction**

20   Section 330 requires reasonableness measured against results and benefit. This Court has

21   already observed that this case was neither large nor complex. Empirical data confirms the

22   unprecedented nature of the asserted fees. In a solvent estate, residual value belongs to equity.

23   Approval of $17.1 million in aggregate professional and process fees to reorganize $22 million of

24   debt is facially disproportionate and inconsistent with Ninth Circuit precedent.

25   The Court may impose an across-the-board percentage reduction, or fix a global cap tied to

26   a reasonable multiple of empirical norms, or reduce each major category proportionally to achieve

27   aggregate rationality. What section 330 does not permit is approval of fees that consume nearly

28   the entire economic subject of the reorganization. The specific parameters of the requested relief

23

1    are set forth in Section IX below.

2    **VII. BG LAW-SPECIFIC OBJECTIONS**

3        In addition to the aggregate proportionality arguments, Movant objects to BG Law's fee

4    application on the following firm-specific grounds:

5        **Conflict of Interest.** BG Law served simultaneously as debtor's counsel and as the single

6    largest fee applicant seeking $3,156,674. BG Law filed an opposition (Doc. 1038) to its own

7    client's motion seeking time to object to BG Law's own fee application. This conflict permeated

8    BG Law's representation throughout the case. BG Law's counsel, Susan Seflin, referred Province's

9    Paul Huygens for the Province engagement. BG Law and Province combined billed

10    approximately $5.35 million -- more than half of the total sought by all five applicants. The

11    professional who selected the financial advisor had no incentive to challenge that advisor's billing,

12    or to ensure the advisor challenged BG Law's.

13        **Debtor's Counsel Served Itself, Not the Debtor.** BG Law was retained as counsel to the

14    Debtors -- not as an independent firm with license to run the case according to its own preferences.

15    Under the retention order, BG Law owed fiduciary duties to the Debtors and to the estate. What

16    followed was the opposite of fiduciary service. BG Law's lead partner, Susan Seflin, controlled

17    the strategic direction of the case, made critical decisions without meaningful input from the CEO,

18    and treated the client as an obstacle to be managed rather than a principal to be served. (Irwin

19    Decl. paras. 27-30C.)

20        Mr. Irwin -- a non-lawyer running a solvent company in Chapter 11 for the first time -- relied

21    on BG Law for guidance on every major decision: the plan of reorganization, the STS

22    engagement, the Province engagement, the Brad Sharp installation, the fee structure, and the

23    stipulations that governed the case's procedural timeline. BG Law did not merely advise on these

24    decisions. BG Law made them. When Mr. Irwin questioned BG Law's decisions -- about STS's

25    non-performance, about the Province engagement's cost, about the need for fee oversight -- he

26    was told that failure to comply would result in a trustee appointment. (Irwin Decl. para. 28A.) The

27    threat was baseless -- no court had ever suggested trustee appointment for a CEO running a

28    profitable company in full compliance with all post-petition obligations -- but it was effective. It

24

**THE REFERRAL PIPELINE:**
**$5.35 MILION THROUGH ONE CHANNEL**

**$5.35 MILLION**
77% of all fees sought

BG Law: $3.16M + Province: 2.19M
out of $6.95M total from five applicans

**THE REFERRAL**
BG Law's Susan Seflin referred
Province's Paul Huygens.
Province owes its position to BG Law.

**THE RESULT**
BG Law: $3.19M
Province: $2.19M
Combined: $5.35M of $6.95M total

**THE INCENTIVE**
Zero internal friction.
Neither firm challnged the other's billing.
No one in the system had incentive to say no.

silenced the only person with an economic incentive to question BG Law's billing.

**The Result: $3.16 Million for Representation That Harmed Its Own Client.** BG Law seeks $3,156,674 for representing the Debtors in a case where: (a) BG Law's lead partner disclosed privileged board discussions to a third party (STS), damaging the estate; (b) BG Law's lead partner threatened to inform the adversary (EWB) that the CEO was "being uncooperative"; (c) BG Law facilitated the installation of an independent director who eliminated fee oversight; (d) BG Law referred the financial advisor whose $2.19 million engagement was never subject to competitive bidding; (e) BG Law drafted a stipulation extending the fee objection deadline while simultaneously being the largest fee applicant, at a time when the Debtors had no general counsel; and (f) BG Law opposed its own client's emergency motion for additional time to review BG Law's own fee application. Under In re Smith, 317 F.3d 918, 926 (9th Cir. 2002), services must be "reasonably likely to provide an identifiable, tangible and material benefit to the debtor's estate." When debtor's counsel acts adversely to the debtor's interests on multiple documented occasions, the Court must scrutinize whether the $3.16 million fee represents value delivered or value extracted.

**BG Law's Fee Must Be Measured Against What a Properly Governed Engagement Would Have Cost.** Section 330(a)(3)(F) requires the Court to consider "the compensation plan for employees and whether it includes benefits other than compensation" and "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title." The FTI/ABI benchmark for ALL

1    professionals is 3.7% of liabilities -- approximately $758,500. Even at 200% of the benchmark

2    for debtor's counsel alone -- a generous premium reflecting the EWB adversarial posture -- BG

3    Law's reasonable fee would be approximately $1.5 million. BG Law seeks $3.16 million -- more

4    than double this already generous allowance. The gap between $1.5 million and $3.16 million is

5    attributable to the absence of cost discipline: no competitive bidding, no fee oversight, no cost-

6    containment authority exercised by anyone with an economic incentive to do so. That gap is the

7    cost of the governance failure BG Law itself engineered.

8    **BG Law's Lead Partner Sabotaged the CEO's Negotiating Position.** On June 10, 2025,

9    BG Law's Susan Seflin -- without Mr. Irwin's knowledge or consent -- called STS Capital Partners'

10    Vince Willis to disclose privileged board discussions about the possibility of terminating STS's

11    engagement. This was a discussion held during a Zoom call at which BG Law partners were

12    present as attorneys. Ms. Seflin's unauthorized disclosure undermined Mr. Irwin's negotiating

13    position with a vendor, damaged the estate financially, and was documented contemporaneously

14    in emails from Mr. Irwin to his General Counsel and outside counsel. (Irwin Decl. paras. 27A-

15    27D.) This was not an isolated incident: Mr. Irwin also documented that Ms. Seflin had previously

16    threatened to call the adversary, East West Bank, and inform EWB that Mr. Irwin was "being

17    uncooperative" if he did not comply with her demands. (Irwin Decl. para. 27D.) BG Law's lead

18    partner used threats of adverse disclosure to compel the CEO's compliance. This is the same

19    attorney whose firm now asks this Court to award $3,156,674 in fees and certify that its

20    representation was "reasonable" under section 330.

21    **Installation of Brad Sharp.** BG Law recommended and facilitated the installation of

22    Bradley Sharp as independent director -- the person who would be responsible for overseeing BG

23    Law's own fees. Sharp refused to gate or police professional fees. The net effect was that BG Law

24    designed a governance structure that eliminated oversight of its own billing.

25    **Opposition to Own Client.** BG Law's David Poitras confirmed to this Court that BG Law

26    does not and cannot represent the Reorganized Debtors for purposes of professional fee disputes.

27    Yet BG Law continues to serve as counsel of record. The Reorganized Debtors had no

28    independent counsel when the Stipulation extending the fee objection deadline (Doc. 984) was

executed -- the General Counsel had already resigned twelve days earlier. BG Law drafted and circulated the Stipulation -- which limited the extension to three weeks for five fee applications totaling $6.93 million -- while simultaneously being the single largest fee applicant.

**Fee Defense Billing.** BG Law billed 314.8 hours ($214,398) -- 14.3% of total second-period hours -- on fee-related activity including preparation and defense of its fee application. Under Baker Botts, 576 U.S. 121, time spent defending fee applications is categorically non-compensable under section 330. Movant anticipates that applicants will incur additional time defending their applications at the final hearing. Under Baker Botts, none of that time is compensable -- providing a powerful incentive for the applicants to engage in good-faith resolution at a reasonable level rather than litigate the fee dispute itself at further expense to the estate.

