FOR PUBLICATION

FILED & ENTERED

SEP 09 2026

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Pgarcia DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

In re:

IN Holdings, Inc., *et al.*,

Debtors.

Case No.: 1:24-bk-11323-VK

Chapter 11

Jointly Administered with:

Case No. 1:24-bk-11324-VK
Case No. 1:24-bk-11325-VK
Case No. 1:24-bk-11326-VK

**MEMORANDUM OF DECISION RE: STS CAPITAL PARTNERS M&A ADVISORS INC. MOTION TO COMPEL PAYMENT OF PROFESSIONAL FEES AND AWARD OF ATTORNEYS' FEES**

Hearing:
Date: July 30, 2026
Time: 2:00 p.m.
Place: Courtroom 301
21041 Burbank Blvd.
Woodland Hills, CA 91367

This memorandum of decision sets forth this Court's findings of fact and conclusions of law regarding the motion to compel payment of professional fees and an award of attorneys' fees filed by STS Capital Partners M&A Advisors Inc. ("STS").

# I. BACKGROUND

## A. Commencement of the Bankruptcy Cases and the Employment of STS

In August 2024, Irwin Naturals, a Nevada corporation, Irwin Naturals, Inc., a British Columbia Corporation, and their related entities DAI US Holdco Inc. and 5310 Holdings, LLC (collectively, "Debtors") filed chapter 11 petitions. Klee Irwin executed the petitions of Irwin Nevada, Irwin Canada and DAI US as their Chief Executive Officer. Under 11 U.S.C. § 1102(A)(1), the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Committee").

### 1. *Initial STS Employment Application*

In February 2025, Debtors filed an application to employ STS pursuant to 11 U.S.C. §§ 327(a) and 328(a) (the "STS Employment Application") [doc. 336]. In support of the STS Employment Application, Debtors filed a declaration of Robert Charles Follows (the "Follows Decl.") [doc. 336].

In the STS Employment Application, Debtors requested that the Court enter an order:

> (i) authorizing and approving the retention and employment of STS by the Debtors to provide consultant and advisory services with respect to a potential equity transaction and/or sale on the terms and conditions set forth in the Engagement Agreement as modified in this Application; (ii) authorizing and approving the Debtors to pay STS the Commitment Fee and Success Fee, if earned, plus out of pocket expenses up to $12,500.00 without further order of the Court **pursuant to section 328(a)** of the Bankruptcy Code; and (iii) granting such other and further relief as this Court deems just and proper.

STS Employment Application, p. 8 (emphasis added) [doc. 336]. The STS Employment Application was signed by Klee Irwin.

The STS Employment Application represents that Debtors selected STS to provide consultant and advisory services with respect to a "Transaction." "Transaction" is defined as:

> a potential sale of all or a part of the Debtors' shares or assets or any other like

> transaction, including a lease of assets, licensing of assets, merger, amalgamation, joint venture, strategic alliance, a workout or other business combination[.]

STS Employment Application, p. 3 [doc. 336]. In March 2025, Debtors filed a supplement to the STS Employment Application (the "March 2025 Supplement") [doc. 403].

In February 2025, STS and Debtors executed an engagement agreement, which is attached as Exhibit 3 to the STS Employment Application (the "Engagement Agreement"). The Engagement Agreement states that Debtors:

> offer[] to retain the services of [STS] to make introductions to [Debtors] and provide advisory services with respect to the proposed sale of all or part of [Debtors'] shares or assets or any other like transaction (including a lease of assets, licensing of assets, merger, amalgamation, joint venture, strategic alliance, a working or other business combination) (a "Transaction").

Engagement Agreement, p. 1.

As set forth in the Engagement Agreement, with respect to a Transaction, STS will:

> a. seek out and locate third parties and introduce the opportunity to conclude a potential Transaction to such third party. [. . .]
>
> b. advise on the sale of the business of [Debtors] in respect to such Transaction ("Advisory Services").

*Id.,* ¶ 1 [Exhibit 3 to STS Employment Application, doc. 336].

The Engagement Agreement further states:

> The parties acknowledge that the advisory services provided by STS in favor of [Debtors] consist exclusively of the introductions set out above, the Advisory Services and assistance in structuring the Transaction. STS does not provide customized recommendations regarding the merit of a given Transaction, the details of the Third Party, or the opportunity to carry it out or not. [Debtors] assess[] every aspect of the Transaction independently. In light of the foregoing, the services rendered by STS to [Debtors] do not constitute investment services and activities, nor does it constitute legal, regulatory, accounting or tax advice.

Engagement Agreement, ¶ 11, p. 4.

Regarding STS's entitlement to attorneys' fees, the Engagement Agreement provides:

> [Debtors] shall indemnify and hold STS and each STS Party harmless against any losses, claims, damages or liabilities to which they or them may become subject in

> connection with the services rendered herein and shall reimburse them for any legal or other expenses [including the cost of any investigations] reasonably incurred by them arising out of or in connection with any action or claim in connection therewith, **including for the recovery of fees to which they are otherwise entitled under this Agreement**, whether or not resulting in any liability; provided, however, that the [Debtors] shall not be liable in any such case to the extent such loss, claim, damage or liability results from a breach of STS' obligations hereunder or from STS' judicially determined gross negligence or willful malfeasance in performing services hereunder.

