FILED & ENTERED

NOV 04 2026

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Pgarcia DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>IN Holdings, Inc., *et al.*,<br><br>Debtors. | Case No.: 1:24-bk-11323-VK<br><br>Chapter 11<br><br>Jointly Administered with:<br><br>Case No.: 1:24-bk-11324-VK<br>Case No.: 1:24-bk-11325-VK<br>Case No.: 1:24-bk-11326-VK<br><br>**MEMORANDUM OF DECISION RE: OBJECTION OF THE REORGANIZED DEBTORS TO CLAIM 63-1 FILED BY MARK GREEN**<br><br><u>Hearing</u>:<br>Date: October 15, 2026<br>Time: 2:00 p.m.<br>Place: Courtroom 301<br>21041 Burbank Blvd.<br>Woodland Hills, CA 91367 |

Following confirmation of the debtors' and the Official Committee of Unsecured Creditors' joint chapter 11 plan of reorganization, the reorganized debtors filed an objection to

claim 63-1, filed by Mark Green [doc. 1432]. On October 15, 2026, the Court held a hearing on the reorganized debtors' objection to Mr. Green's claim. For the reasons set forth below, the Court will sustain the reorganized debtors' objection to Mr. Green's claim.

## I. BACKGROUND

On August 9, 2024, Irwin Naturals, a Nevada corporation ("Irwin Naturals"), Irwin Naturals, Inc., a British Columbia corporation ("Irwin Canada"), and related debtor entities filed chapter 11 petitions. The cases are being jointly administered in case no. 1:24-bk-11323.

Mr. Irwin is the founder of Irwin Naturals (now known as IN Holdings, Inc.) and the controlling shareholder. Declaration of Klee Irwin dated August 30, 2026 ("First Irwin Decl."), ¶ 1 [doc. 1433]. During the time relevant to this dispute, Mr. Irwin was the sole member of Irwin Naturals' board of directors. *Id.* Additionally, in 2018, Mr. Irwin was the president, secretary and treasurer of Irwin Naturals. Supplemental Declaration of Klee Irwin dated September 23, 2026, ¶ 12 ("Supp. Irwin Decl.") [doc. 1545].[1]

### A. The Bylaws of Irwin Naturals

Irwin Naturals was, and remains (under the name of IN Holdings), a Nevada corporation. First Irwin Decl., ¶ 1. Mr. Irwin, as the sole director, adopted Bylaws to govern the management and governance of the corporation. *Id.*, ¶¶ 1 and 16-20. Pursuant to the Bylaws:

> The Directors shall have the general management and control of the business and affairs of the company and shall exercise all of the powers that may be exercised or performed by the corporation, under the statutes, the certificates of incorporation and the By-Laws. Such management will be by equal vote of each member of the Board of Directors with each Board member having an equal vote.
>
> A resolution, in writing, signed by all or a majority of the members of the Board of Directors, shall constitute action by the Board of Directors to effect the action therein expressed, with the same force and effect as though such resolution had been passed at a duly convened meeting; and it shall be the duty of the Secretary to record every such resolution in the Minute Book of the corporation under its proper date.

---

[1] On September 10, 2025, the Court entered an order granting the debtors' motion to reflect changes of certain of the debtors' names, as follows: (1) Irwin Natural's name was changed to IN Holdings, Inc. ("IN Holdings"); and (2) Irwin Canada's name was changed to IN Holdings Canada, Inc. [doc. 803]. For the time period *after* its name change, Irwin Naturals will be referred to as "IN Holdings."

Bylaws, Article III, ¶¶ 4-5, attached as Exhibit B to First Irwin Decl.

The Bylaws state that the President of the corporation:

> […] shall have general charge and control over the affairs of the corporation subject to the Board of Directors. He shall sign or countersign all certificates, contracts and other instruments of the corporation as authorized by the Board of Directors and shall perform all such other duties as are incident to his office or are required by him by the Board of Directors.

*Id.*, Article IV, ¶ 2.

**B. The Separation Agreement and General Release**

In 2004, Mr. Green was hired as vice president of operations and finance of Irwin Naturals. Declaration of Mark Green, ¶ 16 ("Green Decl.") [doc. 1523]. From 2009 until his employment was terminated in 2018, Mr. Green held the title of Chief Financial Officer.[2] *Id.*

The agreement at issue in this dispute is entitled *Separation Agreement and General Release* (the "Separation Agreement"); in October 2018, Mr. Green, Mr. Irwin and Marc Washington executed the Separation Agreement. Exhibit A to First Irwin Decl. [doc. 1433]; First Irwin Decl., ¶ 26. When the Separation Agreement was signed, Rebecca Pearman was the President of Irwin Naturals. First Irwin Decl., ¶ 6. When Marc Washington signed the Separation Agreement, he was Irwin Naturals' Chief Executive Officer. Irwin Decl., ¶¶ 11 and 21-26 and Exhibits C and D thereto [doc. 1433].