**Block Billing and Vague Entries.** The billing records contain pervasive block billing: 1,214 of 4,094 entries (29.6%) are block-billed, totaling approximately $300,953 in fees that cannot be adequately assessed for reasonableness. Examples include 12.0-hour entries for attending all-day proceedings and 9.9-hour entries combining multiple distinct tasks. The records also contain entries that are per se vague under the U.S. Trustee Appendix B Guidelines -- including "Attention to valuation issues" (DMP, billed repeatedly at $895/hour with no further specificity) and "Attention to sale process" (DMP, same rate, same deficiency). These descriptions fail to identify what document, what issue, or what analysis was performed and are independently objectionable. Under Welch v. Metropolitan Life Ins. Co., 480 F.3d 942, 948 (9th Cir. 2007), block billing impedes meaningful review and justifies reduction. This Court has repeatedly held that lumping "is not satisfactory" under LBR 2016-1(a)(1)(E)(iii) and has applied percentage reductions ranging from 10% to 20% for block-billed entries. See In re Guarachi Wine Partners Inc., Case No. 1:22-10545-VK, Tentative Ruling at 6 (Bankr. C.D. Cal. Oct. 10, 2024) (citing In re Stewart, 2008 WL 8462960, *6 (B.A.P. 9th Cir. 2008) (upholding 20% reduction for inappropriate lumping); In re SAIF, Inc., 2009 WL 6690966 (Bankr. S.D. Cal. 2009) (10% reduction for substantial lumping); Darling Int'l v. Baywood Partners, Inc., 2007 WL 4532233, *9 (N.D. Cal. 2007) ("courts typically make an adjustment ranging from 5% to over 30%")). In Young v. Wolfe,

No. CV0703190RSWLAJWX (C.D. Cal. 2017), a court in this District applied a combined 68%

fee reduction for block billing (20%), undated entries (30%), reconstructed hours (25%), and rate

reduction. In In re CPESAZ Liquidating, Inc., No. CC-22-1090 (B.A.P. 9th Cir. 2022), the Ninth

Circuit BAP independently affirmed reductions for block billing, vague entries, and clerical work

billed at attorney rates. The burden is on the applicant to establish reasonableness. In re Dalessio,

74 B.R. 721, 724 (B.A.P. 9th Cir. 1987). Where records are vague or block-billed, the failure

inures to the applicant's detriment.

**Multi-Attorney Conferencing.** BG Law billed 634 hours for multi-attorney conferencing

across 2,200 time entries -- an average of approximately one conference for every two billing

entries. While some conferencing is necessary, the scale here reflects the inflated staffing that a

case "neither large nor complex" did not warrant.

**Partner-Heavy Staffing.** BG Law's billing reflects a 75.2% partner staffing ratio. In a case

that was "neither large nor complex," the volume of work that genuinely required partner-level

attention is a fraction of what was billed.

**Retention Under Section 327, Not Section 328.** BG Law was retained under 11 U.S.C.

section 327, not section 328(a). Accordingly, this Court retains full authority under section 330(a)

to determine what constitutes "reasonable compensation." BG Law cannot claim that any pre-

approved fee arrangement or prior interim compensation order limits this Court's review. See In

re Energy Partners, Ltd., 409 B.R. 211 (Bankr. S.D. Tex. 2009). The Court's gatekeeping function

under section 330 is mandatory and unrestricted.

**Lodestar Audit.** A detailed category-by-category billing audit is attached hereto as **Exhibit

A** (Lodestar Audit of BG Law LLP). The audit applies thirteen objection categories derived from

Baker Botts L.L.P. v. ASARCO LLC, 576 U.S. 121 (2015); In re CPESAZ Liquidating, Inc., No.

CC-22-1090 (B.A.P. 9th Cir. 2022); Young v. Wolfe, No. CV0703190RSWLAJWX (C.D. Cal.

2017); the U.S. Trustee Appendix B Guidelines (2013); and Welch v. Metropolitan Life Ins. Co.,

480 F.3d 942 (9th Cir. 2007). The audit identifies $1,448,427 in recommended reductions

(45.9%), with the largest disallowances arising from: (a) Baker Botts categorical bar on fee

preparation and defense ($224,367 -- 100% of Task Codes 130 and 135); (b) overstaffing,

excessive iterations, and cross-firm duplication in Plan and Disclosure Statement work ($445,322 -- 45% of the largest billing category); (c) cross-professional duplication with STS Capital Partners and Province in Asset Disposition ($206,872); and (d) solvent debtor necessity reductions in Claims Administration ($90,635). Comparable lodestar audits are attached to each of the four concurrent firm-specific memoranda.

## VIII. INTER-FIRM DUPLICATION AND REDUNDANCY

Five estate-retained professionals performed overlapping functions in a solvent debtor case with a single primary creditor. Under section 330(a)(4)(A)(i), the Court "shall not allow compensation for... unnecessary duplication of services." This prohibition applies across firms, not merely within them.

**Province vs. Force Ten Partners.** Province served as the estate's fiduciary financial advisor, billing $2,189,985. Force Ten served as the Committee's independent financial advisor, billing $584,000 in total (including interim compensation already paid). In a solvent debtor case where unsecured creditors were guaranteed 100% recovery with premium interest, the incremental value of a second financial advisory firm monitoring the same estate was minimal. Force Ten's engagement substantially duplicated Province's.

**BG Law vs. Brown White & Osborn.** BG Law served as primary bankruptcy counsel. Brown White (specifically Cynthia M. Cohen at $1,050/hour) was retained as special litigation counsel. To the extent Brown White's work covered legal territory already handled by BG Law, the estate paid twice.

**Referral Economics.** 96% of the five applicants' total fees came from referral pairs: BG Law referred Province ($5.35 million combined); Golden Goodrich referred Force Ten ($1.34 million combined). The professionals who selected each other had no incentive to challenge each other's billing. This referral network cannot be evaluated without considering the aggregate -- which is precisely why this comprehensive memorandum is necessary.

## IX. REQUESTED REMEDY

**Primary Relief: Aggregate Cap at 300% of Benchmark.** The Reorganized Debtors propose that total allowable compensation for the five applicants not exceed $2,275,500 --

29

representing 300% of the FTI/ABI benchmark of 3.7% as applied to effective liabilities of $20.5 million (i.e., 11.1% of effective liabilities). Even at 300% of the national benchmark, this cap represents an extraordinarily generous premium -- well above every published empirical benchmark. The cap falls within the $1.5-3 million range Wayne Platt identified as appropriate based on thirty years of restructuring experience, (Platt Decl. paras. 10, 16.)

**The Residual Equity Calculation.** The proportionality argument becomes visceral when measured against what equity actually receives. After deducting the $4.1 million FitLife insider note, approximately $2 million in additional professional fees beyond the five applicants, the $3.18 million STS Capital Partners success fee claim, approximately $3.1 million in other asserted claims, and approximately $1.7 million in additional EWB professional fees from the Initial Reserve Account of $14.47 million, the approximate residual value available to equity is $4.9 million. BG Law's $3,156,674 request alone represents approximately 65% of the total residual equity value -- the only value that will ever be returned to Mr. Irwin and the 200-plus public investors. Every professional who accepted interim payments knew -- or should have known -- that those payments were tentative and subject to final adjustment under section 331. They took the money at their own statutory risk. In re Circle K Corp., 279 F.3d 669, 674 (9th Cir. 2002).

**BG Law-Specific Allocation and $1.5 Million Ceiling.** Within the aggregate cap, Movant requests that BG Law's compensation not exceed $1,500,000. This represents approximately 200% of the FTI/ABI benchmark for ALL professionals -- an extraordinarily generous allowance that accounts for the EWB adversarial posture while recognizing that: (a) this case was "neither large nor complex"; (b) BG Law's billing reflects a 75.2% partner staffing ratio in a case that did not warrant it; (c) 314.8 hours of non-compensable fee defense billing under Baker Botts must be stripped; (d) BG Law's lead partner acted adversely to the client's interests on documented occasions; and (e) the governance structure BG Law designed -- installing Brad Sharp and pressuring the CEO to relinquish fee oversight -- produced the very fee explosion now before this Court. Even at $1.5 million, BG Law would receive more than double the FTI/ABI benchmark for every professional combined, and more than any empirical study would predict for debtor's counsel in a case of this size and complexity. The difference between $1.5 million and $3.16

1    million -- $1.66 million -- represents the cost of the governance failure BG Law itself engineered,

2    and it should not be borne by equity.

3        **Alternative Relief: Individual Reductions.** In the alternative, and without waiving the

4    aggregate proportionality arguments, Movant objects to BG Law's fees on the firm-specific

5    grounds set forth in Section VII above and requests individual reductions as warranted

6        **Reservation of Excess Fees Pending Appeal.** Movant requests that any professional fees

7    awarded in excess of the aggregate cap be reserved and held by the Plan Distribution Trustee

8    pending resolution of any appeal. All five professionals have already been paid approximately

9    80% of their requested fees through interim compensation. They will suffer no hardship from a

10   temporary hold on the disputed increment.

11       **Disgorgement.** Movant requests that the Court order disgorgement of interim compensation

12   previously paid to BG Law to the extent it exceeds the Court's final fee award, pursuant to section

13   330(a)(5). Section 331 expressly provides that interim compensation is "subject to... deduction of

14   amounts previously allowed." Interim awards are "tentative" and subject to final adjustment. In

15   re Circle K Corp., 279 F.3d 669, 674 (9th Cir. 2002).

16   **X. PRELIMINARY STATEMENT AND STANDING**

17       Klee Irwin ("Movant") files this Memorandum in Support of his Objection to the Final Fee

18   Application of BG Law LLP (Doc. 945), which seeks $3,156,673.72 in fees and expenses. This

19   Memorandum also serves as the primary comprehensive statement of Movant's objections to

20   aggregate professional fee disproportionality, which is incorporated by reference in the four

21   separate memoranda filed concurrently against the remaining fee applicants.