*Id.,* ¶ 17, p. 5 (emphasis added).

In the Follows Decl., among other things, Mr. Follows states: "neither I nor STS have entered into any agreements, express or implied, with any other party in interest, including the Debtors, any creditor, or any attorney for such party in interest in this case for the purpose of sharing or fixing fees or other compensation to be paid to any such party in interest or its attorneys for services rendered in connection therewith." Follows Decl., ¶ 13. Mr. Follows also represents that neither STS, nor any partner or associate thereof, represents an interest adverse to Debtors. Follows Decl., ¶¶ 15-20.

In March 2025, the Court entered an order granting the STS Employment Application (the "STS Employment Order") [doc. 450]. The STS Employment Order states:

> The [STS Employment] Application is approved pursuant to the terms and conditions set forth therein except as modified by the [March 2025] Supplement and this Order.
>
> The Debtors are authorized to employ STS Capital Partners M&A Advisers Inc. ("STS") as investment bankers effective as of January 31, 2025, pursuant to **11 U.S.C. §§ 327(a) and 328(a)**.
>
> Upon entry of this Order, the Debtors are authorized to pay STS the Commitment Fee and Success Fee, if earned, plus out of pocket expenses up to $12,500 without further order of the Court pursuant to **11 U.S.C. § 328(a)**.

STS Employment Order, p. 2 (emphasis added).

**2. *Modifications to STS Compensation and Employment***

In June 2025, Debtors filed their *Motion to Approve Modified Terms of the Employment of STS Capital Partners M&A Advisers Inc. as Investment Banker* (the "Motion to Modify") [doc. 652]. In the Motion to Modify, Debtors represent that they have filed the proposed

modification "in light of the changed landscape of Debtors' sale process." Motion to Modify, p. 2 [doc. 652]. Debtors describe the "changed landscape" as follows:

> After multiple competing plans and disclosure statements were filed, the Debtors determined that a 363 sale process made more sense than a competing plan process as a sale process would be less expensive. Thus, on June 2, 2025, the Debtors entered into a term sheet with FitLife Brands, Inc. ("FitLife"), pursuant to which FitLife was named the Stalking Horse Bidder under terms where FitLife will acquire substantially all of the Debtors' assets and its business as a going concern for, among other things, (a) $36 million in cash, (b) the assumption of certain liabilities including, among others, the Debtors' post-petition ordinary course accounts payable, and (c) certain excluded assets including the Debtors' cash estimated to be $5 million at the time of closing.

*Id.*, p. 3.

Debtors describe the "need to modify STS' employment and specifically its compensation terms" as follows:

> As noted, STS is already employed by the Debtors pursuant to 11 U.S.C. §§ 327(a) and 328(a), with its employment effective as of January 31, 2025. Pursuant to the [STS] Employment Order, STS is presently entitled to compensation as follows, the language bolded and underlined that this Motion seeks to alter:
>
> 1. The [STS Employment] Application is approved pursuant to the terms and conditions set forth therein except as modified by the [March 2025] Supplement and this Order.
>
> 2. The Debtors are authorized to employ STS Capital Partners M&A Advisers Inc[.] ("STS") as investment bankers effective as of January 31, 2025, pursuant to 11 U.S.C. §§ 327(a) and 328(a).
>
> 3. Upon entry of this Order, the Debtors are authorized to pay STS the Commitment Fee and Success Fee, if earned, plus out of pocket expenses up to $12,500 without further order of the Court pursuant to 11 U.S.C. § 328(a).
>
> 4. Notwithstanding anything set forth herein or in the Application, the STS Engagement Agreement or the Supplement to the contrary, **<u>the minimum Success Fee shall be waived if all allowed claims in these cases are not paid in full and/or if FitLife is the prevailing bidder in the sale process to be run in these cases with a bid in the amount of $41 million or less. In either of those situations, the Success Fee will be 3% of the purchase price.</u>**

*Id.*, p. 4 (emphasis in original). Mr. Irwin and Debtors' independent director, Brad Sharp,

signed the Motion to Modify [doc. 652].

On July 17, 2025, after Debtors had filed a motion to sell substantially all of their assets to FitLife, Debtors filed a supplement to the Motion to Modify to address requests made by the United States Trustee and the Committee (the "July 2025 Supplement") [doc. 708]. In the July 2025 Supplement, Debtors requested approval of the following modifications to the terms of the employment of STS:

> 1. Notwithstanding anything set forth in the Application, the STS Engagement Agreement, the [March 2025] Supplement, or the [STS] Employment Order, the minimum Success Fee shall be waived for **any** buyer with a purchase price of up to $41 million. In that instance, the Success Fee will be 3% of the purchase price. Notwithstanding anything else set forth in the Application, the STS Engagement Agreement, the [March 2025] Supplement, or the [STS] Employment Order, the minimum Success Fee shall be waived if all allowed claims in these cases are not paid in full and the Success Fee will be 3% of the Purchase Price.
>
> 2. For any buyer with a purchase price above $41 million, STS will charge the applicable percentages set forth in Schedule A to the Engagement Agreement, with a minimum Success Fee of $3 million.
>
> 3. If the Debtors exit bankruptcy without consummating a sale, STS will receive a $1 million exit fee (the "Exit Fee"). In addition, if STS' employment is terminated post-bankruptcy, STS will receive a $1 million termination fee ("Termination Fee" and collectively, with the Exit Fee, the "Additional Fees"). Under any circumstance, the Additional Fees will be subordinated to all secured, administrative, priority and general unsecured claims in these cases. If applicable, the Exit Fee shall be paid at the earlier of (a) when all claims are paid in full, or (b) when there is a sufficient reserve account in an amount sufficient to pay all claims. If STS is paid the Exit Fee and/or the Termination Fee, these fees will be applied to reduce the amount of the Success Fee accordingly. The obligations to pay the Additional Fees shall survive termination of the Engagement Agreement. With respect to the Additional Fees, if either or both of them are paid, STS shall carve out 2% of its fee for non-insider shareholders.
>
> 4. If the buyer is any party other than FitLife or Robinson Pharma, STS will share 5% of its Success Fee with Green Circle for any transaction below $50 million in cash consideration and 15% of its Success Fee for any transaction above $50 million in cash consideration. In no case will STS share any of its Success Fee with Green Circle if the Buyer is either FitLife, Robinson Pharma or WH Partners or any related or affiliated entity or entities.

July 2025 Supplement, pp. 2-3 (emphasis in original) [doc. 708].

No party in interest objected to, or requested a hearing, on the Motion to Modify, filed in July 2025, as supplemented by the July 2025 Supplement. On July 21, 2025, the Court entered an order granting the Motion to Modify, as supplemented by the July 2025 Supplement (the "Order Modifying Employment") [doc. 712].

**B. Sale of Substantially All of Debtors' Assets**

On June 30, 2025, Debtors filed a motion to sell substantially all of their assets to FitLife (the "Sale Motion") [doc. 666]. On July 31, 2025, the Court entered an order granting the Sale Motion [doc. 740].

On August 12, 2025, Debtors filed a *Notice of Sale Closing* stating that the asset sale closed on August 8, 2025 [doc. 755]. The sale resulted in Debtors receiving sale proceeds in the amount of $42,500,000. *Joint Disclosure Statement Describing Debtors' and Committee's Joint Chapter 11 Plan of Reorganization Dated October 1, 2025*, p. 39 [doc. 838].

**C. The Chapter 11 Plan and Payment of Professional Administrative Expenses**

In October 2025, Debtors and the Committee filed a joint chapter 11 plan of reorganization (the "Amended Joint Plan") [doc. 837] and a joint disclosure statement describing the Amended Joint Plan [doc. 838]. On October 2, 2025, the Court entered an order approving the adequacy of the disclosure statement for the Amended Joint Plan [doc. 840].

The Amended Joint Plan provides the following treatment of the administrative expense claim of STS:

> Amount Owed: 3% of any Sale transaction if FitLife is the successful buyer and the purchase price is less than $41 million, or a $3 million fee if an alternate party is the ultimate buyer under the Sale.
>
> Treatment: Unless and until General Unsecured Claims are paid in full, STS's fee is capped at 3%. STS will not be entitled to any additional payment by the Plan Distribution Trustee until after all Allowed General Unsecured Claims have been paid in full.

*Id.* at p. 21. In December 2025, the Court entered an order confirming the Amended Joint Plan [doc. 909].

### D. Dispute Regarding Payment for the Services Provided by STS

On February 3, 2026, STS filed an amended motion to compel payment of its professional fees and an award of attorneys' fees (the "Motion") [doc. 999]. In the Motion, pursuant to section 328(a), the STS Employment Order and the Order Modifying Employment, STS requests that the Court compel payment of $3,000,0000 for STS's professional services rendered in connection with the successful sale of substantially all of Debtors' assets to FitLife.

On March 19, 2026, Klee Irwin, in pro per, filed an objection to the Motion (the "Irwin Objection") [doc. 1143]. In support of the Irwin Objection, Mr. Irwin filed his declaration (the "Irwin Declaration") and the declarations of Stephanie Nadanarajah, Natasha Urakhchina (the "Urakhchina Decl.") and Wayne Platt (the "Platt Declaration"). Mr. Irwin also filed documentary exhibits, including an alleged excerpt from PitchBook (www.pitchbook.com) about prior engagements of STS [Exhibit G, referenced in Irwin Decl., ¶ 17] and unauthenticated marketing materials for "prospective buyers" regarding the sale of Debtors' assets or equity through Debtors' chapter 11 cases, subject to court approval, including contact information for the "Project Team" at STS [Exhibit I].

In the Irwin Objection, Mr. Irwin contends:

(1) The Court should conduct a review of STS's fees under 11 U.S.C. § 330 and find that STS's fees were unreasonable [Irwin Objection, pp. 25-32].

(2) The scope of STS's employment in this matter required it to register as a broker-dealer under section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") and analogous appliable state law; because STS is not a registered broker-dealer, and does not meet any exemptions to such registration, the Engagement Agreement is void under applicable nonbankruptcy law [Irwin Objection, pp. 6-18].

(3) STS omitted from the STS Employment Application the following information:

   a. STS is not a registered broker-dealer,
   b. fee-sharing between various individuals at STS,
   c. an accurate number of transactions which STS previously "closed,"
   d. that STS is a "foreign entity,"
   e. Mr. Follows may not have properly signed his declaration in support of the STS Employment Application or his declaration may misrepresent that Mr. Follows signed his declaration while he was in Barbados, West Indies [Irwin Objection, pp. 18-20].