As set forth in the Separation Agreement, Marc Washington signed as an "Authorized Representative" of Irwin Naturals. Mr. Irwin signed a signature line which is below the heading "Irwin Naturals," and below the signature line signed by Mr. Washington. Underneath Mr. Irwin's signature line it states his name, "Klee Irwin." Exhibit A to First Irwin Decl. [doc. 1433].

Mr. Irwin's testimony is that he "did not select Mr. Washington to sign for the Company, and [he] was not asked to approve his doing so." First Irwin Decl., ¶ 11. Mr. Irwin also represents that he did not intend his signature on the Separation Agreement "to authorize Mr. Washington, to ratify his signature as an act of the Board, or to bind the Company." First Irwin Decl., ¶ 13.

---

[2] In early 2024, Mr. Green returned to Irwin Naturals when he was re-hired as its Chief Financial Officer. Green Decl., ¶¶ 12, 16.

The Separation Agreement states that Mr. Green's employment at Irwin Naturals terminated on July 20, 2018 and that the parties to the agreement are "Mark Green ('Employee'), Irwin Naturals, a Nevada corporation (the 'Company'), and Klee Irwin ('Shareholder')." *Id.*, p. 1. The recitals to the Separation Agreement state:

> The Parties wish to resolve any and all disputes, claims, complaints, grievances, charges, actions, petition and demands that they may have against each other, including but not limited to, any and all claims arising or in any way relating to Employee's employment with or separation from Company.

*Id.*

In Section 6 of the Separation Agreement, entitled "Release," Mr. Green agrees that "the Additional Consideration provided for in this Agreement represents settlement in full of all outstanding obligations owed to [him] by the Company. . . ." *Id.* Among the released claims set forth in Section 6 are "any and all claims relating to or arising from Employee's employment relationship with the Company and the termination of that relationship" and "any and all claims under the law of any jurisdiction" including wrongful discharge of employment, discrimination, breach of contract, breach of a covenant of good faith and fair dealing and promissory estoppel. *Id.* The release does not extend to any obligations incurred under the Separation Agreement. *Id.*

Section 3 of the Separation Agreement, entitled "Consideration," provides that Mr. Green is entitled to a $1,000,000 payment under the following conditions:

> Contingent on the Company undergoing a Liquidity Event (as defined below) within ten (10) years after Employee's Termination Date, the Company or Shareholder, or Shareholder's estate in the event that Shareholder has died, will provide Employee with a one-time bonus payment in the gross amount of $1,000,000.00 less applicable withholdings for federal and state income and employment taxes within 120 days following the Liquidity Event. If (l) the Company does not undergo a Liquidity Event within this timeframe, or (2) Employee fails to comply with this Agreement or the attached NDA, no payments will be paid or owed to Employee under this Section.
>
> ***For purposes of this Section, "Liquidity Event" means any one or more of the following events in a single or series of transactions***:
>
> (i) the sale or exchange by the shareholders of the Company of the Company stock where the shareholders of the Company before such sale or exchange transfer, directly or indirectly, more than 50% of the beneficial interest in the voting stock of the Company;

(ii) a merger in which the shareholders of the Company before such merger transfer, directly or indirectly, more than 50% of the beneficial interest in the voting stock of the Company and those shareholders do not retain at least a majority of the beneficial interest in the voting stock of the surviving corporation;

(iii) the sale, exchange or transfer (including, without limitation, pursuant to a liquidation or dissolution) of all or substantially all of the Company's assets (other than a sale, exchange or transfer to one or more entities where the shareholders of the Company before such sale, retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the entity or entities to which the assets were transferred, whereby such entity or entities assume all provisions of this agreement);

(iv) business combination;

(v) initial public offering (IPO); or

(vi) similar transaction.

***Consolidations and Reorganizations are specifically excluded from the definition of a Liquidity Event***. Notwithstanding anything to the contrary herein, the Company and Shareholder, as the majority shareholder of the Company as of the date hereof, hereby expressly agree and acknowledge that neither the Company nor the shareholders of the Company shall take any action that would result in the circumvention of this Agreement and the payment to Employee, including, without limitation, structuring a sale, transfer or exchange of the Company's equity or assets in a manner not covered above.

Separation Agreement, § 3 (emphasis added).

In addition to Mr. Green's receipt of a $1,000,000 payment, which is conditioned upon the occurrence of a "Liquidity Event", section 3 of the Separation Agreement provides for Mr. Green: (1) to receive a payment of $300,000, less applicable withholdings for federal and state income and employment taxes, on the "Effective Date" of the agreement; and (2) for Mr. Green to retain a prior advance he received from Irwin Naturals in the amount of $200,000. *Id.*; *see also* Green Decl., ¶¶ 31, 33 and Exhibit A to Green Decl., p. 26 (email from Mr. Irwin dated May 18, 2018).