22       Movant files on dual and alternative bases. First, Movant is the Chairman and Chief

23   Executive Officer of the Reorganized Debtors -- IN Holdings, Inc., IN Holdings Canada, Inc.,

24   5310 Holdings, LLC, and DAI US HoldCo Inc. (collectively, the "Reorganized Debtors") -- and

25   files on their behalf under authority vested by the confirmed Plan. Second, and in the alternative,

26   Movant files in his individual capacity as a creditor of the estate, as a 99.5% equity security holder

27   of the Reorganized Debtors, and as a party in interest under 11 U.S.C. section 1109(b). Standing

28   under section 1109(b) is broadly construed: the statute reflects Congressional intent to "ensure

that all parties in interest are afforded an opportunity to be heard in every aspect of the case." See 11 U.S.C. § 1109(b); In re Alyucan Interstate Corp., 12 B.R. 803, 809 (Bankr. D. Utah 1981).

At the February 19, 2026 hearing on the Reorganized Debtors' Emergency Motion to Enlarge Time (Doc. 1022), the Court was informed that neither of the Reorganized Debtors' counsel of record could represent the Reorganized Debtors in connection with fee objections. BG Law LLP, as the single largest fee applicant, is hopelessly conflicted. Offit Kurman, P.C. withdrew on the morning of the hearing. The Court authorized the undersigned to file pro se fee objections by 12:00 p.m. on Monday, February 23, 2026. Pursuant to the Court's February 20, 2026 Order (Doc. 1053), these objections are filed as separate memoranda for each fee application, each within the 35-page limit under LBR 9013-2, with cross-referencing between memoranda as authorized by the Court.

Movant is joined in these Objections by declarations from Luke Lockhorst and Lyle Maxon, independent members of the Board of Directors of IN Holdings Canada, Inc. -- the publicly traded parent company at the apex of the corporate structure -- who serve as independent directors with fiduciary obligations to the company's more than 200 shareholders. Mr. Lockhorst and Mr. Maxon each file their declarations in their individual capacities as parties in interest under 11 U.S.C. section 1109(b), asserting standing as directors whose fiduciary obligations to equity security holders are directly implicated by the fee awards sought. Their declarations are filed both as standalone filings and as exhibits to the Declaration of Klee Irwin. They set forth their independent judgment that the professional fees sought in this case are unconscionable in relation to the debt reorganized and the value delivered to the estate.

**Disclaimer Regarding Non-Debtor Conduct.** To the extent this Memorandum describes the conduct of East West Bank ("EWB") and other non-debtor parties, such descriptions are presented solely as context relevant to assessing the reasonableness and necessity of professional fees under 11 U.S.C. section 330. Movant does not seek, and expressly disclaims any request for, adjudication of any claims against EWB or any other non-debtor party in connection with this fee proceeding. All rights to pursue such claims in the appropriate forum, including the right to trial by jury, are expressly reserved.

32

6. The following declarations are filed concurrently in support of this Objection:

(a) Declaration of Wayne Platt, CEO and Founding Partner of Marula Capital Group LLC (financial expert);

(b) Declaration of Klee Irwin;

(c) Declaration of Luke Lockhorst, Independent Director, IN Holdings Canada, Inc.;

(d) Declaration of Lyle Maxon, Independent Director, IN Holdings Canada, Inc.;

(e) Declaration of Stephanie Nadanarajah, Operations Director.

**XI. DENIAL OF THE REORGANIZED DEBTORS' RIGHT TO BE HEARD**

On February 11, 2026, the Reorganized Debtors filed an Emergency Motion to Enlarge Time to File Objections to Final Fee Applications (Doc. 1022). The motion documented extraordinary circumstances: the resignation of the Reorganized Debtors' General Counsel on January 9, 2026; a $9 million summary judgment entered against the undersigned on January 27, 2026; the retention of new additional counsel (Offit Kurman, P.C.) who needed time to review five fee applications totaling approximately $6.93 million; and documented medical consequences suffered by the undersigned from the cascading crises.

Three oppositions were filed on February 17, 2026: (a) BG Law LLP (Doc. 1038); (b) Golden Goodrich LLP (Doc. 1036); and (c) East West Bank (Doc. 1037, a "Reservation of Rights" taking no substantive position). Of the two substantive oppositions, BG Law's merits particular attention: BG Law is simultaneously (a) the single largest fee applicant in this case, seeking $3,156,674 (Doc. 945); (b) still counsel of record for the Reorganized Debtors; and (c) the author of an opposition to its own client's motion seeking time to object to BG Law's own fee application. Movant respectfully submits that this is a textbook conflict of interest that this Court should evaluate in assessing the weight to be given BG Law's opposition.

On the morning of February 19, 2026 -- hours before the scheduled hearing -- Offit Kurman withdrew as counsel. At the hearing, Offit Kurman's Casey Donoyan appeared remotely solely to announce "irreconcilable differences." The withdrawal was driven by counsel's own determination that arguing a key rebuttal point -- specifically, that the Stipulation extending the fee objection deadline (Doc. 984) was drafted unilaterally by BG Law while the Reorganized

33

1   Debtors had no general counsel -- would expose Offit Kurman to potential malpractice liability.

2   The Reorganized Debtors' Emergency Motion was denied after the Court heard argument from

3   the two opposing parties but never heard from the movant.

4       Movant preserves the due process objection to the February 19 proceedings and all rights

5   under Fed. R. Bankr. P. 9023 and 9024. The Court gave a lifeline: file pro se fee objections by

6   noon on Monday, February 23, 2026. This Memorandum is that filing. But Movant notes for the

7   record that the substantive arguments the Reorganized Debtors were denied the opportunity to

8   present included:

9       (a) That the Stipulation was drafted and circulated by BG Law -- simultaneously the largest

10  fee applicant and the Reorganized Debtors' counsel responsible for protecting their interests;

11      (b) That the General Counsel had already resigned effective January 9, 2026 -- twelve days

12  before the Stipulation was signed on January 21, 2026 -- leaving the Reorganized Debtors without

13  in-house legal oversight;

14      (c)  That the undersigned, a non-lawyer, received no independent legal advice about the

15          implications of the Stipulation's terms; and

16      (d)  That the three-week extension (to February 11, 2026) was facially inadequate for five

17          separate fee applications totaling $6.93 million.

18  **XII. RESERVATION OF RIGHTS**

19      84.   Movant reserves all rights to litigate claims against EWB and other parties in the

20  appropriate forums, including the right to jury trial, full discovery, and evidence presentation.

21  References to non-debtor conduct herein are solely for fee assessment context and are expressly

22  disclaimed as bases for preclusion in any other proceeding.

23      85.  **Reservation of Appellate Rights.** Movant hereby reserves and preserves the right to

24  appeal any order granting compensation that does not apply the mandatory prohibition of section

25  330(a)(4)(A), that fails to require applicants to demonstrate specific, measurable benefit to the

26  estate, or that declines to apply aggregate proportionality analysis. The legal standard governing

27  section 330(a)(4)(A) -- including whether the statute requires affirmative proof of benefit before

28  lodestar analysis is reached -- is a question of law subject to de novo review on appeal. Movant

34

respectfully requests that this Court make explicit findings as to: (i) what specific benefit each applicant's services provided to the estate; (ii) what the outcome for creditors and equity would have been absent each applicant's engagement; and (iii) how the aggregate fee amount relates to the value delivered. Such findings are necessary for meaningful appellate review.

## XIII. CONCLUSION

86.  BG Law seeks $3,156,674 in fees -- more than every professional in this case combined should have billed under the national benchmark, and 14% of the total debt being reorganized.

87.  In a solvent case that this Court found to be "neither large nor complex," where the company was profitable throughout, no DIP financing was needed, every creditor was paid in full with 14% premium interest, and the company self-funded 80% of professional fees from its own cash flow, BG Law's fee request is indefensible under any proportionality analysis. Ten empirical studies spanning five decades -- including a Federal Reserve Bank of New York meta-analysis and a study published in the Review of Financial Studies -- confirm the aggregate fee pool exceeds every published benchmark by 7x to 36x.

88.  The structural failures documented herein -- the engineered removal of fee oversight, the solvent debtor paradox, and EWB's adversarial fee machine -- explain how fees reached this level. They do not excuse them. The confirmed Plan preserves all objection rights and documents EWB's "unreasonable" professional fees. The Plan conditions payment on this Court's approval. Section 330 requires this Court to exercise that authority

89.  The Supreme Court warned eighty-six years ago that "the history of fees in corporate reorganizations contains many sordid chapters." Dickinson Industrial Site, Inc. v. Cowan, 309 U.S. 382, 388 (1940). Congress responded by enacting section 330 as a gatekeeping statute. The Ninth Circuit built a proportionality doctrine -- from Puget Sound Plywood through Gilsvik -- that gives this Court both the authority and the framework to correct the excess.

90.  When every market-based constraint has been disabled -- when creditors have no reason to object, when the equity holder has been sidelined, when the committee has joined the feast, when the independent director reports to the professionals, and when the adversarial engine runs unchecked -- this Court's independent duty under section 330 is the only safeguard remaining.

The more than 200 investors who placed their trust and capital in this company have no one else to turn to. This Court is their last line of defense.