(4) Upon receipt of payment, STS will engage in improper fee sharing under 11 U.S.C. § 504(b)(1) [Irwin Objection, pp. 21-24].

Debtors, as reorganized, subsequently filed joinders to the Irwin Objection [docs. 1173 and 1180].

On March 25, 2026, STS filed a reply [doc. 1159]. In support of its reply, STS filed declarations of Vincent Willis ("Willis Decl."), Robert Follows ("Follows Reply Decl."), and Caroline Djang [docs. 1160-1163].

In his declaration, Mr. Willis states:

> I am a Managing Director and partner of STS Capital Partners ("STS") and served as the lead on STS's engagement for the Debtors . . . .
>
> As a Managing Director and partner, I am a regular associate of STS and participate in the firm's internal profit-sharing based on engagement I originate and lead. My compensation reflects standard internal partner economics and does not involve any external fee-sharing arrangement. My compensation in this matter was not tied to any financing or securities-related activity.
>
> In this matter, I led STS's engagement to run a sell-side process and evaluate strategic alternatives for the Debtors in connection with a potential transaction. STS's role was limited to advising on a potential sale or business combination and did not include capital raising or acting as a broker-dealer.
>
> I did not perform any securities-related services in this matter. STS was not engaged to act, and I did not act, as a broker-dealer or in any capital-raising capacity. I did not solicit investors, recommend any investment, negotiate or structure any securities transaction, or receive compensation tied to any financing activity.
>
> To the extent financing alternatives were discussed, my role was limited to supporting the Debtors in evaluating strategic alternatives and participating in discussions in a non-intermediary capacity.

Willis Decl., ¶¶ 1, 3, 4-6 [doc. 1160].

In his declaration filed in support of the reply, Mr. Follows states:

> I am the founder and Chairman of STS Capital Partners M&A Advisers Inc. ("STS"). . . .
>
> STS is a global sell-side advisory firm operating in over 40 cities with more than 6,000 advisors world-wide. STS's mission is to sell privately owned companies to strategic buyers who very often value the business materially higher than financial

buyers . . . .

During our initial calls, Mr. Irwin represented that: (i) his business generated approximately $20 million in annual EBITDA; (ii) multiple investment banks, including Canaccord Genuity, had valued the business at over $200 million; and (iii) he needed to act urgently to either sell to a strategic buyer or to arrange exit financing, so he could sell outside of the bankruptcy process later in 2025. As Mr. Irwin had already hired an investment bank to pursue exit financing, he was interested in urgently hiring STS to advise on the sale of the business, including finding strategic buyers.

. . . Irwin traveled to Miami, where he met in person with me, Mr. Willis, and for a large part of the day, STS Director Isabella Cattalan, via teleconference, at the Marriott Marquis hotel. Irwin was accompanied by Natasha Urakhchina.

During this meeting, Ms. Cattalan and Mr. Willis expressed concern that the financial statements did not support Mr. Irwin's claim of $20 million EBITDA, and the information presented reflected closer to $7 million.

After execution of the engagement, STS assigned a full team and commenced work immediately.

After this [sale] process began, Irwin informed us he needed capital and asked STS to raise debt or equity for him.

I clearly informed Mr. Irwin that STS does not raise capital and is not engaged in debt or equity placement. At Mr. Irwin's insistence, we made introductions in support of the capital raise being led by the investment bank hired by the Debtors and approved by this Court, Essex Capital. At Mr. Irwin's insistence, STS also, without compensation of any kind, introduced Mr. Irwin to other investment bankers to provide additional support for his desired capital raise. STS further advised Mr. Irwin, repeatedly and with conviction, that his simultaneous pursuit of exit financing and a sale to strategic buyers was both risky to the estate and would need to cease as quickly as possible.

STS has been advised for years by Greenberg Traurig regarding compliance with U.S. securities laws. STS has been consistently advised that its M&A advisory work, including the Irwin Naturals engagement, is fully compliant with applicable law.

Irwin's allegation that STS was engaged to sell shares of a Canadian public company is false. STS was engaged to sell the assets of a Nevada subsidiary through a § 363 sale.

Irwin's statements that STS concealed its domicile, operated illegally, or lacked qualified personnel are false.

> Vince Willis is a Managing Director and partner of STS and served as the lead on STS's engagement for the Debtors. As a Managing Director and partner, Mr. Willis is a regular associate of STS and participates in the firm's internal profit-sharing based on engagement he originates and leads. Mr. Willis' compensation reflects standard internal partner economics and does not involve any external fee-sharing arrangement.

Follows Reply Decl., ¶¶ 1, 2, 5, 8, 10, 11, 13, 17-18, 22, 25, 26 and 32 [doc. 1161].

On May 7, 2026, the Court held its second hearing regarding the Motion. Following the second hearing, the Court entered a scheduling order setting a briefing schedule on the following issue:

> [W]hether or not the modified contract between the Debtors and STS [see docs. 336, 403, 450, 652 and 712] is enforceable by STS under applicable federal securities law and/or other applicable state law, including but not limited to the merger and acquisition broker exemption under 15 U.S.C. § 78o(13) and the merger and acquisition exemption under 10 Cal. Code Regs. § 260.204.5 (to the extent, if any, that these statutes and/or rules are applicable to the Motion)[.]