The Separation Agreement includes the following provision regarding authority to enter into the agreement:

> **Authority.** Each the Company and the Employee represents and warrants that they have the capacity to act on their own behalf and on behalf of all who might claim through them and to bind them to the terms and conditions of this Agreement.

Separation Agreement, § 18.

Regarding governing law, the Separation Agreement provides that it "shall be construed, interpreted, governed, and enforced in accordance with the laws of the State of California, without regard to choice-of-law provisions." *Id.*, § 24.

**C. The Negotiations Preceding the Execution of the Separation Agreement**

Before the execution of the Separation Agreement, Mr. Green and others on Irwin Naturals' management team had "informal agreements on payouts upon the sale of the company." Green Decl., ¶ 7. In connection with the upcoming termination of Mr. Green's employment, which was to take place in July 2018, Mr. Green's efforts to negotiate his severance package intensified. *Id.*, ¶ 9.

Over several months prior to the execution of the Separation Agreement, Mr. Green, Mr. Irwin and other individuals on Irwin Naturals' management team communicated through email regarding the terms of the Separation Agreement. *See* Exhibit A to Green Decl. Because Mr. Irwin was the controlling stockholder and since "the proceeds from the sale of the company normally flow to the stockholders," Mr. Green "insisted that Irwin be personally liable for the $1 million payout if the buyer refused to pay it directly" to Mr. Green. Green Decl., ¶ 11.

In July 2018, Mr. Irwin and Mr. Green discussed the terms of a potential separation agreement, via email. Green Decl., ¶ 44 and pp. 21-25 of Exhibit A thereto; Supp. Irwin Decl., ¶ 23 and Exhibit M thereto. On September 4, 2018, Mr. Green sent Mr. Irwin, via email, a redline version of the draft separation agreement. Exhibit A to Green Decl., p. 20; Supp. Irwin Decl., ¶ 24 and Exhibit N thereto. In this redline draft of the agreement, Mr. Green included the following language:

> For the purposes of this Section 3(b), "Liquidity Event" means any single or series of related transactions involving any one or more the following events: (i) the sale, transfer or exchange by the shareholders of the Company of the Company's then outstanding stock or other equity interests where the shareholders of the Company before such sale, transfer or exchange transfer, directly or indirectly, held more than 50% of the beneficial interest or voting stock or other equity interests of the

> Company; (ii) a merger, consolidation, reorganization, business combination or similar transaction in which the shareholders of the Company before such merger transfer, directly or indirectly, held more than 50% of the beneficial interest in the voting stock or other equity interests of the Company and those shareholders do not retain at least a majority of the beneficial interest in the voting stock or other equity interests of the surviving corporation . . .

Redline of draft separation agreement, p. 2, attached as Exhibit N to Supp. Irwin Decl.

On September 6, 2018, Mr. Irwin responded to this redline draft. In Mr. Irwin's response, among other things, he rejected Mr. Green's proposed changes to the definition of a "Liquidity Event." Mr. Irwin wrote that the redline was not acceptable because it proposed changes to the definition of "Liquidity Event" that differed from prior language which Mr. Irwin believed they had agreed to as "fair and accurate." Exhibit A to Green Decl., p. 19.

On September 24, 2018, Rebecca Pearman, the President of Irwin Naturals, sent an email to Mr. Irwin which stated: "Marc [Washington] let me know that you were dealing with Mark Green directly on his severance – has this been resolved/finalized?" Exhibit A to Green Decl., pp. 12-13 and 17. Mr. Irwin responded: "The balls in his court. I told him I don't agree with all his changes to the agreement. Awaiting his reply. You may want to follow up with him to confirm the balls in his court." *Id.*

Subsequently on September 24, 2018, Mr. Irwin sent an email to Mr. Green and Ms. Pearman (copying Mr. Washington) and stated:

> If the only change you want to make [to the draft Separation Agreement] is to have me provide that when I sell the company I'll give you the money, then I will have someone make that change. If, after hearing my responses from your email of edit suggestions, you insist on discussing more changes, then it will take more time . . . . If you're good with the one change discussed here, I can send out some instructions to get that in place.

*Id.*, p. 16.

After September 24, 2018, Mr. Irwin and Mr. Green continued to discuss the draft agreement. Regarding the definition of "Liquidity Event," Mr. Irwin and Mr. Green had the following exchange on September 25, 2018:

> [*Mr. Green:*] Also, as I suggested earlier, it would be helpful to expand – consistent with your intentions, I believe – the definition of a qualifying event to cover a single or series of transactions including consolidation, reorganization, business combination, IPO or similar transaction.
>
> [*Mr. Irwin:*] Consolidation? That does not imply I walk away with cash, Mark. IPO, yes, okay. ***Reorganization? No, not tantamount to me getting a boatload of money from divesting 50% or more of the goodwill***.