91. For the foregoing reasons, Movant respectfully requests that this Court grant the relief set forth in Section IX above.

Dated: February 23, 2026

Respectfully submitted,

KLEE IRWIN, Pro Se
Chairman/CEO of Reorganized Debtors, Creditor and 99.5% Equity Security Holder

36

**EXHIBIT A**

**LODESTAR AUDIT — BG LAW LLP (Doc. 945)**

**Exhibit to Memorandum in Support of Objection to Final Fee Application**

**Case No. 1:24-bk-11323-VK | In re IN Holdings, Inc., et al.**

**Prepared: February 23, 2026**

## METHODOLOGY

This audit applies the following standards to each billing category and, where discernible from the fee application narrative and billing detail, to individual entries:

1. **Baker Botts L.L.P. v. ASARCO LLC, 576 U.S. 121 (2015):** Fee application preparation and fee defense time is categorically non-compensable under § 330. 100% disallowance of Task Codes 130 and 135.

2. **11 U.S.C. § 330(a)(4)(A)(i):** "The court shall not allow compensation for... unnecessary duplication of services." Cross-firm duplication flagged where BG Law performed functions overlapping with Brown White (litigation), Province (financial analysis), or Force Ten (financial advisory).

3. **Welch v. Metropolitan Life Ins. Co., 480 F.3d 942, 948 (9th Cir. 2007):** Block billing impedes meaningful judicial review. Block-billed entries (multiple discrete tasks in a single entry) identified and subjected to 30% presumptive reduction per Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

4. **In re Puget Sound Plywood, Inc., 924 F.2d 955, 958 (9th Cir. 1991):** Counsel must exercise "billing judgment" and scale fees to reasonably expected recovery. Multi-attorney conferencing exceeding 15% of total hours in any category flagged for 50% reduction of excess.

5. **11 U.S.C. § 330(a)(3)(D):** Services must be "performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed." Court found this case "neither large nor complex" (Doc. 516 at 16). Overstaffing (3+ timekeepers billing same task/date) flagged for partner-level reduction.

6. **In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 852 (3d Cir. 1994):** The test is what an economically motivated private client would pay. Partner-heavy staffing (>60% partner

1

ratio) subjected to rate-blending reduction for work appropriate for associates.

7. **Solvent Debtor Necessity Test:** In a hyper-solvent case where creditors were paid 100% with 14% premium interest, each service must demonstrate specific, incremental benefit to the estate beyond what solvency already guaranteed. Discretionary adversarial billing in a case with assured recovery flagged for reduction.

## TIMEKEEPER SUMMARY

| Timekeeper | Role | Admitted | Rate(s) | Hours | Fees |
|---|---|---|---|---|---|
| Howard Gubner (HMG) | Partner | 1991 | $1,195 | 1.2 | $1,434.00 |
| David M. Poitras (DMP) | Partner | 1989 | $895-$995 | 670.3 | $638,238.50 |
| Stanley Komorsky (JBK) | Partner | 1991 | $825 | 1.9 | $1,567.50 |
| Susan K. Seflin (SKS) | Partner | 2001 | $825-$895 | 1,385.8 | $1,199,116.00 |
| Richard Bregman (RLB) | Partner | 1990 | $895 | 7.8 | $6,981.00 |
| Jessica Bagdanov (JLB) | Partner | 2011 | $725-$795 | 194.0 | $143,793.00 |
| Monica Teesdale (MAT) | Sr. Assoc | 2013 | $645-$695 | 65.9 | $45,240.50 |
| Jessica S. Wellington (JSW) | Associate | 2018 | $525-$595 | 617.7 | $345,922.50 |
| Treshinsky | Paralegal | — | $395 | 66.1 | $26,329.50 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Fields | Paralegal | — | $325 | 29.2 | $11,156.00 |
| Paul | Law Clerk | — | $300 | 0.2 | $60.00 |
| **TOTAL** | | | **$795.97 eff.** | **3,040.1** | **$2,419,838.50** |

**Partner staffing ratio: 75.2%** (2,261.0 of 3,040.1 hours). Industry norm for mid-market bankruptcy: ~45-55%.

## CATEGORY-BY-CATEGORY AUDIT

**CATEGORY A: Asset Analysis & Recovery (Task Code 100)**

• **Hours:** 2.6 | **Fees:** $2,126.00 | **% of Total:** 0.09%

• **Assessment:** Minimal. No objection to this category.

• **Recommended Reduction:** $0

• **Allowed:** $2,126.00

**CATEGORY B: Asset Disposition (Task Code 105)**

• **Hours:** 674.6 | **Fees:** $574,643.00 | **% of Total:** 23.8%

• **Assessment:** This is the second-largest category. BG Law billed 674.6 hours for sale-related work including drafting bid procedures, NDAs, asset purchase agreements, and coordinating with STS Capital Partners, FitLife, Robinson, EWB, and the Committee. Key concerns:

– **Overlap with STS Capital Partners:** STS was retained as investment banker at a $3.18M success fee specifically to manage the sale process. BG Law billing 674.6 hours on sale-related matters duplicates STS's core function. An economically motivated private client paying a $3.18M investment banking fee would not simultaneously pay its law firm $574,643 for parallel sale management.

3

– **Overlap with Province:** Province, as financial advisor ($2.19M), was simultaneously analyzing valuation, bid requirements, and sale alternatives.

– **Block billing detected:** Multiple entries combine "review correspondence," "prepare response," "exchange emails," and "conversation with [party]" in single entries with 1.0-2.6 hour blocks. Examples from Exhibit 1:

  – 2/10/2025 SKS: 2.2 hrs "Review Fitlife offer and analysis... revise draft response... exchange correspondence (multiple)... with client" — 4 discrete tasks

  – 2/25/2025 SKS: 2.3 hrs "Draft stipulation... exchange correspondence (multiple)... exchange correspondence (multiple) with Adam Meislik and Jeff Golden" — 4 discrete tasks

  – 3/13/2025 SKS: 2.6 hrs "Review and revise bid procedures motion [2.2]; revise Platt and Willis declarations [.4]" — mixed tasks

  – 3/14/2025 DMP: 4.0 hrs "Work on bid procedures pleadings" — vague block

– **Multi-attorney conferencing:** DMP and SKS frequently billed the same day for the same sale-related matters (e.g., 2/10, 2/27, 3/7, 3/10, 3/11, 3/13, 3/14), often with JLB and JSW also billing. Four timekeepers billing the same category on the same day is overstaffing for a "neither large nor complex" case.

• **Recommended Reductions:**

  – 20% cross-professional duplication with STS/Province: -$114,929

  – 15% block billing penalty on block-billed entries (est. 40% of category): -$34,479

  – 10% overstaffing reduction on multi-timekeeper overlap days: -$57,464

• **Total Recommended Reduction:** $206,872 (36%)

• **Allowed:** $367,771


**CATEGORY C: Business Operations (Task Code 110)**

• **Hours:** 41.3 | **Fees:** $35,371.50 | **% of Total:** 1.5%

• **Assessment:** Includes independent director appointment and business operations communication. Key concern:

     – BG Law drafted and prepared the motion to appoint Brad Sharp as independent director
      — the person who subsequently refused to gate BG Law's own fees. This creates a
      structural conflict: BG Law billed the estate to install its own fee watchdog who then
      declined to watch.

• **Recommended Reduction:** 50% of Sharp-related entries (est. $10,000): -$10,000

• **Allowed:** $25,372

**CATEGORY D: General Case Administration (Task Code 115)**

• **Hours:** 62.1 | **Fees:** $51,027.50 | **% of Total:** 2.1%

• **Assessment:** Administrative work including MORs, compliance, status conferences, and
     docket maintenance. Routine work performed primarily at partner rates ($825-$895/hr).
     Rate concern:

     – Filing MORs, preparing status reports, and administrative compliance are associate-level
      tasks. At an associate rate of $550/hr (midpoint), the rate premium on 50% of these
      hours is unjustified.

• **Recommended Reduction:** Rate blend reduction on 50% of hours (31 hrs × $275 rate
     differential): -$8,525

• **Allowed:** $42,503

**CATEGORY E: Claims Administration (Task Code 120)**

• **Hours:** 277.9 | **Fees:** $226,588.50 | **% of Total:** 9.4%

• **Assessment:** Claims review, objections, negotiations with individual claimants (IRS, Karled,
     Armanino, Rebecca Rausch, etc.). Key concerns:

     – In a solvent debtor case paying 100% with premium interest, the marginal value of
      aggressive claims litigation is near zero — every claim was going to be paid in full.
      Extensive claims objection work in a solvent case benefits the professionals (who
      generate fees) more than the estate (which was paying every claim regardless).

     – **Solvent debtor necessity test:** The Court should ask: which of these 277.9 hours of

claims work changed the outcome for any creditor? In a case where every creditor received 100% with 14% premium interest, the answer approaches zero.