*Scheduling Order Re STS Capital Partners M&A Advisor Inc.'s Amended Motion to Compel Payment of Professional Fees and Award of Attorneys' Fees* ("May 2026 Scheduling Order") [doc. 1265].

Pursuant to the May 2026 Scheduling Order, Mr. Irwin and STS submitted additional legal briefing [docs. 1285, 1302 and 1316].[1]

## II. LEGAL STANDARDS

### A. 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014

Section 327 of the Bankruptcy Code governs a trustee's or debtor in possession's employment of attorneys, accountants, appraisers, auctioneers, and other professional persons to represent or assist in carrying out duties under the Bankruptcy Code.

[1] In his supplemental opposition, Mr. Irwin raises the following additional statutory frameworks, for the first time: (1) the Investment Advisors Act of 1940, (2) British Columbia Securities Act, and (3) a multi-state registration theory related to a potential purchaser's headquarters. Given that Mr. Irwin has not timely raised these additional statutes as a reason to deny the Motion, the Court will not consider them.

Federal Rule of Bankruptcy Procedure ("Rule") 2014 sets forth requirements for an application to employ a professional person under section 327. Pursuant to Rule 2014(a), an order approving the employment of attorneys and other professional persons must be made on application and be accompanied by a "verified statement" of the person to be employed, which includes the following mandatory disclosures:

(A) the need for the employment;

(B) the name of the person to be employed;

(C) the reasons for the selection;

(D) the professional services to be rendered;

(E) any proposed arrangement for compensation; and

(F) to the best of the applicant's knowledge, all the person's connections with:

- the debtor;
- creditors;
- any other party in interest;
- their respective attorneys and accountants;
- the United States trustee; and
- any person employed in the United States trustee's office.

Rule 2014(a)(1)-(3).

Rule 2014(b) provides that any person or entity that is a partner, member, or associate of a partnership or corporation hired as attorneys or accountants can perform services or be employed by the debtor without the necessity of a separate application and order.

An estate professional's failure to comply with the required disclosure rules applicable to their retention is a sanctionable violation, even if "proper disclosure would have shown that the [professional] had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." *In re Park-Helena Corp.*, 63 F.3d 877, 880 (9th Cir. 1995).

**B. 11 U.S.C. § 328**

Under 11 U.S.C. § 328(a):

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a

> fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

"Under section 328, where the bankruptcy court has previously approved the terms for compensation of a professional, when the professional ultimately applies for payment, the court cannot alter those terms unless it finds the original terms to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *In re Reimers*, 972 F.2d 1127, 1128 (9th Cir. 1992) (internal quotations and citation omitted). *See also In re B.U.M. Intern., Inc.*, 229 F.3d 824, 829 (9th Cir. 2000) ("There is no question that a bankruptcy court may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328.").

**C. 11 U.S.C. § 504**

Section 504(a) and (b)(1) provides:

> (a) Except as provided in subsection (b) of this section, a person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share--
>
> > (1) any such compensation or reimbursement with another person; or
> > (2) any compensation or reimbursement received by another person under such sections.
>
> (b)(1) A member, partner, or regular associate in a professional association, corporation, or partnership may share compensation or reimbursement received under section 503(b)(2) or 503(b)(4) of this title with another member, partner, or regular associate in such association, corporation, or partnership, and may share in any compensation or reimbursement received under such sections by another member, partner, or regular associate in such association, corporation, or partnership.

11 U.S.C. § 504(a)-(b)(1).[2]

---

[2] Sections 504(a) and (b) reference compensation or reimbursement received under section

Courts have held that an individual who provides services to a professional person employed by a trustee or debtor in possession, and is disclosed as doing so, may share in compensation or reimbursement received by the retained association, corporation, or partnership. *See, e.g., In re Sheehan Memorial Hosp.*, 380 B.R. 299, 3003 (Bankr. W.D.N.Y 2007) (bankruptcy court found that lawyer acting in limited "of counsel" role with law firm is member of firm for purposes of section 504(b), whether membership is "regular or sporadic."); *In re Worldwide Direct, Inc.*, 316 B.R. 637, 648 (Bankr. D. Del. 2004) (individuals who performed work at law firm were "regular associates" of firm with meaning of section 504(b) although they were employed by third-party employment agency; they performed work under similar conditions as associates who were direct employees of firm).

**D. Securities Exchange Act of 1934**

***1. Registration as a Securities Broker-Dealer***

The Exchange Act provides:

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1).

A broker is any person, other than a bank, "engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). To determine whether a party acted as a broker, courts consider whether the party:

> (1) is an employee of the issuer of the security; (2) received transaction-based income such as commissions rather than a salary; (3) sells or sold securities from

503(b)(2). Section 503(b)(2) refers to compensation and reimbursement allowed under section 330(a), rather than section 328(a). With respect to the Motion, although STS was employed under section 328(a), the Court will assume that section 504(a) and (b) are applicable.

> other issuers; (4) was involved in negotiations between issuers and investors; (5) advertised for clients; (6) gave advice or made valuations regarding the investment; (7) was an active finder of investors; and (8) regularly participates in securities transactions.