*Id.*, p. 15 (emphasis added).

Mr. Green responded: "Everything sounds OK to me. I'm fine if you want to leave out consolidation and reorganization, but I hope we can insert brief language saying a transaction will not deliberately be structured to avoid paying me out." *Id.*, p. 14.

In response, Mr. Irwin sent an email to Mr. Green, Ms. Pearman, Mr. Washington and others, with the statement: "I'm fine with that guys.jist [sic] make the edits and agree on them. Then hand off to me for signature." [3] *Id.*

**D. Communications After Execution of the Separation Agreement**

In November 2018, Mr. Green received $300,000 from Irwin Naturals, pursuant to the Separation Agreement. Green Decl., ¶ 10 and p. 3 of Exhibit A thereto.

After Mr. Green received the $300,0000 payment, Mr. Green regularly emailed Mr. Irwin to determine if there had been a change in control of ownership of Irwin Naturals. Declaration of Stephanie Nadanarajah dated September 23, 2026, ¶¶ 2-4 [doc. 1544]; *see also* Exhibits 1, 2 and 5 thereto. For example, in July 2021, in an email to Mr. Irwin, Mr. Green stated:

> I'm just writing to do my six-month check in – you will recall, pursuant to Paragraph 19 of the SEPARATION AGREEMENT AND GENERAL RELEASE, you "committed to provide an Affidavit to Employee detailing the then current state of all hold of Company Equity upon verbal or written request of Employee." As in last July, in lieu of a notarized affidavit, please feel free to send an email stating that there has been no change in stock ownership since I left Irwin Naturals.

---

[3] Mr. Irwin has asserted: "[w]hen I wrote that, I was approving the points Mr. Green and I just settled in that exchange, including the language he had asked for against structuring a transaction to avoid paying him, and telling Mr. Washington and Ms. Pearman to make those edits. I was not addressing who would sign for the Company. No one raised with me whether Marc Washington had authority to sign for the Company, and I did not consider that question." Supp. Irwin Decl., ¶ 5.

Supp. Irwin Decl., ¶ 22 and Exhibit L thereto.

Mr. Irwin responded to Mr. Green, stating “Hi, Mark. Good to hear from you. Yes, a change has occurred. Mike and Rebecca each have 2.5%. a trust I control for my kids has 10%.” *Id.*

**E. Mr. Green’s Return to Irwin Naturals**

In February 2024, Mr. Irwin contacted Mr. Green to discuss the prospect of Irwin Naturals re-hiring Mr. Green. Green Decl., ¶ 12. Mr. Green asserts that Mr. Irwin recruited him because Mr. Irwin “felt that his interest and my interests were aligned due to the $1 million payout upon the sale of the company.” *Id.*

In early 2024, Irwin Naturals rehired Mr. Green in the position as Chief Financial Officer and Secretary. First Irwin Decl., ¶ 3. After the debtors filed their chapter 11 petitions in August 2024, Mr. Green remained employed with Irwin Naturals. *Id.*

On March 27, 2025, Mr. Green filed proof of an unsecured claim in the amount of $1,000,000, which is Claim 63-1 (the “Claim”).

**F. Relevant Events During the Chapter 11 Cases**

Following a hearing held in July 2025, the Court entered an order approving a sale of assets related to the debtors’ supplement business (the “Sale”) to the designee of FitLife Brands, Inc. (“FitLife”) [doc. 740]; this transaction closed on August 8, 2025 [doc. 755].

On October 1, 2025, the debtors and the Official Committee of Unsecured Creditors filed a joint chapter 11 plan of reorganization (the “Plan”) [doc. 837]. On December 3, 2025, the Court entered its *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors’ and Committee’s Joint Chapter 11 Plan of Reorganization Dated October 1, 2025* [doc. 909].

As set forth in the Plan:

> The Plan is a reorganizing plan – which will be funded by the sale proceeds from the sale of the Debtors’ supplement business, which sale closed on August 8, 2025. Among other assets, the Debtors retain significant net operating losses ("NOLs") and are in the process of determining whether they start a new consumer packaged goods business and/or merge with an existing consumer packaged goods business. The Plan provides for, among other things, (a) the appointment of a plan distribution agent (the "Plan Distribution Trustee") and the creation of a plan distribution trust (the "Plan Distribution Trust") that will hold certain cash sufficient in an amount to pay certain claims (the "Trust Assets"), (b) the distribution of

> payments by the Plan Distribution Trustee and the Reorganized Debtors in accordance with the Plan, and (c) for the Debtors to continue as going concerns to establish a new business.

Plan, pp. 1-2.