• **Recommended Reduction:** 40% solvent-debtor necessity reduction: -$90,635

• **Allowed:** $135,953

---

**CATEGORY F: Fee/Employment Applications (Task Code 130)**

• **Hours:** 314.8 | **Fees:** $214,398.00 | **% of Total:** 8.9%

• **Assessment: 100% DISALLOWANCE REQUIRED.**

— Under Baker Botts L.L.P. v. ASARCO LLC, 576 U.S. 121 (2015), the Supreme Court held that § 330(a)(1) does not permit compensation for time spent preparing fee applications. This is a categorical bar.

— BG Law billed 314.8 hours — 10.4% of total Second Period hours — preparing its own fee application AND the fee applications of other professionals (Essex, STS, RSM, Province, BWO, Marula, JGJ). BG Law effectively served as the fee-application factory for the entire estate, billing the estate to prepare the fee requests that the estate would then have to pay.

— This category also includes BG Law's time drafting its own interim fee application and reviewing other professionals' monthly fee statements — classic self-interested billing.

— Even under the more generous In re CLST Enterprises standard (3-5% cap), BG Law's 10.4% is more than double the acceptable maximum.

— Note: BG Law's preparation of OTHER professionals' fee applications (Essex, STS, RSM, Province, BWO) at partner rates is doubly objectionable — those professionals should have prepared their own applications.

• **Recommended Reduction:** 100% disallowance: -$214,398

• **Allowed:** $0.00

**CATEGORY G: Fee/Employment Objections (Task Code 135)**

- **Hours:** 11.9 | **Fees:** $9,968.50 | **% of Total:** 0.4%

- **Assessment: 100% DISALLOWANCE REQUIRED.**

  – Under Baker Botts, fee defense is categorically non-compensable. BG Law billed 11.9
    hours responding to objections to employment applications and fee applications.

  – Additional fee defense time will have been incurred in connection with the February 25,
    2026 hearing. None of it is compensable.

- **Recommended Reduction:** 100% disallowance: -$9,968.50

- **Allowed:** $0.00

---

**CATEGORY H: Financing (Task Code 140)**

- **Hours:** 195.3 | **Fees:** $170,335.50 | **% of Total:** 7.0%

- **Assessment:** Cash collateral motions, DIP financing analysis, secured claims, and EWB
  negotiations. Key concerns:

  – **No DIP financing was needed.** The company was profitable throughout and self-funded
    operations. Yet BG Law billed 195.3 hours on "financing" issues. The bulk of this time
    was devoted to cash collateral disputes with EWB — disputes that were driven by
    EWB's adversarial posture, not by any genuine financing need.

  – **Overlap with Province:** Province, as financial advisor, was simultaneously analyzing
    cash flow projections, budgets, and variance reports referenced in this category.

  – **Block billing:** "Attention to valuation issues" (DMP, multiple dates, 0.5-0.6 hrs each) —
    vague, non-specific entries.

- **Recommended Reduction:**

  – 25% duplication with Province on financial analysis: -$42,584

  – 10% for vague/block-billed entries: -$17,034

- **Total Recommended Reduction:** $59,618 (35%)

- **Allowed:** $110,718

7

**CATEGORY I: Plan and Disclosure Statement (Task Code 170)**

• **Hours:** 1,281.2 | **Fees:** $989,604.00 | **% of Total:** 40.9%

• **Assessment: This is the largest category by far — 42.1% of all Second Period fees.** It encompasses plan drafting, disclosure statement preparation, confirmation hearings, discovery, and the appeal. Key concerns:

— **Volume:** 1,281.2 hours of plan-related work in a case the Court found "neither large nor complex." For context, many mid-market Chapter 11 cases complete plan drafting and confirmation in 200-400 hours of attorney time. BG Law billed more than three times that amount.

— **Multiple plan iterations:** BG Law drafted the Proposed Second Amended DS, the Second Amended DS and related chapter 11 plan, the Third Amended DS and related plan, the Joint Plan and disclosure statement, plus objections to FitLife DS and Robinson DS. The multiple iterations reflect the adversarial environment created by EWB and FitLife, but the question under § 330 is whether the resulting cost was commensurate with the complexity of the actual disputes.

— **Overlap with Province and Force Ten:** Plan economics, distribution waterfalls, and feasibility analysis necessarily involved Province ($2.19M) and Force Ten ($424K). Three firms analyzing the same plan economics is inherently duplicative in a solvent case with a single viable plan structure.

— **Exclusivity motion work included:** BG Law includes time on the motion to extend exclusivity and the motion to terminate exclusivity — procedural motions that do not add value to the estate.

— **Appeal work included:** BG Law includes 52.9 hours ($33,131.50) for the appeal. This is also categorized separately as Task Code "Appeal" but appears to overlap.

— **Multi-attorney staffing:** Plan work involved SKS, DMP, JSW, JLB, MAT, and JBK — six timekeepers on plan work in a "neither large nor complex" case. On peak days (e.g., 3/13/2025, 3/14/2025), four or more timekeepers billed the same plan category.

8

- **Recommended Reductions:**

  – 20% overstaffing/excessive iteration reduction: -$197,921

  – 15% cross-firm duplication with Province/Force Ten: -$148,441

  – 10% block billing penalty on block-billed entries: -$98,960

- **Total Recommended Reduction:** $445,322 (45%)

- **Allowed:** $544,282

---

**CATEGORY J: Relief from Stay (Task Code 180)**

- **Hours:** 0.9 | **Fees:** $805.50 | **% of Total:** 0.03%

- **Assessment:** Minimal. No objection.

- **Recommended Reduction:** $0

- **Allowed:** $805.50

**CATEGORY K: Litigation - General (Task Code Lit)**

- **Hours:** 124.6 | **Fees:** $111,839.00 | **% of Total:** 4.6%

- **Assessment:** Litigation claims against EWB, mediation, and district court litigation. Key
  concerns:

  – **Overlap with Brown White:** Brown White was retained as special litigation counsel
    specifically for this work, billing $249,458 at $1,050/hr. If BG Law was simultaneously
    billing 124.6 hours on litigation, the estate paid for two firms to perform the same
    litigation function.

  – **Mediation overlap:** Both BG Law and Brown White billed for mediation preparation and
    attendance.

  – **Solvent debtor necessity:** Litigation against EWB in the bankruptcy context, while
    potentially valuable, must be measured against its actual contribution. The mediation
    resulted in the same plan structure that solvency already guaranteed.

- **Recommended Reduction:**

  – 50% cross-firm duplication with Brown White: -$55,920

  – 15% solvent debtor necessity: -$16,776

- **Total Recommended Reduction:** $72,696 (65%)

- **Allowed:** $39,143

---

**CATEGORY L: The Appeal (Task Code 6120.001.01)**

- **Hours:** 52.9 | **Fees:** $33,131.50 | **% of Total:** 1.4%

- **Assessment:** BAP Stay Motion, opening brief, stipulation to dismiss. These services are not inherently objectionable, but:

  – The appeal was ultimately dismissed by stipulation — raising the question whether the briefing delivered net value to the estate.

  – Overlap with Plan category (170) is acknowledged in the fee application itself.

- **Recommended Reduction:** 25% for limited value realized: -$8,283

- **Allowed:** $24,849

---

## SUMMARY OF RECOMMENDED REDUCTIONS

| Category | Code | BG Claimed | Recommended Reduction | Basis | Allowed |
|---|---|---|---|---|---|
| Asset Analysis | 100 | $2,126 | $0 | — | $2,126 |
| Asset Disposition | 105 | $574,643 | -$206,872 (36%) | STS/Province overlap, block billing, | $367,771 |

| | | | | overstaffing | |
|---|---|---|---|---|---|
| Business Ops | 110 | $35,372 | -$10,000 (28%) | Sharp-installation conflict | $25,372 |
| General Case Admin | 115 | $51,028 | -$8,525 (17%) | Rate blending (associate-level work at partner rates) | $42,503 |
| Claims Admin | 120 | $226,589 | -$90,635 (40%) | Solvent debtor necessity — claims paid 100% regardless | $135,953 |
| Fee/Employment Apps | 130 | $214,398 | **-$214,398 (100%)** | **Baker Botts categorical bar** | **$0** |
| Fee/Employment Obj | 135 | $9,969 | **-$9,969 (100%)** | **Baker Botts categorical bar** | **$0** |
| Financing | 140 | $170,336 | -$59,618 (35%) | Province overlap, vague entries, no DIP needed | $110,718 |
| Plan and DS | 170 | $989,604 | -$445,322 (45%) | Overstaffing, excessive iterations, cross-firm duplication | $544,282 |
| Relief from Stay | 180 | $806 | $0 | — | $806 |
| Litigation | Lit | $111,839 | -$72,696 (65%) | Brown White duplication, solvent debtor necessity | $39,143 |
| Appeal | 6120.001.01 | $33,132 | -$8,283 (25%) | Dismissed by | $24,849 |

11

| | | | | stipulation, limited value | |
|---|---|---|---|---|---|
| **SECOND PERIOD TOTAL** | | $2,419,839 | -$1,126,317 (46.5%) | | $1,293,522 |

## FIRST COVERED PERIOD

BG Law's First Covered Period fees of $659,407.93 (Aug 13 - Dec 31, 2024) are subject to the same analytical framework. A proportional reduction of 46.5% yields $352,783 allowed.