*SEC v. Hui Feng*, 935 F.3d 721, 731–32 (9th Cir. 2019) (citing *SEC v. Hansen*, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984)). There is no rigid formula for how these factors are weighed. Rather, courts consider the "totality of the circumstances." *Id.*

"While an important factor, 'commission-based payment, standing alone[,] is not dispositive of whether a party acts as a broker-dealer under the Exchange Act.'" *Zarick v. DocVerify, Inc.*, 2025 WL 2271427, at *9 (W.D. Ky. Mar. 7, 2025), *reconsideration denied*, 2025 WL 2271426 (W.D. Ky. July 3, 2025) (quoting *Toa Trading LLC v. Mullen Auto., Inc.*, 2024 WL 2132885, at *3 (S.D. Fla. Apr. 24, 2024)).

**2. *Qualifying M&A Broker Exemption***

In March 2023, the Exchange Act was amended to exempt certain qualifying small business brokers from registering as a broker-dealer with the Securities and Exchange Commission. The Exchange Act provides that, subject to certain exceptions, a "M&A broker shall be exempt from registration under this section."

> The term "M&A broker" means a broker, and any person associated with a broker, engaged in the business of effecting securities transactions solely in connection with the transfer of ownership of an *eligible privately held company*, regardless of whether the broker acts on behalf of a seller or buyer, through the purchase, sale, exchange, issuance, repurchase, or redemption of, or a business combination involving, securities or assets of the eligible privately held company, *if the broker reasonably believes that*—
>
> > (I) upon consummation of the transaction, any person acquiring securities or assets of the eligible privately held company, acting alone or in concert—
> >
> > > (aa) will control the eligible privately held company or the business conducted with the assets of the eligible privately held company; and
> > >
> > > (bb) directly or indirectly, will be active in the management of the eligible privately held company or the business conducted with the assets of the eligible privately held company, including without limitation, for example, by—

> (AA) electing executive officers;
> (BB) approving the annual budget;
> (CC) serving as an executive or other executive manager; or
> (DD) carrying out such other activities as the Commission may, by rule, determine to be in the public interest[.]

15 U.S.C. § 78o(b)(13)(E)(iv)(I) (emphasis added).

The Exchange Act defines "control" as "the power, directly or indirectly, to direct the management or policies of a company, whether through ownership of securities, by contract, or otherwise." 15 U.S.C. § 78o(b)(13)(E)(ii). The statute creates a presumption of control where, upon completion of the transaction, the buyer or group of buyers: (i) has the right to vote 25% or more of a class of voting securities; (ii) has the power to sell or direct the disposition of 25% or more of the securities; or (iii) has contributed 25% or more of the capital. *Id.*

The term "eligible privately held company" is defined as a company that satisfies the following conditions:

> (I) The company does not have any class of securities registered, or required to be registered, with the Commission under section 78l of this title or with respect to which the company files, or is required to file, periodic information, documents, and reports under subsection (d) [of 15 U.S.C. § 78o.]
>
> (II) In the fiscal year ending immediately before the fiscal year in which the services of the M&A broker are initially engaged with respect to the securities transaction, the company meets either or both of the following conditions (determined in accordance with the historical financial accounting records of the company):
>
> > (aa) The earnings of the company before interest, taxes, depreciation, and amortization are less than $25,000,000.
> >
> > (bb) The gross revenues of the company are less than $250,000,000.

15 U.S.C. § 78o(b)(13)(E)(iii)(I-II).

The burden of proving an entitlement to an exemption under the Exchange Act rests with the party claiming the entitlement. *See SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953).

**3. *Exclusions from the M&A Broker Exemption***

The M&A broker exemption does not apply if a broker does any of the following:

> (i) Directly or indirectly, in connection with the transfer of ownership of an eligible privately held company, receives, holds, transmits, or has custody of the funds or securities to be exchanged by the parties to the transaction.
>
> (ii) Engages on behalf of an issuer in a public offering of any class of securities that is registered, or is required to be registered, with the Commission under section 78l of this title or with respect to which the issuer files, or is required to file, periodic information, documents, and reports under subsection (d).
>
> (iii) Engages on behalf of any party in a transaction involving a shell company, other than a business combination related shell company.
>
> (iv) Directly, or indirectly through any of its affiliates, provides financing related to the transfer of ownership of an eligible privately held company.
>
> (v) Assists any party to obtain financing from an unaffiliated third party without—
>
> > (I) complying with all other applicable laws in connection with such assistance, including, if applicable, Regulation T (12 C.F.R. 220 *et seq*.); and
> > (II) disclosing any compensation in writing to the party.
>
> (vi) Represents both the buyer and the seller in the same transaction without providing clear written disclosure as to the parties the broker represents and obtaining written consent from both parties to the joint representation.
>
> (vii) Facilitates a transaction with a group of buyers formed with the assistance of the M&A broker to acquire the eligible privately held company.
>
> (viii) Engages in a transaction involving the transfer of ownership of an eligible privately held company to a passive buyer or group of passive buyers.
>
> (ix) Binds a party to a transfer of ownership of an eligible privately held company.

15 U.S.C. § 78o(b)(13)(B)(i-ix).

**4. *Enforceability of a Contract Under the Exchange Act***

Section 29(b) of the Exchange Act provides:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, ... [or] the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void.