Regarding payments to creditors through the Plan Distribution Trust, the Plan provides:

> The Plan Distribution Trust shall be established and shall become effective on the Effective Date. The Plan Distribution Trust is created pursuant to the Plan and the Confirmation Order, and no separate trust instrument shall be required. The sole purpose of the Plan Distribution Trust will be to hold $13.5 million in Cash to make the Distributions required of it by the Plan. Each creditor holding an Allowed Claim will receive in full satisfaction, settlement, release and discharge of such Claim, payment in full of such Allowed Claim from the Plan Distribution Trust.

Plan, p. 28.

Mr. Irwin holds a general unsecured claim against the debtors' estates in the principal amount of $1,035,682; this claim is based on a subordinated promissory note, dated October 19, 2023. *See* Claim 55-1. Under the Plan, Mr. Irwin's unsecured claim is placed in Class 4; Class 4 is subordinated to all allowed general unsecured claims of non-insiders, which are placed in Class 3. After the payment in full of all allowed claims of non-insiders in Class 3, Mr. Irwin's allowed claim may be paid in full. Plan, pp. 6 and 33.

The designee of FitLife, i.e., IN Acquisition Corp., did not purchase the stock of Irwin Naturals or the other debtors. *See* Sections 2.1 and 2.2(j) of the *Asset Purchase and Sale Agreement*, attached as Exhibit B to the debtors' motion to approve the Sale *and* the Order granting that motion [docs. 666, 740]. Equity holders of Irwin Naturals, including Mr. Irwin, retain their interests under the Plan, and the Plan does not provide for the payment of cash to Mr. Irwin or other insiders, based on their equity interests. Plan, pp. 6, 27.[4]

---

[4] In comparison, pursuant to the Plan, non-insider shareholders of IN Canada retain their existing number of equity shares *unless* they vote to receive a pro rata cash distribution of $225,000. *See* Plan, pp. 6, 27. In his declaration dated September 23, 2026, the Plan Distribution Trustee, Bradley Sharp, states that ten non-insider shareholders of IN Canada "made this election for a pro rata cash distribution of $47,254.50." *Id.*, ¶ 23 [doc. 1540].

Under the Plan, IN Holdings retained claims against the debtors' prepetition secured lenders and other third-parties, its stock ownership of 5310 Holdings, LLC, and net operating losses incurred during prepetition tax years. Plan, pp. 2, 4-5, 27 and 35-36. Additionally, IN Holdings retains certain trademarks that were not transferred in the Sale. Supp. Irwin Decl., ¶ 22.

**G. The Objection to the Claim**

On August 30, 2026, the reorganized debtors filed an objection to the Claim (the "Objection") [doc. 1432]. The reorganized debtors contend that Irwin Naturals did not properly authorize the Separation Agreement and, even if the Separation Agreement had been properly authorized, the conditions triggering payment of $1 million to Mr. Green pursuant to the Separation Agreement have not occurred.

In support of the Objection, the reorganized debtors submitted the First Irwin Decl. Regarding the authority of Marc Washington, who signed the Separation Agreement as an "Authorized Representative," Mr. Irwin states: (1) the Bylaws, and the terms of Mr. Washington's employment agreement, prevented Mr. Washington from executing the Separation Agreement without additional authorization from Irwin Naturals' board of directors (consisting of Mr. Irwin as the sole director) and (2) Mr. Washington was not authorized by a written resolution of Irwin Naturals' board of directors to execute the Separation Agreement on behalf of Irwin Naturals.

Regarding the conditions triggering Mr. Green's right to receive the $1 million payment, Mr. Irwin states:

> My contemporaneous understanding, reflected in the March 2024 [email] exchange [between myself and Mr. Green], was that the $1,000,000 was an opportunity tied to equity sales, to future performance, and to a transaction that realized value for my family's ownership – not a payment triggered by a bankruptcy reorganization that produced no owner liquidity.
>
> The Company's assets were sold in a court-supervised sale under 11 U.S.C. § 363 to FitLife Brands, Inc., which closed on August 8, 2025. The Debtors did not pursue this sale as a voluntary, value-maximizing exit; they pursued refinancing in order to avoid it. The sale occurred within, and as a step toward, a Chapter 11 plan of reorganization that this Court confirmed, under which the Debtors emerged as the Reorganized Debtors. The Company was not liquidated and was not dissolved. The

> sale proceeds remained in the bankruptcy process for creditor treatment. No shareholder sold any voting equity, no shareholder received sale proceeds, and lender action had displaced my control over the outcome of the transaction. I received no proceeds from the sale. I am aware of no evidence that the bankruptcy filing or the structure of the transaction was chosen in order to avoid Mr. Green's contingent payment; the Debtors pursued refinancing in order to avoid the sale.

First Irwin Decl., ¶¶ 28 and 30.