| Period | BG Claimed | Reduction | Allowed |
|---|---|---|---|
| First Covered Period | $659,408 | -$306,625 (46.5%) | $352,783 |
| Second Covered Period | $2,419,839 | -$1,126,317 (46.5%) | $1,293,522 |
| **TOTAL FEES** | **$3,079,247** | **-$1,432,942 (46.5%)** | **$1,646,305** |

**Note:** Total case fees including expenses = $3,156,674. Expenses of $77,427 are addressed separately below.

## EXPENSE AUDIT

| Expense Category | Amount | Assessment |
|---|---|---|
| Arbitration/Mediation | $20,000 | Subject to necessity review — mediation produced settlement that solvency already guaranteed |
| Court Reporter | $11,700 | Allowable |
| Online Research (Westlaw/Pacer) | $9,800 | Partially allowable — pro rata Westlaw allocation methodology should be scrutinized |
| Outside Professional Services | $15,700 | Requires itemization — "outside professional services" is too vague |

| Photocopies/Prints ($0.20/pg) | Various | Industry standard |
|---|---|---|
| Facsimile ($1.00/pg) | Various | Anachronistic — fax charges in 2025 are questionable |
| Parking | Various | Allowable at cost |
| Postage | Various | Allowable |
| **Total Expenses** | **$77,427** | **Recommended 20% reduction: -$15,485** |

## AGGREGATE RECOMMENDED ALLOWANCE FOR BG LAW

| Component | BG Claimed | Recommended Allowed |
|---|---|---|
| Fees (both periods) | $3,079,247 | $1,646,305 |
| Expenses | $77,427 | $61,942 |
| **TOTAL** | **$3,156,674** | **$1,708,247** |

**Reduction: $1,448,427 (45.9%)**

This recommended allowance of $1,708,247 falls within Wayne Platt's stated range for total professional fees for all professionals in a case of this size ($1-3 million), confirming that even at this reduced level, BG Law's compensation remains generous for its role as primary counsel in a case that was "neither large nor complex."

## ALTERNATIVE: AGGREGATE CAP ALLOCATION

Under the primary remedy requested in the BG Law Memorandum (aggregate cap of $2,275,500 for all five applicants), BG Law's proportional allocation would be approximately **$1,069,500** — reflecting BG Law's 47% share of total fees sought. The lodestar audit supports a reduction to at least $1,708,247 on independent grounds, and the aggregate cap provides a further basis for reduction if the Court adopts the proportionality framework.

1

2

3   *Prepared in support of the Objection filed by Klee Irwin, Pro Se, Chairman/CEO of

4   Reorganized Debtors, Creditor and 99.5% Equity Security Holder, pursuant to 11 U.S.C. §

5   1109(b).*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LODESTAR AUDIT — BG LAW LLP (Doc. 945)**

**Exhibit to Memorandum in Support of Objection to Final Fee Application**

**Case No. 1:24-bk-11323-VK | In re IN Holdings, Inc., et al.**

**Prepared: February 23, 2026**

## METHODOLOGY

This audit applies the following standards to each billing category and, where discernible from the fee application narrative and billing detail, to individual entries:

1. **Baker Botts L.L.P. v. ASARCO LLC, 576 U.S. 121 (2015):** Fee application preparation and fee defense time is categorically non-compensable under § 330. 100% disallowance of Task Codes 130 and 135.

2. **11 U.S.C. § 330(a)(4)(A)(i):** "The court shall not allow compensation for... unnecessary duplication of services." Cross-firm duplication flagged where BG Law performed functions overlapping with Brown White (litigation), Province (financial analysis), or Force Ten (financial advisory).

3. **Welch v. Metropolitan Life Ins. Co., 480 F.3d 942, 948 (9th Cir. 2007):** Block billing impedes meaningful judicial review. Block-billed entries (multiple discrete tasks in a single entry) identified and subjected to 30% presumptive reduction per Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

4. **In re Puget Sound Plywood, Inc., 924 F.2d 955, 958 (9th Cir. 1991):** Counsel must exercise "billing judgment" and scale fees to reasonably expected recovery. Multi-attorney conferencing exceeding 15% of total hours in any category flagged for 50% reduction of excess.

5. **11 U.S.C. § 330(a)(3)(D):** Services must be "performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed." Court found this case "neither large nor complex" (Doc. 516 at 16). Overstaffing (3+ timekeepers billing same task/date) flagged for partner-level reduction.

6. **In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 852 (3d Cir. 1994):** The test is what an

economically motivated private client would pay. Partner-heavy staffing (>60% partner ratio) subjected to rate-blending reduction for work appropriate for associates.

7. **Solvent Debtor Necessity Test:** In a hyper-solvent case where creditors were paid 100% with 14% premium interest, each service must demonstrate specific, incremental benefit to the estate beyond what solvency already guaranteed. Discretionary adversarial billing in a case with assured recovery flagged for reduction.

## TIMEKEEPER SUMMARY

| Timekeeper | Role | Admitted | Rate(s) | Hours | Fees |
|---|---|---|---|---|---|
| Howard Gubner (HMG) | Partner | 1991 | $1,195 | 1.2 | $1,434.00 |
| David M. Poitras (DMP) | Partner | 1989 | $895-$995 | 670.3 | $638,238.50 |
| Stanley Komorsky (JBK) | Partner | 1991 | $825 | 1.9 | $1,567.50 |
| Susan K. Seflin (SKS) | Partner | 2001 | $825-$895 | 1,385.8 | $1,199,116.00 |
| Richard Bregman (RLB) | Partner | 1990 | $895 | 7.8 | $6,981.00 |
| Jessica Bagdanov (JLB) | Partner | 2011 | $725-$795 | 194.0 | $143,793.00 |
| Monica Teesdale (MAT) | Sr. Assoc | 2013 | $645-$695 | 65.9 | $45,240.50 |
| Jessica S. Wellington (JSW) | Associate | 2018 | $525-$595 | 617.7 | $345,922.50 |

| Treshinsky | Paralegal | — | $395 | 66.1 | $26,329.50 |
|---|---|---|---|---|---|
| Fields | Paralegal | — | $325 | 29.2 | $11,156.00 |
| Paul | Law Clerk | — | $300 | 0.2 | $60.00 |
| **TOTAL** | | | **$795.97 eff.** | **3,040.1** | **$2,419,838.50** |

**Partner staffing ratio: 75.2%** (2,261.0 of 3,040.1 hours). Industry norm for mid-market bankruptcy: ~45-55%.

## CATEGORY-BY-CATEGORY AUDIT

**CATEGORY A: Asset Analysis & Recovery (Task Code 100)**

• **Hours:** 2.6 | **Fees:** $2,126.00 | **% of Total:** 0.09%

• **Assessment:** Minimal. No objection to this category.

• **Recommended Reduction:** $0

• **Allowed:** $2,126.00

**CATEGORY B: Asset Disposition (Task Code 105)**

• **Hours:** 674.6 | **Fees:** $574,643.00 | **% of Total:** 23.8%

• **Assessment:** This is the second-largest category. BG Law billed 674.6 hours for sale-related work including drafting bid procedures, NDAs, asset purchase agreements, and coordinating with STS Capital Partners, FitLife, Robinson, EWB, and the Committee. Key concerns:

  – **Overlap with STS Capital Partners:** STS was retained as investment banker at a $3.18M success fee specifically to manage the sale process. BG Law billing 674.6 hours on sale-related matters duplicates STS's core function. An economically motivated private client paying a $3.18M investment banking fee would not simultaneously pay its

17

law firm $574,643 for parallel sale management.

– **Overlap with Province:** Province, as financial advisor ($2.19M), was simultaneously analyzing valuation, bid requirements, and sale alternatives.

– **Block billing detected:** Multiple entries combine "review correspondence," "prepare response," "exchange emails," and "conversation with [party]" in single entries with 1.0-2.6 hour blocks. Examples from Exhibit 1:

– 2/10/2025 SKS: 2.2 hrs "Review Fitlife offer and analysis... revise draft response... exchange correspondence (multiple)... with client" — 4 discrete tasks

– 2/25/2025 SKS: 2.3 hrs "Draft stipulation... exchange correspondence (multiple)... exchange correspondence (multiple) with Adam Meislik and Jeff Golden" — 4 discrete tasks

– 3/13/2025 SKS: 2.6 hrs "Review and revise bid procedures motion [2.2]; revise Platt and Willis declarations [.4]" — mixed tasks

– 3/14/2025 DMP: 4.0 hrs "Work on bid procedures pleadings" — vague block

– **Multi-attorney conferencing:** DMP and SKS frequently billed the same day for the same sale-related matters (e.g., 2/10, 2/27, 3/7, 3/10, 3/11, 3/13, 3/14), often with JLB and JSW also billing. Four timekeepers billing the same category on the same day is overstaffing for a "neither large nor complex" case.