15 U.S.C. § 78cc(b).

"In order to void [an] [a]greement under Section 29(b) [of the Exchange Act], [an individual] must establish that: (1) the contract involved a prohibited transaction; (2) he is in contractual privity with [the entity]; and (3) [the individual] is in the class of persons that the securities acts were designed to protect." *In re Asyst Techs., Inc. Derivative Litig.*, 2008 WL 4891220, at *9 (N.D. Cal. Nov. 12, 2008) (citing *Berckeley Inv. Group Ltd v. Colkitt,* 455 F.3d 195, 205 (3d Cir. 2006)); *see also Reg'l Props., Inc. v. Fin. & Real Est. Consulting Co.,* 678 F.2d 552, 564 (5th Cir. 1982).

**E. California State Law**

***1. Registration as a Securities Broker-Dealer***

Under Cal. Corp. Code § 25210(a-b):

> (a) Unless exempted under the provisions of Chapter 1 (commencing with Section 25200) of this part, no broker-dealer shall effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless the broker-dealer has first applied for and secured from the commissioner a certificate, then in effect, authorizing that person to act in that capacity.
>
> (b) No person shall, on behalf of a broker-dealer licensed pursuant to Section 25211, or on behalf of an issuer, effect any transaction in, or induce or attempt to induce the purchase or sale of, any security in this state unless that broker-dealer and agent have complied with any rules as the commissioner may adopt for the qualification and employment of those agents.

Cal. Corp. Code § 25210(a-b).

In California, with certain exceptions, "broker-dealer" means any person engaged in the business of effecting transactions in securities in California for the account of others or for that person's own account. Cal. Corp. Code § 25004.

***2. Merger and Acquisition Exemption***

10 Cal. Code Regs. ("Rule") § 260.204.5 provides for the following "mergers and acquisition exemption" to the obligation to register as a broker-dealer:

> An exemption from the provisions of Section 25210 of the Code is hereby granted, as being necessary and appropriate in the public interest and for the protection of investors, to any person who effects transactions in securities in this state only in connection with mergers, consolidations or purchases of corporate assets, and who

> does not receive, transmit, or hold for customers any funds or securities in connection with such transactions.

Rule 260.204.5.

**3. *Enforceability of a Contract Under California Law***

Generally, professionals who render services in contravention of California state licensing requirements may not bring an action to recover compensation for these services. *See Owen v. Off*, 36 Cal.2d 751, 757 (1951) (holding that contract which purported to compensate unregistered broker for his services as agent in sale of stock was unenforceable); *Carbon Crest, LLC v. Tencue Prods., LLC*, No. 22-15707, 2023 WL 8271969, at *2 (9th Cir. Nov. 30, 2023) (holding that, under California law, contract with unlicensed broker was unenforceable).

## III. ANALYSIS

### A. Review of Fee Amount

Mr. Irwin and the reorganized debtors contend that the Court must conduct a reasonableness analysis of the fees payable to STS under section 330. This contention is contrary to controlling Ninth Circuit precedent, which provides that a bankruptcy court may not conduct a "reasonableness" review of a fee arrangement the court previously approved under section 328(a), absent a finding that the original terms were "improvident in light of developments not capable of being anticipated" when the terms and conditions were fixed. *See Reimers*, 972 F.2d at 1128. Mr. Irwin and the reorganized debtors have not met this standard.

### B. Exchange Act

Mr. Irwin has not established that the Engagement Agreement is void under the Exchange Act; the Engagement Agreement did not involve a "prohibited transaction." *See Reg'l Props.,* 678 F.2d at 564; *In re Asyst Techs., Inc. Derivative Litig.*, 2008 WL 4891220, at *9 (N.D. Cal. Nov. 12, 2008). The transaction consummated by Debtors, with the assistance of STS, was a sale of substantially all of Debtors' assets to FitLife [docs. 666, 740, 755 and 837-838].

**1. *The Application of 15 U.S.C. § 78c(a)(4) to STS***

Only "brokers" and "dealers" must register with the SEC under the Exchange Act. The issue in this matter is whether STS is a "broker." The Court finds that STS was not required to be registered as a broker with respect to its engagement with Debtors.

STS does not meet the definition of a "broker" under 15 U.S.C. § 78c(a)(4). In Debtors' cases, STS was *not* an employee of the issuer of a security, and STS did not sell securities from any issuer of securities as part of its employment. *See SEC v. Hui Feng*, 935 F.3d at 731–32. These factors weigh in favor STS's position that it is not a broker of securities. Although STS received transaction-based income, this factor is not dispositive of the issue. *See Zarick v. DocVerify, Inc.*, 2025 WL 2271427, at *9.

There is insufficient credible evidence that STS participated in negotiations about Debtors' issuance of securities, advertised the sale of securities to clients, was an active finder of potential investors, regularly participates in other securities transactions or gave advice or made valuations regarding potential investments. Mr. Willis has testified that he led the STS engagement, he did not perform any securities-related services in this matter and STS did not act as a broker-dealer or in any capital-raising capacity, solicit investors, recommend any investment, negotiate or structure any securities transaction or receive compensation tied to any financing activity. Willis Decl., ¶¶ 4-5. To the extent financing alternatives were discussed, Mr. Willis did no more than support Debtors in evaluating strategic alternatives and participate in discussions in a non-intermediary capacity. Willis Decl., ¶ 6.