On September 16, 2026, Mr. Green filed a response to the Objection [doc. 1523]. In his declaration filed in support of the response, Mr. Green argues that Mr. Irwin, as the sole director of Irwin Naturals, personally negotiated key terms of the Separation Agreement and Mr. Washington had actual authority to bind Irwin Naturals to the Separation Agreement.[5] Green Decl., ¶¶ 37-39.

To the extent Mr. Washington did not have actual authority to bind the company, Mr. Green asserts that he had left his employment at Irwin Naturals before Mr. Washington executed the Separation Agreement, was unaware of any limitations in Mr. Washington's employment agreement to conduct business on behalf of Irwin Naturals and believed Mr. Washington had authority to bind Irwin Naturals. *Id.*, ¶¶ 21-23, 29-30, 37-40.

If Mr. Washington did not have actual or apparent authority to bind Irwin Naturals, Mr. Green contends that Irwin Naturals benefitted from the terms of the Separation Agreement, in which Mr. Green provided a general release, and Mr. Irwin reviewed and signed the agreement after Mr. Washington did so; as a result, and as evidenced by subsequent email communications between Mr. Green and Mr. Irwin, Mr. Washington's execution of the Separation Agreement was ratified.

Mr. Green further contends that the Sale constitutes a "Liquidity Event" under the Separation Agreement and that the Sale "generated liquidity" for Mr. Irwin.

On September 23, 2026, the reorganized debtors filed a reply in support of the Objection (the "Reply") [doc. 1543]. In support of the Reply, the reorganized debtors submitted the Supp.

---

[5] In September 2026, the reorganized debtors filed evidentiary objections to the declaration of Mark Green, filed in support of the response [doc. 1546]. The Court has ruled to sustain each of those evidentiary objections.

Irwin Decl. and a declaration of Stephanie Nadanarajah [doc. 1544].[6]

## II. LEGAL STANDARDS

### A. Authority of a Corporate Agent

Concerning the authority of an agent to bind a corporation, courts apply the law of the state of incorporation. *See Digital Ally, Inc. v. Z3 Tech., LLC*, 864 F. Supp. 2d 1050, 1069 (D. Kan. 2012), *aff'd in part*, 754 F.3d 802 (10th Cir. 2014)(applying Nevada law). The Nevada Corporate Code provides:

> Any contract or conveyance, otherwise lawful, made in the name of a corporation, which is ***authorized or ratified by the directors***, or ***is done within the scope of the authority, actual or apparent, given by the directors***, binds the corporation, and the corporation acquires rights thereunder, whether the contract is signed or is wholly or in part executory.

N.R.S. 78.135(3) (emphasis added).

#### *1. Actual Authority*

A Nevada corporation's "board of directors has full control over the affairs of the corporation." N.R.S. 78.120(1). Unless otherwise restricted by a company's articles of incorporation or bylaws, members of a board of directors may act by meeting or without a meeting by written consent of all members. NRS 78.315(1)-(2).

> While it is true that a corporation ordinarily acts by resolutions which are adopted at formal meetings of its board of directors and are entered in its minutes, it is also

[6] 11 U.S.C. § 502(a) provides that a proof of claim is deemed allowed, unless a party in interest objects. Fed. R. Bankr. P. 3001(f) provides that a proof of claim executed and filed in accordance with the rules constitutes *prima facie* evidence of the validity and amount of the claim.

"To defeat the claim, the objector must come forward with sufficient evidence and show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *Lundell v. Anchor Const. Specialists, Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000). "If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence." *Id*.

Although the "burden of going forward is primarily a procedural matter pertaining to the order of presenting evidence," the substantive burden of proof remains at all times upon the claimant. *In re Garvida*, 347 B.R. 697, 706 (9th Cir. BAP 2006); *Lundell*, 223 F.3d at 1039.

> true that decisions reached by all the directors and stockholders of a closed corporation at informal conferences will be binding upon the corporation when, by custom and with the consent of all concerned, corporate formalities have been dispensed with and the corporate affairs have been carried on through such informal conferences.

*Brainard v. De La Montanya,* 18 Cal. 2d 502, 511, 116 P.2d 66 (1941).

Under Nevada law, actual authority exists when "at the time of taking legal action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act[.]" *Simmons Self-Storage v. Rib Roof, Inc.*, 130 Nev. 540, 549, 331 P.3d 850, 856 (2014), *as modified on denial of reh'g* (Nov. 24, 2014). "When examining whether actual authority exists, we focus on an agent's reasonable belief." *Id.* at 130 Nev. 549-50 (holding that "substantial evidence supports the district court's finding that Cartwright lacked actual authority because she had no reasonable basis for believing that respondent authorized her to sign the release forms").