• **Recommended Reductions:**

– 20% cross-professional duplication with STS/Province: -$114,929

– 15% block billing penalty on block-billed entries (est. 40% of category): -$34,479

– 10% overstaffing reduction on multi-timekeeper overlap days: -$57,464

• **Total Recommended Reduction:** $206,872 (36%)

• **Allowed:** $367,771

**CATEGORY C: Business Operations (Task Code 110)**

• **Hours:** 41.3 | **Fees:** $35,371.50 | **% of Total:** 1.5%

- **Assessment:** Includes independent director appointment and business operations communication. Key concern:

  – BG Law drafted and prepared the motion to appoint Brad Sharp as independent director — the person who subsequently refused to gate BG Law's own fees. This creates a structural conflict: BG Law billed the estate to install its own fee watchdog who then declined to watch.

- **Recommended Reduction:** 50% of Sharp-related entries (est. $10,000): -$10,000

- **Allowed:** $25,372


**CATEGORY D: General Case Administration (Task Code 115)**

- **Hours:** 62.1 | **Fees:** $51,027.50 | **% of Total:** 2.1%

- **Assessment:** Administrative work including MORs, compliance, status conferences, and docket maintenance. Routine work performed primarily at partner rates ($825-$895/hr). Rate concern:

  – Filing MORs, preparing status reports, and administrative compliance are associate-level tasks. At an associate rate of $550/hr (midpoint), the rate premium on 50% of these hours is unjustified.

- **Recommended Reduction:** Rate blend reduction on 50% of hours (31 hrs × $275 rate differential): -$8,525

- **Allowed:** $42,503


**CATEGORY E: Claims Administration (Task Code 120)**

- **Hours:** 277.9 | **Fees:** $226,588.50 | **% of Total:** 9.4%

- **Assessment:** Claims review, objections, negotiations with individual claimants (IRS, Karled, Armanino, Rebecca Rausch, etc.). Key concerns:

  – In a solvent debtor case paying 100% with premium interest, the marginal value of aggressive claims litigation is near zero — every claim was going to be paid in full. Extensive claims objection work in a solvent case benefits the professionals (who

19

generate fees) more than the estate (which was paying every claim regardless).

    – **Solvent debtor necessity test:** The Court should ask: which of these 277.9 hours of claims work changed the outcome for any creditor? In a case where every creditor received 100% with 14% premium interest, the answer approaches zero.

• **Recommended Reduction:** 40% solvent-debtor necessity reduction: -$90,635

• **Allowed:** $135,953

---

**CATEGORY F: Fee/Employment Applications (Task Code 130)**

• **Hours:** 314.8 | **Fees:** $214,398.00 | **% of Total:** 8.9%

• **Assessment: 100% DISALLOWANCE REQUIRED.**

    – Under Baker Botts L.L.P. v. ASARCO LLC, 576 U.S. 121 (2015), the Supreme Court held that § 330(a)(1) does not permit compensation for time spent preparing fee applications. This is a categorical bar.

    – BG Law billed 314.8 hours — 10.4% of total Second Period hours — preparing its own fee application AND the fee applications of other professionals (Essex, STS, RSM, Province, BWO, Marula, JGJ). BG Law effectively served as the fee-application factory for the entire estate, billing the estate to prepare the fee requests that the estate would then have to pay.

    – This category also includes BG Law's time drafting its own interim fee application and reviewing other professionals' monthly fee statements — classic self-interested billing.

    – Even under the more generous In re CLST Enterprises standard (3-5% cap), BG Law's 10.4% is more than double the acceptable maximum.

    – Note: BG Law's preparation of OTHER professionals' fee applications (Essex, STS, RSM, Province, BWO) at partner rates is doubly objectionable — those professionals should have prepared their own applications.

• **Recommended Reduction:** 100% disallowance: -$214,398

• **Allowed:** $0.00

20

**CATEGORY G: Fee/Employment Objections (Task Code 135)**

• **Hours:** 11.9 | **Fees:** $9,968.50 | **% of Total:** 0.4%

• **Assessment: 100% DISALLOWANCE REQUIRED.**

    — Under Baker Botts, fee defense is categorically non-compensable. BG Law billed 11.9
        hours responding to objections to employment applications and fee applications.

    — Additional fee defense time will have been incurred in connection with the February 25,
        2026 hearing. None of it is compensable.

• **Recommended Reduction:** 100% disallowance: -$9,968.50

• **Allowed:** $0.00

---

**CATEGORY H: Financing (Task Code 140)**

• **Hours:** 195.3 | **Fees:** $170,335.50 | **% of Total:** 7.0%

• **Assessment:** Cash collateral motions, DIP financing analysis, secured claims, and EWB
  negotiations. Key concerns:

    — **No DIP financing was needed.** The company was profitable throughout and self-funded
        operations. Yet BG Law billed 195.3 hours on "financing" issues. The bulk of this time
        was devoted to cash collateral disputes with EWB — disputes that were driven by
        EWB's adversarial posture, not by any genuine financing need.

    — **Overlap with Province:** Province, as financial advisor, was simultaneously analyzing
        cash flow projections, budgets, and variance reports referenced in this category.

    — **Block billing:** "Attention to valuation issues" (DMP, multiple dates, 0.5-0.6 hrs each) —
        vague, non-specific entries.

• **Recommended Reduction:**

    — 25% duplication with Province on financial analysis: -$42,584

    — 10% for vague/block-billed entries: -$17,034

- **Total Recommended Reduction: $59,618 (35%)**

- **Allowed: $110,718**

---

**CATEGORY I: Plan and Disclosure Statement (Task Code 170)**

- **Hours: 1,281.2 | Fees: $989,604.00 | % of Total: 40.9%**

- **Assessment: This is the largest category by far — 42.1% of all Second Period fees.** It encompasses plan drafting, disclosure statement preparation, confirmation hearings, discovery, and the appeal. Key concerns:

  – **Volume:** 1,281.2 hours of plan-related work in a case the Court found "neither large nor complex." For context, many mid-market Chapter 11 cases complete plan drafting and confirmation in 200-400 hours of attorney time. BG Law billed more than three times that amount.

  – **Multiple plan iterations:** BG Law drafted the Proposed Second Amended DS, the Second Amended DS and related chapter 11 plan, the Third Amended DS and related plan, the Joint Plan and disclosure statement, plus objections to FitLife DS and Robinson DS. The multiple iterations reflect the adversarial environment created by EWB and FitLife, but the question under § 330 is whether the resulting cost was commensurate with the complexity of the actual disputes.

  – **Overlap with Province and Force Ten:** Plan economics, distribution waterfalls, and feasibility analysis necessarily involved Province ($2.19M) and Force Ten ($424K). Three firms analyzing the same plan economics is inherently duplicative in a solvent case with a single viable plan structure.

  – **Exclusivity motion work included:** BG Law includes time on the motion to extend exclusivity and the motion to terminate exclusivity — procedural motions that do not add value to the estate.

  – **Appeal work included:** BG Law includes 52.9 hours ($33,131.50) for the appeal. This is also categorized separately as Task Code "Appeal" but appears to overlap.

  – **Multi-attorney staffing:** Plan work involved SKS, DMP, JSW, JLB, MAT, and JBK —

six timekeepers on plan work in a "neither large nor complex" case. On peak days (e.g., 3/13/2025, 3/14/2025), four or more timekeepers billed the same plan category.

• **Recommended Reductions:**

   – 20% overstaffing/excessive iteration reduction: -$197,921

   – 15% cross-firm duplication with Province/Force Ten: -$148,441

   – 10% block billing penalty on block-billed entries: -$98,960

• **Total Recommended Reduction:** $445,322 (45%)

• **Allowed:** $544,282

---

**CATEGORY J: Relief from Stay (Task Code 180)**

• **Hours:** 0.9 | **Fees:** $805.50 | **% of Total:** 0.03%

• **Assessment:** Minimal. No objection.

• **Recommended Reduction:** $0

• **Allowed:** $805.50

**CATEGORY K: Litigation - General (Task Code Lit)**

• **Hours:** 124.6 | **Fees:** $111,839.00 | **% of Total:** 4.6%

• **Assessment:** Litigation claims against EWB, mediation, and district court litigation. Key concerns:

   – **Overlap with Brown White:** Brown White was retained as special litigation counsel specifically for this work, billing $249,458 at $1,050/hr. If BG Law was simultaneously billing 124.6 hours on litigation, the estate paid for two firms to perform the same litigation function.

   – **Mediation overlap:** Both BG Law and Brown White billed for mediation preparation and attendance.

    — **Solvent debtor necessity:** Litigation against EWB in the bankruptcy context, while potentially valuable, must be measured against its actual contribution. The mediation resulted in the same plan structure that solvency already guaranteed.

• **Recommended Reduction:**

    — 50% cross-firm duplication with Brown White: -$55,920

    — 15% solvent debtor necessity: -$16,776

• **Total Recommended Reduction:** $72,696 (65%)

• **Allowed:** $39,143

---

**CATEGORY L: The Appeal (Task Code 6120.001.01)**

• **Hours:** 52.9 | **Fees:** $33,131.50 | **% of Total:** 1.4%

• **Assessment:** BAP Stay Motion, opening brief, stipulation to dismiss. These services are not inherently objectionable, but:

    — The appeal was ultimately dismissed by stipulation — raising the question whether the briefing delivered net value to the estate.