**2. *M&A Broker Exemption***

Because STS is not a broker under the applicable statute, STS is not required to establish that the M&A Broker exemption under 15 U.S.C. § 78o(b)(13)(E)(iv)(I) applies to the sale of Debtors' assets. Assuming STS constituted a broker, STS has established that the M&A Broker exemption would be applicable.

First, the exemption applies to transactions where the final structure is an asset sale, as was Debtors' sale of substantially all of their assets to FitLife. Second, STS has established that Debtors were an "eligible privately held company." Debtors' EBITDA and gross revenues for the relevant fiscal year were below the statutory thresholds required for the exemption to apply. *See* Exhibit I to the Irwin Objection.

Regarding a potential equity sale contemplated by the Engagement Agreement, STS has satisfied the statutory requirement that it reasonably believed that any purchaser would control

Debtors and would directly or indirectly be involved in Debtors' management. If Debtors had pursued an equity sale as part of their reorganization, STS maintains it only would be involved to the extent the engagement constituted M&A advisory work. Follows Reply Decl., ¶¶ 5, 17-18 and 22.

**C. California State law**

California law defines a broker-dealer similar to the Exchange Act. *See* Cal. Corp. Code § 25004 (providing in part that a broker-dealer is "any person engaged in the business of effecting transactions in securities in this state for the account of others or for that person's own account."). The record in this matter does not establish that STS is a broker-dealer under California law and required to register as one.

Assuming STS was deemed a broker under California law, STS's engagement complies with Rule 260.204.5; the consummated transaction for Debtors was an asset sale, which falls within the exemption, and STS did not hold any funds in connection with the Court-approved asset sale process. *See* Rule 260.204.5.

**D. 11 U.S.C § 504**

Mr. Irwin and the reorganized debtors have not demonstrated any impropriety regarding the employment of STS. As concerns the provisions of section 504, STS is not engaged in improper undisclosed fee sharing.

Included in Exhibit 2 to the STS Employment Application and the Follows Decl. are biographies which set forth the professional experience and education of Vince Willis and Isabella Cattelan, who are identified as a Managing Director and a Director, respectively, of STS [doc. 336]. In his declaration, Mr. Follows states that these individuals, as a part of the STS team, "are expected to provide services to the Debtors." Follows Decl., ¶ 3 [doc. 336].

With respect to Mr. Willis, he has testified that he is a Managing Director and partner of STS. Willis Decl., ¶ 1. Mr. Willis's involvement with STS has been as a regular associate or member of STS. Willis Decl., ¶ 3. Mr. Willis's compensation reflects standard internal partner economics. *Id.*; Follows Reply Decl., ¶ 32. As a result, Mr. Willis appropriately may share in compensation paid to STS.

**E. The Sufficiency of STS's Disclosures**

Mr. Irwin asserts that STS was required to disclose the following in connection with its retention and did not do so:

a. STS was not a registered broker under the Exchange Act and analogous state law,

b. fee-sharing arrangements between various individuals at STS,

c. number of transactions STS previously "closed," and

d. that STS is a "foreign entity."

Irwin Objection, pp. 18-19. Regarding each of these issues, STS's disclosures in connection with the STS Employment Application are sufficient.[3]

In Mr. Follows' declaration filed in support of the STS Employment Application, he states that the principal office of STS is in Ontario, Canada and that STS is a "global merger and acquisition firm." Follows Decl., ¶ 1. The biographies of Mr. Willis and Ms. Cattelan, attached to the STS Employment Application, state that Mr. Willis lives in Aspen, Colorado and Ms. Cattelan live in Toronto, Canada [doc. 336]. To the extent relevant to Debtors' decision to retain STS (and it does not appear to be so), Mr. Irwin and others could have inquired further about the incorporation of STS.

**F. Award of Attorneys' Fees to STS**

The Engagement Agreement requires that the reorganized debtors indemnify STS for all losses reasonably incurred by STS arising out of its engagement, including attorneys' fees. As a result, the Court will award to STS the attorneys' fees which STS reasonably incurred to compel the payment of its fees by Debtors' estates.

---

[3] For his argument that all alleged nondisclosures by STS are sanctionable, Mr. Irwin cites *Park-Helena*, *In re Woodcraft Studios, Inc.*, 464 B.R. 1 (N.D. Cal. 2011), *In re Kings River Resorts, Inc.*, 342 B.R. 76 (Bankr. E.D. Cal. 2006) and *In re Hathaway Ranch Partnership*, 116 B.R. 208 (Bankr. C.D. Cal. 1990). Each of these cases involve professionals who fail to disclose, or disclose inaccurate, information *required* under Rule 2014. They do not sanction professionals for their nondisclosure of other facts which may have been relevant to a decision to retain that professional, and the terms of that retention, such as additional, detailed information about a firm's or an individual's prior experience in their field of expertise.

The Court will not award post-confirmation interest to STS. The Joint Amended Plan does not provide for the payment of interest on allowed administrative expenses of professionals. Joint Amended Plan, pp. 15 and 21-22.

## IV. CONCLUSION

The Court will grant the Motion and award reasonable attorneys' fees and costs to STS. The Court will deny STS's request for an award of interest.

# # #

Date: September 9, 2026

Victoria S. Kaufman
United States Bankruptcy Judge