***2. Apparent Authority***

> Under Nevada law, "[a]pparent authority is 'that authority which a principal holds his agent out as possessing or permits him to exercise or to represent himself as possessing, under such circumstances as to estop the principal from denying its existence.'" [*Dixon v. Thatcher*, 103 Nev. 414, 742 P.2d 1029, 1031 (1987) (quoting *Myers v. Jones*, 99 Nev. 91, 657 P.2d 1163, 1164 (1983)).] Once the principal cloaks the agent with the apparent authority to act, the principal is estopped from later denying the actions of the agent. [*Ellis v. Nelson*, 68 Nev. 410, 233 P.2d 1072, 1076 (1951).] Apparent authority is an application of the doctrine of equitable estoppel, of which reasonable reliance is a necessary element. [*Great Am. Ins. Co. v. Gen. Builders, Inc.*, 113 Nev. 346, 934 P.2d 257, 261 (1997)]. The party who claims reliance must not have closed his eyes to warnings or inconsistent circumstances. [*Id.* (internal quotations omitted).]

*Digital Ally,* 864 F. Supp. 2d at 1071. "'Apparent authority, including a third-party's reasonable reliance on such authority, is a question of fact.'" *Id*. (quoting *Great Am. Ins. Co.*, 934 P.2d at 261).

Under Nevada law, "[t]he objective reasonableness inquiry asks whether 'a person of ordinary prudence, conversant with business usages and the nature of the particular business, acting in good faith, and giving heed not only to opposing inferences but also to all restrictions

which are brought to his notice, would reasonably rely' on the existence of such authority." *Starr Indem. & Liability Co. v. Signature Flight Support Corp.*, 2025 WL 2437492, at *1 (9th Cir. Aug. 25, 2025) (quoting *Ellis*, 233 P.2d at 1076).

In *Digital Ally,* the court applied Nevada law to determine whether a purchase contract was void, because the executive vice president who signed on the corporation's behalf lacked the necessary authority. The issues before the court were whether the executive vice president acted with actual or apparent authority and whether the company ratified the contract after its execution.

The court considered the testimony of individuals with knowledge of the corporation's past contracting practices and those involved in the execution of the contract at issue. The court held that the executive vice president had apparent authority to execute the contract because the contract counterparty "subjectively believed that [the executive vice president] had authority to execute [the contract] on behalf of Digital and that this belief was objectively reasonable." *Digital Ally*, 849 F.Supp.2d at 1074.

***3. Ratification***

"Under Nevada law, 'contract ratification is the adoption of a previously formed contract, notwithstanding a quality that rendered it relatively void.'" *In re Afflalo*, 2024 WL 1574360, at *1 (9th Cir. Apr. 11, 2024) (quoting *Merrill v. DeMott*, 951 P.2d 1040, 1044 (Nev. 1997)).

> If the agent was without authority to make the contract in the first place, it is the corporation's duty to repudiate it within a reasonable time; if it fails to repudiate the contract, the presumption is that the unauthorized contract has been ratified. Furthermore, even though a corporate agent may have had no authority to enter into a contract on behalf of the corporation in the first place, the corporation may be bound by estoppel and ratification by acquiescing in the arrangement over a period of time and receiving the benefits of the contract.

2 William Meade Fletcher *et al.*, *Fletcher Cyclopedia of the Law of Corporations* § 466 (September 2026 update).

"The doctrine of ratification by conduct is similar to the principle of estoppel . . . , however it operates to make the contract legally valid other than simply preventing a party from challenging the contract's validity." *Merrill,* 951 P.2d at 1044-45 (holding that lease was ratified

by lessees and enforceable by landlord because lessees "conducted themselves as though they intended to be bound by the lease.")

**B. Contractual Interpretation Under California Law**

Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of [the California Civil Code]." *Id.* § 1639. "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." *Id.*, § 1647.

"'[C]ourts must preliminarily consider all credible evidence offered to prove the intention of the parties so that courts can place themselves in the same situation in which the parties found themselves at the time of contracting.'" *Yancey v. Ccfi Companies, LLC*, 2025 WL 2719361, at *3 (E.D. Cal. Sept. 24, 2025) (quoting *Oakland-Alameda Cnty. Coliseum Auth. v. Golden State Warriors, LLC*, 53 Cal. App. 5th 807, 817 (2020)).

**III. ANALYSIS**

**A. Authority to Execute the Separation Agreement**

Because Irwin Naturals (now known as IN Holdings) is incorporated under the laws of Nevada, the Court will analyze the authority of Irwin Naturals' officers and agents under Nevada law. Under Nevada law, an officer or agent of a corporation has only the authority delegated to him by the bylaws and/or the board of directors. *See* NRS § 78.130(3).