    — Overlap with Plan category (170) is acknowledged in the fee application itself.

• **Recommended Reduction:** 25% for limited value realized: -$8,283

• **Allowed:** $24,849

---

**SUMMARY OF RECOMMENDED REDUCTIONS**

| Category | Code | BG Claimed | Recommended Reduction | Basis | Allowed |
|---|---|---|---|---|---|
| | | | | | |

| Asset Analysis | 100 | $2,126 | $0 | — | $2,126 |
|---|---|---|---|---|---|
| Asset Disposition | 105 | $574,643 | -$206,872 (36%) | STS/Province overlap, block billing, overstaffing | $367,771 |
| Business Ops | 110 | $35,372 | -$10,000 (28%) | Sharp-installation conflict | $25,372 |
| General Case Admin | 115 | $51,028 | -$8,525 (17%) | Rate blending (associate-level work at partner rates) | $42,503 |
| Claims Admin | 120 | $226,589 | -$90,635 (40%) | Solvent debtor necessity — claims paid 100% regardless | $135,953 |
| Fee/Employment Apps | 130 | $214,398 | **-$214,398 (100%)** | **Baker Botts categorical bar** | **$0** |
| Fee/Employment Obj | 135 | $9,969 | **-$9,969 (100%)** | **Baker Botts categorical bar** | **$0** |
| Financing | 140 | $170,336 | -$59,618 (35%) | Province overlap, vague entries, no DIP needed | $110,718 |
| Plan and DS | 170 | $989,604 | -$445,322 (45%) | Overstaffing, excessive iterations, cross-firm duplication | $544,282 |
| Relief from Stay | 180 | $806 | $0 | — | $806 |

| Litigation | Lit | $111,839 | -$72,696 (65%) | Brown White duplication, solvent debtor necessity | $39,143 |
| Appeal | 6120.001.01 | $33,132 | -$8,283 (25%) | Dismissed by stipulation, limited value | $24,849 |
| **SECOND PERIOD TOTAL** | | **$2,419,839** | **-$1,126,317 (46.5%)** | | **$1,293,522** |

## FIRST COVERED PERIOD

BG Law's First Covered Period fees of $659,407.93 (Aug 13 - Dec 31, 2024) are subject to the same analytical framework. A proportional reduction of 46.5% yields $352,783 allowed.

| Period | BG Claimed | Reduction | Allowed |
|---|---|---|---|
| First Covered Period | $659,408 | -$306,625 (46.5%) | $352,783 |
| Second Covered Period | $2,419,839 | -$1,126,317 (46.5%) | $1,293,522 |
| **TOTAL FEES** | **$3,079,247** | **-$1,432,942 (46.5%)** | **$1,646,305** |

**Note:** Total case fees including expenses = $3,156,674. Expenses of $77,427 are addressed separately below.

## EXPENSE AUDIT

| Expense Category | Amount | Assessment |
|---|---|---|
| Arbitration/Mediation | $20,000 | Subject to necessity review — mediation produced settlement that solvency already guaranteed |
| Court Reporter | $11,700 | Allowable |

| Online Research (Westlaw/Pacer) | $9,800 | Partially allowable — pro rata Westlaw allocation methodology should be scrutinized |
|---|---|---|
| Outside Professional Services | $15,700 | Requires itemization — "outside professional services" is too vague |
| Photocopies/Prints ($0.20/pg) | Various | Industry standard |
| Facsimile ($1.00/pg) | Various | Anachronistic — fax charges in 2025 are questionable |
| Parking | Various | Allowable at cost |
| Postage | Various | Allowable |
| **Total Expenses** | **$77,427** | **Recommended 20% reduction: - $15,485** |

## AGGREGATE RECOMMENDED ALLOWANCE FOR BG LAW

| Component | BG Claimed | Recommended Allowed |
|---|---|---|
| Fees (both periods) | $3,079,247 | $1,646,305 |
| Expenses | $77,427 | $61,942 |
| **TOTAL** | **$3,156,674** | **$1,708,247** |

**Reduction: $1,448,427 (45.9%)**

This recommended allowance of $1,708,247 falls within Wayne Platt's stated range for total professional fees for all professionals in a case of this size ($1-3 million), confirming that even at this reduced level, BG Law's compensation remains generous for its role as primary counsel in a case that was "neither large nor complex."

## ALTERNATIVE: AGGREGATE CAP ALLOCATION

27

Under the primary remedy requested in the BG Law Memorandum (aggregate cap of $2,275,500 for all five applicants), BG Law's proportional allocation would be approximately **$1,069,500** — reflecting BG Law's 47% share of total fees sought. The lodestar audit supports a reduction to at least $1,708,247 on independent grounds, and the aggregate cap provides a further basis for reduction if the Court adopts the proportionality framework.

---

*Prepared in support of the Objection filed by Klee Irwin, Pro Se, Chairman/CEO of Reorganized Debtors, Creditor and 99.5% Equity Security Holder, pursuant to 11 U.S.C. § 1109(b).*

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

1620 Will Geer Rd., Topanga, CA 90290

A true and correct copy of the foregoing document entitled (*specify*): _____
MEMORANDUM IN SUPPORT OF OBJECTION TO FINAL FEE APPLICATION OF BG LAW LLP [Doc. 945]
_____
_____

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) February 23, 2026, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☑ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

JUDGE KAUFMAN WAIVES SERVICE OF JUDGE'S COPIES FOR DOCUMENTS THAT ARE 25 PAGES OR LESS.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 02/23/2026 | STEPHANIE NADANARAJAH | |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

- **Kyra E Andrassy**   kandrassy@raineslaw.com, bclark@raineslaw.com;csantiago@raineslaw.com
- **Jessica L Bagdanov**   jbagdanov@bg.law, ecf@bg.law
- **Ryan W Beall**   rbeall@go2.law,
  kadele@go2.law;dfitzgerald@go2.law;rbeall@ecf.courtdrive.com;cmeeker@go2.law
- **Anthony Bisconti**   tbisconti@bklwlaw.com, 1193516420@filings.docketbird.com,docket@bklwlaw.com
- **Ori S Blumenfeld**   ori.blumenfeld@offitkurman.com, liyah.lewis@offitkurman.com;ik-
  maurice.ibe@offitkurman.com
- **Matthew Bouslog**   mbouslog@allenmatkins.com, ncampos@allenmatkins.com
- **Katherine Bunker**   kate.bunker@usdoj.gov
- **Cynthia M Cohen**   ccohen@brownwhitelaw.com
- **Robert Allen Curtis**   rcurtis@foleybezek.com
- **Caroline Djang**   cdjang@buchalter.com, docket@buchalter.com;lverstegen@buchalter.com
- **Casey Z Donoyan**   cdonoyan@lakklawyers.com, smcfadden@lakklawyers.com;ncondren@lakklawyers.com
- **Erin R. Fay**   efay@wsgr.com, lmcgee@wsgr.com
- **Evelina Gentry**   evelina.gentry@akerman.com, eileen.lewis@akerman.com;reyko.delpino@akerman.com
- **Fred Glass**   fglass@fairharborcapital.com
- **Jeffrey I Golden**   jgolden@go2.law,
  kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;dfitzgerald@go2.law;golden.jeffreyi.b1179
  54@notify.bestcase.com
- **Garrick A Hollander**   ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Alphamorlai Lamine Kebeh**   MKebeh@allenmatkins.com, mdiaz@allenmatkins.com
- **Alexandria Lattner**   alattner@sheppardmullin.com, ehwalters@sheppardmullin.com
- **Matthew A Macdonald**   matthew.macdonald@wsgr.com
- **Sina Maghsoudi**   sinalegal@gmail.com,
  g8645@notify.cincompass.com;maghsoudi.sinab128731@notify.bestcase.com
- **David W. Meadows**   david@davidwmeadowslaw.com
- **Joshua Nyman**   josh@ramsaurlaw.com, alecia@ramsaurlaw.com
- **Douglas A Plazak**   dplazak@rhlaw.com
- **David M Poitras**   dpoitras@bg.law
- **Terrel Ross**   tross@trcmllc.com
- **Susan K Seflin**   sseflin@bg.law
- **Jonathan Seligmann Shenson**   jshenson@greenbergglusker.com,
  calendar@greenbergglusker.com;cmillerwatkins@greenbergglusker.com;MilanaECF@ggfirm.com
- **Yuriko M Shikai**   yshikai@neufeldmarks.com
- **Ashley M Teesdale**   ateesdale@bg.law, ecf@bg.law
- **United States Trustee (SV)**   ustpregion16.wh.ecf@usdoj.gov
- **Ronghua Wang**   sophia.wang@afslaw.com, yvonne.li@afslaw.com
- **Pamela Kohlman Webster**   pwebster@buchalter.com, smartin@buchalter.com
- **Jessica Wellington**   jwellington@bg.law, ecf@bg.law

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                 F 9013-3.1.PROOF.SERVICE