Mr. Green has not identified any provision in the Bylaws or a written resolution by Mr. Irwin, acting as the board of directors, explicitly authorizing Irwin Naturals to be bound by the Separation Agreement or authorizing Mr. Washington to sign the Separation Agreement. Regarding a close corporation like Irwin Naturals, although a formal meeting or resolution may not be necessary in all circumstances, Mr. Green has not submitted evidence of Mr. Washinton's understanding of his own scope of authority to execute the Separation Agreement on behalf of Irwin Naturals. *See Simmons Self-Storage,* 130 Nev. at 549 (agent must reasonably believe, in

accordance with principal's manifestations to agent, that principal wishes agent to act); *see also Brainard v. De La Montanya,* 18 Cal. 2d at 511.

Whether or not Mr. Washington had actual authority to bind Irwin Naturals to the terms of the Separation Agreement, Mr. Washington had apparent authority to execute the Separation Agreement on behalf of Irwin Naturals. Between July and October 2018, Mr. Irwin and Mr. Green corresponded many times to negotiate the terms of the Separation Agreement. On September 25, 2018, in response to an email from Mr. Green, Mr. Irwin sent an email concurrently to Mr. Green, Mr. Washington and others, stating he was "fine" with Mr. Green's proposed edits to the Separation Agreement. In this email, Mr. Irwin instructed employees of Irwin Naturals to "make the edits and agree on them." Exhibit A to Green Decl., p. 17. When he entered into the Separation Agreement, Mr. Green reasonably relied on this correspondence and the execution of the Separation Agreement by Mr. Washington and Mr. Irwin.

Mr. Washington, who signed the Separation Agreement as the "Authorized Agent" of Irwin Naturals, was Irwin Naturals' acting Chief Executive Officer. The Separation Agreement includes an express representation and warranty that Mr. Washington had the capacity to act as Irwin Naturals' authorized agent. Separation Agreement, ¶ 18. Moreover, Mr. Irwin also signed the Separation Agreement.

Mr. Green's employment at Irwin Naturals was terminated in July 2018; this is nearly three months before the parties signed the Separation Agreement. Green Decl., ¶ 16. When the Separation Agreement was signed, Mr. Green was not privy to whether Mr. Irwin, as the sole member of Irwin Naturals' board of directors, and who had individually signed the Separation Agreement, had insufficiently authorized Mr. Washington's execution of that agreement. Based on these facts, Mr. Green's subjective belief that the Separation Agreement was enforceable against Irwin Naturals is objectively reasonable.

Because Mr. Washington had apparent authority to enter into the Separation Agreement on behalf of Irwin Naturals, the Court need not find that Irwin Naturals also ratified the Separation Agreement. Nevertheless, assuming that Mr. Washington did not act with apparent authority to execute the Separation Agreement on behalf of Irwin Naturals, Irwin Naturals did

not repudiate the agreement within a reasonable time. Instead, Irwin Naturals ratified the Separation Agreement.

In 2018, when Irwin Naturals paid Mr. Green $300,000, pursuant to the Separation Agreement, Irwin Naturals partially performed under the Separation Agreement. Green Decl., ¶ 10 and Exhibit A thereto. Moreover, following the parties' execution of the Settlement Agreement, when Mr. Green sent emails to Mr. Irwin about circumstances which could trigger his receipt of the $1 million payment under the Separation Agreement, Mr. Irwin did not indicate that he questioned the enforceability of Irwin Naturals' obligations under the Separation Agreement.

**B. The Alleged Liquidity Event**

Although the Separation Agreement is an enforceable contractual obligation of IN Holdings, Mr. Green is not entitled to a $1 million payment under the Separation Agreement at this time.

The Separation Agreement states: "Consolidations and Reorganizations are specifically excluded from the definition of a Liquidity Event." *Id.* The sale of the debtors' supplement business was integral to the Plan – which is a plan of reorganization. Under the Plan, allowed unsecured claims of creditors are paid in full from the net proceeds of the debtors' sale of their supplement business, and IN Holdings has been reorganized. IN Holdings has retained significant assets, including claims against the reorganized debtors' prepetition secured lenders, IN Holdings' stock ownership of 5310 Holdings, LLC, and substantial net operating losses. Plan, pp. 2, 4-5, 27 and 35-36.

The email correspondence between Mr. Irwin and Mr. Green, before they executed the Separation Agreement, reflect that the parties intended for Irwin Naturals to pay $1 million to Mr. Green if a transaction or sale of Irwin Naturals took place which resulted in a change of control of Irwin Naturals and generated income to Mr. Irwin, as a stockholder. Here, there has been no change in shareholder control as a result of the Sale. Under the Plan, Mr. Irwin has retained his entire equity interest in IN Holdings, and Mr. Irwin is not receiving any distribution on account of his equity interest.

Because a "Liquidity Event" under the Separation Agreement has not taken place, the Court will sustain the objection to the Claim.

## IV. CONCLUSION

The Court will sustain the Objection.

The reorganized debtors must submit the order within seven days.

###

Date: November 4, 2026

Victoria S. Kaufman
United States Bankruptcy Judge